# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

**J.J.,** by and through his next friend,
Sakeena Jackson; **K.D.,** by and through
her next friends John Levy and Meranda
Davis; **C.M.,** by and through his next
friend Toinette Ducksworth; **R.N.,** by
and through his next friend Gloria
Norwood, for themselves and all others
similarly situated,

**Plaintiffs,**

**v.**                                                    **Civil Action No. 17-CV-47**

**Jon E. Litscher,** in his official capacity
as Secretary of the Wisconsin
Department of Corrections; **John D.
Paquin** in his official capacity as
Administrator of Division of Juvenile
Corrections of the Wisconsin
Department of Corrections**; Wendy A.
Peterson** in her official capacity as
Superintendent of the Lincoln Hills
School for Boys and the Copper Lake
School for Girls**; Brian Gustke,** in his
official capacity as Director of Security
for the Lincoln Hills School for Boys
and the Copper Lake School for Girls,

**Defendants.**

## CLASS ACTION COMPLAINT FOR
## DECLARATORY AND
## INJUNCTIVE RELIEF

1

## INTRODUCTION

The State of Wisconsin operates the Lincoln Hills School for Boys and the Copper Lake School for Girls, which incarcerate approximately 150-200 youth who are as young as 14 years old, in remote northern Wisconsin.  The State routinely subjects these youth to unlawful solitary confinement, mechanical restraints and pepper spraying. Prior to state and federal raids on the facility at the end of 2015, staff also regularly physically abused youth in the facility.  Currently, Wisconsin's juvenile corrections officials lock up approximately 15 to 20% percent or more of the facilities' young residents in solitary confinement cells for 22 or 23 hours per day.  Many of these children are forced to spend their only free hour of time per day outside of a solitary confinement cell in handcuffs and chained to a table.  Officers also repeatedly and excessively use Bear Mace and other pepper sprays against the youth, causing them excruciating pain and impairing their breathing.  These practices constitute serious violations of the children's constitutional rights, including their rights to substantive due process, as guaranteed by the Fourteenth Amendment to the United States Constitution, and their right to be free from cruel and unusual punishment, as guaranteed by the Eighth Amendment to the United States Constitution.  Plaintiffs J.J., K.D., C.M., and R.N. bring this civil rights class action lawsuit, on their own behalf and on behalf of all other children who are or will be incarcerated at Lincoln Hills and Copper Lake, to seek injunctive relief against these inhumane practices.

## JURISDICTION AND VENUE

1.      This action is brought under 42 U.S.C. § 1983, because Defendants, and each of them, acting under color of state law, have deprived Plaintiffs, and the members of the class of persons they represent, of rights secured under the United States Constitution.

2

2.      This action arises under the Eighth and Fourteenth Amendments to the United States Constitution.  Accordingly, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 1343 (civil rights jurisdiction).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the dispute occurred in this district and Defendants reside in this district.

## PLAINTIFFS

4.      Plaintiff J.J. is currently in custody in the Lincoln Hills School for Boys.  Plaintiff J.J. is a minor child, and therefore brings this lawsuit through his next friend and mother, Sakeena Jackson.  Ms. Jackson is an adult resident of Milwaukee County in the State of Wisconsin.  Sakeena Jackson brings this action on Plaintiff J.J.'s behalf pursuant to Fed R. Civ. P. 17(c)(2).  Sakeena Jackson is dedicated to the best interests of Plaintiff J.J. and will advocate for those best interests in this action.

5.      Plaintiff K.D. is currently in custody in the Copper Lake School for Girls.  Plaintiff K.D. is a minor child and therefore brings this lawsuit through her next friends, her father, John Levy, and her mother, Meranda Davis.  Mr. Levy and Ms. Davis are adult residents of Milwaukee County in the State of Wisconsin.  They bring this action on Plaintiff K.D.'s behalf pursuant to Fed. R. Civ. P. 17(c)(2).  They are dedicated to the best interests of Plaintiff K.D. and will advocate for those best interests in this action.

6.      Plaintiff C.M. is currently in custody in the Lincoln Hills School for Boys.  Plaintiff C.M. is a minor child, and therefore brings this lawsuit through his next friend and mother, Toinette Ducksworth   Ms. Ducksworth is an adult resident of Milwaukee County in the State of Wisconsin.  Toinette Ducksworth brings this action on Plaintiff C.M.'s behalf pursuant

3

to Fed R. Civ. P. 17(c)(2).  Toinette Ducksworth is dedicated to the best interests of Plaintiff C.M. and will advocate for those best interests in this action.

7.      Plaintiff R.N. is currently in custody of the Mendota Juvenile Treatment Center after being transferred there from Lincoln Hills School for Boys.  Plaintiff R.N. is a minor child, and therefore brings this lawsuit through his next friend and adoptive mother, Gloria Norwood. Ms. Norwood is an adult resident of Milwaukee County in the State of Wisconsin.  Gloria Norwood brings this action on Plaintiff R.N.'s behalf pursuant to Fed R. Civ. P. 17(c)(2).  Gloria Norwood is dedicated to the best interests of Plaintiff R.N. and will advocate for those best interests in this action.

## DEFENDANTS

8.      Defendant Jon E. Litscher is Secretary of the Wisconsin Department of Corrections ("DOC"), the Wisconsin state agency designated to oversee correctional facilities in the State of Wisconsin including Type 1 Juvenile Correctional Facilities.  Defendant Litscher is sued in his official capacity.  As Secretary of DOC, Defendant Litscher is in charge of the administration and supervision of DOC, and is ultimately responsible for the administration and supervision of the Lincoln Hills School for Boys ("LHS") and the Copper Lake School for Girls ("CLS").

9.      Defendant John D. Paquin is the Administrator of the Division of Juvenile Corrections.  Defendant Paquin is sued in his official capacity.  As Administrator of the Division of Juvenile Corrections, Defendant Paquin is in charge of the administration and supervision of juvenile corrections within DOC, and is responsible for the administration and supervision of LHS and CLS.

10.     Defendant Wendy A. Peterson is the Superintendent of LHS and CLS and is sued in her official capacity.  As Superintendent, Defendant Peterson is also responsible for ensuring that all legal responsibilities delegated to LHS and CLS, as set forth in state statutes, state policy, and/or governmental rules and regulations, are appropriately met.

11.     Defendant Brian Gustke is the Director of Security at LHS and CLS and is sued in his official capacity.  As Director of Security, Defendant Gustke is responsible for the security and discipline of inmates at LHS and CLS.

## FACTUAL ALLEGATIONS

### The Wisconsin Youth Prisons

12.     Lincoln Hills School for Boys (LHS) and Copper Lake School for Girls (CLS) are located on a single property in the town of Irma in Lincoln County, Wisconsin.  The LHS/CLS facility is a "secured juvenile corrections institution" operated by the Wisconsin DOC and is also referred to as Type 1 juvenile correctional facility.

13.     A Type 1 juvenile correctional facility uses physical security mechanisms such as fences, barbed wire, and locked doors, in addition to control and surveillance by staff members, to restrict the liberty of youth committed to the facility by the court.

