## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **J.J.,** by and through his next friend, Sakeena Jackson; *et al.*, for themselves and all others similarly situated,<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**Jon E. Litscher,** in his official capacity as Secretary of the Wisconsin Department of Corrections, *et al.*,<br><br>**Defendants.** | **Civil Action No. 17-CV-47** |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65(a) of the Federal Rules Civil Procedure and the Western District of Wisconsin's Procedure for Seeking Injunctive Relief, Plaintiffs, by and through their undersigned counsel, submit this Brief in Support of Plaintiffs' Motion for Preliminary Injunction.

## I.    INTRODUCTION

Plaintiffs seek to end Defendants' illegal and excessive use of solitary confinement, pepper spray, and physical restraints on youth detained at Lincoln Hills School for Boys ("LHS") and Copper Lake School for Girls ("CLS") (collectively "LHS/CLS"). These practices are dangerous, counterproductive, and unconstitutional under the Eighth and Fourteenth Amendments. Unsurprisingly, they are also profoundly out–of–step with those at other juvenile correctional facilities. Plaintiffs represent a proposed class consisting of all youth who are now, or in the future will be, confined at Lincoln Hills School for Boys and Copper Lake School for Girls. *See* Plaintiffs' Motion for Class Certification (Dkt. No. 2).

To put a stop to the ongoing harms to the children at LHS/CLS caused by these unconstitutional practices, Plaintiffs urgently move this Court for a preliminary injunction ordering Defendants and their agents to: (1) eliminate the use of solitary confinement for disciplinary or punitive purposes, and limit any removal of youth from the general population to rare and temporary responses to prevent imminent and serious physical harm to persons; (2) eliminate the routine use of mechanical restraints, including handcuffing juveniles in solitary confinement to a waist belt and tethering youth to a table during their only time out of their cells, and limit all mechanical restraint use within the institution to rare and temporary responses necessary to prevent imminent and serious physical harm to persons or during transportation outside the institution; and (3) eliminate the use of pepper spray for punishment and behavior management or control, and limit any use of such chemical agents to rare and temporary responses necessary to prevent imminent and serious physical harm to persons. Each of these practices violates Plaintiffs' and class members' rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Plaintiffs file this motion for interim relief due to the extreme and ongoing danger posed by these practices. Plaintiffs have sufficient proof for preliminary relief, even without conducting formal discovery, to demonstrate a likelihood of success on the merits of their Eighth and Fourteenth Amendment claims. As set out below, Plaintiffs have no adequate remedy at law and will suffer irreparable harm if the Court does not grant a preliminary injunction. Defendants, on the other hand, will not suffer irreparable harm if the Court enjoins these unconstitutional practices on a preliminary basis, and the public interest weighs heavily in favor of granting a preliminary injunction to protect incarcerated youth from ongoing abuses. However, to the extent this Court determines that additional factual development is necessary to decide this motion, Plaintiffs ask

QB\45208043.1

this Court to order expedited discovery, including limited depositions, to be completed before a hearing on the motion. *See* Section V, *infra*.

## II. THE FACTS WHICH SUPPORT AN IMMEDIATE PRELIMINARY INJUNCTION

### A. Defendants Incarcerate Boys and Girls as Young as 14 at LHS/CLS.

The State of Wisconsin imprisons approximately 165–180 children at Lincoln Hills School for Boys and Copper Lake School for Girls. (Plaintiffs' Proposed Finding of Fact ("PFOF") # 20.) Children are sent to LHS/CLS for a variety of offenses pursuant to the Juvenile Justice Code. (PFOF # 22.) Defendants hold the children at LHS/CLS in nine housing units (seven for boys and two for girls) euphemistically called "cottages." (PFOF # 21.)

Approximately 70% of youth at LHS/CLS are African–American and 59% are from Milwaukee County. (PFOF ## 22-23.) LHS/CLS is located near Irma, in Northern Wisconsin, approximately 215 miles from Milwaukee. (PFOF # 18.) The Department of Corrections has prioritized recruiting and hiring guards, called "youth counselors," and other staff for LHS/CLS from the geographical area near the prison, which results in an overwhelmingly white workforce. (PFOF # 19.)

### B. Defendants Place LHS/CLS Youth in Solitary Confinement for Weeks and Months at a Time as a Form of Discipline or Punishment.

Defendants punish children at LHS/CLS for violating institutional rules by putting them in solitary confinement, which the department refers to as "restrictive" or "security" housing. (PFOF # 28); *see also* Wis. Adm. Code § DOC 373.80(3). On any given day, Defendants are holding between 12% and 20% of the children at LHS/CLS in solitary confinement. (PFOF ## 31-32.) Defendants send boys to serve solitary confinement sentences in one of two restrictive housing units, the Eleanor Roosevelt and Clifford Krueger cottages; girls serving solitary confinement

sentences are sent to a restrictive wing of one of the general housing units at CLS, the Ida B. Wells cottage. (PFOF ## 29-30.)

Solitary confinement sentences vary in length, from a few days to weeks or even months. (PFOF # 39.)[1] Defendants have held some children in solitary confinement for most of their time at LHS/CLS. (PFOF # 41.) While some of the infractions leading to solitary confinement are serious, LHS/CLS routinely sends children to solitary confinement for even non–violent rule violations. (PFOF # 33.) For instance, one of the Plaintiffs, J.J., was sentenced to nine days of solitary for running away from staff while confined in restraints. (PFOF # 36.) Another, S.K., was sent to solitary for allegedly stealing "gummi worms" candy. (PFOF # 34.) Defendants have sometimes even sent children to solitary cells for engaging in self-harming behavior; Plaintiff K.D. was punished for being "disruptive" by tying a sweater around her neck. (PFOF # 38.)

Conditions for children in the security units are brutal. Children generally spend at least 22–23 hours per day alone in small, bleak cells. (PFOF # 42.) Although children supposedly are entitled to one hour out of their cells each day for exercise, guards often take away even this minimal "out time" for rule violations. (PFOF # 45.) Children also may get an hour a day of "school," if a teacher is available, but are denied other rehabilitative programming – such as Aggression Replacement Training and Juvenile Cognitive Intervention Program – while in solitary. (PFOF # 43.)

---

[1] Although Defendants may contest the allegation that children are frequently sentenced to more than a brief stay in solitary, they have admitted previously that children frequently receive sentences of a week or more *at disposition* after a hearing. (*See* PFOF # 39.) But even this fails to tell the whole story because children frequently spend days or even weeks in "prehearing security" (that is, solitary) *before they even receive their hearing and disposition*. (PFOF # 40.) As explained below, experts in juvenile justice consider *any* use of solitary confinement–other than for a few hours for cooling off–as unnecessary and counterproductive to restoring and maintaining security in juvenile correctional facilities.

QB\45208043.1

The solitary confinement cells measure approximately seven or eight feet by 10 feet, and have a large metal door with a small window and one or two slots through which guards pass food trays. (PFOF # 49.) Lights in the cells are illuminated at all times, though they are dimmed during the night. (PFOF # 51.)

Boys in solitary confinement may be in "high hall" or "low hall." (PFOF # 46.) High hall is more restrictive than low hall. (PFOF # 47.) When boys first go to solitary, they are generally in high hall status, until LHS staff decides they have "earned" their way to low hall. (PFOF # 48.)

The solitary cells in high hall have a low bed and mattress and a combination metal toilet and sink fixture. (PFOF ## 52-53, 55.) Boys are only allowed to have a small amount of toilet paper in the cell and must ask guards for more when they need it. (PFOF # 56.) The boys cannot flush the toilets themselves and must ask the guards to do so; it sometimes takes a long time to get the toilet flushed and the cells begin to reek. (PFOF # 57.) The boys' cells in low hall and the girls' solitary cells in Wells have no toilet or sink, so these children must put on a call light so that guards can let them out to go to the toilet. (PFOF ## 54, 58.) It sometimes takes so long for the guards to respond that the children are forced to urinate or defecate in their cells. (PFOF # 59.)

The only furniture in the solitary cells at LHS/CLS is a bed (and the toilet–sink fixture in high hall cells for boys). (PFOF # 52.) Property restrictions are severe. Children have the clothes they wear, a toothbrush and perhaps a book or two in their cells; they do not have anything to write with. (PFOF # 60.) Defendants do not permit the boys in high hall to have *any* paper, other than books, in their cells, while boys in low hall may have mail in their cells. (PFOF # 61.)

