## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **J.J.,** by and through his next friend, Sakeena Jackson; *et al.*, for themselves and all others similarly situated,<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**Jon E. Litscher,** in his official capacity as Secretary of the Wisconsin Department of Corrections, *et al.*,<br><br>**Defendants.** | **Civil Action No. 17-CV-47** |

### PLAINTIFFS' STATEMENT OF PROPOSED FACTS

Pursuant to the Western District's Procedure to be Followed on Motions for Injunctive Relief, Plaintiffs, on behalf of themselves and all others similarly situated, submit the following statement of proposed record facts and facts that Plaintiffs intend to prove at an evidentiary hearing (hereinafter, "Proposed Findings of Fact" or "PFOF"). As noted below, many of the Proposed Findings of Fact below are fully supported by the facts of record; Plaintiffs also intend to supplement these facts with testimony and additional evidentiary support at a forthcoming Preliminary Injunction Hearing.

#### The Parties

1.      Lincoln Hills School for Boys ("LHS") and Copper Lake School for Girls ("CLS" and collectively "LHS/CLS") is a secured juvenile corrections institution operated by the Wisconsin Department of Corrections ("DOC"). (Graham Decl. ¶ 2 & Ex. A at 7:23-8:2 (Litscher Testimony).)

2.      Plaintiffs are children who are currently, or have recently been, in Wisconsin

DOC's custody at LHS/CLS. (PFOF ## 3-11.)

3.      Plaintiff J.J. is a 17-year-old boy from Milwaukee who was recently in custody at LHS. J.J was 15 years old when he was first incarcerated at LHS. (J.J. Decl. ¶¶ 1-2.)

4.      Plaintiff K.D. is a 15-year-old girl from Milwaukee who was recently in custody at CLS starting in July 2016. (K.D. Decl. ¶¶1-2.)

5.      Plaintiff C.M. is a 17-year-old boy from Milwaukee who is currently in custody at LHS. C.M. has been at LHS since November 2016 and expects to remain there until May 2017. (C.M. Decl. ¶¶ 1-2.)

6.      Plaintiff R.N. is a 15-year-old boy who is currently in custody at the Mendota Juvenile Treatment Center, after being transferred there from LHS in December 2016. (R.N. Decl. ¶ 1.)

7.      Plaintiff M.S. is a 16-year-old boy from Wausau who is currently in custody at LHS. M.S. has been at LHS since August 2016 and expects to remain there until August 2017. (M.S. Decl. ¶¶ 1-2.)

8.      Plaintiff A.V. is a 17-year-old boy from Milwaukee who is currently in custody at LHS. A.V. has been at LHS since June 2016. (A.V. Decl. ¶¶ 1-2.)

9.      Plaintiff M.R. is 17-year-old boy from Kenosha County who is currently in custody at LHS. M.R. has been at LHS since 2016, and he was also was at LHS before, starting in 2014. (M.R. Decl. ¶¶ 1-2.)

10.      Plaintiff S.K. is a 17-year-old girl currently in custody at CLS.  S.K. has been in CLS since July of 2016, and she was also at CLS in May 2015, and from October 2015 to March 2016 and in May 2016. *Id.*  (S.K. Decl. ¶¶1-2.)

11.      Plaintiff A.P. is a 15-year-old girl who is currently in custody at CLS. A.P. has

been at CLS since about July of 2016. (A.P. Decl. ¶¶ 1-2.)

12.     Defendant Jon E. Litscher is Secretary of the Wisconsin Department of Corrections. (Compl. ¶ 8; Answer ¶ 8.) As Secretary of DOC, Defendant Litscher is in charge of the administration and supervision of DOC, and is ultimately responsible for the administration and supervision of LHS and CLS. (Graham Ex. C (DOC website); Wis. Stat. §§ 15.04, 15.05, 15.14, 301.03(9)-(10); Proposed Preliminary Injunction Hearing Testimony ("PI Hearing Testimony".)

13.     Defendant John D. Paquin is the Administrator of the Division of Juvenile Corrections. (Compl. ¶ 9; Answer ¶ 9.) As Administrator of the Division of Juvenile Corrections, Defendant Paquin is in charge of the administration and supervision of juvenile corrections within DOC, and is responsible for the administration and supervision of LHS and CLS. (Graham Decl. ¶ 2 & Ex. A at 18:23-19:2 (McCulley Testimony); Graham Ex. D (DOC website); PI Hearing Testimony.)

14.     Defendant Wendy A. Peterson is the Superintendent of LHS and CLS. (Compl. ¶10; Answer ¶10.) As Superintendent, Defendant Peterson is also responsible for ensuring that all legal responsibilities delegated to LHS and CLS, as set forth in the state statutes, state policy and/or governmental rules and regulations are appropriately met. (PI Hearing Testimony.)

15.     Defendant Brian Gutske is the Director of Security at LHS and CLS. (Compl. ¶ 11; Answer ¶ 11.) As Director of Security, Defendant Gutske is responsible for the security and discipline of inmates at LHS and CLS. (PI Hearing Testimony.)

**Jurisdiction and Venue**

16.     This action arises under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution. (Amend. Compl. ¶¶ 2-3.) Accordingly, this Court has jurisdiction

over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 1343 (civil rights jurisdiction).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the dispute occurred at LHS/CLS, which is located in this district. (Amend. Compl. ¶ 4; *see also* PFOF # 18.)

**Background Facts About LHS/CLS**

18.     LHS/CLS is located near Irma, in Northern Wisconsin, approximately 215 miles from Milwaukee. (Compl ¶ 12; Answer ¶ 12; *see also* Graham Decl. Ex. E; PI Hearing Testimony.)

19.     The Department of Corrections has prioritized recruiting and hiring guards, called "youth counselors," and other staff for LHS/CLS from the geographical area near the prison, which results in an overwhelmingly white workforce. (Graham Decl. ¶ 2 & Ex. A at 48:4-49:24, 56:24-57:10; PI Hearing Testimony.)

