## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

**Plaintiff J.J.,** by and through his
next friend, Sakeena Jackson; *et al.*,
for themselves and all others
similarly situated,

**Plaintiffs,**

v.

**Jon E. Litscher,** in his official
capacity as Secretary of the
Wisconsin Department of
Corrections, *et al.*,

**Defendants.**

**Civil Action No. 17-CV-47**

## DECLARATION OF VINCENT N. SCHIRALDI, M.S.W.

I, Vincent N. Schiraldi, M.S.W. hereby declare as follows:

1.      I submit this declaration in support of the Plaintiffs' Motion for a Preliminary

Injunction.  If called upon to testify, I could and would do so competently as follows.

### SUMMARY OF FINDINGS

2.      It is my professional opinion that disciplinary isolation, shackling and pepper-

spraying youth as practiced by the Wisconsin Department of Corrections (DOC) in the Lincoln

Hills School for Boys and Copper Lake School for Girls are excessively restrictive, a substantial

departure from accepted professional standards, practice and judgment and not reasonably

calculated to maintain and/or restore facility discipline and security.  This is particularly

egregious in a juvenile justice context since youth are developmentally less mature and more

malleable than adults, and since it is the purpose of the juvenile justice system generally, and the

Wisconsin juvenile justice system specifically, to rehabilitate young people and return them to society better off than when they entered placement (National Research Council, 2013[1]).

3.      The punitive use of lengthy periods of isolation has been found to be ineffective in fostering behavior change and may contribute to violent acting out and exacerbate mental illness (Taylor-Nicholson & Krisberg, 2013; Deitch, 2013). The prevailing professional view and practice is to employ positive behavioral management to reduce institutional violence and improve youth behavior without requiring the use of solitary confinement, pepper spray and mechanical restraints. Such approaches entail a combination of practices, programs and policies that jointly create an orderly and rehabilitative youth correctional environment while minimizing the use of solitary confinement, restraints and other negative reinforcement techniques (DeMuro, 2014).

## QUALIFICATIONS

4.      From 2005 to 2010, I was Director of the District of Columbia's executive branch juvenile justice agency, the Department of Youth Rehabilitation Services ("DYRS"). During that time, I closed the District's antiquated 208-bed youth correctional facility, the Oak Hill Youth Detention Center, and opened and ran two replacement facilities – the Youth Services Center, an 88-bed detention facility, and the New Beginnings Youth Development Center, a 60-bed commitment facility. During my tenure there, we closed our solitary unit entirely and moved toward an approach modeled after the one used in the state of Missouri and favoring the use of rigorous programming, improved staff to youth ratios, de-escalation and youth development training and, when a youth was a danger to staff or other youth, short-term "time

---

[1] Fuller citations to research, standards and other literature are set forth in the references at the end of this declaration.

outs." We also rewrote our mechanical restraints policy to reduce the use of mechanical restraints. The Department did not use pepper spray at all for youth in our care.

5.      From 2010 to 2014, I was Commissioner of New York City's Department of Probation which supervised approximately 30,000 adults and juveniles sentenced to probation by the city's courts. From 2014 to 2015, I was a Senior Advisor to the New York City Mayor's Office of Criminal Justice. One of my duties at the Mayor's Office was to work with the New York City Department of Correction, which had recently been sued by the U.S. Department of Justice, to improve conditions for youth ages 16 and 17 in the juvenile living unit on Rikers Island. The city expanded programming, trained staff in de-escalation techniques, improved staff-to-youth ratios and eliminated the use of punitive segregation on the juvenile unit.

6.      During my time as Director of DYRS, I was a member of, and Regional Coordinator for, the Council of Juvenile Correctional Administrators ("CJCA"), a national membership association comprised of directors or administrators of statewide and county juvenile justice agencies. I was also a member of the Juvenile Justice Leadership Network at Georgetown University where I also served as a lecturer. During my tenure as New York City Probation Commissioner, I was a member of both the New York State Council of Probation Administrators and the American Probation and Parole Association. Both of these associations dealt with best practices and standards for the treatment of court-involved young people, among other things.

7.      Previously, I was founder and executive director of the Center on Juvenile and Criminal Justice from 1991 to 2002 and founder and executive director of the Justice Policy Institute from 2002 to 2005. In both of those positions, I provided technical assistance for juvenile justice systems through government and foundation funding.

8.      I started my professional career as a line staff/houseparent working for New York State's juvenile correctional agency, the Division for Youth, from 1980-1982. I also served as a foster parent for a delinquent youth in 1989 through the San Francisco Department of Social Services.

9.      I am currently a Senior Research Fellow directing the Harvard Kennedy School's Program in Criminal Justice Policy and Management ("PCJ"). I have also been an adjunct lecturer teaching graduate and undergraduate courses in juvenile justice at New York University's Wagner School of Public Administration and Silver School of Social Work and at San Francisco State University. I have additionally co-edited a book entitled *Reforming Juvenile Justice*. I have published over 40 articles and book chapters pertaining to young adult and juvenile justice during my 37-year career in the justice field. I have also appeared on national television and radio and been quoted in newspapers throughout the country on criminal and juvenile justice matters.

10.     I have testified before the United States Congress and to legislative and administrative bodies in numerous states about criminal and juvenile justice matters.

