# UNITED STATES DISTRICT COURT
## FOR THE
## WESTERN DISTRICT OF WISCONSIN

**J.J.**, by and through his next friend,
Saleena Jackson; **K.D.**, by and through
her next friends, John Levy and Meranda
Davis; **C.M.**, by and through his next friend
Toinette Ducksworth; **R.N.**, by and through
his next friend Gloria Norwood, **M.S.**, by
and through his next friend Jolene Waupekanay;
**A.V.**, by and through his next friend Veronica
Rocha-Montejano; **M.R.**, by and through his next
friend Autumn Rodgers; **S.K.**, by and through her
next friend, Thomas Korn; and **A.P.**, by and
through her next friend, Louise Plaskey, for
themselves and all others similarly situated,

      Plaintiffs,

v.　　　　　　　　　　　　　　　　**Case No.: 17-CV-47**

**JON E. LITSCHER**, in his official capacity
as Secretary of the Wisconsin Department
of Corrections; **JOHN D. PAQUIN**, in his
official capacity as Administrator of
Division of Juvenile Corrections of the
Wisconsin Department of Corrections;
**WENDY A. PETERSON** in her official capacity
as Superintendent of the Lincoln Hills
School for Boys and the Copper Lake
School for Girls; **BRIAN GUSTKE**, in his official
Capacity as Director of Security for the Lincoln
Hills School for Boys and the Copper Lake
School for Girls,

      Defendants.

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendants, Jon E. Litscher, John D. Paquin, Wendy A. Peterson, and Brian Gustke, by their attorneys, Crivello Carlson, S.C., hereby respectfully submit this Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction.

## INTRODUCTION

Plaintiffs necessarily paint their claims and proposed injunctive relief with a wide brush, avoiding their burden of proof and instead citing to irrelevant, nationwide data, and expert opinions based solely on generic allegations. The result of these efforts is an insufficient record incapable of establishing a single constitutional deprivation, much less proof of institutional unconstitutional policies or practices at Lincoln Hill School for Boys ("LHS") and Copper Lake School for Girls ("CLS"). Plaintiffs' inability to establish any unconstitutional deprivations is reflected in their proposed injunctive order, which incorporates ambiguous terminology with no constitutional basis, ultimately amounting to an impermissibly vague and overly restrictive re-write of portions of the Wisconsin Administrative Code.

Despite their failure to show a likelihood of success on the constitutional merits of this case, Plaintiffs ask the Court for a preliminary injunction that would effectively upend the way LHS and CLS run their facilities for the duration of this litigation. Plaintiffs have not provided evidence or legal authority establishing support for the suggested injunction, the practical effects of which would lead to absurd limits on LHS and CLS staffs' abilities to maintain safe and secure institutions. Importantly, a preliminary injunction could ultimately harm

continuous ongoing efforts at LHS and CLS to move towards the reduction in uses of restrictive housing, incapacitating agents, and mechanical restraints. The imposition of best practices should not be court-ordered, but instead continually evaluated and implemented by the staff and administrators most familiar with the institutions.

For these reasons and those outlined below, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

## ARGUMENT

### I.  INJUNCTIVE RELIEF IS A DRASTIC REMEDY THAT SHOULD NOT BE GRANTED AS A MATTER OF COURSE.

A preliminary injunction "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Boucher v. Sch. Bd. of School Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998) (emphasis in original) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)). While the decision whether to grant or deny a request for preliminary injunction is within the district court's discretion pursuant to Federal Rule of Civil Procedure 65(a), injunctions "should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *Boucher*, 134 F.3d at 824; Fed. R. Civ. P. 65(a).

In determining whether a movant has carried its burden, the court must first determine whether the movant has demonstrated: 1) that its case has a reasonable likelihood of success on the merits; 2) that no adequate remedy at law exists; and 3) the movant will suffer irreparable injury if the preliminary injunction is denied. *Ty,*

*Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). The movant bears the burden of persuasion with regards to each factor. *Cox v. City of Chicago,* 868 F.2d 217, 219 (7th Cir. 1989). "If a plaintiff fails to meet just one of the prerequisites for a preliminary injunction, the injunction must be denied." *Id.* at 222 (reversing the grant of a preliminary injunction where plaintiffs did not demonstrate a reasonable likelihood of success on the merits). Moreover, the inquiry into the likelihood-of-success element is a "threshold factor." *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1213 (7th Cir. 1997); *see also O'Connor v. Bd. of Ed. of Sch. Dist. No. 23*, 645 F.2d 578, 580–82 (7th Cir. 1981). If the movant cannot establish a likelihood of success on the merits, the analysis ends there. *Rust*, 131 F.3d at 1213. A party who can show only a negligible chance of victory is not entitled to a preliminary injunction, no matter how grave the harm it faces. *Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 123 (7th Cir. 1982).

Even where a movant is able to demonstrate each of the factors, the court must then move onto the balancing stage. First, it must consider "the irreparable harm that the **nonmoving** party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Ty, Inc.*, 237 F.3d at 895 (emphasis added). If the movant is able to prevail in this balancing test, the Court must then consider the public interest in denying or granting the injunction. *Id.* (citing *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994)).

Here, Plaintiffs cannot meet their burden as to the threshold requirement of showing their likelihood of success on the merits. Further, Plaintiffs cannot show irreparable harm or the lack of an adequate remedy at law. Additionally, the balancing of harms favors the Defendants, and Plaintiffs cannot establish that the public interest in granting their motion outweighs the public interest in denying it. Accordingly, their Motion should be denied.

## II. PLAINTIFFS HAVE NOT MADE A CLEAR SHOWING TO CARRY THEIR BURDEN OF PERSUASION FOR THE EXTRAORDINARY AND DRASTIC REMEDY OF AN INJUNCTION.

### A. Plaintiffs Cannot Establish a Likelihood of Success on the Merits.

#### 1. *To succeed on the merits, Plaintiffs must show that LHS and CLS policies or customs caused their alleged constitutional deprivations.*

Plaintiffs have sued the Defendants in their official capacities seeking only injunctive and declaratory relief. (Dkt. 13, Am. Compl. ¶¶ 14–17). Moreover, Plaintiffs' Amended Complaint asserts constitutional violations allegedly arising from the policies and practices in place at LHS and CLS. (*Id.* ¶¶ 220–92.) Thus, to obtain preliminary injunctive relief, Plaintiffs must first demonstrate a likelihood of success on their claim that the constitutional deprivations alleged in their Amended Complaint are and will be caused by policies or customs at LHS and CLS.

An official-capacity suit against state officials for injunctive relief is treated as a suit against the State. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n. 10, (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office[, and is] no

different from a suit against the State itself."); *see also Leahy v. Bd. of Trustees of Comm. College Dist. No. 508, County of Cook, State of Ill.*, 912 F.2d 917, 922 (7th Cir. 1990) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985), and *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694 (1978), for the proposition that official-capacity suits are effectively treated as suits "against the municipality or state"). In order to prove governmental liability, the state or state agency's "'policy or custom' must have played a part in the violation of federal law." *Graham*, 473 U.S. at 166 (citing *Monell,* 436 U.S. at 694); *Odogba v. Wisconsin Dept. of Justice*, 22 F. Supp. 3d 895, 909–10 (E.D. Wis. 2014).

