UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WISCONSIN

---

**J.J.**, by and through his next friend,
Saleena Jackson; **K.D.**, by and through
her next friends, John Levy and Meranda
Davis; **C.M.**, by and through his next friend
Toinette Ducksworth; **R.N.**, by and through
his next friend Gloria Norwood, **M.S.,** by
and through his next friend Jolene Waupekanay;
**A.V.,** by and through his next friend Veronica
Rocha-Montejano; **M.R.,** by and through his next
friend Autumn Rodgers; **S.K.,** by and through her
next friend, Thomas Korn; and **A.P.,** by and
through her next friend, Louise Plaskey, for
themselves and all others similarly situated,

    Plaintiffs,

v.                                                             **Case No.: 17-CV-47**

**JON E. LITSCHER**, in his official capacity
as Secretary of the Wisconsin Department
of Corrections; **JOHN D. PAQUIN**, in his
official capacity as Administrator of
Division of Juvenile Corrections of the
Wisconsin Department of Corrections;
**WENDY A. PETERSON** in her official capacity
as Superintendent of the Lincoln Hills
School for Boys and the Copper Lake
School for Girls; **BRIAN GUSTKE**, in his official
Capacity as Director of Security for the Lincoln
Hills School for Boys and the Copper Lake
School for Girls,

    Defendants.

---

# DECLARATION OF BRIAN GUSTKE

---

I, BRIAN GUSTKE, being first duly sworn upon oath, declare and state as follows:

1. I am the Security Director at Lincoln Hill School for Boys ("LHS") and Copper Lake School for Girls ("CLS"), both of which are located in Irma, Wisconsin, and under the purview of the State of Wisconsin Department of Corrections ("DOC"). I have held the position of Security Director since July 11, 2016.

2. I make this declaration based on my own personal knowledge, training, and more than 15 years' experience in the corrections field.

3. I graduated from Wautoma High School in 1996. In February, 2001, I graduated from the State of Wisconsin Department of Corrections Training Academy in Oshkosh, Wisconsin. From February, 2001, to July, 2016, I held several positions at Redgranite Correctional Institution, an adult correctional institution located in Redgranite, Wisconsin, including: Correctional Officer (approximately 3 years); promoted to Correctional Sergeant (approximately 2.5 years); promoted to Supervising Officer I (approximately 1.5 years); promoted to Supervising Officer II (Line Captain, approximately 2.5 years; Segregation Captain, approximately 4 years; Administrative Captain approximately 1 year); the Administrative Captain at Redgranite is the designee to the Security Director. In July, 2016, I then moved into my current position of Security Director for LHS and CLS.

4. In 2012, I graduated from the State of Wisconsin Enterprise Management Development Academy. I have been a Principles of Subject Control

Instructor for the DOC since 2008, and I was a member of the Emergency Response Unit at Redgranite, where, among other things, I was trained in the use of firearms and incapacitating agents. From 2010 to July, 2016, I was the Assistant Commander of the Crisis Negotiations Team at Redgranite.

5. I am familiar with the policies, practices, and customs related to operating LHS and CLS, including policies, practices, and customs relating to restrictive housing, mechanical restraints, and incapacitating agents. I am also familiar with the record-keeping procedures at LHS and CLS as it relates to records created and retained in the ordinary course of business.

6. I have reviewed the allegations in the Amended Complaint in the above-captioned action, and I am familiar with the general allegations and claims made in this lawsuit.

7. LHS and CLS were created by and operate under the purview of the DOC and are thus subject to DOC ch. 373, Wis. Admin. Code.

8. Under the Wisconsin Administrative Code provisions governing Lincoln Hills School for Boys ("LHS") and Copper Lake School for Girls ("CLS"), "youth" means "a person or persons supervised by the department in an institution consistent with the requirements of law and regardless of age." Wis. Admin. Code DOC § 373.03(29).

