**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

J.J., *et. al.*,

                              Plaintiffs,

v.                                                          Case No. 17-CV-47

Jon E. Litscher, *et. al.*,

                              Defendants.

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION**
**FOR PRELIMINARY INJUNCTION**

I.        **INTRODUCTION**

Defendants' discovery production to date makes it abundantly clear that youth at Lincoln

Hills School and Copper Lake School ("LHS and CLS") have endured and continue to endure

dangerous, counterproductive, and unconstitutional conditions and practices. They sit in solitary

confinement for days, weeks, or months. Defendants put many youth in solitary confinement in

handcuffs and tether them to a table or desk for the brief time they spend out of their cells.

Defendants frequently spray youth with burning "chemical agents" to compel compliance with

their commands. Defendants argue this Court should let them make improvements by themselves

and on their own schedule. But it is clear that without a preliminary injunction Defendants will

continue to impose harm on the youth in their care.

II.       **ADDITIONAL FACTS OBTAINED IN DISCOVERY**

Plaintiffs filed their motion and opening brief before they had any opportunity to conduct

formal discovery, but even so, they set forth substantial evidence in support of their request for

preliminary injunctive relief. Since that time, through ongoing discovery, Plaintiffs have obtained significant additional evidence that supports their requested relief.

Defendants admit many of the key facts that paint a harrowing picture of life at LHS and CLS, particularly for children who find themselves in solitary confinement. For example, Defendants admit that youth, including some of the named Plaintiffs, have been held in solitary confinement for more than fifty consecutive days, and that some have spent more than 180 cumulative days in solitary. (Defs.' Resp. to Pls.' Supp. & Am. Statement of Proposed Facts (Dkt. 50, ¶ 39); Decl. of Laurence J. Dupuis in Support of Plaintiffs' Motion for a Preliminary Injunction ("Dupuis Decl."), Ex. A, Request for Admission ("RFA") 25, 26.) They admit that they have placed youth with mental illness in solitary confinement and have sent some youth who have been in solitary confinement to the Mendota Juvenile Treatment Center for mental health treatment. (*Id.,* RFA 16, 17.) They also admit that between 12-20 percent of the youth at LHS and CLS are in "restrictive housing" at any given time. ((Dkt. 50, ¶ 31; Dupuis Decl. ¶¶ 3-8 & Ex. B (as recently as May 2017, on average, 16.4 percent of youth at LHS and CLS were in solitary confinement.).)

Defendants admit that they place youth in restrictive housing to punish them for rule violations (Dkt 50, ¶ 28; Dupuis Decl., Ex. A, RFA 5), and that "[i]t is not unusual for LHS or CLS to place youth in restrictive housing for non-violent rule violations." (Dkt. 50, ¶ 33.) Indeed, Defendants concede that they put one of the named Plaintiffs in restrictive housing for stealing candy and another for stealing headband paint. (*Id.* at ¶ 34, 35.) Defendants held these Plaintiffs in solitary on "prehearing security" status for three days each, even though their violations were ultimately found to be "minor" and warranted the discipline of only oral reprimands. (Dupuis Decl., Exs. C, D.)

While Defendants use the term "restrictive housing," the conditions they describe constitute solitary confinement. They admit the cells measure 7'5" by 11'4". (Dkt. 50, ¶ 49.) They admit that the cells have only a bed, and, in some cases, a sink-toilet fixture, and no other furniture. (Dkt. 50, ¶ 52.) They admit that youth in restrictive housing eat all their meals in their cells. (Dupuis Decl., Ex. A (RFA 9).) They admit that youth are rarely allowed paper in their cells. (Dkt. 50, ¶ 61.) They admit that lights in the cells remain illuminated at all times. (Dkt. 50, ¶ 51.) They admit that youth in cells with toilets are not able to flush their own toilets and receive only a limited amount of toilet paper, regardless of that individual youth's behavior, and that youth without toilets in their cells must wait for guards to respond to call lights to use the bathroom. (Dkt. 50, ¶¶ 56, 57.) They do not appear to dispute that some youth have urinated and defecated in their cells because of guards' delays in responding to call lights.[1] (*Id.,* ¶¶ 58, 59.)

Although Defendants attempt to minimize the severity of the deprivations they impose on youth at LHS and CLS, and conflate aspiration with actuality when describing their policies and practices, the conditions to which Defendants subject these youth are largely as bleak as Plaintiffs described. For example, despite Defendants' purported policy[2] requiring that most youth in solitary—those in "modified confinement"—receive a minimum of four hours per day out of their cells (Dkt. 49 at 29; Dkt. 50, ¶ 42; Dupuis Decl. ¶ 13 & Ex. G),[3] Defendants do not

---

[1] Defendants do no more than posit that some youth may have urinated or defecated in their cells for reasons other than a lack of responsiveness. (Dkt. 50, ¶ 59; Gustke Decl. (Dkt. 52, ¶ 39).)

[2] Defendants deny that they have a "*policy* at LHS and CLS mandating or stating that youth *must* spend 22 or 23 hours per day alone in their rooms." (Dkt. 49 at 29; Dkt. 50, ¶ 42 (emphasis added).) But Plaintiffs' proposed finding did not assert that Defendants had a formal policy "mandating" that youth remain in their cells 22-23 hours per day. Rather, the proposed finding, based on the uncontroverted declarations of nine plaintiffs describing their personal experiences, asserted that children in solitary "generally spend 22-23 hours per day alone in their cells." (Dkt. 18, ¶ 42.)

[3] Defendant Gustke himself undermines the implication that youth in solitary get *at least* four hours out of cell per day by acknowledging that these youth are "given approximately one hour in a common day room each day . . ." and "this out-of-room time is in addition to time youth spend out of their rooms for schooling, hygiene, and exercise, all of which *can* total *approximately* four or more hours, per day." (Dkt. 52, ¶ 29 (emphasis added); Dkt. 49 at 29.)

directly refute the sworn statements of nine youth that they spent 22 or 23 hours per day in their cells in restrictive housing at LHS and CLS. (Dkt. 50, ¶ 42.)[4] Moreover, Defendants recently produced logs in discovery indicating that four hours of time out of cell appears to be rare. (Dupuis Decl., Ex. F.) Fewer than three hours per day out of cell appears to be far more common, and one or two, or even *zero*, hours of out time occurs not infrequently. (*Id.*) For example, one entry from December 31, 2016, shows that despite having "expected behavior," youth A.A. was in "lower day" for just an hour, from 13:30-14:30. (*Id.*) An entry from May 24, 2017, shows youth C.B. was only out of his cell for a shower, and showers are limited to 10 minutes by policy. (*Id.*; Dupuis Decl. Ex. G (Post Orders) at 4.)[5]

Defendants also restrict the education and programming available to youth in solitary confinement. They do not appear to dispute that youth in solitary receive only one hour of school per day, and they affirmatively admit that there are days when no school at all is provided. (Dkt. 50, ¶ 43.) They do not argue that they allow youth in solitary to participate in rehabilitative programs designed to address anger and behavioral issues, such as Aggression Replacement Training and Juvenile Cognitive Intervention Program.[6] (*Id.*; *see also, e.g.*, Dupuis Decl.,Exs. H & I (social services notes indicating youth in RHU not eligible for programming).) And despite Defendants' claim that "[o]n days when teachers are not on site, youth spend one-on-one time

---

[4] Defendants object to these proposed finding as "vague and ambiguous as to time," suggesting that Defendants may have recently begun to *try* to improve their practices without denying Plaintiffs' accounts. (*Id.*; *see also* Dkt. 50 at pp. 4-5 (objecting that "[m]any of Plaintiffs' proposed facts fail to delineate time frames. The policies, practices, and customs at LHS and CLS have changed over the years . . . ."); *see also* Dkt. 49 at 41 (describing "ongoing and *recent* conversations" among DOC officials "about taking steps to ensure and encourage out-of-room time for youth in both high hall and low hall at CLS" and steps that "are already *underway* to modify youth's schedules for more out-of-room time.") (emphasis added); Dkt. 52, ¶ 64 (same).)

