# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **J.J.,** by and through his next friend, Sakeena Jackson; *et al.*, for themselves and all others similarly situated,<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**Jon E. Litscher,** in his official capacity as Secretary of the Wisconsin Department of Corrections, *et al.*,<br><br>**Defendants.** | **Civil Action No. 17-CV-47** |

## PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSES TO PLAINTIFFS' SUPPLEMENTED AND AMENDED STATEMENT OF PROPOSED FACTS

Plaintiffs, on behalf of themselves and all others similarly situated, submit the following reply to Defendants' Responses to Plaintiffs' Supplemented and Amended Statement of Proposed Facts. (Dkt. 50.) Plaintiffs' reply includes references to materials that have been obtained through discovery since the initial filing of their motion for a preliminary injunction, including Defendants' recent responses to Plaintiffs' Requests to Admit, photographs taken in connection with Plaintiffs' expert Vincent Schiraldi's inspection of Lincoln Hills and Copper Lake on May 25, 2017, and documents produced by Defendants in response to Plaintiffs' first request for production. Plaintiffs intend to present further evidence in support of their motion at the hearing commencing on June 22, 2017, as indicated below.

### The Parties

1.      Lincoln Hills School for Boys ("LHS") and Copper Lake School for Girls ("CLS" and collectively "LHS/CLS") is a secured juvenile corrections institution operated by the

Wisconsin Department of Corrections ("DOC"). (Graham Decl. ¶ 2 & Ex. A at 7:23-8:2 (Litscher Testimony).)

 **DEFENDANTS' RESPONSE:** No dispute.

 **PLAINTIFFS' REPLY:** No reply needed.

 2. Plaintiffs are children who are currently, or have recently been, in Wisconsin DOC's custody at LHS/CLS. (PFOF ## 3-11.)

 **DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the term "recently." Subject to and notwithstanding said objection, no dispute.

 **PLAINTIFFS' REPLY**: No reply needed.

 3. Plaintiff J.J. is a 17-year-old boy from Milwaukee who was recently in custody at LHS. J.J was 15 years old when he was first incarcerated at LHS. (J.J. Decl. ¶¶ 1-2.)

 **RESPONSE: No dispute.**

 **PLAINTIFFS' REPLY:** Plaintiff J.J. has been sent back to LHS.  (2d J.J. Decl (Dkt. 47) ¶ 7.)

 4. Plaintiff K.D. is a 15-year-old girl from Milwaukee who was recently in custody at CLS starting in July 2016. (K.D. Decl. ¶¶1-2.)

 **DEFENDANTS' RESPONSE:** No dispute.

 **PLAINTIFFS' REPLY:** No reply needed.

 5. Plaintiff C.M. is a 17-year-old boy from Milwaukee who is currently in custody at LHS. C.M. has been at LHS since November 2016 and expects to remain there until May 2017. (C.M. Decl. ¶¶ 1-2.)

 **DEFENDANTS' RESPONSE:** No dispute.

 **PLAINTIFFS' REPLY:** No reply needed.

 6. Plaintiff R.N. is a 15-year-old boy who is currently in custody at the Mendota

Juvenile Treatment Center, after being transferred there from LHS in December 2016. (R.N. Decl. ¶ 1.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

7.     Plaintiff M.S. is a 16-year-old boy from Wausau who is currently in custody at LHS. M.S. has been at LHS since August 2016 and expects to remain there until August 2017. (M.S. Decl. ¶¶ 1-2.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

8.     Plaintiff A.V. is a 17-year-old boy from Milwaukee who is currently in custody at LHS. A.V. has been at LHS since June 2016. (A.V. Decl. ¶¶ 1-2.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

9.     Plaintiff M.R. is 17-year-old boy from Kenosha County who is currently in custody at LHS. M.R. has been at LHS since 2016, and he was also was at LHS before, starting in 2014. (M.R. Decl. ¶¶ 1-2.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

10.     Plaintiff S.K. is a 17-year-old girl currently in custody at CLS.  S.K. has been in CLS since July of 2016, and she was also at CLS in May 2015, and from October 2015 to March 2016 and in May 2016. *Id.*  (S.K. Decl. ¶¶1-2.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

11.     Plaintiff A.P. is a 15-year-old girl who is currently in custody at CLS. A.P. has

QB\45723579.2

been at CLS since about July of 2016. (A.P. Decl. ¶¶ 1-2.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

12. Defendant Jon E. Litscher is Secretary of the Wisconsin Department of Corrections. (Compl. ¶ 8; Answer ¶ 8.) As Secretary of DOC, Defendant Litscher is in charge of the administration and supervision of DOC, and is ultimately responsible for the administration and supervision of LHS and CLS. (Graham Ex. C (DOC website); Wis. Stat. §§ 15.04, 15.05, 15.14, 301.03(9)-(10); Proposed Preliminary Injunction Hearing Testimony ("PI Hearing Testimony".)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the terms "administration" and "supervision." Subject to and notwithstanding said objection, no dispute.

**PLAINTIFFS' REPLY:** No reply needed.

13. Defendant John D. Paquin is the Administrator of the Division of Juvenile Corrections. (Compl. ¶ 9; Answer ¶ 9.) As Administrator of the Division of Juvenile Corrections, Defendant Paquin is in charge of the administration and supervision of juvenile corrections within DOC, and is responsible for the administration and supervision of LHS and CLS. (Graham Decl. ¶ 2 & Ex. A at 18:23-19:2 (McCulley Testimony); Graham Ex. D (DOC website); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the terms "administration" and "supervision." Subject to and notwithstanding said objection, no dispute.

**PLAINTIFFS' REPLY:** No reply needed.

QB\45723579.2

14.     Defendant Wendy A. Peterson is the Superintendent of LHS and CLS. (Compl. ¶10; Answer ¶10.) As Superintendent, Defendant Peterson is also responsible for ensuring that all legal responsibilities delegated to LHS and CLS, as set forth in the state statutes, state policy and/or governmental rules and regulations are appropriately met. (PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the phrase "ensuring that all legal responsibilities delegated." Subject to and notwithstanding said objection, no dispute.

**PLAINTIFFS' REPLY:** No reply needed.

15.     Defendant Brian Gutske is the Director of Security at LHS and CLS. (Compl. ¶ 11; Answer ¶ 11.) As Director of Security, Defendant Gutske is responsible for the security and discipline of inmates at LHS and CLS. (PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the terms "security" and "discipline." Subject to and notwithstanding said objection, no dispute that Mr. Gustke is the Security Director at LHS and CLS.

**PLAINTIFFS' REPLY:** No reply needed.

## Jurisdiction and Venue

16.     This action arises under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution. (Amend. Compl. ¶¶ 2-3.) Accordingly, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 1343 (civil rights jurisdiction).

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events giving rise to the dispute occurred at LHS/CLS, which is located in this district. (Amend. Compl. ¶ 4; *see also* PFOF # 18.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

## Background Facts About LHS/CLS

18.     LHS/CLS is located near Irma, in Northern Wisconsin, approximately 215 miles from Milwaukee. (Compl ¶ 12; Answer ¶ 12; *see also* Graham Decl. Ex. E; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

19.     The Department of Corrections has prioritized recruiting and hiring guards, called "youth counselors," and other staff for LHS/CLS from the geographical area near the prison, which results in an overwhelmingly white workforce. (Graham Decl. ¶ 2 & Ex. A at 48:4-49:24, 56:24-57:10; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. The Department of Corrections ("DOC") prioritizes recruiting and hiring qualified youth counselors based on their individual credentials. The DOC does not prioritize its recruiting process based on geography or race. (Aff. of Kari Beir ¶ 3.)

**PLAINTIFFS' REPLY:**  Defendants admit that in early March, 2017, 96.5% of the staff at LHS and CLS were Caucasian. (Dupuis Decl., Ex. A, Defs.' Responses to Plaintiffs' First Set of Requests for Admissions ("RFA") No. 49.)

20.     The State of Wisconsin imprisons approximately 165-180 children at LHS/CLS at any given time. (Graham Decl. ¶ 2 & Ex. A at 19:20-25 (McCulley Testimony) (155 boys and 22

girls at LHS/CLS); Graham Decl. ¶ 3 & Ex. B at 8 (same as for February 10, 2017); Dupuis

Class Cert. Decl. Ex. C (dkt. # 4-3) at 54 (Midnight Population Breakdown Log, 10-25-2016)

(167 total youth at LHS & CLS); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inaccurate in its use of

the term "imprisons." A more appropriate term is "incarcerate." Subject to and notwithstanding

said objection, no dispute.

**PLAINTIFFS' REPLY:** No reply needed.

21.      There are seven housing units for boys at LHS, and two housing units for girls at

CLS. DOC refers to these housing units as "cottages." (Dupuis Class Cert. Decl. Ex. A (dkt. # 4-

1) at 4 Biennial Budget Issue Paper); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous

as to time. Subject to a notwithstanding said objection, no dispute that there are seven housing

units for boys at LHS and two housing units for girls at CLS. Further, "cottage" is an antiquated

term as referenced in this Proposed Fact—today, housing units are referred to as "units." (Aff. of

Brian Gustke ¶ 14.)

**PLAINTIFFS' REPLY:** No reply needed.

22.      Children are sent to LHS/CLS for a variety of offenses pursuant to the Juvenile

Justice Code. (Graham Decl. ¶ 3 & Ex. B at 9.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY**: No reply needed.

23.      Approximately 59% of youth at LHS/CLS are from Milwaukee County. (Graham

Decl. ¶ 2 & Ex. A at 58:10-21.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous

as to time; further, it is not relevant to any parties' claim or defense and thus is unnecessary to

deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact. Subject to and notwithstanding said objection, no dispute that, as of a particular date, approximately 59% of the youth at LHS/CLS were adjudged delinquent in Milwaukee County.

**PLAINTIFFS' REPLY**: Plaintiffs may introduce testimony or evidence at the hearing to establish the current proportion of the youth at LHS/CLS who are from Milwaukee County.

24.     Approximately 70% of youth at LHS/CLS are African-American. (Graham ¶ 2, Decl. Ex. A at 57:17-23.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to time; further, it is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact. Subject to and notwithstanding said objection, no dispute that, as of a particular date, approximately 70% of the youth at LHS/CLS are African-American.

**PLAINTIFFS' REPLY**: Plaintiffs may introduce testimony or evidence at the hearing to establish the current proportion of the youth at LHS/CLS who are African-American.

25.     Many of the youth at LHS/CLS have significant histories of trauma and abuse, exposure to violence, and mental health needs.  (Graham Decl. ¶ 2 & Ex. A. at 18:17-21; *see also* Grassian Decl. ¶ 46; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to time and the phrase "significant histories." Subject to and notwithstanding said objection, no dispute that many of the youth at LHS/CLS experienced some type or degree of trauma before arriving at LHS/CLS.

**PLAINTIFFS' REPLY**: Plaintiffs anticipate presenting testimony or evidence at the hearing regarding mental health conditions of youth at Lincoln Hills/Copper Lake.

QB\45723579.2

26.     Vincent Schiraldi is an expert in juvenile corrections practice who is now at the Harvard Kennedy School of Government and who previously directed the District of Columbia's juvenile corrections facilities, and who is qualified to offer an opinion about the prevalence and effectiveness of juvenile corrections practices. (Schiraldi Decl. ¶¶ 4, 9; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute that Mr. Schiraldi's opinions shed any light on the constitutionality of any policies, practices, or procedures at LHS or CLS. Object to the treatment of Mr. Schiraldi's opinions as facts and thus assert his opinions are unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Mr. Schiraldi's testimony does not amount to a denial of the proposed finding.  For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, on May 25, 2017 – subsequent to the filing of the Plaintiffs' motion for a preliminary injunction – Mr. Schiraldi personally visited and inspected LHS/CLS and spoke with several Plaintiffs. He has also reviewed discovery produced by Defendants since the filing of the motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Mr. Schiraldi's expert opinions under F.R.E. 702-703.

27.     According to Mr. Schiraldi, the conditions at LHS and CLS "combine to create a profoundly isolating, powerless and desolate experience for youth . . . ."(Schiraldi Decl. ¶ 63.)

