**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

**J.J.**, by and through his next friend,
Sakeena Jackson, for themselves and all
others similarly situated,

      Plaintiffs,

v.

                                    Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity
as Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

## STIPULATION FOR CONSENT DECREE AND PERMANENT INJUNCTION

---

The parties, by their respective undersigned counsel, hereby stipulate and agree to the following Consent Decree and Permanent Injunction (the "Agreement" or the "Consent Decree").

### I.    INTRODUCTION AND RECITALS

A.    On January 23, 2017, the Plaintiffs filed a Class Action Complaint for Declaratory and Injunctive Relief, initiating the above-captioned action under 42 U.S.C. § 1983.  On January 24, 2017, the Plaintiffs filed a Motion for Class Certification. The Plaintiffs amended their Complaint on April 18, 2017, and filed a Motion for Preliminary Injunction on April 19, 2017.  The Defendants answered the Complaint and Amended Complaint, and responded to the Plaintiffs' motions. The parties conducted significant discovery.

B.    The claims in this action relate to the use of restrictive housing (a/k/a room confinement), chemical agents, mechanical restraints, and strip searches at Lincoln Hills School (LHS) and Copper Lake School (CLS).  Following briefing, hearings, and rulings by the Court, and the parties' input, the Court entered a preliminary injunction on July 10, 2017. The Court entered an order certifying a class on September 15, 2017.

C.   The parties to this Agreement are the Plaintiffs, individually named and those similarly situated; the State of Wisconsin (State); the Secretary of the Wisconsin Department of Corrections (DOC); the Administrator of the DOC Division of Juvenile Corrections; the Superintendent of LHS and CLS; and the Director of Security for LHS and CLS.

D.   Anticipating the costs of litigation and recognizing a shared interest in improving the conditions of confinement for youth at LHS and CLS, the Plaintiffs and Defendants intend for the full compliance with this Agreement to resolve all claims in the above-captioned action.

E.   In entering into this Agreement, the State does not admit any violations of constitutional rights of youth confined at LHS and CLS, nor does it admit any violation of state or federal law.  This Agreement may not be used as evidence of liability in any other legal proceeding.  However, the State remains firmly committed to improving the conditions of confinement for youth at LHS and CLS.

## II.   DEFINITIONS

A.   **Presumptive Applicability of Administrative Code.**  Unless defined below, the terms in this Consent Decree and Permanent Injunction shall be defined as they are defined in Wisconsin Administrative Code, Chs. DOC 346 & 371-396.

B.   **Room confinement.**  Room confinement shall be defined as the involuntary restriction of a youth alone in a cell, room, or other area, excluding the confinement of a youth to such an area during normal sleeping hours or on observation status.  This definition includes but is not limited to pre-hearing segregation, disciplinary or punitive segregation, and administrative confinement.

## III.   SUBSTANTIVE RELIEF

A.   **Room Confinement**

1.   **Punitive Confinement**.

a.   Subject to the terms and provisions of Section V(C)(3)(g), effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

b.   Subject to the terms and provisions of Section V(C)(3)(g), effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room confinement.

2

c.   Subject to the terms and provisions of Section V(C)(3)(g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

2.   **Administrative Confinement.** Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others.  Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of  imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

a.   Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

i.   A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of  imminent physical harm to others, and

ii.   A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

b.   Administrative confinement time limits may be tolled from 8 pm to 8 am.

c.   Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

d.   The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others, and shall supersede any rule or policy to the contrary.

3.   **Youth at imminent risk of serious self-harm.** Effective immediately upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Policy #500.70.24 as set forth in Appendix A, and shall treat youth at risk of self-harm in compliance with that amended policy.

4. **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a. Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

b. Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

c. Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

d. Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth's mental health or if other options will adequately protect the youth or staff.

e. Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

f. Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the

4

youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any property restrictions on a daily basis and document the review.

g.    Youth in room confinement shall receive:

    i.    All regularly scheduled social worker visits, mental health services, and other health services.

    ii.    Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

    iii.    Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

    iv.    Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

    v.    Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

    vi.    Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

5.    **Notification of Rights**. Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

5

6. **Documentation**. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

B. **OC-Spray and Other Chemical Agents**

1. **OC reduction plan.** Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached and incorporated hereto as Appendix B, as outlined in the preliminary injunction.

2. **Prohibition on use of OC-Spray and other Chemical Agents.** Subject to the terms and provisions of Section V(C)(3)(g), within twelve (12) months of entry of the Court's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

C. **Mechanical Restraints.** The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1. **Prohibition on types and uses of mechanical restraints.**

   a. Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

   b. Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others, and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

   c. No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

      i. Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

      ii. Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

      iii. During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption

that restraints are not used.  Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

d.   Mechanical restraints shall never be used for punishment or discipline.

e.   Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

f.   Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

g.   Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living unit.  No youth shall be left alone in restraints.  Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

2.   **Documentation**. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

D.   **Strip Searches.** The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

1.   **Prohibition on strip searches without probable cause.** Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

2.   **Strip searches with probable cause**.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

7

3.   **Process for strip searches.**

   a.   When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

   b.   Under no circumstance may a youth be strip searched within view of another youth.

   c.   Strip searches may only be conducted by individuals of the same gender identity as the youth being searched, unless the search is conducted by a medical professional.

   d.   Strip searches must be conducted by staff trained in trauma-informed practices.

   e.   If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

4.   **Documentation.** Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

E.   **De-escalation Training.** Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

F.   **Programming.** Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts to implement the recommendations.

G.   **Staffing.** Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

H.   **Amendments to administrative code.** Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (1) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

### IV.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A.   **Incident review process.** Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent.  Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review all uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

B.   **Quality assurance.** The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

### V.   CONTINUING JURISIDICTION, MONITORING, ENFORCEMENT AND TERMINATION

A.   **Continuing Jurisdiction.** The terms of this Agreement will be incorporated into an  order to be entered by the Court. The Court will retain jurisdiction over this action until the Agreement terminates and all claims for injunctive relief in the Action have been  dismissed.

