J.J., by and through his next friend,
Sakeena Jackson, for themselves and all
others similarly situated,

    Plaintiffs,

v.

JON E. LITSCHER, in his official capacity
as Secretary of the Wisconsin Department
of Corrections, et al.,

    Defendants.

Case No.: 17-CV-47

## STIPULATION AND CONSENT DECREE AND PERMANENT INJUNCTION

The parties, by their respective undersigned counsel, hereby stipulate and agree to entry by the Court of the following Consent Decree and Permanent Injunction (the "Agreement" or the "Consent Decree").

### I. INTRODUCTION AND RECITALS

A.     On January 23, 2017, the Plaintiffs filed a Class Action Complaint for Declaratory and Injunctive Relief, initiating the above-captioned action under 42 U.S.C. § 1983. On January 24, 2017, the Plaintiffs filed a Motion for Class Certification. The Plaintiffs amended their Complaint on April 18, 2017, and filed a Motion for Preliminary Injunction on April 19, 2017. The Defendants answered the Complaint and Amended Complaint, and responded to the Plaintiffs' motions. The parties conducted significant discovery.

B.     The claims in this action relate to the use of restrictive housing (a/k/a room confinement), chemical agents, mechanical restraints, and strip searches at Lincoln Hills School (LHS) and Copper Lake School (CLS). Following briefing, hearings, and rulings by the Court, and the parties' input, the Court entered a preliminary injunction on July 10, 2017. The Court entered an order certifying a class on September 15, 2017.

C.     The parties to this Agreement are the Plaintiffs, individually named and those

similarly situated; the State of Wisconsin (State); the Secretary of the Wisconsin Department of Corrections (DOC); the Administrator of the DOC Division of Juvenile Corrections; the Superintendent of LHS and CLS; and the Director of Security for LHS and CLS.

D. Anticipating the costs of litigation and recognizing a shared interest in improving the conditions of confinement for youth at LHS and CLS, the Plaintiffs and Defendants intend for the full compliance with this Agreement to resolve all claims in the above-captioned action.

E. In entering into this Agreement, the State does not admit any violations of constitutional rights of youth confined at LHS and CLS, nor does it admit any violation of state or federal law. This Agreement may not be used as evidence of liability in any other legal proceeding. However, the State remains firmly committed to improving the conditions of confinement for youth at LHS and CLS.

## II. DEFINITIONS

A. **Presumptive Applicability of Administrative Code.** Unless defined below, the terms in this Consent Decree and Permanent Injunction shall be defined as they are defined in Wisconsin Administrative Code, Chs. DOC 346 & 371-396.

B. **Room confinement.** Room confinement shall be defined as the involuntary restriction of a youth alone in a cell, room, or other area, excluding the confinement of a youth to such an area during normal sleeping hours or on observation status. This definition includes but is not limited to pre-hearing segregation, disciplinary or punitive segregation, and administrative confinement.

## III. SUBSTANTIVE RELIEF

A. **Room Confinement**

   1. **Punitive Confinement.**

      a. Subject to the terms and provisions of Section V(C)(3)(g), effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

      b. Subject to the terms and provisions of Section V(C)(3)(g), effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room confinement.

      c. Subject to the terms and provisions of Section V(C)(3)(g),

effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

2. **Administrative Confinement.** Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

   a. Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

      i. A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

      ii. A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

   b. Administrative confinement time limits may be tolled from 8 pm to 8 am.

   c. Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

   d. The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others, and shall supersede any rule or policy to the contrary.

3. **Youth at imminent risk of serious self-harm.** Effective immediately upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Policy #500.70.24 as set forth in Appendix A, and shall treat youth at risk of self-harm in compliance with that amended policy.

4. **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a. Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

b. Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

c. Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

d. Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth's mental health or if other options will adequately protect the youth or staff.

e. Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

f. Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any property restrictions on a daily basis and document the

review.

    g.   Youth in room confinement shall receive:

        i.   All regularly scheduled social worker visits, mental health services, and other health services.

        ii.   Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

        iii.   Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

        iv.   Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

        v.   Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

        vi.   Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

5. **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

6. **Documentation.** Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in

room confinement. The youth must be promptly provided with this report immediately upon its completion.

B. **OC-Spray and Other Chemical Agents**

1. **OC reduction plan.** Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached and incorporated hereto as Appendix B, as outlined in the preliminary injunction.

