UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                                    Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

FIRST REPORT OF THE MONITOR

---

Teresa Abreu, Monitor, hereby submits this status report.

## **INTRODUCTION**

On January 23, 2017, the Plaintiffs filed a Class Action Complaint for Declaratory and Injunctive
Relief, initiating the above-captioned action under 42 U.S.C. § 1983.  The claims in this action
relate to the use of room confinement, chemical agents, mechanical restraints, and strip searches
at Lincoln Hills School ("LHS") and Copper Lake School ("CLS"). Various legal proceedings
ensued which led to the Stipulation For Consent Decree And Permanent Injunction, filed on June
1, 2018 and entered by the Court on September 21, 2018.

The Parties agreed that Teresa Abreu would be retained to serve as the Parties ' jointly appointed
Monitor. The final Monitor contract was executed on October 25, 2018. Defendants provided the
Monitor with the relevant Administrative Code provisions, policies, training documentation, as
well as the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey,
Teresa Abreu and Jennifer Lutz as per the court order. The Monitor requested to be included on
the distribution list for all shift reports and any monthly reports that are required under the court
orders in this case.  The Monitor is very pleased with the level of cooperation, communication and
responsiveness from the parties. Anytime the Monitor has requested documentation or explanation
either prior to, during, or after the site visit, the parties have complied.  Additionally, when the
Monitor has made recommendations with regard to a process or procedure, document
modifications, or policy changes, the Wisconsin Division of Juvenile Corrections Director and
LHS/CLS Superintendent have been receptive and when possible, modified pursuant to the

Monitor's recommendations. Plaintiffs' have also made themselves available to the Monitor and have shared any documentation that they believe would be helpful to the assessment. The Monitor requested a seven (7) day extension to file the draft status report as additional documentation was needed in order to complete this report.

## SITE VISIT

The first site visit by the Monitor took place on December 6-8, 2018. The Monitor reviewed materials provided by the parties prior to, during, and after the site visit. Materials included, but were not limited to, relevant court filings, policies, procedures, training documents, resident handbooks, room check logs, school schedules, recreation schedules, counselor logs, "Stop, Think, Act, Review," ("STAR") room documentation, video footage of OC spray incidents, all of the monthly data submitted to the parties per this court order, training records, work rules, position descriptions, employee leave data, grievance logs, behavior and treatment plans, mechanical restraint documentation, incident reports, restrictive housing documentation, and PbS data. The Parties were present during the site visit. Under the Consent Decree, the Monitor shall have access to LHS/CLS at any time for the inspections and site visits. Access included the ability to inspect and photograph all youth living areas, control rooms in housing units, visiting areas, areas where searches of students are conducted, any isolation or restrictive housing rooms or rooms used for such purpose, classrooms, counseling or social services rooms, and to speak with any youth in a private and confidential setting. The Monitor did take photographs, visited the above referenced areas, and interviewed youth and staff. The Monitor understands that a three-day site visit is just a snap shot overview of LHS/CLS.

In December 2017, the Wisconsin Department of Corrections ("DOC"), the Division of Juvenile Corrections ("DJC") contracted with the Council of Juvenile Correction Administrators ("CJCA") and the Center for Children's Law and Policy ("CCLP") to provide technical assistance to support their efforts in addressing the use of solitary confinement, pepper spray, mechanical restrains, and strip search policy and procedures. The Monitor was part of the team that offered technical assistance in February 2018 and thus, had the opportunity to do a site visit and assessment of LHS/CLS albeit in a different capacity. Therefore, the Monitor had familiarity with operations of LHS/CLS prior to this December site visit. The Monitor assessed compliance with the Consent Decree as well as the implementation of recommendations in the February technical assistance report.

