UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J**., by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

     Plaintiffs,

v.                                                                  Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

     Defendants.

---

SECOND REPORT OF THE MONITOR

---

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The First Report of the Monitor was filed with the Court on January 13, 2019.  The Monitor's second report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates from the last site visit which took place December 6-8, 2018.

## SITE VISIT

The second site visit by the Monitor took place on March 8-11, 2019.  The Monitor reviewed materials provided by the parties prior to, during, and after the site visit.  Materials included, but were not limited to: policies, procedures, resident handbooks (including the pilot Krueger program), grievances, school schedules, recreation schedules, counselor logs, various staff memos and daily shift reports, video footage of use of force incidents, all of the monthly data submitted to the parties per this court order for the months of December through February, unit rules, work rules, employee leave data, employee corrective action reports, behavior and treatment plans, mechanical restraint documentation, incident reports, other housing documentation, and various proposals for capital projects such as paint, furniture, and electronic room monitoring systems. The Parties were present during the site visit. The Monitor took photographs, toured LHS/CLS, and interviewed youth and staff.  Approximately thirty-four (34) youth and twenty-five (25) staff

were interviewed by the parties.

The Monitor learned that in January of 2019, newly elected Governor Evers and Secretary Carr and other members of their staff toured LHS/CLS. Governor Evers and Secretary Carr spoke to youth and staff during this visit and spent time with the leadership team. Secretary Carr and Deputy Secretary Pechacek visited LHS/CLS on February 11, 2019 to tour and talk with youth and staff. Based on interviews with youth and staff, these visits had a positive impact as they were able to provide feedback as it relates to daily life at LHS/CLS and meet the new administration in person. Additionally, the Monitor met with Secretary Carr and members of his staff in Madison, Wisconsin after completion of the LHS/CLS site visit. The Monitor debriefed with Secretary Carr and he and his team expressed a commitment to improving conditions for youth and staff at LHS/CLS.

## **GENERAL OBSERVATIONS**

Physical Plant

The general areas of the facility were clean, however youth living units were not as clean as the last site visit. Unfortunately, during this site visit, LHS/CLS had more of an institutional feel as the holiday decorations that were displayed during the last visit were not replaced with other decor and there did not appear to be any changes with respect to paint color, murals, furniture, etc. as recommended in the previous Monitor report and the February 2018 technical assistance report. Much of the unit signage (youth behavior expectations) were written in a negative tone with a lot of bold "DO NOT" "NOT ALLOWED" "DO NOT ENTER!!!!". There was still a lot of graffiti and etching of glass throughout LHS/CLS. The Monitor was told that staff are working on getting the glass in the doors replaced when etching obstructs the staff's view into the room and they were working on painting over the graffiti. Defendants informed the Monitor that there was a bid for painting the interior of the cottages and that there will be a youth program to further decorate the walls with murals and artwork once the base painting project is completed. Youth rooms and bathrooms remain unchanged in terms of cleanliness. There needs to be a continued focus on youth rooms being clean and orderly and the bathrooms being cleaned more regularly and thoroughly. Overall, there was not an improvement in the overall physical plant. Furthermore, several serious incidents occurred in which youth have used furniture and other unsecured unit equipment during unit disturbances to facilitate escapes from their housing units and used debris from these disturbances as potential weapons against staff. Safety and security searches of all buildings need to be conducted to remove excessive objects, materials, equipment, furniture, etc., to enhance the safety and security of the units/buildings. Defendants should consider replacing existing furniture with furniture that is specifically designed and engineered for secure environments. The Monitor is hopeful that there will be noticeable improvement as to cleanliness, reduced graffiti, and etched glass during the next site visit.

Living Unit/School Observations

The average daily population is 145 which is the same as that of the last site visit. Some of the

cottages were combined due to population and staff shortages. The Monitor saw some staff engaging with youth, several youths were out cleaning, recreation was taking place, and telephone calls were being made. The Monitor did observe tournaments taking place and the volunteers in the Foster Grandparent's program were interacting with youth.  As recommended in the technical report, a youth advisory council has been implemented, however, the Monitor made some suggested modifications. The Monitor saw a significant amount of idle time for youth during the site visit. Recommendations were made in the February 2018 technical assistance report that should be implemented as to additional programming that would be beneficial to youth.

The boys' cottages were similar to the last visit, but the Monitor observed significant differences in the girls' cottage. All the girls were on the King unit. The girls, in general, were less jovial, less talkative, less active on their unit, were not actively engaged in programming, and seemed quite agitated.  There was a noticeable difference in the attitudes of the girls during this site visit.  During the last visit, the girls were laughing, making popcorn, interacting with staff and youth in a positive manner, and were doing artwork. There was no decoration or artwork in King during this visit. The Monitor asked staff for the room logs and staff could not find them (Monitor wanted to look at confinement documentation.)  Everything written in the unit for the youth was written in a negative tone as described above. The girls' mugshots were taped to the tables which is where each girl is assigned during out time. It was reported that the girls' school and recreation activities were more limited than they were during the last site visit.  It was reported that the girls were not allowed to use the main school or main gym as a consequence for passing notes to the boys. It would be helpful for the agency to utilize a consultant to focus on gender specific programming to enhance the programs and activities for the girls' facility.

