UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J**., by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                               Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

THIRD REPORT OF THE MONITOR

---

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Second Report of the Monitor was filed with the Court on April 17, 2019.  The Monitor's third report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates from the second site visit which took place March 8-11, 2019.

## SITE VISIT

The third site visit by the Monitor took place on May 31 through June 2, 2019.  The Monitor reviewed materials provided by the parties prior to, during, and after the site visit.  Materials included, but were not limited to: updated Krueger program handbook, grievances, school schedules, recreation schedules, counselor logs, staff memos, daily shift reports, video footage of use of force incidents, all of the monthly data submitted to the parties per this court order, unit rules, work rules, employee leave data, employee corrective action reports, behavior and treatment plans, mechanical restraint documentation, incident reports, other housing documentation, self-assessment report, facility enhancement report, and various meeting minutes. The Parties were present during the site visit. The Monitor took photographs, toured LHS/CLS, and interviewed youth and staff.  Approximately forty-five (45) youth and thirty (30) staff were interviewed formally and informally by the parties during this site visit.

## **GENERAL OBSERVATIONS**

Physical Plant

There were significant improvements made throughout LHS/CLS.  The general areas of the facility and living units were much cleaner than the last visit. Staff put together Spring cleaning contests with rewards for youth.  The feedback has been positive from youth and staff.  Many of the recommendations made in previous Monitor reports and the February 2018 technical assistance report have been implemented (described in more detail throughout this report).  Youth behavior expectations were written in a positive tone versus the negative tone observed during the last two site visits.  There was less graffiti and etched glass throughout the facility overall and sanding and painting have been done in several areas.  Defendants need to continue to monitor and cover/replace graffiti and etched glass as there are still areas with significant graffiti/etched glass (Black Elk and TIP units).

During the last site visit, the Defendants informed the Monitor that there was a bid for painting the interior of the cottages and that there would be a youth art program to further decorate the walls with murals and artwork once the base painting project is completed.  It is evident that the painting and decorating projects have begun and the Monitor has been told the work will continue throughout LHS/CLS facilities.  Renovations have been completed on one of the girls' units, although they had not yet moved into the building at the time of the site visit.  The renovations are very impressive and will aid in reducing the "prison" like feel and should have a positive impact on the overall atmosphere once renovations are completed and the girls move into the cottage.  There have been art supplies purchased for youth to use on the living units.

In general, youth rooms and bathrooms remain messy and dirty.  There needs to be a continued focus on youth rooms being clean and orderly and the bathrooms being cleaned more regularly and thoroughly.  Several maintenance issues were observed throughout the facility which needed attention such as bathroom leaks and faucets and toilets not working, etc. The Monitor recommended including incentives around the room/bathroom cleanliness in the new behavioral management system that is being developed. In the last report, the Monitor noted that there were several serious incidents in which youth used furniture and other unsecured unit equipment to facilitate escapes from their housing units and used debris from these disturbances as potential weapons against staff.  Defendants have made efforts to remove and/or secure items that have been used by youth in disturbances and built barriers around areas containing these objects in order to create a safer environment. The Monitor recommended that searches of all buildings need to be conducted to remove excessive objects, materials, equipment, furniture, etc., to enhance the safety and security of the units/buildings and to maintain a more orderly and safe environment.  There was clear evidence that this is being completed on a more regular and thorough basis.  The Monitor recommended that Defendants should consider replacing existing furniture with furniture that is specifically designed and engineered for secure environments and the secure furniture has been piloted in a living unit.  The Monitor also noted that one or more living units had security bars on the exterior windows to prevent such disturbance and reduce the likelihood of a disturbance or escape.  It might be worth placing similar preventive measures on other units to deter such behavior.  Defendants should be commended for vastly improving the overall atmosphere at

2

LHS/CLS.

School/Living Units Observations

The Monitor visited each cottage twice during this site visit with the exception of Krueger and TIP (Monitor visited these units three times) and toured the school on Friday when school was in session.  Below, are the Monitor's observations:

The Monitor saw the majority of staff engaging with youth. Specifically, teachers engaged with youth in the classrooms. Several youths were working diligently cleaning the school area and living units. Youth attitudes overall were much improved during this site visit.  The school had positive messages throughout, artwork displayed, names of youth on the honor roll were displayed, windows in classrooms were no longer covered so there was a clear unobstructed view which increases safety for staff and youth, youth were engaged in the classrooms, and the school was very clean.  The Monitor observed a psychologist having a session with a youth outside of the school sitting at a table. The Monitor observed flag football tournaments taking place and there were volunteers in the Foster Grandparent's program present.  The Monitor recommended that the Defendants hire an education expert to complete an assessment of the educational programming at LHS/CLS. The Defendants retained the expert who completed the assessment prior to the Monitor's visit.  The Defendants will share the assessment with the Monitor upon completion. The teachers seemed to enjoy their job, but they are struggling with staff shortages and wish there was more technology available.  There were 8 teachers absent from work on Friday.

All the girls were on the King unit.  The other girls' cottage (Wells) was being renovated.  The Monitor was happy to see that there was an improvement in the overall atmosphere of the girls' unit and improvement of youth attitudes. Staff were engaged with the youth during free time, the unit was clean, furniture had been reupholstered (youth helped), and staff were eating with youth at the tables.  The Monitor asked staff for the safety/welfare check forms and there was a vast improvement of documentation.  Everything written in the unit for the youth was written in a positive tone and the girls' mugshots were no longer taped to the tables.  Youth rooms were still very messy.  The girls are not allowed out at the same time (high hall and low hall) and the Monitor observed five youth confined.  The Monitor continues to recommend that all youth should be out at the same time engaged in programming.  Staffing ratios as observed by the Monitor would support this. The Agency needs to focus on gender specific programming to enhance the programs and activities for the girls' facility.

The girls will move to Wells upon completion of the renovation project.  The new Wells cottage should be the cottage that all cottages should be modeled after.  It was recommended that the institutional paint be replaced with colorful paint.  The paint color on Wells is a beautiful blue and green, the décor is beautiful and soothing, the furniture is comfortable, there are motivational sayings on the wall, and the shower curtains are bright and colorful.  There is a sensory room for the girls to relax in.  There is chalkboard paint in the youth rooms to encourage artwork and writing (reduce graffiti).  There is a "model" room with furniture that is specifically designed and engineered for secure environments (bed, desk, shelf, and chair).  The Monitor believes this model room will enhance the safety and well-being of youth.  The Monitor believes that the renovations to this cottage will enhance the quality of life for youth and staff as well improve the overall

atmosphere. The Monitor looks forward to the expansion of these rooms throughout LHS and CLS.

