UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J**., by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

     Plaintiffs,

v.                                                                                          Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

     Defendants.

---

FOURTH REPORT OF THE MONITOR

---

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Third Report of the Monitor was filed with the Court on July 1, 2019. The Monitor's fourth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates from the third site visit which took place May 31, 2019. Any documentation or updates submitted after the conclusion of the fourth site visit will be addressed in the fifth report of the Monitor.

## SITE VISIT

The fourth site visit by the Monitor took place on September 13 through September 15, 2019. The Monitor reviewed materials provided by the parties prior to, during, and after the site visit. Materials included, but were not limited to: updated Krueger program handbook, grievances, counselor logs, staff memos, daily shift reports, video footage of use of force incidents and activity on unit, all of the monthly data submitted to the parties per this court order, unit rules, work rules, employee leave data, employee corrective action reports, behavior and treatment plans, mechanical restraint documentation, incident reports, other housing documentation, self-assessment report and supporting documentation including policy drafts, facility enhancement report, and various meeting minutes. The Parties were present during the site visit. The Monitor took photographs,

toured LHS/CLS, and interviewed youth and staff. Approximately thirty-two (32) youth and twenty-eight (28) staff were interviewed formally and informally by the Parties during this site visit.

## GENERAL OBSERVATIONS

Physical Plant

The general areas of the facility were very clean and orderly.  The atmosphere was very calm throughout LHS/CLS.  Youth and staff seemed much more relaxed and happy than in previous visits. All of the landscaping has been completed and the outdoor space is very inviting. The majority of the recommendations as to physical plant modifications made in previous Monitor reports and the February 2018 technical assistance report have been implemented or are in progress (described in more detail throughout this report). The etched glass issue has been resolved by installing new windows throughout the facility.  Several other physical plant improvements have been made including, but not limited to, permanently mounted security fans in living units, Hughes unit perimeter fence repaired, roof deterrent system in place, new boilers in living units, cottage exterior window replacement, and fixing of some drainage issues.  Additional projects not yet completed are the camera upgrade, electronic rounds tracking system, electrical upgrade, and installing a new generator.  The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.  There is still a significant amount of graffiti in Addams and Black Elk.  The Monitor gave suggestions for tracking, monitoring and accountability for graffiti. Defendants will need to continue to monitor and cover graffiti on an ongoing basis.

Previously, the Defendants informed the Monitor that there was a bid for painting the interior of the cottages and a youth art program to further decorate the walls with murals and artwork. There are several new beautiful murals and art projects that have been completed since the last site visit and more are currently underway throughout the facility. Renovations have been completed on one of the girls' units (Wells), and the girls are now in the newly renovated unit as of June 6, 2019. Dubois and Miller are also in the process of being renovated and this will continue throughout the facility.  The renovations to date are exceptional.

In general, youth rooms were cleaner (most beds were made) but the bathrooms remain messy and dirty.  However, several maintenance issues that were observed throughout the facility during the last site visit which needed attention such as bathroom leaks, faucets running, and toilets not working, etc. have been addressed.  The Monitor recommended including incentives around the room/bathroom cleanliness in the new behavioral management system.  Defendants have included this in their behavior management system and Spring and Summer Clean Up contests have occurred, and other incentives are planned on a regular basis. Defendants have removed and/or secured items that have been used by youth in disturbances and built barriers around areas containing these objects in order to create a safer environment. The Monitor recommended that searches of all buildings be conducted to remove excessive objects, materials, equipment, furniture, etc., to enhance the safety and security of the units/buildings and to maintain a more orderly and safe environment.  The process for area and personal searches has been updated and is being documented electronically using J-Tracker. The Monitor previously recommended that Defendants consider replacing existing furniture with furniture that is specifically designed and engineered for secure environments and the secure

furniture has been piloted in a living unit. The Monitor also noted that one or more living units had security bars on the exterior windows to prevent such disturbance and reduce the likelihood of a disturbance or escape. Additional security enhancements on Krueger and other areas have been implemented. There is a schedule for the removing of existing furniture and replacement with a goal completion date of June 2020.

School/Living Units Observations

The Monitor visited each cottage and toured the school on Friday.  The Monitor recommended that "split hall" time be eliminated, and youth remain out in the day room during medicine pass, counts, and shift change. As of September 3, 2019, the Defendants have ceased doing confinement for these reasons throughout LHS/CLS.  Another notable change, which had been implemented starting on Sept. 3, 2019, was that the units had moved to "open dayrooms" which allowed the youth to be out of their rooms from at least 8 a.m. to 8 p.m. This change generally seemed to improve youth morale.

There was an awards assembly on Friday thus, the Monitor could not observe youth in school during this site visit. Below, are the Monitor's observations:

The Monitor saw the majority of staff engaging with youth. As stated above, there was an awards ceremony for the "Summer Games" event that took place (which included all the boys' units other than Krueger).  Awards were given out for both LHS/CLS youth.  The Monitor observed the ceremony for LHS youth. The staff were sitting with youth, youth were engaged, and it was a positive atmosphere with no incidents taking place.  It was evident that this was a joyous event for staff and youth which carried into a positive atmosphere throughout the entire day. Youth attitudes overall were very good during this site visit.  All the improvements in the school area made prior to the last site visit are still evident. The school had positive messages throughout, artwork displayed, names of youth on the honor roll were displayed, windows in classrooms were no longer covered so there was a clear unobstructed view which increases safety for staff and youth and the school was very clean. The Monitor previously recommended that the Defendants hire an education expert to complete an assessment of the educational programming at LHS/CLS. The expert was retained and provided initial observations. The expert plans to return in November to further assess the education department's operations and make specific recommendations. The Defendants did move the girls' educational programming out of the main school and into a smaller building in the Copper Lake section of the facility, with far fewer amenities and facilities than in the main school.  The Monitor highly recommended that the girls return to the main school as soon as possible. Defendants have indicated they will work towards this goal. In addition, youth on levels 1 and 2 in the Krueger Program continue to attend school in classrooms on their living units. The Educational expert will make recommendations to education and specifically address education for youth on Krueger.