14.     The Wisconsin Juvenile Code, Chapter 938, Wis. Stats., provides the legal framework for children charged with a crime under the general rubric of delinquency proceedings.  Wisconsin Statutes § 938.34 lists a multitude of different programs, activities or placements a court might order, and refers to them as "[t]he dispositions under this section." Section 938.34(4m) permits a juvenile court to order an adjudged delinquent to a "secured correctional facility" under the supervision of the DOC.

15.     Pursuant to Wisconsin Statutes § 938.505(1), the DOC has "the right and duty to protect, train, discipline, treat, and confine the juvenile and to provide food, shelter, legal services, education, and ordinary medical and dental care for the juvenile, subject to the rights, duties, and responsibilities of the guardian of the juvenile…."

16.     An adjudication of delinquency is not the same as a criminal conviction.  The procedural protections available to juveniles are different from the protections available to adults, and the primary goal of delinquency proceedings is the rehabilitation and treatment of the juvenile.  *See*, *e.g.*, Wis. Stat. § 938.01(2)(f) (juvenile code's objectives include "respond[ing] to a juvenile offender's needs for care and treatment, consistent with the prevention of delinquency, each juvenile's best interest, and protection of the public, by allowing the court to utilize the most effective dispositional option"); Wis. Stat. § 938.01(2)(c) (objectives also include "development of competency in the juvenile offender, so that he or she is more capable of living productively and responsibly in the community").

17.     Juveniles may receive a correctional placement at LHS/CLS under Wis. Stat. § 938.34(4m), and such placements typically extend for one or two years.  Additionally, juveniles who are adjudicated delinquent for certain serious offenses may receive a Serious Juvenile Offender (SJO) disposition order, which includes an initial placement in LHS or CLS.  Most SJO orders extend for five years, although for the most serious offenses the order may extend until the juvenile reaches 25 years of age.  *See* Wis. Stat. §§ 938.34(4h) & 938.538.

18.     In addition to juveniles who are placed at LHS and CLS pursuant to dispositional orders, boys and girls under the age of 18 who have been waived into adult court and have been convicted of felonies may begin serving some or all of their adult sentences at LHS or CLS.

6

19.     Prior to 2011, DOC operated additional secured juvenile correction institutions. To address the declining juvenile correctional population, the State of Wisconsin consolidated juvenile correctional operations by closing two facilities in southern Wisconsin, Ethan Allen School for Boys and Southern Oaks Girls School.  As of June 27, 2011, all youth from these facilities had been transferred to Lincoln Hills and Copper Lake Schools.

20.     On information and belief, approximately 145 boys and 20 girls are currently being held at the LHS/CLS facility.

21.     On information and belief, most of the youth held at LHS and CLS are African-American.

22.     On information and belief, most of the youth held at LHS and CLS come from Milwaukee—215 miles and 3½ hours away.

23.     On information and belief, a substantial percentage of the youth held at LHS and CLS have a history of childhood trauma, mental illness, cognitive impairments, or developmental disabilities.

**LHS and CLS Hold 15-20% or More of Incarcerated Youth in Solitary Confinement**

24.     By policy and practice, Defendants routinely use solitary confinement to discipline and punish boys and girls at LHS and CLS for violating institutional rules.  At any given time, approximately 15 to 20%—or more—of the population of LHS and CLS is held in solitary confinement, and an even larger percentage of the youth have been subjected to solitary confinement at one point or another during their incarceration at LHS and CLS.

25.     The DOC uses the terms "restrictive housing," "close confinement," "modified confinement," "administrative confinement," "segregation" or "security" to refer to its practice

of solitary confinement: confining a child alone in a locked cell for 22-23 hours per day for punishment or for discipline or for asserted security reasons.

26.     LHS operates two segregation buildings: the "Krueger unit" and the "Roosevelt unit." Each unit has two wings, and each wing consists of a corridor with about a dozen solitary confinement cells per wing. Between the wings is a guard station, offices, a small kitchen, and a common area with several metal tables.

27.     CLS has a smaller population and does not have a separate segregation unit. Instead, one wing of CLS's "Wells unit" is used for youth held in solitary confinement.

28.     According to the most recent data supplied by DOC, on October 25, 2016, there were 167 youth incarcerated at LHS and CLS. Of that number, 28 youth, or nearly 17% of the population, were being held in solitary confinement on that day.

29.     DOC data also show that, at any given time, the percentage of the LHS/CLS population being held in solitary confinement is between about 15 and 20%—and sometimes more.

30.     A cell in the segregation units is approximately seven by ten feet. The cell is entered through a large metal door which swings out. The door has a small glass window about nose height and one or two slots through which food trays are passed. Youth extend their forearms through the door slot before and after being placed in the cell so that the guards may lock or unlock the handcuffs they must wear when they are out of their cells. The single window to the outside is covered with bars.

31.     The typical segregation cell layout is depicted below (not to scale):



32.     The windows in the doors of cells in the Krueger unit have a cover which can be closed.  From time to time, guards in Krueger will close those covers so a youth cannot see out of his cell into the corridor.

33.     A cell in the LHS segregation units has a mattress on the floor or on a frame approximately three inches above the floor.  There is a combination metal sink and toilet in the cell.  Segregation cells at CLS are similar, but some have no sink or toilet in the cell, instead containing only a mattress.  The cells have no other furnishings.  There is no mirror or anything else on the walls.  The cells have no desk or chair; youth sit on either the toilet or their mattress for 22 or 23 hours per day.  Many of the cells have no call button to request attention from staff, so youth must scream or cover the surveillance cameras in their rooms to get attention.

34.     A light in the segregation cell stays lit 24 hours per day.  The light is dimmed from approximately 10 p.m. to 6 a.m. but is not turned off.

35.     The segregation cells are dirty and smell like sweat and urine.

36.     Defendants often sentence youth to solitary confinement even for infractions that do not pose a serious threat to safety, such as disrespecting staff, refusing to lock into a cell, or

"running."  On information and belief, Defendants often sentence youth to solitary confinement for periods of 30 or 60 days for a variety of offenses—especially when youth have been disciplined previously, or for fighting regardless of whether the altercation was likely to or did result in injury.  Even when youth are charged with relatively minor rule infractions, they often spend up to 14 days in segregation while they await the issuance of a conduct report and a hearing, and then frequently get a few additional days from the hearing examiner as punishment.

37.    Other than a book or two, a toothbrush, and limited bedding and clothing, youth in solitary are permitted no other personal belongings, educational materials, writing or drawing utensils, computers, games, or toys.  In general, a youth can only have one book at a time in his or her cell, which the youth can choose from a book cart in the segregation unit. Many youth are not permitted to have even paper in their cells.

38.    Boys receive only a small amount of toilet paper and must request more when they need it. Boys also may not flush their toilets themselves, but must ask the guards to turn the toilet on to allow them to flush it.  Because the girls' solitary cells do not have a sink or toilet, the girls must push a call button and ask guards to be escorted to the bathroom.  Guards sometimes take a long time to respond to requests to use the bathroom.

39.    Defendants also significantly limit the education youth held in solitary confinement receive.  In the general population, the youth typically receive four to five hours of education Monday-Friday.  In solitary confinement, Defendants' pattern and practice is to reduce this educational programming to a single hour outside the cell with a teacher who comes to the segregation unit and meets with about three youth at a time.  During this time, they may be locked to a desk in the classroom.