## C. Defendants Frequently Place Children in Mechanical Restraints in their Limited Time Out of their Cells.

When children in solitary are allowed out of their cells, guards frequently place children in mechanical restraints. (PFOF # 62.) This is referred to as being "on the belt." (PFOF # 62.) Guards

put the child in handcuffs, secure the handcuffs to a belt around the child's waist, and chain the child to a table in the day room or to a desk in the classroom, even during their "exercise" time. (PFOF # 63.)

In high hall, boys are always on the belt. (PFOF # 66.) Boys in low hall are generally not on the belt, meaning they spend their limited time out of the cell without physical restraints. (PFOF # 67.) However, when more than one boy is in the day space at a time, guards may keep even boys on low hall on the belt. (PFOF # 67.) As a consequence, for boys on the belt, there is no opportunity for large muscle exercise or other meaningful activity or interaction outside of their cells. (PFOF # 64.) Moreover, treating the children no better than chained animals is emotionally damaging and humiliating. (PFOF # 73.)

Defendants keep many boys on the belt for most of the time they are in solitary. (PFOF # 68.) Defendants also put some girls "on the belt" in solitary. (PFOF # 69.)

### D. Solitary Confinement Damages the Children at LHS/CLS Emotionally and Psychologically.

Children at LHS/CLS describe extreme emotional suffering caused by solitary confinement. J.J. says he and other youth in solitary were "treated . . . like dogs in cages, causing us more trauma." (PFOF # 74.) He was sad and depressed, had trouble sleeping, felt anxious and restless and was easily provoked to anger by little things, like being ignored. (PFOF # 74.) C.M. suffered from anxiety, was irritated by the noise of other youth yelling into the hallways from their cells, lost sleep and even had his hair fall out. (PFOF # 75.) Like J.J., C.M. felt he was "treated like an animal, cuffed to come out for a shower, cuffed to come out for school, cuffed any time I got out." (PFOF # 75.) K.D. was irritated, angry, anxious, restless, sad and hopeless, and sometimes even "felt like dying" in solitary. (PFOF # 76.) A.V. was depressed, sleepless and emotional. (PFOF # 77.) M.S. felt anxious, depressed and "degraded due to the inhumane

treatment." (PFOF # 78.) A.P. was angry and negative, and sometimes wanted to hurt herself. (PFOF # 79.) M.R. would wake up angry with his heart pounding, and experienced extreme boredom. (PFOF # 79.) R.N. was depressed, sad, and lonely, and while in solitary, he attempted to strangle himself with the cord of a fan. (PFOF # 81.)

The symptoms experienced by these children are consistent with those identified in the psychiatric literature as being caused by solitary confinement. (PFOF # 82.) As explained in the Declaration of Stuart Grassian, M.D.:

> [During the 19th century] a major body of clinical literature developed which documented the psychiatric disturbances created by such stringent conditions of confinement. The paradigmatic disturbance was an agitated confusional state which, in more severe cases, had the characteristics of a florid delirium, characterized by severe confusional, paranoid, and hallucinatory features, and also by intense agitation and random, impulsive violence–whether directed at others or self-directed.

(PFOF # 83.) In sum, isolation causes a "profoundly deleterious effect on mental functioning." (PFOF # 84.)

Unsurprisingly, the harm to juveniles is even more severe. Solitary confinement causes far greater harm in juveniles than in adults, and the risks of solitary confinement to juveniles are alarming. (PFOF # 85.) Research on adolescent development makes clear why juvenile solitary confinement is "uniquely harmful": "brain function and neural connectedness are still evolving and developing during adolescence, especially so in regard to the functioning of the prefrontal cortex–that part of the brain most centrally involved in inhibiting emotional reactivity." (PFOF # 86.) Stress derails brain development, and for a juvenile, simply being placed in isolation–the utter helplessness of it–is enormously stressful. (PFOF # 87.)

Dr. Grassian has noted that juveniles in detention "have great difficulty in managing their behavior, especially under stressful conditions." (PFOF # 89.) Thus, "[w]hen placed in detention

facilities, many are likely to commit disciplinary infractions, and are especially likely to be placed into solitary confinement." (PFOF # 89.) Unfortunately, "such individuals are precisely the group least capable of tolerating the stresses and the perceptual, occupational, and social deprivations of solitary confinement," are "exquisitely vulnerable to psychiatric and behavioral decompensation when housed in solitary confinement," and are "especially likely to become even more behaviorally out of control, leading to more and more time in solitary." (PFOF # 89.)

Thus, solitary confinement causes lasting–and potentially permanent–harm to children's developing brains and psyches. "[S]olitary confinement . . . will among other harms, permanently affect the juvenile's capacity to modulate affect and to inhibit impulsivity, likely permanently impairing his capacity to manage his life as an adult." (PFOF # 88.)

## E. Defendants Use Pepper Spray at LHS/CLS to Punish and Control Behavior.

Defendants routinely use pepper spray to punish children and to control their behavior at LHS/CLS. (PFOF ## 94-95.) Pepper spray is a form of chemical restraint, generally containing irritants extracted from the resin of hot peppers. (PFOF # 92.) It causes intense pain, coughing and eye and skin irritation for those upon whom it is administered. (PFOF # 93.) When it is inhaled, pepper spray inflames the respiratory tract and temporarily restricts breathing to shallow breaths. (PFOF # 93.) It can also lead to damage of nerves and eyes, and to respiratory arrest or asphyxiation of people with asthma. (PFOF # 93.)

In accordance with policies of Defendants, staff at LHS/CLS have repeatedly blasted Plaintiffs and other children at LHS/CLS with pepper spray, causing severe pain and physical distress. (PFOF ## 95-102.) Those who have been sprayed describe their suffering as burning their skin and eyes and impairing their breathing. (PFOF # 98.) Even those children who have not been sprayed directly have suffered as a result of clouds of spray used on other children. (PFOF # 99.)

8

Two plaintiffs described coughing up blood as a result of such exposure. (PFOF # 100.) Another boy felt nauseous and light headed, and experienced burning eyes and skin and shortness of breath. (PFOF # 101.) Even the residue of pepper spray on blankets or cell walls feels like it is burning the body. (PFOF # 102.)

Adding insult to injury, after LHS/CLS staff pepper spray children they force them to remove all of their clothing and lock the children in a shower "cage." (PFOF # 103.) Showering initially worsens the pain because it causes the pepper spray to spread to all areas of the body. (PFOF # 104.) When the youth get out of the shower, guards make them wear nothing but a thin gown–often made of paper–and replace the regular mattresses in their solitary cells with a hard rubber mat. (PFOF # 105.)

The use of pepper spray at LHS/CLS has increased dramatically since the beginning of 2016. LHS/CLS staff documented 198 pepper spray incidents in the first 10 months of 2016–nearly 20 deployments per month, compared with 45 incidents in all of 2015. (PFOF ## 106, 110.) For example, Plaintiff J.J. has been pepper sprayed five or six times. (PFOF # 107.) R.N. and M.R. both have been pepper sprayed so many times they could not even count them. (PFOF # 108.)

### F. Defendants' Use of Solitary Confinement, Restraints and Pepper Spray Is Unnecessary for and Counterproductive to Institutional Security and Rehabilitation.

Defendants claim that they use solitary confinement, restraints and pepper spray to restore and maintain institutional security by controlling youth misbehavior.[2] However, the Defendants'

---

[2] For example, in the Lincoln Hills Youth Handbook, the DOC answers the question "What happens if a youth does not follow a rule?" by stating that "Discipline rules are written to help youth change their poor behavior. Staff want youth to learn to make good decisions in the institution and the community." (PFOF # 111.) DOC's "Restrictive Housing Unit" policy states it is intended to provide "a safe, structured and healthy environment that encourages youth to participate appropriately and effectively and to gain motivation toward cooperating in order to eventually return to an open living unit." (PFOF # 112.)

use of these measures is not only unnecessary to achieve security objectives, it is actually *counterproductive*.

Vincent Schiraldi is an expert in juvenile corrections practice who is now at the Harvard Kennedy School of Government and who previously directed the District of Columbia's juvenile corrections facilities. (PFOF # 26.) Mr. Schiraldi describes Wisconsin's practices as "excessively restrictive, a substantial departure from accepted professional standards, practice and judgment and not reasonably calculated to maintain or restore facility discipline and security." (PFOF # 114.) Research demonstrates that "[u]se of punitive and excessively restrictive practices like solitary confinement, pepper spray and shackling have been associated with worse, not better, institutional and behavioral outcomes." (PFOF # 113, 115.)