20.     The State of Wisconsin imprisons approximately 165-180 children at LHS/CLS at any given time. (Graham Decl. ¶ 2 & Ex. A at 19:20-25 (McCulley Testimony) (155 boys and 22 girls at LHS/CLS); Graham Decl. ¶ 3 & Ex. B at 8 (same as for February 10, 2017); Dupuis Class Cert. Decl. Ex. C (dkt. # 4-3) at 54 (Midnight Population Breakdown Log, 10-25-2016) (167 total youth at LHS & CLS); PI Hearing Testimony.)

21.     There are seven housing units for boys at LHS, and two housing units for girls at CLS. DOC refers to these housing units as "cottages." (Dupuis Class Cert. Decl. Ex. A (dkt. # 4-1) at 4 Biennial Budget Issue Paper); PI Hearing Testimony.)

22.     Children are sent to LHS/CLS for a variety of offenses pursuant to the Juvenile Justice Code. (Graham Decl. ¶ 3 & Ex. B at 9.)

QB\45208204.1

23. Approximately 59% of youth at LHS/CLS are from Milwaukee County. (Graham Decl. ¶ 2 & Ex. A at 58:10-21.)

24. Approximately 70% of youth at LHS/CLS are African-American. (Graham ¶ 2, Decl. Ex. A at 57:17-23.)

25. Many of the youth at LHS/CLS have significant histories of trauma and abuse, exposure to violence, and mental health needs. (Graham Decl. ¶ 2 & Ex. A. at 18:17-21; *see also* Grassian Decl. ¶ 46; PI Hearing Testimony.)

26. Vincent Schiraldi is an expert in juvenile corrections practice who is now at the Harvard Kennedy School of Government and who previously directed the District of Columbia's juvenile corrections facilities, and who is qualified to offer an opinion about the prevalence and effectiveness of juvenile corrections practices. (Schiraldi Decl. ¶¶ 4, 9; PI Hearing Testimony.)

27. According to Mr. Schiraldi, the conditions at LHS and CLS "combine to create a profoundly isolating, powerless and desolate experience for youth . . . ."(Schiraldi Decl. ¶ 63.)

**Solitary Confinement Generally**

28. Defendants punish children at LHS/CLS for violating institutional rules by putting them in solitary confinement, which the department refers to as "restrictive" or "security" housing. (Wis. Adm. Code § DOC 373.80(3); Graham Decl. ¶2 & Ex. A at 81:3-17; Graham Decl. Ex. F (Larson Response) ("Youth who violate major conduct rules (DOC 373.14 through DOC 373.65) are most commonly housed in the [restrictive housing unit] for transient periods of time awaiting due process and/or serving a consequential time period determined through due process."); PI Hearing Testimony.)

29. Defendants place girls serving solitary sentences in a restrictive wing of one of the general housing units at CLS, the Ida B. Wells cottage. (Dupuis Class Cert Decl. ¶¶ 5-10, Ex.

C (dkt. # 4-3); A.P. Decl. ¶ 10; S.K. Decl. ¶ 11; PI Hearing Testimony.)

30.     Defendants send boys to serve solitary confinement sentences in one of two restrictive housing units, the Eleanor Roosevelt and Clifford Krueger cottages. (Dupuis Class Cert Decl. ¶¶ 5-10, Ex. C (dkt. # 4-3); PI Hearing Testimony.)

31.     At any given time, Defendants hold approximately 12 to 20% of the CLS/LHS population is in solitary confinement. (Dupuis Class Cert. Decl. ¶¶ 2, 9-10 & Ex. A (dkt. # 4-1) at 4, ¶¶ 5-10, Ex. C at 1-54; PI Hearing Testimony.)

32.     On October 25, 2016, for example, there were 167 children incarcerated at LHS/CLS, and 28 of those children were being held in solitary confinement on that day. (Dupuis Class Cert. Decl. ¶10 & Ex. C (dkt. # 4-3) at 54; PI Hearing Testimony.)

33.     While some of the infractions leading to solitary confinement are serious, LHS/CLS also routinely sends children to solitary confinement for non-violent rule violations. (PFOF # 34- 37; PI Hearing Testimony.)

34.     S.K. was sent to solitary for allegedly stealing "gummi worms" candy. (S.K. Decl. ¶ 3; PI Hearing Testimony.)

35.     K.D. was sent to solitary for allegedly stealing headband paint which she found in the art room. (K.D. Decl. ¶ 4; PI Hearing Testimony.)

36.     J.J. was sentenced to solitary for nine days, from August 1 to August 9, 2016, for running away from staff while confined in restraints. (Dupuis Class Cert. Decl. ¶ 14 & Ex. E (dkt. # 4-5, Conduct Report 81954 (8-1-16) & related documents); PI Hearing Testimony.)

37.     Additionally, J.J. was sentenced to solitary for multiple days for covering his window and camera with paper and refusing to remove it. (Dupuis Class Cert. Decl. ¶ 14 & Ex. E (dkt. # 4-5, Conduct Report 82381 (9-16-16) & related documents); PI Hearing Testimony.)

38.     Defendants have sometimes even sent youth to solitary cells after they have engaged in self-harming behavior. For example, K.D. was sent to solitary for six days, from September 2 to September 8, 2016, for being "disruptive" and engaging in "self-harm and disfigurement" after she tied a sweater around her neck. (K.D. Decl. ¶ 4; Graham Decl. Ex. G; PI Hearing Testimony.)

39.     Solitary confinement sentences vary in length, from a few days to weeks or even several months. (M.R. Decl. ¶ 3; M.S. Decl. ¶3 (more than 20 days for violating LHS rules); Dupuis Class Cert Decl. ¶¶ 13-14, Ex. E  (dkt. # 4-5) (sentences ranging from three to 72 days for a variety of infractions); Graham Decl. Ex. F at 2 (Larson Response) ("On average, a youth whose violation is assaultive (Fighting, Battery, Threats, etc.) receives in the neighborhood of 10 days to 14 days at disposition. Other non-assaultive offenses (Obstruction, Orders, Soliciting Staff, etc.), are disposed of with significantly shorter periods of time (on average four to six or seven days)."); PI Hearing Testimony.)