11.     I was appointed to the California Blue Ribbon Commission on Inmate Population Management from 1988 to 1990 and was the first President of the San Francisco Juvenile Probation Commission in 1990. I served on Washington, DC's Juvenile Justice Advisory Group (2006-2009) and was a member of the Federal Juvenile Justice Advisory Commission of the Office of Juvenile Justice and Delinquency Prevention (2007-2008). I was also a member of the National Academies of Sciences Committee on Juvenile Justice Reform Implementation from 2013 to 2014 that produced the book *Implementing Juvenile Justice Reform: The Federal Role.*

12.     I have a Bachelors Degree in Social Psychology from the State University of New York at Binghamton and a Masters of Social Work from New York University.
I have attached a true and correct copy of my Curriculum Vitae to this declaration as Appendix A.

13.     In this matter, I have been retained by plaintiffs' counsel.  I am being compensated at an hourly rate and my compensation is not dependent on any particular conclusions or the outcome of this matter.

14.     Plaintiffs' counsel has made available to me a number of documents in this case. I have attached a true and correct copy of a list of these documents to this declaration as Appendix B.

### RESEARCH AND STANDARDS REGARDING
### SOLITARY CONFINEMENT, PEPPER SPRAY AND PHYSICAL RESTRAINTS

15.     Disciplinary isolation, sometimes called "solitary confinement," "isolation" or "punitive segregation," is the placement of youths into segregation as a punishment for misconduct other than as a temporary response to behavior that immediately threatens the safety of the youth or staff.  It is distinguished from temporary room confinement, "time outs" or "cool downs" in which youths are isolated from other youths, generally in their own room, for a period of minutes to a few hours while staff counsel them and engage in de-escalation techniques that facilitate youths stabilizing their behavior so they are able to return to normal facility activities.

16.     Pepper spray or oleoresin capsicum, is a form of chemical restraint, generally containing irritants extracted from the resin of hot peppers.  It causes intense pain, coughing and eye and skin irritation for those upon whom it is administered.  When it is inhaled, pepper spray inflames the respiratory tract and temporarily restricts breathing to shallow breaths (Council of Juvenile Correctional Administrators, 2011).

17.     Pepper spray not only causes pain, but also has been linked to respiratory arrest, deterioration of nerve tissue and corneal damage, acute hypertension, and potential asphyxiation when used on people with asthma (Smith and Stopford, 1999). Further, youth and staff may suffer from pepper spray's effects in enclosed facilities even when they are not the targets of its use (Center for Children's Law and Policy, n.d.).

18.     One survey conducted by the Texas Office of the Independent Ombudsman in Texas' juvenile correctional facilities found that neither staff nor youth believed pepper spray was effective at controlling youth behavior. Only 4% of youth and 18% of staff believed that pepper spray worked to control youth's negative behavior. By contrast, 33% of staff believed that the best way of controlling unruly youth is de-escalation and 65% of youth said they simply needed a cool-off period (Deitch, 2013).

19.     Nearly nine out of ten juvenile correctional agencies do not authorize staff to carry chemical sprays in secure facilities (Council of Juvenile Correctional Administrators, 2011).

20.     There is an emerging consensus among practitioners, professional organizations and researchers that solitary confinement, pepper spray and the use mechanical restraints should be eliminated in juvenile correctional facilities or used as a means of last resort only after less intrusive and harmful practices are deemed insufficient to curb a youth's destructive or dangerous behavior (See, for example, Performance-based standards of the Council of Juvenile Corrections Administrators; Positive Behavior Interventions & Supports; Core Correctional Practices of the University of Cincinnati's Corrections Institute; the Missouri Model; and the Sanctuary Model). This consensus is informed by increasingly sophisticated and definitive research about the negative outcomes of such practices; research from neurobiology and

developmental psychology about the distinct needs and behaviors of adolescents; and professional and international standards about best practices in juvenile correctional facilities.

21. Use of punitive and excessively restrictive practices like solitary confinement, pepper spray and shackling have been associated with worse, not better, institutional and behavioral outcomes (Taylor-Nicholson & Krisberg, 2013; Deitch, 2013). Solitary confinement has been associated with depression, anxiety, psychosis and increased risk of suicide and self-harm (American Academy of Child and Adolescent Psychiatry, 2012; Hayes, 2009).

22. Further, these restrictive practices have not been shown to improve institutional safety for youth and staff and as such are not reasonably calculated to restore facility discipline and security. This is especially so as compared to positive behavioral approaches, which include de-escalation techniques and graduated sanctions and rewards as a means of managing behavior of even violent youth in locked custody (DeMuro, 2014).

23. Across all developmental spheres, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting. They experience time differently—a day for a child feels longer than a day to an adult (Wittman and Lehnhoff, 2005; DiLonardo, 1994)—and have a greater need for social stimulation. The American Academy of Child and Adolescent Psychiatry has concluded that, due to their developmental vulnerability, adolescents are in particular danger of adverse reactions to prolonged stays in isolation (American Academy of Child and Adolescent Psychiatry, 2012).

24. Youth held in solitary confinement for 23 hours a day typically begin to lose their sense of reality, and can become paranoid, anxious and despondent, all of which can exacerbate existing mental health conditions (Human Rights Watch, 2012). Given that many of the youth in

custody have experienced some serious trauma in their lives or have undiagnosed or untreated mental illness, they are particularly vulnerable.

## LEGISLATION AND PRACTICE IS INCREASINGLY ESCHEWING SOLITARY CONFINEMENT, PEPPER SPRAY AND MECHANICAL RESTRAINTS FOR JUVENILES

25.     As a result of this research and evolving standards of practice, practitioners and policy makers have been increasingly eschewing the use of solitary confinement and other punitive and restrictive practices in juvenile institutions.

26.     In 2012, United States Attorney General Eric Holder empaneled the National Task Force on Children Exposed to Violence which recommended the abolition of solitary confinement for juveniles, writing that, "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement" (National Task Force, 2012, p. 178).