The Supreme Court has repeatedly emphasized that governmental liability cannot rest upon the doctrine of *respondeat superior*. *See Bd. of County Com'rs of Bryan County, Okl. V. Brown*, 520 U.S. 397, 403 (1997); *Graham*, 473 U.S. at 167 (citing *Monell,* 436 U.S. at 694); *see also Odogba*, 22 F. Supp. 3d at 909. In other words, vicarious liability "cannot be the foundation of liability" against the State. *See Walker v. Rowe*, 791 F.2d 507, 508–09 (7th Cir. 1986). "[P]ublic employees are responsible for their own misdeeds but not for anyone else's." *Odogba*, 22 F. Supp. 3d at 909 (quoting *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir.2009)).

Rather, to be successful on the merits of their prospective injunctive relief, Plaintiffs must establish that LHS and CLS currently authorize or maintain a policy or custom of approving conduct that results in their alleged constitutional injuries. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Graham*, 473 U.S. at 165–66, and *Monell*, 436 U.S. at 690–94).

Plaintiffs have failed to provide evidence or analysis drawing a link between any specific policy or practice at LHS or CLS and a particular constitutional deprivation. Instead, they simply conclude that because restrictive housing, incapacitating agents, and mechanical restraints are *allowed* at LHS and CLS, any alleged constitutional deprivation is somehow correlated with that allowance. This is not enough to show a likelihood of success on their claims.

Moreover, even if Plaintiffs could establish a constitutional deprivation, they would be unable to establish that the deprivation resulted from a policy, custom, or a decision of a policymaker. While a custom or practice "may be so persistent and widespread [that it has] the force of law," "[t]he word 'widespread' must be taken seriously." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970); *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan*, 463 F.3d at 790 (emphasis added). Rather, there must be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*

Additionally, where a plaintiff claims that the governmental entity has not directly inflicted an injury but has nonetheless caused an employee to do so through a custom or policy, "rigorous standards of culpability and causation must be applied to ensure that the [governmental entity] is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405. To demonstrate that a governmental entity "is

liable for a harmful custom or practice, the plaintiff must show that [governmental] policymakers were deliberately indifferent as to the **known or obvious** consequences." *Thomas*, 604 F.3d 293, 303 (7th Cir. 2010) (emphasis added). "A showing of simple or even heightened negligence will not suffice." *Brown*, 520 U.S. at 407. "In other words, [the governmental policymakers] must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303.

Here, Plaintiffs cannot establish that any policy, practice, or custom resulted in a deprivation of their constitutional rights. Nor can they establish that any of the Defendants were deliberately indifferent to a known or obvious consequence of any policy or practice—in other words, that they would cause unconstitutional harm. *Id.* Accordingly, Plaintiffs cannot show a likelihood of success on the merits of their claims.

> **2.** **To succeed on the merits, Plaintiffs must establish that LHS and CLS policies or customs violated their Eighth Amendment rights.**

In determining whether the Plaintiffs' constitutional rights have been violated by policies or customs at LHS and CLS, the Court should look to the Eighth Amendment standard, rather than the Fourteenth Amendment standard applicable to pre-trial detainees.

Plaintiffs argue that adjudged-delinquent youth in Wisconsin are afforded additional constitutional protections under the Fourteenth Amendment that extend beyond the Eighth Amendment protections for post-trial detainees. (Dkt. 17, Pls.'

Br. Supp. Mot. Prelim. Inj. at 12–19.) Thus, despite being adjudged delinquent, Plaintiffs urge the Court to apply the same analysis used for pre-trial detainees in deciding the merits of Plaintiffs' claims. *See* (*id.* 21 n.5.) However, Plaintiffs have not cited any authority that requires this Court to create a new constitutional standard for analyzing conditions-of-confinement or excessive-force claims brought by adjudged-delinquent juveniles in Wisconsin.

Instead, Plaintiffs turn to *Nelson v. Heyne*'s discussion of the right to rehabilitation and urge the Court to apply the Fourteenth Amendment standard to all of Plaintiffs' constitutional claims, including those based on the use of force and conditions of confinement. *See* (Pls. Br. Supp. Mot. Prelim. Inj. at 14–17); 491 F.2d 352, 358–60 (7th Cir. 1974). However, as Plaintiffs recognize, the Seventh Circuit treated the *Nelson* plaintiffs' cruel-and-unusual punishment claims separately from the court's discussion of the right to rehabilitation. *See* 491 F.2d at 354, 358. In so doing, Plaintiffs attempt to stretch the holding in *Nelson* far beyond its reach.

As it relates to the Fourteenth Amendment, the *Nelson* court simply noted the well-recognized rule that the Eighth Amendment is applicable to the states through the Fourteenth Amendment, and generally discussed rehabilitation in juvenile facilities, separate and apart from Plaintiffs' constitutional claims.[1] *Id.* at 355, 360. The fact that the Seventh Circuit discussed rehabilitative treatment holds no significance for the constitutional analyses of conditions-of-confinement and use-of-force claims.

---

[1] In its March 9, 2017, decision allowing Plaintiffs to proceed on claims, this Court correctly noted that "it is not clear that juvenile offenders have a 'right to rehabilitation' under the Fourteenth Amendment." (Dkt. 10) (citing *Patrick v. Raemisch*, 550 F. Supp. 2d 859, 865 (W.D. Wis. 2008)).

Plaintiffs then attempt to analogize non-analogous cases, where non-punitive confinement may have favored the Fourteenth Amendment over the Eighth Amendment. (Dkt. 17, Pls.' Br. Supp. Mot. Prelim. Inj. at 16.) Because the Wisconsin Juvenile Justice Code is not punitive, Plaintiffs argue, this case is akin to the cases dealing with non-punitive confinement. (*Id.*) However, Plaintiffs argument requires an oversimplified reading of the Wisconsin Juvenile Justice Code, which identifies several "equally important purposes" of the juvenile justice system. *See* Wis. Stat. § 938.01(2). One of those equally important purposes is "[t]o hold each juvenile offender **directly accountable** for his or her acts." Wis. Stat. § 938.01(2) (emphasis added).

The Seventh Circuit has expressly recognized the Wisconsin juvenile justice system's multifaceted purposes, stating "[t]he statutory mission of the Wisconsin juvenile justice system includes, *inter alia*, **punishment**, deterrence, and 'the development of competency in the juvenile offender, so that he or she is more capable of living productively and responsibly in the community.'" *Henry v. Milwaukee County*, 539 F.3d 573, 575–76 (7th Cir. 2008) (emphasis added) (citing and quoting Wis. Stat. § 938.01(2)). Thus, Plaintiffs' have misplaced their reliance on cases[2] where the Fourteenth Amendment is applied to non-punitive[3]

---

[2] *See, e.g.*, (Dkt. 17, Pls.' Br. Supp. Mot. Prelim. Inj. at 15) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)).