9. Within LHS and CLS, the phrase "restrictive housing" generally refers to two types of confinement, including "close confinement" and "modified confinement," both of which are defined under sections 373.03(3) and (22) of the

DOC Administrative Code. "Close confinement" is a type of restrictive housing that means "restriction of a youth to the youth's assigned room with a minimum of one hour out of room time per day." Wis. Admin. Code DOC § 373.03(3). "Modified confinement" is a type of restrictive housing that means "restriction of a youth to the youth's assigned room with a minimum of 4 hours of out-of-room time per day." Wis. Admin. Code DOC § 373.03(22). Both close and modified confinement could be used at LHS and CLS, per DOC ch. 373, Wis. Admin. Code. However, LHS and CLS mostly use modified confinement. During my time at LHS and CLS, I cannot recall the use of close confinement.

10. "On the belt" is an inaccurate, obsolete, slang term that does not describe any policies or practices at LHS or CLS.

11. Staff at LHS and CLS use the phrase "belt status" to refer to a youth who is, for the most part, placed in mechanical restraints around his or her wrists that also attach to a belt worn around the waist.

12. The phrase "pepper spray" refers to multiple different types of incapacitating agents. LHS and CLS only use one kind of incapacitating agent, called Oleoresin Capsicum ("OC").

13. As of April 15, 2017, Vincent Schiraldi and Dr. Stuart Grassian had not visited LHS or CLS.

14. "Cottage" is an antiquated term—today, housing units are referred to as "units."

15. Not every violation of a conduct rule leads to placement in restrictive

4

housing. A "major violation" of the conduct rules as outlined in DOC ch. 373, Wis. Admin. Code, may result in a youth being placed in restrictive housing. Not every violation of conduct rules is a major violation.

16. It is not unusual for LHS or CLS to place youth in restrictive housing for non-violent rule violations because not all major violations of the conduct rules relate to violence. LHS and CLS do not routinely place youth in restrictive housing for non-violent rule violations.

17. S.K. was placed in restrictive housing for stealing candy from a cupboard in the kitchen at CLS.

18. K.D. was placed in restrictive housing for stealing headband paint from the art room and using the paint to decorate headbands with the word "Eastside," that the staff deemed to constitute graffiti and potentially pose a safety risk.

19. J.J. was issued conduct report #81954 for pulling away from staff escort while in restraints. The hearing was held on August 8, 2016, and J.J. was given the disposition of modified confinement for one day. He returned to the general population living unit on August 9, 2016.

20. J.J. was placed in modified confinement for his behavior. He was given multiple opportunities to remove the items from his window and camera, but he refused. Staff must be able to see into a youth's room to ensure the youth's safety and well-being are not jeopardized.

21. K.D. was issued a conduct report on September 2, 2016. She admitted

to yelling, cursing, and refusing to attend school. She was sent back to her room and, while in her room, she covered her room window and tied an item around her neck. The disposition on the conduct report states that K.D. received zero days in modified confinement.

22. The length of time a youth is placed in restrictive housing depends on the circumstances of each major conduct rule violation, including, but not limited to, the type of restrictive housing, the youth's behavior, and the number of major rules violations within a given period of time.

23. Wisconsin Administrative Code DOC §§ 373.80, 81 outline some of the rules governing the length of time a youth may be placed in restrictive housing.

24. "Prehearing security" is not synonymous with "restrictive housing." Prehearing security is governed by Wis. Admin. Code DOC § 373.13. For instance, a youth's own room may be used for prehearing security.

25. Any given youth's time in restrictive housing depends on their frequency and degree of major conduct rules violations committed by that youth.

26. There is no policy at LHS and CLS mandating or stating that youth must spend 22 or 23 hours per day alone in their rooms. The amount of time a given youth is permitted out of his or her room in restrictive housing above and beyond the minimum requirements depends on the youths' behavior. Youth are allowed out of their rooms while in restrictive housing for a variety of reasons, including, but not limited to, recreation time, education, and hygiene.