[5] These are examples of the materials Defendants recently produced. Plaintiffs anticipate introducing additional evidence on this issue at the hearing.

[6] This denial of access to behavioral rehabilitation programs is not only excessively punitive, it is self-evidently counterproductive for youth, who find themselves in solitary because of behavioral problems. (Dkt. 19, ¶ 64.)

with social workers, who work with youth in a variety of other educational and rehabilitative activities," (Dkt. 50, ¶ 43), Defendants' own logs show that is simply not the case. For example, Youth C.B. received neither a visit from a social worker nor education on multiple days in late May 2017. (Dupuis Decl., Ex. F.)

The use of mechanical restraints is also commonplace. Defendants admit that all the youth in "high hall"—the more restrictive wings of the boys' solitary confinement units (Dkt. 50, ¶¶ 46-47)—as well as some of the girls in solitary, are handcuffed to waist belts and tethered to a table or a desk when they are outside their cells in day space or in a classroom (Dkt. 50, ¶¶ 62, 63, 66; Dupuis Decl., Ex. J ("All Youth In High Hall Are On Belt Status"); *Id.* Ex. K (photographs of youth tethered to table, length of tether).). Defendants admit that they have kept some youth on "belt status" for more than twenty-eight consecutive days. (*Id.*, Ex. A (RFA 29).) Defendants admit that they only review a youth's belt status once a week, (Dkt. 50, ¶ 68), so even a child who presents no risk of ongoing harm may remain on the belt for up to a week before her status is even reviewed.

Moreover, what little exercise time youth on belt status get is spent locked alone in a 7 ½ foot x 11 foot solitary confinement cell with the bed removed, where the exercise "equipment" amounts to a basketball and/or yoga ball and sometimes an exercise mat. (Second J.J. Decl. (Dkt. 47 ¶ 7); Dupuis Decl., Ex. J (photographs of exercise cell and control panel showing cell no. 123 marked "Gold's Gym Exercise Room".) Time locked alone in such a tiny and spartan cell can hardly count as exercise time, much less as time *out* of cell.

Defendants also admit to prodigious use of pepper spray. Defendants admit that they used pepper spray 198 times from January through October 2016 (Dkt. 50, ¶ 106), after using it only 45 times in all of 2015 (Dkt. 50, ¶ 110). Recently produced reports show that Defendants used

pepper spray on youth at LHS and CLS at least 227 times in 2016 and 75 times from January 1, 2017 through April 23, 2017, a rate of nearly 20 incidents per month. (Dupuis Decl. ¶¶ 19, 20 & Ex. M.) Defendants admit that they pepper sprayed Plaintiff J.J. four times, Plaintiff M.R. seventeen times and Plaintiff R.N. nineteen times. (Dkt. 50, ¶¶ 107-108.) Both M.R. and J.J. have asthma. (Dupuis Decl., Exs. N, O.)

Although Defendants assert that they use these chemical agents "as a last resort in situations where youth show escalated resistance and do not respond to conservative measures of control, in order to avoid safety hazards to staff and youth," (Dkt. 50, ¶ 95), they also admit that they have used pepper spray on youth who were in mechanical restraints or who were locked in their cells at the time Defendants sprayed them. (Dupuis Decl., Ex. A (RFA 20, 21).)

Moreover, by insisting that they are already taking steps to reduce their use of restrictive housing, mechanical restraints and pepper spray, Defendants tacitly admit that their existing solitary confinement, restraint and pepper spray practices are unnecessary and harmful. (Dkt. 49 at 2-3 (describing "continuous ongoing efforts at LHS and CLS to move towards the reduction in uses of restrictive housing, incapacitating agents, and mechanical restraints."); *id.* at 41.) Defendants do not deny that most juvenile facilities around the country have eliminated punitive solitary confinement and have reduced the use of isolation to "cool-out" periods lasting at most hours, in contrast to the days and weeks that children at LHS and CLS spend in restrictive housing. (Dkt. 50, ¶ 120 ("No dispute as to the descriptions of practices in other states.").) They admit that the elimination of solitary confinement at juvenile facilities in other jurisdictions has led to reductions in violent acts at those institutions, making them safer than when they used solitary. (Dkt. 50, ¶ 121.) They do not dispute that juvenile correctional facilities in many other jurisdictions do not use pepper spray *at all*. (Dkt. 50, ¶¶ 124-125.) They also acknowledge that

numerous professional organizations and expert agencies have recommended the elimination of punitive solitary confinement, the restriction of security-related isolation to a maximum of a few hours, and the elimination of pepper spray for juvenile prisoners. (Dkt. 50, ¶¶ 127, 128, 130, 131, 133.)

Defendants also contest the admissibility of the opinions of Plaintiffs' experts, but their objections rest principally upon the fact that neither expert had visited the facility, interviewed youth, or reviewed discovery at the time the preliminary injunction motion was filed. (Dkt. 49 at 23-30; Dkt. 50 at 3-4.)[7] Of course, because the preliminary injunction motion was filed shortly after this Court's screening order and before even the preliminary pretrial conference, such visits, interviews and discovery would have been impossible at the time. In any event, both of Plaintiffs' experts have now been given access to and reviewed materials produced by Defendants in discovery, and Plaintiffs' juvenile corrections expert, Vincent Schiraldi, M.S.W., inspected LHS and CLS and spoke with both staff and Plaintiffs on May 25, 2017.

Based on Defendants' pleadings, it therefore appears that the primary factual questions to be resolved at the preliminary injunction hearing will be: the nature of some of the conditions in the solitary confinement units, including the actual time children in these units spend outside of their cells, the Defendants' practices relating to use of mechanical restraints and pepper spray, and the content and bases of Plaintiffs' expert witness opinions after they obtained access to additional information through discovery.

---

[7] Defendants also understate the extent of the information about the practices at LHS and CLS available to the experts at the time of their declarations. For example, although Defendants claim that the experts relied solely on the allegations of the complaint, five plaintiff affidavits, and the Wisconsin Statutes and Administrative Code (Dkt. 50 at 4), Mr. Shiraldi also reviewed the Defendants' own written policies and procedures, pepper spray logs, counts of youth in solitary confinement units, and disciplinary records of some youth obtained through open records requests and filed with Plaintiffs' motion for class certification. (*See* Dkt. 19-2 (list of documents reviewed by V. Schiraldi, including various DOC policies and procedures, redacted disciplinary records, chemical agents monthly reports, and cell confinement logs); *see also* Dkt. 20, ¶¶ 10-12 (list of documents reviewed by Dr. Grassian, including DOC policies and procedures).)