**DEFENDANTS' RESPONSE:** No dispute that Mr. Schiraldi may hold such an opinion, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Mr. Schiraldi's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, on May 25, 2017 – subsequent to the filing of the Plaintiffs' motion for a preliminary injunction – Mr. Schiraldi personally visited and inspected LHS/CLS and spoke with several Plaintiffs. He has also reviewed discovery produced by Defendants since the filing of the motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Mr. Schiraldi's expert opinions under F.R.E. 702-703.

### Solitary Confinement Generally

28.     Defendants punish children at LHS/CLS for violating institutional rules by putting them in solitary confinement, which the department refers to as "restrictive" or "security" housing. (Wis. Adm. Code § DOC 373.80(3); Graham Decl. ¶2 & Ex. A at 81:3-17; Graham Decl. Ex. F (Larson Response) ("Youth who violate major conduct rules (DOC 373.14 through DOC 373.65) are most commonly housed in the [restrictive housing unit] for transient periods of time awaiting due process and/or serving a consequential time period determined through due process."); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. Not every violation of a conduct rule leads to placement in restrictive housing. (Gustke Decl. ¶ 15.) A "major violation" of the conduct rules as outlined in DOC ch. 373, Wis. Admin. Code, may result in a youth being placed in restrictive housing. (*Id.*) Not every violation of conduct rules is a major violation. (*Id.*)

**PLAINTIFFS' REPLY**: Defendants do not appear to dispute that they punish youth accused of violating "major" conduct rules by placing them in restrictive housing. Plaintiffs did not assert that all rule violations result in solitary confinement (which Defendants' refer to as

"restrictive housing"), and do not dispute that some violations of conduct rules (*e.g.,* some violations of *minor* conduct rules) do not result in a placement in restrictive housing. However, as Defendants admit, *infra*. ¶¶ 33-37, they punish youth with restrictive housing for non-violent conduct.

29.     Defendants place girls serving solitary sentences in a restrictive wing of one of the general housing units at CLS, the Ida B. Wells cottage. (Dupuis Class Cert Decl. ¶¶ 5-10, Ex. C (dkt. # 4-3); A.P. Decl. ¶ 10; S.K. Decl. ¶ 11; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

30.     Defendants send boys to serve solitary confinement sentences in one of two restrictive housing units, the Eleanor Roosevelt and Clifford Krueger cottages.  (Dupuis Class Cert Decl. ¶¶ 5-10, Ex. C (dkt. # 4-3); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

31.     At any given time, Defendants hold approximately 12 to 20% of the CLS/LHS population is in solitary confinement. (Dupuis Class Cert. Decl. ¶¶ 2, 9-10 & Ex. A (dkt. # 4-1) at 4, ¶¶ 5-10, Ex. C at 1-54; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that, at a given time, approximately 12 to 20% of the CLS/LHS population might be in restrictive housing.

**PLAINTIFFS' REPLY:** Records recently produced by Defendants in discovery show that from May 1, 2017 to May 30, 2017, 9.4% − 20.5% of the children at CLS/LHS population were in restrictive housing, with an average daily percentage of 16.4% in restrictive housing. (Dupuis Decl., Ex. B (Midnight Population Logs).)

32.     On October 25, 2016, for example, there were 167 children incarcerated at LHS/CLS, and 28 of those children were being held in solitary confinement on that day. (Dupuis Class Cert. Decl. ¶10 & Ex. C (dkt. # 4-3) at 54; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

33.     While some of the infractions leading to solitary confinement are serious, LHS/CLS also routinely sends children to solitary confinement for non-violent rule violations. (PFOF # 34- 37; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. It is not unusual for LHS or CLS to place youth in restrictive housing for non-violent rule violations because not all major violations of the conduct rules relate to violence. (Gustke Decl. ¶ 16.) However, LHS and CLS do not "routinely" place youth in restrictive housing for non-violent rule violations. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants do not dispute that "it is not unusual" for them to place children who commit non-violent offenses in restrictive housing. They appear only to dispute the meaning of the word "routine."

34.     S.K. was sent to solitary for allegedly stealing "gummi worms" candy. (S.K. Decl. ¶ 3; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that S.K. was placed in restrictive housing for stealing candy from a cupboard in the kitchen at CLS. (Gustke Decl. ¶ 17.)

**PLAINTIFFS' REPLY:** Documents recently produced by Defendants in discovery show that on February 11, 2017, they placed S.K. in restrictive housing before she had a hearing, and that on February 14, 2017, after S.K. spent three days in solitary, the violation was

determined to be a "minor violation" warranting only an "oral reprimand." (Dupuis Decl., Ex. C (S.K. Disciplinary records).)

35.     K.D. was sent to solitary for allegedly stealing headband paint which she found in the art room.  (K.D. Decl. ¶ 4; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that K.D. was placed in restrictive housing for stealing headband paint from the art room and using the paint to decorate headbands with the word "Eastside," that the staff deemed to constitute graffiti and potentially pose a safety risk. (Gustke Decl. ¶ 18.)

**PLAINTIFFS' REPLY:** Documents recently produced by Defendants in discovery show that on February 11, 2017, they placed K.D. in restrictive housing for "theft," not for graffiti or for any behavior posing a safety risk, and that on February 14, 2017, after K.D. spent three days in solitary, the violation was determined to be a "minor violation" warranting only an "oral reprimand." (Dupuis Decl., Ex. D (K.D. Disciplinary records).)

36.     J.J. was sentenced to solitary for nine days, from August 1 to August 9, 2016, for running away from staff while confined in restraints. (Dupuis Class Cert. Decl. ¶ 14 & Ex. E (dkt. # 4-5, Conduct Report 81954 (8-1-16) & related documents); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. The use of the term "sentenced" is inaccurate. The more accurate term is "adjudicated" or "adjudged." Subject to and notwithstanding said objection, dispute. J.J. was issued conduct report #81954 for pulling away from staff escort while in restraints. (Gustke Decl. ¶ 19.) The hearing was held on August 8, 2016, and J.J. was given the disposition of modified confinement for one day. (*Id.*) He returned to the general population living unit on August 9, 2016. (*Id.*)

**PLAINTIFFS' REPLY:** No reply needed.

37.     Additionally, J.J. was sentenced to solitary for multiple days for covering his window and camera with paper and refusing to remove it. (Dupuis Class Cert. Decl. ¶ 14 & Ex. E (dkt. # 4-5, Conduct Report 82381 (9-16-16) & related documents); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. The use of the term "sentenced" is inaccurate. The more accurate term is "adjudicated" or "adjudged." Subject to and notwithstanding said objection, J.J. was placed in modified confinement for his behavior. (Gustke Decl. ¶ 20.) He was given multiple opportunities to remove the items from his window and camera, but he refused. (*Id.*) Staff must be able to see into a youth's room to ensure the youth's safety and well-being are not jeopardized. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants' do not appear to dispute that J.J. was placed in restrictive housing for covering his window and camera.

38.     Defendants have sometimes even sent youth to solitary cells after they have engaged in self-harming behavior. For example, K.D. was sent to solitary for six days, from September 2 to September 8, 2016, for being "disruptive" and engaging in "self-harm and disfigurement" after she tied a sweater around her neck. (K.D. Decl. ¶ 4; Graham Decl. Ex. G; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. K.D. was issued a conduct report on September 2, 2016. (Gustke Decl. ¶ 21.) She admitted to yelling, cursing, and refusing to attend school. (*Id.*) She was sent back to her room and, while in her room, she covered her room window and tied an item around her neck. (*Id.*) The disposition on the conduct report states that K.D. received zero days in modified confinement. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants do not appear to dispute that on Sept. 2, 2016, they placed K.D. in "prehearing security," that she did not have a hearing until Sept. 8, 2016, or that

at the hearing she was found "guilty" of "Disruptive Conduct" and "Self Harm and Disfigurement," and that she was not released from restrictive housing to return to her regular living unit until after the hearing on Sept. 8, as documents cited by Plaintiffs' in support of this finding reflect.

      39.    Solitary confinement sentences vary in length, from a few days to weeks or even several months. (M.R. Decl. ¶ 3; M.S. Decl. ¶3 (more than 20 days for violating LHS rules); Dupuis Class Cert Decl. ¶¶ 13-14, Ex. E (dkt. # 4-5) (sentences ranging from three to 72 days for a variety of infractions); Graham Decl. Ex. F at 2 (Larson Response) ("On average, a youth whose violation is assaultive (Fighting, Battery, Threats, etc.) receives in the neighborhood of 10 days to 14 days at disposition. Other non-assaultive offenses (Obstruction, Orders, Soliciting Staff, etc.), are disposed of with significantly shorter periods of time (on average four to six or seven days)."); PI Hearing Testimony.)

      **DEFENDANTS' RESPONSE:** Objection. The use of the term "sentenced" is inaccurate. The more accurate term is "adjudicated" or "adjudged." Subject to and notwithstanding said objection, dispute. The length of time a youth is placed in restrictive housing depends on the circumstances of each major conduct rule violation, including, but not limited to, the type of restrictive housing, the youth's behavior, and the number of major rules violations within a given period of time. (Gustke Decl. ¶ 22.) Wis. Admin. Code DOC § 373.80(3) states:

> If the hearing office finds that a youth committed a major conduct rule violation, the hearing officer shall consider any extenuating or mitigating circumstances in determining the appropriate major penalty disposition, which may include any of the following:
>     (a)    First major conduct rule violation within 60 days: not to exceed close confinement for 3 days and modified confinement for an additional 40 days.

15

      (b)      Second major conduct rule violation within 60 days: not to exceed close confinement for 4 days and modified confinement for an additional 50 days.

      (c)      Third and each subsequent major conduct rule violation within 60 days: not to exceed close confinement for 6 days and modified confinement for an additional 60 days.

(*Id.*); *see also* Wis. Admin. Code DOC §§ 373.80, 373.81(5) ("An institution may not require a youth to serve 90 or more continuous days of confinement without the approval of the administrator").

      **PLAINTIFFS' REPLY:** Defendants do not appear to dispute that solitary confinement sentences or adjudications can be as along as "a few  days  to weeks or even several months." Defendants admit that some youth have been held in restrictive housing for more than 50 consecutive days, and that some have been held in restrictive housing for more than 180 cumulative days. (Dupuis Decl., Ex. A (RFA 25, 26).)

      40.      Defendants frequently place children in "prehearing security" status for a week or more while they await a conduct report, hearing, disposition, and any consequential sentence. (C.M. Decl. ¶ 6 (one week in solitary without conduct report); M.S. Decl. ¶ 3 (one week until conduct report and hearing a couple days later); Graham Decl. Ex. G (six days, from September 2-8, 2016, in "prehearing security" before the September 8 hearing). This means that youth frequently spend a number of days in solitary confinement before they even receive an opportunity to be heard and a disposition.  (*Id.*)

      **DEFENDANTS' RESPONSE:** Dispute. "Prehearing security" is not synonymous with restrictive housing. (Gustke Decl. ¶¶ 23–24.) Prehearing security is governed by Wis. Admin. Code DOC § 373.13. (*Id.*) For instance, a youth's own room may be used for prehearing security. (*Id.*) The Wisconsin Administrative Code prohibits placing any youth in prehearing security pending a hearing for longer than 21 days. Wis. Admin. Code DOC § 373.13(5).

Further, "[i]f upon review it is determined that confinement is not appropriate, the youth shall be released from prehearing security immediately." *Id.*

**PLAINTIFFS' REPLY:** Plaintiffs alleged that Defendants frequently place youth in prehearing security for a week or more, not for more than 21 days. In addition, while Defendants allege that a youth's own room "may" be used for prehearing security, they do not allege that in fact they do so, much less that they do so routinely. Documents cited by Plaintiffs in support of these proposed findings reflect that boys in "prehearing security" status are placed in the Krueger and Roosevelt security units, and girls are placed in the Wells security wing. (*See, e.g.*, Notices of Placement in Prehearing Security, *in* Graham Decl., Ex. G ((Dkt. 30-7) and Dupuis Decl. Ex. E (Dkt. 4-5); Dupuis Decl., Ex. E (M.S. placed in prehearing security from Dubois cottage to Krueger restrictive housing unit).) Plaintiffs anticipate introducing testimony or evidence at the hearing on this issue.