B.   **Termination.**

   1.   Defendants may move for termination of the Agreement and dismissal of all claims in accordance with section 2 below on the earlier of the date on which: (a) all juveniles have been transferred from LHS/CLS to the appropriate Type 1 juvenile correctional facility or to secured residential care centers for children and youth, or (b) 36 months after entry of the Court's order incorporating this Agreement.

   2.   The Court shall grant the motion and the Agreement shall terminate and all claims shall be dismissed if:

      a.   The Department of Corrections <u>has permanently closed</u> the Type 1 juvenile correctional facilities housed at LHS and CLS, and the Administrative Code <u>has been amended</u> as provided in Section III.

H, after the Monitor has conducted a single inspection of each facility under section V.C.3.c.; or

b.   The Department of Corrections has not permanently closed the Type 1 juvenile correctional facilities housed at LHS and CLS and the Administrative Code has not been amended as provided in Section III.H, after the Monitor has certified, in two consecutive inspections of each operational Type 1 juvenile correctional facility, conducted after the 36 month term of this agreement, that such facilities are operating in compliance with sections III.A, B, C, and D; or

c.   The Department of Corrections has not permanently closed the Type 1 juvenile correctional facilities housed at LHS and CLS but the Administrative Code has been amended as provided in Section III.H, after the Monitor has certified, in two consecutive inspections of each operational Type 1 juvenile correctional facility that such facilities are operating in compliance with sections III.A, B, C, and D; or

d.   The Department of Corrections has permanently closed the Type 1 juvenile correctional facilities housed at LHS and CLS but the Administrative Code has not been amended as provided in Section III.H, after the Monitor has certified, in two consecutive inspections of each operational Type 1 juvenile correctional facility, that such facilities are operating in compliance with sections III.A, B, C, and D

## C.   Monitoring.

1.   The Parties agree that Teresa Abreu will be retained to serve as the Parties' jointly appointed Monitor.  Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations.  Should Teresa Abreu become unwilling or unable to act as Monitor, the Parties will meet and confer to attempt to agree upon a replacement.  Should the Parties be unable to agree on a Monitor within 45 days of Teresa Abreu becoming unavailable, they will each recommend two potential Monitors, from which the Court will select a replacement.  The intention of the Parties is that Defendants will develop the capability to comply with the substantive provisions of the Agreement without long-term monitoring beyond the duration in Section V(B) of this Agreement and the Monitor will assist Defendants in developing this capability.

2.   Within two weeks of the Court's order incorporating this Agreement, Defendants shall provide the Monitor with a copy of the relevant Administrative Code provisions, as well as with the February 26, 2018

10

report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz.

**3.** The Monitor shall:

    a.    Have access to LHS and CLS at any time determined by the monitor for the inspections and site visits described below. Such access shall include ability to inspect and photograph all youth living areas (including but not limited to student rooms, day spaces, exercise rooms or outdoor recreation spaces), control rooms in housing units, visiting areas, areas where searches of students are conducted, any isolation or restrictive housing rooms or rooms used for such purpose, classrooms, counseling or social services rooms, and to speak with any youth in a private and confidential setting. The Parties' counsel may attend the Monitor's site visits. The Monitor may have private conversations with staff, and with youth with the youth's consent.

    b.    Conduct monitoring site visits at LHS and CLS at least four times in the first calendar year of the Agreement and at least two times per calendar year for the duration of the Agreement.

    c.    Conduct an inspection or inspections of each new facility which is created and operated by DOC pursuant to 2017 Wisconsin Act 185 within two to three months after the opening of each such facility pursuant to the terms in V(B)(2). For the purposes of such inspection only, the Monitor may have access to documents, site visits, and interviews described in section (a).

    d.    Have authority to request, and obtain from Defendants within five days of any such request, incident reports involving any youth and any documents relating to or reflecting staffing levels and staff training, use of room confinement, use of OC-spray or other chemical agents, use of mechanical restraints, strip searches, positive behavior interventions and supports, and de-escalation practices at LHS/CLS, or, for the purpose of inspection of new facilities described in the preceding subsection, at such new facilities.

    e.    Within two weeks of each site visit, produce and send to the Parties' counsel a draft Compliance Status Report assessing the Defendants' compliance with the substantive terms of the Agreement. The Compliance Status Reports shall summarize any review of documents and other pertinent information and assess whether the Defendants are non-compliant, in partial compliance, or in full compliance with each of the substantive terms set forth in the Substantive Relief sections of this Agreement. The parties may

submit written comments to the Monitor within five days of receiving the draft Compliance Status Report. Within five days of receiving any such comments, the Monitor will produce and distribute to the Parties a final Compliance Status Report for each site visit, which will be filed with the Court, with appropriate redactions of any information identifying particular youth.

f.   Within two weeks of Court approval of this Agreement, obtain from Defendants all of Defendants' policies, procedures and training materials related to room confinement, use of OC spray or other chemical agents, use of mechanical restraints, strip searches, positive behavior interventions and supports, and de-escalation practices at LHS/CLS. Within four weeks of receiving such materials, the Monitor will make recommendations for changes to Defendants' codes, policies, procedures, and training materials so that the codes, policies, procedures, and training materials comply with or contribute to compliance with the substantive terms of this Agreement.

g.   Be empowered to adjust any deadline one time for implementation of a specific provision of this Agreement in order ensure the safety of youth and staff. If it is in the interest of youth and staff and will not adversely affect the safety of youth and staff, the Monitor may also recommend shortening a specific deadline. Any Party who objects to the Monitor's adjustment of any deadline may petition, on an expedited basis, the Court to review the determination, or the reasonableness of the length of time of any extension, taking into account the safety of youth and staff and the reasonableness of Defendants' efforts to comply with the terms of this agreement. The opposing Party shall have five days to respond to any such petition. Any further extensions require court approval.