2. **Prohibition on use of OC-Spray and other Chemical Agents.** Subject to the terms and provisions of Section V(C)(3)(g), within twelve (12) months of entry of the Court's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

C. **Mechanical Restraints.** The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1. **Prohibition on types and uses of mechanical restraints.**

    a. Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

    b. Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others, and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

    c. No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

        i. Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

        ii. Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

        iii. During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

6

d. Mechanical restraints shall never be used for punishment or discipline.

e. Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

f. Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

g. Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living unit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter. As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

2. **Documentation.** Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

D. **Strip Searches.** The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

1. **Prohibition on strip searches without probable cause.** Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

2. **Strip searches with probable cause.** Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

3. **Process for strip searches.**

   a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

   b. Under no circumstance may a youth be strip searched within view of another youth.

  c. Strip searches may only be conducted by individuals of the same gender identity as the youth being searched, unless the search is conducted by a medical professional.

  d. Strip searches must be conducted by staff trained in trauma-informed practices.

  e. If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

 4. **Documentation**. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

E. **De-escalation Training.** Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

F. **Programming.** Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts to implement the recommendations.

G. **Staffing.** Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

H. **Amendments to administrative code.** Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (1) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

## IV. DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A. **Incident review process.** Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members

of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review all uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

B. **Quality assurance.** The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

## V. CONTINUING JURISIDICTION, MONITORING, ENFORCEMENT AND TERMINATION

A. **Continuing Jurisdiction.** The terms of this Agreement will be incorporated into an order to be entered by the Court. The Court will retain jurisdiction over this action until the Agreement terminates and all claims for injunctive relief in the Action have been dismissed.

B. **Termination.**

1. Defendants may move for termination of the Agreement and dismissal of all claims in accordance with section 2 below on the earlier of the date on which: (a) all juveniles have been transferred from LHS/CLS to the appropriate Type 1 juvenile correctional facility or to secured residential care centers for children and youth, or (b) 36 months after entry of the Court's order incorporating this Agreement.

2. The Court shall grant the motion and the Agreement shall terminate and all claims shall be dismissed if:

   a. The Department of Corrections has permanently closed the Type 1 juvenile correctional facilities housed at LHS and CLS, and the Administrative Code has been amended as provided in Section III.H, after the Monitor has conducted a single inspection of each facility under section V.C.3.c.; or

   b. The Department of Corrections has not permanently closed the Type 1 juvenile correctional facilities housed at LHS and CLS and the Administrative Code has not been amended as provided in Section III.H, after the Monitor has certified, in two consecutive inspections of each operational Type 1 juvenile correctional facility, conducted after the 36 month term of this agreement, that such facilities are operating in compliance with sections III.A, B, C, and D; or

   c. The Department of Corrections has not permanently closed the Type 1 juvenile correctional facilities housed at LHS and CLS but the Administrative Code has been amended as provided in Section III.H, after the Monitor has certified, in two consecutive inspections of each operational Type 1 juvenile correctional facility that such facilities are operating in compliance with sections III.A, B, C, and D; or

   d. The Department of Corrections has permanently closed the Type 1 juvenile correctional facilities housed at LHS and CLS but the Administrative Code has not been amended as provided in Section III.H, after the Monitor has certified, in two consecutive inspections of each operational Type 1 juvenile correctional facility, that such facilities are operating in compliance with sections III.A, B, C, and D

C. **Monitoring.**

   1. The Parties agree that Teresa Abreu will be retained to serve as the Parties' jointly appointed Monitor. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations. Should Teresa Abreu become unwilling or unable to act as Monitor, the Parties will meet and confer to attempt to agree upon a replacement. Should the Parties be unable to agree on a Monitor within 45 days of Teresa Abreu becoming unavailable, they will each recommend two potential Monitors, from which the Court will select a replacement. The intention of the Parties is that Defendants will develop the capability to comply with the substantive provisions of the Agreement without long-term monitoring

beyond the duration in Section V(B) of this Agreement and the Monitor will assist Defendants in developing this capability.

2. Within two weeks of the Court's order incorporating this Agreement, Defendants shall provide the Monitor with a copy of the relevant Administrative Code provisions, as well as with the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz.