## GENERAL OBSERVATIONS

### Physical Plant

The general areas of the facility were clean and orderly. LHS/CLS were decorated nicely for the holidays and the youth seemed to enjoy decorating the units. A holiday decoration contest was underway during the site visit and youth seemed highly motivated by the contest. Although the general areas were clean, the youth rooms and bathrooms were not. There needs to be a focus on youth rooms being clean and organized and the bathrooms being cleaned more regularly and

thoroughly.  There is a lot of graffiti and etching of glass throughout LHS/CLS.  Efforts should be made to monitor youth more closely as well as painting over the graffiti and replacing etched glass so that visibility is improved into the youth rooms.  Murals and artwork have been added to the visiting areas and a couple of the cottages. The Monitor encourages the continuation of brightening up the cottages with colorful paint, murals, and artwork to change the institutional feel as previously recommended in the February technical assistance report.

<u>Youth Population</u>

The average daily population is lower than it was in February by approximately 18% (dropping from 170 to 140).  The Monitor did not observe any youth on living units in mechanical restraints which is a vast improvement from the February technical assistance visit. Staff should be commended for making this visible change. CLS (girls) were very talkative, active on their unit, and were actively participating in arts and crafts.  The Monitor saw some staff engaging with youth, recreation was taking place, telephone calls were being made regularly, and religious volunteers were present on one of the boys' units in which five boys were actively participating.  However, there still seemed to be a lack of meaningful programming as pointed out in the February 2018 assessment report. That said, the facility has made some progress in reducing youth idleness and in-room placements but needs to continue these efforts.  Recommendations were made in the February 2018 technical assistance report that should be implemented as to additional programming that would be beneficial to youth.

<u>Staffing</u>

Staffing problems continue to exist, and they continue to be serious, chronic, and dangerous. There are 311 total positions at LHS/CLS.  Approximately 155 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA").  Defendants have offered sign on bonuses as recommended in the technical assistance report which seemed to help in the filling of vacancies. Although the number of vacancies for the YC and YCA positions from February to December 2018 has significantly reduced, there are still significant staffing challenges.  The teacher vacancy rate is significantly higher now than in February 2018.  A focus needs to be made on recruiting teachers. Financial incentives have been added which hopefully helps with recruiting efforts.  The Monitor understands that filling teacher vacancies and retention is a challenge throughout the country.

| Position | Vacancy Rate % as of February 20, 2018 | Vacancy Rate % as of November 28, 2018 |
|---|---|---|
| Youth Counselor | 48% (45 out of 94) | 22% (23 of 105) |
| Youth Counselor Adv | 45% (27 of 60) | 18% (9 of 50) |
| Teacher | 25%  (7 of 28) | 39% (11 of 28) |
| Social Worker | 13% (2 of 15) | 14% (2 of 14) |

| YEAR | FMLA | FMLA | FMLA | FMLA/Workman's |
|---|---|---|---|---|

|  | Intermittent total | Intermittent Direct Care | Continuous Non-security | Comp Continuous Direct Care |
|---|---|---|---|---|
| 2018 | 43 | 34 | 1 | 18 (13 YC's; 5 YCA's) |
| 2017 | 38 |  | 4 | 1 |
| 2016 | 29 |  | 1 | 0 |
| 2015 | 33 |  | 8 | 0 |

In February 2018, there were approximately 48% of youth counselor positions vacant (45 of 94) and today there is about 22% vacancy (23 of 105). In February 2018, there were 45% of Youth Counselor Advanced positions vacant (27 out of 60), and today there is 18% vacancy (9 out of 50). Although the number of vacancies is reduced for direct care workers, the number of staff on leave (FMLA continuous and intermittent, Workers Comp', and disability, etc.) are approximately 62 employees of the 311 allocated positions, which is about 20%. This number is significantly higher when looking at direct care staff (YC's and YCA's). Of the 155 direct care positions, 32 are vacant and another 18 are on some type of leave, which reflects a total vacancy of 32%. This does not include any benefit time the employees receive (vacation, sick, etc.) This means the number of posts needed to be covered due to vacancies is much higher than what LHS/CLS can cover. Perhaps non-traditional scheduling or scheduling changes can be created in the meantime or combining units in order to adequately supervise youth while still meeting legally mandated staffing requirements and ensuring the safety of youth and staff.