With respect the boys' cottages, generally all the youth rooms were messy and dirty.  The Monitor reviewed the "counselor logs" which document name of staff, youth safety/welfare checks, counts, and activity on each living unit and none of the documentation complied with policy/procedure, this Court Order, and/or best practices.  In Curtis, 17 out of 24 youth were confined to their rooms (something that was, improperly, not documented as "room confinement"). Youth that were in the day room were playing cards.  There was explicit graffiti on the walls and the living unit smelled. Staff were positioned in or near the staff office on the unit and were not in the lower day room with youth. Youth on Black Elk were out eating when the Monitor toured. Staff were not observed eating or sitting with youth but were positioned in or near the staff office on the unit.  The Monitor was happy to see that all the youth were out of their rooms and the atmosphere was more relaxed than the other living units. Adams (intake unit) had a lot of graffiti on the walls. Youth rooms on Roosevelt (where the TIP program is now located) were cleaner than the other living units.  Mug shots were taped on the youth doors. Staff were eating with youth and staff were engaged with the youth. On Krueger, only two youth are allowed to be in the day room at a time which means there is significant confinement on this unit.  At the time of the site visit, Krueger was no longer the Restrictive Housing Unit ("RHU") but is operating under a new "Krueger Program" which in a number of respects does operate as restrictive housing. The Krueger program includes Phases 1-3, with youth progressing from more to less restrictive situations. Youth in the Krueger Program reported that there were a lot of limitations and that the program was not run like general population. Here again, it is highly recommended that the agency hires a consultant to help with programming and activities for the boys.

The school seemed less controlled than last visit.  Some of the windows in the classrooms had paper over the windows, which is a safety concern as staff cannot see inside the rooms. Foster Grandparents were present and engaged. Teachers reported that 50% of the youth were in special education, yet there are only three special education teachers.  The teachers seemed to enjoy their job, but they are struggling with staff shortages and wish there was more technology available. Some classrooms had youth actively engaged and others had several youths with heads down and/or sitting on top of desks and being disruptive with no redirection from teachers.   The Defendants asked for an education consultant, and the Monitor has made recommendations.

Staffing

Staffing problems continue to exist at LHS/CLS. There are 311 total positions at LHS/CLS. Approximately 155 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA")).   The Defendants have made significant progress with the number of vacancies for the Youth Counselor positions, however there are still a large number of staff on various leaves of absence (FMLA/Workers' Comp, etc.) which contributes to the staffing shortages.   Staffing challenges remain as evidenced by the number of staff working overtime/double shifts. The teacher vacancy rate remains unchanged and recruiting remains a challenge.

| Position | Vacancy Rate % as of February 20, 2018 | Vacancy Rate % as of November 28, 2018 | Vacancy Rate % as of March 14, 2019 |
|---|---|---|---|
| Youth Counselor | 48% (45 out of 94) | 22% (23 of 105) | 15% (16 out of 105) |
| Youth Counselor Adv | 45% (27 of 60) | 18% (9 of 50) | 26% (24 out of 50) |
| Teacher | 25%  (7 of 28) | 39% (11 of 28) | 39% (11 of 28) |
| Social Worker | 13% (2 of 15) | 14% (2 of 14) | 0% (14 of 14) |

The Monitor recommended combining living units in order to adequately supervise youth while still meeting legally mandated staffing requirements and ensuring the safety of youth and staff. The Defendants have combined cottages as recommended in the technical assistance report, but non-traditional scheduling or scheduling changes have not been considered. In the last report, the Monitor recommended that the facility conduct a full staffing assessment to include a relief factor analysis looking at all leave types and its impact on staffing levels. To date, this has not occurred.

The Monitor spoke to over twenty-five (25) staff and the majority said they are tired and often work double shifts several days in a row. The vast majority of staff do not feel safe and do not feel they are adequately trained and prepared with the alternatives to OC spray and reduction/elimination of confinement. The Defendants will not be able to come into substantial compliance with the Court Order without solving the staffing issues. The Monitor cannot stress enough the need to make staff wellness a major focus moving forward.  Recommendations for staff wellness were made in the February 2018 technical assistance report that should be explored further. Although there was communication with staff and youth regarding the reform effort

(written and verbal), the Monitor recommended that the message be communicated differently, which the Monitor shared during the site visit.  As recommended in the technical assistance report, staff are engaged in developing programming and policy changes. The Monitor saw that there were employees recognized as "Employees of the Month."   The Defendants should continue to create policy driven staff recognition programs, and tap into staff's talents, passions, and interests (artists, musicians, yoga etc.) to bring into programming. Staff exhaustion, fear, and discontent are hindering any positive relationship building with the youth.