With respect the boys' cottages, generally, all the youth rooms were messy and dirty. The Monitor reviewed the safety/wellness documentation and it has greatly improved from the last visit. The Monitor worked with the Defendants on creating an individualized form to be used for safety/wellness checks as opposed to using one form to document all youth that was kept in the staff offices. During the last site visit, none of the documentation complied with policy and procedure. During this site visit, the Monitor observed staff doing the safety/wellness checks and the Monitor only found one entry that was not compliant with policy and procedure. Staff are doing a much better job at doing the safety/welfare observations and documenting. The Monitor made further recommendations to the forms that will make it easier for staff to complete. In previous reports, the Monitor commented on staff placement on the unit. During this site visit, staff were placed near the youth and were much more interactive with the youth. This is a vast improvement from previous visits.

In Krueger, the unit was clean, there was more artwork on the walls, mugshot pictures were removed, and youth (Levels 1 and 2) were engaged in the classrooms on the unit on Friday. Youth rooms were cleaner on Krueger than on other units. The Monitor observed two youth in their rooms but was told the youth were in the rooms at the youths' request. Staff were appropriately engaging with youth.

In Addams, the living unit was clean, there was a beautiful mural on the wall, the graffiti was removed, and all the glass on the doors were replaced. There were some clean youth rooms on this unit. There were five youth confined, some youth were outside, and some youth were in the day room. Safety/Welfare checks were complete. Staff were appropriately engaging with youth.

In Black Elk, the unit was clean, but the hallways and rooms were not. There is a lot of graffiti on this unit. One room had a sheet up over the bed preventing staff from observing the youth, two youth were doing each other's hair (in violation of policy), and the other youth were in the day area. The bathroom floor was very wet. Safety/Welfare checks were completed but were not staggered.

 In Curtis, the unit was clean. Five youths were in their rooms (significantly less than the last site visit). Youth were very chatty on both days. Youth seemed happy. Safety/welfare checks were complete. Youth were out in living area during free time and eating at meal time. Staff were appropriately engaging with youth.

The Miller unit was generally clean but the rooms on this unit were extremely dirty. It is evident that youth have not cleaned their rooms (if at all) in several days. The youth were at the gym when the Monitor visited on the first day. Youth were in the day areas on the second day making phone calls and watching television. Staff were appropriately engaging with youth.

In Dubois, youth were just coming back from outdoor recreation. The Unit was clean and orderly. Youth were very chatty and spoke quite positively about staff. Youth rooms were messy. Safety/welfare checks were complete. Staff were appropriately engaging with youth.

In Roosevelt (TIP unit), there were 4 rooms with so much etching on glass that you could not see into the room at all. The Monitor notified the Superintendent that the youth should be moved to different rooms until this can be fixed.  This unit was by far the cleanest unit. The floors sparkled. Youth were out eating and relaxing in the day room.  Staff were appropriately engaging with youth. The Monitor recommended this cottage be shut down and TIP relocated because this unit has the doors with small windows with a food tray slot. Recently, (after the site visit) the Monitor was shown sample windows (larger) that will make observations easier for staff until administration decides whether to keep youth in Roosevelt.  It will be a better atmosphere in the other cottages. This was the only unit that had balls as chairs inside the youth rooms. Although there have been improvements in activities for the boys, idle time is still high.  It is highly recommended that the agency hires a consultant to help with programming and activities for the boys.

In fact, the Monitor was very impressed with the number of positive comments and attitudes shared from both the staff and youth perspectives.  Administration, staff and youth should be commended. During this site visit, LHS/CLS had less of an institutional feel and the overall atmosphere has vastly improved.  The Monitor saw more positive interactions between staff and youth.  The grass was replaced with new sod and there was new landscaping. The Monitor observed several youths riding their bikes around campus, which was something the Monitor had never seen before at any facility.  This was a very positive activity to initiate.

<u>Staffing</u>

Direct care staffing vacancy percentage has slightly improved from the last site visit, however, staffing issues continue to exist at LHS/CLS. There are 311 total positions at LHS/CLS. Approximately 155 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA")).   There are still a large number of staff on various leaves of absence (FMLA/Workers' Comp, etc.) which contributes to the staffing shortages and mandated overtime. The teacher vacancy rate remains unchanged – and very high - and recruiting remains a challenge. This is directly impacted education for youth. The Monitor looks forward to the educational expert's assessment/report.

| Position | Vacancy Rate % as of November 28, 2018 2018 | Vacancy Rate % as of March 14, 2019 | Vacancy Rate % as of May 31, 2019 |
|---|---|---|---|
| Youth Counselor | 22% (23 of 105) | 15% (16 out of 105) | 11.5% (12 out of 105) |
| Youth Counselor Adv | 18% (9 of 50) | 48% (24 out of 50) | 50% (25 of 50) |
| Teacher | 39% (11 of 28) | 39% (11 of 28) | 43% (12 of 28) |
| Social Worker | 14% (2 of 14) | 0% (14 of 14) | 0% (14 of 14) |

In order to address staffing challenged at LHS/CLS, effective April 28, 2019, security personnel began receiving a $5.00/hour add-on for worked  hours. Eligible employees are in the classifications of  Correctional  Officer,  Correctional  Sergeant,  Youth  Counselor  and  Youth

Counselor Advanced. The effectiveness of this increase on recruiting and retention cannot be assessed at this time, but it seems that this could have had an impact on existing LHS/CLS staff's morale.

The Monitor believes non-traditional scheduling should still be considered.  In the last report, the Monitor recommended that the facility conduct a full staffing assessment to include a relief factor analysis looking at all leave types and its impact on staffing levels. Defendants should also review the staffing composition per shift/per cottage as there are a lot of new staff working together which poses additional challenges.