All the girls were back in Wells since the renovation project was completed. Staff were engaged with the youth during free time, the unit was clean, the girls had good attitudes and were very polite and somewhat chatty. The safety/welfare checks were completed and up to date and staggered. One youth was voluntarily in her room, but it was not documented. Staff on Wells need to make sure they are logging when youth voluntarily go into and exit their rooms. The Monitor recommended that the Defendants needed to focus on gender specific programming to enhance the programs and activities for the girls' facility. A Youth In Custody Practice Model ("YICPM") subject matter

expert provided training to facility staff August 27-30, 2019. Administration should continue to train and utilize the training in their programming on a regular basis.  Feedback from the training was very positive.

With respect the boys' cottages, generally, all the youth rooms were cleaner than last visit. The Monitor reviewed the safety/wellness documentation and it has greatly improved from the last visit. Documentation complied with policy and procedure in 97% of the logs reviewed in LHS. Staff should be commended for the significant improvement in the safety/welfare observations and documentation. The Monitor made further recommendations to the forms that will make it easier for staff to complete and would require less staffing. In previous reports, the Monitor commented on staff placement on the unit. During this site visit, staff were placed near the youth and were much more interactive with the youth. However, now that the youth are all out of their rooms from 8 A.M. to 8 P.M. (generally speaking), staff need to consider adjusting staff placement on the unit to make sure staff are aware of which youth are in the general living space, in their rooms, restrooms, outdoor yard, etc. There were significantly less youth in their rooms during this site visit than any of the previous site visits.

In Krueger, the unit was clean. Youth rooms were messier on Krueger than during the last site visit.  The Monitor observed three youth in their rooms but was told the youth were in the rooms at the youths' request. Other youth were playing basketball, watching television, and making phone calls. Staff knew the count on the unit.

In Addams, the living unit was clean and there was a beautiful mural on the wall.  There were no youth on the unit as they were at recreation.  Although the graffiti was removed prior to the last visit, there was significant graffiti in the youth rooms.  The bathroom was very dirty, and the faucets were on slightly. The television was on in the unit despite there being no one on the unit. Safety/Welfare checks were unavailable since the youth were not in the cottage.

In Black Elk, the unit was clean and calm. There is a lot of graffiti in the rooms as was present during the last site visit. Youth were playing cards, watching television, and braiding hair. Staff were preparing lunch for the youth. Youth were appropriately chatty with the monitoring team and staff. Four youth were in their rooms and the safety/welfare checks were completed and staggered.

In Curtis, the general area of the unit was clean and calm. Bathrooms were dirty. All youth were out of their rooms. Youth were very chatty.  Youth were watching television, making phone calls, and talking with each other. Safety/welfare checks were complete and staggered. Med passes was taking place and youth were appropriately receiving medication. Some of the youth rooms were clean and some were not. Staff were appropriately engaging with youth.

The Rogers unit was generally clean and youth rooms were generally clean. The bathroom was not clean and had a strong smell of urine. Youth were watching television, playing cards, video games and talking with each other.  One of the youth rooms had a strong smell of urine. Staff immediately addressed this when the Monitor brought this to their attention. A few of the youth rooms had personal pictures on their windows. The Monitor informed the staff that the windows into the youth rooms need to be unobstructed and pictures should be placed in another area of the room.  Staff immediately removed the pictures. All youth were out in the day room (no one was confined). Safety/welfare checks were conducted every 30 minutes or less and staggered.  Staff

were appropriately engaging with youth.

In Hughes, the unit was clean and calm. Youth rooms were generally clean. Youth were on the telephone, talking with each other, and some youth were eating. The nurse was on the unit and engaged.  Youth were very chatty and spoke quite positively about LHS.  Youth rooms were messy. Safety/welfare checks were complete and staggered. Staff were appropriately engaging with youth.

The Roosevelt unit (TIP) was loud and the unit smelled. Some youth were watching television, some youth were outside, were very chatty, and staff were engaged. The glass in the youth rooms has all been changed out to bigger windows. There were three youth with phone restrictions as confirmed by staff. It is very important that youth have access to the telephone and be able to communicate with family.  The Monitor suggested that phone usage should not be a restriction unless there is an extreme circumstance. While the Defendants use of phone restrictions as a sanction has decreased significantly during the reporting period, it is critical that eliminating phone restrictions except in extreme circumstances be implemented immediately.

Once all of the renovations in the cottages are completed, the Monitor believes this will enhance the safety, well-being, and quality of life for youth and staff. The Monitor looks forward to the continued expansion of the new rooms design throughout LHS and CLS.

Staff and youth continue to make positive comments and have positive attitudes. The Monitor saw the same positive interactions between staff and youth as the last visit.  LHS/CLS continues to have less of an institutional feel and the overall atmosphere has vastly improved. There is a significant reduction in the number of youth confined.