40.     Defendants do not permit boys held in solitary confinement to receive phone calls for the first twenty days in security status.  After twenty days, a boy can have a short phone call with his family.

41.     According to Wisconsin Administrative Code § DOC 373.03(3) (for disciplinary solitary confinement) and § DOC 374.03(4) (for administrative solitary confinement), youth in segregation should have one hour of time out of the cell each day for exercise.  However, the staff has a pattern and practice of frequently taking away "out time" for minor infractions.

42.     Even those youth permitted "out time" are frequently kept in mechanical restraints during the limited time they are allowed out of their cells.  Known as being "on the belt," youth are handcuffed and the handcuffs are attached to a canvas belt encircling the youth's waist.  By policy and practice, LHS keeps all new male arrivals at the segregation unit "on the belt" regardless of the reason the youth was sent to segregation.  Upon information and belief, at CLS, girls deemed to have exhibited some form of violent behavior are placed "on the belt" during their hour out of cell while in solitary confinement.

43.     On information and belief, most youth in segregation are "on the belt" while out of their cells for the duration or a large portion of their time in solitary confinement.  DOC's regulations expressly permit the use of restraints as a matter of course for juveniles in solitary confinement.  Wisconsin Administrative Code § DOC 376.09 governs use of mechanical restraints (including "handcuffs with restraining belt or chain") and authorizes use on "a youth who is in security status while the youth is outside the place of confinement."

44.     If a youth is "on the belt," the youth spends his or her "out time" chained to a table in the central area of the segregation unit in front of the guard station.  Depending on the

number of youth currently in the security units, there might be two or three youth chained to tables for the same hour.

45.     For the girls at CLS in segregation, the hour of "out time" includes their shower, a period of time of room cleaning, and perhaps 15 minutes of exercise before they are locked back in their cells.

46.     Staff in the security units review a youth's continued status on the belt once a week.  If the staff decide that the youth has been on good behavior, the youth may be allowed out of his or her cell without being in restraints.

47.     If the youth is "off the belt," the youth goes outside during his or her one hour of "out time."  "Outside" means that the youth is allowed, usually alone, into an outdoor caged area paved with concrete.

48.     Youth who are "on the belt" remain in restraints during their hour of education and are not allowed to have writing instruments in their cells.

49.     In addition, when Defendants put youth into segregation, they revoke access to the very programs which might help and rehabilitate the youth, such as Aggression Replacement Training (ART) and the Juvenile Cognitive Intervention Program (Phases I and II).  If a youth misses more than a few sessions of any such program because he or she is in solitary confinement, Defendants require the youth to start the program over from the beginning.

50.     Failure to complete these programs also results in additional punitive consequences.  Defendants' Office of Juvenile Offender Review (OJOR) considers failure to complete these programs a justification to deny a transfer out of LHS or CLS to a step down facility or to deny early release.

**Solitary Confinement Causes Serious Damage to Incarcerated Youth**

51.     Solitary confinement is particularly damaging to youth, who are still developing physically, psychologically, and socially.

52.     Youth in segregation face a significant risk of serious mental harm.  Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, hyper-vigilance, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior.

53.     These mental health concerns can cause long-term harm.  Solitary confinement can lead to chronic conditions like depression, which, in teenagers, can manifest as anger or as self-harm.  In addition, children who experience depression and anxiety in their teenage years are at higher risk of presenting with these diagnoses again.  Symptoms associated with depression, such as low self-esteem, insomnia, inattention, low energy, fatigue, weight loss, and feelings of hopelessness can similarly persist into adulthood.  There is a 10 to 15% mortality rate associated with depression, and solitary confinement increases the risk of suicide substantially compared to the risk in the general population.

54.     Solitary confinement of youth can also lead to long-term erosion of trust with adults, resulting in paranoia, anger, and hatred.  Juveniles emerging from solitary have trouble forming the therapeutic relationships necessary to address the mental health concerns resulting from solitary confinement.

55.     The risk of harm from solitary is made worse by the disproportionately high incidence of preexisting trauma and mental health concerns among juveniles in the criminal justice system.  Research shows that more than 60% of the youth in correctional settings have an

underlying major mental illness.  Stress from isolation can compound past trauma and exacerbate mental illnesses and disabilities.

56.     For those youth with a history of trauma, mental illnesses, or developmental disabilities, the risk of harm is especially great.  They already have weakened adaptive mechanisms, are at a higher risk for further mental health complications, are more susceptible to significant trauma from social isolation, and are more likely to suffer long-lasting consequences from the trauma of isolation than those without mental illnesses or disabilities.

57.     Not only is it harmful to deprive a youth of meaningful social interaction or mental stimulation, it also is counterproductive to the goals of ensuring safety, security, and good order.  Research shows that segregating youth results in increased agitation and an increased risk of misbehavior.  Facilities that have reduced their reliance on disciplinary isolation and instead have adopted more appropriate techniques for managing juveniles have seen reductions in rates of violence and misbehavior.  Most of these facilities allow for short-term separation—measured in *hours*, not days, weeks, or months (as is the case in LHS/CLS)—and then only as a last resort when other options fail to defuse situations that pose an acute risk of harm to the juvenile or others.

58.     In a series of Eighth Amendment cases involving the death penalty and life without parole sentences, the Supreme Court has held that the Constitution requires that children not be punished like adults without first accounting for the unique traits that make them children.

59.     A number of professional organizations and institutions have echoed the Supreme Court's principle that incarcerated children cannot be treated like adults.  The National Commission on Correctional Health Care ("NCCHC"), for example, issued a statement establishing that juveniles should not be placed in solitary confinement for any duration; the

statement highlighted juveniles' particular vulnerability to adverse reactions to isolation.  The World Health Organization ("WHO"), the United Nations, and other international bodies have also recognized that solitary confinement is particularly harmful to a child's psychological well-being and cognitive development.  Acknowledging the high risk of mental illness as well as the higher rates of suicide and self-harm for youth in solitary confinement, the United Nation's (U.N.) Special Rapporteur on Torture, in a 2015 report, condemned solitary confinement of children for any duration, calling it torture.

60.     Similarly, in 1999, the Office of Juvenile Justice and Delinquency Prevention of the United States Department of Justice (USDOJ) commissioned "the first comprehensive effort to determine the scope and distribution of suicides by youth in our public and private juvenile facilities throughout the country."  The study found that fifty percent of victims were in isolation at the time of their suicide, and sixty-two percent of victims had a history of isolation, noting "rates of suicidal behavior appeared to be higher for youth who were isolated from their peers or assigned to single room housing."  Lindsey M. Hayes, Nat'l Ctr. on Inst. & Alternatives, *Juvenile Suicide in Confinement: A National Survey* 42 (2004); *see also* Steven H. Rosenbaum, Chief, Special Litig. Section, U.S. Dep't of Justice, Remarks before the Fourteenth Annual National Juvenile Corrections and Detention Forum (May 16, 1999) ("The use of extended isolation as a method of behavior control, for example, is an import from the adult system that has proven both harmful and counterproductive when applied to juveniles.  It too often leads to increased incidents of depression and self-mutilation among isolated juveniles, while also exacerbating their behavior problems.  We know that the use of prolonged isolation leads to increased, not decreased, acting out, particularly among juveniles with mental illness.")