As a result of this research, juvenile correctional systems "have been increasingly eschewing the use of solitary confinement and other punitive and restrictive practices in juvenile institutions." (PFOF # 118.) In 2016, the federal government eliminated the use of solitary confinement of juveniles in federal custody and a number of states and municipalities have similarly eliminated or severely curtailed the use of protective or disciplinary isolation of children. (PFOF # 119.) Those that retain some use of isolation generally limit it to "cool-out" periods measured in minutes or hours, not the days and weeks imposed at LHS/CLS. (PFOF # 120.) And the elimination of punitive solitary confinement has led to *reductions* in violent acts at juvenile facilities (PFOF # 121), making those institutions safer than they were when they employed solitary as a behavior management tool.

Further, the use of restraints in anything other than limited circumstances—much less routinely handcuffing youth to a belt when they are out of their cells and then handcuffing them to a table or desk as Defendants do—is clearly out of step with professional recommendations, and

10

unnecessary. For example, the District of Columbia strictly limits the use of mechanical restraints, such as handcuffs, to only those instances where it is necessary to prevent injury or escape and only for the amount of time the necessity remains, while Mississippi allows restraints only for transportation. (PFOF ## 122, 123.)

With regard to pepper spray, nearly 90% of juvenile correctional agencies that responded to a Council of Juvenile Correctional Administrators survey do not authorize its use. (PFOF # 124.) For example, Massachusetts, the District of Columbia, Ohio, and Mississippi do not permit the use of pepper spray in juvenile institutions, and Oklahoma is actively working to reduce and eventually eliminate its use (PFOF ## 125, 126.)

Consistent with these developments in state and local policy and practice, numerous professional organizations and agencies recommend the elimination or strict limitation of punitive solitary confinement, pepper spray, and mechanical restraints in juvenile facilities. (PFOF ##127-138.)

Defendants are fully aware of these trends in policy and practice to eliminate punitive solitary confinement and the use of pepper spray and mechanical restraints on children. (PFOF ## 140-143.) They have participated in the Council of Juvenile Corrections Administrators programs, including its "Performance-based Standards" program, since at least 2014. (PFOF # 140.) Defendants also received a letter, in October 2016, from Plaintiffs' counsel advising them of the Obama Administration's elimination of solitary for juveniles and the American Medical Association's call to eliminate disciplinary use of solitary for youth. (PFOF # 141.) In addition, Wisconsin advocates have been stressing the harmful consequences of these practices since at least early 2016. (PFOF ## 142-143.) Despite these warnings, Defendants have continued to engage in these damaging and counterproductive practices.

## III.    PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, the plaintiffs must show that their underlying case has a likelihood of success on the merits, no adequate remedy at law exists, and they will suffer irreparable harm without the injunction. *Wood v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007). A finding of likelihood of success requires only that the plaintiffs present a "plausible claim on the merits." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782-83 (7th Cir. 2011) ("the threshold for establishing likelihood of success is low," and plaintiffs "need[] only to present a claim plausible enough that (if the other preliminary injunction factors cut in their favor) the entry of a preliminary injunction would be an appropriate step.").

If the plaintiffs show a likelihood of success, inadequacy of damages, and irreparable harm, the court then must balance the harm to the parties and to the public interest from granting or denying the injunction. *Wood*, 496 F.3d at 622; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013); *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). As set out below, this standard is easily met in this case.

## IV.    PLAINTIFFS ARE ENTITLED TO PRELIMINARY RELIEF ENJOINING THE UNCONSTITUTIONAL PRACTICES OF SOLITARY CONFINEMENT, SHACKLING AND PEPPER SPRAY.

### A.    Children in State Custody Are Entitled to Heightened Constitutional Protections

For more than half a century, the United States Supreme Court has repeatedly reaffirmed that "[c]hildren have a very special place in life which law should reflect." *May v. Anderson*, 345 U.S. 528, 536 (1953) (Frankfurter, J., concurring); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011) ("'[O]ur history is replete with laws and judicial recognition' that children cannot

be viewed simply as miniature adults.") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115–16 (1982)).

The basic principle that children are different from adults, and that the "distinctive attributes of youth" have legal significance, is reflected in a diverse array of constitutional contexts, ranging from First Amendment protections, to the reasonableness of searches, to the protection against cruel and unusual punishment. *See, e.g.*, *Miller v. Alabama*, 132 S. Ct. 2455, 2464 (2012) ("[C]hildren are constitutionally different from adults for purposes of sentencing."); *J.D.B.*, 564 U.S. at 272 (explaining that children "'are more vulnerable or susceptible to . . . outside pressures' than adults," and adopting a "reasonable child" standard for determining the scope of *Miranda* protections) (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)); *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 379 (2009) (relying upon the unique vulnerability of adolescents, and their heightened expectation of privacy, to hold a suspicionless strip search unconstitutional in the school context); *Ginsberg v. New York*, 390 U.S. 629, 638 (1968) (recognizing that exposure to obscenity may be harmful to minors even when it would not harm adults). For children in state custody, this principle takes on heightened importance. These children, who have been involuntarily removed from the custody of their parents and often have complex histories and needs, are entirely dependent upon the state for their care, safety, and well-being. *See Wis. Indus. Sch. For Girls v. Clark County*, 103 Wis. 651, 79 N.W.2d 422, 428 (1899) ("It would be impossible to suggest a higher public duty than that of protecting and caring for minors" who come into state care). Moreover, the state has assumed custody of these children not for the purpose of punishing them, but to provide treatment to help them rehabilitate and grow into successful adults.

QB\45208043.1

Accordingly, as the Seventh Circuit has recognized, the state owes juvenile offenders not only the duty to provide safe conditions and protect them from harm, but also the duty to provide rehabilitative treatment. *See Nelson v. Heyne*, 491 F.2d 352, 358 (7th Cir. 1974).

1.      **The Fourteenth Amendment Accords Juvenile Offenders Affirmative Rights Beyond the Eighth Amendment's Prohibition on Cruel and Unusual Punishment, Including the Right to Rehabilitative Treatment**

More than forty years ago, in *Nelson v. Heyne*, the Seventh Circuit held that juvenile offenders in state custody "have the right under the 14th Amendment due process clause to rehabilitative treatment." *Id.* at 360. Although adult inmates do not have a corresponding right, *see French v. Heyne*, 547 F.2d 994, 1002 (7th Cir. 1976), the court explained that the juvenile system is intended to be "rehabilitative" and "clinical," rather than punitive, noting that the Supreme Court has "assumed, in passing on the validity of juvenile proceedings, that a state must provide treatment for juveniles." *Nelson*, 491 F.2d at 358–59 (citing *Kent v. United States*, 383 U.S. 541 (1966)).[3]

The Seventh Circuit further emphasized the state's assumption of parental responsibilities, explaining that "[w]hen a state assumes the place of a juvenile's parents, it assumes as well the parental duties," and so its treatment of children in its care should "be what proper parental care would provide." *Id.* at 360; *see also id.* at 359 (concluding that a state satisfies this duty "if, and only if, [the state] furnishes adequate treatment to the detainee"). Accordingly, juveniles' "right to treatment" under the Fourteenth Amendment includes the "right to minimum acceptable standards of care and treatment for juveniles'" and "the right to individualized care and treatment." *Xiong v.*

---

[3] The decision in *Patrick v. Raemisch*, 550 F. Supp. 2d 859 (W.D. Wis. 2008), cited by the Court in its Order on Leave to Proceed (Dkt. 10 at 3), is not in conflict with the *Nelson* holding. In *Patrick*, the court denied an *adult* inmate's challenge to his lack of access to a sex offender treatment program, concluding that under *French v. Heyne*, 547 F.2d at 1002, lack of access to treatment is not "cruel and unusual punishment." 550 F. Supp. 2d at 865. That case did not involve a Fourteenth Amendment challenge, nor did it involve a juvenile offender.

*Wagner*, 700 F.3d 282, 294 (7th Cir. 2012) (quoting *Nelson*, 491 F.2d at 360) (internal quotation marks omitted).