40.     Defendants frequently place children in "prehearing security" status for a week or more while they await a conduct report, hearing, disposition, and any consequential sentence. (C.M. Decl. ¶ 6 (one week in solitary without conduct report); M.S. Decl. ¶ 3 (one week until conduct report and hearing a couple days later); Graham Decl. Ex. G (six days, from September 2-8, 2016, in "prehearing security" before the September 8 hearing). This means that youth frequently spend a number of days in solitary confinement before they even receive an opportunity to be heard and a disposition.  (*Id.*)

41.     Through a combination of prehearing security status and consequential sentences, Defendants have held some children in solitary confinement for most of their time at LHS/CLS. (J.J. Decl. ¶ 3; M.R. Decl. ¶3; R.N. Decl. ¶ 5; PI Hearing Testimony.)

**Life in Solitary Confinement**

42.     When confined to solitary at LHS and CLS, children generally spend 22-23 hours per day alone in their cells. (A.V. Decl. ¶ 3 (22-23 hours per day in cell); C.M. Decl. ¶ 3 (same); J.J. Decl. ¶ 3 (same); M.R. Decl. ¶ 4 (same); A.P. Decl. ¶ 4 (same); S.K. Decl. ¶ 4 (same); R.N. Decl. ¶ 6 (same); M.S. Decl. ¶ 4 (23 hours per day in cell); K.D. Decl. ¶ 5 (same); PI Hearing Testimony.)

43.     Children may get an hour a day of "school" if a teacher is available, but are denied other rehabilitative programming – such as Aggression Replacement Training and Juvenile Cognitive Intervention Program – while in solitary.  (A.V. Decl. ¶ 4, K.D. Decl. ¶ 6, C.M. Decl. ¶ 4, S.K. Decl. ¶ 6, M.S. Decl. ¶ 5, J.J. Decl. ¶ 4, M.R. Decl. ¶ 5, A.P. Decl. ¶ 5; R.N. Decl. ¶ 7; PI Hearing Testimony.)

44.     On days when a child is out of his or her cell for school or to visit health services or a lawyer, the guards sometimes consider that time his "out time," and the child does not get any other "out time" for the day.  (M.S. Decl. ¶ 4; A.P. Decl. ¶ 4; PI Hearing Testimony.)

45.     Guards often even take away this minimal "out time" for rule violations. (S.K. Decl. ¶ 5; PI Hearing Testimony.)

46.     Boys in solitary confinement may be in "high hall" or "low hall."  (J.J. Dec. ¶ 10; M.S. Decl. ¶ 6; PI Hearing Testimony.)

47.     High hall is more restrictive than low hall. (J.J. Decl. ¶¶ 10-12; M.S. Decl. ¶ 6; PI Hearing Testimony.)

48.     When boys first go to solitary, they are generally in high hall status, until LHS staff decides they have "earned" their way to low hall. (J.J. Decl. ¶ 10; PI Hearing Testimony.)

49.     Solitary cells measure approximately seven or eight feet by ten feet, have a large

metal door with a small window and one or two slots through which guards pass food trays. (A.P. Decl. ¶ 8; S.K. Decl. ¶ 9; M.R. Decl. ¶ 8; R.N. ¶ 10; A.V. Decl. ¶ 7; C.M. Decl. ¶ 11; J.J. Decl. ¶ 7; M.S. Decl. ¶ 8; PI Hearing Testimony.)

     50.    The windows in the doors of the cells in the Krueger unit have a cover which can be closed. Sometimes, guards in Krueger will close those covers so that the boy cannot see out of his cell in to the corridor. (J.J. Decl. ¶9; C.M. Decl. ¶13; PI Hearing Testimony.)

     51.    Lights in the cells are illuminated at all times, though they are dimmed during the night. (A.V. Decl. ¶ 11; C.M. Decl. ¶ 16; J.J. Decl. ¶ 13; K.D. Decl. ¶ 7; M.S. Decl. ¶ 13; R.N. Decl. ¶ 14; M.R. Decl. ¶ 12; A.P. Decl. ¶ 10; S.K. Decl. ¶ 11; PI Hearing Testimony.)

     52.    The only furniture in the solitary cells at LHS/CLS is a bed, and in some of the cells, a sink-toilet fixture. (A.V. Decl. ¶ 9; C.M. Decl. ¶ 14; M.S. Decl. ¶ 10; J.J. Decl. ¶¶ 10-11; K.D. Decl. ¶ 7; PI Hearing Testimony.)

     53.    A typical segregation cell in high hall is like the diagram depicted below (not to scale):



(J.J. Decl. ¶ 8; A.V. Decl. ¶ 8; C.M. Decl. ¶ 12; M.R. ¶ 9; R.N. ¶ 11; PI Hearing Testimony.)

     54.    A segregation cell in the Wells cottage looks like the diagram depicted above,

without the combination sink/toilet and the door opens inward instead of outward. (A.P. Decl. ¶ 9; S.K. Decl. ¶ 10; PI Hearing Testimony.)

55.     The mattress is typically on a low frame very close to the ground, or even on the ground if there is no bedframe at all. (C.M. Decl. ¶ 14; A.V. Decl. ¶ 9; J.J. Decl. ¶ 10; M.S. Decl. ¶ 10; M.R. Decl. ¶ 10; A.P. Decl. ¶ 10; R.N. Decl. ¶ 12; PI Hearing Testimony.)

56.     Boys in high hall are only allowed to have a small amount of toilet paper in the cell and must ask guards for more when they need it. (C.M. Decl. ¶ 17; J.J. Decl. ¶ 14; PI Hearing Testimony.)