27.     The Task Force found that 65% of girls and 70% of boys in juvenile confinement have been diagnosed with multiple mental health disorders and a quarter of youth in confinement have attempted suicide.  They noted that youth in confinement have disproportionately suffered trauma in their young lives and that institutionalization, and particularly the use of isolation and mechanical restraints, can re-traumatize them.  The Task Force noted:

> Moreover, detention facilities and the justice system, through their routine practices, can bring additional harm to already traumatized youth. For example, the use of solitary confinement, isolation, and improper restraints can have devastating effects on these youth. Detention facilities must maintain safety without relying on practices that are dangerous and that compromise the mental and physical well-being of the youth in their care. (National Task Force, 2012, p. 175).

28.     In a national survey of suicides in juvenile institutions published by the federal Office of Juvenile Justice and Delinquency Prevention in 2009, half (50.6%) of youth who

committed suicide in juvenile institutions did so while in isolation; the most frequent reason why they were placed in isolation was failure to follow rules/inappropriate behavior. Nearly two-thirds (65.8%) of those who committed suicide in juvenile institutions had a history of mental illness (Hayes, 2009).

29.     In 2015, President Obama ordered the Department of Justice to conduct a study of the Federal Bureau of Prisons' use of solitary confinement for all inmates, including juveniles (Eilperin, 2016). In 2016, upon receipt of that study, he banned solitary confinement of juveniles in Federal custody, summarizing the research on the impact of solitary confinement:

> Research suggests that solitary confinement has the potential to lead to devastating, lasting psychological consequences. It has been linked to depression, alienation, withdrawal, a reduced ability to interact with others and the potential for violent behavior. Some studies indicate that it can worsen existing mental illnesses and even trigger new ones. Prisoners in solitary are more likely to commit suicide, especially juveniles and people with mental illnesses (Obama, 2016).

30.     Last year, legislation was enacted in the District of Columbia, California, Colorado and Nebraska limiting the use of solitary confinement in juvenile facilities. The California bill was endorsed by the California Probation Officers Association whose members operate dozens of juvenile correctional facilities throughout the state (www.stopsolitaryforkids.org).

31.     This U.S. legislation is reflective of international standards, treaties and advisories, which consistently recommend against the use of solitary, pepper spray and mechanical restraints. The Convention of the Rights of the Child (United Nations, 1989), the United Nations' Rules for the Protection of Juveniles Deprived of their Liberty, the Committee on the Rights of the Child (United Nations, 1990) and the United Nations' Standard Minimum

Rules for the Treatment of Prisoners (United Nations, 1957 and 1977) all prohibit the use of solitary confinement for juveniles.

32.     Numerous states and jurisdictions have reduced or eliminated the use of solitary confinement, pepper spray and mechanical restraints by policy and practice as well. Alaska; Connecticut; Illinois; Los Angeles, California; Maine; Massachusetts; Nevada; Oklahoma; Oregon; and Ohio have sharply reduced solitary for youth in their juvenile facilities (stopsolitaryforkids.org).

33.     For example, the Massachusetts Department of Youth Services (DYS) rarely uses solitary confinement for more than two hours (Correspondence with DYS Director Peter Forbes, 2017). In the last quarter of 2016, the average length of stay for DYS youth in room confinement was an hour and one minute. Room confinement in Massachusetts may not be used "as a consequence for non-compliance; punishment; harassment; or in retaliation for any youth conduct" and youth may not be placed on room confinement if they are on suicide watch. DYS policy further states that, "Room confinement may only be used when less restrictive interventions have failed and for the least amount of time required for the youth to regain self-control." Massachusetts does not use pepper spray in its facilities.

34.     In the District of Columbia, the only form of mechanical restraints allowed is handcuffs (Correspondence with DYRS Director, Clinton Lacey, 2017). Those may only be used after verbal de-escalation techniques have been insufficient to bring the situation under control and "for the amount of time necessary to bring the situation under control or to prevent injury or escape and must be removed as soon as the situation giving rise to the need for handcuffs is no longer present" (Department of Youth Rehabilitation Services, 2016). Youth may never be restrained to fixed objects and the use of mechanical restraints requires the

permission of the highest ranking DYRS official on grounds at the time of the restraint. DYRS does not use pepper spray.

35.     DYRS also tracks its use of room confinement – or "cool-outs" – in order to continually assure that they are not being overused and are complying with departmental policy. In 2016, in their two facilities with a combined 148-bed capacity, there were 2,312 room confinements of youth in DYRS custody. The average cool-out lasted 80 minutes and the most frequent cool-out duration was 59 minutes. The longest cool-out was 23.75 hours and the shortest, 2 minutes. Only 11 cool-outs out of the 2,312 (fewer than 1%) in 2016 lasted longer than six hours (Correspondence with DYRS Director, Clinton Lacey, 2017).

36.     The D.C. Council recently passed the Comprehensive Youth Justice Amendment Act which prohibits shackling of pregnant girls in DYRS custody, eliminates disciplinary room confinement and limits safety and administrative confinements to 6 hours or less (Council of the District of Columbia, 2016).

37.     Pursuant to litigation over conditions of confinement in the Ohio Department of Youth Services (ODYS), ODYS closed its Special Housing Units (these are entire units used for solitary confinement, like the Krueger, Roosevelt and Wells segregation units operated by the Wisconsin DOC) and has reduced solitary confinement to an average of under three hours. In 2014, ODYS eliminated the use of seclusion as punishment. As a result of these reforms, the rate of seclusion dropped by 89% and the rate of violent acts in their facilities dropped by 22% when comparing January – November 2014 vs. January – November 2015. ODYS does not use pepper spray in its facilities (Ohio Department of Youth Services, 2015).