[3] In *Vann v. Scott*, 467 F.2d 1235, 1241 (7th Cir. 1972), the Seventh Circuit recognized that "neither the inapplicability nor the applicability of the Eighth Amendment is controlled by the label—whether 'rehabilitation' or punishment'—accorded to a child in the State's custody." The reasoning in *Vann* involved an Illinois statute that expressly rejected the notion that Illinois juvenile justice system was punitive. *Id.* Thus, the reasoning in *Vann* is even more apt here, where the Wisconsin

confinement because Wisconsin's Juvenile Justice Code includes punishment among its many equally important purposes.

This Court should instead look to appellate and district court decisions across the country applying Eighth Amendment standards in cases where juveniles bring conditions-of-confinement and use-of-force claims. *See, e.g.*, *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 261 (3rd Cir. 2010) (holding that the more-specific-provision rule required adjudicated delinquent juvenile's conditions-of-confinement and failure-to-protect claims to be analyzed as Eighth Amendment claims rather than as Fourteenth Amendment substantive due process claims); *Morales v. Turman*, 562 F.2d 993, 998–99 n.1 (5th Cir. 1977) ("The [E]ighth [A]mendment applies to juvenile detention centers as well as to adult prisons. . . . Even in some of the cases that refer to a right to treatment for juvenile offenders the conduct involved actually violated the [E]ighth [A]mendment and could have been decided merely on that basis."); *Tribble v. Arkansas Dept. of Human Services*, 77 F.3d 268, 270–71 (8th Cir. 1996) (applying the Eighth Amendment to an action brought against a juvenile-delinquency residence for failing to segregate a juvenile from a fellow juvenile with violent tendencies before one physically assaulted the other); *Troy D. v. Mickens*, 806 F. Supp. 2d 758, 771–72 (D.N.J. 2011) (holding that adjudicated delinquent juveniles' "constitutional claims concerning their conditions of confinement, failure to protect from harm and lack of medical care should be analyzed under the Eighth Amendment" rather than the

legislature has expressly stated that one of the purposes for the Wisconsin juvenile justice system <u>is</u> punitive.

11

Fourteenth Amendment); *Inmates of Boys' Training School v. Affleck*, 346 F. Supp. 1354, 1366 (D.R.I. 1972) ("The fact that juveniles are *in theory* not punished, but merely confined for rehabilitative purposes, does not preclude operation of the Eighth Amendment."). These cases are instructive and aligned with the facts and issues in this case.

Accordingly, while Defendants will address each of Plaintiffs' arguments, including their contentions that the Fourteenth Amendment should apply to their claims, the Court should only analyze this action under the Eighth Amendment.

> **3.** **_Plaintiffs cannot establish that the current policies or customs at LHS and CLS related to restrictive housing cause violations of their Eighth or Fourteenth Amendment rights._**

Plaintiffs assert that the policies and practices at LHS and CLS relating to the use of restrictive housing violate the Eight and Fourteenth Amendment standards for detainees' conditions of confinement. (Dkt. 17, Pls.' Br. Supp. Prelim. Inj. at 19–29.) For the reasons explained below, Plaintiffs cannot esatblish a likelihood of success in the merits of these claims.

> **a.** **Under the Eighth Amendment, Plaintiffs must show LHS and CLS's current restrictive housing policies or customs constitute deliberate indifference to Plaintiffs' health or safety.**

The Eighth Amendment imposes a duty on officials to provide humane conditions of confinement to post-trial detainees such that detainees receive "adequate food, clothing, shelter, and medical care . . . ." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To that end:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference.

*Id.* at 837.

The law is clear that in order to establish a viable Eighth Amendment conditions-of-confinement claim, Plaintiffs must demonstrate both that they suffered a serious deprivation and that Defendants acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This test consists of both an objective and subjective component. *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991). The objective prong concerns whether the conditions exceeded contemporary bounds of decency of a mature, civilized society. *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). The subjective component is met if an official knows of and disregards an excessive risk to a detainee's health or safety. *Farmer*, 511 U.S. at 837.

This total disregard for a detainee's safety is the "functional equivalent of **wanting** harm to come to the [detainee]." *McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991) (emphasis added). Negligence does not satisfy the "deliberate indifference" standard, and it is not enough to show that penal officials merely failed to act reasonably. *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994). If either the objective or subjective prong is not satisfied, a post-trial detainee cannot make out a conditions claim. *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir.

1994).  The Seventh Circuit has also suggested generally that the detainee must demonstrate that conditions actually caused some form of physical harm, over and above "considerable unpleasantness." *Harris v. Fleming*, 839 F.2d 1232, 1235–36 (7th Cir. 1988).

    **b.** **Under the Fourteenth Amendment, Plaintiffs must show LHS and CLS's current restrictive housing policies or customs constitute deliberate indifference to Plaintiffs' health and safety.**

Even assuming, *arguendo*, that the Fourteenth Amendment applies to Plaintiffs' conditions-of-confinement claim, they still fall short in showing a likelihood of success on the merits.

Under the Fourteenth Amendment, Plaintiffs' conditions-of-confinement claims would be akin to those of a pre-trial detainee.  *See Bell*, 441 U.S. at 535 (1979).  A pre-trial detainee's rights under the due process clause are at least as great as the protections available to a convicted prisoner under the Eighth Amendment.  *Anderson v. Guschenritter*, 836 F.2d 346, 349 (7th Cir. 1988).  Thus, pre-trial detainees may not be subjected to conditions of confinement designed to punish them unless a particular restriction or condition is reasonably related to a legitimate government objective.  *Block v. Rutherford*, 468 U.S. 576, 584 (1984).

    **c.** **LHS and CLS's restrictive housing policies and practices do not cause conditions of confinement that violate the Eighth and Fourteenth Amendments.**

Here, the evidence in the current record falls well short of showing that LHS and CLS policies or customs regarding restrictive housing disregard excessive risks

to Plaintiffs' health or safety. Indeed, the current record falls well short of even showing a single instance of an unconstitutional use of restrictive housing.

As of February of 2017, 73% of states, including Wisconsin, used restrictive housing in their juvenile correctional facilities. (Decl. of Megan Jones ¶ 9.) Within LHS and CLS, the phrase "restrictive housing" generally refers to two types of confinement, including "close confinement" and "modified confinement," both of which are defined under sections 373.03(3) and (22) of the DOC Administrative Code. (Gustke Decl. ¶ 9.) "Close confinement" is a type of restrictive housing that means "restriction of a youth to the youth's assigned room with a minimum of one hour out of room time per day." Wis. Admin. Code DOC § 373.03(3). "Modified confinement" is a type of restrictive housing that means "restriction of a youth to the youth's assigned room with a minimum of 4 hours of out-of-room time per day." Wis. Admin. Code DOC § 373.03(22).

There is no policy at LHS and CLS mandating or stating that youth must spend 22 or 23 hours per day alone in their rooms. (*Id.* ¶ 26.) Indeed, "modified confinement" is mostly used at LHS and CLS. (*Id.* ¶ 9.)[4] The amount of time a given youth is permitted out of his or her room in restrictive housing above and beyond the minimum requirements are discretionary and depend on the youths' behavior. (*Id.*) Youth are allowed out of their rooms while in restrictive housing for a variety of reasons, including, but not limited to, recreation time, education, and hygiene. (*Id.*) The length of time a youth is placed in restrictive housing depends

---

[4] In fact, Brian Gustke, the Security Director for LHS and CLS, cannot recall the use of close confinement since his time at the institutions.

on the circumstances of each major conduct rule violation, including, but not limited to, the type of restrictive housing, the youth's behavior, and the number of major rules violations within a given period of time. (*Id.* ¶ 22.)