27. Aggression Replacement Training and the Juvenile Cognitive

Intervention Program are not the only types of rehabilitative programming youth may receive. Youth at LHS and CLS are in school year-round. Thus, school is not required every day. On days when teachers are not on site, youth spend one-on-one time with social workers, who work with youth in a variety of other educational and rehabilitative activities.

28. Restrictive housing at LHS and CLS are divided into two areas—"high hall" and "low hall." In general, high hall is more restrictive than low hall at LHS.

29. In both high hall and low hall, youth are not restricted to their rooms for 23 or 24 hours per day. Rather, youth in both halls are given approximately one hour in a common day room each day, which allows them to converse with other youth, complete paper work, handle their personal property, and write and receive mail. This out-of-room time is in addition to time youth spend out of their rooms for schooling, hygiene, and exercise, all of which can total approximately four or more hours, per day.

30. Out-of-room time is different for each youth depending, in part, on their behavior while in restrictive housing.

31. Whether youth at LHS are placed in high hall or low hall depends on, among other things, the youth's level of aggression.

32. The exact measurements of rooms in restrictive housing are 7 feet, 5 inches by 11 feet, 4 inches.

33. Door covers may be closed for privacy or safety reasons, including, but not limited to, times when medication is distributed or if disruptive youth are in the

hallway.

34. Lights stay illuminated, as required by policy, for safety reasons, including, but not limited to, monitoring youth at all times for potential self-harm, hiding under beds, or destruction of property.

35. Some restrictive housing rooms in Wells have sinks and toilets.

36. Mattresses are close to the ground for safety reasons, including, but not limited to, youth hiding under beds during room checks.

37. Toilet paper is allowed in small amounts for safety reasons. For instance, in the past, youth have abused toilet paper in their rooms in several ways, including, but not limited to, using the toilet paper to cover windows and cameras, obstructing the staff's view into their rooms.

38. For those rooms in restrictive housing at CLS that lack a toilet and sink, youth must turn on a call light so that guards can let them out to go to the toilet.

39. Youth might defecate or urinate in their rooms for a number of reasons, not because staff is unresponsive. There have been instances of youth defecating and urinating in inappropriate places in their rooms even when their rooms are equipped with toilets.

40. The personal property allowed in rooms differ for each youth depending on their individual treatment plan. For instance, some youth have stress balls, chalk, and crayons. By contrast, pens and pencils are not allowed in rooms because they can pose safety hazards for self-harm or harm against the staff.

41. On occasion, youth have been allowed to have paper in their rooms. Most of the time, however, paper is not permitted in youth's rooms, other than in books.

42. Only youth in high hall and CLS restrictive housing are placed in mechanical restraints when outside their rooms, with certain exceptions such as, for example, recreational time. Youth in low hall are not placed in mechanical restraints outside their rooms. Pursuant Division of Juvenile Correctoins Policy #500.70.10, a true and correct copy of which is attached hereto as Exhibit A, "[t]he Division of Juvenile Corrections may use mechanical restraints to confine youth at risk of immediate physical injury to self or others."

43. Youth are never chained to tables or desks. For some youth on belt status, he or she may be temporarily tethered to a table in a day room or desk in a classroom by a nylon tether for, among other things, safety concerns based on the youth's behavior.

44. Youth who are on belt status have mechanical restraints temporarily removed so that they can exercise. Further, youth on belt status can write, as well as interact with staff and talk to other youth.

45. New youth arrivals at the restrictive housing units in LHS can be placed directly in low hall and thus not placed on belt status.

46. Whether mechanical restraints are applied to youth at LHS in low hall depends on the youth's behavior and his conduct in the living unit.

47. Whether mechanical restraints are applied to youth at LHS depends

on the youth's behavior and his conduct in the living unit. Youth in high hall are reviewed weekly to determine whether they are to be kept on belt status.