## III.   ARGUMENT

As set forth in Plaintiffs' opening brief, to obtain a preliminary injunction, Plaintiffs must show that their underlying case has a likelihood of success on the merits, that no adequate remedy at law exists, and that they will suffer irreparable harm without the injunction. *Wood v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007). "The threshold for establishing likelihood of success is low," and requires only that Plaintiffs "present a claim plausible enough that . . . the entry of a preliminary injunction would be an appropriate step." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782-83 (7th Cir. 2011). If Plaintiffs satisfy these three elements, the court must then balance the harm to the parties and to the public interest from granting or denying the injunction. *Wood*, 496 F.3d at 622.

Plaintiffs have demonstrated a likelihood of success on the merits of their claims, there is no adequate remedy at law, they will suffer irreparable harm without the requested relief, and the balance of the equities favors injunctive relief.

### A.  Plaintiffs Are More Than Likely to Succeed on the Merits

#### 1.   Defendants Apply the Wrong Legal Framework, Incorrectly Relying Upon *Monell v. Department of Social Services*

Defendants' entire argument rests on an incorrect legal premise: that Plaintiffs can prevail only if they show that Defendants' "policies or customs" caused or are causing Plaintiffs' constitutional deprivations. (Dkt. 49 at 5.) While there can be no serious dispute that Defendants have widespread policies or practices to extensively use solitary confinement, mechanical restraints and pepper spray, Defendants' argument incorrectly imports the "policy or custom" framework from the doctrine of municipal liability and relies heavily on cases regarding state immunity from damages. These doctrines are not relevant to this case; Defendants are not municipal actors and Plaintiffs are not seeking monetary damages from state officials.

In *Monell v. Department of Social Services*, the Supreme Court considered whether a local government can be considered a "person"—and therefore sued—under 42 U.S.C. § 1983 for an injury caused by its employees. The Court concluded that such a suit is only permissible when "a government's policy or custom" can be said to inflict the injury. 436 U.S. 658, 694 (1978). Subsequently, the Supreme Court limited suits against *state* officials under § 1983, concluding that state officials are protected from damages suits by Eleventh Amendment sovereign immunity. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

This case falls into neither of those categories. Instead, Plaintiffs bring a classic prison conditions of confinement case, solely seeking systemic injunctive relief against state officials to remedy ongoing violations of federal law. *See, e.g., Brown v. Plata*, 563 U.S. 493 (2011); *Hutto v. Finney*, 437 U.S. 678 (1978); *Wellman v. Faulkner*, 715 F.2d 269 (7th Cir. 1983). This type of suit is expressly permitted under *Will* and *Graham*. *See Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" (quoting *Graham*, 473 U.S. at 167 n.14)); *Graham*, 473 U.S. at 169 n.18 ("In an injunctive or declaratory action grounded on federal law, the State's immunity *can* be overcome by naming state officials as defendants." (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 (1984); *Ex parte Young*, 209 U.S. 123 (1908) (emphasis in original)).[8] Rather, as the Seventh Circuit has explained, in cases against state officials in which plaintiffs are not seeking damages, the court "need only conduct a 'straightforward inquiry'" into

---

[8] Defendants do not assert that they are immune from suit, nor could they, as this case fits into the classic *Ex parte Young* framework. *See* 209 U.S. at 167-68 (1908) (state sovereign immunity does not bar suits against state officials for injunctive relief to remedy ongoing violations of federal law).

whether there is "an ongoing violation of federal law" and whether the requested relief can be "properly characterized as prospective." *Indiana Protection & Advocacy Servs. v. Indiana Family & Social Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010) (internal citations omitted). The Court should therefore disregard Defendants' citations to *Monell* and subsequent cases interpreting when practices amount to a "policy or custom" (*see* Dkt. 49 at 5-8), as they are not relevant to this matter.

### 2. Plaintiffs' Claims Should Be Analyzed Under a Constitutional Standard That Considers Children's Distinct Developmental Characteristics and Needs

Defendants also incorrectly characterize the constitutional standard applicable to this case. Although Defendants' harmful policies and practices cannot pass constitutional muster under any standard, Plaintiffs' claims should be analyzed under the more protective Fourteenth Amendment standard, in accordance with the Seventh Circuit's decision in *Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974). And even under the Eighth Amendment, Plaintiffs are entitled to a constitutional standard that takes into account their developmental vulnerabilities and distinct needs.

In arguing that the Eighth Amendment governs in this case, Defendants misread the Seventh Circuit's decision in *Nelson v. Heyne*. Defendants assert that *Nelson* did not analyze conditions of confinement claims under the Fourteenth Amendment, but "simply noted the well-recognized rule that the Eighth Amendment is applicable to the states through the Fourteenth Amendment, and generally discussed rehabilitation in juvenile facilities, separate and apart from Plaintiffs' constitutional claims." (Dkt. 49 at 9.) This assertion is false. *Nelson* explicitly held that "plaintiff juveniles have the right under the 14th Amendment due process clause to rehabilitative treatment." 491 F.2d at 360. Further, the Seventh Circuit applied this Fourteenth Amendment analysis to the juveniles' particular conditions of confinement, considering whether

the limited individualized treatment available amounted to "the minimal treatment required to provide constitutional due process." *Id. Nelson*'s identification of a right to treatment is therefore clearly rooted in the Fourteenth Amendment due process protections.

Nor are the later Supreme Court cases applying the Fourteenth Amendment in non-punitive contexts inapt, as Defendants suggest. (Dkt. 49 at 10.) The Seventh Circuit has recognized the similarity between the juvenile justice system and other systems designed for treatment or rehabilitation. In *K.H. v. Morgan*, the court noted that *Nelson*'s identification of a juvenile right to treatment "anticipated" the Supreme Court's ruling in *Youngberg* that the Fourteenth Amendment applies when institutional conditions are not designed to punish. *See K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982), and *Nelson*, 491 F.2d at 360). Although Wisconsin's Juvenile Justice Code includes goals of both rehabilitation *and* accountability and punishment, that does not render the Fourteenth Amendment inapplicable. These dual objectives are common to juvenile justice systems around the country and do not undermine the fundamentally rehabilitative mission of the system. In fact, *Nelson* specifically noted that "the juvenile process has elements of both the criminal and mental health processes," yet still concluded that the system overall is intended to be "rehabilitative" and "clinical," rather than "punitive"—and applied the Fourteenth Amendment standard. *Nelson*, 491 F.2d at 358-39, 360.

Moreover, while Plaintiffs' opening brief highlighted cases applying the Fourteenth Amendment in juvenile conditions cases, Defendants fail to identify a single case in which a court ruled that the Fourteenth Amendment is *inapplicable* in juvenile conditions of confinement cases. Rather, the cases from other circuits that Defendants cite either did not involve a Fourteenth Amendment claim or the court resolved the matter without deciding whether the

Fourteenth Amendment might apply under different circumstances. *See Morales v. Turman*, 562 F.2d 993, 998-99 (5th Cir. 1977) (declining to decide if a right to treatment exists under the Fourteenth Amendment because the challenged conditions "could be eliminated as cruel and unusual" without ruling on that issue); *Tribble v. Ark. Dept. of Human Servs.*, 77 F.3d 268, 270 (8th Cir. 1996) (applying the Eighth Amendment without any consideration of a Fourteenth Amendment claim); *Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354, 1364 (D.R.I. 1972) (emphasizing that children are entitled to constitutional protections, and thus are protected against cruel and unusual punishment, without any consideration of the Fourteenth Amendment); *Troy D. v. Mickens*, 806 F. Supp. 2d 758, 772 (D.N.J. 2011) (concluding that even under the Eighth Amendment standard plaintiffs' solitary confinement claims could proceed); *cf. Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 257, 261 n.10 (3d Cir. 2010) (applying the Eighth Amendment to decide whether "playing tackle football without equipment poses a 'substantial risk' of serious harm," and noting that they "need not address [plaintiff's] arguments under the Fourteenth Amendment").