41.    Through a combination of prehearing security status and consequential sentences, Defendants have held some children in solitary confinement for most of their time at LHS/CLS. (J.J. Decl. ¶ 3; M.R. Decl. ¶3; R.N. Decl. ¶ 5; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to time and the phrases "some children" and "most of their time." Subject to and notwithstanding said objection, dispute. Any given youth's time in restrictive housing depends on their frequency and degree of major conduct rules violations committed by that youth. (Gustke Decl. ¶ 25.)

**PLAINTIFFS' REPLY:** Defendants do not deny that they have held "some children," including Plaintiffs J.J., M.R. and R.N., in solitary for most of their time at LHS/CLS. Defendants admit that some youth have been in restrictive housing for more than 180

17

cumulative days. (Dupuis Decl., Ex. A (RFA 26).)

<strong>Life in Solitary Confinement</strong>

42.     When confined to solitary at LHS and CLS, children generally spend 22-23 hours per day alone in their cells. (A.V. Decl. ¶ 3 (22-23 hours per day in cell); C.M. Decl. ¶ 3 (same); J.J. Decl. ¶ 3 (same); M.R. Decl. ¶ 4 (same); A.P. Decl. ¶ 4 (same); S.K. Decl. ¶ 4 (same); R.N. Decl. ¶ 6 (same); M.S. Decl. ¶ 4 (23 hours per day in cell); K.D. Decl. ¶ 5 (same); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as time. Subject to and notwithstanding said objection, dispute. "Close confinement" requires "a *minimum* of one hour out of room time per day." Wis. Admin. Code DOC § 373.03(3) (emphasis added). "Modified confinement" requires "a *minimum* of 4 hours of out-of-room time per day." Wis. Admin. Code DOC § 373.03(22) (emphasis added). There is no policy at LHS and CLS mandating or stating that youth must spend 22 or 23 hours per day alone in their rooms. (Gustke Decl. ¶ 26.) The amount of time a given youth is permitted out of his or her room in restrictive housing above and beyond the minimum requirements depends on the youths' behavior. (*Id.*) Youth are allowed out of their rooms while in restrictive housing for a variety of reasons, including, but not limited to, recreation time, education, and hygiene. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants do not appear to dispute that youth on "close confinement" may spend 23 hours per day in their cells. Moreover, while Defendants quote the administrative code for the proposition that youth in "modified confinement" must get "a minimum" of four hours per day out of their cells, Defendant Gutske admits that at most time out of room for some youth "can" total "approximately" four or more hours per day, not "a minimum" of four hours per day. (Gutske Decl. (Dkt. 52) ¶ 29.) Defendants' objection to the

18

proposed finding as "vague and ambiguous as to time" also suggests that Defendants may have recently begun to try to change some of their practices - without denying Plaintiffs' accounts of their experiences. "Individual Youth Program Records" and "Out Time Records" for restrictive housing units, recently obtained from Defendants in discovery, confirm that youth frequently receive only an hour or two per day of time out of cell and also appear to confirm that guards take away out time for rule violations. (Dupuis Decl., Ex. F, (Examples of RHU Individual Youth Program Records and STU Out Time Records); *Id.* Ex. G at 4, 6 (Post Orders showing that showers are limited to 10 minutes and exercise may be limited to 20 minutes).) Plaintiffs anticipate presenting testimony and additional documentary evidence at the hearing about this issue.

43.     Children may get an hour a day of "school" if a teacher is available, but are denied other rehabilitative programming – such as Aggression Replacement Training and Juvenile Cognitive Intervention Program – while in solitary. (A.V. Decl. ¶ 4, K.D. Decl. ¶ 6, C.M. Decl. ¶ 4, S.K. Decl. ¶ 6, M.S. Decl. ¶ 5, J.J. Decl. ¶ 4, M.R. Decl. ¶ 5, A.P. Decl. ¶ 5; R.N. Decl. ¶ 7; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. The two types of rehabilitative programming referenced in this Proposed Fact are not the only types of rehabilitative programming youth may receive. (Gustke Decl. ¶ 27.) Youth at LHS and CLS are in school year-round. (*Id.*) Thus, school is not required every day. (*Id.*) On days when teachers are not on site, youth spend one-on-one time with social workers, who work with youth in a variety of other educational and rehabilitative activities. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants do not dispute that youth receive only "an hour" of school a day when a teacher is available. Defendants also do not dispute that youth in restrictive

housing do not get school every day. Defendants fail to provide any information as to the amount of time social workers work with youth when teachers are not available, or as to the nature of the activities in which they engage, and recent discovery confirms that Defendants prevent children in restrictive housing from participating in rehabilitative programs designed to address their anger and behavioral issues, such as Aggression Replacement Training and Juvenile Cognitive Intervention Program. (*See, e.g.*, Dupuis Decl., Ex. H (J.J. Social Service notes); *Id.*, Ex. I (M.M. Social Service notes).) Plaintiffs anticipate presenting testimony and evidence on this issue at the hearing.

44.     On days when a child is out of his or her cell for school or to visit health services or a lawyer, the guards sometimes consider that time his "out time," and the child does not get any other "out time" for the day.  (M.S. Decl. ¶ 4; A.P. Decl. ¶ 4; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

45.     Guards often even take away this minimal "out time" for rule violations. (S.K. Decl. ¶ 5; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to time and the term "often." Subject to and notwithstanding said objection, dispute. The amount of time a given youth is permitted out of his or her room in restrictive housing above and beyond the minimum requirements depends on the youths' behavior. (Gustke Decl. ¶ 26.)

**PLAINTIFFS' REPLY:** Defendants' assertion that the "amount of time a given youth is permitted out of his or her room . . . depends on the youth's behavior" does not constitute a denial that guards take away out-time for rule infractions. "Individual Youth Program Records" and "Out Time Records" for restrictive housing units, recently obtained from Defendants in

discovery, confirm that youth frequently receive only an hour or two per day of time out of cell and also appear to confirm that guards take away out time for rule violations. (Dupuis Decl., Ex. F (Examples of RHU Individual Youth Program Records and STU Out Time Records); *Id.* Ex. G at 4, 6 (Post Orders showing that showers are limited to 10 minutes and exercise may be limited to 20 minutes).) Plaintiffs anticipate presenting testimony and additional documentary evidence at the hearing about this issue.

46.     Boys in solitary confinement may be in "high hall" or "low hall." (J.J. Dec. ¶ 10; M.S. Decl. ¶ 6; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

47.     High hall is more restrictive than low hall. (J.J. Decl. ¶¶ 10-12; M.S. Decl. ¶ 6; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that, in general, high hall is more restrictive than low hall. (Gustke Decl. ¶ 28.)

**PLAINTIFFS' REPLY:** No reply needed.

48.     When boys first go to solitary, they are generally in high hall status, until LHS staff decides they have "earned" their way to low hall. (J.J. Decl. ¶ 10; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. Whether youth at LHS are placed in high hall or low hall depends on, among other things, the youth's level of aggression. (Gustke Decl. ¶ 31.)

**PLAINTIFFS' REPLY:** Plaintiffs anticipate introducing testimony or evidence at the hearing regarding this issue.

49.     Solitary cells measure approximately seven or eight feet by ten feet, have a large metal door with a small window and one or two slots through which guards pass food trays.

QB\45723579.2

(A.P. Decl. ¶ 8; S.K. Decl. ¶ 9; M.R. Decl. ¶ 8; R.N. ¶ 10; A.V. Decl. ¶ 7; C.M. Decl. ¶ 11; J.J. Decl. ¶ 7; M.S. Decl. ¶ 8; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** The exact measurements of rooms in restrictive housing are 7 feet, 5 inches by 11 feet, 4 inches. (Gustke Decl. ¶ 32.)

**PLAINTIFFS' REPLY:** Plaintiffs do not dispute these measurements. They note, however, that the square footage based on Defendants' measurement (84 square feet) is roughly the same as their estimate of eight feet by ten feet (80 square feet).

50.     The windows in the doors of the cells in the Krueger unit have a cover which can be closed. Sometimes, guards in Krueger will close those covers so that the boy cannot see out of his cell in to the corridor. (J.J. Decl. ¶9; C.M. Decl. ¶13; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute. Door covers may be closed for privacy or safety reasons, including, but not limited to, times when medication is distributed or if disruptive youth are in the hallway. (Gustke Decl. ¶ 33.)

**PLAINTIFFS' REPLY:** No reply needed.

51.     Lights in the cells are illuminated at all times, though they are dimmed during the night. (A.V. Decl. ¶ 11; C.M. Decl. ¶ 16; J.J. Decl. ¶ 13; K.D. Decl. ¶ 7; M.S. Decl. ¶ 13; R.N. Decl. ¶ 14; M.R. Decl. ¶ 12; A.P. Decl. ¶ 10; S.K. Decl. ¶ 11; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute. Lights stay illuminated, as required by policy, for safety reasons, including, but not limited to, monitoring youth at all times for potential self-harm, hiding under beds, or destruction of property. (Gustke Decl. ¶ 35.)

**PLAINTIFFS' REPLY:** No reply needed.

52.     The only furniture in the solitary cells at LHS/CLS is a bed, and in some of the cells, a sink-toilet fixture. (A.V. Decl. ¶ 9; C.M. Decl. ¶ 14; M.S. Decl. ¶ 10; J.J. Decl. ¶¶ 10-11;

K.D. Decl. ¶ 7; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE**:  No Dispute.

**PLAINTIFFS' REPLY**: No reply needed.

53.     A typical segregation cell in high hall is like the diagram depicted below (not to scale):  (J.J. Decl. ¶ 8; A.V. Decl. ¶ 8; C.M. Decl. ¶ 12; M.R. ¶ 9; R.N. ¶ 11; PI Hearing Testimony.)



**DEFENDANTS' RESPONSE**:  No Dispute.

**PLAINTIFFS' REPLY**: No reply needed.

54.     A segregation cell in the Wells cottage looks like the diagram depicted above, without the combination sink/toilet and the door opens inward instead of outward. (A.P. Decl. ¶ 9; S.K. Decl. ¶ 10; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that the restrictive housing rooms in Wells look like the diagram depicted in Proposed Fact No. 53, but dispute that all of the restrictive housing rooms in Wells lack a sink and toilet—some restrictive housing rooms in Wells have sinks and toilets. (Gustke Decl. ¶ 35.)

**PLAINTIFFS' REPLY:** Defendants do not dispute that some of the cells in the restrictive housing wing in Wells lack sinks and toilets.

55. The mattress is typically on a low frame very close to the ground, or even on the ground if there is no bedframe at all. (C.M. Decl. ¶ 14; A.V. Decl. ¶ 9; J.J. Decl. ¶ 10; M.S. Decl. ¶ 10; M.R. Decl. ¶ 10; A.P. Decl. ¶ 10; R.N. Decl. ¶ 12; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute. Mattresses are close to the ground for safety reasons, including, but not limited to, youth hiding under beds during room checks. (Gustke Decl. ¶ 36.)

**PLAINTIFFS' REPLY:** No reply needed.

56. Boys in high hall are only allowed to have a small amount of toilet paper in the cell and must ask guards for more when they need it. (C.M. Decl. ¶ 17; J.J. Decl. ¶ 14; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute. Toilet paper is allowed in small amounts for safety reasons. (Gustke Decl. ¶ 37.) For instance, in the past, youth have abused toilet paper in their rooms in several ways, including, but not limited to, using the toilet paper to cover windows and cameras, obstructing the staff's view into their rooms. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants admit that any youth in a solitary cell with a toilet receives only a small amount of toilet paper, not because *that particular* youth has misused or threatened to misuse toilet paper, but because *other* youth "in the past . . . have abused toilet paper." Accordingly, the rationing of toilet paper is not a response to the risks a particular youth presents, but a part of the general punishment of solitary confinement.

57. The boys in high hall cannot flush the toilets themselves and so must ask the guards to do so; it sometimes takes a long time to get the toilet flushed and the cells begin to

reek. (C.M. Decl. ¶ 17; J.J. Decl. ¶ 14; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the term "reek" and the phrase "a long time." Subject to and notwithstanding said objection, no dispute that the youth in high hall must ask the staff to flush their toilets.