4.   Defendants will pay the Monitor's reasonable fees and costs. The Parties recognize that DOC needs to be able to anticipate the costs associated with the Monitor's services. Accordingly, the Monitor's fees will be presumed reasonable if they are less than or equal to $130,000.00 for the first year of monitoring and $100,000.00 per year for any subsequent years. However, the Parties also recognize that the reasonable activities of Teresa Abreu or any replacement Monitor should not be unreasonably restricted by hourly caps. Should the Monitor or Plaintiffs believe that the presumptive cap will unreasonably interfere with effective Monitoring, the Monitor or the Plaintiff may, after meeting and conferring with Defendants in a good faith effort to resolve the dispute, move the Court for an increase in the presumptive reasonable fee.

5.   Limitations on public disclosures by Monitor. Except as required or authorized by the terms of this Agreement or the parties acting together,

the Monitor shall not: make any public statements (at a conference or otherwise) or issue public findings with regard to any act or omission of the State or its agents, representatives or employees, or disclose non-public information provided to the Monitor pursuant to this Agreement. Any press statement made by the Monitor regarding his/her employment must first be approved, in writing, by the parties. The Monitor shall not voluntarily testify in any other litigation or proceeding with regard to any act or omission of the State or any of its agents, representatives, or employees related to this Agreement, nor voluntarily testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement. Reports issued by the Monitor shall not be admissible against the State in any proceeding other than a proceeding related to the enforcement of this Agreement. Unless such conflict is waived by the parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the State or its departments, officers, agents or employees. The records maintained by the Monitor shall be kept confidential to the extent permitted by Wisconsin's Public Records Law and the federal Freedom of Information Act. This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

**D.    Enforcement.**

1.    Plaintiffs' counsel will have access to LHS/CLS on two days' notice to inspect any youth living areas and speak with youth in a confidential setting.  Plaintiffs' counsel will be able to speak confidentially to youth by telephone on one day's notice.

2.    Defendants shall produce to Plaintiffs each month by the 10th day of the following month: (1) a report of the  number of youth held in any form of room confinement during the  month, which shall include the duration of and reason for each instance  of such confinement; (2) a report of the time out of cell and property  restrictions for each youth held in any form of room confinement during  the month; (3) a report of any instances of use of mechanical restraints  during the month, including reasons for and duration of the restraint; (4)  a report of any instances of use force, including any uses of OC spray  or other chemical agents including reasons for the use of force or OC spray;  and (5) a report of any strip searches of youth  during the month, including the reason for each strip search, the  conditions under which the search was performed (including the location  of and personnel performing the search), and any contraband found in  the search.

13

3.     Defendants shall produce to Plaintiffs and the Monitor each month by the 10th day of the following month, a report indicating the youth subject to room confinement under observation status and the duration that the youth spent in such room confinement.  While not subject to any compliance assessment, the Monitor may choose to comment on the use of room confinement for youth in observation status within a Compliance Status Report pursuant to Section V(C)(3)(e).

4.     If the Plaintiffs believe that any of the monthly reports provided in D(2) above indicate non-compliance with a substantive provision of the Agreement, the Plaintiffs may, after meeting and conferring with the Monitor and Defendants in a good faith effort to resolve the alleged non-compliance, bring a motion to the Court for enforcement of the Agreement. Any enforcement order may require Defendants to take additional actions designed to achieve at least partial compliance. Upon any finding in a final Compliance Monitoring Report that the Defendants are non-compliant with any substantive provision of the Agreement, the Plaintiffs may, after meeting and conferring with Defendants in a good faith effort to seek resolution of the non-compliance, bring a motion to the Court for enforcement of the Agreement or Contempt.

E.    **Additional Provisions.**

1.     The Parties stipulate, based on the entire record, that the relief set forth in this Agreement meets the requirements of 18 U.S.C 3626(a)(1)(A), and the Parties shall jointly request that the  Court make these findings.

2.     Defendants agree not to unilaterally move to terminate or modify this agreement under 18 U.S.C. § 3626(b) until the Agreement ends according to its terms.

3.     Plaintiffs will seek reasonable attorneys' fees and costs for work performed up to and through the Date of Final Approval of this Agreement. The Parties will attempt to reach an agreement regarding the amount of fees and costs after negotiations regarding the substantive  terms of this Agreement have concluded.  Plaintiffs will seek reasonable attorneys' fees and costs for facilitating and monitoring the implementation of this Agreement for the duration of the Agreement.  If the parties are unable to reach an agreement as to the amount of fees for such monitoring, Plaintiffs shall submit a fee petition to the Court for determination.

4.     Plaintiffs' counsel may send in writing to Defendants' counsel time-sensitive concerns about the treatment of individual youth.  Defendants' counsel agrees to make reasonable efforts to investigate these concerns and respond in writing to Plaintiffs' counsel within a reasonable period of time.

5.    In the event of circumstances threatening to cause immediate or irreparable harm to the class or any portion of the class, Plaintiffs may seek immediate judicial relief.

6.    The Parties will work together to ensure the timely preparation and filing of all motions, briefs, and documents necessary to obtain preliminary and final approval of this Agreement pursuant to applicable rules and statutes.

7.    This Agreement supersedes all other agreements made between the Parties and all preliminary orders issued during the course of this litigation regardless of form.