3. The Monitor shall:

   a. Have access to LHS and CLS at any time determined by the monitor for the inspections and site visits described below. Such access shall include ability to inspect and photograph all youth living areas (including but not limited to student rooms, day spaces, exercise rooms or outdoor recreation spaces), control rooms in housing units, visiting areas, areas where searches of students are conducted, any isolation or restrictive housing rooms or rooms used for such purpose, classrooms, counseling or social services rooms, and to speak with any youth in a private and confidential setting. The Parties' counsel may attend the Monitor's site visits. The Monitor may have private conversations with staff, and with youth with the youth's consent.

   b. Conduct monitoring site visits at LHS and CLS at least four times in the first calendar year of the Agreement and at least two times per calendar year for the duration of the Agreement.

   c. Conduct an inspection or inspections of each new facility which is created and operated by DOC pursuant to 2017 Wisconsin Act 185 within two to three months after the opening of each such facility pursuant to the terms in V(B)(2). For the purposes of such inspection only, the Monitor may have access to documents, site visits, and interviews described in section (a).

   d. Have authority to request, and obtain from Defendants within five days of any such request, incident reports involving any youth and any documents relating to or reflecting staffing levels and staff training, use of room confinement, use of OC-spray or other chemical agents, use of mechanical restraints, strip searches, positive behavior interventions and supports, and de-escalation practices at LHS/CLS, or, for the purpose of inspection of new facilities described in the preceding subsection, at such new facilities.

   e. Within two weeks of each site visit, produce and send to the Parties' counsel a draft Compliance Status Report assessing the

11

Defendants' compliance with the substantive terms of the Agreement. The Compliance Status Reports shall summarize any review of documents and other pertinent information and assess whether the Defendants are non-compliant, in partial compliance, or in full compliance with each of the substantive terms set forth in the Substantive Relief sections of this Agreement. The parties may submit written comments to the Monitor within five days of receiving the draft Compliance Status Report. Within five days of receiving any such comments, the Monitor will produce and distribute to the Parties a final Compliance Status Report for each site visit, which will be filed with the Court, with appropriate redactions of any information identifying particular youth.

f. Within two weeks of Court approval of this Agreement, obtain from Defendants all of Defendants' policies, procedures and training materials related to room confinement, use of OC spray or other chemical agents, use of mechanical restraints, strip searches, positive behavior interventions and supports, and de-escalation practices at LHS/CLS. Within four weeks of receiving such materials, the Monitor will make recommendations for changes to Defendants' codes, policies, procedures, and training materials so that the codes, policies, procedures, and training materials comply with or contribute to compliance with the substantive terms of this Agreement.

g. Be empowered to adjust any deadline one time for implementation of a specific provision of this Agreement in order ensure the safety of youth and staff. If it is in the interest of youth and staff and will not adversely affect the safety of youth and staff, the Monitor may also recommend shortening a specific deadline. Any Party who objects to the Monitor's adjustment of any deadline may petition, on an expedited basis, the Court to review the determination, or the reasonableness of the length of time of any extension, taking into account the safety of youth and staff and the reasonableness of Defendants' efforts to comply with the terms of this agreement. The opposing Party shall have five days to respond to any such petition. Any further extensions require court approval.

4. Defendants will pay the Monitor's reasonable fees and costs. The Parties recognize that DOC needs to be able to anticipate the costs associated with the Monitor's services. Accordingly, the Monitor's fees will be presumed reasonable if they are less than or equal to $130,000.00 for the first year of monitoring and $100,000.00 per year for any subsequent years. However, the Parties also recognize that the reasonable activities of Teresa Abreu or any replacement Monitor should not be unreasonably restricted by hourly caps. Should the Monitor or Plaintiffs believe that the presumptive cap will unreasonably interfere with effective Monitoring,

the Monitor or the Plaintiff may, after meeting and conferring with Defendants in a good faith effort to resolve the dispute, move the Court for an increase in the presumptive reasonable fee.

5. Limitations on public disclosures by Monitor. Except as required or authorized by the terms of this Agreement or the parties acting together, the Monitor shall not: make any public statements (at a conference or otherwise) or issue public findings with regard to any act or omission of the State or its agents, representatives or employees, or disclose non-public information provided to the Monitor pursuant to this Agreement. Any press statement made by the Monitor regarding his/her employment must first be approved, in writing, by the parties. The Monitor shall not voluntarily testify in any other litigation or proceeding with regard to any act or omission of the State or any of its agents, representatives, or employees related to this Agreement, nor voluntarily testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement. Reports issued by the Monitor shall not be admissible against the State in any proceeding other than a proceeding related to the enforcement of this Agreement. Unless such conflict is waived by the parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the State or its departments, officers, agents or employees. The records maintained by the Monitor shall be kept confidential to the extent permitted by Wisconsin's Public Records Law and the federal Freedom of Information Act. This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for monitoring this Agreement.

D. **Enforcement.**

1. Plaintiffs' counsel will have access to LHS/CLS on two days' notice to inspect any youth living areas and speak with youth in a confidential setting. Plaintiffs' counsel will be able to speak confidentially to youth by telephone on one day's notice.