It would be very beneficial and useful for the facility to conduct a full staffing assessment to include a relief factor analysis looking at all leave types and its impact on staffing levels. A complete staffing analysis would provide the agency with an accurate relief factor based on all leave types, which would then allow for a more accurate assessment of the staffing situation. The Monitor can assist with this assessment.

In order to try and cover the posts needed, staff have been working double shifts often. The Monitor suggested tracking the number of staff working double shifts in order to better understand issues and also, to ensure that the same staff are not working double shifts consistently. It is unreasonable to expect staff to actively engage with youth, actively participate in training, understand and change the practices of the facility when they are working so many hours per week. The Monitor spoke to over 25 staff and the majority said they are tired, frustrated, and barely see their families and friends. Most staff live about 50 minutes from the facility which further exacerbates the problem. The vast majority of staff do not feel safe and do not feel they are adequately trained and prepared with the alternatives to pepper stray, confinement, and restraints. The perception from staff is no one cares about them and all the focus is on the youth. The Defendants will not be able to come into substantial compliance with the Court Order without solving the staffing issues. Staff wellness needs to be a focus moving forward. Several recommendations were made in the February 2018 technical assistance report that should be implemented.

The jurisdiction utilizes Performance Based Standards ("PbS") which is a program for juvenile justice agencies, facilities, and residential care providers to identify, monitor, and improve conditions and services provided to youths using national standards and outcome measures. There

are many PbS outcome measures including specific measures involving staff. PbS data, outcome measure Safety 14, reflects that 59.20% of staff report fearing for their safety at LHS and 45.95% at CLS report fear for their safety. Both rates are significantly higher compared to the 25.43% national field average. When asked "in your opinion, what would make this facility safer?", staff responded:

**LHS**

| More staff | 83 | 66% |
|---|---|---|
| Training | 67 | 54% |
| Safety equipment | 54 | 43% |
| Other | 43 | 34% |
| Less overcrowding | 16 | 13% |

**CLS**

| More staff | 24 | 65% |
|---|---|---|
| Training | 23 | 62% |
| Safety equipment | 15 | 41% |
| Other | 11 | 30% |
| Less overcrowding | 4 | 11% |

Furthermore, when asked what training they would like to see, staff provided the following responses:

General behavior management
Verbal de-escalation
Gang training
Adolescent development
Safety and security
Ethics
Cultural diversity and awareness
Communication
Agency policies and procedures
Appropriate staff/youth relationships
Appropriate use of restraints
Juvenile rights
Use of isolation
Incident reporting
Aggression Replacement Therapy (ART)

Suicide prevention
Cognitive behavior programs
Reporting, documenting and investigating allegations
Of sexual abuse/victimization
Sexual assault prevention
Functional Family Therapy (FFT)
LGBTQI
First aid, CPR, AED
Fire safety

Efforts should be made to incorporate these trainings identified by staff.  For those trainings that are already implemented, perhaps the training can be offered more frequently.  There are training and resource recommendations made in the February 2018 technical assistance report that need to be explored. The Monitor is happy to connect the Defendants with these resources.

In looking at the number one overall issue around the need for "more staff" and excessive overtime, recommendations for staffing could be pulling staff from other facilities and/or contracting with a private security company to supplement the staffing at LHS/CLS. The Monitor did note that the department is taking advantage of other agency staff, such as probation and parole staff to help cover posts.  This was seen as a very positive approach for both facility staff and parole staff who seemed to enjoy the opportunity. Defendants are encouraged to explore increasing the use of other agency staff and ensuring that the staff meet the required training.

Recommendations for staff wellness were made in the February 2018 report and should be explored further. There were many recommendations that have not been implemented including, but not limited to more communication with staff regarding the reform effort, involving staff when developing programming and policy changes, creating policy driven staff recognition programs, and tap into staff 's talents, passions, and interests (artists, musicians, yoga etc.) to bring into programming.  It is clear from the PbS data and interactions the Monitor had with staff that much more focus needs to be placed on staff wellness.  This is a primary driver of the turnover issues and is a driving factor in the overall climate and atmosphere of the facility.  Staff unhappiness and discontent is hindering any positive relationship building with the youth.