The hearing officer position has been eliminated due to the restrictive housing unit ("RHU") being eliminated and replaced with a new pilot "Krueger Program." The Monitor believes that there is a need for this position particularly in light of youth interviews (in more detail below).  During this site visit, the Monitor spent time with the mental health staff (PSU) and the recreation staff and was very impressed with the level of energy, commitment and shared vision for what programming can look like at LHS/CLS.  The Monitor suggests modifying the mental health and recreational staff work schedules to include more evening and weekend hours which is when youth idleness is at the highest.  The Monitor believes this would have a huge impact on youth and staff.

<u>Quality Assurance</u>

Data collection continues to be a significant problem at LHS/CLS.   The Monitor stressed the fact that data-driven decision making is critical to the safety and quality of life of youth and staff, as well as to ascertain compliance with the Court Order. Data continues to not be accurately recorded, adequately collected or analyzed for incidents giving rise to this litigation.  Not only does there need to be additional data measures, but a plan should be developed for implementation of competent data collection with a focus on accuracy at the line staff level (*i.e.* safety/welfare check logs, incident reports, use of force incidents, all confinement, youth idleness, grievances, educational hours per youth, etc.).

The jurisdiction utilizes Performance Based Standards ("PbS") which is a program for juvenile justice agencies, facilities, and residential care providers to identify, monitor, and improve conditions and services provided to youths using national standards and outcome measures. The Monitor cannot include updated outcome measures in this report because PbS data collection cycles only occur twice a year, in April and October. When it becomes available, the Monitor will update the Court.

The Monitor recommended that the jurisdiction monitor incidents of assaults, fights, youth and staff injuries, and other critical outcomes measures on a monthly basis using the most recent PbS field averages as a guide to gauge the overall safety for staff and youth.  During the site visit, the Monitor met with the Department of Juvenile Corrections Program and Policy Chief in which the Monitor provided examples of a monthly outcomes metrics data report (separate from the PbS outcome measures) that would be beneficial to the overall safety and quality of life for youth and staff. The Monitor will update the Court on any data improvements in the next report.

To address the need for a quality assurance and improvement program, the Defendants have created two new positions (Quality Assurance Specialist and Program and Policy Analyst).  The goal will be to continuously assess not only compliance with this Court Order, but the quality and

adequacy of the social and recreational programming provided, healthcare, education, environmental health and safety, and discipline and order. The Monitor is happy to work with the individuals selected for these positions. It is clear from discussions with Secretary Carr and his staff that this will be priority hiring.

The Program and Policy team for the Division of Juvenile Corrections should work with the vendor (J-Tracker) to include other critical measures as described during the site visit. The Monitor continues to have difficulty assessing accuracy of the data because of the lack of documentation, lack of electronic systems to automatically capture data, and lack of staff available whose sole responsibility is data collection and analysis. To address the data issues, the Defendants have created two new positions, identified funding for experts as recommended by the Monitor, and an electronic room check system was tested recently (a module of a currently existing system) and is being piloted at LHS/CLS.

Policies and Procedures

Significant revisions to policy and procedure and Administrative Codes have not yet occurred. The Monitor does not have any updates as to when certain Codes will be repealed and recreated. All policies refer to the Administrative Code and thus modifications to the Administrative Code should be a priority as stated in the First Report of the Monitor.

Policies relevant to LHS/CLS need to be compliant with the federal court orders and should contain a quality assurance section for every policy. After review of updated DOC DJC policies and procedures and local procedures, quality assurance is still not part of the policies and reference to this litigation is not listed in the "references" section. Policy and procedure changes still need to be made as it relates to Security and Inspections, Mental Health Screening, Mechanical Restraints, Clinical Observations, Youth Movement and Suspension of Movement, Use of Force, Searches of Youth (not compliant with Court Order), Emergency Response Unit, and several others. The Monitor was pleased to see that the CARE team has been implemented and is being regularly utilized, however, a policy and procedure needs to be created which clearly outlines the mission of the CARE team, identify circumstances where CARE team will be deployed, describes how staff are chosen for the CARE team, and includes a quality assurance section. The Monitor suggests increasing the CARE team as it appears they are successful at deescalating situations and their hours of operation should be extended to evening and increased weekend hours when youth are not in school. Also, many of the policies continue to indicate "discuss at staff meeting." There should be formalized training with employee sign offs acknowledging receipt and understanding. Effective proficiency testing for all training classes still needs to be developed. The Monitor will continue to work with the Defendants on policy and procedure.

Youth Interviews

Plaintiffs' counsel and the Monitor conducted several youth interviews. Approximately thirty (34) youth were interviewed during the site visit (formally and informally).