The Monitor spoke to over thirty staff and the majority of staff seem energetic and stated they are less tired and are working less double shifts than previously reported.  The vast majority of staff want more training on alternatives to OC spray and reduction/elimination of confinement. The majority of staff also expressed the desire to have more programming for youth. Staff said they enjoy interacting with youth and are accepting of the changes that are taking place.  Most staff did not have a fear that the elimination of OC Spray was coming but want more training and want alternatives to OC spray.  Staff are showing much more attention to building relationships with youth and in engaging youth in a positive manner.

The Defendants have implemented many of the recommendations for staff wellness. The Monitor continues to stress the need to make staff wellness a major focus moving forward.  There has been improved communication with staff and youth regarding the reform effort (written and verbal). As recommended in the technical assistance report, staff are engaged in developing programming and policy changes and are actively participating in youth and family council meetings. The Monitor saw that there were employees recognized as "Employees of the Month" and there was an ice cream social for staff during the site visit.  There were reminders for staff to stay hydrated with bottles of water offered. Krueger Living Unit Program was a finalist in the SALUTE awards Team category. Each of the 17 members who are most consistently part of staffing the Krueger Unit received certificates and coffee mugs for being nominated. There is correctional officer appreciation calendar and Teachers Appreciation Month.  The Defendants should continue to create policy driven staff recognition programs, and tap into staff's talents, passions, and interests (artists, musicians, yoga etc.) to bring into programming.

As part of the agency and facility commitment to improving conditions for both staff and youth, they are engaging in the Youth in Custody Practice Model (YICPM), which will be explained in greater detail under the next section.  As part of the YICPM, the agency will be using their "subject matter expert" (SME) technical assistance days to focus on programing enhancement and staff wellness.  The SME TA should have a positive impact on both if these focus areas.

The Monitor continues to suggest modifying the mental health and recreational staff work schedules to include more evening and weekend hours which is when youth idleness is at the highest.  The Monitor believes this would have a huge impact on youth and staff.

<u>Quality Assurance</u>

Data continues to be a significant problem at LHS/CLS.   The Monitor continues to stress the fact that data-driven decision making is critical to the safety and quality of life of youth and staff, as

well as to ascertain compliance with the Court Order. Data continues to not be accurately recorded, adequately collected or analyzed for incidents subject to the court order in this case. Not only do there need to be additional data measures, but a plan must be developed for implementation of competent data collection with a focus on accuracy at the line staff level (*i.e.* safety/welfare check logs, incident reports, use of force incidents, all confinement, youth idleness, grievances, educational hours per youth, etc.).

As mentioned previously in this report, the agency and facility have begun working with a team of experts in the Youth in Custody Practice Model (YICPM) Cohort Three. Informed by research on "what works" in serving youth in custody, as well as professional standards and the field's preeminent thinking on best practices, the YICPM initiative is designed to assist state and county juvenile justice agencies and facility providers to implement a comprehensive and effective service delivery approach. Utilizing the YICPM monograph as a roadmap, the Council of Juvenile Correctional Administrators (CJCA), the Center for Juvenile Justice Reform at Georgetown University's McCourt School of Public Policy (CJJR), and a team of consultants will provide participating sites with 18 months of training and technical assistance (TTA) to align core, research-based principles with everyday practice, and achieve more positive outcomes for youth, families, staff and communities.

The Youth in Custody Practice Model offers agencies and facilities guidance on essential practices in four key areas:
1. Case planning;
2. Facility-based services (e.g., education, behavioral health, behavior management, rehabilitative programming);
3. Transition/reentry; and
4. Community-based services.

The enumerated practices stem from the view that services and approaches for system-involved youth and their families should be: research-based; developmentally appropriate; family-centered; individually focused and predicated on validated assessments; strength-based; trauma-informed; data-informed and outcome-driven; culturally responsive; and coordinated. Ultimately, the goals of the YICPM initiative are to (1) promote safe, fair and healthy environments for youth, staff and families; (2) prepare, equip, empower and support staff to provide effective services; (3) increase positive youth and family experiences and outcomes; and (4) enhance community safety. Anticipated outcomes from the effort are listed in the section below, titled "Goals, Expected Outcomes and Evaluation."

The Monitor feels that this is a positive step and that participation in the YICPM will be extremely useful in aligning the core principles of the practice model as they relate to the areas of focus under the Monitor's review.

The jurisdiction also utilizes the Performance Based Standards ("PbS") which is a program for juvenile justice agencies, facilities, and residential care providers to identify, monitor, and improve conditions and services provided to youths using national standards and outcome measures. PbS is a holistic management tool. PbS standards address facility safety, security, order, programming and fairness as well as services provided to respond to youths' needs for physical health, behavioral

health, substance use, education, vocational education, reentry planning and connection to family and community. Performance achieving the standards is measured by both quantitative and qualitative data from administrative forms, youth records, incident reports, climate surveys of youths, staff and families and exit interviews of youths (only those leaving long-term correction facilities.) PbS trains and supports participants to collect the data, analyze the results and use them to change practices using a structured and measurable improvement planning process.

During the site visit, the Monitor spent considerable time going through the PbS April data collection report to review how the data measures can be used in making critical decisions as well as how it can be utilized for the creation of the quality assurance program. The Monitor also reviewed the report functions which will be very useful for management. The Monitor recommended that the jurisdiction monitor incidents of assaults, fights, youth and staff injuries, and other critical outcomes measures on a monthly basis using the most recent PbS field averages as a guide to gauge the overall safety for staff and youth. As a note, PbS data collection cycles occur twice annually, in April and October, however, there are ways to monitor the critical outcome measures on a monthly basis, possibly using J Tracker or another monthly metrics report which this Monitor could assist in setting up.

When looking at the PbS facility performance profiles for April 2019, we see some progress being made but improvement is needed in regard to the critical outcome measures, primarily those that relate to safety, order, security and programming. For example, Critical Outcome Performance Same/Better than the field average scores are rated at 54.55% for CLS and 51.25% at LHS. Critical Outcome Performance Better than Last Data Collection Profile Scores are 48.48% for CLS and 63.64% for LHS. What this data indicates is a need for continued focus and monitoring on critical outcome measures in order to reduce incidents effecting these outcome measures. The facility should conduct a thorough review of the April PbS data and incident reports in order to better understand the nature of these incidents, as well as any specific information around the times of day, day of week, staff involved, etc., that may provide better insight on the driving causes around the incidents and help identify strategic corrective action plans or development of the PbS Facility Improvement Plan (FIP).