Administration, staff and youth should be commended. There are still complaints from youth, however. The biggest complaints from youth were regarding the new vendor for canteen, perceived unfairness of how the new behavioral point system was applied, being bored due to lack of programs and activities, and being put on phone restrictions (which cuts them off from vital support from their families).Due to the fact that youth have more time out of their rooms, there needs to be an even bigger focus on reducing youth idleness and more structured programming should be put into place.

Staffing

In August 2019, Defendants hired a new Administrator who will oversee the Division of Juvenile Corrections.   Additionally, a new Security Director for LHS/CLS was hired in July 2019.  Direct care staffing vacancy percentage has improved from the last site visit, however, staffing issues continue to exist at LHS/CLS. There are 311 total positions at LHS/CLS. Approximately 155 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA"). There are still a large number of staff on various leaves of absence (FMLA/Workers' Comp, etc.) which contributes to the staffing shortages and mandated overtime. The teacher vacancy rate remains high but with slight improvement over the last three months. Recruiting is still a challenge. This is directly impacting education for youth. The Monitor looks forward to the educational expert's assessment/report which will be available after his second site visit.

| Position | Vacancy Rate % as of November 28, 2018 | Vacancy Rate % as of March 14, 2019 | Vacancy Rate % as of May 31, 2019 | Vacancy Rate % as of Sept. 6, 2019 |
|---|---|---|---|---|
| Youth Counselor | 22% (23 of 105) | 15% (16 out of 105) | 11.5% (12 out of 105) | 14% (15 out of 105) |
| Youth Counselor Adv. | 18% (9 of 50) | 48% (24 out of 50) | 50% (25 out of 50) | 7% ( 3.5 out of 50) |
| Teacher | 39% (11 of 28) | 39% (11 of 28) | 43% (12 of 28) | 36% (10 of 28) |
| Social Worker | 14% (2 of 14) | 0% (14 of 14) | 0% (14 of 14) | 21.5% (3 of 14) |

In order to address staffing challenged at LHS/CLS, effective April 28, 2019, security personnel began receiving a $5.00/hour add-on for worked hours. Eligible employees are in the classifications of Correctional Officer, Correctional Sergeant, Youth Counselor and Youth Counselor Advanced.  Additionally, most recent youth counselor academy began in August of 2019 and has 23 members. This is a considerable increase compared to the academies earlier this year. Prior to the $5.00 add-on, the vacancy rate for the Youth Counselor and Youth Counselor Advance staff was at approximately twenty percent (20%). As of August, that has fallen to ten percent (10%) which is an overall decrease of approximately fifty percent (50%).  The Monitor also recommended non-traditional scheduling. LHS/CLS has decided to implement a 12-hour schedule starting in November. In the last report, the Monitor recommended that the facility conduct a full staffing assessment to include a relief factor analysis looking at all leave types and its impact on staffing levels. A staffing assessment has been completed.  The Monitor made recommendations to the staffing analysis.

The Monitor spoke to over twenty-eight (28) staff and the majority of staff seem energetic despite working many double shifts. The vast majority of staff expressed the desire to have more programming for youth.  The Monitor asked staff their thoughts on the new 12-hour schedule and most staff are fine with the change. In fact, more staff were concerned that they will lose overtime once the schedule changes.  In response to the Monitor's last report, the administration conducted Situational Awareness Training (a POSC update training) focused on alternative techniques to prevent and address behavioral problems provided to staff in July and August. The facility plans to continue this, and other similar trainings based on staff input going forward. Staff said they enjoy interacting with youth and are accepting of the changes that are taking place. Staff did not have a problem with youth no longer being confined during shift changes, medicine pass, or due to split hall. Most staff did not have a fear that the elimination of OC Spray was coming. Most staff continue to show more attention to building relationships with youth and in engaging youth in a positive manner.

The Defendants have implemented many of the recommendations for staff wellness. The Monitor continues to stress the need to make staff wellness a major focus moving forward. The Monitor saw that there were employees recognized as "Employees of the Month."  The Monitor also suggested creating a relaxing staff break room especially since they will be working 12-hour shifts starting in

November.  It is important that the break room is inviting and relaxing and should not have an institutional feel. The Defendants should continue to create policy driven staff recognition programs, and tap into staff's talents, passions, and interests to bring into programming as previously recommended.

There has been improved communication with staff and youth regarding the reform effort (written and verbal).  Many of the communications to staff and youth have been written a positive manner, although there is a need to ensure that new policies and instructions do not focus on the court order as reason for changes, but rather emphasize that these changes constitute proper policy and procedure.   As recommended in the technical assistance report, staff are engaged in developing programming and policy changes and are actively participating in youth and family council meetings. However, staff can further be engaged in these processes.  There is too much unstructured free time throughout LHS/CLS.  The Monitor made recommendations of furthering meaningful staff engagement (groups on canteen issues, creating a newsletter, talent shows etc.)

As part of the agency and facility commitment to improving conditions for both staff and youth, they are continuing to engage in the Youth in Custody Practice Model (YICPM), which was explained in the previous Monitor report.

The Monitor suggested modifying the mental health (PSU) and recreational staff work schedules to include more evening and weekend hours. PSU work until at least 8 P.M. during the week and are on-call 24/7. The Defendants should continue to involve PSU staff, especially leadership, in making improvements at the facility (such as improvements to incentives, consequences, and working with the OJOR system.) Currently, there is a PSU staff member who comes in each weekend to perform rounds and will report to the facility as needed in addition to the scheduled rounds. Recreation staff are working until 9 or 10 P.M. and two new Recreation Leaders were hired in July and September. One will focus on art and the other on music.