61.     National and international standards governing corrections and juvenile justice uniformly condemn the use of solitary confinement in juvenile facilities and provide that where segregation is necessary in certain acutely dangerous situations, it should be as brief as possible.

62.     The USDOJ's Office of Juvenile Justice and Delinquency Prevention Standards for the Administration of Juvenile Justice ("JJDPA Standards") provide that no juvenile should be placed in room confinement for more than twenty-four hours.  Standards for the Admin. of Juvenile Justice § 4.52 (Nat'l Advisory Committee for Juvenile Justice and Delinquency Prevention 1980).

63.     The Juvenile Detention Alternatives Initiative (JDAI), which has developed the most widely recognized set of national best practices on the use of solitary confinement with juvenile populations, provides that solitary confinement can never be used for purposes of punishment or discipline and must be limited to periods of less than 4 hours.

64.     Having recognized in a 2012 report that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement," the USDOJ subsequently recommended that the use of solitary confinement for juveniles in federal prisons be prohibited, and President Obama adopted that recommendation in 2016.

65.     The American Medical Association ("AMA"), the American Academy of Child and Adolescent Psychiatry, and the NCCHC all have called on correctional facilities to halt the use of solitary confinement of juveniles for disciplinary purposes.

66.     The international community has also condemned the placement of children in solitary confinement.  International law prohibits the use of isolation as a disciplinary tool. Specifically, the U.N.'s Rules for the Protection of Juveniles Deprived of their Liberty declare that "all disciplinary measures constituting cruel, inhuman or degrading treatment shall be

strictly prohibited, including corporal punishment, placement in a dark cell, closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned."  G.A. Res. 45/113, Annex ¶ 67 (Dec. 14, 1990).

67.     Furthermore, long-term solitary confinement can be a form of psychological torture, which international law strictly prohibits.  *See*, *e.g.*, United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46 (Dec. 10, 1984); *see also* Atul Gawande, *Hellhole*, The New Yorker, Mar. 30, 2009.

68.     National and state standards and guidelines also recognize that it is essential for youth confined in juvenile justice facilities to have a meaningful opportunity to exercise every day.  Standards set by various governmental and non-governmental entities, such as OJJDP, the NCCHC, the American Bar Association and the Council of Juvenile Correctional Administrators ("CJCA"), make it clear that juveniles must have at least one hour per day of actual, strenuous, large-muscle exercise, with many recommending two or more hours per day, for both physical and mental health needs.  These standards also make it clear that keeping a child on the belt and handcuffed to a table does not constitute "exercise."

69.     Use of restraints is known to cause both physical and psychological harm. *See* Johnson, *Being Restrained: A study of power and powerlessness¸* 19 ISSUES IN MENTAL HEALTH NURSING 191, 196-203 (1998); Singh, Singh, Davis, Latham & Ayers, *Reconsidering the Use of Seclusion and Restraints in Inpatient Child and Adult Psychiatry,* 8 J. OF CHILD & FAM. STUD. 243, 244 (1999).

70.     The practice of putting youth "on the belt" in restraints for weeks and months at a time violates recognized national and international standards.

17

71.    The Institute of Judicial Administration - ABA Standards for Juvenile Justice,

Standards Relating to Corrections Administration, provide:

> **7.8 Limitations on restraints and weapons.**
> **A. Mechanical restraints**. Given the small size of programs, it should not be
> necessary to use mechanical restraints within the facility. The program director
> may authorize the use of mechanical restraints during transportation only.

72.    Article 64 of the U.N. Rules for the Protection of Juveniles Deprived of their

Liberty provides:  "Instruments of restraint and force can only be used in exceptional cases,

where all other control methods have been exhausted and failed. . . . They should not cause

humiliation or degradation, and should be used restrictively and only for the shortest possible

period of time."  G.A. Res. 45/113, U.N. GAOR, 45th Sess., Supp. No. 49A, art. 64, U.N. Doc.

A/45/49 (1990).

73.    The U.N. Standard Minimum Rules for the Treatment of Prisoners (adopted by

the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders,

held at Geneva in 1955, and approved by the Economic and Social Council by its resolutions 663

C (XXIV) of 31 July 1957 and 2076 (LXII) of 13 May 1977), similarly state:

> 33. Instruments of restraint, such as handcuffs, chains, irons and straitjackets,
> shall never be applied as a punishment. Furthermore, chains or irons shall not be
> used as restraints.
>
> Other instruments of restraint shall not be used except in the following
> circumstances:
>
> (a) As a precaution against escape during a transfer, provided that they shall be
> removed when the prisoner appears before a judicial or administrative authority;
>
> (b) On medical grounds by direction of the medical officer;
>
> (c) By order of the director, if other methods of control fail, in order to prevent a
> prisoner from injuring himself or others or from damaging property; in such
> instances the director shall at once consult the medical officer and report to the
> higher administrative authority.

**Defendants Are Aware or Should Be Aware of the Risks of Solitary Confinement and Restraints, But Have Deliberately Chosen to Ignore Those Risks**

74.     Defendants know or should be aware of the risks of solitary confinement for youth.  President Obama's actions to prohibit solitary confinement of juveniles in federal custody—and the research on which the prohibition was based—were widely reported in the media.

75.     DOC officials are familiar with NCCHC policies and statements as a result of their efforts to achieve NCCHC accreditation of their facilities, and so should be aware of the NCCHC's policy position advocating a ban on solitary confinement of juveniles.

76.     On October 25, 2016, Defendant Litscher received correspondence advising him of the position of the AMA that solitary confinement of juveniles should be banned and of the Obama administration's prohibition of solitary confinement of federal juvenile prisoners.

77.     Defendants nonetheless continue to subject numerous youth at LHS and CLS to extended periods of solitary confinement, with deliberate indifference to the substantial risk of serious harm it creates.

78.     Similarly, Defendants are or should be aware of the harm to juveniles caused by the use of restraints, such as being handcuffed to a waist belt and tethered to a table.  The international law standards have been in place and research on the harm of restraints has been available for decades, and it is obvious that shackling a child to a table for the only hour he or she is allowed out of her cell is demeaning, psychologically harmful, and prevents essential large-muscle exercise.

79.     Defendants nonetheless continue to routinely restrain youth in solitary confinement by placing them "on the belt" for most or significant portions of their stays in solitary, with deliberate indifference to the substantial risk of harm such restraints create.

**The Plaintiffs Have Been Subjected To Excessive and Painful Pepper Spraying**

80.     In addition to solitary confinement, Defendants have a pattern and practice of routinely using pepper spray to control the behavior of the youth in their custody, both while in the general population and in solitary confinement.

81.     Guards at LHS and CLS have a pattern and practice of using pepper spray unnecessarily and unreasonably on youth for minor non-violent infractions, such as refusing to go into their rooms, refusing to leave their rooms, covering up the cameras in the segregation unit, and failing to follow commands.  In fact, Defendants' policy expressly permits use of pepper spray to "enforce a DOC rule, a posted policy or procedure or an order of staff member," even without any risk of harm to staff or youth or danger to the security of the institution.  DOC DJC Policy & Procedure 300.05.05 (9-28-2016).