Since the *Nelson* decision, the United States Supreme Court has agreed that the state has heightened duties toward confined individuals under the Fourteenth Amendment where the purpose of the confinement is not punitive. In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Court explained that involuntarily committed individuals "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22. In light of that difference in purpose, the Court concluded that the committed individual in that case had the right to "minimally adequate or reasonable training," in addition to the basic rights to safe conditions and freedom from undue restraints provided to all confined individuals. *Id.* at 319. The Court has similarly extended additional protections to pretrial detainees, holding, in *Bell v. Wolfish*, that because they have not been "convicted of any crimes," pretrial detainees cannot be subjected to conditions that "amount to punishment." 441 U.S. 520, 535, 545 (1979); *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015) (clarifying that the Fourteenth Amendment excessive force standard applicable to pretrial detainees is indeed more protective than the Eighth Amendment standard).

Based upon the Supreme Court's reasoning in *Youngberg* and *Bell*, courts around the country have concluded that the Fourteenth Amendment provides heightened protections to juvenile offenders. Like pretrial detainees and involuntarily committed patients, youth in state custody due to a delinquency adjudication are not confined for punitive purposes. *See Nelson*, 491 F.2d at 358 (describing the rehabilitative purpose of the juvenile justice system); *Vann v. Scott*, 467 F.2d 1235, 1239 (7th Cir. 1972) (explaining that the purpose of the "delinquent" classification is "to afford the State an adequate opportunity to rehabilitate and safeguard delinquent minors

rather than to punish them");[4] *see also* Wis. Stat. § 928.01(2)(f) (stating that a primary purpose of the juvenile justice system is "to respond to a juvenile offender's needs for care and treatment"). Indeed, *Nelson* accentuates this point, concluding that any state juvenile code that did *not* include a rehabilitative purpose "would itself be unconstitutional." *Nelson*, 491 F.2d at 360 n.12. In recognition of the rehabilitative purpose of the juvenile justice system, and the state's responsibility toward the young people in its care, many courts have followed the Seventh Circuit's approach in *Nelson* and held that children in state custody are entitled to additional protection under the Fourteenth Amendment. *See, e.g.*, *A.M. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 579 (3rd Cir. 2004) (analyzing conditions claims that arose both before and after plaintiff's delinquent adjudication under the *Youngberg* standard); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (applying the Fourteenth Amendment standard because "the Oregon juvenile justice system is noncriminal and nonpenal"); *Santana v. Collazo*, 714 F.2d 1172, 1180-83 (1st Cir. 1983) (concluding that the Fourteenth Amendment applies because juveniles have not been convicted of crimes and so are entitled to a higher level of scrutiny of their conditions of confinement).

### 2. The Eighth Amendment Standard Is Also More Protective When Applied to Juvenile Offenders

Even under the Eighth Amendment, children have greater rights and protections than adult inmates. Although, as explained above, the Fourteenth Amendment governs juvenile conditions of

---

[4] In *Vann*, the parties disagreed on whether the Eighth Amendment applies to individuals adjudicated delinquent, with the state arguing that children are *not* entitled to Eighth Amendment protections because Illinois law does not authorize the "punishment" of juveniles at all. 467 F.2d at 1240. The court rejected the notion that the label assigned to the confinement – "whether 'rehabilitation' or punishment'" – could dictate the scope of a child's constitutional protections. *Id.* at 1241. The court concluded that some of the practices plaintiffs described could amount to "cruel and unusual punishment" under the Eighth Amendment. *Id.* The *Vann* decision did not consider whether a more protective standard than the Eighth Amendment could apply, as neither party made that argument and the decision predates both *Nelson* and the Supreme Court's holding in *Youngberg*, which articulated the Fourteenth Amendment's greater protections

16

confinement and excessive force cases, the Seventh Circuit has determined that conditions in youth prisons may violate the Eighth Amendment as well. In *Nelson*, which was decided before the Supreme Court's decisions in *Youngberg* and *Bell*, the court applied *both* the Eighth Amendment and the Fourteenth Amendment standards, holding that the Eighth Amendment was violated when youth were beaten and involuntarily administered drugs, and analyzing the lack of rehabilitative treatment under the Fourteenth Amendment. *See Nelson*, 491 F.2d at 354–358. The court did not expressly hold, however, that *only* the Eighth Amendment protected juveniles from excessive force claims. Especially given the Supreme Court's subsequent statements indicating that the Fourteenth Amendment standard applies when the purpose of confinement in not punitive, the Eighth Amendment should not be considered the exclusive source of protection for juveniles in prisons. *See Youngberg*, 457 U.S. at 319.

Regardless of which constitutional provision applies, both the *Nelson* decision and a series of recent decisions from the United States Supreme Court demonstrate that any application of the Eighth Amendment to juvenile offenders must take into account their distinctive developmental characteristics and particular needs. In *Nelson*, the Seventh Circuit applied an Eighth Amendment standard that took into account the rehabilitative aims of the juvenile justice system and the particular needs of juvenile offenders. In assessing whether the facility's use of corporal punishment amounted to cruel and unusual punishment, the Court considered whether the practice was "unnecessary and therefore excessive," a more protective standard than the "deliberate indifference" standard generally applied to adults. *See Nelson*, 491 F.2d at 355. Citing expert testimony suggesting that the beatings undermined the rehabilitative purpose of the facility because they likely resulted "in greater aggression by a child," and emphasizing that the current trend was toward elimination of corporal punishment in correctional institutions, the court

17

concluded that any interest the facility had in preserving order could not justify the potential danger posed by the beatings, and thus the practice was unconstitutional. *Id.* at 357.

This approach–which considered the seriousness of the risk of harm in light of juvenile vulnerability and the purpose of the juvenile justice system–is in accord with the Supreme Court's recent line of cases holding that juveniles enjoy greater constitutional protections than adults under the Eighth Amendment. *See Miller v. Alabama*, 132 S. Ct. at 2475 (striking down mandatory imposition of life without parole sentences for juveniles); *Graham v. Florida*, 560 U.S. 48, 82 (striking down life without parole sentences for juveniles convicted of nonhomicide offenses); *Roper v. Simmons*, 543 U.S. at 578–79 (striking down the juvenile death penalty as unconstitutional); *see also Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016) (holding *Miller* retroactive on collateral review). Each of these cases highlights the importance of adolescent status on the constitutional standard, with the Court emphasizing that children differ from adults in their maturity, susceptibility to outside influences, and capacity for change. *See, e.g.*, *Miller*, 132 S. Ct. at 2463–64 (explaining that these traits make children "constitutionally different from adults for purposes of sentencing"). Rules of criminal procedure that fail to take these characteristics into account, the Court has said, "would be flawed." *Graham*, 560 U.S. at 76.

Of particular relevance here, the Supreme Court has emphasized that adolescents' developmental characteristics render them more vulnerable to lasting psychological harm than adults. *See Roper*, 543 U.S. at 569 (explaining that adolescence is a period when youth are "most susceptible . . . to psychological damage") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). Because of this developmental vulnerability, conditions that are constitutionally acceptable for adults may be unduly harsh for children. *See Montgomery*, 136 S. Ct. at 732

("[C]ertain punishments [are] disproportionate when applied to juveniles."); *Graham*, 560 U.S. at 70 (concluding that "[l]ife without parole is an especially harsh punishment for a juvenile").

In sum, regardless of which constitutional provision is implicated, it is clear that the applicable standard must take into account the particular needs of juveniles. And, as explained below, the appalling conditions at Lincoln Hills and Copper Lake cannot pass constitutional muster under any standard–even under the more deferential Eighth Amendment standard applicable to adults.

### B. Plaintiffs Are Likely to Succeed on Their Eighth and Fourteenth Amendment Challenges to Defendants' Use of Solitary Confinement

Courts around the country, including the United States Supreme Court, have long expressed serious constitutional concerns about the use of solitary confinement. Indeed, as early as 1890, the Supreme Court noted the human toll of solitary confinement, citing studies showing that prisoners exposed to solitary confinement, even for a short time, often fell into "a semi–fatuous condition," "became violently insane," or committed suicide. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (quoting *In re Medley*, 134 U.S. 160, 168 (1890)). Although the Supreme Court has not yet addressed the constitutionality of solitary confinement of juveniles, it has repeatedly emphasized that children's developmental characteristics include vulnerabilities that require unique protections, and nearly every district court that has confronted the issue has found that even short periods of solitary confinement violate juveniles' constitutional rights under the Eighth or Fourteenth Amendments. *See infra* p. 24. Defendants' extreme use of disciplinary solitary confinement offends both Amendments, depriving Plaintiffs of their right to rehabilitative treatment, and violating their right to humane conditions of confinement.