57.     The boys in high hall cannot flush the toilets themselves and so must ask the guards to do so; it sometimes takes a long time to get the toilet flushed and the cells begin to reek. (C.M. Decl. ¶ 17; J.J. Decl. ¶ 14; PI Hearing Testimony.)

58.     The boys' cells in low hall and the girls' solitary cells have no toilet or sink, so these children must turn on a call light so that guards can let them out to go to the toilet.  (M.S. Decl. ¶ 11; J.J. Decl. ¶ 11; K.D. Decl. ¶ 8; S.K. Decl. ¶ 12; A.P. Decl. ¶ 11; PI Hearing Testimony.)

59.     It sometimes takes so long for the guards to respond that the children urinate or defecate in their cells.  (M.S. Decl. ¶ 11; J.J. Decl. ¶ 11; AP Decl. ¶ 11; PI Hearing Testimony.)

60.     Property restrictions are severe. Children have the clothes they wear, a toothbrush and perhaps a book or two in their cells; they do not have anything to write with. (A.V. Decl. ¶ 10; C.M. Decl. ¶ 15; M.S. Decl. ¶ 12; J.J. Decl. ¶ 12; K.D. Decl. ¶ 7; R.N. Decl. ¶ 13; S.K. Decl. ¶ 11; A.P. Decl. ¶ 10; M.R. Decl. ¶ 11; PI Hearing Testimony.)

61.     Defendants do not permit the boys in high hall and girls in restrictive housing to have *any* paper, other than books, in their cells, while boys in low hall may have mail in their

cells. (J.J. Decl. ¶ 12; R. N. Decl. ¶ 13; K.D. Decl. ¶ 7; M.R. Decl. ¶ 11; M.S. Decl. ¶ 12; C.M.

Decl. ¶ 15; A.P. Decl. ¶ 10; S.K. Decl. ¶ 11; A.V. Decl. ¶ 10; PI Hearing Testimony.)

### Use of Mechanical Restraints in Solitary

62.     Even when children in solitary are allowed out of their cells, guards frequently

place them in mechanical restraints, which is referred to as being "on the belt." (J.J. Decl. ¶6;

A.V. Decl. ¶5; C.M. Decl. ¶7; M.S. Decl. ¶ 7; R.N. Decl. ¶ 9; M.R. Decl. ¶ 7; A.P. Decl. ¶ 7;

Dupuis Class Cert. Decl. ¶15 & Ex. E  (dkt. # 4-5) at 8, 14, 28, 31, 39, 43, 48, 59, 71; PI Hearing

Testimony.)

63.     To place a child "on the belt," guards place the child's hands in handcuffs, secure

the handcuffs to a belt around the child's waist, and chain the child to a table in the day room or

to a desk in the classroom. (C.M. Decl. ¶¶ 7-8; A.V. Decl. ¶¶ 5-6; J.J. Decl. ¶ 6; M.S. Decl. ¶ 7;

M.R. Decl. ¶ 7; R.N. Decl. ¶ 9; A.P. Decl. ¶ 7; PI Hearing Testimony.)

64.     A child handcuffed and chained to a table while out of his or her cell cannot

meaningfully exercise, interact with others or engage in any activity that requires use of the

hands. (PI Hearing Testimony.)

65.     By policy and/or practice, LHS generally keeps all new male arrivals at the

solitary confinement unit "on the belt" regardless of the reason the youth was sent to solitary.

(J.J. Decl. ¶ 6; A.V. Decl. ¶ 5; C.M. Decl. ¶ 7; M.R. Decl. ¶ 6; R.N. Decl. ¶ 8; PI Hearing

Testimony.)

66.     When boys are in high hall, they are always "on the belt." (PI Hearing

Testimony.)

67.     Boys in low hall are generally not on the belt, meaning they spend their limited

time out of the cell without physical restraints. However, when more than one boy is in the day

space at a time, guards may keep even boys on low hall on the belt. (M.S. Decl. ¶ 6; PI Hearing Testimony.)

68.     Defendants keep many boys on the belt for most of the time they are in solitary. (J.J. Decl. ¶ 6; M.R. Decl. ¶ 7; R.N. Decl. ¶ 9; Dupuis Class Cert. Decl. ¶ 15 & Ex. E (dkt. # 4-5); PI Hearing Testimony.)

69.     Defendants also place some of the girls on the belt during their time out of cell while in solitary confinement. (K.D. Decl. ¶13; A.P. Decl. ¶¶ 6-7; S.K. Decl. ¶ 7; PI Hearing Testimony.)

**Solitary Confinement Causes Psychological Harm to Youth**

70.     Stuart Grassian, M.D. is a psychiatrist who has studied the effects of solitary confinement on juveniles and adults for decades and is qualified to render an effect on the psychological harms of solitary confinement and other conditions of confinement.  (Grassian Decl. ¶¶ 1-12; PI Hearing Testimony.)

71.     According to Dr. Grassian, the conditions at Lincoln Hills and Copper Lake are "substantially more onerous than is generally the norm for adult prisoners in solitary confinement," and during the "entire course" of his professional experience, Dr. Grassian has "never encountered a situation where the 'exercise hour' was spent chained to a table, creating no opportunity whatsoever to actually exercise." (Grassian Decl. ¶¶ 17, 20; PI Hearing.)

72.     Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, hyper-vigilance, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior. (J.J. Decl. ¶16; A.V. Decl. ¶13; C.M. Decl. ¶19; K.D. Decl. ¶¶9-10; R.N. Decl. ¶ 15; M.R. Decl. ¶¶ 13-14; M.S. Decl. ¶ 14; S.K. Decl. ¶ 13; A.P. Decl. ¶ 13; Grassian Decl. ¶¶  50-55; PI Hearing Testimony.)

QB\45208204.1

73.     Additionally, children are emotionally damaged and humiliated when they are treated like chained animals. (J.J. Decl. ¶5; C.M. Decl. ¶19.)