38.     In addition, states have agreed to limit solitary confinement for youth pursuant to court settlements. Mississippi and New York, for example, both banned or limited solitary

confinement for juveniles in state custody as part of litigation settlements
(www.stopsolitaryforkids.org).

39.     In September 2014, after the U.S. Department of Justice released a 79-page report
detailing wholesale abuses at Rikers Island, an adult correctional complex operated by New York
City, the city agreed to abandon the use of isolation for prisoners younger than 18 and has now
done so for youth through age 21 (Winerip and Schwirtz, 2015).

40.     The Mississippi Department of Corrections operates a separate, 42-bed Youthful
Offender Unit (YOU) inside their 3,557-bed Central Mississippi Correctional Facility (CMCF).

41.     Even though the YOU contains those youth in Mississippi under age 18 who have
been sentenced to adult imprisonment for very serious charges, it does not use pepper spray
inside the unit (by practice, although policy allows it), only uses mechanical restraints for
transportation, and makes exceedingly sparing use of room confinement.  Instead, the YOU
pioneered a "positive behavior management" approach that makes systematic use of a graduated
approach to de-escalation along with positive incentives and the withdrawal of those incentives
to modify youth behaviors (Correspondence with Youthful Offender Unit Warden Leander
Parker, 2017).

42.     The YOU makes use of three graduated grades of room confinement – "Cool
Down," Emergency Cell Confinement (ECC), and Disciplinary Cell Confinement (DCC)
(Parker, 2015).  In 2016, youth in the YOU spent a total of 137.5 hours in Cool Down; and ECCs
were used 15 times in 2016 for a total of 68.91 hours or about 4.6 hours per ECC.
(Correspondence with Youthful Offender Unit Warden Leander Parker, 2017).

43.     YOU Disciplinary Cell Confinement is a form of segregation from the general
population that can occur after a due process disciplinary hearing, which must occur within 24

hours if the youth is on cell confinement during the pendency of the hearing. Youth may be in DCC for up to 72 hours, which can be shortened by good behavior or extended, in extraordinary circumstances and only by MDOC's Deputy Commissioner of Institutions. (Parker, 2015, p.7).

44.     In 2016, youth at the YOU were placed in Disciplinary Cell Confinement a total of 18 times for an average of 1.5 DCC placements a month. Three of those youth had their time in DCC shortened; none had it lengthened beyond 72 hours (Correspondence with Leander Parker, 2017).

45.     The Oklahoma Office of Juvenile Affairs (OJA), Oklahoma's juvenile corrections agency, formed a transition plan that will actively reduce, and eventually eliminate, the use of pepper spray. Pepper spray was first introduced into the Oklahoma juvenile system in 2012. After a 9-month review reevaluating the use of pepper spray, the OJA board of directors adopted the transition plan on March 18, 2016 (Palmer, 2016).

46.     The federal Office of Juvenile Justice and Delinquency Prevention ("OJJDP") supports efforts to end youth solitary confinement. OJJDP has funded the Youth in Custody Practice Model that trains juvenile justice agencies on best practices relating to juvenile confinement, including the elimination of solitary confinement (Center for Juvenile Justice Reform, n.d.). On April 19, 2016, the Administrator of OJJDP, Robert Listenbee, spoke in support of the launch of a national campaign to eliminate solitary confinement in juvenile correctional facilities, the "Stop Solitary for Kids Campaign" (www.stopsolitaryforkids.org). Later that month, Listenbee stated at the annual conference of the Coalition for Juvenile Justice, "Our goal is to eliminate the practice" of solitary confinement for juveniles (Barr, 2015).

**PROFESSIONAL ORGANIZATIONS AND PROFESSIONAL STANDARDS
RECOMMEND AGAINST SOLITARY CONFINEMENT,
PEPPER SPRAY AND MECHANICAL RESTRAINTS**

47. Many professional organizations including the American Academy of Adolescent and Child Psychiatry, the American Psychological Association, the National Partnership for Juvenile Services, the American Bar Association and the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative ("JDAI") support the end of solitary confinement for youth.

48. The Council of Juvenile Correctional Administrators ("CJCA") is a national non-profit organization, formed in 1994 to improve local juvenile correctional services, programs and practices so that youths within systems succeed when they return to the community. In April, 2015, in response to "the dangers and costs of using isolation in juvenile correctional and detention facilities," CJCA released a toolkit entitled *Reducing the Use of Isolation* (Council of Juvenile Correctional Administrators, 2015). The toolkit has been presented via a webinar offered to all CJCA members; to date the webinar has been presented four times since its release, with more viewings scheduled. CJCA's toolkit is based on research, best practices and lessons learned, including action steps departments can take to limit the use of isolation. The toolkit states, in pertinent part:

> Academic research continues to show that placing incarcerated youths in isolation has negative public safety consequences, does not reduce violence and likely increases recidivism. Subjecting developing adolescents to isolation can cause permanent psychological damage and multiple studies suggest it is highly correlated with suicide. Additionally, youths who are placed in isolation can be subjected to revocation of privileges such as reduced family visitation or limited access to educational programming and classes – two practices research has shown positively impacts youths. Research also has shown that isolation can cause serious psychological, physical, and developmental harm, resulting in persistent mental health problems, or worse, suicide. Lengthy periods of isolation can be equally traumatizing and the result is the same serious risk to health. These risks are magnified for youths with disabilities or histories of trauma and abuse. Experts agree that adolescents are particularly vulnerable to psychological harm caused by isolation because their brains are still developing. Solitary confinement is the most harmful and extreme form of isolation and has damaging impacts... There is no research showing the benefits of using isolation to manage youths' behavior...Conversely, research has shown that the facilities that minimally use isolation are more safe – fewer injuries to youths and staff, less suicidal behavior and overall violence – and healthier

staff-youth relationships that lead to less recidivism. (Council of Juvenile Correctional Administrators, 2015. pp.3-4)