Restrictive housing at LHS and CLS are divided into two areas—"high hall" and "low hall." In general, high hall is more restrictive than low hall at LHS. (*Id.* ¶ 28.) In both high hall and low hall, youth are not restricted to their rooms for 23 or 24 hours per day. (*Id.* ¶ 29.) Rather, youth in both halls are given approximately one hour in a common day room each day, which allows them to converse with other youth, complete paper work, handle their personal property, and write and receive mail. (*Id.*) This out-of-room time **is in addition** to time youth spend out of their rooms for schooling, hygiene, and exercise, all of which can total approximately four or more hours, per day. (*Id.*)

Thus, at the outset, LHS and CLS are in line with the majority of states that currently use some form of restrictive housing. Moreover, despite Plaintiffs' repetitive use of the archaic term "solitary confinement," the policies and practices at LHS and CLS make clear that restrictive housing is **not** synonymous with "solitary confinement," to the extent that term refers to extended isolation. Plaintiffs are provided with out-of-room time every day, as well as exercise, contact with staff and other youth, and education. (*Id.* ¶ 29.) Contrary to Plaintiffs' contentions, youth are not restricted to their rooms for 23 or 24 hours per day. (*Id.*)

### 4. Plaintiffs cannot establish that the current policies or customs at LHS and CLS related to mechanical restraints and incapacitating agents cause violations of their Eighth or Fourteenth Amendment rights.

Plaintiffs assert that the policies and practices at LHS and CLS relating to the use of mechanical restraints and incapacitating agents violate the Eight and Fourteenth Amendment prohibitions against excessive force. (Dkt. 17, Pls.' Br. Supp. Prelim. Inj. at 29–34.) For the reasons explained below, Plaintiffs cannot show a likelihood of success on the merits of these claims.

### a. Under the Eighth Amendment, Plaintiffs must show that LHS and CLS's current mechanical restraints and incapacitating agents policies or customs cause "malicious and sadistic" uses of force.

Under the Eighth Amendment, this claim requires the Court to determine whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Stated another way, Plaintiffs must show that Defendants' policies or customs cause the malicious and sadistic use of force against Plaintiffs. *Graham*, 473 U.S. at 166 (citing *Monell,* 436 U.S. at 694). "After incarceration, only the 'unnecessary and wanton infliction of pain' . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Ingraham v. Wright,* 430 U.S. 651, 670 (1977) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)) (internal citations omitted).

To constitute cruel and unusual punishment, conduct must involve more than ordinary lack of due care for the inmate's interests or safety. *Whitley*, 475 U.S. at

319. Courts set a high bar for claimants because "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 321–22 (quoting *Bell*, 441 U.S. at 547). Thus, excessive force claims under the Eighth Amendment require showings of "*actual intent* or *deliberate indifference*," which include the subjective inquiry of "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause harm." *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (emphasis in original) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)); *see also Kervin v. Barnes*, 144 Fed. Appx. 551, 552 (7th Cir. 2005) (noting that waiting 10 to 20 minutes before allowing an inmate to wash off incapacitating agent did not violate Eighth Amdnement).

> **b.  Under the Fourteenth Amendment, Plaintiffs must show LHS and CLS's current mechanical restraints and incapacitating agents policies or customs cause objectively unreasonable uses of force.**

Even assuming, for the sake of argument, that the Fourteenth Amendment applies to Plaintiffs' excessive force claim, they still fall short in showing a likelihood of success on the merits.

To prevail on an excessive force claim under the Fourteenth Amendment, a pre-trial detainee must prove that the use of force was objectively unreasonable. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).[5]  That is, the pretrial

---

[5] The holding in *Kingsley* should only apply in the use-of-force context, not in conditions-of-confinement cases.  *See, e.g.*, *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017) (". . . *Kingsley*

detainee must show "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 2473–74. In the context of this action, then, Plaintiffs must show that the LHS and CLS policies regarding mechanical restraints and incapacitating agents cause uses of force that are not rationally related to legitimate governmental objectives. *Id.*; *Graham*, 473 U.S. at 166 (citing *Monell,* 436 U.S. at 694).

Because the Fourteenth Amendment applies the objective reasonableness standard to use-of-force cases brought by pre-trial detainees, cases discussing objective reasonable standards governing the use of incapacitating agents in the context of the Fourth Amendment are instructive here. To determine whether a law enforcement officer has violated the Fourth Amendment in using force, courts ask whether "the officer used greater force than was reasonably necessary . . . ." *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 486 (7th Cir. 2011) (internal quotations omitted).

In this context, incapacitating agents are viewed as nonlethal, intermediate levels of force, which do not generally "constitute as much force as so-called impact weapons, such as baton launchers and beanbag projectiles." *Id.* "Courts have often held that it is reasonable to use pepper spray against a suspect who is physically resisting arrest; conversely, when the use of pepper spray is gratuitous or unprovoked, courts often have considered it excessive." *Id.* Thus, the use of

was an excessive force case, and we have not yet addressed whether its reasoning extends to claims of allegedly inadequate care . . . .").

incapacitating agents may be reasonable even when there is no imminent or immediate threat of harm. *See id.* at 486–87 (reasoning that the use of an incapacitating agent was reasonable where a reasonable officer could have believed the suspect was resisting arrest, even though the suspect had communicated his willingness to submit to arrest).

### c. LHS and CLS mechanical restraints and incapacitating agents policies and practices do not constitute the use of excessive force in violation of the Eighth and Fourteenth Amendments.

Here, Plaintiffs have not shown how the current policies governing the use of mechanical restraints or incapacitating agents cause the malicious and sadistic use of force against Plaintiffs. Nor do they show how the current mechanical restraints and incapacitating agents policies cause objectively unreasonable uses of force at LHS and CLS. Again, by painting with broad strokes and citing nationwide data, Plaintiffs have even failed to put forth evidence sufficient to show a single constitutional deprivation through the use of mechanical restraints or incapacitating agents. Moreover, Plaintiffs cannot establish a likelihood of success on the merits of their Eighth and Fourteenth Amendment excessive force claims.

First, at LHS and CLS mechanical restraints are "not intended nor will they be used as a means of punishment." (Gustke Decl. ¶ 42, Ex. A.) Instead, "[r]estraint equipment is utilized as a temporary and short-term measure to establish and maintain safety when youth are at substantial risk to harm themselves or others." (*Id.*) Staff may also consider mechanical restraints for a youth "who has repeatedly self-injured within a short period of time in a manner

that has significant medical risks." (*Id.*) Thus, the plain language of the Division of Juvenile Corrections does not show how the policy might cause the use of excessive force with mechanical restraints. Moreover, it is the practice at LHS and CLS that, youth behavior permitting, mechanical restraints are removed for exercise each day and, even while restraints are applied, youth still have the ability to write and interact with staff and other youth while in the restrictive housing day room. (*Id.* ¶ 44.) These policies and practices can hardly be said to rise to the level of malicious and sadistic use of force, or even rising to the level of objective unreasonableness. The policies outline legitimate interests in maintaining safety and order in the institution.