48. Youth do not spend their exercise time in mechanical restraints.

49. Youth at LHS and CLS are not treated like chained animals.

50. LHS and CLS staff are trained to use and carry the incapacitating agent Oleoresin Capsicum ("OC").

51. The physical effects of a particular incapacitating agent varies based on the particular person. The incapacitating agents at LHS and CLS are not designed to inflame the respiratory tracts or temporarily restrict breathing, as compared to other incapacitating agents.

52. Staff administer incapacitating agents in accordance with the applicable use of force and incapacitating agents policies. A true and correct copy of Division of Juvenile Corrections Policy #300.05.02 regarding use of force is attached hereto as Exhibit B.

53. Incapacitating agents are not utilized as a form of punishment for youth's conduct. Rather, incapacitating agents are used as a last resort in situations where youth show escalated resistance and do not respond to conservative measures of control, in order to avoid safety hazards to staff and youth. Based on my experience, it is my opinion that the use of incapacitating agents have resulted in fewer injuries to staff and youth because, without incapacitating agents, staff would be required to deal with escalating incidents hands-on, potentially leading to greater risk of physical altercations and injuries.

54. Incapacitating agents (Oleoresin Capsicum) come in the form of a Mark III, Mark IV, or Mark IX deployment systems—all of which refer to the size of the carrying canister. The incapacitating agent can either be in the form of foam or liquid.

55. Incapacitating agents can be dispensed in the "fogger" setting or the "streamer" setting, and the setting is chosen based on the circumstances and need.

56. All staff members who carry incapacitating agents, as part of their training, are required to be exposed to incapacitating agents, and each person responds to such exposure differently.

57. LHS and CLS staff allow youth to decontaminate after incapacitating agents are dispensed. The physical effects of the decontamination process varies based on the particular person.

58. Paper gowns are no longer used at LHS and CLS, beginning in late 2016 or early 2017. The decision on whether a youth is given a cloth gown or new clothes is determined on a case-by-case basis, in part, based on the youth's behavior, such as indications of self-harm or abuse to property. Otherwise, youth are simply issued clean clothes.

59. According to LHS and CLS records, incapacitating agents were administered on J.J. four times.

60. According to LHS and CLS records, incapacitating agents were administered on M.R. seventeen times and R.N. nineteen times.

61. On October 30, 2016, R.N. was in his room and refused to pull his arms

back into the pass-through opening in his door after being provided toilet paper. Staff briefly left the room to report R.N.'s refusal to a supervisor. R.N. was able to grab a cord attached to a fan located in the hallway outside of his room. Staff responded, and R.N. refused to let go of the cord. Staff took possession of the cord in an attempt to regain control over it. R.N. began wrapping the cord around his neck and staff stopped pulling the cord. The supervising youth counselor presented an incapacitating agent to R.N. and instructed R.N. to drop the cord. R.N. dropped the cord, and it was removed from the area. R.N. still refused to bring his arms back into his room through the pass-through opening and spit in the face of staff attempting to talk with him. Based on R.N.'s behavior and consultation with PSU, it was determined that R.N. be placed in a security gown on control status. R.N. continued to refuse to comply after multiple instructions, so incapacitating agents were used to gain compliance and prevent any further incidents of potential self-harm or jeopardize the staff's safety.

62. LHS and CLS participate in Performance-based Standards, and I have received training through that program.

63. I am aware of the general trends and practices towards within the juvenile-correction field related to minimizing the use of restrictive housing, mechanical restraints, and incapacitating agents.

64. LHS and CLS are part of these general trends. For instance, among officials at the DOC, LHS, and CLS, there are ongoing and recent conversations about taking steps to ensure and encourage out-of-room time for youth in both high

hall and low hall at CLS. Steps are already underway to modify youth's schedules for more out-of-room time. Similarly, officials are considering how best to address youth who tend to need more staff supervision and attention such that those youth can receive more individualized treatment and care.

                                                Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 26th day of May, 2017.

                                                By: *s/ Brian Gustke*
                                                        BRIAN GUSTKE