Although Defendants assert that some of these cases are "instructive and aligned with the facts and issues in this case," it is for an entirely different reason than Defendants suggest: several cases conclude that prolonged solitary confinement of juveniles is an abusive practice that raises serious constitutional concerns, even under the more deferential Eighth Amendment standard. For instance, in *Inmates of Boys' Training School*, the court held that keeping children in solitary confinement for *three to seven days* violates the Eighth Amendment, noting that "[i]f a boy were confined indoors by his parents, given no education or exercise and allowed no visitors, and his medical needs were ignored, it is likely that the state would intervene and remove the child for his own protection." 346 F. Supp. at 1360; s*ee also Morales*, 562 F.2d at

997-98 (explaining that the "serious abuses found by the District Court, such as beatings and prolonged solitary confinement," could amount to cruel and unusual punishment); *Troy D.*, 806 F. Supp. 2d at 777 (permitting constitutional claims by two juveniles kept in isolation for 225 and for 50 days, respectively, to proceed).

Defendants also fail to address Plaintiffs' argument that even under the Eighth Amendment, children are entitled to heightened protections. In a series of recent Eighth Amendment cases, the United States Supreme Court has reiterated that "children are constitutionally different from adults," in part because they are more vulnerable to harm. *See Miller v. Alabama*, 567 U.S. 460, 471 (2012) (citing *Roper v. Simmons*, 543 U.S. 551, 569 (2005); *Graham v. Florida*, 560 U.S. 48, 68 (2010)); *see also Montgomery v. Louisiana*, 136 S. Ct. 718, 732 (2016) ("[C]ertain punishments [are] disproportionate when applied to juveniles."). Thus it is clear that courts must consider adolescents' distinct developmental characteristics and vulnerabilities when assessing whether conditions of confinement pose a substantial risk of serious harm under the Eighth Amendment. *See also V.W. ex. rel. Williams v. Conway*, No. 9:16-CV-1150, -- F. Supp. 3d --, 2017 WL 696808, at *19 (N.D.N.Y. Feb. 22, 2017) (concluding that punitive solitary confinement of youth violates the Eighth Amendment, noting the "broad consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults" and citing to *Graham* and *Roper*); *Doe ex rel. Frazier v. Hommrich*, No. 3-16-0799, 2017 WL 1091864, at *2 (M.D. Tenn. March 22, 2017) (mem.) (noting that "courts around the country have found increased protections for juveniles . . . under the Eighth and Fourteenth Amendments," and concluding that isolating juveniles in solitary confinement for punitive or disciplinary purposes constitutes "inhumane treatment" in violation of the Eighth Amendment). Moreover, Defendants' use of solitary confinement, mechanical

restraints, and pepper spray are unconstitutional under any standard—even the adult Eighth

Amendment standard—as demonstrated in the next section.

### 3. Plaintiffs Are More Than Likely to Succeed on the Merits of their Solitary Confinement Claims Under Any Standard

Defendants contend that Plaintiffs have failed to show that the "restrictive housing

policies and practices" at LHS and CLS reflect deliberate indifference to Plaintiffs' health and

safety. (Dkt. 49, at 14-15.) Defendants' argument is largely semantic; they admit the substance of

most of Plaintiffs' factual allegations, taking primary issue with Plaintiffs' use of the term

"solitary confinement." Regardless of the terminology used, Plaintiffs have produced abundant

evidence establishing that Defendants' acknowledged practices pose a substantial risk of serious

harm, and thus that Plaintiffs are likely to succeed on their solitary confinement claims.

For an adult to succeed on a deliberate indifference claim against a prison official under

the Eighth Amendment,[9] a plaintiff must show that the challenged practice poses a "substantial

risk of serious harm," and that the official "knows of and disregards" that risk.[10] *Brown v. Budz*,

398 F.3d 904, 910-13 (7th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 838

(1994)). The plaintiff "need not establish that prison officials actually intended harm to befall

him," *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); all that is required is that the official is

"aware of the facts from which an inference could be drawn that a substantial risk of serious

harm exists" and the official in fact draws that inference. *Brown*, 398 F.3d at 913. The harm does

not have to be a physical harm, nor does it need to have actually befallen the plaintiff, so long as

---

[9] Any condition that "would violate the Eighth Amendment could also violate the Fourteenth Amendment." *See Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009).

[10] As explained in Plaintiffs' opening brief, this subjective standard is not the correct standard in juvenile conditions cases. (Dkt. 17, at 21 n.5.) Rather, because the state has a duty to protect and care for minors in state custody, even under the Eighth Amendment the intent element in juvenile cases can be satisfied if defendants knew or should of have known of a substantial risk of serious harm.

the risk of harm is substantial. *See Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016) (permitting claims for both physical and psychological harm, and noting that although a plaintiff must have suffered some physical injury to recover compensatory damages for mental and emotional injuries, other forms of relief are permitted even where an injury is purely psychological). Under this standard, when prison officials permit the practice of isolating youth in cells by themselves, despite knowledge of its risk of harm to children, that satisfies both elements of a deliberate indifference claim. *See Doe ex rel. Frazier*, 2017 WL 1091864, at *2 ("[S]olitary confinement of juveniles in government custody for punitive or disciplinary reasons, especially for extended periods of time and especially for youth who may suffer from mental illness, violates the Eighth Amendment's prohibitions against the inhumane treatment of detainees."); *V.W. ex rel. Williams*, 2017 WL 696808, at *19-20 (prison officials' use of "disciplinary isolation is not *reasonably* calculated to restore safety . . . and, in fact, represents conscious disregard of the substantial risks posed on the juvenile class") (emphasis in original).

There is no dispute in this case that Defendants' knowingly permit the widespread use of involuntary confinement of youth in rooms by themselves, often for extended periods of time. Defendants acknowledge that they have confined youth in their rooms for more than fifty consecutive days, and that some youth have spent more than 180 cumulative days in restrictive housing. (Dupuis Decl., Ex. A (RFA 25, 26).) These prolonged periods of isolation greatly exceed periods found to raise constitutional concerns in other cases. *See, e.g.*, *H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1088 (11th Cir. 1986) (describing the emotional harm caused by isolation of a juvenile for seven days); *Morgan v. Sproat*, 432 F. Supp. 1130, 1138–40 (D. Miss. 1977) (concluding that confining teenagers for an average of 11 days, with time out of their cells for recreation and showers, violates the Eighth Amendment); *Inmates of Boys' Training Sch.*,

346 F. Supp. at 1366–67 (holding that three to seven days in isolation amounts to cruel and usual punishment). Further, Defendants do not suggest that the extended periods of solitary confinement they impose are uncommon, nor do they contend that placing youth in restrictive housing for days, weeks or even months at a time is an unusual or aberrational event that violates official policy or institutional norms.

Defendants also agree that "solitary confinement, in general, negatively impacts juveniles." (Dkt. 50, ¶ 72.) While they argue that their practices do not constitute "solitary confinement," the conditions they have created fit the classic definition of solitary confinement: confining youth to small cells with, generally, only a bed and sometimes a sink-toilet fixture; having youth spend the vast majority of each day alone in these cells, even eating their meals there[11]; imposing significant personal property restrictions upon youth, including regularly depriving youth of paper; keeping the cells illuminated at all times; and having some youth spend most or all their limited time out of their cell handcuffed to waist belts and tethered to a table or desk. (*See*, *e.g.*, Dkt. 50, ¶¶ 49, 51, 52, 60, 62, 63, 66; Dupuis Decl., Ex. A (RFA 9).)