**PLAINTIFFS' REPLY:** Defendants objections do not constitute a dispute that staff sometimes delay in flushing toilets and that odors of feces and urine in toilets will linger until flushing occurs.

58.     The boys' cells in low hall and the girls' solitary cells have no toilet or sink, so these children must turn on a call light so that guards can let them out to go to the toilet.  (M.S. Decl. ¶ 11; J.J. Decl. ¶ 11; K.D. Decl. ¶ 8; S.K. Decl. ¶ 12; A.P. Decl. ¶ 11; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that the youths' rooms in low hall at LHS do not have a toilet or sink, so those youth must turn on a call light so that guards can let them out to go to the toilet. Dispute that all restrictive housing rooms at CLS lack a toilet and sink—some of those rooms contain toilets and sinks. (Gustke Decl. ¶ 35.) For those rooms in restrictive housing at CLS that lack a toilet and sink, youth must turn on a call light so that guards can let them out to go to the toilet. (Gustke Decl. ¶ 38.)

**PLAINTIFFS' REPLY:** No reply needed.

59.     It sometimes takes so long for the guards to respond that the children urinate or defecate in their cells.  (M.S. Decl. ¶ 11; J.J. Decl. ¶ 11; AP Decl. ¶ 11; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the phrase "so long." Subject to and notwithstanding said objection, dispute that youth defecate and urinate in their rooms because it takes staff "so long" to respond. There have been

25

instances of youth defecating and urinating in inappropriate places in their rooms even when their rooms are equipped with toilets. (Gustke Decl. ¶ 39.)

**PLAINTIFFS' REPLY:** Although Defendants posit that youth may urinate or defecate in their cells for reasons other than guards' delayed responses, they do not dispute the assertions in Plaintiffs' declarations that they have urinated or defecated in their cells due to the delayed responses.

60.     Property restrictions are severe. Children have the clothes they wear, a toothbrush and perhaps a book or two in their cells; they do not have anything to write with. (A.V. Decl. ¶ 10; C.M. Decl. ¶ 15; M.S. Decl. ¶ 12; J.J. Decl. ¶ 12; K.D. Decl. ¶ 7; R.N. Decl. ¶ 13; S.K. Decl. ¶ 11; A.P. Decl. ¶ 10; M.R. Decl. ¶ 11; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the term "severe." Subject to and notwithstanding said objection, dispute. The personal property allowed in rooms differ for each youth depending on their individual treatment plan. (Gustke Decl. ¶ 40.) For instance, some youth have stress balls, chalk, and crayons. (*Id.*) By contrast, pens and pencils are not allowed in rooms because they can pose safety hazards for self-harm or harm against the staff. (*Id.*)

**PLAINTIFFS' REPLY:** Plaintiffs anticipate introducing testimony or evidence at the hearing about this issue.

61.     Defendants do not permit the boys in high hall and girls in restrictive housing to have *any* paper, other than books, in their cells, while boys in low hall may have mail in their cells. (J.J. Decl. ¶ 12; R. N. Decl. ¶ 13; K.D. Decl. ¶ 7; M.R. Decl. ¶ 11; M.S. Decl. ¶ 12; C.M. Decl. ¶ 15; A.P. Decl. ¶ 10; S.K. Decl. ¶ 11; A.V. Decl. ¶ 10; PI Hearing Testimony.)

QB\45723579.2

**DEFENDANTS' RESPONSE:** Dispute. On occasion, youth have been allowed to have paper in their rooms. (Gustke Decl. ¶ 41.) Most of the time, however, paper is not permitted in youth's rooms, other than in books. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants admit that "most of the time" youth may not have paper in their restrictive housing cells.

### Use of Mechanical Restraints in Solitary

62.     Even when children in solitary are allowed out of their cells, guards frequently place them in mechanical restraints, which is referred to as being "on the belt." (J.J. Decl. ¶6; A.V. Decl. ¶5; C.M. Decl. ¶7; M.S. Decl. ¶ 7; R.N. Decl. ¶ 9; M.R. Decl. ¶ 7; A.P. Decl. ¶ 7; Dupuis Class Cert. Decl. ¶15 & Ex. E  (dkt. # 4-5) at 8, 14, 28, 31, 39, 43, 48, 59, 71; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. Only youth in high hall and CLS restrictive housing are placed in mechanical restraints when outside their rooms, with certain exceptions such as, for example, recreational time. (Gustke Decl. ¶ 42.) Youth in low hall are not placed in mechanical restraints outside their rooms. (*Id.*)

**PLAINTIFFS' REPLY:** Despite their denial, Defendants have put youth in low hall "on the belt" during their out time. (*See, e.g., infra.*, Defs.' Response to PFOF No. 67 ("Whether mechanical restraints are applied to youth at LHS in low hall depends on the youth's behavior and his conduct in the living unit."); M.S. Decl. (Dkt. 25) ¶ 7.   With respect to the balance of Defendants' response, it is couched in the present tense, presumably because no exercise rooms existed until well past the filing of this litigation. Defendants do not appear to dispute the declarations of numerous Plaintiffs that when "on the belt" they have spent their "out time" – which encompassed "recreational time" – tethered to a table in the day room. Moreover, while

Defendants have labeled "exercise rooms" on their control panels as "Gold's Gym," the rooms are in fact restrictive housing unit cells, seven feet, five inches by eleven feet four inches, from which the beds have been removed and which contain a yoga ball. Youth are locked into those cells alone and given about 30 minutes for their "exercise." (Dupuis Decl., Ex. J (Photographs from expert site visit); Second JJ Decl. (Dkt. 47) ¶ 7.) Plaintiffs intend to present testimony and evidence about this issue at the hearing.

63.    To place a child "on the belt," guards place the child's hands in handcuffs, secure the handcuffs to a belt around the child's waist, and chain the child to a table in the day room or to a desk in the classroom. (C.M. Decl. ¶¶ 7-8; A.V. Decl. ¶¶ 5-6; J.J. Decl. ¶ 6; M.S. Decl. ¶ 7; M.R. Decl. ¶ 7; R.N. Decl. ¶ 9; A.P. Decl. ¶ 7; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that "belt status" refers to a youth who is, for the most part, placed in mechanical restraints around his or her wrists that also attach to a belt worn around the waist. (Gustke Decl. ¶¶ 11, 43.) Dispute that youth are ever "chain[ed]" to tables or desks. (*Id.*) For some youth on belt status, he or she may be tethered to a table in a day room or desk in a classroom by a nylon tether for, among other things, safety concerns based on the youth's behavior. (*Id.*)

**PLAINTIFFS' REPLY:** Plaintiffs anticipate presenting additional testimony or evidence at the hearing regarding this issue.

64.    A child handcuffed and chained to a table while out of his or her cell cannot meaningfully exercise, interact with others or engage in any activity that requires use of the hands. (PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the term "meaningfully." Subject to and notwithstanding said objection, dispute. Youth who

28

are on belt status have mechanical restraints temporarily removed so that they can exercise. (Gustke Decl. ¶ 44.) Further, youth on belt status can write, as well as interact with staff and talk to other youth. (*Id.*)

**PLAINTIFFS' REPLY:** Regarding "exercise" time for youth in belt status, see Plaintiffs' Reply to PFOF 62, *supra*. Moreover, at the table in the day room, the tether and belt combination provide only about five inches from the edge of the table for youth to move their hands, making writing extremely awkward and difficult. (Dupuis Decl., Ex. K (Photographs taken during expert site visit).) Plaintiffs also anticipate presenting testimony and evidence regarding this issue at the hearing.

65.     By policy and/or practice, LHS generally keeps all new male arrivals at the solitary confinement unit "on the belt" regardless of the reason the youth was sent to solitary. (J.J. Decl. ¶ 6; A.V. Decl. ¶ 5; C.M. Decl. ¶ 7; M.R. Decl. ¶ 6; R.N. Decl. ¶ 8; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. Youth can be placed directly in low hall and thus not placed on belt status. (Gustke Decl. ¶ 45.) Moreover, Pursuant Division of Juvenile Correctoins Policy #500.70.10 "[t]he Division of Juvenile Corrections may use mechanical restraints to confine youth at risk of immediate physical injury to self or others." (Gustke Decl. ¶ 42, Ex. A.)

**PLAINTIFFS' REPLY:** Some youth in low hall are placed on belt status. (*See*, Defs.' Resp. to PFOF No. 67, *infra*; M.S. Decl. (Dkt. 25) ¶ 6).)

66.     When boys are in high hall, they are always "on the belt." (PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

67.     Boys in low hall are generally not on the belt, meaning they spend their limited time out of the cell without physical restraints. However, when more than one boy is in the day space at a time, guards may keep even boys on low hall on the belt. (M.S. Decl. ¶ 6; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. Whether mechanical restraints are applied to youth at LHS in low hall depends on the youth's behavior and his conduct in the living unit. (Gustke Decl. ¶ 46.)

**PLAINTIFFS' REPLY:** No reply needed.

68.     Defendants keep many boys on the belt for most of the time they are in solitary. (J.J. Decl. ¶ 6; M.R. Decl. ¶ 7; R.N. Decl. ¶ 9; Dupuis Class Cert. Decl. ¶ 15 & Ex. E (dkt. # 4-5); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. Whether mechanical restraints are applied to youth at LHS depends on the youth's behavior and his conduct in the living unit. (Gustke Decl. ¶ 47.) Youth in high hall are reviewed weekly to determine whether they are to be kept on belt status. (*Id.*)

**PLAINTIFFS' REPLY**: Defendants do not dispute that they keep "many" boys on the belt "for most of the time" they are in solitary. In addition, because Defendants only review belt status weekly, a youth with appropriate behavior and conduct may still remain on the belt for up to a week, pending that review.

69.     Defendants also place some of the girls on the belt during their time out of cell while in solitary confinement. (K.D. Decl. ¶13; A.P. Decl. ¶¶ 6-7; S.K. Decl. ¶ 7; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

### Solitary Confinement Causes Psychological Harm to Youth

70.     Stuart Grassian, M.D. is a psychiatrist who has studied the effects of solitary confinement on juveniles and adults for decades and is qualified to render an effect on the psychological harms of solitary confinement and other conditions of confinement. (Grassian Decl. ¶¶ 1-12; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute that Dr. Grassian's opinions shed any light on the constitutionality of any policies, practices, or procedures at LHS or CLS. Object to the treatment of Dr. Grassian's opinions as facts and thus assert his opinions are unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. At the PI hearing Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

71.     According to Dr. Grassian, the conditions at Lincoln Hills and Copper Lake are "substantially more onerous than is generally the norm for adult prisoners in solitary confinement," and during the "entire course" of his professional experience, Dr. Grassian has "never encountered a situation where the 'exercise hour' was spent chained to a table, creating no opportunity whatsoever to actually exercise." (Grassian Decl. ¶¶ 17, 20; PI Hearing.)

**DEFENDANTS' RESPONSE:** No dispute that Dr. Grassian may hold such an opinion, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is

31

unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact. Further, dispute that youth spend their exercise time in mechanical restraints. (Gustke Decl. ¶ 48.)

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703. With regard to Defendants' dispute that youth spend exercise time in restraints, see Plaintiffs' Reply to PFOF 62, *supra*.

72.    Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, hyper-vigilance, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior. (J.J. Decl. ¶16; A.V. Decl. ¶13; C.M. Decl. ¶19; K.D. Decl. ¶¶9-10; R.N. Decl. ¶ 15; M.R. Decl. ¶¶ 13-14; M.S. Decl. ¶ 14; S.K. Decl. ¶ 13; A.P. Decl. ¶ 13; Grassian Decl. ¶¶ 50-55; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that solitary confinement, in general, negatively impacts juveniles. However, dispute that "solitary confinement," as that term is used in Plaintiffs' Statement of Proposed Facts is an accurate, complete, or proper description of any practices as LHS and CLS.

**PLAINTIFFS' REPLY:** Defendants do not dispute the adverse effects of solitary confinement. In addition to the evidentiary materials included with the Plaintiffs' Proposed

Findings and this Reply, at the hearing Plaintiffs will present testimony and evidence on the nature of solitary confinement at LHS/CLS, and expert testimony that such confinement has adverse effects.