8.    This Agreement constitutes the final written expression of all of the terms of the settlement between the Parties and is a complete and exclusive statement of those terms, except that:

    a .   The Agreement may be modified at any time by a written and signed document executed by mutual agreement of Plaintiffs' counsel and Defendants' counsel;

    b .   Plaintiffs' attorneys' fees and costs, when agreed upon, will be incorporated as a term of this Agreement.

9.    All modifications to this Agreement will be filed with the Court.

[SIGNATURES ON FOLLOWING PAGES]

Dated this 25th day of May, 2018.

Attorneys for the Plaintiffs

ACLU OF WISCONSIN FOUNDATION

By:

LAURENCE J. DUPUIS, SBN 1029261
KARYN L. ROTKER, SBN 1007719
R. TIMOTHY MUTH, SBN 1010710
ACLU of Wisconsin Foundation
207 E. Buffalo Street, Suite 325
Milwaukee, WI 53202
Phone: 414-272-4032
Fax: 414-272-0182
Emails: ldupuis@aclu-wi.org
krotker@aclu-wi.org
tmuth@aclu-wi.org

THE JUVENILE LAW CENTER

By:

JESSICA FEIERMAN
KAREN LINDELL
MARSHA LEVICK
KATHERINE BURDICK
The Philadelphia Building
1315 Walnut Street, 4th Floor
Philadelphia, PA 19107
Phone: 215-625-0551
Fax: 215-625-2808
Emails: jfeierman@jlc.org;
klindell@jlc.org
mlevick@jlc.org
kburdick@jlc.org

QUARLES & BRADY LLP

By:

MATTHEW J. SPLITEK, SBN 1045592
RACHEL A. GRAHAM, SBN 1069214
33 East Main Street, Suite 900

16

Madison, WI 53703
Phone: 608-251-5000
Emails:matthew.splitek@quarles.com
rachel.graham@quarles.com

QUARLES & BRADY LLP
EMILY L. STEDMAN, SBN 1095313
ZACHARY T. EASTBURN, SBN 1094676
411 East Wisconsin Ave., Suite 2350
Milwaukee, WI 53202-4426
Phone:  414-277-5000
Emails: emily.stedman@quarles.com
zachary.eastburn@quarles.com

Dated this 25th day of May, 2018.

CRIVELLO CARLSON, S.C.
Attorneys for Defendants Jon E.
Litscher, John D. Paquin, Wendy A.
Peterson, Brian Gustke


By: _____

SAMUEL C. HALL, JR.
SBN 1045476
BENJAMIN A. SPARKS
SBN 1092405
710 North Plankinton Avenue #500
Milwaukee, WI 53203
Phone: 414-271-7722
Fax: 414-271-4438
Emails: shall@crivellocarlson.com
bsparks@crivellocarlson.com

APPENDIX A

| | | EFFECTIVE DATE<br>2/1/2017 | PAGE   NUMBER   1<br>of 7 |
|---|---|---|---|
| | **WISCONSIN**<br>**DEPARTMENT OF**<br>**CORRECTIONS**<br><br>**Division of Juvenile**<br>**Corrections**<br><br>**Policy and Procedure** | MANUAL REFERENCE | ☒      New ☐          Revision |
| | | DJC POLICY #<br>500.70.24 | Original Date: [Comments] |
| | | ORIGINATED BY  John D Paquin,<br>Administrator | |
| | | X | Date Signed:  2/1/2017 |

| DISSEMINATION | | PRIORITY | |
|---|---|---|---|
| ☐   **All Staff** | ☐   **Community Facilities** | ☒   **Policy/Directive**<br>Discuss at Staff Meeting | ☐   **Information**<br>Read/Route/Post |
| ☒   **Institution** | | | |
| ☐   **Field Offices** | ☐   **Confidential-Security Related** | REPLACES POLICY N/A | |
| ☐   **Health Services** | ☐   **Supervisory Staff Only** | | |

**SUBJECT: Clinical Observation**

## Purpose

The purpose of this policy is to reduce and prevent the risk of harm to youth.

## Policy

The Division of Juvenile Corrections shall place youth on clinical observation status as necessary to ensure the safety of youth and others.

## References

DAI Policy 500.70.05 – Mental Health Treatment - Crisis Services

DAI Policy 500.70.06 – Consent for Mental Health Services

Wisconsin Administrative Code Ch. DOC 375 – Observation Status in Type 1 Secured Correctional Facility

Wisconsin Statutes Ch. 51 – State Alcohol, Drug Abuse, Developmental Disabilities and Mental Health Act

## Definitions, Acronyms, and Forms

ACP – Advanced Care Provider

ADO – Administrative Duty Officer

Clinical Observation – A non-punitive status used to ensure the safety of the youth or the safety of others. A youth may be placed in clinical observation for mental illness and dangerousness to self or others, or (when not mentally ill) for dangerousness to self.

DJC – Division of Juvenile Corrections

| Clinical Observation | EFFECTIVE DATE 2/1/2017 | PAGE NUMBER 2 of 8 |
|---|---|---|

DOC – Department of Corrections

DOC-27C – Placement/Review of Offender Mental Health Observation

DOC-112B – Observation of Offender

DOC–1846 – Incident Report -DJC

DOC-2099 – Notice of Review for Continued Observation


DOC-3035D – Youth Request for Psychological Services

HSU – Health Services Unit

Mental Illness – For the purpose of evaluating youth who have extended stays in clinical observation, mental illness is a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life.

MJTC – Mendota Juvenile Treatment Center

PHI – Protected Health Information

PSU – Psychological Services Unit

PSU Staff – Employees classified as Psychologist Supervisor, Psychologist-Licensed, Psychological Associate, Crisis Intervention Worker, Psychological Services Assistant, Clinical Social Worker, or any other clinical classification that is directly supervised by Psychological Services.