2. Defendants shall produce to Plaintiffs each month by the 10th day of the following month: (1) a report of the number of youth held in any form of room confinement during the month, which shall include the duration of and reason for each instance of such confinement; (2) a report of the time out of cell and property restrictions for each youth held in any form of room confinement during the month; (3) a report of any instances of use of mechanical restraints during the month, including reasons for and duration of the restraint; (4) a report of any instances of use force, including any uses of OC spray or other chemical agents including reasons for the use of

force or OC spray; and (5) a report of any strip searches of youth during the month, including the reason for each strip search, the conditions under which the search was performed (including the location of and personnel performing the search), and any contraband found in the search.

3. Defendants shall produce to Plaintiffs and the Monitor each month by the 10th day of the following month, a report indicating the youth subject to room confinement under observation status and the duration that the youth spent in such room confinement. While not subject to any compliance assessment, the Monitor may choose to comment on the use of room confinement for youth in observation status within a Compliance Status Report pursuant to Section V(C)(3)(e).

4. If the Plaintiffs believe that any of the monthly reports provided in D(2) above indicate non-compliance with a substantive provision of the Agreement, the Plaintiffs may, after meeting and conferring with the Monitor and Defendants in a good faith effort to resolve the alleged non-compliance, bring a motion to the Court for enforcement of the Agreement. Any enforcement order may require Defendants to take additional actions designed to achieve at least partial compliance. Upon any finding in a final Compliance Monitoring Report that the Defendants are non-compliant with any substantive provision of the Agreement, the Plaintiffs may, after meeting and conferring with Defendants in a good faith effort to seek resolution of the non-compliance, bring a motion to the Court for enforcement of the Agreement or Contempt.

E. **Additional Provisions.**

1. The Parties stipulate, based on the entire record, that the relief set forth in this Agreement meets the requirements of 18 U.S.C 3626(a)(1)(A), and the Parties shall jointly request that the Court make these findings.

2. Defendants agree not to unilaterally move to terminate or modify this agreement under 18 U.S.C. § 3626(b) until the Agreement ends according to its terms.

3. Plaintiffs will seek reasonable attorneys' fees and costs for work performed up to and through the Date of Final Approval of this Agreement. The Parties will attempt to reach an agreement regarding the amount of fees and costs after negotiations regarding the substantive terms of this Agreement have concluded. Plaintiffs will seek reasonable attorneys' fees and costs for facilitating and monitoring the implementation of this Agreement for the duration of the Agreement. If the parties are unable to reach an agreement as to the amount of fees for such monitoring, Plaintiffs shall submit a fee petition to the Court for determination.

4. Plaintiffs' counsel may send in writing to Defendants' counsel time-sensitive concerns about the treatment of individual youth. Defendants' counsel agrees to make reasonable efforts to investigate these concerns and respond in writing to Plaintiffs' counsel within a reasonable period of time.

5. In the event of circumstances threatening to cause immediate or irreparable harm to the class or any portion of the class, Plaintiffs may seek immediate judicial relief.

6. The Parties will work together to ensure the timely preparation and filing of all motions, briefs, and documents necessary to obtain preliminary and final approval of this Agreement pursuant to applicable rules and statutes.

7. This Agreement supersedes all other agreements made between the Parties and all preliminary orders issued during the course of this litigation regardless of form.

8. This Agreement constitutes the final written expression of all of the terms of the settlement between the Parties and is a complete and exclusive statement of those terms, except that:

   a. The Agreement may be modified at any time by a written and signed document executed by mutual agreement of Plaintiffs' counsel and Defendants' counsel, subject to approval by the Court;

   b. Plaintiffs' attorneys' fees and costs, when agreed upon, will be incorporated as a term of this Agreement.

9. All modifications to this Agreement will be filed with the Court.

**F. Attorney Fees**

1. Defendants agree to pay Plaintiffs' counsel the sum of eight hundred eighty-five thousand dollars ($885,000) in full satisfaction of all claims for fees and costs for work done by plaintiffs' counsel through June 18, 2018, in connection with this litigation. Payment shall be made within twenty (20) days of the Court's entry of an Order granting Final Approval to the Settlement Agreement.

2. Defendants agree to pay Plaintiffs' Counsel's reasonable expenses and fees for time reasonably spent on this case from June 19, 2018, through the date of the Court's entry of an Order granting Final Approval to the Settlement Agreement. The Parties agree that plaintiffs shall be compensated for their time at the rate of $220.50/hour (the current Prison Litigation Reform Act cap). Such payment shall be in full satisfaction of all claims for fees and costs for work done by plaintiffs' counsel in connection with this litigation from June 19, 2018, through the date of the

Court's entry of an Order granting Final Approval to the Settlement Agreement.