Finally, while the perceptions of staff and their fear for safety are real fears, the PbS data regarding staff assaults do not reflect that the facility or staff are less safe than they were in October of 2017. In fact, according to outcome measure, Safety 12 – Assaults on Staff, there were 50% fewer staff assaults during the October 2018 data collection cycle than there were during the October 2017 cycle at LHS.  This reflected a change from eight (8) incidents down to four (4).  The incident rate of assaults at LHS essentially tied the national field average rate of 0.11. This also holds true when looking at Safety 3 – Injuries to staff during the same data collection periods.  Again, we see a 50% reduction in staff injuries at LHS, from eight (8) injuries in October 2017 to four (4) in October 2018.  This is data that should be shared with staff.

Since PbS data collection cycles only occur twice a year, in April and October, it is recommended that the jurisdiction monitor incidents of assaults, fights, youth and staff injuries, and other critical outcomes measures on a monthly basis using the most recent PbS field averages as a guide to

gauge the overall safety for staff and youth.  The Monitor can provide an example of a monthly outcomes metrics data report that has been used in other jurisdictions if requested.

Quality Assurance

Data collection remains a significant problem at LHS/CLS.  Data driven decision making is critical to the safety and quality of life of youth and staff. Data is not being accurately recorded, adequately collected or analyzed for incidents giving rise to this litigation.   A quality assurance and improvement program need to be created to continuously assess not only compliance with this court order, but the quality and adequacy of the social and recreational programming provided, healthcare, education, environmental health and safety, and discipline and order.  The Jurisdiction utilizes J Tracker which is a jail system that is being converted to a juvenile system.   The Defendants have stated that this system can be modified to include other data measures as requested. The Monitor suggests that the Defendants work with the vendor to include other critical measures.  Information put into the system is automatically generated but tracking of time is manual. Ideally, a plan should be developed for implementation of competent data collection with a focus on accuracy at the line staff level.  Although many data points are collected as per the court order, the accuracy of the data is unable to be determined for several reasons *i.e.* lack of documentation, lack of electronic systems to automatically capture data, and lack of staff available whose sole responsibility is data collection and analysis.

LHS/CLS has become a Level 2 site for PbS.  Levels of performance quantify how well a facility has mastered the basics of data collection, analysis, the processes of PbS teamwork and Facility Improvement Plan ("FIP") monitoring.  Level 2 means that there is a focus on the "Critical Outcome Measures" that PbS experts and practitioners have identified as the most important indicators of safety and order within a facility. The information about injuries, assaults, suicidal behaviors, isolation, screenings, restraints and staff and youth fear for safety that give an immediate picture of the facilities' safety or violence. Because the facility is at a Level 2, they can now be part of the national field average.  This reflects significant progress on the part of the agency/facility in quality of the data being recorded and captured for PbS data collection cycles. As stated previously, the use of a monthly outcomes metric report will greatly aid in the continued monitoring of critical outcomes measures and quality assurance practices.

Policies and Procedures

The policies and procedures that have been provided to the Monitor are Wisconsin Department of Corrections, Division of Juvenile Corrections and policies specific to LHS/CLS. DOC has identified sections of the administrative code that needs to be modified, but significant revisions have not yet occurred.  The Monitor has been told implementation will take some time as it requires certain Codes to be repealed and recreated. All policies refer back to the administrative code and thus modifications to the administrative code should be a priority.

Policies are Division wide and the procedures are local. Local facilities (like LHS/CLS) can adopt the Division policy "as written" for the local procedure or create their own.  If a local facility wanted to be more detailed than the Division policy, this would be done under facility and region procedures developed by DOC.  Policies relevant to LHS/CLS need to be compliant with the