Several youths were able to identify staff that they thought were caring and often interacted with them in a positive way. There were also staff identified as being consistently disrespectful, unfair,

exhibited favoritism, and provoked youth to act out. Youth stated most staff do not interact with them other than directing them. Youth reported several inconsistencies involving staff not following the grievance procedure, program rules, phone restrictions, canteen, and inconsistencies in the staff assigned to the various living units. This is not to say that there are not staff who actively engage with youth, but more staff need to engage with the youth in a productive manner.

The common complaints from youth interviewed were that they were bored and had nothing to do (not enough programming or activities) and too much time being confined (both for misbehavior and for administrative reasons, including inadequate staffing and/or lack of other activities for them to do). Youth disliked split hallway times (half of youth locked in rooms while remainder are out in day room). Youth who spent time in RHU had the same complaints as stated in the Monitor's last report. RHU was eliminated in January 2019 and replaced with the pilot "Krueger Program." Youth in the "Krueger Program" reported that they are being confined alone in their cells without due process, had no television privileges except educational programs, limited education, were not offered recreation in "Phase 1" of the program, and felt it was similar to RHU.

Youth also stated that strip searches were occurring. When interviewing youth who have been OC sprayed, they complained that they were unjustly sprayed, and the decontamination process took a long time. Youth complained of delayed response to call lights (often indicated when a youth has to use the restroom because there is no toilet in their rooms).

The Monitor found that much of what youth reported was accurate. When touring the all of the living units, youth were often confined. (even youth outside of TIP and Krueger). When reviewing confinement logs, the logs did not reflect confinement time as staff believe time spent alone in a cell for "cool offs," counts, "resets," split hall out time, and periods of positive behavior ("PPB") were not confinement time. Staff did not think that time spent alone in a cell by any youth not in Krueger for whatever reason, including for reasons related to a youth's own behavior, to the behavior of other youths, to lack of activities, or for other administrative reasons was confinement time which should be documented. The Monitor observed that when youth were out of their rooms, most were not engaged in structured programming. Most (not all) staff were not engaging with youth in a positive manner but were usually standing arms crossed and verbally directing youth to do one thing or another. With respect to the youth statements regarding staff not responding to their call lights timely or at all, this was confirmed in a survey and camera review. 10 out of 10 youth reported staff not responding timely to the lights in their room.

With respect to the youths' statements on OC usage and decontamination, the Monitor reviewed some documentation that shows the time between spray and decontamination is excessive. Also, in reviewing video of several OC spray incidents, there were lesser means available. The threat of OC Spray is made often, as documented in the daily shift reports.

The Monitor observed (and youth reported) several positive interactions between youth and staff. One youth did report that LHS is "way better than before" and was much happier. Some youth liked being in the Krueger Program and spoke positively of the staff and structure. Youth generally liked the food offered at LHS/CLS. Youth really enjoyed when staff sat with them at meals, or at the tables when the youth were conversing with friends. Youth enjoyed playing games with the staff and enjoyed the basketball and ping pong tournaments.

The Defendants have made efforts to identify and contact community partners to increase programming at LHS/CLS such as technical schools, local colleges, Boys and Girls Club, and various ministries. Hopefully, there will be continued movement on bringing in community partners. There have been be more resources identified, specifically, positions created for dedicated staff allocated to make the necessary changes needed to improve conditions for youth and staff, funding for various capital projects and national experts on a temporary basis to assist in developing systems, programs, and assist in making the necessary changes to reach substantial compliance with the Court Order. Defendants need to continue revisiting the February technical assistance report and develop a plan to implement the recommendations contained within that will improve the quality of life and conditions for youth and staff.

## COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION

Below is the Monitor's assessment of compliance with the consent decree. As previously stated, there is a challenge with adequacy of data for many areas (documentation, accuracy, consistency, and analysis) thus, some sections do not contain a detailed narrative.

    A.    Room Confinement

        1.    Punitive Confinement.

                a.  Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court 's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Although the official data shows that there was not a single youth in punitive confinement in excess of seven days during this review period, however, documentation of youth time in room confinement is inconsistent and inadequate. Given the long-standing staffing deficiencies, there is an urgent need to also explore methods for promptly reducing youth populations. This might include expediting the OJOR process and evaluating youth for placement under community supervision, including intensive community supervision, as permitted by state law. During the site visit, there was much discussion on the definition of "punitive" confinement. The Defendants believe since RHU has been replaced by the Krueger Program, that there is no administrative or punitive confinement or need for due process. The Monitor deemed many instances of confinement as punitive but because staff did not view these as punitive, there is no data available to assess compliance Also, because confinement logs are not accurately recorded, the Monitor cannot assess the pre-hearing and post-hearing time. One youth (female) reported being on PPB ("Periods of Positive Behavior") in excess of 7 days. The Monitor can say that the majority of youth are not confined in excess of seven days.**