To address the need for a quality assurance and improvement program, the Defendants have created two new positions (Quality Assurance Specialist and Program and Policy Analyst). The goal will be to continuously assess not only compliance with this Court Order, but the quality and adequacy of the social and recreational programming provided, healthcare, education, environmental health and safety, and discipline and order. The Monitor is happy to work with the individuals selected for these positions and already has worked with one of the individuals selected. The second individual was hired after the third site visit thus, the Monitor has not had the opportunity to meet. The Monitor is looking forward to working with this individual.

The Program and Policy team for the Division of Juvenile Corrections should continue to work with the vendor (J-Tracker) to include other critical measures as described during the site visit. The Monitor is unable to assess the accuracy of the data because of the lack of documentation and quality of documentation and the ability to track via electronic systems to automatically capture data. To address the data issues, the Defendants have created and filled two new positions, identified funding for experts as recommended by the Monitor, and is working towards developing

an electronic room check system.

Policies and Procedures

Significant revisions to policy and procedure and Administrative Codes have not yet occurred. DJC Admin Rules Committee had its first meeting on May 30, 2019. The Monitor does not have any updates as to when certain Codes will be repealed and recreated. All policies refer to the Administrative Code and thus modifications to the Administrative Code should be a priority as stated in the First and Second Report of the Monitor.

Policies relevant to LHS/CLS need to be compliant with the federal court orders and should contain a quality assurance section for every policy.  After review of some of the updated DOC DJC policies and procedures and local procedures, quality assurance is still not part of the policies and reference to this litigation is not listed in the "references" section.  Policy and procedure changes still need to be made as it relates to Security and Inspections, Mechanical Restraints, Clinical Observations, Youth Movement and Suspension of Movement, Use of Force, Searches of Youth (not compliant with Court Order), Emergency Response Unit, and several others.  The Monitor was pleased to see that the CARE team has been implemented and is being regularly utilized, however, a policy and procedure needs to be created which clearly outlines the mission of the CARE team, identify circumstances where CARE team will be deployed, describes how staff are chosen for the CARE team, and includes a quality assurance section. The Monitor suggests increasing the CARE team as it appears they are successful at deescalating situations and their hours of operation should be extended to evening and increased weekend hours when youth are not in school. The CARE team has an 78.5% success rate when utilized which is very good.  Also, many of the policies continue to indicate "discuss at staff meeting."  There should be formalized training with employee sign offs acknowledging receipt and understanding.  Effective proficiency testing for all training classes still needs to be developed.  The Monitor will continue to work with the Defendants on policy and procedure.

Youth Interviews

Plaintiffs' counsel and the Monitor conducted several youth interviews.  Approximately forty-five (45) youth were interviewed during the site visit (formally and informally).

Many youths said that LHS/CLS was better today than it was a year ago.  A few youths said conditions had not improved (some were at LHS/CLS less than a year).  Many stated that staff interacted with them more than they used to.  Most youth who participated in the Youth Advisory Council really liked it (although one youth thought it was pointless).  The overwhelming majority said that they were not confined much, were not restrained, and were not strip searched (which was a huge improvement from interviews with youth during last visit).  A few thought staff were "going through the motions" but wished they spent more time with them.  Youth were able to identify staff they really liked and when asked why they liked them, the youth told the Monitor it was because they were fair, consistent, and cared for them.  There were still a few reports by youth of concerns about some staff members. A number of youth also expressed concerns about staff not promptly intervening when fights occur. In addition, youth still thought there were several inconsistencies involving staff not following the grievance procedure, program rules, canteen, and inconsistencies in the staff assigned to the various living units.  Youth really do like it when they

have the same staff working with them.

The common complaints from youth interviewed were that they were bored and had nothing to do (not enough programming or activities) even though they admitted there is more now than before, but they still want (and could use) more activities, since too much time without activities can breed problems. Youth disliked split hallway times (half of youth locked in rooms while the remainder are out in day room). Several complained about the mosquitos and did not want to go outside because of it. Youth complained about other youth, peer pressure, and bullying and felt staff did not try and stop it. They were mad when youth would run around and not follow directives because it impacted their ability to participate in programming or would have to go to their rooms until there was control of the unit. Youth complained about two specific incidents which were being investigated at the time of the site visit.

When interviewing youth who have been OC sprayed, youth were asked if they decontaminated quickly and vast majority said yes (this is also supported by the video watched during site visit). Some youth said they chose not to get decontaminated. Youth complained that they did not feel safe because youth were not being confined anymore when they got in altercations (no consequences when they act out). A few said they were worried about staff when OC is eliminated. Youth continued to frequently complain of delayed response to call lights (often indicated when a youth has to use the restroom because there is no toilet in their rooms).

The Monitor found that much of what youth reported was accurate. When touring all of the living units, fewer youth were confined than during last site visit. Youth who were in their rooms were there because they chose to be, or due to split halls, shift change, or counts. The Monitor reported in the last report that confinement logs did not reflect confinement time as staff believed time spent alone in a cell for "cool offs," counts, "resets," split hall out time, and periods of positive behavior ("PPB") were not confinement time. Staff also did not think that time spent alone in a cell by any youth not in Krueger for whatever reason, was confinement time which should be documented. After the last site visit, direction was given clearly defining "confinement" to staff and now staff are aware of what confinement is and will have to document accordingly. The Monitor anticipates documentation moving forward will be more accurate. The Monitor did observe less idle time, but there still is room for improvement. Comparing the April and October activity logs in PbS, significant improvement has been made in reducing idleness. Operational room confinement still remains significantly higher than the field as does unstructured leisure activity hours. Most staff were engaged with youth in a positive manner and were placed in the vicinity of youth (as opposed to in their offices like last visit). With respect to the youth statements regarding staff not responding to their call lights timely or at all, this was confirmed in a survey and even with the Monitor's own eyes. Ten out of 10 youth reported staff not responding timely to the lights in their room.

With respect to the youths' statements on OC usage and decontamination, the Monitor reviewed some documentation that shows the time between spray and decontamination has improved greatly. Also, in reviewing video of several OC spray incidents, the decontamination was soon after spray when youth wanted the decontamination. The threat of OC Spray is made often, as documented in the daily shift reports.