Quality Assurance ("QA")

To address the need for a quality assurance and improvement program, the Defendants have created and now filled both QA positions (Quality Assurance Specialist and Program and Policy Analyst). The goal is to continuously assess not only compliance with this court order, but the quality and adequacy of the social and recreational programming provided, healthcare, education, environmental health, safety, and discipline. The Monitor has begun working with the individuals selected for these positions.

Defendants have created a comprehensive quality assurance program that will greatly increase the accuracy and quality of data.  Defendants have developed new systems and review processes.  It is clear that the persons responsible for quality assurance are eager to make improvements.   The Monitor anticipates a huge improvement in data collection in the months to come.  During each site visit, the Monitor focuses on different aspects of the operation.  During this site visit, the Monitor spent a lot of time going over data and discussing how data can be used in different capacities in order to make decisions impacting the lives of youth and staff.  The Monitor made suggestions on forms used that will allow line staff to more easily record data that can then be collected and analyzed.   The Monitor provided samples of policies which included quality assurance   measures.  The Defendants have created a "Quality Assurance Review" process that

will be completed every month.  The Defendants have drafted policy and procedure based on the Monitor's suggestions.   Additionally, "Incident Debrief Process" enhancements have been implemented and continue to be developed for further improvement. Visual Monitoring, youth complaints, and CARE Team quality assurance processes have been developed and implemented. Observation checks, incident debrief, and searches are the next processes to be piloted. Facility Procedures including a QA portion for eight different processes have been drafted and are in the final stages of internal approval process.

Data recording has improved in safety/security checks, incident reports, use of force reports, grievances, PSU/Medical documentation, mechanical restraints, searches, and meals in and out of room on Krueger.  There needs to be a continued focus on adequacy of data collected and analysis of other subjects of the court order.  Defendants need to make this is a priority.

The Monitor has discussed PbS in detail in previous reports, and thus, will not go into detail in this fourth report.  Although PbS data collection cycles occur twice annually, in April and October, the Defendants are looking into ways to monitor the critical outcome measures on a monthly basis, possibly using J-Tracker.  Facility Improvement Plans have been created after PbS Coach Site Visit and has been forwarded to the Monitor.

The Program and Policy team for the Division of Juvenile Corrections should continue to work with the vendor (J-Tracker) to include other critical measures as described during the site visit and continue to work towards developing an electronic room check system. A vendor has been awarded a contract for electronic room checks and additional tracking of other youth activity.

<u>Policies and Procedures</u>

Revisions to policy, procedure and Administrative Codes are occurring but have not been finalized. DJC Administrative Rules Committee had its first meeting on May 30, 2019. The process for amending Administrative Code DOC Chapter 376 began as of September 3, 2019. The process for amending DOC Chapter 373 will begin after public hearings on the scope statement describing changes are held on September 20. All policies refer to the Administrative Code and thus modifications to the Administrative Code should continue to be a priority. Two previously existing division policies have draft amendments and six facility procedures have been drafted including a QA portion:

Two division policies:
300.05.09 – Searches of Youth
500.70.04 – Clinical Observation

Six facility procedures:
900.04.01 – CARE Team
900.05.01 – Visual Monitoring
900.05.02 – Mechanical Restraints
900.05.03 – Administrative Confinement
900.05.04 – Rapid Response Team
900.05.05 – Incident Debrief

Interim policies and procedures for LHS/CLS need to continue to be developed. Policies relevant to LHS/CLS need to be compliant with the federal court orders and should contain a quality assurance section for every policy. Defendants should continue to update policy and procedures because without updated policies and procedures which include quality assurance measures, substantial compliance with the court order cannot be achieved.

There should be formalized training with employee sign offs acknowledging receipt and understanding all policies and procedures. Effective proficiency testing for all training classes still needs to be developed. The Monitor will continue to work with the Defendants on policy and procedure.

<u>Youth Interviews</u>

Plaintiffs' counsel and the Monitor conducted several youth interviews. Approximately thirty-two (32) youth were interviewed during the site visit (formally and informally). In previous visits, several youth wanted a more formal discussion with the ACLU attorney and/or Monitor. There were significantly less requests this visit. In general, the major complaints from youth were the new canteen vendor, perceived unfairness in how the point system was applied, being cut off from the phone—and therefore often family contact—as a punishment, and the desire to have more things to do. The overwhelming majority said that they were not confined much, if at all, were not restrained, and were not strip searched. A few youths did like when staff did unit and rooms searches. Most youth did not have complaints about staff but there were still a few youths concerned about how some staff members treated them. Most youth liked the modified behavior management program. There were a few who discussed certain situations and the Monitor and ACLU looked into the allegations during and after the site visit. Because of the new policies regarding open dayrooms (no split out time) and doors on privilege (youth can leave their rooms without permission), confinement due to split halls, counts, shift change, and medication pass is effectively ending confinement outside of administrative confinement. The Monitor believes that has had an overall positive impact.

Most staff were engaged with youth in a positive manner and were placed in the vicinity of youth. As mentioned, staff positioning probably needs to be reevaluated now that all youth are out of their rooms and have more freedom to move about.

The Monitor observed (and youth reported) several positive interactions between youth and staff. Defendants have implemented more PM programming activities. PSU has also initiated a number of additional groups and expanded the availability of these sessions to youth. Defendants continue to offer more programming however, there is still too much idle time especially during the weekend. Defendants are and should continue to identify more resources and continue to implement the programs as recommended by the experts retained. Defendants have made significant progress in improving the quality of life for youth and staff.

**COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION**

Below is the Monitor's assessment of compliance with the consent decree. As previously stated,

there is a challenge with adequacy of data for many areas (documentation, accuracy, consistency, and analysis) thus, some sections do not contain a detailed narrative.

Room Confinement

1. Punitive Confinement.

   a. Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence either in data or youth interviews that indicate youth are being confined for seven days.  If Defendants improve their quality of data and documentation and incorporate the court order into policy and procedure –and if this improvement is sustained - they will reach substantial compliance.**

   b. Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is no evidence either in data or youth interviews that indicate youth are being confined for three days.  If Defendants improve their quality of data and documentation and incorporate the court order into policy and procedure – and if this improvement is sustained - they will reach substantial compliance.**

   c. Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: There is no evidence in data/reports that indicate youth are being subject to punitive room confinement.  During this reporting period, the Defendants have improved documentation and have issued directives and created procedures to address youth behavior.  If Defendants improve their quality of data and documentation and incorporate the court order into policy and procedure – and if this improvement is sustained - they will reach substantial compliance.**

2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others.  Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an

initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  During the last reporting period, there were instances in which administrative confinement was being used for youth who did not pose a serious risk of imminent physical harm. It also appeared that, rather than releasing youth from confinement as soon as they no longer pose a risk, Defendants were generally treating four hours as a default minimum period of time for administrative confinement. The Monitor suggested how to document this requirement in policy and in forms as well as made suggestions to place youth in the day room once they no longer pose a serious risk of imminent physical harm to others. Defendants have incorporated the Monitor's suggestions.  Documentation and data from July were utilized in the incident debriefing and administrative confinement process which has significantly enhanced Defendant's ability to track administrative confinement placements. Incident Debrief and administrative confinement procedures are part of the eight procedures drafted and undergoing review prior to finalization. The Monitor suggested alternatives to confinement for administrative purposes such as med pass, counts, shift change, and split hall time. As of September 3, open dayrooms and doors on privilege have addressed many confinement issues during these periods.  During the last site visit, generally, youth who were in administrative confinement were transferred to the Krueger program.  This has changed in that now most youth serve the administrative confinement on their home unit. Some youth are serving their confinement on Krueger and are referred to the "Krueger Program." The Krueger Program has been modified based on some of the Monitor's recommendations, but there is still more refinement that needs to happen.  Although youth have behavioral plans developed, the program needs to be improved to include more robust behavioral plans and the plan needs to be revisited with more frequency should a youth not be able to return to the home unit in an appropriate period of time.   The Monitor also suggested that the Defendants evaluate the length of time it takes for a youth to move through levels 1 and 2 and that the policy and procedure clearly outlines the criteria for referral into the program as well as criteria for exiting the program.  Defendants conduct training, improve their quality of data and documentation and incorporate the court order into policy and procedure – and if this improvement is sustained - they will reach substantial compliance.**

a. Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

    i.      A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  In a large number of instances, it does not seem that administrative confinement is being extended. In the instances where confinement has been extended, a mental health associate (PSU) has authorized it. If Defendants improve their quality of data and documentation and incorporate the court order into policy and procedure – and if this improvement is sustained - they will reach substantial compliance.**

    ii.      A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.  During the last site visit, generally, youth who were in administrative confinement were in the Krueger program.  This has changed in that now most youth serve the administrative confinement on their home unit. Some youth are serving their confinement on Krueger and are referred to the "Krueger Program." The Krueger Program has been modified based on some of the Monitor's recommendations, but there is still more refinement that needs to happen.  Although youth have behavioral plans developed, the program needs to be improved to include more robust behavioral plans and the plan needs to be revisited with more frequency should a youth not be able to return in an appropriate period of time.  The Monitor also suggested that the Defendants evaluate the length of time it takes for a youth to move through levels 1 and 2 and that the policy and procedure clearly outlines the criteria for referral into the program. Defendants need to improve their quality of data and documentation and incorporate the court order into policy and procedure and train staff accordingly.**

    b.    Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE.  Time is being tolled from 8 pm to 8 am.**

    c.    Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced  plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is no evidence that administrative confinement has been extended beyond 24 hours, and thus there have not been such transfer plans created. If Defendants improve their quality of data and documentation, and incorporate the court order into policy and procedure, they will be in substantial compliance.**

d.   The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. If Defendants improve their quality of data and documentation, and incorporate the court order into policy and procedure, they will be in substantial compliance.**

3.   Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended pol icy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 was updated on 9/19/18 and the dates contained in the policy has been corrected. The Monitor suggests a more formal training and staff sign off reflecting they read and understand policy. Additionally, a quality assurance mechanism needs to be finalized.**

4.   **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a.   Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  As previously stated, the Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. The Monitor recommended that Defendants replace the existing room furniture with furniture that is specifically designed and engineered for secure environments. The new replacement furniture which is in the Wells unit is consistent with what the Monitor would expect to see in a secure facility and should certainly reduce the opportunity for suicidal incidents within the youth rooms. There is a plan in place to make such changes in the rest of LHS/CLS.**

**With respect to youth rooms, there was some change from the last site visit. Most youth rooms had their beds made and were cleaner than last visit. The Monitor did not observe rooms with multiple blankets/sheets covering large areas of the room. Room searches are taking place more often.  There has been significant improvement on graffiti and etching on the glass which has improved staff's ability to clearly see the youth through the window. Also, on the TIP unit, the Monitor recommended that the windows to be changed**