82.     According to records maintained by the Defendants, guards at LHS and CLS have used pepper spray on the youth in their care at least 198 times in the period January through October 2016.

83.     Guards at LHS and CLS use several different forms of pepper spray on youth in their custody, including "Bear Mace," which is marketed as being able to protect hikers from charging bears.  Other types of pepper spray in use at LHS and CLS include Phantom and Ghost. Some pepper sprays are used to create a cloud which will fill the youth's cell.  Others are sprayed directly at the face or body of a youth.

84.     Oleoresin capsicum ("OC"), the active ingredient in pepper spray, causes intense burning, coughing, and temporary blindness.

85.     After youth are pepper sprayed, they are routinely locked into a cage in a shower. The effects of the spray are temporarily worsened by exposure to water and spread to sensitive

areas such as the groin, causing intense pain.  To avoid this acute increase in pain, some youth choose not to turn on the shower, but as a result the spray remains on their skin, prolonging the duration of their pain.

86.     After guards use pepper spray on youth in solitary confinement, the guards remove all of the youth's clothes and provide only a paper or cloth gown.

87.     After guards use pepper spray on youth in the segregation units, the guards remove the regular mattress from the cells, providing only a rubber security mat in its place.

88.     Youth at CLS and LHS have described being pepper sprayed as "feeling like you were hit a hundred times."  The effects of the spray can last for days, and are reactivated by water even days later, such as when the child washes his or her face.

89.     The JDAI standards require juvenile justice facilities to strictly prohibit the use of chemical agents.  Juvenile Detention Facility Assessment - Standards Instrument (2014 Update) at 104.

90.     The Council of Juvenile Correctional Administrators  has also declared that pepper spray use is both harmful and counter-productive:

> [Pepper spray's] use has been shunned by juvenile correctional agencies because of the harm it causes to youths and the negative impact on staff-youth relationships, the key to successful juvenile rehabilitative programming. Very few states authorize its use and in the states that allow its use in policy, most prohibit the use except as a last resort and with many conditions and few facilities put it into practice.

*Pepper Spray in Juvenile Facilities*, CJCA, *available at* http://cjca.net/attachments/

article/172/ CJCA.Issue.Brief.OCSpray.pdf.

**Defendants Are Aware or Should Be Aware of the Risks of Harm Posed by Pepper Spray and Have Deliberately Chosen to Ignore Those Risks**

91.     Defendants know or should be aware of the risk of harm to juveniles from using pepper spray and are aware that it is generally not necessary to manage juvenile misbehavior.

92.     On information and belief, Defendants are members of the CJCA, *see* Agency Directory, CJCA, http://cjca.net/index.php/resources/agency-directory (last visited Jan. 20, 2017), an organization that has condemned the use of pepper spray in juvenile correctional facilities.

93.     Defendants nonetheless, as a matter of both practice and policy, continue to use pepper spray extensively.  Indeed, Defendants' current policy, DOC 305.05.05 (part I.H.), far from confining use of pepper spray to a last resort, expressly permits the use of pepper spray "to enforce a DOC rule, a posted policy or procedure or an order of staff member."

**The Named Plaintiffs Have Repeatedly Been and are Likely in the Future To Be Subjected to Solitary Confinement, Mechanical Restraints and Pepper Spray**

**Plaintiff J.J.**

94.     Plaintiff J.J. is an African American boy from the City of Milwaukee, Wisconsin. He was first committed to LHS in 2015 at the age of 15.  He was initially given a one-year correctional placement, which was extended for an additional year.

95.     J.J. has spent most of his time at Lincoln Hills in solitary confinement; he has been sent to solitary on approximately ten separate occasions for a variety of reasons.  Because of his time in solitary confinement, J.J. has been limited in the amount of schooling he has been able to receive and has not been able to complete programs designed for his rehabilitation.

96.     According to J.J., the guards in the segregation units "treat us like dogs, in cages, causing us more trauma."

97.     J.J. believes that the guards intentionally provoke him and trigger him to react.

98.     J.J. has been diagnosed with attention deficit hyperactivity disorder (ADHD).

99.     When in solitary confinement, J.J. has been "on the belt" for most of the time he is allowed out of his cell.  In addition, Defendants have frequently taken away J.J.'s out time.

100.     J.J. exhibits symptoms that are consistent with symptoms that are frequently caused by solitary confinement.  When he is in solitary confinement, he has trouble sleeping, he feels anxious and is easily irritated by minor things, like being ignored, and he is increasingly prone to anger.  He has had episodes of sadness and restlessness while in solitary.

101.     J.J. was in solitary confinement as of January 13, 2017, and was not scheduled to be released until January 21, 2017.  He reasonably fears that he will be returned to solitary confinement again at LHS in the absence of injunctive relief.

102.     LHS staff have also pepper-sprayed J.J. five or six times, including shooting the burning spray directly in his face.  For example, on one occasion in 2016, J.J. was pepper-sprayed as guards were attempting to take him to segregation.  After being pepper sprayed, the guards threw him into the prison van, where he was left in a cloud of mace.

103.     In another incident in July 2015, J.J. asked for a supervisor and refused to go back into his cell in segregation until he talked to a supervisor about his shower.  Several guards arrived and surrounded him in a circle and told him to get on the ground.  He did not.  The guards were preparing to pepper spray J.J. when he bolted for his cell.  Although there was no threat of injury to anyone, the guards pepper-sprayed J.J. as he ran past and into his cell.

104.     J.J. reasonably fears that he will again be subjected to the use of pepper spray by LHS staff in the absence of injunctive relief.

105.     J.J. has filed grievances and appeals regarding Defendants' use of solitary confinement and pepper spray pursuant to Defendants' inmate complaint procedures and exhausted his available administrative remedies.

**Plaintiff K.D.**

106.     Plaintiff K.D. is an African American girl from the City of Milwaukee, Wisconsin.  She was first committed to CLS in July 2016 at the age of 14 with a one-year dispositional order.

107.     Since she has been at CLS, K.D. has been placed in solitary confinement on three separate occasions.  Her alleged infractions included being loud and being disruptive, for which she was sent to solitary confinement for periods ranging from three to nine days.

108.     K.D. has been diagnosed with ADHD.

109.     K.D. exhibits symptoms that are consistent with symptoms that are frequently caused by solitary confinement.  She experienced anxiety, sadness, hopelessness, restlessness, and finds that solitary confinement makes her increasingly irritated and angry.  Her sadness and hopelessness were so profound she had suicidal thoughts.

110.     While Defendants were holding K.D. in solitary confinement, they used so much pepper spray on another girl in solitary confinement that spray filled the corridor.  The cloud of pepper spray made K.D., and, on information and belief, other girls in the wing, cough and gag, and burned their throats.  Although the guards used masks to protect themselves from the impact of the spray, they offered no protection to any of the youth in that wing, including K.D.

111.     K.D. reasonably fears that she will be returned to solitary confinement again at CLS, if she is not granted injunctive relief.