QB\45208043.1

1. **Defendants' Use of Solitary Confinement Violates the Eighth Amendment**

All confined individuals, but especially children, are entitled to "humane conditions" that "provide for their 'basic human needs.'" *Rice v. Correctional Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012) (quoting *Rhodes v. Chapman*, 452 U.S. 337 (1981)). Claims alleging violations of this right may be analyzed under either the Eighth or the Fourteenth Amendment, depending on the purpose for the confinement, with the Fourteenth Amendment offering a more protective standard. *See Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996) (noting that the Fourteenth Amendment offers "a higher standard [of protection] than that provided by the Eighth Amendment"). Although, as explained above, Plaintiffs contend that the Fourteenth Amendment governs all of their claims, the focus of this section is on the Eighth Amendment standard, as any conditions "that would violate the Eighth Amendment would also violate the Fourteenth Amendment." *See Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009).

To establish that conditions of confinement are constitutionally inadequate, an inmate must satisfy two requirements: (1) the alleged harm must be "sufficiently serious," or the conditions of confinement must objectively pose a "substantial risk of serious harm"; and (2) a prison official must have a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The level of culpability generally required in an Eighth Amendment case is "deliberate indifference," which requires that the official "knows of and disregards an excessive risk to inmate health or safety." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 838). This subjective standard is satisfied if the official is "aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists," and the official in fact

draws that inference. *Id.* (quoting *Farmer*, 511 U.S. at 838).[5] Plaintiffs have satisfied each of these elements, demonstrating the substantial risk of serious harm that solitary confinement poses to children, and presenting evidence that Defendants knew of and ignored that risk.

a. **Defendants' Extensive and Unnecessary Use of Solitary Confinement Poses a Significant Risk of Serious Harm to Children**

A harm is sufficiently serious for Eighth Amendment purposes where, as here, there is a serious risk of denial of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. This objective component of the analysis is "contextual and responsive to 'contemporary standards of decency,'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Because children have different needs and developmental characteristics than adults, the harms of a particular practice or punishment may be more severe for children than for adults. *See Graham*, 560 U.S. at 70. The potential harms alleged may be physical or psychological, *Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016), and "[i]t goes without saying that suicide is a serious harm," *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (alteration and internal quotation marks omitted). In some cases, a combination of conditions of confinement may establish a sufficiently serious risk of harm, even when "each alone would not do so." *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). In assessing whether a risk of harm

---

[5] Plaintiffs contend this subjective standard is not in fact the correct standard in juvenile conditions cases. As explained above, the subjective deliberate indifference standard is part of the Eighth Amendment analysis applicable to adults. Under the more protective Fourteenth Amendment standard, the defendant's intent is analyzed using an *objective* standard, meaning that the plaintiff is not required to prove the defendant's subjective state of mind. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015) (applying this objective standard in a Fourteenth Amendment excessive force case); *see also Davis v. Wessel*, 792 F.3d 793, 801 (7th Cir. 2015) (concluding that the objective standard is "instructive" in the due process analysis of conditions claims outside of the excessive force context). Further, because the state has a duty to protect and care for minors in state custody, it has an affirmative responsibility to know and understand whether its practices are harmful to juveniles. *See Wis. Indus. Sch. For Girls v. Clark County*, 103 Wis. 651, 79 N.W.2d 422 (1899); *see also Nelson*, 491 F.2d at 359-60. Accordingly, even under the Eighth Amendment standard, the intent element in juvenile cases can be satisfied if defendants knew *or should have known* of a substantial risk of serious harm.

QB\45208043.1

violates "contemporary standards of decency," courts rely on federal and state practices, as well as scientific studies. *See Hall v. Florida*, 134 S. Ct. 1986, 1993 (2014) (considering "psychiatric and professional studies" to resolve an Eighth Amendment claim); *Graham*, 560 U.S. at 62 (looking to federal and state practices). The harsh conditions in solitary confinement at Lincoln Hills and Copper Lake deprive children of their basic developmental necessities – including social interaction, mental stimulation, physical exercise, and emotional support – and pose a serious risk of long-term psychological and physical harm.

As the evidence here shows, solitary confinement poses serious health risks, even to adults. A body of clinical literature studying adult inmates has documented the psychiatric effects of highly restrictive conditions, which can include a "florid delirium" characterized by confusion, paranoia, hallucinations, and intense agitation. (PFOF # 83.) Studies on the effects of sensory deprivation and social isolation have similarly shown that individuals exposed to these conditions, including political prisoners and space travelers, can experience "profoundly deleterious effect[s] on mental functioning." (PFOF # 84.) These effects can be particularly severe for adults with underlying mental health conditions, and numerous courts have held that the Eighth Amendment prohibits placing adults with mental health conditions in solitary confinement. *See, e.g.*, *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995).[6] A majority of juvenile offenders have underlying mental health conditions; these youth are *at least* as vulnerable as adults to the risk of serious harm. (PFOF ## 25, 85-88); *see also V.W. v. Conway*, — F. Supp. 3d —, 2017 WL 696808, at *19 (N.D.N.Y. Feb. 22, 2017) (concluding that juvenile solitary confinement poses a serious

---

[6] *See also e.g.*, *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1117 (W.D. Wis. 2001) (granting injunctive relief to prisoners with serious mental illness held in almost complete isolation); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (holding that defendants' policies and practices of housing inmates with mental illness in segregated housing violate the Eighth Amendment); *Ind. Protection & Advocacy Servs. Comm'n v. Comm'r*, 1:08-cv-01317, 2012 WL 6738517, a *23 (S.D. Ind., Dec. 31, 2012) (holding that placing prisoners with serious mental illness in segregation without providing them adequate mental health treatment violates the Eighth Amendment).

risk of harm in part because "courts have found that the imposition of solitary confinement violated the rights of *adult* inmates with mental conditions"); *Doe v. Hommrich*, Memorandum, — F.Supp.3d—, 2017 WL 1091864 at *3 (M.D. Tenn. March 22, 2017) (noting that "courts around the country have found increased protections for juveniles and persons with diminished capacities" under the Eighth and Fourteenth Amendments, and concluding that punitive solitary confinement of juveniles, particularly "youth who may suffer from mental illness," likely violates the Eighth Amendment).

The harms of solitary confinement are even more acute for children. Indeed, because of adolescents' developmental vulnerability, juvenile solitary confinement is "uniquely harmful," and there is "great danger that such confinement can permanently impair the individual's ability to manage life as an adult." (PFOF # 86); *see also V.W. v. Conway*, 2017 WL 696808, at *19 ("[T]here is a broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults."). The Supreme Court has repeatedly recognized that children are fundamentally different from adults in ways that make them highly "susceptible to influence and to psychological damage." *See, e.g.*, *Miller*, 132 S. Ct. at 183. Due to the psychological vulnerabilities of youth, even short periods of solitary confinement place them at much greater risk of long-term harms, including psychological disturbances, stunted emotional and cognitive growth, and impaired psychosocial development. (PFOF # 85 (quoting the National Commission on Correctional Health Care for the proposition that for juveniles, features of adolescent development make "time spent in solitary confinement even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting").)

In recognition of the serious risks of harm to children posed by solitary confinement, prominent medical and correctional groups have called for a ban on the practice for juveniles.

(PFOF ## 127-133.) Numerous states, as well as the federal government, have outlawed isolation of children for any longer than a few hours. (PFOF ## 119-120.) This consensus view that solitary confinement poses a serious risk of harm to children demonstrates that the practice violates "contemporary standards of decency." *See Hudson*, 503 U.S. at 9. Moreover, courts around the country have held that solitary confinement of juveniles, even for short periods of time, poses a substantial risk of serious harm. *See, e.g.*, *Doe v. Hommrich*, *supra*, 2017 WL 1091864 (enjoining the use of disciplinary isolation of juveniles because the practice likely constitutes "inhumane treatment" in violation of the Eighth and Fourteenth Amendments); *V.W. v. Conway*, 2017 WL 696808, at *19 (concluding that evidence of the consensus view of the harms of solitary confinement to children "clearly demonstrate[s] that juveniles face an objectively sufficiently serious risk of harm" and enjoining defendants' use of disciplinary isolation on juveniles); *Morgan v. Sproat*, 432 F. Supp. 1130, 1138–40 (S.D. Miss. 1977) (relying on expert testimony of harm to conclude that confining teenagers for an average of 11 days, with time out of their cells for recreation and showers, violates the Eighth Amendment); *Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354, 1360, 1366–67 (D.R.I. 1972) (holding that three to seven days in isolation amounts to cruel and usual punishment); *see also H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1088 (11th Cir. 1986) (describing the emotional harm caused by isolation of a juvenile for "seven days, shackled and handcuffed to a metal bunk for part of that time and deprived of virtually every physical or emotional stimulus," and noting that "[j]uveniles are even more susceptible to mental anguish than adult convicts").