74.     J.J. says he and other youth in solitary were "treated . . . like dogs in cages, causing us more trauma." (J.J. Decl. ¶ 5.) He was sad and depressed, had trouble sleeping, felt anxious and restless and was easily provoked to anger by little things, like being ignored. (J.J. Decl. ¶ 16.)

75.     C.M. suffered from anxiety, was irritated by the noise of other youth yelling into the hallways from their cells, lost sleep and even had his hair fall out. Like J.J., he felt he was "treated like an animal, cuffed to come out for a shower, cuffed to come out for school, cuffed any time I got out." (C.M. Decl. ¶ 19.)

76.     K.D. was irritated, angry, anxious, restless, sad and hopeless, and sometimes even "felt like dying" in solitary. (K.D. Decl. ¶ 10.)

77.     A.V. was depressed and sleepless and would "get emotional." (A.V. Decl. ¶ 13.)

78.     M.S. felt anxious, depressed and "degraded due to the inhumane treatment." (M.S. Decl. ¶ 14.)

79.     A.P. was angry and negative, and sometimes wanted to hurt herself. (A.P. Decl. ¶ 13.)

80.     M.R. says that he would wake up angry and his heart pounding, and sometimes he became so bored that "even getting pepper sprayed seem[ed] like something to fill part of [his] day." (M.R. Decl. ¶ 13.)

81.     R.N. was depressed, sad, and lonely. While in solitary, R.N. attempted to strangle himself with the cord of a fan. (R.N. Decl. ¶ 15.)

82.     The symptoms experienced by these children are consistent with those identified

in the psychiatric research as being caused by solitary confinement. (Grassian Decl. ¶¶ 35-49; PI Hearing Testimony.)

83.     Dr. Grassian describes the research as follows: "[During the 19th century], a major body of clinical literature developed which documented the psychiatric disturbances created by such stringent conditions of confinement. The paradigmatic disturbance was an agitated confusional state which, in more severe cases, had the characteristics of a florid delirium, characterized by severe confusional, paranoid, and hallucinatory features, and also by intense agitation and random, impulsive violence–whether directed at others or self–directed." (Grassian Decl. ¶ 27; PI Hearing Testimony.)

84.     Studies of groups that experience "severe restriction of environmental and social stimulation," including patients in intensive care units, polar and submarine expeditions, and those involved in space travel, show that such deprivation "has a profoundly deleterious effect on mental functioning." (Grassian Decl. ¶¶ 23-24; PI Hearing Testimony.

85.     Solitary confinement of juveniles causes far greater harm than does such confinement in adults, and the risk of harm to juveniles is alarming. (Grassian Decl. ¶ 35; *see also* Graham Decl. Ex. N at 3 ("Psychologically, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting."); PI Hearing Testimony.)

86.     Additionally, solitary confinement of juveniles is "uniquely harmful" because "brain function and neural connectedness are still evolving and developing during adolescence, especially so in regard to the functioning of the prefrontal cortex–that part of the brain most centrally involved in inhibiting emotional reactivity." (Grassian Decl. ¶ 36; PI Hearing Testimony.)

87.     Brain development can be derailed by stress, and "[f]or a juvenile, simply being placed in isolation–the utter helplessness of it–is enormously stressful." (Grassian Decl. ¶¶ 37-43; PI Hearing Testimony.)

88.     Thus solitary confinement causes lasting–and potentially permanent–harm to children's developing brains and psyches. (Grassian Decl. ¶ 58) ("[S]olitary confinement . . . will among other harms, permanently affect the juvenile's capacity to modulate affect and to inhibit impulsivity, likely permanently impairing his capacity to manage his life as an adult."); PI Hearing Testimony.)

89.     Dr. Grassian also notes that when juveniles in detention "have great difficulty in managing their emotions and behavior, especially under stressful conditions," they are "likely to commit disciplinary infractions, and are especially likely to be placed into solitary confinement." Unfortunately, "such individuals are precisely the group least capable of tolerating the stresses and the perceptual, occupational, and social deprivations of solitary confinement" and are also "exquisitely vulnerable to psychiatric and behavioral decompensation when housed in solitary confinement" and are "especially likely to become even more behaviorally out of control, leading to more and more time in solitary." (Grassian Decl. ¶ 50; PI Hearing Testimony.)

90.     "[O]nce an individual is placed into the harsh and restrictive environment of solitary, there is a major risk that his emotional state will deteriorate and his behavior will become more chaotic, dangerous, and even violent." (Grassian Decl. ¶ 51; PI Hearing Testimony.)

91.     Solitary confinement of juveniles "represents a tragedy both for the individual and for the greater community," because people who spent "significant time in solitary confinement are *more* likely to commit violent crimes than those individuals who did not experience such a

15

destructive and cruel environment." (Grassian Decl. ¶ 59; PI Hearing Testimony.)

**Pepper Spray**

92.     Pepper spray is a form of chemical restraint, generally containing irritants extracted from the resin of hot peppers.  (Schiraldi Decl. ¶ 16.)

93.     Pepper spray causes intense pain, coughing and eye and skin irritation for those upon whom it is administered.  When it is inhaled, pepper spray inflames the respiratory tract and temporarily restricts breathing to shallow breaths. It can also lead to damage of nerves and eyes, and to respiratory arrest or asphyxiation of people with asthma.  (Schiraldi Decl. ¶¶ 16-17; J.J. Decl. ¶ 20; M.R. ¶¶ 15-16; R.N. Decl. ¶ 17; M.S. Decl. ¶ 17; A.V. Decl. ¶ 15; S.K. Decl. ¶ 15; A.P. Decl. ¶ 15; K.D. Decl. ¶ 11; C.M. Decl. ¶ 10; PI Hearing Testimony.)