49.    In a separate position paper entitled *Physical and Mechanical Interventions with Juvenile Offenders* (Council of Juvenile Correctional Administrators, n.d., p. 156), CJCA offers the following guidance for juvenile correctional administrators:

   a. Use of physical interventions or restraints is a last resort and should always follow the prudent preventative use of screening, classification and programmatic interventions;
   b. Physical intervention and/or restraints should only be deployed when de-escalation of the crisis has failed and the need to protect staff, other youths or the jurisdiction's property is necessary;
   c. At such time that those preventive measures fail, physical interventions and restraints should only be done by trained individuals and only used defensively and in a manner that provides maximum safety for the staff and youths;
   d. Use of physical or other intrusive intervention methods should only continue as long as the youth presents a danger to self, other or property;
   e. Medical, mental health and/or administrative case reviews of interventions deployed should be a part of the quality assurance process and required.

50.    In May 2011, CJCA published an *Issue Brief* on the use of pepper spray. It noted that, while the use of pepper spray, "is widely accepted and used by law enforcement and adult corrections agencies across the country, its use has been shunned by juvenile correctional agencies because of the harm it causes to youths and the negative impact it has on staff-youth relationships." The CJCA brief goes on to state, "very few states authorize its use and in the states that allow its use in policy, most prohibit the use except as a last resort and with many conditions and few facilities put it into practice" (Council of Juvenile Correctional Administrators, 2011). CJCA reported that few studies at the time focused specifically on pepper spray use in juvenile settings, but research by M. Smith and K. M. Bowman, "on other types of restraint use (physical and mechanical) in juvenile confinement settings show that applying restraints disrupts correctional climates by creating anger and feelings of unfair use of authority, in addition to negatively impacting staff. One recent study found that restraints are

often applied as punishment rather than in response to immediate threats of violence; and youths describe incidents of restraint as causing physical and emotional pain" (Council of Juvenile Correctional Administrators, 2011, p.1). Both the youth who were restrained and the adults who restrained them experienced lingering emotional and behavioral post restraint effects. Another study, cited by CJCA in the brief by R. B Snyder and A. Kupchik, "found that facilities with high numbers of restraint incidents are more likely to have higher rates of safety problems, including youth and staff injury, suicidal behavior, youths injured by staff and fear among youths" (Council of Juvenile Correctional Administrators, 2011, p.1).

51.     The Juvenile Detention Alternatives Initiative (JDAI) was initially piloted in five large counties throughout the United States in 1994 by the Annie E. Casey Foundation to reduce the use of pre-adjudication detention and improve facility conditions. JDAI now operates in nearly 300 counties nationwide. JDAI publishes analyses, tools, and practice guides including facility standards and assessment materials (www.aecf.org).

52.     JDAI's Juvenile Detention Facility Assessment, 2014 Update, notes significant changes in professional practice and evolving legal standards. These updated standards prohibit the use of room confinement or isolation for discipline, punishment, administrative convenience, retaliation, staffing shortages, or reasons other than as temporary response to behavior that threatens immediate harm to a youth or others. The JDAI standards also suggest requiring the regular review of data on the use of physical force, restraints, and room confinement, disaggregated by race, ethnicity and gender. JDAI standards call for:

> ...regular staff training in conflict management, de-escalation of confrontations, crisis intervention techniques, management of assaultive behavior, minimizing trauma involved in the use of physical force and mechanical restraints and the facility's continuum of methods of control. Staff follow a graduated set of interventions that avoid the use of physical force or mechanical restraints, employ a range of interventions or actions before using physical force or restraint, and permit only the least restrictive measures in order to

prevent harm to the youth or others. The only mechanical restraints that staff may use in the facility are handcuffs. Staff only use physical force or mechanical restraints by employing the least restrictive appropriate means and only for the amount of time necessary to bring the situation under control. As soon as a youth regains self-control, staff stop using physical force or mechanical restraints. Staff never leave youth who are sleeping in restraints. Staff never leave youth who are in restraints alone…The facility develops and implements written policies, procedures and actual practices to prohibit the use of chemical agents, including pepper spray, tear gas and mace or the use of chemical or medical restraints (Juvenile Detention Alternatives Initiative, 2014 pp. 173-174).

53.    Access to JDAI standards, research, practice guides, an e-Newsletter and other resources for professionals working in juvenile corrections, including an online JDAI Helpdesk, is available on the Annie E. Casey Foundation website, www.aecf.org.

54.    The National Commission on Correctional Health Care (NCCHC) provides Standards and resources for correctional health care professionals as well as "position statements on medical, technical, ethical and managerial issues not fully covered in the standards." Guidelines, management tools and white papers from experts are also available on the organization's website, www.ncchc.org.

55.    In a 2016 position statement, an update on its 2012 position paper "Prevention of Juvenile Suicide in Correctional Settings," the NCCHC suggests that juvenile correctional officials "explore alternatives to room confinement," noting:

> The inherent restriction in meaningful social interaction and environmental stimulation and the lack of control adversely impact the health and welfare of all who are held in solitary confinement…Even those without a prior history of mental illness may experience a deterioration in mental health, experiencing anxiety, depression, anger, diminished impulse control, paranoia, visual and auditory hallucinations, cognitive disturbances, obsessive thoughts, paranoia, hypersensitivity to stimuli, posttraumatic stress disorder, self-harm, suicide, and/or psychosis. Some of these effects may persist after release from solitary confinement. Moreover, the very nature of prolonged social isolation is antithetical to the goals of rehabilitation and social integration…These consequences are especially harmful to juveniles whose brains are still developing and those with mental health problems (The National Commission on Correctional Health Care, 2016).