Second, incapacitating agents are not used as a form of punishment for youth's conduct. (Gustke Decl. ¶ 53.) "Rather, incapacitating agents are used as a last resort in situations where youth show escalated resistance and do not respond to conservative measures of control, in order to avoid safety hazards to staff and youth." (*Id.*) Moreover, incapacitating agents are administered in accordance with applicable use-of-force policies, one of which specifically prohibits excessive force, corporal punishment, verbal abuse, and any other form of abuse. (*Id.* ¶ 52, Ex. B) Indeed, "[e]ven in an emergency situation, staff will only use that amount of force that is reasonable and necessary [t]o control the situation." (*Id.*) One of the policy's express goals is to use force in such a way that "minimizes situations that requires the use of force by staff." (*Id.*)

Indeed, one of Defendants' responses to Plaintiffs' Proposed Facts is illustrative of Defendants' attempt to use conservative measures before resorting to the use of incapacitating agents. *See* (*id.* ¶ 61); (Dkt. 44, Pls.' Supp. Am. SPF ¶ 109.) On October 30, 2016, R.N. was in his room and refused to pull his arms back into the pass-through opening in his door after being provided toilet paper. (*Id.*) Staff briefly left the room to report R.N.'s refusal to a supervisor. (*Id.*) R.N. was able to grab a cord attached to a fan located in the hallway outside of his room. (*Id.*) Staff responded, and R.N. refused to let go of the cord. (*Id.*) R.N. began wrapping the cord around his neck and staff stopped pulling the cord. (*Id.*) The supervising youth counselor presented an incapacitating agent to R.N. and instructed R.N. to drop the cord. (*Id.*) R.N. dropped the cord, and it was removed from the area. (*Id.*) R.N. still refused to bring his arms back into his room through the pass-through opening and spit in the face of staff attempting to talk with him. (*Id.*) Based on R.N.'s behavior and consultation with PSU, it was determined that R.N. be placed in a security gown on control status. (*Id.*) R.N. continued to refuse to comply after multiple instructions, so incapacitating agents were used to gain compliance and prevent any further incidents of potential self-harm or jeopardize the safety of staff. (*Id.*)

Plaintiffs' reference to the incident with R.N. is indicative of their inability to prove that the policies and practices at LHS and CLS cause the use of excessive force. Further, as shown by the example above, even through the proposed facts offered by the Plaintiffs, the use of incapacitating agents has not been shown to

violate the Constitution. Accordingly, because Plaintiffs' cannot satisfy their burden of proving a likelihood of success on the merits, their Motion must be denied.

### 5. *Plaintiffs cannot establish a likelihood of success on the merits because their experts should be disregarded under Daubert.*

#### a. For expert evidence to be admissible, an expert must offer evidence that is reliable and relevant.

Federal Rule of Evidence 702 and *Daubert* govern the admission of expert testimony. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 594–95 (1993). Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702

Accordingly, a district court is obligated to function as a "gatekeeper" regarding expert testimony, which requires insuring that the proposed testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589. In order to make such an evaluation, a court utilizes a three-prong analysis: (1) whether the expert is properly qualified; (2) whether the testimony's reasoning or methodology is scientifically reliable; and (3) whether the testimony assists the trier of fact in understanding the evidence or determining a fact. *Ervin v. Johnson & Johnson,*

*Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).  The plaintiff bears the burden of proving admissibility of an expert opinion by satisfying each of these requirements.  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *Ervin*, 492 F.3d at 904.  For each opinion, the plaintiff through its expert must thus "explain the methodologies and principles supporting the opinion."  *Minix v. Canarecci,* 597 F.3d 824, 835 (7th Cir. 2010).

Importantly, even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."  *Clark v. Takata Corp.,* 192 F.3d 750, 759 n.5 (7th Cir. 1999).  Nevertheless, "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter . . . [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology."  *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).  Accordingly, "[an] expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology."  *Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919, 924 (7th Cir. 2000).

*Daubert* provided a non-exhaustive list of factors to be used in determining the soundness of an expert's methodology:  (1) whether the theory can be or has been tested;  (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential error rate when applied; and (4)

whether the theory has been generally accepted in the relevant scientific, technical, or professional community. *Daubert,* 509 U.S. at 593–94.[6]

Ultimately, the object of the court's Rule 702 reliability inquiry is to ensure that the opinions expressed by testifying experts "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba– Geigy Corp.,* 78 F.3d 316, 318 (7th Cir. 1996).

When determining whether an expert's testimony is admissible, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003) (citing *Gen. Elec. v. Joiner,* 522 U.S. 136, 146 (1997)). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.,* 522 U.S. at 146. An expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elec. Corp. v.*

---

[6] The Advisory Committee Notes to Rule 702, also suggest:

> benchmarks for gauging expert reliability, including: (5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (7) "whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (8) "whether the expert has adequately accounted for obvious alternative explanations"; (9) "whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (10) "whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give."

*WH-T Broad. Corp.,* 395 F.3d 416, 419 (7th Cir. 2005); *see also Mamah,* 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert."). Indeed, the Seventh Circuit has consistently held that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp.,* 395 F.3d at 419–20 (collecting cases). Nor is it enough for an expert to offer assurances that such opinions, techniques or conclusions are "reliable" and based on appropriate experience, training and expertise. The Court in *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005), explained that a court simply cannot take the expert's word for it:

> The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *See* Fed. R. Evid. 702 advisory committee's note. When *Daubert* was remanded back by the Ninth Circuit, the court stated that "[w]e've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough." *Daubert*, 43 F.3d 1311, 1319 (9th Cir. 1995).

*Thomas*, 398 F.3d at 432.

In addition to the qualifications and reliability inquiry, a district court should confirm that an expert's testimony is relevant; this means that the testimony must "assist the trier of fact to understand the evidence or to determine a fact at issue." *Ervin*, 492 F.3d at 904. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert*, 509 U.S. at 587 (citing F.R.E. 401). Even if a district court finds expert testimony relevant, F.R.E. 403 requires that the court must still determine if the

testimony's probative value is substantially outweighed by the danger of unfair prejudice and the risk of misleading the jury. *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 900 (E.D. Wis. 2010).

Further, the Supreme Court in *Daubert* cautioned against "expert opinions" formulated solely for purposes of litigation. Accordingly, as part of its evaluation the Court must determine "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert*, 43 F.3d 1311 (9th Cir. 1995).

> **b.** **Mr. Schiraldi and Dr. Grassian's Opinions are Not Reliable, Scientific or Specialized and Offer No Necessary Value or Guidance to the Fact Finder.**

Even if an expert is otherwise qualified to render an opinion, an additional two-pronged analysis that carefully considers both the "reliability" and the "relevance" of the proposed opinion is still applied to the proposed expert testimony. The court in *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) explained:

> Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express. As we observed in *Quiet Technology*, 'while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability . . . . [O]ur caselaw plainly established that one may considered an expert but still offer unreliable testimony.' 326 F.3d at 1341–42. Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility.