Indeed, the risk of serious harm posed by Defendants' practices is evident, as confirmed by Plaintiffs' experts. Although Defendants quibble over the the experts' qualifications and the bases of their opinions, they do not challenge the consensus view from professional associations and experts in the field that solitary confinement is harmful to youth, particularly youth with underlying mental health issues. Nor do Defendants plead ignorance of these views; rather, they

---

[11] Although Defendants claim that youth *can* be allowed out of their cells for four or more hours (Dkt. 52, ¶ 29), they point to no direct evidence that this occurs often or at all. To the contrary, there is evidence showing that in recent months youth have spent entire days in solitary with no "out time," or with only one hour outside of the cell. Moreover, the marginal difference between one to two hours per day outside of a cell that Plaintiffs describe, and the theoretical possibility of "approximately four or more hours" (Dkt. 52, ¶ 29) does little to change the isolating experience of prolonged solitary confinement or to alleviate its harms, as Dr. Grassian will explain at the hearing. Moreover, for the significant percentage of the youth on "belt status," this out time consists of being "tethered" to a table in the day room.

affirmatively assert that they participate in the Council of Juvenile Correctional Administrators'

Performance-based Standards, which recommend limiting solitary confinement of juveniles to no

more than a few hours (Dkt. 50, ¶ 133); they claim to "make reasonable efforts to stay current on

trends, literature, and developments pertaining to operating state juvenile correctional facilities"

(Dupuis Decl., Ex. A (RFA 52-59)); and they admit to being "aware of the general trends and

practices towards minimizing the use of restrictive housing." (Dkt. 50, ¶ 140.)

Yet, despite this knowledge, Defendants admit that they continue to place an average of

more than 15 percent of the youth at LHS and CLS in solitary confinement. (Dkt. 51, ¶ 9.) They

impose solitary even on youth "whose records include a diagnosis of mental illness, disorder or

defect" (Dupuis Decl., Ex. A (RFA 16)), and admit that some youth have been directly

transferred to an intensive mental health treatment center after spending time in solitary. (*Id.*

(RFA 17); *see also* Dkt. 50, ¶ 25 (admitting that "many of the youth at LHS/CLS experienced

some type or degree of trauma before arriving at LHS/CLS").)

Defendants also do not dispute the symptoms described by Plaintiffs, including

depression, difficulty sleeping, anxiety, hair loss, irritability, intent to self-harm, and suicidal

ideation, suggesting only that Plaintiffs lack the expertise to show those symptoms were caused

by their experience in solitary confinement. Plaintiffs, of course, are competent to testify

regarding their personal experiences. *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659

(7th Cir. 1991) (explaining that lay witnesses may submit affidavits and testify "from their

personal knowledge," including "inferences and opinions . . . grounded in observation or other

first-hand personal experience"). They have done so in the declarations submitted with their

original motion, which should be considered by this Court.[12] (Dkt. 21-29.) Moreover, during the hearing, Dr. Grassian will testify about Plaintiffs' symptoms based on his review of records produced in discovery.

Defendants continue to subject youth to this risk of harm even though they also appear to concede that punitive solitary confinement is unnecessary and can be counterproductive to institutional safety. In addition to acknowledging general awareness of trends toward the elimination of solitary confinement, Defendants do not dispute that "elimination of punitive solitary confinement has led to *reductions* in violent acts at juvenile facilities, making those institutions safer than they were when they used solitary." (Dkt. 50, ¶ 121.) Yet Defendants not only continue to place youth in restrictive housing for disciplinary purposes, they also agree that it is "not unusual for LHS or CLS to place youth in restrictive housing [even] for non-violent rule violations." (Dkt. 50, ¶ 33). Defendants point to no specific purpose or justification for using isolation as a disciplinary tool under those circumstances. Defendants' only stated defense of their use of punitive solitary confinement is that their practices are "in line with the majority of states that currently use some form of restrictive housing." (Dkt. 49, at 16.) But this assertion is contradicted by their own evidence, which shows that more than half of states "prohibit the use of punitive solitary confinement in juvenile correctional facilities by law or practice." (Dkt. 51-2 at 2.)

In sum, the undisputed evidence shows that Defendants' practices—whether termed "solitary confinement" or "restrictive housing"—pose a "substantial risk of serious harm," and

---

[12] The rules of evidence do not apply with the same rigor to preliminary injunction proceedings as to trial. *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010); *Ty, Inc. v. GMA Access., Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) ("Affidavits are ordinarily inadmissible at trials but they are fully admissible in summary proceedings, including preliminary-injunction proceedings.")

that Defendants "know[] of and disregard[]" that risk, in violation of Plaintiffs' constitutional rights. *See Brown*, 398 F.3d at 910-13.

### 4. Plaintiffs Are More Than Likely to Succeed on the Merits of their Challenge to Defendants' Use of Mechanical Restraints and Pepper Spray

Plaintiffs have also produced substantial uncontested evidence of Defendants' pervasive and unnecessary reliance on mechanical restraints and pepper spray—or "belt status" and "OC," as Defendants prefer to refer to these practices. It is well established that both restraints and "incapacitating agents" such as pepper spray can amount to "excessive force" under the Eighth Amendment when used unnecessarily or without penological justification. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008). By knowingly tolerating the widespread use of pepper spray and mechanical restraints in situations in which there is no threat to safety or security, Defendants are deliberately indifferent to the excessive use of force by LHS and CLS staff, in violation of the Eighth Amendment.[13]

Defendants' argument to the contrary is rooted in their misunderstanding of the appropriate legal framework. Defendants contend that Plaintiffs must show that official "policies or customs" cause an excessive use of force. (Dkt. 49 at 20.) This argument is based on Defendants' misplaced reliance on the *Monell* standard, which, as explained above, is inapplicable to this case. Using this incorrect premise, Defendants suggest that so long as the facilities' written policies *could* be applied in a constitutional manner, there is no Eighth Amendment violation. For instance, Defendants argue that "the plain language of the Division of Juvenile Corrections does not show how the policy might cause the use of excessive force with mechanical restraints." (Dkt. 49 at 21.) This is not the relevant inquiry. Even if a facility has a

---

[13] As explained above, *see supra* n.9, Plaintiffs contend that the Fourteenth Amendment governs their claims, but focus on the Eighth Amendment as conduct that violates the Eighth Amendment would also violate the Fourteenth.

facially appropriate policy, prison officials violate the Eighth Amendment if they knowingly disregard uses of excessive force by staff. *See*, *e.g.*, *Vaughan v. Ricketts*, 859 F.2d 736, 741 (9th Cir. 1988) (abrogated on other grounds); *Buckner v. Hollins*, 983 F.2d 119, 122 (8th Cir. 1993); *see also Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009) (explaining that even prison officials who do not directly use excessive force violate the constitution if they "had reason to know" that an officer "was using excessive force or committing a constitutional violation" and they "had a realistic opportunity to intervene to prevent the act from occurring"). The correct inquiry is therefore whether the use of pepper spray and mechanical restraints at LHS and CLS amounts to "excessive force"—that is, whether the practices are used "unnecessarily, without penological justification, or for the very purpose of punishment or harm"—and whether Defendants knowingly permit that use, not whether a written policy itself causes harm.[14] *See Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010).