73. Additionally, children are emotionally damaged and humiliated when they are treated like chained animals. (J.J. Decl. ¶5; C.M. Decl. ¶19.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inadmissible because it constitutes opinion testimony by lay witnesses that is not rationally based on the witnesses' perception, not helpful to determining a fact in issue, and not based on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. Moreover, there is no supporting evidence that these witnesses have personal knowledge of the matters discussed in this Proposed Fact. *Id.* 602. Subject to and notwithstanding said objection, dispute that youth at LHS and CLS are treated like "chained animals." (Gustke Decl. ¶ 49.)

**PLAINTIFFS' REPLY:** Plaintiffs are competent to testify to their own emotional reactions to their own experiences and their declarations may be relied upon in preliminary injunction proceedings, where the rules of evidence apply with less rigor.

74. J.J. says he and other youth in solitary were "treated . . . like dogs in cages, causing us more trauma." (J.J. Decl. ¶ 5.) He was sad and depressed, had trouble sleeping, felt anxious and restless and was easily provoked to anger by little things, like being ignored. (J.J. Decl. ¶ 16.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inadmissible because it constitutes opinion testimony by lay witnesses that is not rationally based on the witnesses' perception, not helpful to determining a fact in issue, and not based on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. Subject to and notwithstanding said objection,

no dispute that J.J. may have felt certain emotions. However, dispute that J.J. has the expertise to draw a casual connection between those emotions and any policy, practice, or custom at LHS.

**PLAINTIFFS' REPLY:** Plaintiffs are competent to testify to their own emotional reactions to their own experiences and their declarations may be relied upon in preliminary injunction proceedings, where the rules of evidence apply with less rigor.

75.     C.M. suffered from anxiety, was irritated by the noise of other youth yelling into the hallways from their cells, lost sleep and even had his hair fall out. Like J.J., he felt he was "treated like an animal, cuffed to come out for a shower, cuffed to come out for school, cuffed any time I got out." (C.M. Decl. ¶ 19.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inadmissible because it constitutes opinion testimony by lay witnesses that is not rationally based on the witnesses' perception, not helpful to determining a fact in issue, and not based on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. Subject to and notwithstanding said objection, no dispute that C.M. may have felt certain emotions. However, dispute that C.M. has the expertise to draw a casual connection between those emotions and any policy, practice, or custom at LHS.

**PLAINTIFFS' REPLY:** Plaintiffs are competent to testify to their own emotional reactions to their own experiences and their declarations may be relied upon in preliminary injunction proceedings, where the rules of evidence apply with less rigor.

76.     K.D. was irritated, angry, anxious, restless, sad and hopeless, and sometimes even "felt like dying" in solitary. (K.D. Decl. ¶ 10.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inadmissible because it constitutes opinion testimony by lay witnesses that is not rationally based on the witnesses'

perception, not helpful to determining a fact in issue, and not based on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. Subject to and notwithstanding said objection, no dispute that K.D. may have felt certain emotions. However, dispute that K.D. has the expertise to draw a casual connection between those emotions and any policy, practice, or custom at LHS.

**PLAINTIFFS' REPLY:** Plaintiffs are competent to testify to their own emotional reactions to their own experiences and their declarations may be relied upon in preliminary injunction proceedings, where the rules of evidence apply with less rigor.

77.     A.V. was depressed and sleepless and would "get emotional." (A.V. Decl. ¶ 13.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inadmissible because it constitutes opinion testimony by lay witnesses that is not rationally based on the witnesses' perception, not helpful to determining a fact in issue, and not based on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. Subject to and notwithstanding said objection, no dispute that A.V. may have felt certain emotions. However, dispute that A.V. has the expertise to draw a casual connection between those emotions and any policy, practice, or custom at LHS.

**PLAINTIFFS' REPLY:** Plaintiffs are competent to testify to their own emotional reactions to their own experiences and their declarations may be relied upon in preliminary injunction proceedings, where the rules of evidence apply with less rigor.

78.     M.S. felt anxious, depressed and "degraded due to the inhumane treatment." (M.S. Decl. ¶ 14.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inadmissible because it constitutes opinion testimony by lay witnesses that is not rationally based on the witnesses'

perception, not helpful to determining a fact in issue, and not based on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. Subject to and notwithstanding said objection, no dispute that M.S. may have felt certain emotions. However, dispute that M.S. has the expertise to draw a casual connection between those emotions and any policy, practice, or custom at LHS.

**PLAINTIFFS' REPLY:** Plaintiffs are competent to testify to their own emotional reactions to their own experiences and their declarations may be relied upon in preliminary injunction proceedings, where the rules of evidence apply with less rigor.

79.     A.P. was angry and negative, and sometimes wanted to hurt herself. (A.P. Decl. ¶ 13.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inadmissible because it constitutes opinion testimony by lay witnesses that is not rationally based on the witnesses' perception, not helpful to determining a fact in issue, and not based on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. Subject to and notwithstanding said objection, no dispute that A.P. may have felt certain emotions. However, dispute that A.P. has the expertise to draw a casual connection between those emotions and any policy, practice, or custom at LHS.

**PLAINTIFFS' REPLY:** Plaintiffs are competent to testify to their own emotional reactions to their own experiences and their declarations may be relied upon in preliminary injunction proceedings, where the rules of evidence apply with less rigor.

80.     M.R. says that he would wake up angry and his heart pounding, and sometimes he became so bored that "even getting pepper sprayed seem[ed] like something to fill part of [his] day." (M.R. Decl. ¶ 13.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inadmissible because it constitutes opinion testimony by lay witnesses that is not rationally based on the witnesses' perception, not helpful to determining a fact in issue, and not based on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. Subject to and notwithstanding said objection, no dispute that M.R. may have felt certain emotions. However, dispute that M.R. has the expertise to draw a casual connection between those emotions and any policy, practice, or custom at LHS.

**PLAINTIFFS' REPLY:** Plaintiffs are competent to testify to their own emotional reactions to their own experiences and their declarations may be relied upon in preliminary injunction proceedings, where the rules of evidence apply with less rigor.

81.     R.N. was depressed, sad, and lonely. While in solitary, R.N. attempted to strangle himself with the cord of a fan. (R.N. Decl. ¶ 15.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is inadmissible because it constitutes opinion testimony by lay witnesses that is not rationally based on the witnesses' perception, not helpful to determining a fact in issue, and not based on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. Subject to and notwithstanding said objection, no dispute that R.N. may have felt certain emotions. However, dispute that R.N. has the expertise to draw a casual connection between those emotions and any policy, practice, or custom at LHS. Further, object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Plaintiffs are competent to testify to their own emotional reactions to their own experiences and their declarations may be relied upon in preliminary injunction proceedings, where the rules of evidence apply with less rigor.

82. The symptoms experienced by these children are consistent with those identified in the psychiatric research as being caused by solitary confinement. (Grassian Decl. ¶¶ 35-49; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that Dr. Grassian may proffer an opinion consistent with this Propose Fact, but dispute that Dr. Grassian's declaration is sufficient to support an opinion of causation because there is no evidence that Dr. Grassian ever treated or even met any of the named plaintiffs. *See* (Dkt. 20, Decl. Stuart Grassian, M.D., 10–12.) Further, object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

83. Dr. Grassian describes the research as follows: "[During the 19th century], a major body of clinical literature developed which documented the psychiatric disturbances created by such stringent conditions of confinement. The paradigmatic disturbance was an agitated confusional state which, in more severe cases, had the characteristics of a florid

delirium, characterized by severe confusional, paranoid, and hallucinatory features, and also by intense agitation and random, impulsive violence–whether directed at others or self–directed." (Grassian Decl. ¶ 27; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that Dr. Grassian describes certain research as stated in the Proposed Fact, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

84. Studies of groups that experience "severe restriction of environmental and social stimulation," including patients in intensive care units, polar and submarine expeditions, and those involved in space travel, show that such deprivation "has a profoundly deleterious effect on mental functioning." (Grassian Decl. ¶¶ 23-24; PI Hearing Testimony.

**DEFENDANTS' RESPONSE:** No dispute that this Proposed Fact summarizes and/or quotes Dr. Grassian's Declaration, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to

QB\45723579.2

Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

85.      Solitary confinement of juveniles causes far greater harm than does such confinement in adults, and the risk of harm to juveniles is alarming. (Grassian Decl. ¶ 35; *see also* Graham Decl. Ex. N at 3 ("Psychologically, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting."); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that this Proposed Fact summarizes and/or quotes Dr. Grassian's Declaration, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding.  For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

86.      Additionally, solitary confinement of juveniles is "uniquely harmful" because "brain function and neural connectedness are still evolving and developing during adolescence, especially so in regard to the functioning of the prefrontal cortex–that part of the brain most centrally involved in inhibiting emotional reactivity." (Grassian Decl. ¶ 36; PI Hearing

Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that this Proposed Fact summarizes and/or quotes Dr. Grassian's Declaration, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

87. Brain development can be derailed by stress, and "[f]or a juvenile, simply being placed in isolation–the utter helplessness of it–is enormously stressful." (Grassian Decl. ¶¶ 37-43; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that this Proposed Fact summarizes and/or quotes Dr. Grassian's Declaration, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the

QB\45723579.2

preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

88.　　Thus solitary confinement causes lasting–and potentially permanent–harm to children's developing brains and psyches. (Grassian Decl. ¶ 58) ("[S]olitary confinement . . . will among other harms, permanently affect the juvenile's capacity to modulate affect and to inhibit impulsivity, likely permanently impairing his capacity to manage his life as an adult."); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that this Proposed Fact summarizes and/or quotes Dr. Grassian's Declaration, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

89.　　Dr. Grassian also notes that when juveniles in detention "have great difficulty in managing their emotions and behavior, especially under stressful conditions," they are "likely to commit disciplinary infractions, and are especially likely to be placed into solitary confinement." Unfortunately, "such individuals are precisely the group least capable of tolerating the stresses and the perceptual, occupational, and social deprivations of solitary confinement" and are also "exquisitely vulnerable to psychiatric and behavioral decompensation when housed in solitary

42

confinement" and are "especially likely to become even more behaviorally out of control, leading to more and more time in solitary." (Grassian Decl. ¶ 50; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that this Proposed Fact summarizes and/or quotes Dr. Grassian's Declaration, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

90.     "[O]nce an individual is placed into the harsh and restrictive environment of solitary, there is a major risk that his emotional state will deteriorate and his behavior will become more chaotic, dangerous, and even violent." (Grassian Decl. ¶ 51; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that this Proposed Fact summarizes and/or quotes Dr. Grassian's Declaration, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover,

Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

91.     Solitary confinement of juveniles "represents a tragedy both for the individual and for the greater community," because people who spent "significant time in solitary confinement are *more* likely to commit violent crimes than those individuals who did not experience such a destructive and cruel environment." (Grassian Decl. ¶ 59; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that this Proposed Fact summarizes and/or quotes Dr. Grassian's Declaration, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding.  For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

**Pepper Spray**

92.     Pepper spray is a form of chemical restraint, generally containing irritants extracted from the resin of hot peppers.  (Schiraldi Decl. ¶ 16.)

**DEFENDANTS' RESPONSE:** No dispute. LHS and CLS staff are trained to use and carry the incapacitating agent Oleoresin Capsicum ("OC"). (Gustke Decl. ¶ 50.)

**PLAINTIFFS' REPLY:** No reply needed.

93.     Pepper spray causes intense pain, coughing and eye and skin irritation for those upon whom it is administered.  When it is inhaled, pepper spray inflames the respiratory tract and temporarily restricts breathing to shallow breaths. It can also lead to damage of nerves and eyes, and to respiratory arrest or asphyxiation of people with asthma.  (Schiraldi Decl. ¶¶ 16-17; J.J. Decl. ¶ 20; M.R. ¶¶ 15-16; R.N. Decl. ¶ 17; M.S. Decl. ¶ 17; A.V. Decl. ¶ 15; S.K. Decl. ¶ 15; A.P. Decl. ¶ 15; K.D. Decl. ¶ 11; C.M. Decl. ¶ 10; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. The physical effects of a particular incapacitating agent varies based on the particular person. (Gustke Decl. ¶ 51.) Further, dispute that the incapacitating agents at LHS and CLS inflame the respiratory tracts or temporarily restrict breathing, compared to other incapacitating agents. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants' response does not amount to a denial.  Defendants do not deny that the pepper spray used at LHS/CLS has the effects set forth in the proposed finding, only that the effects vary from person to person and that the effects on breathing and respiratory function are not as extreme as some other, unnamed, incapacitating agents.  The Response also misstates the Gustke Declaration, which says only that the sprays used by Defendants are not "designed to" inflame the respiratory tract or restrict breathing, "compared to other incapacitating agents." Moreover, Defendants' own use of force policy recognizes that OC spray "a chemical restraint that causes irritation to the eyes and skin."  (Dkt. 52-2.)