State Treatment Facility – Winnebago Mental Health Institute or Mendota Juvenile Treatment Center

WMHI – Winnebago Mental Health Institute

Working Days – All days except Saturdays, Sundays and legal holidays.


**Procedure**

    I.   **Initial Placement**

        A.  Any staff member, or youth by way of self-referral, may recommend that a youth be placed in clinical observation.

        B.  Those authorized to place youth in clinical observation include Psychologist Supervisors, Psychologists-Licensed, Psychological Associates, Crisis Intervention Workers .

        C.  If the staff listed in I.B. are not immediately available for consultation or for evaluation of the youth, a Registered Nurse, ADO, Security Director,  Security Supervisor or Superintendent may place a youth in clinical observation. Reasonable attempts should be made to consult PSU prior to placing a youth in clinical observation.  If non-PSU staff place a youth in clinical observation, a Security Supervisor shall ensure that PSU staff are notified as soon as possible after the placement.

        D.  If on-site, staff authorizing the initial placement shall verbally inform the youth of the reason for placement into clinical observation at the time of placement. When the staff authorizing the initial placement is not on-site, the staff placing a youth on observation shall inform the youth of the reason for the placement.


    II.   **PSU monitoring**

        A.  Initial Evaluation

| Clinical Observation | EFFECTIVE DATE 2/1/2017 | PAGE NUMBER 3 of 8 |
| --- | --- | --- |

    1. When a clinical observation placement occurs during business hours, PSU staff shall evaluate the youth face to face as soon as possible, but on the same day.

    2. When a clinical observation placement occurs outside of business hours, PSU on-call staff shall be consulted via telephone by the on-site supervisor to determine appropriate level of monitoring and property allowance. PSU staff shall complete a face to face evaluation of the youth as soon as clinically appropriate, but no longer than 16 hours after initial placement.

B. Subsequent PSU evaluations shall take place at a minimum of every working day while the youth remains in clinical observation with 5, 10 or 15 minute checks. In the case of weekends or holidays the time period between PSU evaluations shall never exceed three calendar days.

C. If a youth is placed in clinical observation with constant monitoring subsequent PSU evaluations shall take place daily regardless of whether it is a weekend or holiday.

D. PSU staff shall consult with registered nursing staff as needed when any organic causes for youth's clinical observation placement are suspected.

E. PSU staff shall instruct other DJC staff regarding the clinical management of the youth.

F. PSU staff shall verbally advise a youth of the results of the initial evaluation as soon as possible but within 24 hours of the evaluation. Youth shall be provided with written results of the evaluation within ten working days unless providing paper is clinically contraindicated. A copy of DOC-27C may serve as the written results of the evaluation.

G. For youth under age 18 placed in observation status, PSU staff shall notify the youth's parent/guardian of the youth's observation status.

H. Youth placed in room confinement under observation status shall be provided therapeutic activities such as counseling, meetings with PSU staff, and interactions with staff members trained to work with youth engaged in or threatening self-harm or suicide.

I. Staff making placement decisions for youth on observation status shall consider whether the youth can remain safely in observation status in general population.

## III.   HSU Monitoring

A. PSU staff will notify a HSU staff member whenever a youth is placed on constant monitoring, 5 minute monitoring, or 10 minute monitoring.

B. A Registered Nurse shall complete a health assessment of a youth in clinical observation status on constant monitoring, 5 minute monitoring or 10 minute monitoring, at least once per day to rule out any organic causes for youth's clinical observation placement and to monitor youth's well-being.

C. PSU staff will notify a HSU staff member whenever a youth is taken off constant monitoring, 5 minute monitoring, or 10 minute monitoring.

## IV.   Supervision

A. Assignment of supervision levels

    1. PSU staff shall determine the level of supervision.

    2. PSU staff shall authorize any decrease in the level of supervision.

    3. If PSU staff cannot be readily consulted, staff may increase the level of supervision if circumstances indicate that the youth has an increased risk of harm to self.

| Clinical Observation | EFFECTIVE DATE 2/1/2017 | PAGE NUMBER 4 of 8 |
|---|---|---|

B. Close observation

    1. Every youth who is placed in clinical observation shall, at a minimum, be placed in close observation status.

    2. Staff shall observe the activities of a youth in close observation at staggered intervals not to exceed 15 minutes. Observations checks shall take place at room-front and be recorded on DOC-112B.

    3. PSU staff will assess the level of close monitoring warranted.

        i. 15 minute - may be in the housing unit

        ii. 10 minute - in observation room

        iii. 5 minute - in observation room

C. Constant observation

    1. Youth at high risk for imminent suicidal behavior and self-harm behaviors shall be placed on constant observation.

    2. Constant observation involves continuous line-of-sight monitoring by a security staff whose assignment is dedicated to the monitoring and well-being of the youth. Observed self-injurious behaviors shall be immediately reported to Supervisor/designee, PSU, and HSU. Observations shall be recorded on DO112B at intervals not to exceed 15 minutes.

    3. For any youth who is placed in constant observation, PSU staff shall consider and document on DOC-27C whether a transfer to a state treatment facility is appropriate.

D. A youth may require mechanical restraint while in clinical observation status.

E. Youth who have a history of suicidal thoughts or feelings may be appropriate for settings other than clinical observation, provided that there is a treatment plan, clinical follow-up by PSU staff, and periodic review at multidisciplinary meetings.

F. Closed circuit television monitoring may be used in addition to, but never a substitute for, the above monitoring levels.

G. Property Allowance

    1. PSU staff shall determine a youth's allowed property in relation to the level of risk and after consultation with a Supervisor.