3. Defendants agree to pay Plaintiffs' Counsel's reasonable expenses and fees for time reasonably spent on this case from the date of the Court's entry of an Order granting Final Approval to the Settlement Agreement. The Parties agree that Plaintiffs shall be compensated for their time at the highest rate permitted by the Prison Litigation Reform Act at the time each request for fees is submitted to Defendants.

4. The Parties agree that the time and expenses for no more than two attorneys for the Plaintiffs to attend site visits by the monitor are presumptively reasonable. However, the Parties also understand that circumstances may justify additional attorney time for particular site visits. This provision shall not be construed to limit the time Plaintiffs' counsel may reasonably spend on this case outside of the monitor's site visits.

5. Submissions for fees and costs shall be made as follows: Plaintiffs' counsel shall submit to defendants' counsel documentation of fees and costs from time-to-time. Defendants may review the documentation and, within twenty (20) days of receiving such documentation, either pay the amount sought in full or provide Plaintiffs' Counsel with a written response identifying amounts objected to as unreasonable. The Parties will attempt to resolve all disputes among themselves, with payment to be made within ten (10) days of resolution. If the parties are unable to resolve their differences, the parties agree that the dispute shall be submitted to the District Court or a magistrate judge for a determination of whether and to what extent plaintiffs' counsel's claimed fees and costs are reasonable under the circumstances. The parties agree to abide by the determination of the District Court or magistrate judge, and defendants shall pay the amount determined to be reasonable within ten (10) days of the determination.

6. This Addendum may be modified at any time by a written and signed document executed by mutual agreement of Plaintiffs' counsel and Defendants' counsel. All modifications to this Addendum will be filed with the Court.

7. This Addendum may be signed in counterpart originals.

Dated this 13th day of September, 2018.

    Attorneys for the Plaintiffs

    ACLU OF WISCONSIN FOUNDATION

    By:    /s/ Laurence J. Dupuis
             LAURENCE J. DUPUIS
             SBN 1029261
             KARYN L. ROTKER
             SBN 1007719
             R. TIMOTHY MUTH
             SBN 1010710
             ACLU of Wisconsin Foundation
             207 E. Buffalo Street, Suite 325
             Milwaukee, WI 53202
             Phone: 414-272-4032
             Fax: 414-272-0182
             Emails: ldupuis@aclu-wi.org
             krotker@aclu-wi.org
             tmuth@aclu-wi.org

             THE JUVENILE LAW CENTER
             JESSICA FEIERMAN
             KAREN LINDELL
             MARSHA LEVICK
             KATHERINE BURDICK
             The Philadelphia Building
             1315 Walnut Street, 4th Floor
             Philadelphia, PA 19107
             Phone: 215-625-0551
             Fax: 215-625-2808
             Emails: jfeierman@jlc.org;
             klindell@jlc.org
             mlevick@jlc.org
             kburdick@jlc.org

             QUARLES & BRADY LLP
             MATTHEW J. SPLITEK
             SBN 1045592

RACHEL A. GRAHAM
SBN 1069214
33 East Main Street, Suite 900
Madison, WI 53703
Phone: 608-251-5000
Emails:
matthew.splitek@quarles.com
rachel.graham@quarles.com

QUARLES & BRADY LLP
EMILY L. STEDMAN
SBN 1095313
ZACHARY T EASTBURN
SBN 1094676
411 East Wisconsin Ave., Suite 2350
Milwaukee, WI 53202-4426
Phone: 414-277-5000
Emails:
emily.stedman@quarles.com
zachary.eastburn@quarles.com

Dated this 13th day of September, 2018.

        CRIVELLO CARLSON, S.C.
        Attorneys for Defendants Jon E.
        Litscher, John D. Paquin, Wendy A.
        Peterson, Brian Gustke


By:   /s/ Samuel C. Hall, Jr.
       SAMUEL C. HALL, JR.
       SBN 1045476
       BENJAMIN A. SPARKS
       SBN 1092405
       710 North Plankinton Avenue #500
       Milwaukee, WI 53203

Phone: 414-271-7722
Fax: 414-271-4438
Emails: shall@crivellocarlson.com
bsparks@crivellocarlson.com

Entered <u>OCTOBER 31</u>, 2018

SO ORDERED,

*[signature]*

JAMES D. PETERSON
District Judge