federal court orders and should contain a quality assurance section for each and every policy. After review of the DOC DJC policies and procedures and local procedures, quality assurance is not part of the policies and reference to this litigation is not listed in the "references" section.  Policy and procedure changes still need to be made as it relates to Youth Movement and Suspension of Movement, Use of Force (last updated 9/28/16), Searches of Youth (updated 10/16/18), Emergency Response Unit, and several others.  The Monitor was pleased to see that the CARE team has been implemented as recommended in the February technical assistance report, however, a policy and procedure needs to be created which will clearly outline the mission of the CARE team, identify circumstances where CARE team will be deployed, and how staff are chosen for the CARE team. Also, many of the policies indicate "discuss at staff meeting."   Many policies and procedures replace old policies. There should be formalized training with employee sign offs acknowledging receipt and understanding.  Effective proficiency testing for all training classes needs to be developed.  The Monitor will continue to work with the Defendants on policy and procedure.

<u>Youth Interviews</u>

Plaintiffs' counsel and the Monitor conducted several youth interviews.  Approximately forty (40) youth were interviewed during the site visit.   Several youths were able to identify staff that they thought were fair, consistent, and caring.  There were also staff identified as being consistently disrespectful, dishonest, or manipulative. The common complaints from youth interviewed were lack of meaningful programming, delayed response to call lights (often indicated when a youth has to use the restroom because there is no toilet in their rooms), group punishment, and too much time being confined.  Youth stated most staff do not interact with them other than directing them. The Monitor agrees with the youth's assessment of staff interaction.  This is not to say that there are not staff who actively engage with youth, but more staff need to engage with the youth in a productive manner. Youth also said that staff showed favoritism and points were often taken away for what they perceive as trivial reasons.

Youth found the grievance procedures confusing and did not really feel like their grievances were being heard or addressed. Several youths on RHU (Restrictive Housing Unit) admitted to being sent to the Unit because of fights with other youth, but others said they were sent for other reasons such as disrespecting staff, refusing to go into their rooms, or being in an unauthorized area or sent for a "cool off" period. When interviewing youth who have been OC sprayed, they complained that the decontamination process took over half an hour and sometimes longer. Currently, times of spray and times of decontamination are not being documented. The Monitor made a recommendation as to this documentation.  All use of force incident reports should include a medical assessment form indicating the date and time of the use of force medical assessment and any injuries or medical concerns noted during the examination.  This should be done for <u>ALL</u> use of force incidents, including physical, mechanical and chemical. This process ensures youth are assessed within reasonable time frames and documentation made of any injuries, conditions and treatments provided.

Overall, there have been significant improvements in various areas of concern, but there is still more work to do.  Defendants need to revisit the February technical assistance report and develop a plan to implement the many recommendations contained within that will improve the quality of

life and conditions for youth and staff.  There needs to be more resources, specifically, dedicated staff allocated to make the necessary changes needed to improve conditions for youth and staff. Defendants also need to assess whether there is a need to bring in outside national experts on a temporary basis to assist in developing systems, programs, and assist in making the necessary changes in order to reach substantial compliance with the court order which will vastly improve the quality of life for youth and staff.

## COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION

Below is the Monitor's assessment of compliance with the consent decree. As previously stated, there is a challenge with adequacy of data for many areas (documentation, accuracy, consistency, and analysis) thus, some sections do not contain a detailed narrative. The Monitor will work with Defendants on this challenge.

    A.    Room Confinement

        1.    Punitive Confinement.

            a.  Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court 's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Majority of youth are not confined in excess of seven days. However, there are challenges to reliability of documentation. The Monitor will work with Defendants on suggested form modifications and quality assurance program.**

            b.  Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: N/A.  It has not been seven months after entry of the Court's order. The Monitor will assess compliance at the appropriate time.**

            c.  Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: N/A. It has not been ten months after entry of the Court's order. The    Monitor will assess compliance at the appropriate time.**

2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others.  Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE as to administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. There are instances where administrative confinement was used in situations where the Monitor would not consider the youth to be a risk for "imminent physical harm to others." The Monitor will review confinement of youth with recommendations to forms/policies/procedures and incident reviews. N/A as to the remainder of the section as it has not been six months after entry of the Court's order. The Monitor will assess compliance at the appropriate time.**

   a.   Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

      1.   A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: N/A.  It has not been six months after entry of the Court's order. The Monitor will assess compliance at the appropriate time.**

      i i.   A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS: N/A.  It has not been six months after entry of the Court's order. The Monitor will assess compliance at the appropriate time.**

   b.   Administrative confinement time limits may be tolled from 8 pm to

8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE.  In general, time is being tolled from 8 pm to 8 am.  The Monitor will review data collection, policies and procedures, forms, and quality assurance program in order to improve the current system of documentation.**

       c.    Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced  plan.