                b.      Subject to the terms and provisions of Section V(C)(3)(g),
                      Effective seven months after entry of the Court's order incorporating

this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: N/A. It has not been seven months after entry of the Court's order on September 21, 2018). The Monitor will assess compliance at the appropriate time.**

      c.      Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: N/A: It has not been ten months after entry of the Court's order incorporating the Agreement. The Monitor will assess compliance with this section at the applicable time. However, the Monitor suggests that the parties and Monitor have a further discussion on what constitutes "punitive" confinement ahead of the established elimination timeframe because there are several types of confinement currently utilized – inside and outside the Krueger program - that the Monitor would deem "punitive." These include (but are not necessarily limited to) PPB, Resets, Cool offs as being used at LHS/CLS, "reflection," and times when youth are confined due to some youth acting up on a unit.**

      2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: N/A. It has not been six months after entry of the Court's September 21, 2018 Order. The Monitor will assess compliance at the appropriate time. If Defendants implement "administrative confinement" in the way it was during the visit, with PPB substituting for it, the Monitor believes this may violate this Agreement.**

      a.      Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12

hours) when:

1.   A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: N/A.  It has not been six months after entry of the Court's September 21, 2018 Order. The Monitor will assess compliance at the appropriate time.**

i i.   A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  N/A.  It has not been six months after entry of the Court's September 21, 2018 Order. The Monitor will assess compliance at the appropriate time**

b.   Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE.  Although it has not been six months after entry of the Court's September 21, 2018 Order, time is being tolled from 8 pm to 8 am.**

c.   Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced  plan.

**COMPLIANCE STATUS: N/A.  It has not been six months after entry of the Court's September 21, 2018 Order.  The Monitor will assess compliance at the appropriate time.**

d.   The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: N/A.  It has not been six months after entry of the Court's September 21, 2018 Order. The Monitor will assess compliance at the appropriate time.**

3.   Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended pol icy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  DJC Clinical Observation policy 500.70.24 was updated on 9/19/18 and dates were corrected. Training on policy changes has not occurred to date although the Monitor has been told it has been discussed in roll call. The Monitor saw meeting notes reflecting the change. The Monitor suggests a more formal**

training and staff sign off reflecting they read and understand policy. Additionally, a quality assurance mechanism needs to be created.

4. **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a. Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: Non-Compliance. The Monitor would not deem any room in any facility as being "suicide resistant," however there are safety and security measures that can be put into place to reduce the risk of suicides. With respect to youth rooms, there is no change from the last site visit. Most youth rooms were not clean and organized. Several rooms had multiple blankets/sheets covering large areas of the room making it difficult for staff to assess whether there is contraband that can be harmful to youth inside the rooms or assessing youth activity while in bed. Most rooms had graffiti and etching on the glass which makes it difficult for staff to clearly see the youth through the window. There are beds and screening in some rooms that create increased suicide risk. The Monitor has been told and shown that quotes have been received to replace the furniture in rooms and other modifications.**

**Room checks are not well documented and not being done on an individual basis. The Monitor personally observed that room check forms continue to be kept in the staff office. Safety/welfare documentation show that room checks are not being completed in staggered intervals and some were completed more than 30 minutes apart. The Monitor also observed staff fill in the logs well after the fact and not contemporaneous with the room check. The Monitor recognizes that an electronic system is being explored by the agency, but this will take some time. Safety/welfare checks need to be a priority and the Monitor hoped that the recommendations made would have been implemented by the time this second site visit occurred. While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

b. Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. A common complaint among youth in rooms without toilets (dry rooms) is that staff are very slow to respond when they indicate**

they need to use the restroom. Administration investigated this complaint and it was proven that this is in fact occurring frequently.  There is no documentation created to show whether this requirement is being met or not. Defendants need to create a form, policy, and quality assurance measures as to this section and others.  Administration needs to continue to investigate and hold staff accountable until the problem is fixed.  Staff need to be held accountable should an investigation reveal the delay is purposeful.

    c.  Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible.  PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved but still needs more improvement.  Time of call to PSU staff is now being documented on the incident report. This requirement should be included in the development of a quality assurance program.**

    d.  Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1 , MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Monitor requested any documentation indicating that confinement is contraindicated and there were no instances documented. There is a form "Psychology Input for Security Decision" which is where the contraindication would be documented and there is a policy (Policy 500.70.04) Again, as with all policies, a section should be created to include quality assurance and monitored by facility administrators.**

    e.  Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose.  Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in