The Monitor observed (and youth reported) several positive interactions between youth and staff. Youth reported that LHS is "way better than before" and were much happier and the Monitor could observe the youth and staff's demeanor which reflect this.  Youth complained about the food more during this site visit.  Youth really enjoyed when staff sat with them at meals, or at the tables when the youth were conversing with friends.  Youth enjoyed playing games with the staff and enjoyed the basketball, ping pong, and flag football tournaments.  The Monitor observed many of these activities. Youth that sign up will participate in Spades tournament, chess/checkers, bags, Scategories, etc. Additional staff are being utilized to facilitate afternoon/evening programming. The following programming has been added for youth:

- DBT skills group for CLS youth
- Debate Club – voluntary for all LHS youth
- Art Therapy Group – voluntary for all LHS youth
- DBT skills – voluntary/referral based for LHS youth other than TIP and Krueger
- CBT for Insomnia – voluntary for Curtis youth
- Prison Preparation Group – voluntary for Curtis youth
- DBT Skills group for TIP youth – referral based/voluntary for TIP
- Music, Movement, Movie Group – Currently running in Krueger
- DBT Skills group for Krueger youth
- Journaling Group – voluntary for Krueger youth
- Building Mastery – voluntary for Krueger youth
- Sex Offender Treatment Programming – referral based – joint run by treatment specialist
- Yoga – voluntary for all youth
- Book Club – voluntary for all youth
- Biblio-therapy Group – voluntary for youth

The Monitor has been told in the future that the following will be offered:

- Music, Movement, Movie – will be offered to other LHS youth on a voluntary basis in the near future
- The Art of Storytelling – voluntary for all LHS youth
- Game-Based CBT for Child Sexual Abuse Group – Referral based for CLS

The Defendants have made efforts to identify and contact community partners to increase programming at LHS/CLS. Hopefully, there will be continued movement on bringing in community partners.  As previously mentioned, there is still a need for culturally relevant programming.

There have been significantly more resources identified, specifically, positions created for dedicated staff allocated to make the necessary changes needed to improve conditions for youth and staff, funding for various capital projects and national experts on a temporary basis to assist in developing systems, programs, education, and assist in making the necessary changes to reach

substantial compliance with the Court Order. Defendants have made significant progress in improving the quality of life for youth and staff.

## COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION

Below is the Monitor's assessment of compliance with the consent decree. As previously stated, there is a challenge with adequacy of data for many areas (documentation, accuracy, consistency, and analysis) thus, some sections do not contain a detailed narrative.

A.    Room Confinement

    1.    Punitive Confinement.

        a.  Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence either in data or youth interviews that indicate youth are being confined for seven days.  If Defendants improve their quality of data and documentation and incorporate the court order into policy and procedure –and if this improvement is sustained - they will reach substantial compliance.**

        b.    Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is no evidence either in data or youth interviews that indicate youth are being confined for three days.  If Defendants improve their quality of data and documentation and incorporate the court order into policy and procedure – and if this improvement is sustained -  they will reach substantial compliance.**

        c.    Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: It has not been ten months after the entry of the Court's order. The Monitor will assess compliance at the appropriate time. However, youth are being confined for behavior such as for "reflection", split halls (sometimes due to behavior), and sometimes as a group when several youths engage in disruptive behavior.  These actions do represent a form of confinement as defined by the court order, which needs to be documented so that compliance with section can be assessed at the appropriate time.**

2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others.  Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  For this reporting period, there were instances in which administrative confinement was being used for youth who did not pose a serious risk of imminent physical harm.  It also appears that, rather than releasing youth from confinement as soon as they no longer pose a risk, Defendants are generally treating four hours as a default minimum period of time for administrative confinement. The Monitor suggested how to document this requirement in policy and in forms as well as made suggestions to place youth in the day room once they no longer pose a serious risk of imminent physical harm to others. Defendants need to improve their quality of data and documentation and incorporate the court order into policy and procedure.  The Monitor also discussed alternatives to confinement for administrative purposes such as med pass, counts, shift change, and split hall time.**

a.   Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

1.   A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  In a large number of instances, it does not seem that administrative confinement is being extended.  Defendants need to improve their quality of data and documentation and incorporate the court order into policy and procedure.**

ii.   A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

13

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Generally, youth who are in administrative confinement are in the Krueger program.  Although youth have behavioral plans developed, the program needs to be improved to include more robust behavioral plans and the plan needs to be revisited should a youth not be able to return in an appropriate period of time.  The Monitor spent several hours reviewing and discussing the Krueger program.  The Defendants were working on updating the program. Defendants need to improve their quality of data and documentation and incorporate the court order into policy and procedure.**

> b.   Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE.  Time is being tolled from 8 pm to 8 am.**

> c.   Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced  plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   There is no evidence that administrative confinement has been extended beyond 24 hours, and thus there have not been such transfer plans created. If Defendants improve their quality of data and documentation, and incorporate the court order into policy and procedure, they will be in substantial compliance.**

> d.   The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to improve their quality of data and documentation and incorporate the court order into policy and procedure.**

> 3.   Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended pol icy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  DJC Clinical Observation policy 500.70.24 was updated on 9/19/18 and the dates contained in the policy has been corrected. The Monitor suggests a more formal training and staff sign off reflecting they read and understand policy. Additionally, a quality assurance mechanism needs to be created.**

> 4.   **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions

shall apply to youth in any form of room confinement:

a.   Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: NON-COMPLIANCE.   As previously stated, the Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant.  The Monitor recommended that Defendants replace the existing room furniture with furniture that is specifically designed and engineered for secure environments.  The new replacement furniture which is in the Wells unit is consistent with what the Monitor would expect to see in a secure facility and should certainly reduce the opportunity for suicidal incidents within the youth rooms. The Defendants have a mock room with the new furniture which will be a significant improvement once completed throughout LHS/CLS.**

**With respect to youth rooms, there is little to no change from the last site visit. Most youth rooms were not clean or organized. Several rooms had multiple blankets/sheets covering large areas of the room making it difficult for staff to assess whether there is contraband that can be harmful to youth inside the rooms or assessing youth activity while in bed. There has been improvement on graffiti and etching on the glass which has improved staff's ability to clearly see the youth through the window. Also, on the TIP unit, the Monitor recommended that the windows to be changed (they are very small and pretty high on the door). Post site visit, the Monitor has seen the new windows which will be installed that are much larger and will improve visibility.**