**(they were very small and pretty high on the door). These new windows have been installed.**

**Safety/Welfare checks have significantly improved and are now being done on an individual basis. Safety/welfare documentation show that room checks are being completed at least every 30 minutes and are staggered in the majority of cases. Defendants have provided additional personnel to ensure that the checks are being done in accordance to policy and procedure. There are also regular quality assurance reviews in order to increase compliance. As previously mentioned in this report, The Monitor has made recommendations to the forms that will simplify the process. The Monitor recognizes that an electronic system is being explored by the agency, but this will take some time. Safety/welfare checks should continue to be a priority and progress needs to continue to be made. While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model. Defendants should be commended for the vast improvement on these safety/welfare checks.**

> b.   Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS:   PARTIAL COMPLIANCE. Youth did not complain about access to water, hygiene supplies, or night time toilet usage.  This is a huge improvement from the last visit. If Defendants improve their quality of data and documentation, and incorporate the court order into policy and procedure, they will be in substantial compliance.**

> c.   Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible.  PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved but still needs more improvement.  Time of call to PSU staff is now being documented on the incident report in most instances, but there is room for improvement. This requirement should be included in the development of a quality assurance program.**

d.  Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1 , MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Monitor requested any documentation indicating that confinement is contraindicated and there were no instances documented during this review period. There is a form "Psychology Input for Security Decision" which is where the contraindication would be documented and there is a policy (Policy 500.70.04).**

e.  Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Safety/Welfare checks have significantly improved and are now being done on an individual basis. Safety/welfare documentation show that room checks are being completed at least every 30 minutes and are staggered in the majority of cases. Defendants have provided additional personnel to ensure that the checks are being done in accordance to policy and procedure.  There are also regular quality assurance reviews in order to increase compliance. As previously mentioned in this report, The Monitor has made recommendations to the forms that will simplify the process. The Monitor recognizes that an electronic system is being explored by the agency, but this will take some time. Safety/welfare checks should continue to be a priority and progress needs to continue to be made.**

**Defendants are holding staff accountable for this reporting period as there were 27 "Letters of Expectation" and two staff were formally disciplined related to visual monitoring. The agency is going to implement an electronic, software-based rounds checking system. PSU staff do visit youth daily when on site and have increased in-person hours on the weekend as recommended by the Monitor.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model. Defendants should be commended for the vast improvement on these safety/welfare checks.**

> f.    Any youth in room confinement shall have property items similar to or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth.  A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Property restrictions are most commonly applied by PSU for safety reasons, however forms and process for documenting any potential property restrictions need to be created and implemented.**

> g.    Youth in room confinement shall receive:

> 1.    All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided.  Once documentation, the quality assurance program is finalized, and this requirement is clearly in policy and procedure, Defendants will be in substantial compliance.**

> ii.    Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is a lack of documentation as to specific programming that occurs daily.  The Monitor anticipates this will change once the Krueger Program is updated/modified according to discussions during the site visits. Also, there are occasions where staffing levels do not allow for planned programming. There has been improvement in available programming, but there is still a lack of other activities for youth to engage in resulting in excessive amounts of idle time. At the visit, it was stated that the OJOR no longer requires specific programming such as ART to be released from LHS and that the programming provided in the Krueger program (such as DBT) will suffice, but this needs to be verified, documented and included in policy and procedure.**

> iii.    Educational services with the general population to the

extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services.   Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Educational Services for general population occur in the classrooms in the school area. Youth in the Targeted Intervention Program ("TIP") attend classes in the school area but separate from the general population. Youth in Krueger do not receive educational services in the school area (except for youth on Phase 3) but remain on living units. Additionally, during this reporting period, administration decided to move the girls' educational services out of the traditional school area and into a building with far fewer amenities and facilities than the main school. The Monitor recommends that all youth regardless of status have education in the school area.  The education expert will make further recommendations that should be implemented. The Defendants are working on bringing more culturally relevant program into LHS/CLS.**

iv.      Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. "Out time" has significantly improved in the last three weeks of this reporting period. "Split hall" (which means a portion of youth are confined to their rooms while others are out, and they rotate) ceased in September. The Monitor regularly saw youth conversing with other youth and staff during out time.  In youth interviews, youth stated that they are not really confined to their rooms at all.  Youth still want more structured activities when they are out of their rooms and feel they do not really do anything, which, as discussed elsewhere, is a significant problem. The Krueger program is out of pilot form, and the leadership has re-evaluated the program to ensure compliance with the court order and technical assistance report with the Monitor's assistance. More refinement to the Krueger Program needs to occur as discussed during the site visit.  Enhancing programs and meaningful activities for the Krueger program should have a positive impact and allow for youth to return to their home cottages more quickly.**

v.      Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth

eating that meal out of the cell.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. The majority of meals take place out of the room but there are several occasions where youth eat meals in their rooms when there is not an immediate and substantial threat of physical harm. The Monitor did not witness youth eating in their rooms but has reviewed documentation in which youth are eating meals in their room.  Should a youth eat a meal in their room, the decision by staff needs to be justified, supported by documentation, and instances need to be reviewed by facility administrators. Meals are not documented on living units except Krueger, but they need to be. When reviewing the Krueger documentation, a large number of youth are eating in their rooms without evidence of a threat of physical harm. There are less blank entries (meaning staff is not documenting whether youth are eating in rooms or not)  than during the last review period.  Policy and procedure needs to incorporate this section of the court order and quality assurance measure created.**

vi.     Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Logs indicate that youth are receiving 3 hours of "out time" per day or 30 hours per week. This has significantly increased since confinement due to split halls, confinement for shift change, counts, and medicine pass has been discontinued.  Documentation and data collection need to be improved.**