112.     K.D. reasonably fears that she will again be subjected to pepper spray by CLS staff in the absence of injunctive relief.

113.    K.D. has filed grievances and appeals regarding Defendants' use of solitary confinement and pepper spray pursuant to Defendants' inmate complaint procedures and exhausted her available administrative remedies.

**Plaintiff C.M.**

114.    Plaintiff C.M. is an African American boy from the City of Milwaukee, Wisconsin.  He was committed to LHS on November 16, 2016, and will be held there until he turns 18 in May, 2017.

115.    In his first six weeks at LHS, C.M. spent more than two weeks in solitary confinement for two separate incidents.

116.    Neither incident involved any violence or threat to security.

117.    On his first confinement in solitary, C.M. was released after seven days.  He had never received any written notice of charges against him or any type of due process hearing to justify this punishment.  Defendants told him they were releasing him because no disciplinary conduct report had ever been prepared.

118.    Despite the fact that C.M. had not been involved in any violent incident or threat, he was initially placed "on the belt" for multiple days, due to the LHS policy and practice of placing all new arrivals in segregation on the belt.

119.    C.M. was taken to solitary the second time shortly before Christmas, 2016.  The staff supervisor told C.M. that this time a conduct report would actually be prepared.  He was released on or about December 29, 2016, without having received written notice of the charges against him or a due process hearing, although he was told orally he was found guilty of the misconduct.

120.    C.M. exhibits symptoms that are consistent with symptoms that are frequently caused by solitary confinement.  He was sad because he could not speak with his mother.  He felt anxious and was unable to sleep.  He was irritable and annoyed by the noise in the unit.  He felt treated like an animal: cuffed to come out of the cell, cuffed to shower, cuffed everywhere he went.  His hair started falling out.

121.    C.M. has been in solitary confinement and reasonably fears that he will be kept in solitary confinement or returned to solitary confinement again at LHS if he is not granted injunctive relief.

122.    C.M. has filed grievances regarding Defendants' use of solitary confinement pursuant to Defendants' inmate complaint procedures and exhausted his available administrative remedies.

### Plaintiff R.N.

123.    Plaintiff R.N. is a 14-year-old African-American boy from Milwaukee County. He arrived at LHS in April, 2016, only two months after his 14th birthday.

124.    Between April 2016 and December 2016, R.N. estimates he spent only two weeks out of solitary confinement.  As a result he received extremely limited educational programming and virtually no rehabilitative programming during his time at LHS.

125.    R.N. has been pepper-sprayed many times by staff at LHS.  Each time he has suffered an intense burning sensation over all the affected areas of his body.

126.    After pepper-spraying R.N. in the solitary confinement unit, the staff would remove R.N.'s mattress from his cell and replace it with only a hard rubber security mat.  On one occasion, he was forced to sleep four consecutive nights on just the security mat.  On another

occasion, the staff did not even provide a security mat, but forced R.N. to try to sleep on the cold bed frame.

127.    R.N. has been diagnosed with ADHD.

128.    R.N. exhibits symptoms that are consistent with symptoms that are frequently caused by solitary confinement.  R.N. has been on suicide watch.  In one incident, he reached an electrical cord attached to a fan near his door, pulled it through the food tray slot, and wrapped it around his neck.  Guards responding to this behavior initially pulled on the cord, leaving marks on R.N.'s neck, then fogged his room with pepper spray.

129.    On December 7, 2016, R.N. was transferred to MJTC for diagnosis and treatment of mental health concerns.

130.    R.N. reasonably fears that he may be returned to LHS and that he will be returned to solitary confinement again at LHS in the absence of injunctive relief.

131.    R.N. reasonably fears that he may be returned to LHS and that he will again be subjected to the use of pepper spray by LHS staff in the absence of injunctive relief.

132.    R.N. has filed grievances regarding Defendants' use of solitary confinement and pepper spray pursuant to Defendants' inmate complaint procedures and exhausted his available administrative remedies.

## CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and all members of the class of persons who are now, or will be in the future, incarcerated at LHS or CLS (the "Class").

134.    Plaintiffs seek class-wide declaratory and injunctive relief pursuant to Rule 23(b)(2).

135.     The Class consists of all youth currently incarcerated at LHS and CLS and any youth who are incarcerated there in the future.  The exact number of inmates currently in the Class is not known to Plaintiffs with certainty, particularly because the number of Class members fluctuates.  On information and belief, the number of current Class members is approximately 165 (145 boys at LHS and 20 girls at CLS).  In addition to Class members currently held at LHS and CLS, the Class consists of an unknown number of youth who will be incarcerated in those facilities in the future and, absent injunctive relief, subjected to the same treatment as youth currently incarcerated.

136.     The individual Plaintiffs' claims are typical of the claims of all members of the Class, because they have all been subjected to solitary confinement, restraints and/or the excessive use of pepper spray, and/or to the threat of being subjected to solitary confinement, restraints, or pepper spray in the future.  Plaintiffs and all members of the Class have similarly suffered harm, or will suffer harm in the future, arising from Defendants' actions and inaction.

137.     Common questions of law and fact exist as to all members of the Class.  These common legal and factual questions include:

a.   Whether Defendants' policy and practice of placing youth in solitary confinement for punitive or disciplinary purposes and for a period longer than a few hours violates the Eighth and/or Fourteenth Amendments to the United States Constitution.

b.   Whether Defendants' policies and practices of using mechanical restraints violates the Eighth and/or Fourteenth Amendments to the United States Constitution.

     c.    Whether Defendants' policies and practices of using pepper spray violate the Eighth and/or Fourteenth Amendments to the United States Constitution.

     d.    Whether Plaintiffs and other Class Members are entitled to the declaratory and injunctive relief they seek.

138.    By routinely confining substantial numbers of youth in solitary confinement for relatively minor infractions and other disciplinary or punitive purposes, and by routinely using pepper spray and restraints on youth to control behavior, Defendants have acted or refused to act on grounds generally applicable to the entire Class.

139.    The claims asserted herein are capable of repetition while evading review.  There is a continuing and substantial public interest in these matters, justifying declaratory and injunctive relief in favor of the Plaintiffs and the Class.

140.    This suit may be maintained as a class action pursuant to Rules 23(a) and (b)(2), Federal Rules of Civil Procedure, because Plaintiffs and other members of the Class seek declaratory and injunctive relief, and all of the above factors of numerosity, commonality, typicality, and adequacy are present.

141.    A class action is the best available method for adjudication of these legal issues because individual litigation of these claims would be impracticable, and individual litigation would be unduly burdensome to the courts.

142.    The named Plaintiffs, their representatives, and Class counsel will fairly and adequately represent the interests of the Class.  The named Plaintiffs and their representatives have no interests in this matter that are antagonistic to other Class Members.  Class counsel have many years of experience in civil rights and class action litigation.

## CLAIMS FOR RELIEF

### Count I: Defendants' Use of Solitary Confinement Violates the Fourteenth Amendment Right to Rehabilitation

143.    The allegations of paragraphs 1 to 142 above are incorporated herein.

144.    The Fourteenth Amendment to the United States Constitution protects the substantive due process rights of the Plaintiffs, juvenile prisoners at Lincoln Hills and Copper Lake, including a right to a rehabilitative environment and rehabilitative treatment.