The particular conditions of solitary confinement at Lincoln Hills and Copper Lake are exceptionally harmful to children. Plaintiffs in these facilities are exposed to extended periods of social and emotional isolation, ranging from days to weeks and even months. (PFOF # 39.) During

their time in solitary, these vulnerable young people are deprived of the "minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834–they spend 22–23 hours per day in a continuously illuminated seven–by–ten–foot cell, with virtually no personal property other than a book and a toothbrush, and with no place to sit other than the toilet or a low bed. (PFOF ## 42, 49, 51, 52, 55.) Those juveniles who are also "on the belt" get no meaningful physical activity, as they are chained to a table during their limited time outside of their cells. (PFOF # 64.) These conditions are "substantially more onerous than is generally the norm for adult prisoners in solitary confinement" around the country, (PFOF # 71), and they "combine to create a profoundly isolating, powerless and desolate experience for youth at Lincoln Hills and Copper Lake." (PFOF # 27.)

Unsurprisingly, many of the young people exposed to these conditions report experiencing symptoms that are frequently caused by solitary confinement, including difficulty sleeping, anxiety, anger, hopelessness, and suicidal ideations. (PFOF ## 74-82.) In light of the substantial evidence demonstrating the significant risk of long-term harm posed by juvenile solitary confinement, these conditions clearly satisfy the objective prong of the Eighth Amendment inquiry.

### b. Defendants Are Deliberately Indifferent to the Risk of Serious Harm to Children

Plaintiffs also have established the subjective element of the Eighth Amendment standard, as Defendants know of the risks to children posed by solitary confinement but nonetheless continue their practice of confining juveniles as punishment for a wide variety of infractions. Although under the Eighth Amendment, Plaintiffs generally must show actual knowledge of the risk of harm, that knowledge "can be inferred by the trier of fact from the obviousness of the risk." *Estate of Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996) (quoting *Haley*, 86 F.3d at 641); *see also Hope v. Pelzer*, 536 U.S. 730, 737 ("We may infer the existence of this subjective state of mind from the

25

fact that the risk of harm is obvious.").[7] Further, Plaintiffs "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. In demonstrating deliberate indifference, Plaintiffs may rely on "developments that postdate the pleadings and pretrial motions," such as continued conduct in the face of allegations and evidence of "an objectively intolerable risk of serious injury." *Id.* At 846 & n.9.

Here, Defendants are well aware of the serious risk of harm to children posed by solitary confinement. Defendants have participated in the Council of Juvenile Corrections Administrators programs, including its "Performance-based Standards" program, since at least 2014. (PFOF # 140.) These programs teach best practices in conditions of confinement of juveniles, including research-based practices for minimizing isolation and use of restraints. (PFOF # 133.) Defendants also have repeatedly been informed of the harms of their practices by community groups and advocates, and they have been made aware of the American Medical Association's condemnation of the disciplinary solitary confinement of youth. (PFOF ## 141-144.) They were further placed on notice of the harmfulness of their practices by the filing of this lawsuit, yet they have continued their damaging and counterproductive practices, in deliberate indifference to the serious risk of harm they are posing to children in their care. *See V.W.*, 2017 WL 696808, at *20 (concluding that defendants were deliberately indifferent to the harms of solitary confinement of youth because "these allegedly unconstitutional practices have continued unabated despite this pending litigation") (citing *Farmer*, 511 U.S. at 846).

---

[7] As explained above, *see supra* note 5, proof of actual knowledge should not be necessary in juvenile cases, as the state has an obligation to protect juveniles in state custody and provide for their needs.

### 2. Defendants' Use of Solitary Confinement Also Violates Plaintiffs' Fourteenth Amendment Right to Rehabilitative Treatment

As explained above, juveniles in state custody have a right to rehabilitative treatment under the Fourteenth Amendment that "includes the 'right to minimum acceptable standards of care and treatment for juveniles and the right to individualized care and treatment.'" *Xiong v. Wagner*, 700 F.3d 282, 295 (7th Cir. 2012) (quoting *Nelson*, 491 F.2d at 360). Defendants' practice of placing children in solitary confinement for days and weeks at a time, under the brutal conditions described herein, denies youth access to any meaningful educational or rehabilitative programming, undermines the rehabilitative purpose of the juvenile justice system, and defies the consensus view among medical and correctional professionals that disciplinary isolation should not be used on juveniles because of the harms and adverse consequences it imposes. Accordingly, Defendants' use of solitary confinement violates Plaintiffs' Fourteenth Amendment right to individualized rehabilitative treatment that meets minimum acceptable standards of care.

Children confined in the isolation cells at Lincoln Hills and Copper Lake are denied virtually all access to rehabilitative treatment, falling woefully short of the standard required by *Nelson*. *See* 491 F.2d at 360. In *Nelson*, the Seventh Circuit held unconstitutional a program that classified juveniles for different treatment programs and activities based on personality and behavior types, noting that the program failed to meet its stated goals and involved limited individual treatment or counseling. *Id.* at 358, 360. Those facts pale in comparison to the conditions experienced by youth at Lincoln Hills and Copper Lake. Here, the young people kept in solitary confinement spend 22–23 hours per day by themselves, with no rehabilitative programming whatsoever during that time, and no meaningful peer interaction or social engagement. (PFOF ## 42, 43, 64.) They are allowed few books and nothing to write with, and their educational programming consists of a single hour per day with a teacher, when they receive educational

programing at all. (PFOF ## 43, 60-61.) Many youth spend their one hour of "out time" for exercise chained to a table, and they may lose this time entirely on days when they have attorney visits or require trips to the infirmary. (PFOF ## 62, 44.) Nothing about their day resembles "rehabilitative treatment"; in fact, Defendants revoke access to the facilities' rehabilitative programming when youth are placed in solitary confinement. (PFOF # 43.)

Defendants' practices are also in conflict with "acceptable standards of care" in juvenile corrections, and they undermine the rehabilitative aims of the system. *See Xiong*, 700 F.3d at 295; *see also Youngberg*, 457 U.S. at 323 (applying a "substantial departure from accepted professional judgment" standard to assess whether plaintiff's Fourteenth Amendment right to treatment had been infringed). As discussed above, numerous medical and correctional associations and organizations oppose the use of solitary confinement on juveniles. (PFOF ## 127-133.) At least 21 states, and the federal government, have banned juvenile facilities from using disciplinary isolation. *See V.W. v. Conway*, 2017 WL 696808, at *19; (PFOF # 119).[8] Widely accepted juvenile correctional standards now limit isolation of children to a brief "cooling off" period measured in minutes or hours and imposed only when necessary to prevent imminent physical harm to self or others. (PFOF ## 131, 133.) Defendants' frequent, lengthy, and excessively restrictive use of solitary confinement is a "substantial departure" from these accepted professional standards. *See Youngberg*, 457 U.S. at 323.

The widespread condemnation of solitary confinement of children reflects growing evidence that the practice is not only harmful, it is also counterproductive. Numerous experts agree that restrictive practices like solitary confinement are associated with worse institutional and

---

[8] *See also* Lowenstein Sandler LLP & Lowenstein Center for the Public Interest, *51–Jurisdiction Survey of Juvenile Solitary Confinement Rules in Juvenile Justice Systems* (Oct. 2015) (listing 29 states that have banned disciplinary isolation of juveniles). (PFOF # 119.)

behavioral outcomes. According to Plaintiffs' expert Vincent Schiraldi, jurisdictions that have eliminated punitive solitary confinement have seen a *reduction* in violent acts at juvenile facilities, which has improved safety for inmates and staff alike. (PFOF # 121.) This result is consistent with psychologists' understanding of juvenile behavior. And as Plaintiffs' expert Stuart Grassian explains, the juveniles most likely to end up in solitary confinement are "precisely the group least capable of tolerating the stresses" of that experience. (PFOF ## 89, 115.) When these youth are subjected to periods of social and emotional isolation, "there is a major risk" that they will emotionally deteriorate and their "behavior will become more chaotic, dangerous, and even violent." (PFOF # 90.) Youth who have spent significant periods of time in solitary confinement are also more likely to commit future crimes, (PFOF # 91), undermining the government's interest in a juvenile justice system that improves rather than harms public safety. *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (concluding that a harmful restriction or condition of confinement violates the Fourteenth Amendment if it "is not reasonably related to a legitimate goal").