94.     Defendants' policy expressly permits use of pepper spray to "enforce a DOC rule, a posted policy or procedure or an order of staff member," and LHS/CLS staff spray children even without any risk of harm to staff or youth or danger to the security of the institution. (DOC DJC Policy & Procedure 300.05.05 (9-28-2016); Dupuis Class Cert. Decl. ¶ 17; J.J. Decl. ¶ 19; M.R. Decl. ¶ 15; PI Hearing Testimony.)

95.     Guards pepper spray children for minor non-violent infractions, such as refusing to go into their rooms, refusing to leave their rooms, covering up the cameras in the segregation unit, failing to follow commands, or threatening self-harm. (J.J. Decl. ¶19; M.R. Decl. ¶15; A.P. Decl. ¶ 15; R.N. Decl. ¶ 15; Dupuis Class Cert. Decl. ¶16 & Ex. E (dkt. # 4-5) at 68-69; PI Hearing Testimony.)

96.     Guards at LHS and CLS use several different forms of pepper spray on youth in their custody.  (K.D. Decl. ¶ 11; J.J. Decl. ¶ 20; M.R. Decl. ¶ 15; PI Hearing Testimony.)

97.     Some pepper sprays are used to create a cloud which will fill the youth's cell or

hallway outside the cell, (C.M. Decl. ¶ 10; K.D. Decl. ¶ 11; M.R. Decl. ¶ 15; R.N. Decl. ¶ 15; M.S. Decl. ¶ 17; A.V. Decl. ¶ 15; S.K. Decl. ¶ 15; A.P. Decl. ¶ 15; PI Hearing Testimony), while others are sprayed directly at the face or body of a youth (J.J. Decl. ¶ 20; PI Hearing Testimony).

98.     Those who have been sprayed describe their suffering as burning their skin and eyes and impairing their breathing. (J.J. Decl. ¶ 20; M.R. Decl. ¶ 16; R.N. Decl. ¶ 17; PI Hearing Testimony.)

99.     Even those children who have not been sprayed directly have suffered as a result of clouds of spray used on other children. (A.V. Decl. ¶ 15; K.D. Decl. ¶ 11; M.S. Decl. ¶¶ 16-17; C.M. Decl. ¶ 10; S.K. Decl. ¶ 15; A.P. Decl. ¶ 15; PI Hearing Testimony.)

100.     Two plaintiffs described coughing up blood as a result of such exposure. (K.D. Decl. ¶ 11; A.P. Decl. ¶ 15; PI Hearing Testimony.)

101.     Another boy felt nauseous and light headed, and experienced burning eyes and skin and shortness of breath.  (A.V. Decl. ¶ 15; PI Hearing Testimony.)

102.     Even the residue of pepper spray on blankets or cell walls feels like it is burning the body.  (M.S. Decl. ¶ 16; A.V. Decl. ¶ 12; PI Hearing Testimony.)

103.     After LHS/CLS staff pepper spray children they force them to remove all of their clothing and lock them in a shower "cage."  (J.J. Decl. ¶ 21; M.R. Decl. ¶ 16; R.N. Decl. ¶ 17; PI Hearing Testimony.)

104.     The shower initially worsens the painful effects of the pepper spray because it spreads the pepper spray throughout the body.  (J.J. Decl. ¶ 21; M.R. Decl. ¶ 16.)

105.     When they get out of the shower, guards make them wear nothing but a thin gown–often made of paper–and replace the regular mattresses in their solitary cells with a hard rubber mat. (M.R. Decl. ¶16; J.J. Decl. ¶ 21; R.N. Decl. ¶ 17; PI Hearing Testimony.)

17

106. According to records maintained by the Defendants, guards at LHS and CLS used pepper spray on the youth in their care at least 198 times in the period January through October 2016, averaging 20 deployments per month. (Dupuis Class Cert. Decl. ¶¶ 11-12 & Ex. D at 1-15; PI Hearing Testimony.)

107. Plaintiff J.J. has been pepper sprayed five or six times. (J.J. Decl. ¶ 18; Dupuis Class Cert. Decl. ¶ 16 & Ex. E (dkt. # 4-5).)

108. M.R. and R.N. were both pepper sprayed "so many times I can't count them." (M.R. Decl. ¶ 15; R.N. Decl. ¶ 16.)

109. Guards fogged R.N.'s room with pepper spray after he attempted to strangle himself by wrapping a cord around his neck. (R.N. Decl. ¶ 15.)

110. By contrast, in all of 2015, staff used pepper spray a total of 45 times and, in one month, January 2015, did not use it at all. (Dupuis Class Cert. Decl. ¶¶ 11-12 & Ex. D (dkt. # 4-4, 2015 Chemical Agents & Incapacitating Devices Monthly Reports).)

**Defendants' Practices Are Unnecessary and Counterproductive**

111. In the Lincoln Hills Youth Handbook, the DOC answers the question "What happens if a youth does not follow a rule?" by stating that "Discipline rules are written to help youth change their poor behavior. Staff want youth to learn to make good decisions in the institution and the community." (Graham Decl. Ex. H at 5 (Wisconsin DOC Division of Juvenile Corrections, Lincoln Hills School Youth Handbook); *see also* Graham Decl. ¶2 & Ex. A at 81:9-20 (Litscher Testimony).)

112. DOC's "Restrictive Housing Unit" policy states it is intended to provide "a safe, structured and healthy environment that encourages youth to participate appropriately and effectively and to gain motivation toward cooperating in order to eventually return to an open living unit." (Graham Decl. Ex. I at 1 (Wisconsin DOC Division of Juvenile Corrections,

18

Restrictive Housing Unit Program).)

113.    However, research demonstrates that "[u]se of punitive and excessively restrictive practices like solitary confinement, pepper spray and shackling have been associated with worse, not better, institutional and behavioral outcomes." (Schiraldi Decl. at ¶ 21; PI Hearing Testimony.)