## SUMMARY OF CONDITIONS AT THE LINCOLN HILL SCHOOL FOR BOYS AND THE COPPER LAKE SCHOOL FOR GIRLS

56.     According to the complaint and declarations by named plaintiffs that were filed in this case, plaintiffs have experienced solitary confinement and shackling and have been pepper-sprayed on numerous occasions.

57.     The Wisconsin Department of Corrections currently maintains approximately 15% to 20% of their youth in solitary confinement on any given day.  DOC staff used pepper spray at least 198 times between January and October 2016.

58.     While Wisconsin DOC youth are sometimes placed into solitary confinement or otherwise subject to the use of pepper spray or mechanical restraints immediately proximate to violently acting out, others have been placed into solitary or been subject to the use of pepper spray and mechanical restraints when they were not a danger to other staff or youth but because they were refusing to follow staff orders or to go into or come out of their cells.  Wisconsin DOC policies allow for the use of mechanical restraints and pepper spray or placement into solitary confinement for behavior infractions that do not pose an imminent danger of harm.  For example, pepper spray and the use of force are authorized by DOC policy for fairly broad purposes, including, "To change the location of a youth who refuses to cooperate and the refusal threatens the security of the facility," or, "To enforce a DOC rule, a posted policy or procedure, or an order of [a] staff member."

59.     Wisconsin DOC youth in solitary confinement are entitled to a minimum of one hour a day out of their cells.  But Wisconsin DOC staff frequently take youths' time out of cell away from them for behavioral infractions while they are in solitary.

60.     When youth do receive one or two hours out of their cells during their period of solitary confinement, they are frequently handcuffed through shackles that run through a loop on

a belt, and then to a table, a practice known as being "on the belt." This further restrains their activity and limits or eliminates any form of exercise for periods of days or weeks at a time. Youth who are "off the belt," i.e. those who are no longer required to be handcuffed during their time out of solitary, frequently exercise in caged, paved areas alone. Youth report that they are "on the belt" initially regardless of what their institutional infractions were that resulted in their placement in solitary.

61.     Wisconsin DOC makes use of isolation as a punitive measure, purportedly to positively impact youth behavior, sometimes "sentencing" youth to 30 or 60 days in isolation. Nationally, the trend is to use isolation only for hours rather than days as a means of calming youth down. In preparing this declaration, I reviewed isolation policies and/or communicated with juvenile and adult correctional officials who were confining youth in juvenile facilities in Massachusetts, Ohio and Washington, D.C., and in adult facilities in Mississippi and New York City to determine their policies in this regard. Massachusetts, New York City, Ohio and Washington, D.C. no longer "sentenced" youth to periods of isolation beyond the period of time it took them to calm down and be able to rejoin regular institutional programming and activities. Only the Youthful Offender Unit in an adult Mississippi "sentenced" youth to solitary confinement and they only did so 18 times last year, for a maximum 72 hours, with 4 hours out-of-cell time, and with time reducible for good behavior.

62.     Youth in Wisconsin DOC often spend days or even weeks in solitary waiting for due process hearings that will determine whether they are guilty of the infraction of which they were accused and whether solitary confinement is the appropriate sanction. As such, youth in the care and custody of Wisconsin DOC are spending more time in solitary confinement merely awaiting adjudication than the total time youth spend in isolation in other jurisdictions.

63.     Youth in Wisconsin DOC solitary confinement are subject to particularly harsh conditions. Cells are small, 7-8' x 10'. Interior lighting is dimmed but not turned off or controlled by youth. Youth are fed through slots in the doors and are handcuffed by inserting their hands through the doors prior to leaving their cells. They are only permitted one or two books, no paper or writing implements, limited toilet paper, and no computers or other materials to stimulate them or reduce idleness or boredom. Some of the boys' cells have toilets that can only be flushed externally by staff when the boys make a request, and sometimes it takes staff a long time to grant that request. In other boys' solitary cells that have no toilets, named plaintiffs report that they have to wait a long to be let out of their cells and that they sometimes soil themselves. The girls' cells do not have toilets in them so they must request to use external bathrooms and staff sometimes take a long time to grant those requests. Youth in solitary are only granted limited education. In my professional opinion, these practices are all unnecessarily restrictive and combine to create a profoundly isolating, powerless and desolate experience for youth in solitary confinement at Lincoln Hills and Copper Lake.

64.     Youth in isolation are also denied access to institutional programming such as Aggression Replacement Therapy (ART) and the Juvenile Cognitive Intervention Program. If the youth's period of isolation requires them to miss more than a few classes of these programs, youth must start over at the beginning, potentially lengthening their entire stay in confinement. This also further isolates these youth from the kinds of programs they need to improve their behavior both inside the facility and upon their return to society.

65.     While she was in solitary, plaintiff K.D. was exposed to pepper spray being used on another girl in solitary confinement causing her to gag and cough, including coughing up blood. During this time, although correctional officers used masks to protect themselves from

the effects of the pepper spray, no similar devices were supplied to the other girls impacted by the pepper spray cloud. DOC policy expressly states, "Incapacitating devices may only be used in outside areas or in large enclosed areas in which the danger of the reduction of oxygen is minimal."