*Frazier*, 387 F.3d at 1261.

As for reliability, the proposed testimony must be supported by "good grounds". *Id*. at 1261. Therefore, where the testimony's "factual basis, data, principles, methods, or their application are called sufficiently into question", then "the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of" the relevant discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). Such "knowledge" must constitute something more than subjective belief or unsupported assumptions.

In addition, an expert cannot circumvent this requirement by citing or relying on his or her "experience" without explaining how that specific experience leads to the conclusion reached, why that experience forms a sufficient basis for the expert's opinion, and how that experience reliably applies to the facts at issue. *Frazier*, 387 F.3d at 1261. "The key consideration is whether the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 149.

The 2000 Advisory Committee's notes to Rule 702 suggest other benchmarks for gauging expert reliability. These included in pertinent part (1) whether maintenance standards and controls exists, (2) whether the testimony relates to matters drawing naturally and directly out of research they have conducted independent of the litigation, or developed expressly for purposes of testifying, (3) whether the expert has unjustifiably extrapolated from accepted premise to an unfounded conclusion, (4) whether the expert has adequately accounted for obvious

alternative explanations, (5) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting, and (6) whether the field of expertise claimed by the expert is known to reach a reliable result from the type of opinion the expert would give.

Both of Plaintiffs' experts base their conclusory opinions solely on the Plaintiffs' allegations, five named-Plaintiffs' affidavits, and the Wisconsin Statutes and Administrative Code. *See* (Dkt. 20, Decl. of Stuart Grassian ¶¶ 10–12); (Dkt. 19, Decl. of Vincent Schiraldi ¶ 56.) Indeed, Dr. Grassian admits that he was asked to assume that the declarations of five named Plaintiffs was true. (Dkt. 20, Grassian Decl. ¶ 12.) Neither expert has reviewed any affidavits or deposition transcripts by any witness from the Wisconsin Department of Corrections, and, as of the dates of their declarations, neither expert has visited LHS or CLS. (Gustke Decl. ¶ 13.)

The unreliability of their opinions is illustrated throughout their declarations. For instance, in Dr. Grassian's opinion is based solely on the Complaint's allegation that youth at LHS and CLS are confined for "**at least** 22–23 hours a day." (Dkt. 20, Grassian Decl. ¶ 16) (emphasis added). Simply put, the on which Dr. Grassian goes on to base his opinion is not true. *See* (Gustke Decl. ¶ 26) ("There is no policy at LHS and CLS mandating or stating that youth must spend 22 or 23 hours per day alone in their rooms"); Wis. Admin. Code DOC § 373.03(3) and (22) (requiring **at least** one to four hours out of room). In fact, youth can spend up to four or more hours outside their rooms each day. (Gustke Decl. ¶ 29.)

Mr. Schiraldi's opinions are based on similarly problematic "factual" bases. For instance, he concludes that "[a]ccording to the complaint and declarations by named plaintiffs that were filed in this case, plaintiffs have experienced solitary confinement and shackling and have been pepper-sprayed on numerous occasions." (Dkt. 19, Schiraldi Decl. ¶ 56.) Mr. Schiraldi fails to consider whether his definition of "solitary confinement" actually aligns with policies or practices at LHS and CLS, making his conclusions unhelpful and generic. *See, e.g.*, (Gustke Decl. ¶ 9) (stating that "close confinement" is rarely used at LHS and CLS).

Thus, because Plaintiffs' experts have based their opinions solely on un-vetted, one-sided "facts" in this litigation, their opinions are inherently unreliable and cannot assist the Court in determining a fact in issue. Accordingly, the Court should disregard expert testimony from Plaintiffs' experts.

## B. Plaintiffs Cannot Establish the Lack of an Adequate Remedy at Law.

Injunctive relief is "extraordinary" and courts should only award it if the movant cannot secure an adequate rectification of its grievance by an award of damages. *See Boucher*, 134 F.3d at 823. Instead, however, Plaintiffs specifically seek a declaration that various policies and practices are unconstitutional and permanent injunctive relief eliminating the use of those practices found to be unconstitutional. *See* (Dkt. 13, Am. Compl. "WHEREFORE" ¶¶ B–C.) A declaratory judgment ruling that the complained of policies and practices are unconstitutional constitutes adequate prospective relief. *See Roman Catholic Found. v. Regents of Univ. of Wisconsin Sys.*, 590 F. Supp. 2d 1083, 1092–93 (W.D. Wis. 2008). Indeed,

Plaintiffs cannot complain that the declaratory relief they seek would not resolve their alleged injuries because they also seek a permanent injunction. *See Perez v. Ledesma*, 401 U.S. 82, 124–25 (1971) (explaining that while declaratory judgment may be valuable, it cannot make unconstitutional acts or statutes disappear; however, injunctions barring enforcement of actions or statutes will "paralyze" the continued action or enforcement).

Thus, because there are various adequate remedies at law that Plaintiffs can and continue to pursue, they are not entitled to preliminary injunctive relief. Their Motion should therefore be denied.

**C.    Plaintiffs Cannot Establish that They Will Suffer Irreparable Harm Absent a Preliminary Injunction.**

Even if the Plaintiffs are able to show a likelihood of success, the Court must then determine how likely that success is, because this impacts the balance of relative harms. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). The less likely a movant is to win, the more heavily "need the balance of harms weigh in his favor." *Id.* Irreparable harm is "harm that cannot be prevented or fully rectified by the final judgment after trial." *Id.* at 386. To be "irreparable," the threat of irreparable injury must be "real," "substantial," and "immediate," not speculative or conjectural. *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983).

Plaintiffs cannot establish that the alleged harm is "immediate" or "real" because they cannot prove with any degree of certainty that the complained of policies or practices will be employed against them during the pendency of this action. For instance, incapacitating agents are not utilized as a form of punishment

for youth's conduct. (Gustke Decl. ¶ 53.) Further, even when youth are placed in restrictive housing, their out-of-room time is dependent on their behavior. (*Id.* ¶ 29.) The same is true relating to whether youth are subject to mechanical restraints. (*Id.* ¶ 46.) In short, none of the policies at LHS or CLS *mandate* the use of incapacitating agents, restrictive housing, or mechanical restraints, and Plaintiffs have not alleged that any policies or customs subject them to incapacitating agents, restrictive housing, or mechanical restraints *absent* a conduct rule violation.

Thus, Plaintiffs' argument effectively asks the Court to assume that they will break institutional conduct rules during the pendency of this action, multiple times over. Indeed, Plaintiffs concede that some of the named plaintiffs may not even be currently in custody at LHS or CLS, *see* (Dkt. 44, Pls.' Supp. Am. SPF ¶ 2), and for the youth who are in custody, there has been no showing that they are currently in restrictive housing or will be subject to the use of force.