Moreover, Defendants' reliance on pepper spray and mechanical restraints is dramatically out-of-step with national trends and, as with solitary confinement, Defendants acknowledge that they "are aware of the general trends and practices" toward minimizing use of mechanical restraints and pepper spray. (Dkt. 50, ¶ 140.) But Defendants assert that the use of "belt status" and pepper spray at LHS and CLS does not amount to excessive force because mechanical restraints are "utilized as a temporary and short-term measure to establish and maintain safety," "incapacitating agents" are used as a "last resort" to "avoid safety hazards to staff and youth," and neither practice is used as a form of punishment. (Dkt. 49 at 20-21.)

---

[14] As explained in Plaintiffs' opening brief, the Fourteenth Amendment deliberate indifference standard is more protective, imposing liability when prison officials' conduct is *objectively* unreasonable. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015).

The uncontested facts show otherwise. Defendants do not dispute that youth placed in "high hall" are always on "belt status," which means that they are handcuffed at the waist and tethered to a table or desk during their limited time outside of their cells. (Dkt. 50, ¶¶ 63, 66.) Placement on "belt status" is reviewed weekly, meaning that a youth could spend up to a week in restraints without posing any safety or security threat. (Dkt. 50, ¶ 68.) In fact, Defendants admit that youth have remained on belt status for more than 28 consecutive days. These prolonged, categorical uses of severely restrictive mechanical restraints cannot be characterized as "a temporary and short-term measure to establish and maintain safety," and Defendants offer no specific justification for using them beyond a generalized reference to "maintaining safety and order in the institution." (Dkt. 49 at 21.)

Defendants also admit to pervasive use of pepper spray, acknowledging that it was deployed on youth at least 198 times between January and October 2016 (Dkt. 50, ¶ 106), including in situations where there is no plausible security threat—such as on youth who were locked in their cells or in mechanical restraints. (Dupuis Decl., Ex. A (RFA 20, 21).)[15] And while they may claim to be working toward reductions in pepper spray use, (Dkt. 52 ¶¶ 63-64), the evidence again shows otherwise: LHS and CLS continue to use pepper spray at an officially reported rate of nearly 20 incidents per month. (Dupuis Decl. ¶¶ 19, 20 & Ex. M.)

In short, staff at LHS and CLS routinely rely on mechanical restraints and pepper spray in situations where there is no immediate threat to safety or institutional security. This use of force is unnecessary and without penological justification, and is therefore "excessive" within the

---

[15] Indeed, the example they focus on—the spraying of Plaintiff R.N. on October 30, 2016—demonstrates this point. Although Defendants' initial use of pepper spray was purportedly to ensure that R.N. would drop a fan cord that he had wrapped around his neck (Dkt. 49 at 22), even after R.N. complied, and while R.N. was locked in his cell, they sprayed him a second time "to gain compliance [with other directions] and prevent any further incidents of potential self-harm or jeopardize the safety of staff." (Dkt. 49 at 22.) In other words, Defendants pepper sprayed a youth who was locked in a cell for failing to follow directions, after the threat of self-harm had abated.

meaning of the Eighth Amendment. Because Defendants knowingly permit this reliance on excessive force, they are deliberately indifferent to the constitutional violation, and thus Plaintiffs are likely to succeed on their excessive force claims. *See Lewis*, 581 F.3d at 472.

### 5. Plaintiffs' Expert Witnesses Are Eminently Qualified and their Proposed Testimony is Highly Relevant and Reliable

Defendants also ask this Court to disregard the expert testimony that Plaintiffs will introduce from Dr. Stuart Grassian, M.D. and Vincent Schiraldi, M.S.W. Both experts submitted declarations in connection with the filing of the preliminary injunction motion (Dkt. 19, 20), and Plaintiffs expect to have both experts testify in court at the hearing on this matter. Defendants do not challenge the expertise of either Dr. Grassian or Mr. Schiraldi. Nor could they, as both are eminently qualified national experts.[16] Rather, their criticism boils down to asserting that the experts rely on "unvetted" facts. (Dkt. 49 at 30). This assertion is both legally and factually inaccurate, and fails to account for the discovery timeline.

This Court and the Seventh Circuit have explained the important role of expert witnesses in cases such as this one. "In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013); *Estate of DiPiazza v. City of Madison*, No. 16-CV-60-WMC, 2017 WL 1843316, * 4 (W.D. Wis. May 5, 2017) (expert testimony in an

---

[16] Mr. Schiraldi has an extensive background in juvenile corrections. He previously served as the Director of Juvenile Corrections in Washington, D.C. and as the Commissioner of the New York City Department of Probation. He has a background in juvenile justice policy and is currently a Senior Research Fellow at the Program in Criminal Justice Policy and Management at the Harvard Kennedy School. (Dkt. 19 (Schiraldi Decl.) ¶¶ 4-11.) This background in both juvenile justice policy and practice makes him eminently qualified to testify about practices in Wisconsin's juvenile facilities and their wide departures from reasonable and acceptable standards.

Similarly, courts have admitted Dr. Grassian's testimony in circumstances identical to the present case. As one court stated, "there is no question that Grassian's . . . testimony and opinions will be helpful to the jury. It is highly doubtful that any juror will have much, if any, knowledge of a jail environment and the effects of solitary confinement on an inmate with mental issues." *Richard v. Hinshaw*, No. CIV.A. 09-1278-MLB, 2013 WL 6632122, at *1 (D. Kan. Dec. 17, 2013); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995) (admitting testimony of Dr. Grassian regarding effects of administrative confinement on inmates' mental status).

excessive force case may be "especially relevant and helpful"); *Hegna v. Wall*, No. 12-CV-184-BBC, 2017 U.S. Dist. LEXIS 64485 (W.D. Wis. Oct. 5, 2013) (expert with long experience in corrections could testify as to actions of Wisconsin DOC officials in supervising prison medical staff). In cases where "reliability concerns focus on [the expert's] personal knowledge or experience," the trial court has "broad latitude to determine" whether the specific factors described in *Daubert* are reasonable measures of reliability in a particular case. *Martin v. F.E. Moran, Inc*., No. 13-C-03526, 2017 WL 1105388, at *3 (N.D. Ill. Mar. 24, 2017). In assessing a witness's qualifications, the issue is not whether the witness is qualified in general, but "whether his 'qualifications provide a foundation for [him] to answer a specific question.'" *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (*quoting Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994)). Additionally, in assessing the reliability of an expert's testimony, the court primarily reviews the "validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013).

Here, the methodologies of both experts are sound. Both rely on an extensive body of literature about practices in juvenile incarceration. Mr. Schiraldi draws also on his own experience directing and reforming juvenile institutions, and he explains the application of those standards and policies to the conditions found at LHS and CLS. Dr. Grassian's opinions are grounded in his decades of clinical experience, as well as his own research contributions to the field. In fact, Supreme Court Justice Anthony Kennedy cited Dr. Grassian's leading article, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325 (2006), in a concurring opinion in *Davis v. Ayala,* 135 S. Ct. 2187, 2208-10 (2015), to describe the side effects of solitary confinement on the mental condition of inmates.