94.     Defendants' policy expressly permits use of pepper spray to "enforce a DOC rule, a posted policy or procedure or an order of staff member," and LHS/CLS staff spray children even without any risk of harm to staff or youth or danger to the security of the institution. (DOC DJC Policy & Procedure 300.05.05 (9-28-2016); Dupuis Class Cert. Decl. ¶ 17; J.J. Decl. ¶ 19; M.R. Decl. ¶ 15; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. Staff administer incapacitating agents in accordance with the applicable use of force and incapacitating agents policies. (Gustke Decl. ¶ 52, Ex. B.)

**PLAINTIFFS' REPLY:** DOC's policy and procedure for "Use of Chemical Agents and Incapacitating Devices" permits use of pepper spray to "enforce a DOC rule, a posted policy or procedure or an order of staff member." (Dupuis Decl,, Ex. L (DJC P&P 300.05.05 ("Use of Chemical Agents and Incapacitating Devices").) Plaintiffs will also present testimony and evidence at the hearing regarding this issue.

95.     Guards pepper spray children for minor non-violent infractions, such as refusing to go into their rooms, refusing to leave their rooms, covering up the cameras in the segregation unit, failing to follow commands, or threatening self-harm. (J.J. Decl. ¶19; M.R. Decl. ¶15; A.P. Decl. ¶ 15; R.N. Decl. ¶ 15; Dupuis Class Cert. Decl. ¶16 & Ex. E (dkt. # 4-5) at 68-69; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague, ambiguous, and incomplete as to the phrases "refusing to go in their rooms," "refusing to leave their rooms," "covering up the cameras in the segregation unit, failing to follow commands," and "threatening self-harm." Subject to and notwithstanding said objection, dispute. Incapacitating agents are not utilized as a form of punishment for youths' conduct. (Gustke Decl. ¶ 53.) Rather, incapacitating agents are used as a last resort in situations where youth show escalated resistance and do not respond to conservative measures of control, in order to avoid safety hazards to staff and youth. (*Id.*)

**PLAINTIFFS' REPLY:** In addition to the materials cited by Plaintiffs in support of this proposed finding, Plaintiffs intend to present testimony and evidence at the hearing

demonstrating that guards use pepper spray on children who refuse to return to their rooms, refuse to leave their rooms, cover their cameras, fail to follow commands, and similar non-violent behavior.

96.     Guards at LHS and CLS use several different forms of pepper spray on youth in their custody.  (K.D. Decl. ¶ 11; J.J. Decl. ¶ 20; M.R. Decl. ¶ 15; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute. Incapacitating agents (Oleoresin Capsicum) come in the form of a Mark III, Mark IV, or Mark IX deployment systems—all of which refer to the size of the carrying canister. (Gustke Decl. ¶ 54.) The incapacitating agent can either be in the form of foam or liquid. (*Id.*)

**PLAINTIFFS' REPLY:** No reply needed.

97.     Some pepper sprays are used to create a cloud which will fill the youth's cell or hallway outside the cell, (C.M. Decl. ¶ 10; K.D. Decl. ¶ 11; M.R. Decl. ¶ 15; R.N. Decl. ¶ 15; M.S. Decl. ¶ 17; A.V. Decl. ¶ 15; S.K. Decl. ¶ 15; A.P. Decl. ¶ 15; PI Hearing Testimony), while others are sprayed directly at the face or body of a youth (J.J. Decl. ¶ 20; PI Hearing Testimony).

**DEFENDANTS' RESPONSE:** No dispute. Incapacitating agents can be dispensed in the "fogger" setting or the "streamer" setting, and the setting is chosen based on the circumstances and need. (Gustke Decl. ¶ 55.)

**PLAINTIFFS' REPLY:** No reply needed.

98.     Those who have been sprayed describe their suffering as burning their skin and eyes and impairing their breathing. (J.J. Decl. ¶ 20; M.R. Decl. ¶ 16; R.N. Decl. ¶ 17; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. The physical effects of a particular incapacitating agent varies based on the particular person. (Gustke Decl. ¶¶ 51, 56.) All staff

members who carry incapacitating agents, as part of their training, are required to be exposed to incapacitating agents, and each person responds to such exposure differently. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants' response does not amount to a denial. Defendants do not deny that the pepper spray used at LHS/CLS has the effects set forth in the proposed finding, only that the effects vary from person to person. The Response also misstates the Gustke Declaration, which says only that the sprays used by Defendants are not "designed to" inflame the respiratory tract or restrict breathing, "compared to other incapacitating agents."

99.     Even those children who have not been sprayed directly have suffered as a result of clouds of spray used on other children. (A.V. Decl. ¶ 15; K.D. Decl. ¶ 11; M.S. Decl. ¶¶ 16-17; C.M. Decl. ¶ 10; S.K. Decl. ¶ 15; A.P. Decl. ¶ 15; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

100.     Two plaintiffs described coughing up blood as a result of such exposure. (K.D. Decl. ¶ 11; A.P. Decl. ¶ 15; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the phrase "such exposure." Subject to and notwithstanding said objection, no dispute that two plaintiffs may have described the information referenced in this Proposed Fact.

**PLAINTIFFS' REPLY:** No reply needed.

101.     Another boy felt nauseous and light headed, and experienced burning eyes and skin and shortness of breath. (A.V. Decl. ¶ 15; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that another youth may have described the information referenced in this Proposed Fact.

**PLAINTIFFS' REPLY:** No reply needed.

102.    Even the residue of pepper spray on blankets or cell walls feels like it is burning the body.  (M.S. Decl. ¶ 16; A.V. Decl. ¶ 12; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that another youth may have described the information referenced in this Proposed Fact.

**PLAINTIFFS' REPLY:** No reply needed.

103.    After LHS/CLS staff pepper spray children they force them to remove all of their clothing and lock them in a shower "cage."  (J.J. Decl. ¶ 21; M.R. Decl. ¶ 16; R.N. Decl. ¶ 17; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that LHS and CLS staff allow youth to decontaminate after incapacitating agents are dispensed. (Gustke Decl. ¶ 57.)

**PLAINTIFFS' REPLY:** No reply needed.

104.    The shower initially worsens the painful effects of the pepper spray because it spreads the pepper spray throughout the body.  (J.J. Decl. ¶ 21; M.R. Decl. ¶ 16.)

**DEFENDANTS' RESPONSE:** The physical effects of a particular incapacitating agent—and the decontamination process—varies based on the particular person. (Gustke Decl. ¶ 57.)

**PLAINTIFFS' REPLY:** Defendants' response does not amount to a denial.  Defendants do not deny that the pepper spray used at LHS/CLS has the effects set forth in the proposed finding, only that the effects vary from person to person.  The Response also misstates the Gustke Declaration, which says only that the sprays used by Defendants are not "designed to" inflame the respiratory tract or restrict breathing, "compared to other incapacitating agents."

105.    When they get out of the shower, guards make them wear nothing but a thin gown–often made of paper–and replace the regular mattresses in their solitary cells with a hard

rubber mat. (M.R. Decl. ¶16; J.J. Decl. ¶ 21; R.N. Decl. ¶ 17; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute. Paper gowns are no longer used, beginning in late 2016 or early 2017. (Gustke Decl. ¶ 58.) The decision on whether a youth is given a cloth gown is determined on a case-by-case basis, in part, based on the youth's behavior, such as indications of self-harm or abuse to property. (*Id.*) Otherwise, youth are simply issued clean clothes. (*Id.*)

**PLAINTIFFS' REPLY:** Defendants do not dispute that paper gowns were used until recently and that cloth gowns may still be used. Plaintiffs may present testimony or other evidence at the hearing about this issue.

106.     According to records maintained by the Defendants, guards at LHS and CLS used pepper spray on the youth in their care at least 198 times in the period January through October 2016, averaging 20 deployments per month. (Dupuis Class Cert. Decl. ¶¶ 11-12 & Ex. D at 1-15; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** Records recently produced in discovery indicate that Defendants used pepper spray on youth at least 227 times in 2016 and 75 times from January 1, 2017, through April 23, 2017, a rate of nearly 20 incidents per month. (Dupuis Decl., Ex. M (2016-2017 Incapacitating Agent Logs).

107.     Plaintiff J.J. has been pepper sprayed five or six times. (J.J. Decl. ¶ 18; Dupuis Class Cert. Decl. ¶ 16 & Ex. E (dkt. # 4-5).)

**DEFENDANTS' RESPONSE:** Dispute. According to LHS and CLS records, incapacitating agents were administered on J.J. four times. (Gustke Decl. ¶ 59.)

**PLAINTIFFS' REPLY:** Defendants do not dispute that J.J. has been pepper sprayed multiple times. Moreover, J.J. has asthma. (Dupuis Decl., Ex. N (Intake screening form for J.J.).)

108. M.R. and R.N. were both pepper sprayed "so many times I can't count them." (M.R. Decl. ¶ 15; R.N. Decl. ¶ 16.)

**DEFENDANTS' RESPONSE:** No dispute that M.R. and R.N. do not recall. According to LHS and CLS records, incapacitating agents were administered on M.R. seventeen times and R.N. nineteen times. (Gustke Decl. ¶ 60.)

**PLAINTIFFS' REPLY:** Defendants do not dispute that these plaintiffs have been pepper sprayed multiple times. Moreover, M.R. has asthma. (Dupuis Decl., Ex. O (M.R. Intake screening form).)

109. Guards fogged R.N.'s room with pepper spray after he attempted to strangle himself by wrapping a cord around his neck. (R.N. Decl. ¶ 15.)

**DEFENDANTS' RESPONSE:** Dispute that this Proposed Fact represents an accurate or complete depiction of the referenced incident. On October 30, 2016, R.N. was in his room and refused to pull his arms back into the pass-through opening in his door after being provided toilet paper. (Gustke Decl. ¶ 61.) Staff briefly left the room to report R.N.'s refusal to a supervisor. (*Id.*) R.N. was able to grab a cord attached to a fan located in the hallway outside of his room. (*Id.*) Staff responded, and R.N. refused to let go of the cord. (*Id.*) Staff took possession of the cord in an attempt to regain control over it. (*Id.*) R.N. began wrapping the cord around his neck and staff stopped pulling the cord. (*Id.*) The supervising youth counselor presented an incapacitating agent to R.N. and instructed R.N. to drop the cord. (*Id.*) R.N. dropped the cord, and it was removed from the area. (*Id.*)

R.N. still refused to bring his arms back into his room through the pass-through opening and spit in the face of staff attempting to talk with him. (*Id.* ¶ ) Based on R.N.'s behavior and consultation with PSU, it was determined that R.N. be placed in a security gown on control status. (*Id.*) R.N. continued to refuse to comply after multiple instructions, so incapacitating agents were used to gain compliance and prevent any further incidents of potential self-harm or jeopardize the staff's safety. (*Id.*)

**PLAINTIFFS' REPLY:** No reply needed.

110.    By contrast, in all of 2015, staff used pepper spray a total of 45 times and, in one month, January 2015, did not use it at all.  (Dupuis Class Cert. Decl. ¶¶ 11-12 & Ex. D (dkt. # 4-4, 2015 Chemical Agents & Incapacitating Devices Monthly Reports).)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

### Defendants' Practices Are Unnecessary and Counterproductive

111.    In the Lincoln Hills Youth Handbook, the DOC answers the question "What happens if a youth does not follow a rule?" by stating that "Discipline rules are written to help youth change their poor behavior. Staff want youth to learn to make good decisions in the institution and the community." (Graham Decl. Ex. H at 5 (Wisconsin DOC Division of Juvenile Corrections, Lincoln Hills School Youth Handbook); *see also* Graham Decl. ¶2 & Ex. A at 81:9-20 (Litscher Testimony).)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

112.    DOC's "Restrictive Housing Unit" policy states it is intended to provide "a safe, structured and healthy environment that encourages youth to participate appropriately and

effectively and to gain motivation toward cooperating in order to eventually return to an open living unit." (Graham Decl. Ex. I at 1 (Wisconsin DOC Division of Juvenile Corrections, Restrictive Housing Unit Program).)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

113.    However, research demonstrates that "[u]se of punitive and excessively restrictive practices like solitary confinement, pepper spray and shackling have been associated with worse, not better, institutional and behavioral outcomes." (Schiraldi Decl. at ¶ 21; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that Mr. Schiraldi may hold such an opinion, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Mr. Schiraldi's testimony does not amount to a denial of the proposed finding.  For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, on May 25, 2017 – subsequent to the filing of the Plaintiffs' motion for a preliminary injunction – Mr. Schiraldi personally visited and inspected LHS/CLS and spoke with several Plaintiffs. He has also reviewed discovery produced by Defendants since the filing of the motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Mr. Schiraldi's expert opinions under F.R.E. 702-703.