    2. The following items are a starting point when determining allowed property at the beginning of a clinical observation placement. PSU staff shall approve access to the following items unless there is a clinical or security reason to withhold them:

        i. Suicide-resistant clothing (e.g., smock or gown).

        ii. A security mat/mattress.

        iii. Bar or liquid soap and a washcloth.

        iv. Bag meals.

        v. Toilet paper.

        vi. DOC-3035 series (includes medical, psychological, and dental).

        vii. Crayon for completing DOC-3035D (a pen insert may be approved by PSU staff).

| Clinical Observation | EFFECTIVE DATE 2/1/2017 | PAGE NUMBER 5 of 8 |
|---|---|---|

      viii.    Shower.

      ix.    Oral hygiene products.

      x.    Security blanket.

3.  If any of the above items are withheld, PSU staff shall review the restriction at each visit so that items may be allowed as soon as appropriate.

4.  If there is an imminent risk to health or safety, then any staff may remove the property, and shall notify PSU staff as soon as possible, following the removal. Reasonable efforts shall be made to consult PSU staff, prior to restricting property.

5.  The Superintendent, Regional Chief, Director or designee has final authority regarding the property and privileges of youth in observation.

H.  Documentation

1.  Staff who observe the behavior that results in observation placement shall complete a DOC-1846.

2.  Non-PSU staff who increase the supervision level of or remove property from a youth in clinical observation shall immediately notify a Security Supervisor and PSU staff and document the action on DOC-112B.

3.  PSU staff shall document every clinical observation placement on DOC-27C. Documentation shall include the reasons for the placement, level of supervision and the initial property allowed.

4.  PSU staff shall record all subsequent evaluations on DOC-27C and include any change in the level of supervision or allowed property.

5.  For placements made when PSU staff are not on-site, PSU staff shall complete the initial DOC-27C at the time of the first evaluation.

6.  PSU staff shall make an entry in the visitor's section of DOC-112B whenever they have contact with a youth. The entry shall note any change in the level of supervision or allowed property.

7.  Completed DOC-27Cs shall be retained in a secure area due to the PHI included on the form. Access to the DOC-27C shall be limited to staff members who have a clearly defined job-related need to know the contents of the form.

I.  Housing

1.  Youth in clinical observation (constant monitoring, 5 minute or 10 minute) shall be housed in rooms designed for suicide prevention purposes. If circumstances require use of another room, the room shall be in proximity to staff and checks shall be carried out at a minimum of five-minute intervals.

2.  Youth in clinical observation on 15 minute observations may be housed in a standard housing unit.

J.  Follow-up

Youth who are released from clinical observation shall be interviewed by PSU staff on the next calendar day, within the seven calendar days, and at least within thirty days after release.

K.  Staffing

| Clinical Observation | EFFECTIVE DATE 2/1/2017 | PAGE NUMBER 6 of 8 |
| --- | --- | --- |

Security staffing for housing units that contain clinical observation rooms shall be sufficient to perform the necessary observation checks and corresponding documentation.

L.   Off-site Healthcare Facilities

1.   In the event that a youth is assessed and/or admitted to an off-site healthcare facility, staff at that facility will be notified of the youth's observation status prior to transfer to care. The particular facility's policies and procedures regarding suicide risk assessment and prevention, rather than those of DJC, will apply for the duration of the youth's stay.

2.   When the youth returns from the off-site healthcare facility, DJC staff shall place the youth back in clinical observation status until evaluated by PSU staff.

3.   PSU staff shall evaluate a youth as soon as possible, on the same day of return from the off-site healthcare facility, to evaluate risk and determine the appropriate level of supervision.

V.   **Extended Stays in Clinical Observation**

A.   If a youth approaches 14 days in clinical observation, PSU staff shall follow the procedures outlined below and described in Wisconsin Administrative Code s. DOC 375.

B.   For all youth:

1.   On or before the 14th day in clinical observation, PSU staff shall complete DOC-2099 and use this form to notify the youth of a Review of Need for Continued Observation.

2.   Within two to five days of making this notification, PSU staff shall conduct a Review of Continued Mental Health Placement as outlined in Wisconsin Administrative Code s. DOC 375.06. The review shall be documented on DOC27C.

3.   Subsequent reviews shall be conducted at least once every 7 days.

C.   For youth who are in clinical observation for mental illness and who are a danger to self or others:

1.   On or before the 14th day in clinical observation, PSU staff shall initiate proceedings for a Chapter 51 commitment if one has not already been obtained.

2.   A referral to MJTC or WMHI shall be submitted requesting that the youth be evaluated for a Chapter 51 commitment.

D.   For youth who are in clinical observation for dangerousness to self (although not mentally ill):

1.   On or before the 14th day in clinical observation, PSU staff shall contact the Psychology Supervisor and Psychology Manager to initiate a Review of Dangerousness to Self.

2.   The review shall be conducted by a Psychologist-Licensed or Psychological Associate from a facility other than the one in which the youth is housed and completed within 30 days of placement.

3.   Results of the review shall be documented on DOC-27C. Any subsequent reviews shall be conducted at least once every 30 days.

| **Clinical Observation** | EFFECTIVE DATE<br>2/1/2017 | PAGE NUMBER<br>7 of 8 |
|---|---|---|

cc:    Office of the Secretary

        DJC Leadership Team

| **Division of Juvenile Corrections Facility/Region Implementation Procedure** | |
|---|---|
| Facility/Region: | |
| DJC Policy Number:  500.70.24 | |
| Subject:  Clinical Observation | |
| New Effective Date:  2/1/2017 | Original Effective Date:  [Comments] |
| Will Implement:    ☐ As Written    ☐ With following procedures for facility implementation | |
| Superintendent's/Regional Chief's Approval: | |

**REFERENCES**

**DEFINITIONS, ACRONYMS, AND FORMS**

**FACILITY PROCEDURE**

I.