**COMPLIANCE STATUS: N/A.  It has not been six months after entry of the Court's order. The Monitor will assess compliance at the appropriate time.**

       d.    The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: N/A.  It has not been six months after entry of the Court's order. The Monitor will assess compliance at the appropriate time.**

       3.    Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended pol icy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Policy has been amended. However, the effective date of policy is inconsistent on each page.  Training on policy changes has not occurred to date although the Monitor has been told it has been discussed in roll call. A Quality Assurance measure needs to be included in the policy.**

       **4.**    **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

       a.    Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: Non-Compliance.  No room can be deemed "suicide resistant."  Most youth rooms were not clean and organized. Youth should receive hygiene items, blankets, sheets etc.  Several rooms had multiple blankets/sheets covering large areas of the room making it difficult for staff to assess whether there is contraband that can be harmful to youth inside the rooms or assessing youth activity while in bed.**

**Most rooms had graffiti and etching on the glass which makes it difficult for staff to clearly see the youth through the window. There are beds and screening in some rooms that create increased suicide risk.  Additionally, room checks should be more frequent and accurately documented on an individual basis. The agency should consider investing in an electronic, software-based system to more effectively monitor and ensure that safety welfare checks are being completed as required.  While not required by the court order, the Monitor recommends increasing the frequency of safety welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

> b.  Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth on Restrictive Housing Unit ("RHU") have sinks and toilets in rooms, therefore youth have immediate access.  A common complaint among youth in rooms without toilets is that staff are very slow to respond when they indicate they need to use the restroom. Several youths independently stated that they urinate and defecate in their garbage cans.  Some youths believe that staff purposely delay their response.  Enough youth stated this that administration needs to investigate this.  There is no documentation to show whether this requirement is being met.**

> c.  Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible.  PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be modified and improved. The Monitor will work with Defendants on developing a quality assurance program.**

> d.  Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need  (a mental health code designation  of MH-1 , MH-2a, MH-2b, or ID), placements  in room confinement will be reviewed

by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Monitor requested any documentation indicating that confinement is contraindicated. The Monitor was verbally told that at least one instance (a couple of months ago) where confinement was contraindicated for one youth. There is a form "Psychology Input for Security Decision" which is where the contraindication would be documented and there is a policy (Policy 500.70.04) Again, as with all policies, a section should be created to include quality assurance and monitored by facility administrators.**

e. Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Room check sheets are kept in the staff office and not kept on each individual door thus, contemporaneous recording is impossible. Every room should have individual room check sheets in which times are not pre-printed. A section should be included for staff to describe a youth's activities while in room. The room checks in RHU are preprinted with times and only contain space for staff initials. Although the requirement in this court order is "at least every 30 minutes" the Monitor recommends that every youth should have a visual inspection at least every 15 minutes at staggered intervals. This is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model. Again, the agency should consider investing in an electronic, software-based rounds checking system to more effectively monitor and ensure that safety welfare checks are being completed as required. PSU Staff do visit youth daily.**

f. Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There appeared to be some rooms in RHU that were sterile. The Monitor could not confirm whether this was restricted as needed for safety. A youth in RHU should have property items similar to a youth in the general population. Documentation needs to be improved as to this requirement.**

> g.   Youth in room confinement shall receive:
>
> > i.   All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided however, there is a lack of documentation and quality of services is difficult to assess.**

> > ii.   Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Programming is inconsistent. There is a lack of documentation as to specific programming that occurs on a daily basis. Also, there are occasions where staffing levels do not allow for planned programming.**