room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  The Monitor's recommendations remain the same as the last report to the Court. Safety/welfare checks continue to be kept in the staff office and not kept on each individual door thus, contemporaneous recording is impossible.  Every room should have individual room check sheets in which times are not pre-printed or pre-written.  A section should be included for staff to describe a youth's activities while in room. Although RHU no longer existed at the time of the site visit, it did exist during this reporting period. The room checks in RHU are preprinted with times and only contain space for staff initials.  Review of staff discipline showed that staff were not disciplined for failure to complete these checks/falsifying. Although the requirement in this Court Order is "at least every 30 minutes" the Monitor recommends that every youth should have a visual inspection at least every 15 minutes at staggered intervals. This is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model. The agency should make an electronic, software-based rounds checking system a priority.  PSU staff do visit youth daily when on site.**

    f.       Any youth in room confinement shall have property items similar to or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth.  A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Some rooms contained more property than outlined in handbooks.  Some rooms had less property in their rooms (RHU, Targeted Intervention Unit ("TIP") and Krueger Unit). Because staff do not consider "PPB," "resets," "reflection," "cool offs," or on occasions where they confine youth to their rooms if/there is a situation on the living unit involving a couple/few youth, etc. as confinement, the Monitor could not confirm whether this was restricted as needed for safety. Documentation needs to be improved as to this requirement and confinement needs to be recorded.**

    g.       Youth in room confinement shall receive:

         1.       All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided, however there is a lack of**

documentation and quality of services is difficult to assess.

> 11.  Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Programming is inconsistent. There is a lack of documentation as to specific programming that occurs daily. There does not seem to be programming when youth are on PPB or, according to the Krueger handbook, in Phase 1 of the program. Also, there are occasions where staffing levels do not allow for planned programming. In addition to the concerns about formal rehabilitative programming, there is also a significant lack of other activities for youth to engage in, resulting in excessive amounts of idle time and excessive hours of room confinement. This occurs especially, but not only, on weekends).**

> 111.  Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services.   Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Educational Services for general population occur in the classrooms in the school area. Youth in the Targeted Intervention Program ("TIP") attend classes in the school area but separate from the general population. Youth in RHU/Krueger do not receive educational services in the school area (except for youth on Phase 3) but remain on living units.  RHU "secure treatment unit out time record" reflect less times spent in education than do the PbS activity logs, although it is unclear how accurate the RHU (Krueger) records are. Secure treatment unit out time records raise significant concerns as to what, if any education the youth in Krueger are receiving.  A review of the logs in February show many days where no education is listed or only shows one period of education.  The youth receive packets to be completed on the Unit.  Youth continue to be "suspended" from school. PbS data is not available for this reporting period, however, it does not appear that youth are engaged in educational activities for more time than during the last visit. Youth stated in interviews that they often do not attend classes or participate in educational services. Youth should be engaged in educational activities (regardless of unit) as a primary program during normal school hours. This should be between 5-6 hours per school day. As reflected in the staffing section of this report, the current teacher vacancy rate remains at 39% (11 of 28 allocated positions) is mostly likely impacting the ability of youth to be in school for longer periods.  There are classes available in welding, business class, and construction, however youth do not seem to actively engage**

in these programs. Moreover, youth who have graduated are reportedly not allowed to participate in these programs at all.  Staff should encourage participation and consider adding other programs that youth will participate in. Educational hours need to be increased for all youth on a daily basis.  The Monitor recommends that all youth regardless of status have education in the school area or, at a minimum, off their living unit. The Monitor also recommends culturally relevant programming/materials be offered. The Monitor has also connected the agency with an education consultant who can be used to assist in enhancing the education program.

iv.       Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth are only allowed out in groups of two in which they rotate back into room every 45 minutes in the new Krueger program and former RHU according to staff.  In youth interviews, youth stated that they spend most of the time in their rooms and when they are out of their rooms, they do not really do anything. There is not any real programming in Phase 1 of the Krueger Program and not a lot in Phase 2. There is limited out time, limited phone calls, no or little television, youth cannot move without permission and have assigned seats, and the limited amount of recreational time is unstructured.  Phase 3 has a little more sensory stimulation. The Monitor recognizes that the Krueger program is in pilot form, and will further assess at the next site visit, but the Monitor recommends that the leadership re-evaluate the program to ensure compliance with the Court Order and technical assistance report.  Enhancing programs and meaningful activities for the Krueger program should have a positive impact and allow for youth to be out of their rooms for significantly longer periods of time than is now being achieved.

v.        Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Majority of meals take place out of the room but there are occasions where youth eat meals in their rooms when there is not an immediate and substantial threat of physical harm.  The Monitor witnessed some youth eating in their rooms and have seen this documented in shift reports. Should a youth eat a meal in their room, the decision by staff needs to be justified, supported by documentation, and instances need to be reviewed by facility administrators.

v1.       Minimum "out time" from the cell of at least 30 hours per

week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Logs indicate that there are many instances where youth are not receiving 3 hours of "out time" per day or 30 hours per week. This is particularly true on weekends and on other days when there is no school, and for youth in Krueger Phase I or PPB. However, actual non-compliance may be more extensive due to the failure to document many forms of room confinement throughout the facility and the lack of consistent contemporaneous documentation. Documentation, data collection and reliability make it difficult for the Monitor to assess level of compliance, and the failure to improve data collection may result in a future finding of non-compliance.**