**Safety/Welfare checks have significantly improved and are now being done on an individual basis.   Safety/welfare documentation show that room checks are being completed every 30 minutes.  Staggered intervals need to be focused on. As previously mentioned in this report, The Monitor has made recommendations to the forms that will simplify the process.  The Monitor recognizes that an electronic system is being explored by the agency, but this will take some time. Safety/welfare checks need to be a priority and progress needs to continue to be made.  While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

b.   Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth have not complained about access to water or hygiene supplies. However, a common complaint among youth in rooms without toilets (dry rooms) continues to be that staff are very slow to respond when they indicate they need to use the restroom. Administration investigated this complaint for this reporting period and the results were the same.  It was proven that this is in fact occurring frequently.  Further, Defendants do not document this issue. Defendants need to create a form, policy, and quality assurance measures as to this section and others.  Administration needs to continue to investigate and hold staff accountable until the problem is fixed.  Staff need to be held accountable should an investigation reveal the delay is purposeful.**

c.  Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible.  PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved but still needs more improvement.  Time of call to PSU staff is now being documented on the incident report in most instances, but there is room for improvement. This requirement should be included in the development of a quality assurance program.**

d.  Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1 , MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Monitor requested any documentation indicating that confinement is contraindicated and there were no instances documented. There is a form "Psychology Input for Security Decision" which is where the contraindication would be documented and there is a policy (Policy 500.70.04) Again, as with all policies, a section should be created to include quality assurance and monitored by facility administrators.**

e.  Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and

contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Safety/Welfare checks have significantly improved and are now being done on an individual basis.  Safety/welfare documentation show that room checks are being completed every 30 minutes.  Staggered intervals need to be focused on. As previously mentioned in this report, The Monitor has made recommendations to the forms that will simplify the process.   The Monitor recognizes that an electronic system is being explored by the agency, but this will take some time. Safety/welfare checks need to be a priority and progress needs to continue to be made.**

**Defendants are holding more staff accountable for this reporting period as there were 36 "Letters of Expectation" and two staff were formally disciplined related to visual monitoring.  Staff need to be held accountable for not completing checks according to policy. In addition, although the requirement in this Court Order is "at least every 30 minutes" the Monitor recommends that every youth should have a visual inspection at least every 15 minutes at staggered intervals. This is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model. The agency should make an electronic, software-based rounds checking system a priority.  PSU staff do visit youth daily when on site.**

> f.   Any youth in room confinement shall have property items similar to or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth.  A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   Some rooms contained more property than outlined in handbooks.  Some rooms had less property in their rooms, such as Krueger and Targeted Intervention Unit ("TIP"). The Monitor could not confirm whether this was restricted as needed for safety. Documentation needs to be improved as to this requirement and confinement needs to be accurately recorded.**

> g.   Youth in room confinement shall receive:

1.        All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided. Once documentation, quality assurance program is created, and this requirement is clearly in policy and procedure, Defendants will be in substantial compliance.**

11.        Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Programming is inconsistent. There is a lack of documentation as to specific programming that occurs daily. There does not seem to be programming when youth are on PPB or, according to the Krueger handbook, in Phase 1 of the program. This was discussed, and the Monitor anticipates this will change once the Krueger is updated/modified according to discussions during the site visit. Also, there are occasions where staffing levels do not allow for planned programming. There has been improvement in available programming, but there is still a lack of other activities for youth to engage in, resulting in excessive amounts of idle time and split hall time (confinement). This occurs especially, but not only, on weekends.**

111.       Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Educational Services for general population occur in the classrooms in the school area. Youth in the Targeted Intervention Program ("TIP") attend classes in the school area but separate from the general population. Youth in Krueger do not receive educational services in the school area (except for youth on Phase 3) but remain on living units. Youth also continue to be "suspended" from school. PbS data is available for this reporting period, and it does appear that youth are engaged in educational activities for more time than during the last visit. As reflected in the staffing section of this report, the current teacher vacancy rate is 43% (12 of 28 allocated positions) is mostly likely impacting the ability of youth to be in school for longer periods. Educational hours need to be increased for all youth on a daily basis. The Monitor recommends that all youth regardless of status have education in the school area or, at a minimum, off their living unit. The Monitor also recommends culturally relevant programming/materials be**

**offered. The Monitor has also connected the agency with an education consultant who has completed the assessment.  The Monitor awaits the report. The Monitor anticipates there will be more recommendations contained in that report.**

iv.     Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Most units still have "split hall" which means a portion of youth are confined to their rooms while others are out, and they rotate. Based on the staffing numbers on the unit, there is no reason that all youth cannot be out in the day room/outside etc. The Monitor saw youth conversing with other youth and staff during out time which is an improvement from the last visit.  In youth interviews, youth stated that they are not confined to their rooms "that much." Some youth actually complained that other youth were not confined enough when they were involved in an altercation.  Youth still want more activities when they are out of their rooms and feel they do not really do anything, which, as discussed elsewhere, is a significant problem. There is not any real programming in Phase 1 of the Krueger Program and not a lot in Phase 2. The Monitor has been told that the Krueger Program is changing to increase out time and youth will receive phone calls and be able to have more movement on the unit. Phase 3 has a little more sensory stimulation. The Krueger program is out of pilot form, and the leadership has re-evaluated the program to ensure compliance with the court order and technical assistance report with the Monitor's assistance.  Enhancing programs and meaningful activities for the Krueger program should have a positive impact and allow for youth to return to their home cottages quicker.**

v.     Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  The majority of meals take place out of the room but there are several occasions where youth eat meals in their rooms when there is not an immediate and substantial threat of physical harm.  The Monitor witnessed some youth eating in their rooms and have seen this documented in shift reports. Should a youth eat a meal in their room, the decision by staff needs to be justified, supported by documentation, and instances need to be reviewed by facility administrators. Meals are not documented on living units except Krueger, but they need to be.  When reviewing the Krueger documentation, a large number of youth are eating in their rooms without evidence of a threat of physical harm. Also, there are several blank entries meaning staff are not documenting whether youth are eating in rooms or not.  There needs to be a**

quality assurance measure created and this requirement needs to in policy and procedure.