5.      **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. It is not clear whether youth are being told that they can grieve their placements in room confinement at all (or being told they can do so within 15 minutes of placement). There were 109 grievances filed by youth during this reporting period (on a variety of issues, not just placement). This indicates many youths utilize the grievance procedures.  Defendants do have a robust tracking system in place.  Defendants do analyze and have created measures for youth grievances. The quality assurance piece needs to ensure grievances are being timely and appropriately addressed and communicated to youth. The Monitor made recommendations to forms which if implemented, should improve data collection.**

6.      Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of

room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are now documenting this more consistently. In addition to improved documentation, there are significantly fewer instances of room confinement. Documentation needs to continue to be completed and consistently applied to all situations, other than sleeping hours, in which youth are confined alone in their rooms and the reason for the confinement. Documentation, data collection and reliability, and quality assurance needs to continue to be improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

      B.     OC-Spray and Other Chemical Agents

          1.    OC reduction plan. Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. OC usage has significantly been reduced during this reporting period. The Monitor made several recommendations including increased training, implementing a specialized team, and ensuring incident reviews are meaningful. Defendants have/will be implementing these recommendations. The CARE Team has been expanded and the specialized team is being created. Defendants should continue to do regular training on de-escalation. Additionally, as recommended in the technical assistance report, a new incentive-based behavior management program that focuses on rewarding positive behavior has been created which will have a direct impact on youth behavior and thus, reduce the need for force of any kind. Continued focus on training, skills development and coaching, continued focus on overall atmosphere should have a positive impact on the number of incidents requiring this type of intervention.**

**The below graph reflects the combined usage of OC at LHS and CLS in 2019.**



2.  Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: N/A.   It was not 12 months at the time of the site visit. Compliance will be assessed by the Monitor at the time required under this section.**

C.  Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1.  Prohibition on types and uses of mechanical restraints.

   a.  Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visits, but logs show there are occasions where youth are placed in mechanical restraints. With better documentation and quality assurance measures, and final policy and procedure, Defendants may be close to achieving substantial compliance with this provision if they can document and establish that there were not less restrictive means available and quality assurance measures and final policy and procedure are in place.**

   b.  Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the

youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraints are rarely used. Documentation has improved over this reporting period.  Documentation needs to be improved to document that an imminent threat of physical harm and when and how that process is reviewed. With better documentation and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

  c. No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

    i. Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

    ii. Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has improved relative to when restraints have been used and rationale for usage.  With better documentation and quality assurance measures and continuing to reduce the use of restraints, Defendants may be close to achieving substantial compliance with this provision.**

    iii. During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used.  Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

  d. Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

    e.    Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence of youth being restrained to a fixed object. With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

    f.    Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Training records indicate that the large majority of staff have received training in physical force, restraints, and trained in proper de-escalation (13 trainings June-September 2019). However, de-escalation training needs to be completed more often (regular, informal, refreshers) so that staff can continue to develop this skill. Proper de-escalation cannot be trained only once, or even only once a year. The Monitor continues to suggest having staff who are very good at de-escalation work with staff who could use a refresher or with new staff especially since a large majority are new.**

    g.    Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living unit.  No youth shall be left alone in restraints.   Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

    2.    Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time

the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process itself is being analyzed for improvement. New data will be available.  The use of mechanical restraints has been significantly curtailed and documentation including the length of time youth spend in restraints when the use of mechanical restraints occurs is now being documented as part of the Incident Debrief process. If Defendants maintains this, they will be close to achieving substantial compliance.**

    D.    Strip Searches. The following provisions are effective immediately upon entry of the Cou1t's order incorporating this Agreement.

        1.    Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that there are occasions where youth are strip searched, albeit at a reduced frequency. In July, there were zero strip searches with or without probable cause. Blanket strip searches of youth at intake or returning from court has ceased. Hygiene checks have been completely eliminated as of August 6, 2019.  The policy for searches needs to be finalized. Defendants are close to being in substantial compliance.**

        2.    Strip searches with probable cause.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that strip searching still occurs but on a much lesser frequency. In July, there were zero strip searches with or without probable cause. Blanket strip searches of youth at intake or returning from court has ceased. Hygiene checks have been completely eliminated as of August 6, 2019.  The policy for searches needs to be finalized. Defendants are close to being in substantial compliance.**

            a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved as to how staff are ensuring that unintended individuals cannot view the search (detail the area where search is occurring, state that there are no recording devices, and document who is present in the area, etc.) If documentation and policy revisions are made, substantial compliance can be obtained.**

    b.  Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved detailing the area where search is conducted and how other youth cannot view the youth being strip searched.  If documentation and policy revisions are made, substantial compliance can be obtained.**

    c.  Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved as to which staff conducted the search, that the search is by staff who is of the same gender identity as the youth if the strip search is being conducted by someone other than a medical professional. The Monitor previously recommended form changes for documentation purposes.**

    d.  Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records indicate that staff have been trained in trauma informed care.**

    e.  If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor is told by direct care staff and PSU is consulted. Documentation needs to be improved.**

    4.  Documentation.  Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. With continued practices, Defendants will be in substantial compliance.**