145.    Defendants have a policy, pattern or practice of use of solitary confinement, described above, which interferes with Plaintiffs' rehabilitation and harms Plaintiffs emotionally, psychologically, physically and educationally.

146.    This use of solitary confinement deprives Plaintiffs of their substantive due process right to rehabilitative treatment and a rehabilitative environment, in violation of the Fourteenth Amendment.

147.    Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

148.    Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury. Unless enjoined by the Court, Defendants will continue to harm Plaintiffs and other class members by depriving them of rehabilitation, in violation of their substantive due process rights under the Fourteenth Amendment.

### Count II: Defendants' Use of Restraints Violates the Fourteenth Amendment Right to Rehabilitation

149.    The allegations of paragraphs 1 to 148 above are incorporated herein.

150.     The Fourteenth Amendment to the United States Constitution protects the substantive due process rights of the Plaintiffs, juvenile prisoners at Lincoln Hills and Copper Lake, including a right to a rehabilitative environment and rehabilitative treatment.

151.     Defendants have a policy, pattern or practice of use of restraints, including placing juveniles "on the belt" and tethering them to tables and desks whenever they are out of their cells in solitary confinement, as described above, which interferes with their rehabilitation and harms Plaintiffs emotionally, psychologically, physically and educationally.

152.     This use of restraints deprives Plaintiffs of their substantive due process right to rehabilitative treatment and a rehabilitative environment, in violation of the Fourteenth Amendment.

153.     Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

154.     Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury. Unless enjoined by the Court, Defendants will continue to harm Plaintiffs and other class members by depriving them of rehabilitation, in violation of their substantive due process rights under the Fourteenth Amendment.

**Count III: Defendants' Use of Restraints Constitutes Excessive Use of Force in Violation of the Fourteenth Amendment**

155.     The allegations of paragraphs 1 to 154 above are incorporated herein.

156.     The Fourteenth Amendment's substantive due process guarantee prohibits juvenile prison officials from using objectively unreasonable force against the juvenile prisoners in their custody.

31

157.    As described above, Defendants have a policy, pattern or practice of excessive use of mechanical restraints, including placing juveniles "on the belt" and tethering them to tables and desks whenever they are out of their cells in solitary confinement.

158.    Defendants' use of restraints is intentional and objectively unreasonable, and thus deprives Plaintiffs of their substantive due process rights, in violation of the Fourteenth Amendment. This excessive use of restraints is not necessary to achieve any legitimate penological purpose and creates a substantial risk of serious emotional, psychological and physical harm to Plaintiffs.

159.    Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

160.    Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury.  Unless enjoined by the Court, Defendants will continue to subject Plaintiffs and other class members to objectively unreasonable force, in violation of their Fourteenth Amendment rights.

**Count IV: Defendants' Use of Pepper Spray Constitutes Excessive Use of Force in Violation of the Fourteenth Amendment**

161.    The allegations of paragraphs 1 to 160 above are incorporated herein.

162.    The Fourteenth Amendment's substantive due process guarantee prohibits juvenile prison officials from using objectively unreasonable force against the juvenile prisoners in their custody.

163.    As described above, Defendants have a policy, pattern or practice of excessive use of pepper spray.

164.    Defendants' use of pepper spray is intentional and objectively unreasonable, and thus deprives Plaintiffs of their substantive due process rights, in violation of the Fourteenth

Amendment. This use of pepper spray is not necessary to achieve any legitimate penological purpose and creates a substantial risk of serious emotional, psychological and physical harm to Plaintiffs.

165.    Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

166.    Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury.  Unless enjoined by the Court, Defendants will continue to subject Plaintiffs and other class members to objectively unreasonable force, in violation of their Fourteenth Amendment rights.

**Count V: Defendants' Failure to Protect Juveniles from Pepper Spray and Restraints Violates the Fourteenth Amendment**

167.    The allegations of paragraphs 1 to 166 above are incorporated herein.

168.    The substantive component of the Due Process Clause of the Fourteenth Amendment requires juvenile prison officials to take reasonable measures to prevent the excessive use of force against juvenile prisoners in the officials' care.

169.    Defendants know that security staff at Lincoln Hills and Copper Lake have a policy, pattern or practice of excessive use of pepper spray and use of restraints and that such use creates a substantial risk that juvenile prisoners will be seriously harmed.

170.    Defendants have failed to take reasonable measures to prevent the excessive use of pepper spray and restraints by security staff at Lincoln Hills and Copper Lake.

171.    By failing to protect Plaintiffs, Defendants have deprived them of their substantive due process rights under the Fourteenth Amendment.

172.    Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

173.    Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury.  Unless enjoined by the Court, Defendants will continue to fail to protect the Plaintiffs and other class members from excessive force, in violation of their Fourteenth Amendment rights.

**Count VI: Defendants' Use of Solitary Confinement Violates the Eighth Amendment**

174.    The allegations of paragraphs 1 to 173 above are incorporated herein.

175.    The Eighth Amendment to the United States Constitution forbids state actors to impose cruel and unusual punishment on convicted prisoners, including acting (or failing to act) with deliberate indifference to a substantial risk of serious harm to prisoners' health or safety.

176.    Defendants have a policy, pattern or practice of routine use of solitary confinement of juvenile prisoners at Lincoln Hills and Copper Lake.  As described above, Defendants' practice of solitary confinement subjects Plaintiffs to, among other harmful conditions: 22-23 hours per day in a single cell—for days, weeks or months at a time—locked behind a solid metal door, with no furniture other than a low bed and a combination toilet/sink, with constant illumination, even at night, and with extremely limited access personal property; shackling the hands of juveniles in solitary confinement to a waist belt during the limited times they are out of their cells for days and sometimes weeks at a time; lack of access to educational and rehabilitative programming while in solitary confinement; and lack of access to meaningful exercise and social interaction.  This solitary confinement creates a substantial risk of serious emotional, psychological and physical harm to Plaintiffs.

177.    Defendants use solitary confinement against juvenile prisoners with deliberate indifference, in that they are or should be aware of the substantial risk of serious harm to the Plaintiffs caused by excessive use of solitary confinement but continue to subject Plaintiffs to such confinement and have failed to take reasonable steps to prevent the harm.

34

178.    By imposing solitary confinement, Defendants have subjected Plaintiffs to cruel and unusual punishment, in violation of the Eight Amendment.

179.    Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

180.    Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury. Unless enjoined by the Court, Defendants will continue to subject the Plaintiffs and other Class members to a substantial risk of serious harm, in violation of their Eighth Amendment rights.

**Count VII: Defendants' Use of Restraints Violates the Eighth Amendment**

181.    The allegations of paragraphs 1 to 180 above are incorporated herein.

182.    The Eighth Amendment to the United States Constitution forbids state actors to impose cruel and unusual punishment on convicted prisoners, including acting (or failing to act) with deliberate indifference to a substantial risk of serious harm to prisoners' health or safety.

183.    Defendants have a policy, pattern or practice of routine and excessive use of restraints, including placing juveniles "on the belt" and tethering them to tables and desks whenever they are out of their cells in solitary confinement.  This excessive solitary confinement creates a substantial risk of serious emotional, psychological and physical harm to Plaintiffs.