In short, the practice of punitive solitary confinement of children is the opposite of rehabilitative, as it both harms youth and undermines public and institutional safety, and thus it contravenes Plaintiffs' constitutional right to rehabilitative treatment under the Fourteenth Amendment.

> **C.     Plaintiffs Are Likely to Succeed on Their Eighth and Fourteenth Amendment Challenges to Defendants' Use of Mechanical Restraints and Pepper Spray.**
>
> > **1.     Defendants' Deliberate Indifference to the Harmful and Unnecessary Use of Pepper Spray and Mechanical Restraints Violates the Eighth Amendment's Prohibition of Excessive Force.**

When the Eighth Amendment applies, as in adult prisons, prison staff ordinarily are liable for use of excessive force under the Eighth Amendment only if they use force "maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992);

*Wilkins v. Gaddy*, 559 U.S. 34, 40 (2010).[9] However, the "malicious and sadistic" standard applies only to the staff members who actually apply force; supervisory staff, such as Defendants, may be liable upon a showing of deliberate indifference to the consequences of their subordinates' use of force. *Madrid v. Gomez*, 889 F. Supp. 1146, 1248–50 (N.D. Cal. 1995); *Vaughan v. Ricketts*, 859 F.2d 736, 741 (9th Cir. 1988) ("[P]rison administrators' indifference to brutal behavior by guards toward inmates [is] sufficient to state an eighth amendment claim."), overruled on other grounds by *Koch v. Ricketts*, 68 F.3d 1191 (1995); *Buckner v. Hollins*, 983 F.2d 119, 122 (8th Cir. 1993) (applying deliberate indifference standard to conduct of officer who failed to intervene in beating by another officer). Courts may infer the existence of this subjective state of mind "from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

Use of force is not excessive when it is reasonably necessary to subdue recalcitrant prisoners, *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010), but when force is *unnecessary*, even force that does not cause serious injury may violate the Eighth Amendment. *Hudson*, 503 U.S. at 9; *see also Nelson*, 491 F.2d at 355 ("A punishment is excessive [under the Eighth Amendment] if it is unnecessary."). Specifically, use of pepper spray violates the Eighth Amendment when used on a prisoner who has "not jeopardized any person's safety or threatened prison security." *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002); *see also Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010) ("[W]here chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement."); *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) ("[I]t is generally recognized that it is a violation of the Eighth Amendment for prison

---

[9] Factors in determining whether use of force was malicious include the need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner. *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009).

officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.") (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (internal quotation marks and emphasis omitted).

LHS and CLS staff routinely use large quantities of pepper spray in circumstances where there is no immediate threat to any person's safety, or to prison security. *See Treats*, 308 F.3d at 872. For instance, staff use pepper spray on youth for minor, non-violent infractions, such as refusing to leave their rooms or for threatening self-harm. (PFOF #95.) The chemical agents used inflict severe, burning pain, and staff deploy it in such quantities that it infiltrates the hallways and neighboring cells. (PFOF ## 93, 98-99.) Youth who have been sprayed report difficulty breathing, burning of the eyes and skin, nausea, and coughing up blood – symptoms that are unsurprising, as causing physical harm "is the very point of the device." *See United States v. Mosley*, 635 F.3d 859, 861-62 (6th Cir. 2011); *see also Headwaters Forest Def. v. Cnty. Of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated on other grounds by* 534 U.S. 801 (2001) (noting that pepper spray is "*designed* to cause intense pain"). Rather than addressing these health concerns, staff members routinely exacerbate the youth's discomfort by depriving them of basic items such as a mattress and any clothing besides a paper or cloth gown. (PFOF # 105.)

This use of pepper spray on children is not only harmful, it is also unnecessary. Plaintiffs' expert Vincent Schiraldi, who ran the juvenile corrections facilities in the District of Columbia, notes that excessively restrictive practices, including pepper spray and shackling, "have been associated with worse, not better, institutional and behavioral outcomes." (PFOF #113.) According to Mr. Schiraldi, numerous agencies no longer authorize guards to carry pepper spray in juvenile facilities. (PFOF ## 124-126.) Numerous professional associations and agencies agree, calling for the strict limitation of pepper spray in juvenile facilities. (PFOF #117.) In light of this national

rejection of the use of pepper spray on children, the practice cannot be said to serve a legitimate penological interest. *See Thomas*, 614 F.3d at 1311.

Defendants' policies and practices permitting the unnecessary use of pepper spray manifest deliberate indifference to the harm caused by subordinate LHS/CLS staff. Defendants' policies authorize use of pepper spray in circumstances when there is no threat to safety or security, and Defendants are aware of the widespread use of chemical agents within LHS and CLS. Under the Department's official policy, LHS/CLS staff may use chemical agents and incapacitating devices if they reasonably believe it is immediately necessary to, *inter alia*, "enforce a DOC rule, a posted policy or procedure or an order of staff member." (PFOF #94.) And Defendants know that subordinate staff's application of this policy has resulted in unnecessary uses of pepper spray, as evidenced by their own records, which show a huge increase in the number of deployments, from 45 in all of 2015 to 198 in the first 10 months of 2016. (PFOF ## 106, 110.) Defendants are also aware of the harm caused by pepper spray, and that LHS/CLS practices are vastly out-of-step with correctional trends around the country. (PFOF # 142.) Defendants have therefore knowingly tolerated their subordinates' excessive use of force, in violation of the Eighth Amendment.

Similarly, Defendants' routine use of mechanical restraints cannot withstand Eighth Amendment scrutiny. As with pepper spray, use of restraints can violate the Eighth Amendment when they cause unnecessary pain or discomfort. *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (finding a clear Eighth Amendment violation when "punitive treatment amounts to gratuitous infliction of 'wanton and necessary' pain"). For instance, the Supreme Court has concluded that handcuffing an adult inmate to a metal rail when "[a]ny safety concerns had long since abated" is clearly unconstitutional. *Id.* Here, Defendants permit staff at LHS to put all boys "on the belt" when they are first sent to solitary confinement and when they remain in "high hall," regardless of

the reason for discipline. (PFOF ## 65-66.) Some girls confined at CLS are also exposed to this practice during their time in solitary confinement. (PFOF #69.) These children spend all of their time outside their cells chained to a table or a desk regardless of whether there is any ongoing safety or security risk, offending basic notions of human dignity. *See Hope*, 536 U.S. at 738 (noting that the "basic concept underlying the Eighth Amendment … is nothing less than the dignity of man"); *see also Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 858 (7th Cir. 2017) ("Dignity serves an important balancing function alongside the legitimate safety and management concerns of jails and prisons."). This harsh, restrictive practice has been rejected in many other institutions and has no penological justification. *See Thomas*, 614 F.3d at 1311. Accordingly, Defendants' acceptance of this practice reflects deliberate indifference to an excessive use of force.

## 2. Defendants' Objectively Unreasonable Conduct Violates the Fourteenth Amendment's Prohibition of Excessive Force.

As explained in section IV.A.1 above, while convicted *adult* prisoners are protected only against "cruel and unusual" punishment, those incarcerated through the juvenile justice system also have affirmative Fourteenth Amendment rights beyond the Eighth Amendment rights accorded to adults. *Nelson v. Heyne,* 491 F.2d at 358–360. Thus, while the Eighth Amendment requires some level of subjective culpability, the Fourteenth Amendment imposes liability when prison officials' conduct is objectively unreasonable. *Kingsley*, 135 S. Ct. at 2472–73 (Fourteenth Amendment excessive force claims by pretrial detainees governed by objective standard). Determining whether a particular use of force is unreasonable requires consideration of, *inter alia*, "the relationship between the *need* for the use of force and the amount of force used." *Id.* at 2473 (emphasis added).

Where, as here, Defendants' policy permits and LHS/CLS staff's actual practice involves the use of pepper spray and mechanical restraints when they are not necessary to restore or

33

maintain security – and indeed explicitly permits it for the sole purpose of enforcing DOC rules and policies – the use of force, which, as shown above is excessive under the Eighth Amendment's subjective standard, is even more clearly excessive under the Fourteenth Amendment's objective standard. *See Lewis*, 581 F.3d at 475 (conditions that violate Eighth Amendment violate Fourteenth Amendment).

### D. Plaintiffs Will Suffer Irreparable Harm If the Court Does Not Grant a Preliminary Injunction, and There Is No Adequate Remedy at Law.