114.    Dr. Schiraldi explains that Wisconsin's practices are "excessively restrictive, a substantial departure from accepted professional standards, practice and judgment and not reasonably calculated to maintain or restore facility discipline and security." (Schiraldi Decl. at ¶ 67; PI Hearing Testimony.)

115.    Dr. Grassian explains that the reason that restrictive and punitive practices are counterproductive with populations in juvenile facilities is that the stress of these practices is likely to push inherently impulsive adolescents, who do not rationally calculate the consequences of their actions, to behave worse, not better.  (Grassian Decl. ¶¶ 50-53.)

116.    Isolation "has been found to be ineffective in fostering behavior change," "may contribute to violent acting out," and "is in fact counterproductive to facility security." (Schiraldi Decl. ¶ 69; *see also* Grassian Decl. ¶ 57, M.R. Decl. ¶ 13; PI Hearing Testimony.)

117.    Pepper spray is also unnecessary, and likely ineffective at controlling youth behavior. (*See*, *e.g.*, Schiraldi Decl. ¶¶ 18, 19, 33, 34, 37, 50; PI Hearing Testimony.)

118.    As a result of research, juvenile correctional systems "have been increasingly eschewing the use of solitary confinement and other punitive and restrictive practices in juvenile institutions." (Schiraldi Decl. ¶ 25; *see also id.* ¶ 20; PI Hearing Testimony.)

119.    In 2016, the federal government eliminated the use of solitary confinement of juveniles in federal custody and a number of states and municipalities have similarly eliminated

QB\45208204.1

or severely curtailed the use of protective or disciplinary isolation of children. (Schiraldi Decl. ¶¶ 29–30, 32; Graham Decl. Ex. Y (listing 29 states that have banned disciplinary isolation of juveniles); PI Hearing Testimony.)

120.     Those that retain some use of isolation generally limit it to "cool-out" periods measured in minutes or hours, not the days and weeks imposed at LHS/CLS.  (Schiraldi Decl. ¶¶ 33, 35, 37, 61-62; *see also* Graham Decl. Ex. V at 4-5; PI Hearing Testimony.)

121.     The elimination of punitive solitary confinement has led to *reductions* in violent acts at juvenile facilities, making those institutions safer than they were when they used solitary. (Schiraldi Decl. ¶ 37; PI Hearing Testimony.)

122.     The District of Columbia strictly limits the use of mechanical restraints, such as handcuffs, to only those instances where it is necessary to prevent injury or escape and only for the amount of time the necessity remains. (Schiraldi Decl. ¶ 34; PI Hearing Testimony.)

123.     Mississippi uses mechanical restraints only for transportation. (Schiraldi Decl. ¶ 41.)

124.     Nearly 90% of juvenile correctional agencies that responded to a Council of Juvenile Correctional Administrators survey do not authorize guards to carry pepper spray in juvenile facilities. (Schiraldi Decl. at ¶ 19; PI Hearing Testimony.)

125.     Massachusetts, the District of Columbia, Ohio, and Mississippi do not use pepper spray in juvenile institutions. (Schiraldi Decl. ¶¶ 33, 34, 37, 41; PI Hearing Testimony.)

126.     Oklahoma is actively working to reduce and eventually eliminate the use of pepper spray. (Schiraldi Decl. ¶ 45.)

127.     Consistent with these developments in state and local policy and practice, numerous professional organizations and agencies recommend the elimination or strict limitation

QB\45208204.1

of punitive solitary confinement, pepper spray, and mechanical restraints in juvenile facilities. (Schiraldi Decl. ¶¶ 47–55; PI Hearing Testimony.)

128.     The American Medical Association ("AMA"), the American Academy of Child and Adolescent Psychiatry ("AACAP"), and the National Commission on Correctional Health Care ("NCCHC") all have called on correctional facilities to halt the use of solitary confinement of juveniles for disciplinary purposes. (Graham Decl. Ex. L, M, N; PI Hearing Testimony.)

129.     In 1999, the Office of Juvenile Justice and Delinquency Prevention of the United States Department of Justice ("USDOJ") commissioned a study that found that fifty percent of suicide victims in juvenile facilities were in isolation at the time of their suicide, and sixty-two percent of victims had a history of isolation. (Graham Decl. Ex. O at viii; PI Hearing Testimony.)

130.     The USDOJ's Office of Juvenile Justice and Delinquency Prevention Standards for the Administration of Juvenile Justice ("JJDPA Standards") provide that no juvenile should be placed in room confinement for more than twenty-four hours. (Graham Decl. Ex. P at 505; PI Hearing Testimony.)

131.     The Juvenile Detention Alternatives Initiative ("JDAI"), which has developed the most widely recognized set of national best practices on the use of solitary confinement with juvenile populations, provides that solitary confinement can never be used for purposes of punishment or discipline and must be limited to periods of less than four hours. (Graham Decl. Ex. Q at 98; PI Hearing Testimony.)

132.     The USDOJ recommended that the use of solitary confinement for juveniles in federal prisons be prohibited, and President Obama adopted that recommendation in January 2016. (Graham Decl. Ex. R at 101 & Ex. S; PI Hearing Testimony.)

133.     The Council of Juvenile Corrections Administrators (CJCA) created a program

called Performance-based Standards (PbS) which uses research-based practices for improving conditions of confinement. (Graham Decl. Ex. V at 2.) CJCA and PbS recommend that if used at all, solitary confinement of juveniles should last no more than a few hours. (*Id.* at 4-6.)

134.     International law prohibits the use of isolation as a disciplinary tool.  Specifically, the United Nation's ("U.N.") Rules for the Protection of Juveniles Deprived of their Liberty declare that "all disciplinary measures constituting cruel, inhuman or degrading treatment shall be strictly prohibited, including corporal punishment, placement in a dark cell, closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned." (Graham Decl. Ex. T at 11; PI Hearing Testimony.)