66.     Each of the named plaintiffs has reported symptoms associated with exposure to solitary confinement. J.J. reports being anxious and having difficulty sleeping, that he is easily annoyed by minor things and prone to anger. K.D. reports feeling anxious, sad and hopeless and also, easily angered. C.M. reports irritability, anxiety, feeling like a caged animal and that his hair started falling out due to anxiety while he was in solitary. R.N. has been on suicide watch and has had at least one suicidal gesture during his stay in solitary confinement.

## USE OF SOLITARY, SHACKLING AND PEPPER SPRAY RELATED TO MAINTAINING OR RESTORING FACILITY DISCIPLINE AND SECURITY IN THE LINCOLN HILL SCHOOL FOR BOYS AND THE COPPER LAKE SCHOOL FOR GIRLS ARE EXCESSIVELY RESTRICTIVE AND NOT REASONABLY RELATED TO RESTORING FACILITY DISCIPLINE AND SECURITY

67.     Based on my training, education, experience and knowledge of juvenile corrections, it is my professional opinion that disciplinary isolation, shackling and pepper-spraying youth as practiced by the Wisconsin Department of Corrections in the Lincoln Hill School for Boys and Copper Lake School for Girls in order to maintain or restore disciplinary security are excessively restrictive, a substantial departure from accepted professional standards, practice and judgment and not reasonably calculated to maintain or restore facility discipline and security. Isolation is an ineffective disciplinary technique for maintaining and restoring facility security and is in fact counterproductive to facility security (Taylor-Nicholson & Krisberg, 2013; Deitch, 2013). It also undermines the rehabilitative goals of the juvenile justice system.

68.     The Wisconsin DOC's practices are especially egregious in a juvenile justice context because the purpose of the juvenile justice system is primarily rehabilitation and treatment with the aim of returning youths to the community better able to succeed than when they were sent to the state's care. Wisconsin's juvenile law defines the objectives of placement in DOC juvenile facilities as the "care and treatment" of youth and the "development of competency in the juvenile offender, so that he or she is more capable of living productively and responsibly in the community." Wis. Stat. § 938.01(2)(c) & (f). Indeed, the Wisconsin DOC's rules and policies reflect the rehabilitative ethic of the juvenile justice system, at least in intent. For example, in the Lincoln Hills Youth Handbook, the DOC answers the question "What happens if a youth does not follow a rule?" by asserting the ascendancy of positive behavior change as the primary goal of rule enforcement as follows, "Discipline rules are written to help youth change their poor behavior. Staff want youth to learn to make good decisions in the institution and the community." (Wisconsin DOC Division of Juvenile Corrections, Lincoln Hills School Youth Handbook at 5.) Further, DOC's "Restrictive Housing Unit" policy acknowledges the purported rehabilitative goal, even for its use of solitary confinement as intended to provide "a safe, structured and healthy environment that encourages youth to participate appropriately and effectively and to gain motivation toward cooperating in order to eventually return to an open living unit." (Wisconsin DOC Division of Juvenile Corrections, Restrictive Housing Unit Program at 1.)

69.     The punitive use of lengthy periods of isolation to effect behavior change has been found to be ineffective and harmful and may contribute to violent acting out and exacerbate mental illness (Taylor-Nicholson & Krisberg, 2013; Deitch, 2013). The prevailing professional view and practice is to utilize positive behavioral management to reduce institutional violence

and improve youth behavior without requiring the use of solitary confinement, pepper spray and mechanical restraints. Positive behavioral management approaches entail a combination of practices, programs and policies that combine to create an orderly and rehabilitative youth correctional environment while minimizing the use of solitary confinement, restraints and other negative reinforcement techniques (Council of Juvenile Correctional Administrators, 2015; DeMuro, 2014). These include:

    a. a graduated system of rewards and sanctions to modify youthful behavior

    b. robust educational and rehabilitative programs to improve behavior and reduce idleness

    c. an adequate complement of staff trained in verbal de-escalation techniques

    d. policies and procedures that recognize that:

        i. room confinement should only be used as a last resort after verbal de-escalation has proven ineffective

        ii. room confinement or restraints should be used for the shortest period of time possible until the youth has calmed down, but for no more than six hours

        iii. de-escalation should continue throughout the period of time when a youth is on room confinement or in handcuffs

        iv. youth should be frequently and personally monitored when on either room confinement or in handcuffs

        v. youth should never be handcuffed to a fixed object

        vi. pepper spray or mace should be prohibited

        vii. beyond a relatively short period of time in room confinement, permission to continue room confinement should come from escalating levels of departmental authorities

        viii. data should be kept on the use of restraints and room confinement and regularly reviewed by the director and his/her management staff

        ix. restraints and room confinement utilization should be objectively evaluated by quality assurance personnel out of the line of authority of those ordering/approving these practices

70.     A positive behavioral management system similar to what is outlined above has been adopted by various models for managing juveniles, including the Performance-based

Standards (PbS) of the Council of Juvenile Corrections Administrators (www.pbstandards.org), the Positive Behavior Interventions and Supports framework (www.pbis.org), the Missouri model (www.mysiconsulting.org), the Sanctuary model (www.sanctuaryweb.com), and the Core Correctional Practices of the University of Cincinnati's Corrections Institute (https://www.uc.edu/corrections/services/trainings/changing_offender_behavior.html).

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 3 day of March, 2017, at Cambridge, Massachusetts.