Accordingly, Plaintiffs cannot show that, absent their own violations of conduct rules at LHS and CLS, they will be subjected to any of the circumstances that they allege will cause them irreparable harm. They therefore cannot show that irreparable harm is "real," "substantial," or "immediate." *Lyons*, 461 U.S. at 111. Indeed, if no named Plaintiff commits any conduct rule violation throughout this litigation, a preliminary injunction would leave them no better or worse off. Accordingly, Plaintiffs cannot show that irreparable harm will result absent a preliminary injunction. Their Motion should therefore be denied.

III. **THE BALANCING TEST DICTATES DENIAL OF A PRELIMINARY INJUNCTION BECAUSE IT IS NOT IN THE PUBLIC INTEREST AND IT WOULD CREATE INSTABILITY TO A JUVENILE CORRECTION INSTITUTION.**

A. **The Harm to Plaintiffs, if Any, Does Not Outweigh the Instability to the Juvenile Correction Institution.**

Even assuming, *arguendo*, that Plaintiffs can establish that they are likely to succeed on the merits and will suffer some irreparable harm in the absence of a preliminary injunction, that harm is greatly outweighed by the harm Defendants will suffer if the injunction is granted. The balance of harms favors denial of Plaintiffs' Motion because the relief they seek is so vague that, at best, it lacks any certainty; at worst, implementation of their requested relief will jeopardize institutional security and upend Defendants' ability to carry out their custodial duties toward all youth under their supervision.

Under Fed. R. Civ. P. 65(d), a preliminary injunction must state its terms specifically and describe in reasonable detail the act or acts restrained or required. *See* Fed. R. Civ. P. 65(d). It is well settled that these provisions are mandatory and "should be respected." *Brumby Metals, Inc. v. Bargen*, 275 F.2d 46, 49 (7th Cir. 1960). If the enjoined party must engage in guesswork in order to determine if he or she is engaging in an activity proscribed by the preliminary injunction, the injunction is impermissibly vague and cannot be enforced. *See Patriot Homes, Inc. v. Forest River Housing, Inc.*, 512 F.3d 412, 415–16 (7th Cir. 2008). The degree of particularity required depends on the nature of the subject matter. *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 83-84 (3d Cir. 1982) (citing *McComb v.*

*Jacksonville Paper Co.*, 336 U.S. 187, 191–92 (1949)).  Additionally, the person enjoined must receive "fair and precisely drawn notice of what the injunction actually prohibits." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 443–44 (1974).

In their Motion for a Preliminary Injunction, Plaintiffs seek to: 1) eliminate totally Defendants' use of restrictive housing "for disciplinary or punitive purposes"; 2) "limit any removal of youth from the general population [to restrictive housing] to rare and temporary responses to prevent imminent and serious physical harm to persons"; 3) eliminate totally the "routine use of mechanical restraints" and limit "all mechanical restraint use within the institution to rare and temporary responses necessary to prevent imminent and serious physical harm to persons or during transportation outside the institution"; 4) eliminate totally the use of incapacitating agents "for punishment and behavior management or control"; and 5) limit the use of incapacitating agents to "rare and temporary responses necessary to prevent imminent and serious physical harm to persons." (Dkt. 17, Pls. Br. Supp. Mot. Prelim. Inj. at 2.)

Plaintiffs tacitly concede that Defendants' use of restrictive housing, mechanical restraints, and incapacitating agents is necessary and appropriate under certain circumstances, because they do not seek an injunction ending the use of such practices altogether.  Instead, they set forth vague and subjective descriptions for the situations in which they believe the use of such practices would be best.  The ambiguity of Plaintiffs' request that these practices be limited only in

certain situations relies on subjective adjectives as qualifiers that render the requested injunction unworkable in the face of rapidly evolving conditions and threats facing staff members.

### 1.   *The proposed injunction language is impermissibly vague.*

The requested injunction is so vague and ambiguous that, as applied, it would require guesswork and speculation.   For example, Plaintiffs' requests regarding the use of restrictive housing seeks to limit the use of such housing "to rare and temporary responses to prevent imminent and serious physical harm to persons." (Dkt. 17, Pls. Br. Supp. Mot. Prelim. Inj. at 2.)  Confusingly, the language of the requested injunction seeks to limit the use of restrictive housing to "rare and temporary responses" to such threats of serious physical harm.  It is unclear how frequently youths could be moved to restrictive housing as the result of imminent threats of serious harm to qualify as "rare."  There is also no indication as to what might constitute a sufficiently "imminent" threat.  Nor is there any guidance regarding what would suffice as "serious physical harm."

Plaintiffs' requests regarding incapacitating agents suffer from the same crucial deficiencies and ambiguities with the language "rare and temporary responses necessary to prevent imminent and serious physical harm to persons." (Dkt. 17, Pls. Br. Supp. Mot. Prelim. Inj. at 2.)  Additionally, the requests seek to eliminate the use of incapacitating agents completely for "behavior management or control," (*id.*), but Plaintiffs provide no clearly defined or delineated explanation for those terms.

Analyzing Plaintiffs' request within the context of their constitutional challenges illustrates the ambiguity in the proposed injunction language. For instance, Plaintiffs ask the Court to issue an order restricting the use of incapacitating agents based on the allegation that the current policy causes staff to use excessive force. When examining whether an act constitutes excessive force, courts must consider "such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321. In analyzing these factors, courts must allow for the fact that corrections officers are often forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving when determining the amount of force that is necessary in a particular situation. *Wilson v. Williams,* 83 F.3d 870, 876 (7th Cir. 1996); *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Incapacitating agents are currently used to avoid physical altercations and to quickly subdue rapidly escalating situations for purposes of ensuring the safety of staff and youth. *See* (Gustke Decl. ¶¶ 52–53, 109.) If staff must constantly undergo an analysis of a vague preliminary injunction while facing uncertain and rapidly escalating situations, the specificity of the proscribed conduct becomes even more critical. Any doubts as to the impact of a vague injunction on their own conduct may cause hesitation and jeopardize the safety and security of the entire institution.

Accordingly, because Plaintiffs have not presented the Court with a proposed injunction containing the requisite specificity, the Court should deny the Motion.

> **2.** **The proposed injunction language conflicts with the Wisconsin Department of Corrections Administrative Code Provisions.**

Plaintiffs are, in effect, asking the Court to craft LHS and CLS interim-policies with no guidance as to how those interim policies will impact, match with, or possibly contradict any current LHS, CLS, or DOC polices. Further, Plaintiffs ask the Court to essentially re-draft portions of the Wisconsin Administrative Code, circumventing the well-settled procedures for that process. Decisions affecting the juvenile facilities are not decisions that should be made hastily. Thus, this Court should deny Plaintiffs' request for preliminary injunction until a full trial on the merits can be completed.

The Wisconsin Administrative Code contains regulations that were specifically promulgated to "provide rules governing the conduct of youth," for "the discipline of youth who violate those conduct rules" and with the goals of operating "orderly institutions," deterring youth from committing further delinquent acts, and to provide a uniform disciplinary process that "enhances the constructive, individualized programming for youth." Wis. Admin. Code DOC §§ 373.01(1)–(4). Adding to the confusion of Plaintiffs' requested preliminary injunction is its incompatibility with these Administrative Code provisions.