Additionally, Mr. Schiraldi and Dr. Grassian reviewed significant materials in preparing their initial declarations in this case, including Plaintiffs' sworn declarations describing their experiences at LHS and CLS. Both are continuing to review additional evidence Defendants have produced in discovery in preparation for their testimony at the preliminary injunction hearing. Mr. Schiraldi has also toured the facility and met with Plaintiffs. Moreover, at the hearing, Plaintiffs will introduce documentary, testimonial and other evidence to provide ample additional support for the proffered expert opinions. Given the current posture of the litigation, both experts have reviewed sufficient evidence upon which to base relevant and reliable conclusions.

Further, when there is no jury trial, and where the court is both the gatekeeper and the finder of fact, the court can make its determination of whether to consider or disregard the testimony at the time it is given at the hearing. *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("It is not that evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different. Where the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened."). Thus, this Court will have the opportunity to consider the expert testimony and draw conclusions about the weight and reliability of the evidence at the preliminary injunction hearing.

**B. The Harm To These Youth Is Likely and Irreparable, and They Have No Adequate Remedy at Law**

In the opening brief, Plaintiffs showed that even temporary constitutional violations constitute irreparable harm. (Dkt. 17 at 34 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Ezell v. City of Chicago*, 651 F.3d 684, 699-700 (7th Cir. 2011); *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wis. 2001)).) They further demonstrated that the unnecessary pain and suffering imposed by mechanical restraints and pepper spray, and the short-term, long-term, and

potentially permanent psychological damages caused by solitary confinement can irreparably harm youth who are exposed to these practices. (*Id.* at 35 (citing Dkt. 18, ¶¶ 64, 72, 73, 83, 85-88 & 93; *Jones 'El*, 164 F. Supp. 2d at 1123; *Hope*, 536 U.S. at 738).) Defendants do not directly respond to these arguments or authorities, nor do they claim that constitutional violations at LHS and CLS can be adequately cured through an award of money damages. (*See id.* (citing *Godinez v. Lane*, 733 F.2d 1250, 1258 (7th Cir. 1984).)

Rather, Defendants appear to argue that Plaintiffs have an adequate remedy at law because they may prevail in obtaining declaratory relief and a permanent injunction at the end of trial. (Dkt. 49 at 30-31.) But a declaratory judgment and injunctive relief at the end of trial do nothing to repair the harm that youth at LHS and CLS will suffer during the pendency of this action.

Defendants also cite to *City of L.A. v. Lyons*, 461 U.S. 95 (1983), for the proposition that that the harm in this case is "speculative" and "conjectural" because the named Plaintiffs might not be subjected to solitary confinement, pepper spray, or mechanical restraints. In *Lyons*, the plaintiff was injured when police officers applied a chokehold to him during a traffic stop. He sought an injunction barring the police from using such holds, but the Supreme Court determined that Lyons lacked standing to obtain an injunction because it was "no more than speculation to assert either that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury." *Id.* at 111. Defendants' reliance on *Lyons* is misplaced for two reasons.

First, a threat of harm ceases to be "speculative" where Plaintiffs allege evidence of a repeated pattern of officially sanctioned behavior. *Deshawn E. ex rel. Charlotte E. v. Safir*, 156

F.3d 340, 344 (2d Cir. 1998) (Plaintiffs had shown a likelihood of recurring injury because unconstitutional polices were "officially endorsed" and were part of a "pattern of illegality."); *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986) (distinguishing *Lyons* on the grounds that "the *Lyons* opinion expressly noted the absence of any written or oral pronouncements by the Los Angeles Police Department sanctioning the unjustifiable application of the chokehold and pointed to the absence of any record evidence showing a pattern of police behavior suggestive of an unconstitutional application of the chokehold"); *Lewis v. Tully*, 99 F.R.D. 632, 639 (N.D. Ill. 1983) (finding a likelihood of future harm where evidence submitted by the plaintiff demonstrated the defendants' illegal practice was routine).

As Defendants acknowledge, the use of solitary confinement, mechanical restraints, and pepper spray at LHS and CLS is officially sanctioned and widespread. (*See supra*, Section II.) An average of approximately 17 percent of the total LHS population and 15.5 percent of the total CLS population is placed in restrictive housing on any given day. (Dkt. 51, ¶ 9.) All of the named Plaintiffs have been sent to solitary confinement, and some have spent virtually all of their time in restrictive housing and on belt status. Every one of the named Plaintiffs has experienced the adverse effects of pepper spray, whether directly or indirectly. Most of the nine named Plaintiffs remain in custody at LHS or CLS will be subject to the use of solitary confinement, restraints, and pepper spray in the future. Under these circumstances, Plaintiffs have demonstrated a very credible threat of recurrent injury.

Second, Defendants' reliance on *Lyons* will be even more misplaced if the Court certifies a class in this case. *See Safir*, 156 F.3d 340, 344 ("Unlike *Lyons*, the plaintiffs in this case allege that they, as a certified class, are likely to suffer future" harm); *LaDuke*, 762 F.2d at 1325

(distinguishing *Lyons* on the grounds that "the plaintiffs constitute a certified class"); *Lewis*, 99 F.R.D. at 639 ("[T]he *Lyons* test plainly has not been satisfied as to [] the named plaintiff. But as we have noted, *Lyons* was not a class action."). Here again, with an average of nearly 17 percent of the youth in solitary at any given time, many of those youth on belt status, and close to twenty pepper spraying incidents each month, it is a virtual certainty that some members of the putative class will suffer from these policies if Defendants are not enjoined.

## C. The Balance of Equities Favors Injunctive Relief to Stop the Damaging Effects of Defendants' Ongoing Practices

With their opening brief, Plaintiffs introduced expert testimony showing that Defendants' policies and practices are not only damaging, but also ineffective and even counterproductive. (*See* Dkt. 17 at 36 (routine use of solitary confinement, mechanical restraints, and pepper spray actually are associated with "worse, not better institutional and behavioral outcomes").) In fact, the Northern District of New York recently enjoined a Syracuse jail from placing juveniles in solitary confinement due, in part, to an "emerging consensus" that it is "an ineffective disciplinary technique for restoring facility security and is in fact counterproductive to facility discipline and security." (*Id.* (citing *V.W. ex rel. Conway*, 2017 WL 696808, at * 5.)

Defendants make no attempt to rebut this expert testimony. Indeed, they have conceded that solitary confinement can be counterproductive. (Dkt. 50, ¶ 121.) They simply assert that Plaintiffs' evidence is "inadmissible," and "unnecessary to deciding the motion for injunctive relief," and they ask the Court to disregard it. Defendants are wrong: this expert testimony is admissible for the reasons articulated above, *see supra* Section III.5, and it is highly probative because it shows how an injunction would not only protect Plaintiffs' but actually advance *Defendants'* interests as well as the public's interest in secure and effective behavior management at LHS and CLS.

### 1. The Proposed Injunction Is Not Impermissibly Vague or Subjective

Defendants assert that the proposed injunction would harm Defendants because it is "vague" and "subjective," and because it would require the staff at LHS and CLS to make judgment calls about whether segregation, restraints, and pepper spray are necessary to prevent imminent harm. (Dkt. 49 at 33-37.) This argument is without merit for three reasons.

First, contrary to Defendants' assertions, the language of the proposed injunction is not vague. It specifically identifies the practices that are prohibited—cell confinement, mechanical restraints, and pepper spray, for disciplinary or punitive purposes. It also specifically identifies when those practices can be used—when they are necessary to prevent imminent and serious physical harm to persons, and mechanical restraints can also be used during transportation outside the institution. Accordingly, the proposed injunction gives fair notice of what is allowed and prohibited, and is wholly unlike the authorities cited by Defendants.