114.    Mr. Schiraldi explains that Wisconsin's practices are "excessively restrictive, a substantial departure from accepted professional standards, practice and judgment and not

reasonably calculated to maintain or restore facility discipline and security." (Schiraldi Decl. at ¶ 67; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that Mr. Schiraldi may hold such an opinion, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Mr. Schiraldi's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, on May 25, 2017 – subsequent to the filing of the Plaintiffs' motion for a preliminary injunction – Mr. Schiraldi personally visited and inspected LHS/CLS and spoke with several Plaintiffs. He has also reviewed discovery produced by Defendants since the filing of the motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Mr. Schiraldi's expert opinions under F.R.E. 702-703.

115.    Dr. Grassian explains that the reason that restrictive and punitive practices are counterproductive with populations in juvenile facilities is that the stress of these practices is likely to push inherently impulsive adolescents, who do not rationally calculate the consequences of their actions, to behave worse, not better. (Grassian Decl. ¶¶ 50-53.)

**DEFENDANTS' RESPONSE:** No dispute that Dr. Grassian may hold such an opinion, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

QB\45723579.2

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, Dr. Grassian has reviewed discovery produced by Defendants subsequent to the filing of the preliminary injunction motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Dr. Grassian's expert opinions under F.R.E. 702-703.

116.    Isolation "has been found to be ineffective in fostering behavior change," "may contribute to violent acting out," and "is in fact counterproductive to facility security." (Schiraldi Decl. ¶ 69; *see also* Grassian Decl. ¶ 57, M.R. Decl. ¶ 13; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that Doctors Schiraldi and Grassian may hold such an opinion, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Dr. Grassian's and Mr. Schiraldi's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, on May 25, 2017 – subsequent to the filing of the Plaintiffs' motion for a preliminary injunction – Mr. Schiraldi personally visited and inspected LHS/CLS and spoke with several Plaintiffs, and both Mr. Schiraldi and Dr. Grassian have reviewed discovery produced by Defendants subsequent to the filing of the motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Mr. Schiraldi's expert opinions under F.R.E. 702-703.

117.    Pepper spray is also unnecessary, and likely ineffective at controlling youth

QB\45723579.2

behavior. (*See*, *e.g.*, Schiraldi Decl. ¶¶ 18, 19, 33, 34, 37, 50; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that Mr. Schiraldi may hold such an opinion, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Mr. Schiraldi's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover, on May 25, 2017 – subsequent to the filing of the Plaintiffs' motion for a preliminary injunction – Mr. Schiraldi personally visited and inspected LHS/CLS and spoke with several Plaintiffs. He has also reviewed discovery produced by Defendants since the filing of the motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Mr. Schiraldi's expert opinions under F.R.E. 702-703.

118.    As a result of research, juvenile correctional systems "have been increasingly eschewing the use of solitary confinement and other punitive and restrictive practices in juvenile institutions." (Schiraldi Decl. ¶ 25; *see also id.* ¶ 20; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute that Mr. Schiraldi may hold such an opinion, but object to the treatment of his opinion as a fact and thus assert that this Proposed Fact is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants' objection to Mr. Schiraldi's testimony does not amount to a denial of the proposed finding. For Plaintiffs' response to Defendants' objections to Mr. Schiraldi's and Dr. Grassian's testimony, see Plaintiffs' Reply Brief, sec. III.A.5. Moreover,

on May 25, 2017 – subsequent to the filing of the Plaintiffs' motion for a preliminary injunction – Mr. Schiraldi personally visited and inspected LHS/CLS and spoke with several Plaintiffs. He has also reviewed discovery produced by Defendants since the filing of the motion. At the hearing, Plaintiffs will lay a foundation for the admissibility of Mr. Schiraldi's expert opinions under F.R.E. 702-703.

119.    In 2016, the federal government eliminated the use of solitary confinement of juveniles in federal custody and a number of states and municipalities have similarly eliminated or severely curtailed the use of protective or disciplinary isolation of children. (Schiraldi Decl. ¶¶ 29–30, 32; Graham Decl. Ex. Y (listing 29 states that have banned disciplinary isolation of juveniles); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply needed.

120.    Those that retain some use of isolation generally limit it to "cool-out" periods measured in minutes or hours, not the days and weeks imposed at LHS/CLS.  (Schiraldi Decl. ¶¶ 33, 35, 37, 61-62; *see also* Graham Decl. Ex. V at 4-5; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Dispute the summarization and characterization of LHS and CLS's restrictive housing policies. No dispute as to the descriptions of practices in other states.

**PLAINTIFFS' REPLY:** In addition to the materials submitted in support of the initial proposed findings of fact, Plaintiffs intend to present testimony and evidence at the hearing regarding the nature of LHS/CLS restrictive housing policies and practices.

121.    The elimination of punitive solitary confinement has led to *reductions* in violent acts at juvenile facilities, making those institutions safer than they were when they used solitary.

(Schiraldi Decl. ¶ 37; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

122.     The District of Columbia strictly limits the use of mechanical restraints, such as handcuffs, to only those instances where it is necessary to prevent injury or escape and only for the amount of time the necessity remains. (Schiraldi Decl. ¶ 34; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

123.     Mississippi uses mechanical restraints only for transportation. (Schiraldi Decl. ¶ 41.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

124.     Nearly 90% of juvenile correctional agencies that responded to a Council of Juvenile Correctional Administrators survey do not authorize guards to carry pepper spray in juvenile facilities. (Schiraldi Decl. at ¶ 19; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

125.     Massachusetts, the District of Columbia, Ohio, and Mississippi do not use pepper spray in juvenile institutions. (Schiraldi Decl. ¶¶ 33, 34, 37, 41; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

126.     Oklahoma is actively working to reduce and eventually eliminate the use of pepper spray. (Schiraldi Decl. ¶ 45.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

127.     Consistent with these developments in state and local policy and practice, numerous professional organizations and agencies recommend the elimination or strict limitation of punitive solitary confinement, pepper spray, and mechanical restraints in juvenile facilities. (Schiraldi Decl. ¶¶ 47–55; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

128.     The American Medical Association ("AMA"), the American Academy of Child and Adolescent Psychiatry ("AACAP"), and the National Commission on Correctional Health Care ("NCCHC") all have called on correctional facilities to halt the use of solitary confinement of juveniles for disciplinary purposes. (Graham Decl. Ex. L, M, N; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

129.     In 1999, the Office of Juvenile Justice and Delinquency Prevention of the United

States Department of Justice ("USDOJ") commissioned a study that found that fifty percent of suicide victims in juvenile facilities were in isolation at the time of their suicide, and sixty-two percent of victims had a history of isolation. (Graham Decl. Ex. O at viii; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

130.    The USDOJ's Office of Juvenile Justice and Delinquency Prevention Standards for the Administration of Juvenile Justice ("JJDPA Standards") provide that no juvenile should be placed in room confinement for more than twenty-four hours. (Graham Decl. Ex. P at 505; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

131.    The Juvenile Detention Alternatives Initiative ("JDAI"), which has developed the most widely recognized set of national best practices on the use of solitary confinement with juvenile populations, provides that solitary confinement can never be used for purposes of punishment or discipline and must be limited to periods of less than four hours. (Graham Decl. Ex. Q at 98; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

132.    The USDOJ recommended that the use of solitary confinement for juveniles in federal prisons be prohibited, and President Obama adopted that recommendation in January 2016. (Graham Decl. Ex. R at 101 & Ex. S; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

133. The Council of Juvenile Corrections Administrators (CJCA) created a program called Performance-based Standards (PbS) which uses research-based practices for improving conditions of confinement. (Graham Decl. Ex. V at 2.) CJCA and PbS recommend that if used at all, solitary confinement of juveniles should last no more than a few hours. (*Id.* at 4-6.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts. Further, LHS and CLS participate in Performance-based Standards. (Gustke Decl. ¶ 62.)

**PLAINTIFFS' REPLY:** No reply needed.

134. International law prohibits the use of isolation as a disciplinary tool. Specifically, the United Nation's ("U.N.") Rules for the Protection of Juveniles Deprived of their Liberty declare that "all disciplinary measures constituting cruel, inhuman or degrading treatment shall be strictly prohibited, including corporal punishment, placement in a dark cell, closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned." (Graham Decl. Ex. T at 11; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact. Subject to and notwithstanding said objection, no dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** While international law does not control, Supreme Court precedent makes such law and trends in foreign nations relevant to the determination of whether a practice violates the Eighth Amendment. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 557 (2005) ("[A]t least from the time of the Court's decision in [*Trop v. Dulles*, 356 U.S. 86 (1958)], the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'").

135. The U.N. Special Rapporteur on Torture, in a 2015 report, condemned disciplinary solitary confinement of individuals with mental, psychological or emotional disabilities for any duration, calling it cruel, inhuman, and degrading treatment. (Graham Decl. Ex. U at 14-15; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact. Subject to and notwithstanding said objection, no dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** While international law does not control, Supreme Court precedent makes such law and trends in foreign nations relevant to the determination of whether a practice violates the Eighth Amendment. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 557 (2005) ("[A]t least from the time of the Court's decision in [*Trop v. Dulles*, 356 U.S. 86 (1958)], the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'").

136. Standards set by various governmental and non-governmental entities, such as OJJDP, the NCCHC, and the American Bar Association ("ABA"), make it clear that juveniles must have at least one hour per day of actual, strenuous, large-muscle exercise, with many recommending two or more hours per day, for both physical and mental health needs. (Graham Decl. Ex. P at 429-30; Ex. W at 32-33; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

137. The Institute of Judicial Administration - ABA Standards for Juvenile Justice, Standards Relating to Corrections Administration, provide:

**7.8 Limitations on restraints and weapons.**
**A. Mechanical restraints**. Given the small size of programs, it should not be necessary to use mechanical restraints within the facility. The program director may authorize the use of mechanical restraints during transportation only.

(Graham Decl. Ex. W at 28-29; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** No dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** No reply needed.

138. Article 64 of the U.N. Rules for the Protection of Juveniles Deprived of their Liberty provides: "Instruments of restraint and force can only be used in exceptional cases, where all other control methods have been exhausted and failed. . . . They should not cause humiliation or degradation, and should be used restrictively and only for the shortest possible period of time." (Graham Decl. Ex. T at 11; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief.

QB\45723579.2

Therefore, the Court should not consider this Proposed Fact. Subject to and notwithstanding said objection, no dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** While international law does not control, Supreme Court precedent makes such law and trends in foreign nations relevant to the determination of whether a practice violates the Eighth Amendment. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 557 (2005) ("[A]t least from the time of the Court's decision in [*Trop v. Dulles*, 356 U.S. 86 (1958)], the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'").