        A.

        B.

            1.

            2.

                a.

                b.

                c.

            3.    C.

II.

III.

| Clinical Observation | EFFECTIVE DATE 2/1/2017 | PAGE NUMBER 8 of 8 |
|---|---|---|

## RESPONSIBILITY

I.      Staff


II.     Youth


III.    Other

**APPENDIX B**

**OC Reduction Plan**

**17cv47UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

J.J., by and through his next friend,
Saleena Jackson, et al.,

      Plaintiffs,

v.                               **Case No.:  17-CV-47**

**JON E. LITSCHER**, et al.,

      Defendants.

## DEFENDANTS' REPORT ON USE OF OC SPRAY PURSUANT TO THE COURT'S PRELIMINARY INJUNCTION

Defendants, Jon E. Litscher, John D. Paquin, Wendy A. Peterson, and Brian Gustke (collectively, "Defendants"), by their undersigned attorneys, Crivello Carlson, S.C., and pursuant to the Court's Preliminary Injunction, hereby submit this Report on the use of OC Spray.

### Injunction, Section C.4

*"Based on the review in the preceding paragraph, by October 31, 2017, defendants shall prepare and provide to counsel and the court a plan to further reduce or eliminate any remaining use of chemical agents."*

### Methodology

The August 2017 report on the use of OC showed that OC was used in response to a variety of precipitating events, many of which have multiple components and, if not responded to appropriately, pose a significant threat to

Case 3:17-cv-00047-jdp Document #: 96 Filed: 10/31/17 Page 2 of 10

youth and staff safety as well as the effective operation of the facility. DJC therefore developed a multi-faceted plan, including consideration of several types of approaches:

- Steps to reduce OC use that are directly responsive to the specific types of incidents previously identified as leading to use of OC. Note that many of these steps have already been taken in response to other requirements in the injunction.
- Steps to reduce the types of incidents that lead to the use of OC.
- Steps directly related to the use of OC and the follow-up response to incidents involving OC deployment.

For the latter two categories, DJC reviewed standards, recommendations, and options from several sources, including:

- The PbS Blueprint section on "Responses to Misbehavior: Restraints," which includes a variety of policies and practices designed to reduce use of all types of restraints, including chemical agents.
- The LHS PbS Facility Improvement Plan for reducing use of OC, which was developed in consultation with DJC's PbS Coach.
- A Center for Children's Law and Policy Fact Sheet on Chemical Agents in Juvenile Facilities (published 5/14/2012).
- A plan developed by the Oklahoma Office of Juvenile Justice in 2016 to eliminate use of OC in its facilities within a 24-month period.

**Plan**

***Responses to Injunction***

Section C.1. of the injunction requires that as of July 21, 2017, OC be used "only when a youth is engaging in physical harm to others or to prevent the youth from causing bodily harm to another." Several of the most common precipitating events for OC use from January – June 2017 did not necessarily meet this standard. Therefore, several changes in practice have taken place.

- The second most common precipitating event was "refusing directives to cease abusing property in an unsafe manner." This included actions such as covering up cameras or windows, thereby preventing staff from properly performing checks to ensure youth safety. Since the injunction, this type of incident has been less common, which LHS management believes is due to youth being in RHU for shorter periods of time and having a more structured schedule of out-time while they are in RHU. When such an incident does occur, staff may need to enter the room to remove the items being mis-used. It is important to note that if the youth then responds in a physically aggressive or threatening manner, the use of OC may then be warranted.

- The third most common precipitating event was "refusing to comply with movement." LHS staff are now directed to use a trained hands-on escort technique to achieve required movement, after attempts to gain verbal compliance are unsuccessful. Again, should the youth become physically

aggressive or resistive in a manner that presents a risk of bodily harm, OC may then be used.

- The fourth most common precipitating event was holding arms out of the trap door, preventing it from being closed and impeding unit operations. LHS management believes that the frequency of these incidents has also decreased due to youth being in RHU for shorter periods and having a more structured schedule. Staff attempt to place youth who are prone to this behavior in rooms where they will not impede operations as much. When it does occur, staff work around the behavior as much as possible, without giving undue attention to the behavior, such as by using a plastic shield to protect staff and youth when they must pass the youth's door.

### *Preventing Incidents That Could Lead to Use of OC*

The steps outlined in this section of the plan are arguably the most important. Because OC can now be used only when a youth is engaging in physical harm to others or to prevent the youth from causing bodily harm to another, the goal of any further steps to reduce use of OC cannot simply be to reduce the number of incidents in which OC is used. Rather, it must be to reduce the use of OC *while maintaining safety of youth and staff*. This is primarily achieved by preventing or diffusing incidents before they reach the point of potential bodily harm. Otherwise, the harm to youth or staff resulting from not intervening in an aggressive incident, or from intervening physically without use of OC, could outweigh the effects of

using OC to prevent such injury. Maintaining a secure and orderly facility is essential to safety for both youth and staff.

Available information from multiple sources on how to prevent and diffuse potentially dangerous incidents consistently follows themes of keeping youth busy and engaged, providing effective training for staff, and providing effective services for youth. The steps outlined below are either underway or in the planning stages.

- Engaging youth in a full schedule of programming to keep youth busy: Daytime school and treatment schedules have been revised, both in general population and in restrictive housing. Additional activities such as basketball tournaments, exercise programs, and crafts have also been added, and further revisions to evening schedules are in process. Recruitment of dedicated Recreation Leader staff is nearly complete, which will offer additional resources to ensure activities and programming during the evening hours, when most OC incidents occurred.