> > iii.   Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services.   Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Educational Services for general population occur in the classrooms in the school area. Youth in the Targeted Intervention Program ("TIP") attend classes in the school area but separate from the general population. Youth in RHU do not receive educational services in the school area but remain on living units.  Youth who are disruptive in class are referred to the STAR room in which youth are encouraged to reflect on their behavior.  Youth fill out a STAR room log which asks what bothered them, where the incident happened, who bothered the youth, what they did, and asks the youth to identify what they need to be able to return to school successfully. Teachers told the Monitor most youth can return to class after their period of reflection. Some youth receive packets to be completed on the Unit.  Youth are often "suspended" from school. According to PbS activity logs, youth are engaged in educational activities for 2.92**

14

**hours a day at CLS and 3.33 hours per day at LHS. Youth should be engaged in educational activities as a primary program during normal school hours. This should be between 5-6 hours per school day. As reflected in the staffing section of this report, the current teacher vacancy rate of 39% (11 of 28 allocated positions) is mostly likely impacting the ability of youth to be in school for longer periods. There are approximately 12 youth who have high school diplomas or GEDs. There are classes available in welding, business class, and construction however youth do not seem to actively engage in these programs. The Monitor interviewed three graduates who indicated that they just cleaned or sat around the Unit. Staff should encourage participation and consider adding other programs that youth will participate. Educational hours need to be increased for all youth on a daily basis. The Monitor recommends that all youth regardless of status have education in the school area.**

> iv.   Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth on RHU were observed sitting in day room with no stimulation. Youth are only allowed out in groups of two in which they rotate back into room every 45 minutes. In youth interviews, youth stated they spend most of the time in their rooms and when they are out of their rooms, they can only talk with each other. No other form of entertainment or programming is offered. Recreational time is unstructured. Additionally, the PbS daily activity log reflects youth spend 5.84 hours a day at LHS and 3.29 hours a day at CLS in "other facility programs". These programs need to be defined so that we can understand what these programs are and if these hours truly represent meaningful activities and/or programs.**

> v.   Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Majority of meals take place out of the room but there are occasions where youth eat meals in their rooms when there is not an immediate and substantial threat of physical harm. Should a youth eat a meal in their room, the decision by staff needs to be justified, supported by documentation, and instances need to be reviewed by facility administrators.**

> v1.   Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.** Logs indicate that there are many instances where youth are not receiving 3 hours of "out time" per day and 30 hours per week. Documentation, data collection and reliability make it difficult for the Monitor to assess level of compliance.

> **5.    Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Youth do utilize the grievance procedure.  From October-November 2018, there were 41 "informal complaints", 99 complaints dismissed, and 19 grievances affirmed. The grievance procedure is very confusing for youth and admittedly for staff. The Monitor suggests reviewing the grievance procedure with staff and youth involvement.  The Monitor does suggest that a more robust tracking system be developed with a quality assurance piece that ensures grievances are being timely and appropriately addressed and communicated to youth.**

> 6.    Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Documentation, data collection and reliability, and quality assurance needs to be improved.**

> B.    OC-Spray and Other Chemical Agents

> 1.    OC reduction plan.  Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to implement their OC reduction plan.  There are youth still being sprayed for having their arms out of trap door, sprayed in instances where lesser means could have been used (video of several instances were watched during the site visit), and spray is being used to "prevent self-harm" when other means can be used. The OC reduction plan should involve training**

staff on a variety of de-escalation skills as well as a directive that OC should only be used in situations that present a serious life safety or threatening situation.  The expanded use of CARE Teams can greatly assist in de-escalating situations and ultimately reducing the use of OC.   Additionally, as recommended in the technical assistance report, a new incentive-based behavior management program that focuses on rewarding positive behavior should be created which will have a direct impact on youth behavior and thus, reduce the need for force of any kind. The following graph reflects the combined usage of OC at LHS and CLS in 2018.



2. Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: N/A.  Compliance will be assessed by the Monitor at the time required under this section.**

C. Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1. Prohibition on types and uses of mechanical restraints.

a. Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:   PARTIAL  COMPLIANCE.   Documentation  needs  to  be**

**improved, forms need to be modified, a quality assurance component needs to be created, and facility administrators need to monitor closely.**

b.      Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Mechanical restraints are used much less than they were previously. There needs to be a continuous effort to monitor youth who are placed in mechanical restraints and consistent documentation.**

c.      No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

1.      Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Documentation needs to be improved and a quality assurance mechanism in place.**

11.      Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Documentation needs to be improved and quality assurance mechanism in place.**

i ii.      During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used.  Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Documentation needs to be improved and quality assurance mechanism in place.**

d.      Mechanical restraints shall never be used for punishment or

discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Use of mechanical restraints has been reduced significantly. Documentation needs to be improved and quality assurance mechanism needs to be in place to fully assess compliance.**

   e.   Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.**

   f.   Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Training records indicate large majority of staff (over 90%) have training in physical force, restraints, and trained in proper de-escalation.  However, documentation needs to be improved and a quality assurance mechanism needs to be in place.**

   g.   Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living unit.  No youth shall be left alone in restraints.  Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

  2.   Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

  D.   Strip Searches. The following provisions are effective immediately upon entry of

19

the Cou1t's order incorporating this Agreement.

1. Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Although strip searches have significantly decreased, staff are doing a "hygiene" check which requires a youth to strip to underwear and bra which seems to be replacing the "strip search." This type of search should only be used for the same reasons as a strip search (probable cause of youth possessing drugs or weapons that could not be discovered through less intrusive means).**

2. Strip searches with probable cause.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

3. Process for strip searches.

   a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

   b. Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

   c. Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

   d.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

e.   Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Training records indicate that majority of staff have been trained in trauma informed care.  Documentation needs to be improved as to strip searches.**

f.   If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

4.   Documentation.  Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

E.   De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The majority of staff have been trained in the new MANDT training and other training which includes de-escalation skills training. The Monitor recommends increasing the training frequency for staff in order to increase their experience and skill levels in managing and de-escalating situations before they result in the use of restraint and/or isolation.  Although there is a use of force review process, it needs to be thorough and comprehensive and include a corrective action plan when force was used where it could have been avoided. A review of instances where de-escalation was successful should be reviewed and used as a training tool. It is important for staff to have a variety of skills that they can rely on in these types of situations and to review actual events.**

F.   Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of id le time in the facility to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Many recommendations were made in the February 2018 technical assistance report that has not been implemented. The facility needs to increase meaningful program and activity hours in order to further reduce youth idleness hours.  As mentioned previously, increasing education hours can greatly assist in reducing idleness time and provide positive youth development strategies through meaningful education and vocational programming.**

G.    Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Some of the recommendations made in the February 2018 report have been implemented (hiring bonus for instance), but other recommendations have not been implemented such as creating staff recognition and wellness programs in order to retain current staff, utilizing suggested recruiting efforts, redrafting job descriptions and job postings which highlights the youth counselor aspect of position instead of "guard" or "corrections" description, rewrite position summary, reassess current staff schedules and placement, consider using ex-employees who left in good standing as contractual or part time staff to fill in the gaps, assessing and ensuring staff are working within the proper and approved staffing ratios.**

H.    Amendments to administrative code.  Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS**:  DOC has identified sections of the administrative code that needs to be modified, but significant revisions have not yet occurred.  The Monitor has been told implementation will take some time as it requires certain Codes to be repealed and recreated. All policies refer back to the administrative code and thus modifications to the administrative code should be a priority.

II.    DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A.    Incident review process.  Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy

superintendent, and the superintendent.  Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Although reviews occur for most incidents, the reviews often occur well after the 24-hour timeframe.  Often the "reviews" do not occur until 3-4 weeks after the incident. All staff involved are not brought together for meaningful discussions.  When it has been determined lesser means could have been used, there is not a corrective action plan developed. The Monitor made suggestions to the Superintendent as to his section.**

B.      Quality assurance.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goa ls that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   (Please see the "general observations" section of this report to the court for explanation.)**

<u>**CONCLUSION**</u>

The Monitor hopes that her report is useful to the Court and the parties.   The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

Teresa Abreu
Monitor