5. **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Many youths utilize the grievance procedures. However, youth still feel the process is confusing and some reported that staff were not following the grievance procedure as required by policy.  It is not clear whether youth are being told that they can grieve their placements in room confinement at all (or within 15 minutes of placement). Moreover, because staff are not considering PPB, resets, reflection, and many other forms of room confinement as confinement, the Monitor does not believe this requirement is being met in such situations (*i.e.* staff is not providing the required notice because they do not believe they have to do so). The Monitor does suggest that a more robust tracking system be developed with a quality assurance piece that ensures grievances are being timely and appropriately addressed and communicated to youth. The Monitor described and showed examples of quality assurance measures to create. The Court Order requires documentation of all forms of room confinement which is not being done. Documentation needs to be implemented and consistently applied to all situations, other than sleeping hours, in which youth are confined alone in their rooms, regardless of what unit they are in or the reason for the confinement. The failure to do so may result in a future finding of non-compliance.**

6. Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Documentation, data collection**

and reliability, and quality assurance needs to be improved.

B.    OC-Spray and Other Chemical Agents

1.    OC reduction plan.  Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to implement their OC reduction plan.  On 2/1/19 Defendants moved into the second phase of OC removal from posts. Currently one person on each unit is carrying OC (the patrols/responders, and the supervisors) There are youth still being sprayed in instances where lesser means could have been used (video of several instances were viewed during the site visit), and spray is being used to "prevent self-harm" when other means could have been used. The OC reduction plan should involve training staff on a variety of de-escalation skills as well as a directive that OC should only be used in situations that present a serious life safety or threatening situation.  The expanded use of CARE Teams can greatly assist in de-escalating situations and ultimately reducing the use of OC.  Additionally, as recommended in the technical assistance report, a new incentive-based behavior management program that focuses on rewarding positive behavior should be created which will have a direct impact on youth behavior and thus, reduce the need for force of any kind.  There has been a significant decrease in the use of OC spray over the last three months (eighteen (18) incidents from December through February compared to forty (46) incidents the prior three months). There remains a need to focus on staff de-escalation training and skills development as well as a need to improve the overall atmosphere and culture of the environment in order to reduce incidents of violence.  Merely reducing or modifying the intervention protocols for these types of incidents is not a sufficient response.**

**The below graph reflects the combined usage of OC at LHS and CLS in 2018/2019.**



LHS/CLS 2018 Combined Chemical Restraint Use

2. Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: N/A.  Compliance will be assessed by the Monitor at the time required under this section.**

C.  Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1.  Prohibition on types and uses of mechanical restraints.

a.  Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.  The Monitor did not personally see any youth in mechanical restraints during site visits, but logs show there are occasions where youth are placed in mechanical restraints and there was one instance of a youth in the belt restraint. Although documentation needs to be improved, there seems to have been considerable improvement made in this area. With better documentation, and quality assurance measure, Defendants may be close to achieving substantial compliance with this provision.**

b.  Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Mechanical restraints are rarely used. There needs to be a continuous effort to monitor youth who are placed in mechanical restraints and consistent documentation. It is difficult to measure compliance based on lack of documentation.**

c.  No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

1.  Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Documentation needs to be**

improved and a quality assurance mechanism in place.

> 11. Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Documentation needs to be improved and quality assurance mechanism in place.**

> i ii. During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used.  Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Documentation needs to be improved and quality assurance mechanism in place.**

> d. Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Use of mechanical restraints has been reduced significantly. Documentation needs to be improved and quality assurance mechanism needs to be in place.**

> e. Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved and quality assurance mechanism needs to be in place.**

> f. Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Training records indicate that the large majority of staff have received training in physical force, restraints, and trained in proper de-escalation.  However, de-escalation training needs to be completed more often (regular, informal, refreshers) so that staff can continue to develop this skill.  Proper de-**

escalation cannot be trained only once a year.  The Monitor suggested having staff who are very good at de-escalation work with staff who could use a refresher or with new staff. During the site visit, there was a unit that was out of control and when the Monitor talked with staff, they all had been at LHS/CLS for a year or less.  Documentation needs to be improved and a quality assurance mechanism needs to be in place.

> g.   Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit.  No youth shall be left alone in restraints.   Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

> 2.   Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

> D.   Strip Searches. The following provisions are effective immediately upon entry of the Cou1t's order incorporating this Agreement.

> 1.   Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: NON-COMPLIANCE/PARTIAL COMPLIANCE. The Monitor reported in her last report that strip searches significantly decreased. However, strip searches without probable cause were reinstituted in January 2019, including strip searching all youth at intake.  On March 15, 2019, a memo was issued to staff to discontinue strip searches without probable cause.  Staff are doing a "hygiene" check which requires a youth to strip to underwear and bra which seems to be replacing the "strip search." This type of search should only be used for the same reasons as a strip search when utilized for this purpose (probable cause of youth possessing drugs or weapons that could not be discovered through less intrusive means). As previously stated, the policy for searches need to be**

amended to reflect the language in this section.