> v1.     Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Logs indicate that most youth are receiving 3 hours of "out time" per day or 30 hours per week. Documentation, data collection and reliability make it difficult for the Monitor to assess level of compliance. The Monitor made several recommendations that should be implemented as soon as possible.**

> **5.     Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  It is not clear whether youth are being told that they can grieve their placements in room confinement at all (or being told they can do so within 15 minutes of placement).  There were 70 grievances filed by youth during this reporting period (on a variety of issues, not just placement). This indicates many youths utilize the grievance procedures. There was only one grievance related to discipline. However, youth still feel the process is confusing and some reported that staff were not following the grievance procedure as required by policy.  The Monitor does suggest that a more robust tracking system be developed with a quality assurance piece that ensures grievances are being timely and appropriately addressed and communicated to youth. The Monitor made recommendations to forms which if implemented, should improve data collection.**

> 6.     Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, which is not being done.  Documentation needs to be completed and consistently applied to all situations, other than sleeping hours, in which youth are confined alone in their rooms, regardless of what unit they are in (including not only Krueger, but *all* units in both LHS and CLS, and the reason for the confinement). Documentation, data collection and reliability, and quality assurance needs**

to be improved.

    B.    OC-Spray and Other Chemical Agents

        1.    OC reduction plan.  Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to implement their OC reduction plan.  There are youth still being sprayed in instances where lesser means could have been used (video of instances were viewed during the site visit), and spray is being used to "prevent self-harm" when other means could have been used. The OC reduction plan should involve training staff on a variety of de-escalation skills as well as a directive that OC should only be used in situations that present a serious life safety or threatening situation.  In reviewing video, it is clear that staff do not have the skills to de-escalate or restrain youth.  Staff are too slow to go hands on when situations require it.  The Monitor made several recommendations including increased training, implementing a specialized team, and ensuring incident reviews are meaningful.  The expanded use of CARE Teams can greatly assist in de-escalating situations and ultimately reducing/eliminating the use of OC.  Additionally, as recommended in the technical assistance report, a new incentive-based behavior management program that focuses on rewarding positive behavior should be created which will have a direct impact on youth behavior and thus, reduce the need for force of any kind.  The Monitor is told the Defendants are working on a new and improved behavior management system which the Monitor will be happy to review prior to implementation. While there continues to be a significant decrease in the use of OC spray over the last six months, there is a rise in the number of incidents during this reporting period.  Continued focus on training, skills development and coaching, continued focus on overall atmosphere should have a positive impact on the number of incidents requiring this type of intervention.  Merely reducing or modifying the intervention protocols for these types of incidents is not a sufficient response.**

**The below graph reflects the combined usage of OC at LHS and CLS in 2018/2019.**



2. Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: N/A.  Compliance will be assessed by the Monitor at the time required under this section.**

C. Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1. Prohibition on types and uses of mechanical restraints.

a. Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.  The Monitor did not personally see any youth in mechanical restraints during site visits, but logs show there are occasions where youth are placed in mechanical restraints – including being put "on the belt" as well as in cuffs. Data shows there were more youth mechanically restrained than during the last reporting period. With better documentation and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision if they can document and establish that there were not less restrictive means available.**

b. Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the

youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Mechanical restraints are rarely used but when they are, there is little or no documentation as to whether and how there is an imminent threat of physical hard, and when and how that process is reviewed.  There needs to be a continuous effort to monitor youth who are placed in mechanical restraints and consistent documentation. With better documentation and quality assurance measures, and returning to the reduction in use of restraints that previously existed, Defendants may be close to achieving substantial compliance with this provision**

    c.    No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

    1.    Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

    11.    Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  However, when restraints have been used, there is little or no documentation of the reasons for doing so, whether and how there is an imminent threat of physical harm, and when and how that process is reviewed. With better documentation and quality assurance measures and returning to the reduction in use of restraints that previously existed, Defendants may be close to achieving substantial compliance with this provision.**

    i ii.    During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used.  Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving**

**substantial compliance with this provision.**

      d.    Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   There is some indication that restraints may be regularly used with youth in Phase 1 at Krueger, which would be inappropriate. By ceasing this practice, and with better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

      e.    Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   There is no evidence of youth being restrained to a fixed object. With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

      f.    Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Training records indicate that the large majority of staff have received training in physical force, restraints, and trained in proper de-escalation.  However, de-escalation training needs to be completed more often (regular, informal, refreshers) so that staff can continue to develop this skill.  Proper de-escalation cannot be trained only once, or even only once a year.  The Monitor suggested having staff who are very good at de-escalation work with staff who could use a refresher or with new staff especially since a large majority are new.  During the site visit, there was a unit that was out of control and when the Monitor talked with staff, they all had been at LHS/CLS for a year or less.  Documentation needs to be improved and a quality assurance mechanism needs to be in place.**

      g.    Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit.  No youth shall be left alone in restraints.   Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

> 2.  Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

> D.  Strip Searches. The following provisions are effective immediately upon entry of the Cou1t's order incorporating this Agreement.

> 1.  Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Documentation shows that strip searching still occurs, but the Monitor cannot assess whether there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means because this is not documented.  Blanket strip searches of youth at intake or returning from court has ceased, but staff are doing a "hygiene" check which requires a youth to strip to underwear and bra which is replacing the "strip search." This type of search should only be used for the same reasons as a strip search when utilized for this purpose (probable cause of youth possessing drugs or weapons that could not be discovered through less intrusive means). As previously stated, the policy for searches need to be amended to reflect the language in this section.**

> 2.  Strip searches with probable cause.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that strip searching is still occurring, but the Monitor cannot assess whether there is probable cause, whether less intrusive means were considered, or whether youth were allowed to change into a tank top or other clothing because this is not documented.  Staff are doing a "hygiene" check which requires a youth to strip to underwear and bra which is replacing the "strip**

search." This type of search should only be used for the same reasons as a strip search when utilized for this purpose. It does not appear that less intrusive searches are attempted before a strip search is conducted. Documentation shows that Staff are conducting pat down searches, but the Monitor did not see any and youth did not report this was happening. Additionally, hygiene checks go beyond tank top or other clothes (youth are stripped to underwear and/or bras.) As previously stated, the policy for searches need to be amended to reflect the language in this section. Documentation needs to be improved.