E.     De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Most staff have been trained in the new MANDT training and other training which includes de-escalation skills training. The Monitor recommends increasing the training frequency for staff to increase their experience and skill levels in managing and de-escalating situations before they result in the use of force, restraint and/or isolation. All staff have completed Mandt training in 2018 and it is included as a component of the Youth Counselor Academy. All staff are required to attend a Mandt refresher training in 2019. There are multiple sessions available to staff beginning in October 2019. The use of force review process has improved. It is more thorough, comprehensive, and timely. Corrective action plans when force was used where it could have been avoided are being done in most cases. The Monitor recommended in instances where de-escalation was successful, those examples should be used as a training tool for other staff including having other staff view the videos.**

F.     Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of id le time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Many of the recommendations that were made in the February 2018 technical assistance report have been implemented such as family events, yoga/Zumba, increased tournaments, more arts, and the additional programming listed in the narrative part of the Third Report of the Monitor. Youth advisory and family councils have been implemented and the Monitor's recommendations have been incorporated into the process (agendas, minutes, frequency, and increased staff involvement). Recreation leaders have been hired to focus on art and music. There have been musical instruments purchased. The Monitor witnessed youth drawing and painting during the site visit. The Monitor also saw the beautiful murals and art work of the youth and staff. The Health Services Unit ("HSU") puts on monthly educational activities that youth can participate, and tablets have been ordered for youth. New PSU groups have been implemented (Mindfulness, Music, Movement, and Movie). PSU is also doing several groups for the CLS students involving teamwork, leadership, and cooperation. Additionally, a weekly schedule of activities has been created as recommended by the Monitor. Although there were more activities for youth during this reporting period, there is still a significant amount of idle time. Now that youth are basically out of their rooms from 8 A.M. to 8 P.M., there is a need for more activities/programming. These activities/programming should be added in addition to school, not as a substitute for education. Also, some of the youth complained about not having music accessible to them. Perhaps, MP3 players could be more widely dispersed amongst all youth.**

As recommended previously, counselors, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. Several staff made suggestions for programming such as art therapy, dog therapy, increased tournaments, job readiness skills, music, balance and restorative justice, and teen court. Many of these suggestions have been implemented. Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. As mentioned previously, increasing education hours, including for youth who have obtained a diploma or HSED, can greatly assist in reducing idleness time and provide positive youth development strategies through meaningful education and vocational programming. The Defendants have retained a consultant that can assist with developing gender and culturally appropriate programming.

G.   Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Most of the recommendations made in the February 2018 report have been implemented such as conducting a staffing analysis, hiring bonuses to obtain new staff, increased wages for current staff, staff recognition, and staff wellness initiatives. There still are major staffing challenges due to various employee leaves and teacher vacancies. Job descriptions have been updated to highlight the youth counselor aspect of position instead of "guard" or "corrections" description. Defendants will be moving to a 12-hour shift starting in November with the goal of assisting with the staffing issues.  The Monitor encourages the Defendants to closely monitor the impact.  Given the long-standing staffing deficiencies, there is an urgent need to also explore methods for promptly reducing youth populations. This might include expediting the OJOR process and evaluating youth for placement under community supervision, including intensive community supervision, as permitted by state law. The Monitor suggests utilizing a strength-based model and ensuring that time spent in units like Krueger is not counted against a youth who comply with the Krueger Program. The average daily population has decreased slightly, but not enough to relieve the staffing issues.

H.   Amendments to administrative code.  Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

COMPLIANCES STATUS:  PARTIAL COMPLIANCE. DOC has identified sections of the Administrative Code that need to be modified, but significant revisions have not yet occurred. The process for amending Administrative Code DOC Chapter 376 began as of

September 3. The process for amending DOC Chapter 373 will begin after public hearings on the scope statement describing changes are held on September 20. Interim policies for LHS/CLS need to be drafted while waiting for final Code revisions.

## IV.     DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

**A. Incident review process.**  Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There has been an improvement in meeting the 24-hour timeline. Informal reviews occur right after an incident. An area of improvement is having staff involved brought together for meaningful discussions. When it has been determined lesser means could have been used, there is a corrective action plan developed now but quality assurance needs to be improved. There is a new QA process implemented for visual monitoring and a framework for other QA measures relating to the consent decree is being created.**

**B.        Quality assurance**.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goa ls that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE**. **Critical quality assurance positions are now filled and will be assisting in developing a quality assurance program. The Monitor reviewed sample performance goals, reviewed PbS in great detail, and made suggestions for monthly performance measures and how to incorporate into policy. The Monitor and the QA staff met and discussed various data points and reports. As discussed throughout this report, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff.  The Monitor is confident that the Defendants will create a competent quality assurance program.**

## **CONCLUSION**

There have been significant improvements to the physical plant of LHS/CLS which is providing a less institutionalized feel for youth and staff. Staff and youth interactions have significantly changed for the better. The overall atmosphere today has vastly improved from a year ago.  Leadership, staff, and youth should be commended because it took a lot of hard work by all to get to the place where LHS/CLS is today.  Defendants have more programming for youth than LHS/CLS has ever had available to youth. Confinement time has been substantially reduced. Direct- care staff vacancies have been reduced.  Critical data/quality assurance positions have been hired. As a result of the progress made, it is clearly evident that these changes are having a positive impact on the overall atmosphere and culture of the facility.

Continued efforts need to be made with reducing teacher vacancies and increasing educational time and quality. Krueger Program needs to be refined. Regular training in de-escalation and physical restraint techniques need to occur. Policies and procedures for LHS/CLS need to continue to be developed. Phone sanctions must cease. Implementing the new quality assurance program needs to be a primary goal.  The physical plant improvements need to continue as scheduled.

Although there is more work to do, the Monitor is very pleased with the progress made over the last year.  The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

Teresa Abreu
Monitor