184.    Defendants use mechanical restraints against juvenile prisoners with deliberate indifference, in that they are or should be aware of the substantial risk of serious harm to the Plaintiffs caused by excessive use of restraints but continue to subject Plaintiffs to it and have failed to take reasonable steps to prevent the harm.

185.    By routinely and excessively using mechanical restraints, Defendants have subjected Plaintiffs to cruel and unusual punishment, in violation of the Eight Amendment.

186.     Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

187.     Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury. Unless enjoined by the Court, Defendants will continue to subject the Plaintiffs and other Class members to a substantial risk of serious harm, in violation of their Eighth Amendment rights.

**Count VIII: Defendants' Use of Restraints Constitutes Excessive Force in Violation of the Eighth Amendment**

188.     The allegations of paragraphs 1 to 187 above are incorporated herein.

189.     The Eighth Amendment prohibition on cruel and unusual punishment forbids state actors to use excessive force against convicted prisoners.

190.     Defendants have a policy, pattern or practice of excessive and unnecessary use of restraints, including placing juveniles "on the belt" and tethering them to tables and desks whenever they are out of their cells in solitary confinement.  This excessive use of restraints is not necessary to achieve any legitimate penological purpose and creates a substantial risk of serious emotional, psychological and physical harm to Plaintiffs.

191.     Defendants' use of restraints is intentional, and Defendants know or should know that such restraints are unnecessary to and ineffective in maintaining or restoring security or discipline, and thus has the purpose and effect of harming Plaintiffs without a legitimate penological purpose.

192.     By the routine and excessive use of restraints, Defendants have subjected Plaintiffs to cruel and unusual punishment, in violation of the Eighth Amendment.

193.     Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

194.     Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury.  Unless enjoined by the Court, Defendants will continue to subject the Plaintiffs and other Class members to excessive force, in violation of their Eighth Amendment rights.

**Count IX: Defendants' Use of Pepper Spray Constitutes Excessive Force in Violation of the Eighth Amendment**

195.     The allegations of paragraphs 1 to 194 above are incorporated herein.

196.     The Eighth Amendment prohibition on cruel and unusual punishment forbids state actors to use excessive force against convicted prisoners.

197.     Defendants have a policy, pattern or practice of excessive use of pepper spray to punish or control the behavior of juvenile prisoners at Lincoln Hills and Copper Lake.

198.     Defendants' use of pepper spray is intentional, and Defendants know or should know that such use of pepper spray is unnecessary to and ineffective in maintaining or restoring security or discipline, and thus has the purpose and effect of harming Plaintiffs without a legitimate penological purpose.

199.     By the routine and excessive use of pepper spray, Defendants have subjected Plaintiffs to cruel and unusual punishment, in violation of the Eighth Amendment.

200.     Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

201.     Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury.  Unless enjoined by the Court, Defendants will continue to subject the Plaintiffs and other Class members to excessive force, in violation of their Eighth Amendment rights.

**Count X: Defendants' Failure to Protect Juveniles from Restraints and Pepper Spray Violates the Eighth Amendment**

202.    The allegations of paragraphs 1 to 201 above are incorporated herein.

203.    The Eighth Amendment prohibition on cruel and unusual punishment requires prison officials to take reasonable measures to prevent the excessive use of force against prisoners in the officials' care.

204.    Defendants know that security staff at Lincoln Hills and Copper Lake have a policy, pattern or practice of excessive use of restraints and pepper spray and that such use creates a substantial risk that Plaintiffs will be seriously harmed.

205.    Defendants have failed to take reasonable measures to prevent the excessive use of restraints and pepper spray by security staff at Lincoln Hills and Copper Lake.

206.    By failing to protect Plaintiffs, Defendants have subjected to cruel and unusual punishment, in violation of the Eighth Amendment.

207.    Defendants, all state employees, have acted or failed to act and are continuing to act or fail to act under color of state law.

208.    Plaintiffs have no adequate remedy at law to address the harms described herein. The relief sought by Plaintiffs is necessary to prevent continued and further injury.  Unless enjoined by the Court, Defendants will continue to fail to protect the Plaintiffs and other Class members from excessive force, in violation of their Eighth Amendment rights.

WHEREFORE, Plaintiffs request that this Court:

A.  Issue an order certifying this action to proceed as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure and appointing the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

38

B.  Declare that Defendants' policies and practices of: confining youth in solitary confinement for disciplinary or punitive purposes or in any case other than a rare and temporary response to avoid imminent serious physical harm to persons; routinely using mechanical restraints, including handcuffing juveniles in solitary confinement to a waist belt and tethering them to a table during their only time out of their cells; and routinely using pepper spray to punish youth and control behavior violate, on their face and as applied, the named Plaintiffs' and class members' rights under the Eighth and Fourteenth Amendment to the United States Constitution;

C.  Grant facial and as applied temporary, preliminary, and permanent injunctive relief prohibiting Defendants from engaging in the practice of solitary confinement for disciplinary or punitive purposes or in any case other than a rare and temporary response to avoid imminent serious physical harm to persons, and prohibiting the use of mechanical restraints, including handcuffing juveniles in solitary confinement to a waist belt and tethering them to a table during their only time out of their cells, and pepper spray except in the rare occasion necessary to avoid imminent serious physical harm to persons;

D.  Issue such further injunctive relief as necessary to rectify the unconstitutional use of solitary confinement, mechanical restraints and pepper spray, including appointing a monitor and requiring Defendants to report all uses of solitary confinement, restraints, and pepper spray at LHS and CLS to the monitor and to class counsel on a weekly basis;

E.  Award reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988; and

F.  Grant such other relief as the Court may deem just and proper.

Dated this 23rd day of January, 2017.

ACLU OF WISCONSIN FOUNDATION
Laurence J. Dupuis, SBN 1029261
Karyn L. Rotker, SBN 1007719
R. Timothy Muth, SBN 1010710
207 E. Buffalo Street, Suite 325
Milwaukee, WI 53202
Telephone: (414) 272-4032
Facsimile: (414) 272-0182
ldupuis@aclu-wi.org
krotker@aclu-wi.org
tmuth@aclu-wi.org

JUVENILE LAW CENTER
Jessica Feierman
Karen Lindell
Marsha Levick
The Philadelphia Building
1315 Walnut Street, 4th Floor
Philadelphia, PA 19107
Telephone: (215) 625-0551
jfeierman@jlc.org
klindell@jlc.org
mlevick@jlc.org

QUARLES & BRADY LLP

s/ Rachel A. Graham

Matthew J. Splitek, SBN 1045592
Rachel A. Graham, SBN 1069214
33 East Main Street, Suite 900
Madison, WI  53703
Telephone: (608) 251-5000
matthew.splitek@quarles.com
rachel.graham@quarles.com
Emily L. Stedman, SBN 1095313
Zachary T. Eastburn,* SBN 1094676
411 East Wisconsin Avenue, Suite 2350
Milwaukee, WI  53202-4426
Telephone: (414) 277-5000
emily.stedman@quarles.com
zachary.eastburn@quarles.com

*admission pending

Attorneys for Plaintiffs