The inquiries into irreparable harm and whether plaintiffs have an adequate remedy at law are closely linked. *See Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wis. 2001). Harm is "irreparable" when an award of money damages cannot adequately compensate Plaintiffs for their injuries. *See Am. Hosp. Supply v. Hosp. Products Ltd.*, 780 F.2d 589, 594 (7th Cir. 1985) ("The premise of the preliminary injunction is that the remedy available at the end of trial will not make the plaintiff whole . . . ."). Here, Plaintiffs have demonstrated a substantial risk of irreparable harm for which there is no adequate remedy at law.

First, the violation of a constitutional right constitutes irreparable harm, even if temporary. *Jones 'El*, 164 F. Supp. 2d at 1123 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Ezell v. City of Chicago*, 651 F.3d 684, 699-700 (7th Cir. 2011).

Second, in prison cases, unnecessary pain and suffering constitute "irreparable harm" sufficient to support a preliminary injunction. *Jones 'El*, 164 F. Supp. 2d at 1123. Here, Plaintiffs have submitted persuasive evidence that the Defendants' continued use of solitary confinement, mechanical restraints, and pepper spray on juveniles is causing and will continue to cause a serious risk of both short–term and long-term or even permanent physical and psychological damage. Pepper spray causes intense pain, coughing, and eye and skin irritation, and has also been linked to long-term physical harm. (PFOF # 93.) A child handcuffed and chained to a table while out of

his or her cell cannot meaningfully exercise, interact with others or engage in any activity that requires use of the hands. (PFOF # 64.) Such shackling also dehumanizes and humiliates the child, treating him or her like an animal. (PFOF # 73); *see also Hope*, 536 U.S. at 738 (handcuffing adult inmate to rail undermines human dignity). Isolation causes mental fog, tunnel vision, and "agitated confusional state[s]" characterized by confusion, paranoia, hallucinations, and "intense agitation and random, impulsive violence–whether directed at others or self-directed." (PFOF ## 83, 72.) These effects are especially alarming in children, whose developing brains can be permanently damaged as a result of long periods of isolation. (PFOF ## 85-88.)

Finally, money damages cannot adequately remedy the injuries that children at LHS/CLS are suffering as a result of Defendants' policies. *Godinez v. Lane*, 733 F.2d 1250, 1258 (7th Cir. 1984). If this Court permits Defendants to continue using punitive solitary confinement and unnecessarily subject youth to pepper spraying and restraints for the duration of this case, whatever ultimate relief Plaintiffs obtain will not make them whole.

### E.   The Balance of the Equities Favors Injunctive Relief.

"[U]pholding constitutional rights serves the public interest." *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004). Moreover, the public interest generally supports an award of preliminary injunctive relief when a plaintiff has demonstrated both a likelihood of success on the merits and irreparable harm. *See V.W. v. Conway*, 2017 WL 696808, at *24 *(citing Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)). The public interest is simply not served by confining children under conditions in which they risk irreparable emotional damage and, in some cases, a risk of death by suicide. *See Jones 'El*, 164 F. Supp. 2d at 1125 (concluding that the public interest was not served by housing

QB\45208043.1

adult prisoners in solitary confinement under conditions that exacerbated existing mental illnesses).

Defendants may assert that their ability to maintain discipline and security at LHS/CLS would be compromised by the entry of a preliminary injunction. However, the evidence demonstrates that Defendants' policies are both ineffective and counterproductive, and actually compromise effective discipline and security at LHS/CLS. Defendants' policies are associated with "worse, not better, institutional and behavioral outcomes." (PFOF # 113.) There is evidence that pepper spray is not effective to control youth behavior. (PFOF # 117.) Likewise, isolation "has been found to be ineffective in fostering behavior change," "may contribute to violent acting out," and is "in fact counterproductive to facility security." (PFOF # 116); *see also V.W. v. Conway*, 2017 WL 696808, at *5 (describing an "emerging consensus among professional organizations in the corrections field" that disciplinary isolation of juveniles is "an ineffective disciplinary technique for restoring facility security and is in fact counterproductive to facility discipline and security"). In sum, the evidence shows that the stress and deprivation that result from Defendants' punitive policies are more likely to compromise security by fostering impulsive and disruptive behavior.

Accordingly, Plaintiffs meet the standard for granting the preliminary injunctive relief sought.[10]

---

[10] The "need, narrowness, intrusiveness" standard of the PLRA is no different from the general requirement that injunctive relief be no broader than necessary to halt/prevent the unconstitutional conduct. *See Jones 'El*, 164 F. Supp. 2d at 116; *Fields v. Smith*, 653 F.3d 550, 558 (7th Cir. 2011); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir.2010) ("[T]he language of the PLRA does not suggest that Congress intended a provision–by–provision explanation of a district court's findings . . . . [T]he statutory language [means] that the courts must do what they have always done when determining the appropriateness of the relief ordered: consider the order as a whole."); *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir.2001) (the PLRA "has not substantially changed the threshold findings and standards required to justify an injunction"); *Smith v. Ark. Dep't of Corr.*, 103 F.3d 637, 647 (8th Cir.1996) (same); *Williams v. Edwards*, 87 F.3d 126, 133 n. 21 (5th Cir.1996) (same).

QB\45208043.1

## V.   IN THE ALTERNATIVE, IF THE COURT DETERMINES THAT ADDITIONAL FACTUAL DEVELOPMENT IS NECESSARY, PLAINTIFFS REQUEST EXPEDITED DISCOVERY.

Due to the procedural posture of this case and the immediate need for an injunction to protect the children at LHS/CLS from continuing harm, Plaintiffs have filed this motion without yet having had the opportunity to conduct formal discovery. For the reasons explained above, Plaintiffs' expert declarations, sworn declarations of youth subjected to these behaviors, and Defendants' own admissions, provide sufficient evidence to support Plaintiffs' Motion for Preliminary Injunction. However, if this Court believes that additional evidence would assist it in rendering a decision, Plaintiffs seek the Court's leave to conduct expedited discovery, including limited depositions, prior to a hearing on the motion.

## VI.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully request a preliminary injunction ordering Defendants and their agents to: (1) eliminate the use of solitary confinement for disciplinary or punitive purposes, and limit any other removal of youth from the general population to rare and temporary responses to prevent imminent and serious physical harm to persons; (2) eliminate the routine use of mechanical restraints, including handcuffing juveniles in solitary confinement to a waist belt and tethering youth to a table during their only time out of their cells, and limit all mechanical restraint use within the institution to rare and temporary responses necessary to prevent imminent and serious physical harm to persons or during transportation outside the institution; and (3) eliminate the use of pepper spray for punishment and behavior control, and limit any use of such chemical agents to rare and temporary responses necessary to prevent imminent and serious physical harm to persons.

QB\45208043.1

Dated this 19th day of April, 2017.

ACLU OF WISCONSIN FOUNDATION
Laurence J. Dupuis (SBN 2029261)
Karyn L. Rotker (SBN 1007719)
R. Timothy Muth (SBN 1010710)
207 E. Buffalo Street, Suite 325
Milwaukee, WI 53202
Telephone: (414) 272–4032
Facsimile: (414) 272–0182
ldupuis@aclu–wi.org
krotker@aclu–wi.org
tmuth@aclu–wi.org

JUVENILE LAW CENTER
Jessica Feierman
Karen Lindell
Marsha Levick
The Philadelphia Building
1315 Walnut Street, 4th Floor
Philadelphia, PA 19107
Telephone: (215) 625–0551
jfeierman@jlc.org
klindell@jlc.org
mlevick@jlc.org

QUARLES & BRADY LLP
Matthew J. Splitek (SBN 1045592)
Rachel A. Graham (SBN 1069214)
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251–5000
matthew.splitek@quarles.com
Rachel.graham@quarles.com

/s/ Zachary T Eastburn
Emily L. Stedman (SBN 1095313)
Zachary T Eastburn (SBN 1094676)
411 East Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
Telephone: (414) 277–5000
emily.stedman@quarles.com
zachary.eastburn@quarles.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April, 2017, I filed the foregoing Plaintiffs' Brief in Support of Motion for Preliminary Injunction using the CM/ECF system, which will send electronic notification of such filing to all counsel of record who are ECF participants. I further certify that on said date, paper copies were sent to those indicated as non–registered ECF participants, via First Class, United States mail, postage prepaid.

/s/ Zachary T Eastburn

QB\45208043.1