135.     The U.N. Special Rapporteur on Torture, in a 2015 report, condemned disciplinary solitary confinement of individuals with mental, psychological or emotional disabilities for any duration, calling it cruel, inhuman, and degrading treatment. (Graham Decl. Ex. U at 14-15; PI Hearing Testimony.)

136.     Standards set by various governmental and non-governmental entities, such as OJJDP, the NCCHC, and the American Bar Association ("ABA"), make it clear that juveniles must have at least one hour per day of actual, strenuous, large-muscle exercise, with many recommending two or more hours per day, for both physical and mental health needs. (Graham Decl. Ex. P at 429-30; Ex. W at 32-33; PI Hearing Testimony.)

137.     The Institute of Judicial Administration - ABA Standards for Juvenile Justice, Standards Relating to Corrections Administration, provide:

> **7.8 Limitations on restraints and weapons.**
> **A. Mechanical restraints**. Given the small size of programs, it should not be necessary to use mechanical restraints within the facility. The program director may authorize the use of mechanical restraints during transportation only.

(Graham Decl. Ex. W at 28-29; PI Hearing Testimony.)

138.     Article 64 of the U.N. Rules for the Protection of Juveniles Deprived of their

Liberty provides: "Instruments of restraint and force can only be used in exceptional cases,

where all other control methods have been exhausted and failed. . . . They should not cause

humiliation or degradation, and should be used restrictively and only for the shortest possible

period of time." (Graham Decl. Ex. T at 11; PI Hearing Testimony.)

139.     The U.N. Standard Minimum Rules for the Treatment of Prisoners (adopted by

the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders,

held at Geneva in 1955, and approved by the Economic and Social Council by its resolutions 663

C (XXIV) of 31 July 1957 and 2076 (LXII) of 13 May 1977), similarly restrict the use of

mechanical restraints. (Graham Decl. Ex. X at 5.)

140.     Defendants are fully aware of the harms caused by punitive solitary confinement,

mechanical restraints, and pepper spray, as well as trends in policy and practice away from these

practices. Among other things, Defendants have participated in the CJCA programs, including its

PbS program, since at least 2014.  Graham Decl. ¶2 & Ex. A at 13:9-14 ("We are working with

[CJCA] to do activities such as using their input, their expertise such that use of – use of force,

use of OCD, restrictive housing, use of restraints are minimized . . . ."); Graham Decl. ¶ 3 & Ex.

B at 16; Graham Decl. Ex. J at 2 (*Core Concepts* Newsletter) (describing LHS/CLS

"participating in" "Performance–based Standards (PbS) . . . a nationally recognized program

developed by the Council of Juvenile Corrections Administrators"); Graham Decl. Ex. K at 3

(*2014 Annual Report*); PI Hearing Testimony.)

141.     Defendants also received a letter, in October 2016, from Plaintiffs' counsel

advising them of the Obama Administration's elimination of solitary for juveniles and the

American Medical Association's call to eliminate disciplinary use of solitary for youth. (Dupuis

23

Class Cert. Decl. ¶ 3 & Ex. B (dkt. # 4–2).)

142.    In addition, advocates in the Wisconsin community have been stressing the harmful consequences of these practices since at least early 2016. Their efforts include op-eds and letters to the editor in Wisconsin publications, a report on the conditions at the facilities, and legislative advocacy, all calling attention to the harmful conditions at Lincoln Hills and Copper Lake. (Graham Decl. Ex. Z at 23-31; PI Hearing Testimony.)

143.    More generally, Defendants are on notice of numerous troubling conditions of confinement at Lincoln Hills and Copper Lake. In 2012, a Racine County judge wrote to Governor Scott Walker about "sordid" and "shock[ing]" conditions at Lincoln Hills, copying the superintendent of the facility. Over the last three years, the facilities have been subject to an internal Department of Corrections investigation and a Department of Justice criminal investigation, and scores of media reports have described brutal conditions at the facilities. (Graham Decl. Ex. Z at 1-31, 34-76; PI Hearing Testimony.)

144.    In February 2017, Defendant Litscher testified before the State Assembly Committee on Corrections regarding conditions at Lincoln Hills and Copper Lake, including the facilities' use of solitary confinement, restraints, and pepper spray. (Graham Decl. ¶ 2 & Ex. A.)

QB\45208204.1

Dated this 19th day of April, 2017.

ACLU OF WISCONSIN FOUNDATION
Laurence J. Dupuis (SBN 2029261)
Karyn L. Rotker (SBN 1007719)
R. Timothy Muth (SBN 1010710)
207 E. Buffalo Street, Suite 325
Milwaukee, WI 53202
Telephone: (414) 272–4032
Facsimile: (414) 272–0182
ldupuis@aclu–wi.org
krotker@aclu–wi.org
tmuth@aclu–wi.org

JUVENILE LAW CENTER
Jessica Feierman
Karen Lindell
Marsha Levick
The Philadelphia Building
1315 Walnut Street, 4th Floor
Philadelphia, PA 19107
Telephone: (215) 625–0551
jfeierman@jlc.org
klindell@jlc.org
mlevick@jlc.org

QUARLES & BRADY LLP
Matthew J. Splitek (SBN 1045592)
Rachel A. Graham (SBN 1069214)
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251–5000
matthew.splitek@quarles.com
Rachel.graham@quarles.com

/s/ Zachary T Eastburn
_____
Emily L. Stedman (SBN 1095313)
Zachary T Eastburn (SBN 1094676)
411 East Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
Telephone: (414) 277–5000
emily.stedman@quarles.com
zachary.eastburn@quarles.com

*Attorneys for Plaintiffs*

QB\45208204.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April, 2017, I filed the foregoing Plaintiffs'

Statement of Proposed Facts using the CM/ECF system, which will send electronic notification

of such filing to all counsel of record who are ECF participants. I further certify that on said date,

paper copies were sent to those indicated as non–registered ECF participants, via First Class,

United States mail, postage prepaid.


/s/ Zachary T. Eastburn_____