_____
Vincent Schiraldi, MSW

3/8/17
/Date

## REFERENCES

American Academy of Child and Adolescent Psychiatry. (2012). *Solitary Confinement of Juvenile Offenders.*

Barr, Sarah. (April 25, 2016). "OJJDP Plans to Help States Eliminate Use of Solitary Confinement for Juveniles." *Juvenile Justice Information Exchange.*

Center for Children's Law and Policy. (n.d.). Chemical Agents in Juvenile Facilities. http://www.cclp.org/wp-content/uploads/2016/06/Fact-Sheet-Chemical-Agents-Final-5-14-12.pdf.

Center for Juvenile Justice Reform. (n.d.). "Youth in Custody Practice Model." http://cjjr.georgetown.edu/certificate-programs/youth-in-custody/.

Correspondence with Massachusetts Department of Youth Services Director, Peter Forbes, 1/27 – 2/9/17.

Correspondence with Mississippi Department of Corrections, Youthful Offender Unit Warden Leander Parker, 2/23 – 2/28/17.

Correspondence with Washington, D.C. Department of Youth Rehabilitation Services Director, Clinton Lacey, 2/9 – 2/22/17.

Council of the District of Columbia. (2016). *Comprehensive Youth Justice Amendment Act.*

Council of Juvenile Correctional Administrators. (2015). "CJCA Toolkit: Reducing the Use of Isolation." http://cjca.net/attachments/article/751/CJCA%20Toolkit%20Reducing%20the%20Use%20of%20Isolation.pdf.

Council of Juvenile Correctional Administrators. (2011). "Pepper Spray in Juvenile Facilities." http://cjca.net/attachments/article/172/CJCA.Issue.Brief.OCSpray.pdf.

Council of Juvenile Correctional Administrators. (n.d.). "Position Paper on: Physical and Mechanical Interventions with Juvenile Offenders." http://cjca.net/attachments/article/156/Interventions.pdf.

Deitch, Michelle, et al. (2013). "Understanding and Addressing Youth Violence in the Texas Juvenile Justice Department: Report to the Office of the Independent Ombudsman."

DeMuro, Paul. (2014). "Towards Abolishing the Use of Disciplinary Isolation in Juvenile Institutions: Some Initial Ideas" (Revised). January 22, 2014.

Department of Youth Rehabilitation Services. (2016). "Policy and Procedures Manual."

DiLonardo, Mary Jo. (February 6, 1994). "Time Does Fly As We Grow Older." *The Chicago Tribune.*

Eilperin, Juliet. (January 26, 2016). "Obama bans solitary confinement for juveniles in federal prisons." *The Washington Post.*

Hayes, Lindsay M. (2009). *Characteristics of Juvenile Suicides in Confinement.* Office of Juvenile Justice and Delinquency Prevention.

Human Rights Watch & American Civil Liberties Union. 2012. *Growing up Locked Down: Youth in Solitary Confinement in Jails and Prisons Across the United States.*

Juvenile Detention Alternatives Initiative (JDAI), A Guide to Juvenile Detention Reform: Juvenile Detention Facility Assessment 2014 Update pp. 173-174 (2014). http://www.aecf.org/m/resourcedoc/aecf-juveniledetentionfacilityassessment-2014.pdf.

Mississippi Department of Corrections. (n.d.). http://www.mdoc.ms.gov/Institutions/Pages/State-Prisons.aspx.

National Commission on Correctional Health Care (NCCHC), 2016 Position Statement, *Background,* 4th para. *http://www.ncchc.org/solitary-confinement.*

National Research Council. (2013). Reforming Juvenile Justice: A Developmental Approach. Committee on Assessing Juvenile Justice Reform, Richard J. Bonnie, Robert L. Johnson, Betty M. Chemers, and Julie A. Schuck, Eds. Washington, DC: The National Academies Press.

National Task Force on Children Exposed to Violence. (2012). Report of the Attorney General's National Task Force on Children Exposed to Violence. United States Department of Justice.

Obama, Barak. (January 25, 2016). "Why we must rethink solitary confinement." *The Washington Post.*

Ohio Department of Youth Services. (2015). Extraordinary *Reform in Ohio's Juvenile Justice System: Providing Reliable Conditions for Helping Youth Change Their Lives.*

Palmer, Jennifer. (January 4, 2016). "Oklahoma to phase out pepper spray in juvenile correction facilities." *The Oklahoman.*

Parker, Leander. (2015). "Clarification on Emergency Cell Confinement." State of Mississippi Department of Corrections.

Smith, C. Gregory & Woodhall Stopford. (1999). "Health Hazards of Pepper Spray," *NORTH CAROLINA MED. J.* 60(6).

Taylor-Nicholson, E, and Krisberg, B. 2013. "Contagion of Violence; Corrections Facilities" in *Contagion of Violence.* Washington, D.C: National Academy of Sciences.

United Nations General Assembly. (1990). A/RES/45/113. 68th plenary meeting. *United Nation Rules for the Protection of Juveniles Deprived of their Liberty.* http://www.un.org/documents/ga/res/45/a45r113.htm

United Nations Human Rights Office of the High Commissioner. (1989). *Convention on the Rights of the Child.* http://www.ohchr.org/EN/ProfessionalInterest/Pages/CRC.aspx.

United Nations Human Rights Office of the High Commissioner. (1957 and 1977). *Standard Minimum Rules for the Treatment of Prisoners.* http://www.ohchr.org/EN/ProfessionalInterest/Pages/TreatmentOfPrisoners.aspx.

Winerip, Michael and Michael Schwirtz. (January 13, 2015). "Rikers to Ban Isolation for Inmates 21 and Younger." *The New York Times.*

Wittman, Marc & Sebastian Lehnhoff. (2005). *Age Effects in Perception of Time.*