In particular, Plaintiffs seek to eliminate the use of what they call "solitary confinement," but they make no effort to connect that term to the Administrative

Code definitions of restrictive housing that are applicable to LHS and CLS. DOC Chapter 373 defines two types of restrictive housing: "close confinement," which is a type of restrictive housing that means "restriction of a youth to the youth's assigned room with a minimum of one hour out of room time per day;" and "modified confinement," which is a type of restrictive housing that means "restriction of a youth to the youth's assigned room with a minimum of 4 hours of out-of-room time per day." Wis. Admin. Code DOC §§ 373.03(3) and (22). It is entirely unclear whether Plaintiffs seek to prohibit the use of one or both of the types of restrictive housing employed at LHS and CLS.

Additionally, Plaintiffs seek to eliminate the use of "solitary confinement" "to rare and temporary responses to prevent imminent and serious physical harm to persons." (Dkt. 17, Pls. Br. Supp. Mot. Prelim. Inj. at 2.) However, DOC Chapter 373 permits the imposition of both types of restrictive housing as a "major penalty" upon a finding that a youth committed a "major conduct rule violation." *See* Wis. Admin. Code DOC §§ 373.03(17)–(18), 373.80(3). Major conduct rule violations include several acts that may or may not involve "imminent and serious physical harm to persons." Moreover, the determination of whether several of the enumerated major conduct violations could pose an imminent risk of serious physical harm would turn on subjective perceptions and an understanding or awareness of, among other things, the context and the youth's history.

For example, the following acts are considered major conduct rule violations that may result in the imposition of restrictive housing: inciting a disturbance,

possessing a weapon, engaging in sexual contact with another youth, escape, obstruction, and using or possessing an intoxicant or paraphernalia. *See* Wis. Admin. Code DOC § 373.11. If a weapon was found under a youth's mattress, staff would be left to guess whether they could still reasonably perceive an imminent threat of serious physical injury and whether they could impose a major penalty for this major conduct rule violation. If two youths were found engaging in otherwise consensual sexual contact, staff would have to speculate as to whether such contact might pose an imminent threat of serious physical harm to either participant before determining whether they could impose a major penalty for the major conduct rule violation. These examples show that by asking the Court to replace even just a small portion of the DOC Administrative Code with incompatible, new provisions, staff may be led to focus their attention on whether their conduct violates a court order rather than whether a youth's conduct violates institutional rules.

Furthermore, restrictive housing is the **<u>only</u>** enumerated penalty for major conduct rule violations. *See* Wis. Admin. Code DOC § 373.80(3). While a minor penalty may be imposed for a major conduct violation, *see* Wis. Admin. Code DOC § 373.11(1), minor penalties include far less serious consequences including verbal or written reprimands, loss of specific privileges, requiring an apology, imposing monetary restitution, and imposing extra duties related to the misconduct. *See* Wis. Admin. Code DOC § 373.68(3). Thus, Plaintiffs seek an injunction that would limit Defendants to imposing these types of minor penalties when a youth has engaged in very serious behavior, such as escaping from the facility or possessing weapons,

simply because the behavior did not pose an "imminent" threat of "serious physical harm" to another person. The foregoing is simply incompatible with maintaining institutional security and control.

Plaintiffs' requested injunction would, in effect, require the Court to determine that the majority of Chapter DOC 373 of the Wisconsin Administrative Code is unconstitutional. Absent the ability to rely on the applicable Administrative Code provisions and make penalty determinations on a case-by-case basis, staff will be left to contemplate whether they are complying with the requested injunction by simply following the Administrative Code. Courts do not permit statutes or regulations to be impermissibly vague, *see generally Kolender v. Lawson*, 461 U.S. 352 (1983), and the Court likewise should not impose an impermissibly vague injunctive order in this case. Accordingly, the Plaintiffs' Motion should be denied because it fails to provide the Court with the requisite level of specificity for the proposed injunction.

### B. The Preliminary Injunction Is Not in the Public Interest.

Even assuming, again for the sake of argument, that Plaintiffs can show a likelihood of success on the merits, irreparable harm, and the requisite balance of harms, they still are not entitled to a preliminary injunction because it is not in the public interest. Further, a preliminary injunction could do more harm than good by hindering ongoing efforts to move LHS and CLS forward in minimizing the uses of restrictive housing, incapacitating agents, and mechanical restraints.

For instance, among officials at the DOC, LHS, and CLS, there are ongoing and recent conversations about taking steps to ensure and encourage out-of-room time for youth in both high hall and low hall at CLS. (Gustke Decl. ¶ 64.) Steps are already underway to modify youth's schedules for more out-of-room time. (*Id.*) Similarly, officials are considering how best to address youth who tend to need more staff supervision and attention such that those youth can receive more individualized treatment and care. (*Id.*) A preliminary injunction will divert attention from these efforts, ultimately slowing LHS and CLS's progress while simultaneously changing how the institutions maintain safe and secure correctional institutions.

It is axiomatic that it is in the public's interest to have safe juvenile correctional institutions. Maintaining institutional security and preserving internal order and discipline are "essential goals" for correctional facilities. *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Id.* at 546–47 (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974)). Corrections staff "must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id.* at 547; *see also Hughes v. Judd*, 108 F. Supp. 3d 1167, 1219–20 (M.D. Fla. 2015).

The ability to have discretion in policies pertaining to restrictive housing, mechanical restraints, and incapacitating agents affords staff at LHS and CLS the continued opportunity to work with youth and individual situations on a case-by-

case basis.  This not only grants the necessary flexibility to ensure the safety of staff and youth within the institution, but it also allows staff to tailor their interactions with youth based in each individual youth's needs.

As the *Nelson* Court explained,

> Without a program of individual treatment the result may be that the juveniles will not be rehabilitated, but warehoused, and that at the termination of detention they will likely be incapable of taking their proper places in free society; their interests and those of the state and the school thereby being defeated.

*Nelson*, 491 F.2d at 359.  Broadly eliminating Defendants' ability to employ restrictive housing, mechanical restraints, and incapacitating agents when faced with unique circumstances and individuals will negatively impact LHS's and CLS's ability to provide necessary rehabilitative treatment.

Accordingly, forcing LHS and CLS to operate under an injunction for the duration of this litigation serves the public's interest far less than denying the injunction where Plaintiffs cannot make a clear showing of constitutional deprivations.  Because the public interest weighs against granting Plaintiffs' Motion, it should be denied.

## CONCLUSION

Based on the foregoing, the Defendants respectfully request that the Court deny the Plaintiffs' Motion for Preliminary Injunction.

Dated this 26th day of May, 2017.

CRIVELLO CARLSON, S.C.
Attorneys for Defendants


By:      *s/ Samuel C. Hall, Jr.*
         SAMUEL C. HALL, JR.
         State Bar No.:  1045476
         BENJAMIN A. SPARKS
         State Bar No.:  1092405

**PO ADDRESS**:
710 North Plankinton Avenue
Suite 500
Milwaukee, WI  53203
Phone:  414-271-7722
Email:      shall@crivellocarlson.com
            bsparks@crivellocarlson.com