Second, the proposed injunction is not rendered unworkable simply because LHS and CLS employees will be required to exercise judgment when confronted by the specific facts of a particular situation. Correctional officers are routinely called upon to make individualized assessments about whether the use of force is reasonable and necessary. Although Rule 65(d) requires a sufficient degree of detail to give an enjoined party fair notice, it "does not require a torrent of words when more words would not produce more enlightenment about what is forbidden." *Scandia Downs Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1432 (7th Cir. 1985).

Third, if Defendants truly find the proposed injunction language to be vague, the proper response would have been to propose alternative language to cure any ambiguity. *See Baskin v. Bogan*, 766 F.3d 648, 672 (7th Cir. 2014) (rejecting "Wisconsin's complaint about the wording of the injunction entered by the district judge," and explaining that "[i]ts lawyers claim to fear

the state's being held in contempt because it doesn't know what measures would satisfy the injunction's command . . . If the state's lawyers really find this command unclear, they should ask the district judge for clarification. . . . . Better yet, they should draw up a plan of compliance and submit it to the judge for approval."); *United States v. Apex Oil Co., Inc.*, 579 F.3d 734, 739 (7th Cir. 2009) (rejecting an argument that an injunction was excessively "vague or open-ended" in part because "Apex has no suggestions for rewriting the injunction").

What Defendants really seem to be suggesting is that it will be difficult to comply with the injunction because there is a culture of excessive and unnecessary use of these harsh and punitive measures at LHS and CLS. For instance, they assert that their interests would be harmed because the administrative code permits them to punish youth for "major conduct rule violations" with days, weeks, and even months of solitary confinement, and the injunction would forbid them from doing so. (Dkt. 49 at 37-40.) The fact that the administrative code sanctions this practice is no excuse if those provisions mandate or permit unconstitutional actions. Undeniably, changing institutional culture is not a simple task and will likely require, among other things, extensive training on de-escalation and rehabilitative treatment. But the fact that change is difficult does not mean that Defendants should be allowed to continue their unconstitutional practices. Courts have "not merely the power but the duty to render a decree" that will effectively remedy a constitutional violation. *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 438 n.4 (1968).

### 2. The Public Interest Favors an Injunction

In the opening brief, Plaintiffs argued that the public interest is served when courts uphold constitutional rights, and that no public interest is served by confining children under conditions where the risk of harm is so great. (Dkt. 17 at 35-36 (citing *Joelner v. Village of*

*Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004); *Jones 'El,* 164 F. Supp. 2d at 1125).) Defendants do not have any effective counter to these arguments or authorities.

Defendants argue that the public interest is served by safe juvenile correctional facilities, but they introduce no evidence to support a claim that their policies and practices on solitary confinement, pepper spray, and restraints are necessary for safety. Not even Defendant Gustke, who in the Director of Security at LHS and CLS, asserts that these policies and practices are necessary to maintain security at the institution. And as shown above, Defendants concede that these policies and practices actually undermine safety.

Curiously, Defendants also assert that court intervention will "hinder[] ongoing efforts to move LHS and CLS forward in minimizing the uses." (Dkt. 49 at 40.) They suggest that "there are ongoing and recent conversations about taking steps" to increase out-of-room time, and that Plaintiffs' requested injunctive relief would somehow impede these efforts. (Dkt. 49 at 40-41.) In short, Defendants seem to acknowledge that their existing policies and practices are problematic, yet they argue that the public interest is better served by allowing LHS and CLS to chart their own course.

This argument fails for at least three reasons. First, Defendants point to no concrete policy changes in out-of-room time, and they do not even mention any ongoing discussions about modifying the policy or practice at LHS and CLS regarding use of mechanical restraints and pepper spray. It is apparent that any modifications voluntarily adopted by Defendants would fall far short of Plaintiffs' requested relief.

Second, the State has been on notice since at least 1983 that LHS's use of solitary confinement is excessive, and, in 1983, Defendants' predecessors promised to voluntarily work to reduce the number of youth who are so confined and the duration of confinements. (Dkt. 50,

¶¶ 145-150.) Almost thirty-five years later, and despite these promises, Defendants place an average of approximately 17 percent of the total population of LHS in solitary confinement on any given day. (Dkt. 51, ¶ 9.) Under these circumstances, any suggestion that Defendants will ameliorate these conditions on their own lacks credibility.

Third, even if Defendants could identify actual changes in policy or practice, "[v]oluntary cessation does not moot a case or controversy unless subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *see also Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 746-47 (7th Cir. 1999) (The defendants "failed to demonstrate that there is no reasonable expectation that the conduct will recur" especially when they never conceded that their policies were unconstitutional and had only temporarily ceased their behavior.); *Lewis v. Washington*, 265 F. Supp. 2d 939, 943, 2003 WL 21267119 (N.D. Ill. 2003) (refusing to moot a case where prison officials changed a policy because no statute or regulation implemented the change, "they have failed to demonstrate that there is no reasonable expectation that the alleged wrong will be repeated.").

## IV. CONCLUSION

For the reasons stated above and in their opening brief, Plaintiffs respectfully request that this Court issue a preliminary injunction ordering Defendants and their agents to: (1) eliminate the use of solitary confinement for disciplinary or punitive purposes, and limit any other removal of youth from the general population to rare and temporary responses to prevent imminent and serious physical harm to persons; (2) eliminate the routine use of mechanical restraints, including handcuffing juveniles in solitary confinement to a waist belt and tethering youth to a table during their time out of their cells, and limit all mechanical restraint use within the institution to rare and temporary responses necessary to prevent imminent and serious physical harm to persons or during transportation outside the institution; and (3) eliminate the use of pepper spray for punishment and behavior control, and limit any use of such chemical agents to rare and temporary responses necessary to prevent imminent and serious physical harm to persons.

Dated this 9th day of June, 2017.

ACLU OF WISCONSIN FOUNDATION
Laurence J. Dupuis (SBN 2029261)
Karyn L. Rotker (SBN 1007719)
R. Timothy Muth (SBN 1010710)
207 E. Buffalo Street, Suite 325
Milwaukee, WI 53202
Telephone: (414) 272-4032
Facsimile: (414) 272-0182
ldupuis@aclu-wi.org
krotker@aclu-wi.org
tmuth@aclu-wi.org

JUVENILE LAW CENTER
Jessica Feierman
Karen Lindell
Katherine Burdick
Marsha Levick
The Philadelphia Building
1315 Walnut Street, 4th Floor
Philadelphia, PA 19107
Telephone: (215) 625-0551
jfeierman@jlc.org
klindell@jlc.org
mlevick@jlc.org

QUARLES & BRADY LLP

/s/ Rachel A. Graham
Matthew J. Splitek (SBN 1045592)
Rachel A. Graham (SBN 1069214)
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251-5000
matthew.splitek@quarles.com
rachel.graham@quarles.com

Emily L. Stedman (SBN 1095313)
Zachary T Eastburn (SBN 1094676)
411 East Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
Telephone: (414) 277-5000
emily.stedman@quarles.com
zachary.eastburn@quarles.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of June, 2017, I filed the foregoing Plaintiffs' Brief in Support of Motion for Preliminary Injunction using the CM/ECF system, which will send electronic notification of such filing to all counsel of record who are ECF participants. I further certify that on said date, paper copies were sent to those indicated as non-registered ECF participants, via First Class, United States mail, postage prepaid.


/s/ Rachel A. Graham