139.    The U.N. Standard Minimum Rules for the Treatment of Prisoners (adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders, held at Geneva in 1955, and approved by the Economic and Social Council by its resolutions 663 C (XXIV) of 31 July 1957 and 2076 (LXII) of 13 May 1977), similarly restrict the use of mechanical restraints. (Graham Decl. Ex. X at 5.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact. Subject to and notwithstanding said objection, no dispute, but reserve the right to supplement this Response based on revelations during cross examination of Plaintiffs' experts.

**PLAINTIFFS' REPLY:** While international law does not control, Supreme Court precedent makes such law and trends in foreign nations relevant to the determination of whether a practice violates the Eighth Amendment. *See, e.g.*, *Roper v. Simmons*, 543 U.S. 551, 557

(2005) ("[A]t least from the time of the Court's decision in [*Trop v. Dulles*, 356 U.S. 86 (1958)], the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'").

140.    Defendants are fully aware of the harms caused by punitive solitary confinement, mechanical restraints, and pepper spray, as well as trends in policy and practice away from these practices. As early as 1983, Defendants' predecessors entered into a settlement agreement acknowledging that LHS's use of solitary confinement was excessive, and that limits should be placed on the reasons for and duration of solitary confinement. Declaration of Laura E. Olsen Dugan ("Olsen Decl.") Exs. A & B.), Additionally, among other things, Defendants have participated in the CJCA programs, including its PbS program, since at least 2014. Graham Decl. ¶2 & Ex. A at 13:9-14 ("We are working with [CJCA] to do activities such as using their input, their expertise such that use of – use of force, use of OCD, restrictive housing, use of restraints are minimized . . . ."); Graham Decl. ¶ 3 & Ex. B at 16; Graham Decl. Ex. J at 2 (*Core Concepts* Newsletter) (describing LHS/CLS "participating in" "Performance–based Standards (PbS) . . . a nationally recognized program developed by the Council of Juvenile Corrections Administrators"); Graham Decl. Ex. K at 3 (*2014 Annual Report*); PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. For instance, in 1983, the Department of Juvenile Corrections was operating under a different arm of the State of Wisconsin, not the Department of Corrections. Indeed, the Department of Corrections did not become its own agency until 1989 Wis. Act 31. Therefore, the Court should not consider this Proposed Fact. Subject to and notwithstanding said objection, no dispute that

Defendants are aware of the general trends and practices towards minimizing the use of restrictive housing, mechanical restraints, and incapacitating agents; LHS and CLS are part of these general trends. (Gustke Decl. ¶¶ 63–64.)

**PLAINTIFFS' REPLY:** Plaintiffs anticipate presenting testimony or evidence reflecting the Defendants' awareness of the harmfulness and ineffectiveness of its practices and of the trend toward elimination of their use.

141.    Defendants also received a letter, in October 2016, from Plaintiffs' counsel advising them of the Obama Administration's elimination of solitary for juveniles and the American Medical Association's call to eliminate disciplinary use of solitary for youth. (Dupuis Class Cert. Decl. ¶ 3 & Ex. B (dkt. # 4–2).)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact. Subject to and notwithstanding said objection, after reasonable inquiry, Defendants cannot confirm or deny whether any of them personally received the letter referenced in this Proposed Fact.

**PLAINTIFFS' REPLY:** Plaintiffs anticipate presenting testimony or evidence showing Defendants' awareness of the harmfulness and ineffectiveness of such practices, and of the consequent trend toward elimination of their use.

142.    In addition, advocates in the Wisconsin community have been stressing the harmful consequences of these practices since at least early 2016. Their efforts include op-eds and letters to the editor in Wisconsin publications, a report on the conditions at the facilities, and legislative advocacy, all calling attention to the harmful conditions at Lincoln Hills and Copper Lake. (Graham Decl. Ex. Z at 23-31; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the phrases "harmful consequences" and "harmful conditions," and is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. Therefore, the Court should not consider this Proposed Fact. Subject to and notwithstanding said objection, no dispute that Defendants are aware of the general trends and practices towards minimizing the use of restrictive housing, mechanical restraints, and incapacitating agents; LHS and CLS are part of these general trends. (Gustke Decl. ¶¶63–64.)

**PLAINTIFFS' REPLY:** Plaintiffs anticipate presenting testimony or evidence showing Defendants' awareness of the harmfulness and ineffectiveness of such practices and of the consequent trend toward elimination of their use.

143. More generally, Defendants are on notice of numerous troubling conditions of confinement at Lincoln Hills and Copper Lake. In 2012, a Racine County judge wrote to Governor Scott Walker about "sordid" and "shock[ing]" conditions at Lincoln Hills, copying the superintendent of the facility. Over the last three years, the facilities have been subject to an internal Department of Corrections investigation and a Department of Justice criminal investigation, and scores of media reports have described brutal conditions at the facilities. (Graham Decl. Ex. Z at 1-31, 34-76; PI Hearing Testimony.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is vague and ambiguous as to the terms "numerous" and "troubling. Further, this Proposed Fact is based on inadmissible hearsay evidence. Fed. R. Evid. 802. Subject to and notwithstanding said objection, no dispute that Defendants are aware of the general trends and practices towards minimizing the use of restrictive housing, mechanical restraints, and incapacitating agents; LHS and CLS are part of these general trends. (Gustke Decl. ¶¶ 63–64.)

**PLAINTIFFS' REPLY:** The evidence is not offered for the truth of the statements contained therein, but to prove Defendants' awareness and state of mind. Plaintiffs anticipate presenting testimony or evidence showing Defendants' awareness of the harmfulness and ineffectiveness of such practices and of the consequent trend toward elimination of their use.

144.    In February 2017, Defendant Litscher testified before the State Assembly Committee on Corrections regarding conditions at Lincoln Hills and Copper Lake, including the facilities' use of solitary confinement, restraints, and pepper spray. (Graham Decl. ¶ 2 & Ex. A.)

**DEFENDANTS' RESPONSE:** No dispute.

**PLAINTIFFS' REPLY:** No reply necessary.

145.    In 1983, Defendants' predecessors settled a lawsuit, *Michael F. et. al v. Reivitz*, Case No 1979-C-2 (W.D. Wis.), that addressed the discipline, complaint, and educational systems at LHS. (Olsen Decl. Exs. A-C.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. For instance, in 1983, the Department of Juvenile Corrections was operating under a different arm of the State of Wisconsin, not the Department of Corrections. Indeed, the Department of Corrections did not become its own agency until 1989 Wis. Act 31. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants do not dispute that their Division of Juvenile Corrections is the successor to the state juvenile corrections agency that was sued in, and subsequently settled, the *Reivitz* case. The terms of the settlement are relevant to Defendants' knowledge that their practices are harmful and ineffective.

146.    In the 1983 settlement, Defendants' predecessors acknowledged that solitary

confinement should not be used as punishment for minor infractions. (Olsen Decl. Ex. B at 4, 5.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. For instance, in 1983, the Department of Juvenile Corrections was operating under a different arm of the State of Wisconsin, not the Department of Corrections. Moreover, it is based on inadmissible hearsay evidence. Fed. R. Evid. 802. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants do not dispute that their Division of Juvenile Corrections is the successor to the state juvenile corrections agency that was sued in, and subsequently settled, the *Reivitz* case. The terms of the settlement are relevant to Defendants' knowledge that their practices are harmful and ineffective. The evidence is not offered for the truth of the statements contained therein, but to prove Defendants' awareness and state of mind.

147.    In the 1983 settlement, Defendants' predecessors acknowledged that solitary confinement should be limited in duration. (Olsen Decl. Ex. B at 5.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. For instance, in 1983, the Department of Juvenile Corrections was operating under a different arm of the State of Wisconsin, not the Department of Corrections. Indeed, the Department of Corrections did not become its own agency until 1989 Wis. Act 31. Moreover, it is based on inadmissible hearsay evidence. Fed. R. Evid. 802. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants do not dispute that their Division of Juvenile Corrections is the successor to the state juvenile corrections agency that was sued in, and

subsequently settled, the *Reivitz* case. The terms of the settlement are relevant to Defendants' knowledge that their practices are harmful and ineffective. The evidence is not offered for the truth of the statements contained therein, but to prove Defendants' awareness or other state of mind.

148.     In the 1983 settlement, Defendants' predecessors agreed to place limits on the reasons for prehearing solitary confinement. (Olsen Decl. Ex. B at 11-12.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. For instance, in 1983, the Department of Juvenile Corrections was operating under a different arm of the State of Wisconsin, not the Department of Corrections. Indeed, the Department of Corrections did not become its own agency until 1989 Wis. Act 31. Moreover, it is based on inadmissible hearsay evidence. Fed. R. Evid. 802. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants do not dispute that their Division of Juvenile Corrections is the successor to the state juvenile corrections agency that was sued in, and subsequently settled, the *Reivitz* case. The terms of the settlement are relevant to Defendants' knowledge that their practices are harmful and ineffective. The evidence is not offered for the truth of the statements contained therein, but to prove Defendants' awareness or other state of mind.

149.     In the 1983 settlement, Defendants' predecessors set a goal that by March 1, 1984, LHS would place no more than five percent of its youth population in solitary confinement at any given time, and required LHS to review and report on the appropriateness of discipline when more than 10 percent of the youth population is in solitary confinement. (Olsen Decl. Ex.

B at 5.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. For instance, in 1983, the Department of Juvenile Corrections was operating under a different arm of the State of Wisconsin, not the Department of Corrections. Indeed, the Department of Corrections did not become its own agency until 1989 Wis. Act 31. Moreover, it is based on inadmissible hearsay evidence. Fed. R. Evid. 802. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants do not dispute that their Division of Juvenile Corrections is the successor to the state juvenile corrections agency that was sued in, and subsequently settled, the *Reivitz* case. The terms of the settlement are relevant to Defendants' knowledge that their practices are harmful and ineffective. The evidence is not offered for the truth of the statements contained therein, but to prove Defendants' awareness or other state of mind.

150. In the 1983 settlement, Defendants' predecessors acknowledged that youth should not be denied education as punishment. (Olsen Decl. Ex. B at 7.)

**DEFENDANTS' RESPONSE:** Objection. This Proposed Fact is not relevant to any parties' claim or defense and thus is unnecessary to deciding the motion for injunctive relief. For instance, in 1983, the Department of Juvenile Corrections was operating under a different arm of the State of Wisconsin, not the Department of Corrections. Indeed, the Department of Corrections did not become its own agency until 1989 Wis. Act 31. Moreover, it is based on inadmissible hearsay evidence. Fed. R. Evid. 802. Therefore, the Court should not consider this Proposed Fact.

**PLAINTIFFS' REPLY:** Defendants do not dispute that their Division of Juvenile Corrections is the successor to the state juvenile corrections agency that was sued in, and subsequently settled, the *Reivitz* case. The terms of the settlement are relevant to Defendants' knowledge that their practices are harmful and ineffective. The evidence is not offered for the truth of the statements contained therein, but to prove Defendants' awareness or other state of mind.

QB\45723579.2

Dated this 9th day of June, 2017.

ACLU OF WISCONSIN FOUNDATION
/s/ Laurence J. Dupuis
Laurence J. Dupuis (SBN 2029261)
Karyn L. Rotker (SBN 1007719)
R. Timothy Muth (SBN 1010710)
207 E. Buffalo Street, Suite 325
Milwaukee, WI 53202
Telephone: (414) 272–4032
Facsimile: (414) 272–0182
ldupuis@aclu–wi.org
krotker@aclu–wi.org
tmuth@aclu–wi.org

JUVENILE LAW CENTER
Jessica Feierman
Karen Lindell
Marsha Levick
The Philadelphia Building
1315 Walnut Street, 4th Floor
Philadelphia, PA 19107
Telephone: (215) 625–0551
jfeierman@jlc.org
klindell@jlc.org
mlevick@jlc.org

QUARLES & BRADY LLP
Matthew J. Splitek (SBN 1045592)
Rachel A. Graham (SBN 1069214)
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251–5000
matthew.splitek@quarles.com
rachel.graham@quarles.com

Emily L. Stedman (SBN 1095313)
Zachary T. Eastburn (SBN 1094676)
411 East Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
Telephone: (414) 277–5000
emily.stedman@quarles.com
zachary.eastburn@quarles.com

*Attorneys for Plaintiffs*