- Ensuring staff are trained on topics such as de-escalation, crisis intervention, adolescent development, mental health, and trauma informed care: All new security staff are trained on each of these topics during the Youth Counselor Preservice Academy, and annual update training for all security staff includes de-escalation and suicide prevention. In addition, 56 CLS/LHS staff across multiple disciplines have recently been trained in the 2-day Crisis Intervention Partners training. Treatment staff have been trained in Motivational interviewing and a number of staff, including TIP unit staff, have been trained

Page 5 of 10

in DBT. Future training efforts will include ethics and boundaries and additional trainings on the above-listed topics.

- Ensuring staff are trained on approved physical force techniques and appropriate use of restraints: All security staff receive initial 40-hour training in Principles of Subject Control and 8 hours of training on incapacitating agents (including exposure), with annual 4-hour update training. Non-security staff receive 24-hour training focused on verbalization skills, threat assessment, first response, and defensive techniques.

- Ensuring adequate staffing, including enough mental health professionals to respond to youths' needs: DJC is working aggressively to recruit security staff, including by holding recruitment events throughout the state and continuing with local Youth Counselor Preservice Academies. LHS has added mental health clinicians and increased the availability of mental health services to all youth. Additional positions, including Youth Counselors, nurses, and a psychologist, were authorized through the 2017-19 biennial budget.

- A crisis response team, composed of staff highly skilled in verbal de-escalation, is called to non-emergency situations in an effort to resolve issues without the use of physical restraint: LHS is currently in the planning stages of developing these crisis response teams. A related effort has recently been implemented in the school with the creation of the "STAR" room, which stands for "Stop, Think, Act, and Review." Youth are referred to the STAR room by teachers in the same

manner youth are referred to any school office. This resource is designed to allow youth to de-escalate or self-regulate if they become disruptive in the classroom. The STAR Room is not disciplinary in nature. It is a place for reflection, problem resolution, and at times a calm environment to complete school assignments.

- The Targeted Intervention Program (TIP) unit, which opened in October 2017, brings together several of the elements above. It is designed to serve the most challenging youth in a staff-intensive, highly structured, treatment-rich environment, including Dialectical Behavioral Therapy (DBT) which is recognized as one of the most effective interventions for individuals with personality disorders and self-harming behaviors. Youth in this unit are divided into small groups that remain together during the daily structured schedule. A Youth Counselor follows each group and attends all classes, groups and recreational activities along with the facilitators. The intent is to keep these youth actively engaged and learning pro-social skills.

- A revised incentive program has been developed to reinforce and encourage positive behaviors by youth. According to evidence-based practice, frequent reinforcement of pro-social behaviors promotes improved behavior and decreases unwanted behavior. The program is currently being implemented in the TIP unit and will be implemented in other general population housing units over the course of the next several months.

- A Youth Advisory Council has been developed and a Family Advisory Council is being developed in order to promote youth and family voice in facility operations. Inclusion of client voice is recognized as a core principle in trauma-informed organizations.

### *Availability, Use, and Response to OC*

Another set of potential options are more specific to the use of OC, including protocols to be followed to minimize harmful effects, ensuring adequate follow-up and review, and limiting the availability of OC.

- A continuum of responses to disruptions, with OC (or other restraints) used as a last resort and de-escalating conflicts before they occur given highest priority: DJC policy clearly states that "verbal interventions/de-escalation techniques receive highest priority for resolving conflict," and this expectation is reinforced through training, incident reviews, performance evaluation, and (when necessary) employee discipline.

- Medical staff maintain a list of contraindications and are consulted before any planned use of force. It is important to note, however, that since OC can only be used when a youth is engaging in physical harm to others or to prevent the youth from causing bodily harm to another, its use is more likely to be reactive than planned. In either case, youth are seen by medical staff following any exposure to OC.

- When planned use of force becomes necessary, a specific protocol is followed that includes video and audio recording. Reactive use of force situations are recorded on body cameras, with handheld recording begun as soon as it can reasonably and safely be accomplished. All use of force incidents are documented on incident reports, with each involved staff person writing an individual narrative.

- Each incident involving use of OC is reviewed on multiple levels, including at the weekly management-level incident review meeting and as part of a use of force review. PbS also recommends debriefing with the youth and the involved staff, which currently occurs on a case by case and less formal basis. CLS/LHS will evaluate options for including these youth and staff debriefings on a consistent, structured basis.

- Data on use of OC is compiled and reviewed on a regular basis as part of PbS and other reporting mechanisms.

Other potential options that have been recommended elsewhere and were considered for inclusion in this plan include further limiting who can carry OC (for example, supervisors only) and storing it in a lockbox or away from the housing units. These steps were determined to not be appropriate for inclusion in the plan at this time, because they would preclude the use of OC when a youth is engaging in physical harm to others or to prevent the youth from causing bodily harm to another. As noted above, this could increase injuries to staff and youth, either through failing to prevent an assault, failure to intervene in assaultive situations,

Page 9 of 10

or through physically intervening in dangerous situations. DJC will continue to assess progress in preventing incidents and reducing OC, and we will continue to evaluate all options on a regular basis.

Dated this 31st day of October, 2017.

CRIVELLO CARLSON, S.C.
Attorneys for Defendants

By:     *s/ Samuel C. Hall, Jr.*
        SAMUEL C. HALL, JR.
        State Bar No.:  1045476
        BENJAMIN A. SPARKS
        State Bar No.:  1092405

**PO ADDRESS**:
710 North Plankinton Avenue
Suite 500
Milwaukee, WI  53203
Phone:  414-271-7722
Email:          shall@crivellocarlson.com
                bsparks@crivellocarlson.com