2.    Strip searches with probable cause.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. It does not appear that less intrusive searches are attempted before a strip search is conducted. Staff are not conducting pat down searches.  This was confirmed with leadership at LHS/CLS. Additionally, hygiene checks go beyond tank top or other clothes (youth are stripped to underwear and/or bras.) Documentation needs to be improved.**

3.    Process for strip searches.

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved as to how staff are ensuring that unintended individuals cannot view the search (detail the area where search is occurring, state that there are no recording devices, and document who is present in the area, etc.)**

b.    Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved detailing the area where search is conducted and how other youth cannot view the youth being strip searched.**

c.    Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

d.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved as to which staff conducted the search, that the search is by staff who is of the same gender identity as the youth if the strip search is being conducted by someone other than a medical professional.**

e.    Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Training records indicate that majority of staff have been trained in trauma informed care.  Documentation needs to be improved as to strip searches.**

> f.   If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor is told by direct care staff and mental staff that mental health is consulted. Documentation needs to be improved.**

> 4.   Documentation.  Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS:   PARTIAL   COMPLIANCE.   Documentation   needs   to   be improved.**

> E.   De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Most staff have been trained in the new MANDT training and other training which includes de-escalation skills training. The Monitor recommends increasing the training frequency for staff to increase their experience and skill levels in managing and de-escalating situations before they result in the use of restraint and/or isolation.  Although there is a use of force review process, it needs to be thorough and comprehensive, include a corrective action plan when force was used where it could have been avoided, and timelier than they are being done. The Monitor recommended in instances where de-escalation was successful, they should be used as a training tool.**

> F.   Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of id le time in the facility to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Many recommendations were made in the February 2018 technical assistance report that have not been implemented. Counselors, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating   and   leading   programming   for   youth.     Several   staff   had   suggestions   for**

**programming such as art therapy, dog therapy, increased tournaments, job readiness skills, music, balance and restorative justice, and teen court. Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. As mentioned previously, increasing education hours can greatly assist in reducing idleness time and provide positive youth development strategies through meaningful education and vocational programming. Recreation and exercise schedules are every other day according to staff and appear to be inconsistent and often limited.  Extended recreation should be considered. The volunteer coordinator has contacted several potential community partners however, the Monitor is unaware if this was successful and hopefully, continued efforts are made.  The Defendants have identified funding to pay for a consultant that can assist with developing gender and culturally appropriate programming. The Monitor is working on gathering potential experts for Defendants to consider.**

G.     Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Some of the recommendations made in the February 2018 report have been implemented such as hiring bonuses and staff recognition.  There has been a huge reduction in vacancy rates for direct care staff.  There still are staffing challenges due various employee leaves. Other recommendations have not been implemented such as developing wellness programs in order to retain current staff, utilizing suggested recruiting efforts, redrafting job descriptions and job postings which highlights the youth counselor aspect of position instead of "guard" or "corrections" description, rewrite position summary, reassess current staff schedules and placement, part-time staff to fill in the gaps and/or outside security firms to supplement existing staff,  or assessing and ensuring staff are not working too much overtime. Given the long-standing staffing deficiencies, there is an urgent need to also explore methods for promptly reducing youth populations. This might include expediting the OJOR process and evaluating youth for placement under community supervision, including intensive community supervision, as permitted by state law.**

H.     Amendments to administrative code.  Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS:  DOC has identified sections of the Administrative Code that need to be modified, but significant revisions have not yet occurred.  The Monitor has been told implementation will take some time as it requires certain Codes to be repealed and recreated. All policies refer to the Administrative Code and thus modifications to the**

Administrative Code should be a priority.  Interim policies should be considered.

II.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A.   Incident review process.   Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent.  Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Although reviews occur for most incidents, the reviews often occur well after the 24-hour timeframe.  Often, the reviews do not occur until 3-4 weeks after the incident. Staff involved are not brought together for meaningful discussions.  When it has been determined lesser means could have been used, there is not a corrective action plan developed. The Monitor made suggestions to the Superintendent as to this section during the site visit utilizing specific incidents occurring during the reporting period.**

B.   Quality assurance.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goa ls that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   (Please see the "general observations" section of this report for explanation.)**

## CONCLUSION

The Defendants have made improvements with reducing mechanical restraints, reducing OC usage, decreasing vacancy rates for direct care staff, creating new positions to help with data collection and quality assurance, identifying funding for various outside experts and funding for physical plant improvements.  Continued efforts need to be made and the Monitor is hopeful that improvements as identified in this report will be evident during the next site visit. The Monitor is

happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

Teresa Abreu
Monitor