3.   Process for strip searches.

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved as to how staff are ensuring that unintended individuals cannot view the search (detail the area where search is occurring, state that there are no recording devices, and document who is present in the area, etc.) If documentation and policy revisions are made, substantial compliance can be obtained.

b.   Under no circumstance may a youth be strip searched within view of another youth.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved detailing the area where search is conducted and how other youth cannot view the youth being strip searched. If documentation and policy revisions are made, substantial compliance can be obtained.

c.   Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

d.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved as to which staff conducted the search, that the search is by staff who is of the same gender identity as the youth if the strip search is being conducted by someone other than a medical professional. The Monitor recommended form changes for documentation purposes.

e.   Strip searches must be conducted by staff trained in trauma-informed practices.

COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Training records indicate that majority of staff have been trained in trauma informed care. Documentation needs to be improved as to strip searches.

       f.     If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor is told by direct care staff and mental staff that mental health is consulted. Documentation needs to be improved.**

    4.    Documentation.  Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

    E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Most staff have been trained in the new MANDT training and other training which includes de-escalation skills training. The Monitor recommends increasing the training frequency for staff to increase their experience and skill levels in managing and de-escalating situations before they result in the use of restraint and/or isolation.  Although there is a use of force review process, it needs to be thorough and comprehensive, include a corrective action plan when force was used where it could have been avoided, and timelier than they are being done. The Monitor recommended in instances where de-escalation was successful, those examples should be used as a training tool for other staff including having other staff view the videos.**

    F.    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of id le time in the facility to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Many of the recommendations that were made in the February 2018 technical assistance report have been implemented such as family events, yoga/Zumba, increased tournaments, more arts, and the additional programming listed in the narrative part of this report. Also, as recommended in the technical report, youth advisory and family councils have been implemented and the Monitor's recommendations have been incorporated into the process (agendas, minutes, frequency, and increased staff involvement). Seven meetings took place over the last three months.  The council meetings are well received by youth and staff. Although there were more activities for youth during this site visit, there is still a significant amount of idle time**

for youth. The Monitor recommended that a programming schedule be created and implemented. A draft version has been created but needs to be implemented and policy and procedure with a data measures needs to be created. The Monitor believes this will assist in reducing idle time and also will hold staff accountable.

As recommended previously, counselors, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. Several staff made suggestions for programming such as art therapy, dog therapy, increased tournaments, job readiness skills, music, balance and restorative justice, and teen court. Many of these suggestions have been implemented or will soon be implemented. During interviews with staff, staff expressed a desire to participate in activities with youth. Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. As mentioned previously, increasing education hours can greatly assist in reducing idleness time and provide positive youth development strategies through meaningful education and vocational programming. Recreation and exercise schedules are every other day according to staff and appear to be inconsistent and often limited due to a variety of reasons. Extended recreation should be considered. The volunteer coordinator has contacted several potential community partners so hopefully this will prove beneficial. The Defendants have identified funding to pay for a consultant that can assist with developing gender and culturally appropriate programming. The Monitor provided potential experts for Defendants to consider.

G. Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Some of the recommendations made in the February 2018 report have been implemented such as hiring bonuses to obtain new staff, increased wages for current staff, staff recognition, and staff wellness initiatives. There has been a huge reduction in vacancy rates for direct care staff over the last six months. There still are major staffing challenges due various employee leaves and teacher vacancies. Other recommendations have not been implemented such as redrafting job descriptions and job postings which highlights the youth counselor aspect of position instead of "guard" or "corrections" description, rewrite position summary, reassess current staff schedules and placement, part-time staff to fill in the gaps and/or outside security firms to supplement existing staff, or assessing and ensuring staff are not working too much overtime. Given the long-standing staffing deficiencies, there is an urgent need to also explore methods for promptly reducing youth populations. This might include expediting the OJOR process and evaluating youth for placement under community supervision, including intensive community supervision, as permitted by state law.

H. Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile

correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS:  DOC has identified sections of the Administrative Code that need to be modified, but significant revisions have not yet occurred.  The Monitor has been told implementation will take some time as it requires certain Codes to be repealed and recreated. All policies refer to the Administrative Code and thus modifications to the Administrative Code should be a priority.  Interim policies should be considered, and the Monitor has been told that there is a mechanism to amend policies for LHS/CLS.**

      II.      DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A.    Incident review process.   Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent.  Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Although reviews occur for most incidents (informally), the reviews often occur well after the 24-hour timeframe.  Often, the reviews do not occur until 3-4 weeks after the incident.  Timeframes have improved from previous months. Staff involved are not brought together for meaningful discussions. When it has been determined lesser means could have been used, there is not a corrective action plan developed. The Monitor made suggestions to the Superintendent as to this section during the site visit utilizing specific incidents occurring during the reporting period similar to the last visit.**

B.    Quality assurance.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goa ls that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Critical quality assurance positions are now filled and will be assisting in developing a quality assurance program.  The Monitor reviewed sample performance goals, reviewed PbS in great detail, and made suggestions for monthly performance measures and how to incorporate into policy.  As discussed throughout this report, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff.**

## <u>CONCLUSION</u>

The Defendants have made significant improvements with improving staff and youth interactions, developing more programming options for youth, reducing confinement time, reducing mechanical restraints, reducing staff vacancies, developing staff wellness initiatives, filling new positions to help with data collection and quality assurance, identifying funding for various outside experts and funding for physical plant improvements, and made physical plant improvements.  As a result of the progress made, it is clearly evident that these changes are having a positive impact on the overall atmosphere and culture of the facility.  Staff are much more engaged with youth and building positive relationships which will ultimately have an impact on reducing incidents of violence, restraint and/or room confinement.

Continued efforts need to be made with reducing teacher vacancies and increasing educational time, training in de-escalation and physical restraint techniques, amending policy and procedures, developing a quality assurance program, developing a means to monitor and track PbS critical outcome measures through a monthly metrics report or dashboard, and continuing the physical plant improvements (paint, murals, etched glass, covering graffiti, furniture in the day room and suicide "resistant furniture." All documentation needs to improve.  There should also be a focus on reducing/eliminating the confinement of youth during normal operational processes such as med pass, counts, shift change and splitting up youth in "high" and "low" halls.  Although there is more work to do, the Monitor was pleased with the progress made over the last three months.  The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

Teresa Abreu
Monitor