UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                        Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

FIFTH REPORT OF THE MONITOR

---

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Fourth Report of the Monitor was filed with the Court on October 11, 2019. The Monitor's fifth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates from the fourth site visit which took place on September 13, 2019.

## SITE VISIT

The fifth site visit by the Monitor took place from February 6 through February 8, 2020. The Monitor reviewed materials provided by the parties prior to, during, and after the site visit. Materials included, but were not limited to: programming materials, staff surveys, PbS data, project plans, grievances, counselor logs, staff memos, daily shift reports, video footage of use of force incidents and activity on unit, all of the monthly data submitted to the parties per this court order, updated unit rules, work rules, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, other housing documentation, policy drafts, facility enhancement report, and various meeting minutes. The Parties were present during the site visit. The Monitor took photographs, toured LHS/CLS, and interviewed youth and staff. Approximately forty-four (44) youth and thirty-one (31) staff were interviewed formally and informally by the Parties during this site visit.

## Overall Quality of Life, Conditions, and Atmosphere

Introduction

While the conditions at Lincoln Hills and Copper Lake have certainly improved since a year ago, documentation and interviews indicated that there has been some regression since the September 2019 site visit, especially with respect to punitive and administrative confinement and the use of restraints. During this reporting period, Defendants have eliminated the use of OC Spray and there were significant incidents in which alternatives to OC spray had to be utilized. The response to these incidents impacted the use of confinement, restraints, programming, and PbS data.  The Monitor anticipates an improvement during the next reporting period. In more detail below, are the observations and recommendations from this site visit.

Physical Plant

The general areas of the facility were very clean and orderly.  It was very cold with snow on the ground but the walkways throughout the facility were shoveled nicely. The atmosphere in general was calm throughout LHS/CLS.  The recommendations as to the physical plant modifications made in previous Monitor reports and the February 2018 technical assistance report have been implemented and/or are progressing. Several physical plant improvements have been completed including, but not limited to, electronic documentation and reporting system ("RFID"), Wells, Miller, Black Elk, DuBois and Curtis cottages remodeling, additional telephones installed in each of the cottages, and the new generator is complete and operational. Additional projects not yet completed are the camera upgrade, electrical upgrade, camera, the new staff break room, and remaining cottage remodels (King, Roosevelt, Krueger, and Rogers).  The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

In general, entrances into the units were very clean and orderly, the day rooms were very clean, and most of the bathrooms in the cottages were clean. The level of cleanliness of youth rooms varied throughout the cottages (described in more detail below). There were no observable maintenance issues observed during this visit.  The Defendants have included the room and unit cleanliness in their behavior management system and "Clean Up" contests continue to occur, and other incentives are planned on a regular basis. Because the Defendants have removed and/or secured items that have been used by youth in disturbances and built barriers, the facility is much safer, particularly in the newly renovated living units. The Monitor recommended that searches of all buildings be conducted to remove excessive objects, materials, equipment, furniture, etc., to enhance the safety and security of the units/buildings and to maintain a more orderly and safer environment.  Defendants now regularly conduct and document searches and there was no evidence of excessive objects, furniture, etc. in the living units or classrooms. This is an improvement from the last site visit.  Youth and staff should be commended. The Defendants replaced existing furniture with furniture that is specifically designed and engineered for secure environments and the secure furniture are in several of the living units.  There is a schedule for removing the remaining of the existing furniture and replacement with a goal completion date of August/September 2020. Defendants believe they will meet this timeline.

School/Living Units Observations

The Monitor visited each cottage and toured the school on Friday.  The school continues to have

positive messages throughout, and artwork displayed. The classrooms and the general school area were very clean. All the girls were in the school area attending class. However, many youth were not in class because five teachers were absent, and when such absences occur youth remain on their units. Youth that were in the classrooms were behaved and engaged. There were two youth in the library reading books. There was one youth in the STAR room. There is now a room designated for the Grandparents program. The youth really enjoy when the grandparents are there. There was somberness this visit as one of the grandparents experienced a serious medical condition (unrelated to her volunteer work) a day before the site visit. The music room moved to a bigger space and the youth are truly enjoying this new space. Recording studios are being developed and the youth and faculty are excited. There were several teacher absences this day so there were not many youth in class. In the afternoon, youth were filtering into the school area for "CR²EW" which is a new social emotional program cultivating resilience, responsibility, empathy, and wisdom. Small groups of youth and staff participate daily, although youth in Levels 1 and 2 on Krueger and youth who have graduated are not included in the program. There was a graduation ceremony on Friday which was very exciting for staff and youth. There is an increased use of online education in the schools. Some youth like this method of instruction, while others did not and felt they would benefit more from instruction by a teacher in the classroom.

The Monitor previously recommended that the Defendants hire an education expert to complete an assessment of the educational program at LHS/CLS. The expert was retained and provided initial observations. The expert returned in November to further assess the education department's operations and make specific recommendations. The Monitor recommends that the Defendants engage the consultant further and work to address the concerns raised – including the need for more deep and meaningful teacher interaction with youth - and implement the recommendations made by the consultant and the Monitor with respect to staffing and the educational program for LHS/CLS. The Monitor reported last time that the Defendants moved the girls' educational programming out of the main school and into a smaller building in the Copper Lake section of the facility, with fewer amenities and facilities than in the main school. The Monitor highly recommended that the girls return to the main school as soon as possible. Although the Monitor recommended that the girls return to the main school sooner, the Defendants did not move the girls back until February 4, 2020. Youth on levels 1 and 2 in the Krueger Program continue to attend school in classrooms on their living unit. The Defendants should consider allowing youth on Levels 1 and 2 to attend class in the main school if their behavior warrants it (similar to the TIP unit at a minimum).

There was a high number of staff at the facility, specifically on the living units during the site visit due to new staff doing on the job training ("OJT"). The Monitor saw staff engaging with youth, although less so than during the September visit. Youth attitudes overall were very good during this site visit. All the youth that the Monitor interacted with were respectful and many were very chatty. OJT staff cannot be counted towards the PREA staffing ratio, but they are able to actively engage with youth. This would have been a great opportunity for staff to sit with youth more, engage in meaningful programming with youth, and learn the day to day responsibilities of youth and staff.

Safety/welfare checks are no longer being completed on paper because the new RFID system has been implemented. The RFID system is a data driven assessment about youth observations, movement, and classification. It measures staff performance on safety/security checks in real time, which will help manage compliance with the various requirements of the Court Order and other

standards. The Monitor could not observe whether the safety/welfare checks were completed and up to date/staggered on the units at the time of the site visit as they are still adjusting to running reports. However, the Monitor did observe the process and witnessed staff completing the rounds on all units. Subsequent to this site visit, the Monitor reviewed a random sampling of the safety/welfare check data from the electronic system. The majority of the checks were in compliance with the Court Order. Staff really like the new electronic system and seem to be adjusting well to the new system.  The new system appears to work much better than the old paper system and, more importantly, staff appear to be paying much better attention to the process and youth safety. One small recommendation for the new RFID system is to change the word "inmate" to youth within the software of the programming and replace the icon with the hands in the cell image for another one (if possible).

During this site visit, the girls were split between King and Wells cottages since the renovation project that was in progress during the last visit is completed and since there was an increase in the number of girls at CLS.  The atmosphere is quite different on the two girls' units. On Wells, the girls were very chatty and respectful.  They expressed how happy they are to be back in the main school. Staff were sitting with the girls at the table while they played games and were doing artwork. The girls were conversing appropriately with each other and staff. The rooms on the unit were generally clean and orderly with beds made. No one was confined to their room and youth were waiting patiently for their meal to be served.  The Monitor observed staff redirecting youth appropriately and youth following staff direction.  Staff were completing their safety/security rounds, engaging with youth, preparing dinner, and medicine pass was occurring.  It was a very calm and happy unit.

King was less calm; staff were not sitting with youth and youth were not engaged in any activities besides sitting at the tables waiting for dinner. The rooms in general were not clean, however, the unit itself was clean and orderly. No one was confined.  Youth seemed more irritable in this unit than on Wells. Inconsistency of staff could be a factor for this difference.

With respect the boys' cottages, generally, the cottages themselves were cleaner than the last visit. The Monitor recommended during the last site visit that staff adjust their placement now that youth are all out of their rooms from 8 a.m. to 8 p.m. (generally speaking) and can more freely move around the unit. Staff were appropriately placed around the unit from a safety perspective.  There were significantly less youth in their rooms during this site visit than any of the previous site visits. As previously mentioned, there were a lot of staff on the living units due to staff completing on the job training (3-5 staff per cottage) but many were standing around the youth observing youth versus sitting with them and engaging. With the number of staff on the unit, some could have placed themselves around the unit and some could have been engaged with youth. During this site visit, staff in general were not interacting with the youth as much as the Monitor observed during the last visit. Perhaps this is because most of the staff at the time the Monitor toured were very new.

In Krueger, the unit was clean. Youth rooms were dirty and had graffiti as observed during the last site visit.  Six (6) youth were out in the day room eating their meals calmly and exhibited good peer relations. There were five (5) staff on the unit.  Four (4) youth were in their rooms as youth on Krueger rotate in and out of their rooms for meals and programming. Staff were sitting with youth and chatting with youth. Based on staffing levels, the Monitor believes that all youth should

have their meals at the same time in order to reduce confinement time.

The Monitor had recommended in all units that "split hall" time (which means that half the youth were confined in their rooms while the other half were out of their cells) be eliminated, and youth remain out in the day room during medicine pass, counts, and shift change thereby reducing operational room confinement significantly. As of September 3, 2019, the Defendants ceased doing confinement for these reasons throughout LHS/CLS. However, the Defendants reinstituted these types of confinements in October 2019 after some significant group disturbances, and they continued through the site visit despite the lack of any major disturbances since October. A few days after the site visit, the Monitor was told that the Defendants stopped doing these types of confinement. LHS/CLS continues to have "open dayrooms" which allow the youth to be out of their rooms from at least 8 a.m. to 8 p.m. for the majority of this reporting period. Youth are happy that they are not being confined to their rooms during these hours although they express concern about a lack of activities.

In Addams (intake unit), the living unit, bathroom, and rooms were very clean and orderly. The cottage is beautifully decorated. There were ten (10) youth on the unit and five (5) staff. Staff were engaged with youth and the youth were quite silly. There were no youth confined. There was significantly less graffiti in the youth rooms than during the last visit. The new staff stated that they were very happy and that the training they received was excellent.

In Black Elk, the unit was clean. Youth were in the day room eating and no youth were confined. Most of the rooms were clean. Youth were pretty rowdy, and it was not a calm environment.

The Rogers unit (TIP) was clean and youth rooms were not as clean as the other units. There were five (5) staff on the unit. Two (2) youth were in their rooms voluntarily. Staff were not engaged and were standing with their arms crossed. Youth were on the unit watching television, playing games, and talking with each other. The unit was calm.

The Hughes living unit was the least clean and had the most graffiti. About half of the rooms were clean and the other half were messy. Youth were out cleaning and eating lunch. There were three (3) staff on the unit. Youth were on the telephone, talking with each other, and some youth were eating. One youth was in his room at his request. We talked with one of the youth on this unit who said this was his second time being at LHS. He said he was here a few years ago and stated that the facility "is way better now than it was back then."

The Miller unit was very clean. Youth rooms were moderately clean. Two youths were in their rooms voluntarily. Youth seemed to really get along. Youth were watching television, braiding hair, and playing foosball.

The Dubois unit was very clean. The bathroom was very dirty. Half of the rooms were clean (one side) and the other half were very messy and dirty. Youth were out in the unit reading, talking, and watching television. No youth were in their room. There were four (4) staff on the unit. Staff were very happy and said that there have been less incidents than in the past.

LHS/CLS continue to have less of an institutional feel and the overall atmosphere is as good as the last site visit. Staff and youth continue to make positive comments and have positive attitudes. The

biggest complaint from youth this visit was the food, canteen out of stock items, and being bored. Youth did not complain to the Monitor about phone restrictions or perceived unfairness of points earned this visit. They did complain to Plaintiffs' counsel about those staff members who were perceived as being quick to deny them points or provoking them and, as youth put it, seemed not to want the youth to succeed, while they appreciated staff who worked with them to succeed.  Two new phones were installed on each of the living units which has allowed more access for youth. Defendants have done an excellent job of essentially eliminating phone restrictions as recommended. In September 2019, there were twenty-seven (27) restrictions and in November there were two (2). A year ago, there were as many as 109 phone restrictions in a month.  Leadership understands the importance of family engagement in the overall well-being of youth. Youth also did not complain about the quality of canteen/prices as they did during the last visit.  During the last visit, the Monitor brought up the youth complaints about the new vendor, cost of canteen, and the impact on programming.  The Defendants were able to address these issues quickly and discussed canteen during four youth advisory groups (reflected in the group notes).

Although there seems to be more programming during school days and school hours, there is still a lack of structured programming in the evening and on weekends, and for youth whose classes are cancelled due to teacher absences. While youth are out of their rooms there should be engaging activities for the youth.  This is extremely noticeable and needed during the weekends when school is not in session and no other programs are occurring, and staff also stated that there was no replacement programming for youth when teachers were absent.  Youth are bored and while being out of their rooms is certainly an improvement, more meaningful activities and weekend programs would also help reduce the risk of youth engaging in anti-social behaviors when they have little else to do Youth need more to do than simply sitting in the dayroom area watching television or playing cards.  The data shows, and the Monitor observed, a high level of self-confinement.  There needs to be a bigger focus on reducing youth idleness and more structured programming should be put into place.  In an effort to develop more activities, Defendants implemented a "Youth Activities Committee" in October 2019. The purpose is to develop staff-directed activities. Defendants anticipate incorporating the Committee's suggestions into programming in the near future.

<u>Staffing</u>

During this reporting period, there have been a few staffing changes. As previously reported, in August 2019, Defendants hired a new Administrator to oversee the Division of Juvenile Corrections.   Additionally, a new Deputy Administrator has been hired during this reporting period. The Monitor had the opportunity to meet the new music recreation worker. He is passionate about his work and the youth absolutely love working with him and enjoy the music program that is being developed. The addition of the music recreation worker is having a positive impact on programming.  One of the two Psychologist Supervisors at LHS/CLS recently took a new position at another DOC facility. The Defendants are actively recruiting for her replacement.

Direct-care staffing vacancy percentage has improved from the last site visit. There have been thirty-nine (39) new direct-care staff hired during this reporting period. There are 311 total positions ("FTEs") at LHS/CLS. Based on population, Defendants determined that they need three (3) fewer teacher FTEs and thus moved the FTEs to other critical positions. Approximately 153 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA"). Through collaboration with the 12-hour committee comprised of the Security Director,

Supervising Youth Counselors, and Youth Counselors, the Youth Counselor and Youth Counselor Advanced posts were re-evaluated.  It was determined that there was a need to reallocate the number of positions in each of these two classifications (as indicated below). There is still a large number of staff on various leaves of absence (FMLA/Workers' Comp, etc.) The teacher vacancy rate remains high but with very slight improvement over the last five months. Recruiting is still a challenge due to the location of the facility, overall teacher shortages, relatively low compensation, and the year-round school calendar. This is directly and negatively impacting education for youth. As previously mentioned, the entire educational program at LHS/CLS needs to be evaluated and improved.

| Position | Vacancy Rate % as of March 14, 2019 | Vacancy Rate % as of May 31, 2019 | Vacancy Rate % as of Sept. 6, 2019 | Vacancy Rate % as of January 30, 2020 |
|---|---|---|---|---|
| Youth Counselor | 15% (16 out of 105) | 11.5% (12 out of 105) | 14% (15 out of 105) | 7% (8 of 115) |
| Youth Counselor Adv. | 48% (24 out of 50) | 50% (25 out of 50) | 7% (3.5 out of 50) | 15% (5.5 of 37.5) |
| Teacher | 39% (11 of 28) | 43% (12 of 28) | 36% (10 of 28) | 32% (8 of 25) |
| Social Worker | 0% (14 of 14) | 0% (14 of 14) | 21.5% (3 of 14) | 21 % (3 of 14) |

In order to address staffing challenges at LHS/CLS, effective April 28, 2019, security personnel began receiving a $5.00/hour add-on for worked hours and twelve (12) hour shifts were piloted in November 2019.  Although there has not been a data driven analysis of the 12-hour shift, there was a very comprehensive staff survey completed. The majority of staff prefer this scheduling. Most staff feel that their quality of life has improved.  Every staff person the Monitor spoke to said they absolutely love the new schedule.  Staff reported that they work less hours and are not ordered to work extra shifts as much as they used to be, which has had a positive impact on their well-being. The Monitor made suggestions for an impact analysis of the new schedule.

The Monitor spoke to over thirty-one (31) staff and the majority of staff seem relatively energetic and happy.  Many of the veteran staff stated that they believed the facility was making good progress, they are beginning to feel safer and things are improving.  There were a lot of new staff shadowing on the units (on the job training). The vast majority of staff again expressed the desire to have more programming for youth.  The new staff really liked their job and said it was better than they thought it would be. They all said that they felt the training they received and, most importantly, the OJT on the units, sufficiently prepared them for the work.  Staff were adjusting well to the new RFID system and were very happy that they did not have to track youth movement/confinement on paper anymore. Also, staff felt they are adjusting very well to the elimination of OC spray. Staff also realize the need to continue building new skills that will help them manage and respond to youth behaviors more positively and enable them to more effectively de-escalate youth.  Staff were very open to talking to the Monitor and genuinely seemed to enjoy their jobs.  In response to the

Monitor's previous reports, the administration conducted Situational Awareness Training (a POSC update training) focused on alternative techniques to prevent and address behavioral problems provided to staff in July, August, and September. There have also been several trainings on suicide prevention and MANDT training. The facility plans to continue to focus on training. Staff are adjusting very well to the changes occurring. In the Monitor's conversation with staff, staff did not raise issues with the elimination of punitive confinement, OC spray, and phone restrictions, or with the new RFID system, open day rooms, or the 12-hour shift.

The Defendants have implemented almost all of the recommendations for staff wellness including increased training, staff recognition program, engaging staff in developing programming and policy changes, actively participating in youth and family council meetings, reducing ordering of staff (mandated overtime), and constructing a relaxing staff lounge. The Monitor continues to stress the need to continue making staff wellness a major focus moving forward.

As part of the agency and facility's desire to improve conditions for both staff and youth, they are continuing to engage in the Youth in Custody Practice Model ("YICPM"), which was explained in the previous Monitor reports. The third YICPM site visit took place November 14-15, 2019. DJC leadership, LHS/CLS managers, and other staff participated. The DJC/facility has finalized plans to use their remaining subject matter expert ("SME") days on training, leadership development and staff capacity to operationalize a treatment practice environment/model. The multidisciplinary team reviewed national best practices, discussed family engagement, healthy environments, youth voiced supporting staff, addressing racial and ethnic disparities, behavior motivation, crisis intervention and management, and education. The Monitor looks forward to the agency implementing these plans to improve conditions of confinement for youth and well-being of staff.

The Defendants are also collaborating with Massachusetts Department of Youth Services to explore Dialectical Behavioral Therapy ("DBT") as a behavior management system. Defendants also reached out to an expert on Trauma and Brain Development in order to enhance training and programming for youth and staff. In September, there was a Reentry Simulation during National Reentry Week. The program simulates the first month in the life of a youth after release from prison. The simulation is set to show the various difficulties a youth encounters post-release. The simulation also helps staff empathize with the anxiety and struggles youth experienced. There were thirty-six (36) boys and ten (10) girls that completed the whole program. The goal is to continue to do the simulations more regularly in the future since the feedback was positive from staff and youth.

The Monitor suggested modifying the mental health (PSU) and recreational staff work schedules to include more evening and weekend hours. PSU staff work until 8 p.m. during the week and are on-call 24/7. The Defendants should continue to involve PSU staff, especially leadership, in making improvements at the facility (such as improvements to incentives, consequences, and working with the OJOR system). Currently, there is a PSU staff member who comes in each weekend to perform rounds, finish notes, and intakes (four hours) and will report to the facility as needed. However, there are no groups or programming involving PSU on the weekends. Weekends are when there is the most idle time. There really is a missed opportunity for PSU involvement during this period.

In addition, documentation indicates that there is a relatively high rate of transferring youth from LHS to Mendota Juvenile Treatment Center (MJTC). Criteria for when such transfers are deemed appropriate should be clear and written in policy and procedure. The Monitor recommends that the facility obtain a mental health expert to evaluate the programming, staffing, and services that exist at LHS/CLS, and make recommendations on how to address the issues raised and improve treatment and services for youth at LHS/CLS.

Quality Assurance ("QA")

As previously reported, to address the need for a quality assurance and improvement program, the Defendants have created and filled both QA positions. The Monitor has had the pleasure of spending time with these individuals over the last five months. The Monitor will be focusing on assisting the team with their data collection and QA program. The goal continues to be not only assessing compliance with this Court Order, but the quality and adequacy of the social and recreational programming provided, healthcare, education, environmental health, safety, and discipline.

During this site visit, the Monitor spent a lot of time going over data including the Performance based Standards ("PbS") from the October data collection cycle. The Defendants have created a "Quality Assurance Review" process that is completed each month. A framework for identified outcome measures was developed to align with PbS national benchmarks. In the interim, an Incident Statistics report from J-Tracker is provided to leaders to capture various types of incidents. Key monthly data is now being shared with leadership relating to youth fights/assaults, horseplay resulting in injuries, youth on staff assaults, use of force incidents, and workers' comp injuries reported. Searches are now documented in J-Tracker and search reports are created and reviewed.

As reported in the fourth report, a vendor has been awarded a contract for an electronic rounds system (RFID). The system is up and running and a staff directive has been provided. QA and policy still need to be developed, but this electronic system will make LHS/CLS safer. Staff and youth should be commended for embracing this upgrade, which is a significant change to how safety/security checks and other youth movement and programming is and will be documented and analyzed.

PbS data collection cycles occur twice annually, in April and October. Facility Improvement Plans ("FIP") have been created after the most recent PbS Coach Site Visit and has been forwarded to the Monitor. PbS is a continuous data-driven improvement model grounded in research that holds juvenile justice agencies, facilities and residential care providers to the highest standards for operations, programs and services. The FIPs are the vehicles for jurisdictions to continuously bring about meaningful change. They bridge the gap between understanding and actions to improve the conditions of confinement at a facility, beginning with identifying the specific outcome measure(s) a facility want to improve. The FIP process provides the facility with the ability to track progress towards identified outcome goals, and receive scores based on that performance and identified FIP goals.

**FIP Action Steps**
PbS offers a 7-action step tool, driven by a research-informed improvement model, to support and guide PbS participating agencies and facilities as they work to achieve both incremental and

sustainable change. The action steps entered into the PbS website make up the team's concrete plan to attain the improvement you are seeking.

1. **Analysis of Performance**
   - Pinpoint the causes of your outcome performance.
2. **Creating Buy-In**
   - Identify how you will engage those whose support you need to improve the targeted outcome or area of change.
3. **Setting Outcome Measure Goal**
   - Create short, interim & long-term goals that provide benchmarks and a vision to work toward.
4. **Improvement Process Action Steps**
   - Develop concrete, measurable actions to address the factors that contributed to your outcome performance.
5. **Interim Measures**
   - Identify how you will monitor your progress toward your goals to see what is working and adjust your strategies as necessary.
6. **Sustaining Performance**
   - Identify strategies that will support what is working to ensure sustainable change.
7. **Performance Recognition**
   - Determine how you will formally and informally recognize staff, youth and other stakeholders for their contribution to the improvement process; celebrate successes!

The following outcome measures were selected for these FIPs based on input from the PbS Coach and facility outcome:

LHS Facility Improvement Plan #1010

| Outcome Measure |
| --- |
| Safety 02 Injuries to youths per 100 person-days of youth confinement. |
| Safety 03 Injuries to staff per 100 staff-days of employment. |
| Safety 04 Injuries to youths by other youths per 100 person-days of youth confinement. |
| Safety 11 Assaults and fights on youth per 100 person-days of youth confinement. |
| Safety 12 Assaults on staff per 100 person-days of youth confinement. |

CLS Facility Improvement Plan # 1009

| Outcome Measure |
| --- |
| Order 08 Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement. |

During the site visit, a thorough and in-depth review was conducted of the October PbS data collection for both LHS and CLS.  During the review, outcome measure data clarification and input was sought from both the facility PbS Site Coordinator and the assigned PbS Coach.  As a result of the review, the following highlights and outcomes are noted:

**PbS Data Quality** – Some issues were identified as to the quality of the data entered for some outcome measures, including outcomes measuring around daily activity durations.  It should be noted that that both LHS and CLS chose to only record unit activity data for a period of one week, rather than for the entire month of October, thereby somewhat skewing the data.  This is particularly true for this data cycle, because the one week in October during which data was collected coincided with the elimination of OC spray and several serious incidents occurred at the facility during the week in question. The facilities have not since experienced similar incidents of this magnitude. The facilities should try to follow the PbS instructions for the interactive Unit Logs which states, "*Enter one Unit Log survey for each living unit in your facility. For this survey, collect and track daily hours minimally for seven consecutive days during the data collection period. Tracking hours for the entire data collection month is preferred. Report activities for what the majority of youths on the unit are participating in.*"

The categories are:

Education                                          Other Facility Programs
Leisure Activity                                 Unit in Sleeping Rooms
Recreation Activity                            Operational Activity

The issues with most of these data points appears to be around unit and area documentation.  For example, there is a discrepancy between the education hours reflected in the PbS activity data with what the school believes should be the correct number of hours a youth is in school. The number of hours fluctuates greatly between units and between boys and girls.  At LHS, the average number of education hours per day is 2.49 hours, with the highest number of hours being reported by the DuBois Unit, 4.00 hours, and the lowest reported by the Roosevelt Unit, at 1.86 hours per day.  At CLS, the average number of education hours is reported at just 2.14 hours per day.  The school principal stated that these hours are incorrect and do not reflect the actual hours youth are attending school. Since this continues to be a discrepancy in the data, further verification of school data is necessary.

Additionally, the unit activity record for the Krueger Unit reflects that youth are spending approximately 20.64 hours per day in their rooms (10.5 hours reflected as sleeping time and 10.14 hours reflected as "in sleeping rooms," room confinement).  The activity log for the Krueger Unit also did not reflect any hours for education.  During discussion with the facility and the PbS Coach,

it was learned that the data for the activity logs was taken as a one-week snapshot. It is possible that this particular week did not reflect a "normal" course of activity for the Krueger Unit, however, it is the data currently available through PbS and is as entered by the facility.

Finally, both sites should work closely with the PbS Coach in order to better address the required data collection for Unit logs going forward for the Interactive Reports to be useful to the sites and to the Monitor. It will take a good understanding of the definitions of each category and all program areas working together to assure comprehensive reporting and data quality. A reminder is that the Unit log looks at what the majority of the residents on each unit are doing during waking hours. The Monitor urges the facility to work more towards reporting data for the entire data collection month in order to get a clearer picture of daily activity in order to better monitor idleness issues.

**Use of Restraint Outcome Measures** - Both LHS and CLS show "0" incidents of use of chemical agents (Order 6) during the October 2019 data collection cycle, which is commendable and per the Settlement Agreement. However, the rate of physical restraints (Order 3 – Physical Restraint Use per 100 person days of confinement) has increased somewhat at both LHS and CLS as has the rate of mechanical restraint (Order 4 – Mechanical Restraint use per 100 person days of confinement) incidents. More remarkable is the higher rate of both Order 3 and Order 4 occurring at the CLS with the girls.

(Note: PbS defines Physical Restraints as facility authorized and trained holds used by staff to subdue an otherwise uncontrollable youth in order to prevent the youth from injuring him or herself, or others. Mechanical Restraints: Mechanical devices used to prevent an uncontrollable youth from injuring him or herself or others. Mechanical restraints may only be used for short periods of time and must be used under medical supervision.)

Also, during the discussions around the use of restraint incidents, facility staff remarked that they had reduced the use of the Care Teams during recent months and this resulted in a higher number of restraint-usage incidents. Care Teams are designed precisely to reduce the need for the use of restraints and have been effectively shown to work at facilities across the country and have been shown to be effective at LHS and CLS as well. It also appears that Administrative Confinement (AC) has increased as a result of a reduced Care Team effort. The Monitoring team reviewed several incidents in which a Care Team response would most likely have resulted in a different outcome.

The Department should more systemically implement the core principles of the Care Team model by utilizing an agency strategic plan process that involves additional staff training in de-escalation techniques; include Care Team deployment information in shift debriefings in order to review the process and provide on-going situational training for staff; implement a Care Team response incident report that also reflects the outcome of the response in order to better track outcomes from Care Team deployments; implement the S.O.D.A.S model (Situation, Options, Disadvantages, Advantages, Solution) into the Care Team model; and, finally, the facility leadership team should incorporate daily/weekly review of all use of force/restraint incidents to evaluate if and when the Care Team should have been activated to help de-escalate a situation. This should be used as a staff training and awareness process to help staff build new skills and to help change their mindsets in how they first react to certain types of youth behaviors.

**Isolation, Room Confinement and Segregation Measures** – Overall, the PbS outcome measures around isolation and room confinement are improved over the April 2019 PbS data collection cycle reflecting over 83.82% of room confinements are terminated in under eight hours, and slightly fewer in under four hours, 80.15%. These are both very commendable achievements, and both are slightly better than the national field averages for these outcome measures.  However, where we see an issue is around Order 13 – Isolation, Room Confinement for reasons not related to behavior.  These appear to primarily be incidents where youth are refusing to participate in programs and education. As you can see from the following chart, self-requested and declined to participate in programs involves 81% of the non-behavior related confinement incidents. There were 112 (12%) recorded incidents during the month of October where youth declined programing/education.

| Value | Count | Percent |
|-------|-------|---------|
| Self-requested | 748 | 79% |
| Declined to participate in program | 112 | 12% |
| Protect other youths or staff | 77 | 8% |
| Consequence for rule violation | 4 | 0% |
| Protect property | 1 | 0% |
| Give youth time to cool off | 1 | 0% |

One youth accounted for 50 confinements and two other youth accounted for 32 confinements each during the month of October.  It would seem based on the above data that the majority of these 114 confinement incidents from these three youth were self-requested and/or declined to participate in programs. Increased and more meaningful programming, less idle time, and increased involvement of mental health staff would certainly improve and help reduce incidents of self-requested and declined to participate confinement incidents.

The PbS Incident reporting data for October reflects the following important data points:

➢ 19% of the incidents occurred in the Roosevelt Unit;
➢ 17% of the incidents occurred in the Rogers Unit;
➢ 95% of all incidents occurred within a living unit;
➢ 84% of incidents involved some form of an "assault;" and
➢ 83% of incidents involved "failure to comply."

**Youth and Staff Climate Surveys** – Both youth and staff appear to be more responsive in utilizing the youth and staff climate surveys.  It is strongly recommended that both department and facility leadership take the time to thoroughly review the agency/jurisdiction count summaries for both the youth and staff climate surveys.  The results can be very insightful and useful for leadership.  Below are some of the survey results that the Monitor found most useful to be included in this report.

Staff Climate Survey Results:

**In your opinion, what would make this facility safer?**

| Value | Count | Percent |
|---|---|---|
| More staff | 121 | 78% |
| Safety equipment | 86 | 55% |
| Training | 67 | 43% |
| Other | 65 | 42% |
| Less overcrowding | 33 | 21% |

In regard to the above chart, the following are the top ten most requested training that staff felt would make the facility safer:

**What training would you like to see?**

| Value | Count | Percent |
|---|---|---|
| Verbal de-escalation | 75 | 48% |
| Safety and security | 60 | 39% |
| Gang training | 51 | 33% |
| Adolescent development | 48 | 31% |
| General behavior management | 48 | 31% |
| Agency policies and procedures | 46 | 30% |
| Ethics | 45 | 29% |
| Appropriate staff/youth relationships | 42 | 27% |
| Communication | 41 | 26% |
| Cultural diversity and awareness | 41 | 26% |

**October 2019 PbS Staff Climate Survey Results:**
➢ 79% of staff responses reported they fear for their safety (it is important to note here that the staff surveys were last conducted in October 2019);
➢ 83% of responses reported they believe the facility is unsafe or very dangerous;
➢ 83% of responses indicate that staff believe they do not have authority to discipline youth appropriately.
➢ It is important to note that the week in October during which PbS data was collected was a temporary period in which there were several disturbances, and may not accurately reflect the current fear levels (as indicated by interviews with staff during the site visit)

**January 2020 DOC/DJC Staff Survey Results:**

➢ Since switching to the 12-hour shifts, 77% of staff strongly agree, agree, or somewhat agree that health and safety has improved for themselves and their co-workers.

➢ 82% of staff strongly agree, agree, or somewhat agree that the change has had a positive impact on their well-being.

➢ 78% of staff strongly agree, agree, or somewhat agree that job satisfaction has improved for themselves and their co-workers.

Youth Climate Survey Results:

**Do you fear for your safety in this facility?**

| Value | Count | Percent |
|---|---|---|
| No | 28 | 44% |
| Yes | 28 | 44% |
| Not recorded | 6 | 9% |
| Refuse to answer | 2 | 3% |

In comparison, the youth fear for safety measure, Safety 13, has steadily improved from the previous two data collection cycles.  The rate still remains higher than the national field average but is improving.

**Within the last six months at this facility, have you been beaten up or threatened with being beaten up?**

| Value | Count | Percent |
|---|---|---|
| Yes | 31 | 48% |
| No | 25 | 39% |
| Not recorded | 6 | 9% |
| Refuse to answer | 2 | 3% |

➢ 52% of youth responded that they do not understand their legal rights;

➢ 96% responded that they know and understand the behavior management points system and know their levels;

➢ 55% reported have received a family visit.

There needs to be a continued focus on adequacy and quality of the data collected and analysis of other subjects of the Court Order.  Defendants need to make this a priority.  Defendants should also pay particular attention to each Facility Improvement Plan as each FIP includes a section for comments relating to the implementation status of each action step completed by the PbS Site Coordinator or assigned staff member. Ongoing FIP review comments are entered by Facility

Administrators, Agency Directors and the assigned PbS Coach.  This is an excellent way to for the agency and facility leadership to monitor on-going progress with each of the FIP goals and to provide input, guidance and direction during the process.

<u>Policies and Procedures</u>

There have not been many revisions made to policy and procedure since the last site visit.  The policy for the Rapid Response Team (900.05.04) has been revised. Administrative Codes have not progressed and have not been finalized.  There have been several staff directives issued including one for the new RFID system, behavior management approach, and staff check lists. All policies refer to the Administrative Code and thus modifications to the Administrative Code should continue to be a priority. Interim policies and procedures for LHS/CLS need to continue to be developed.  Policies relevant to LHS/CLS need to be compliant with the federal court order and should contain a quality assurance section for every policy. Defendants should continue to update policy and procedures because without updated policies and procedures, which include quality assurance measures, substantial compliance with the court order cannot be achieved.

Competency post-tests have been created for MANDT (de-escalation), visual monitoring, and observation checks. There is now a final academy exam that requires short answer/short essay response in key areas and include scenario-based application of knowledge.  All security staff receive one year of field training officer support.

There has been more formalized training that includes employee signoffs acknowledging receipt and understanding of policies and procedures.  Effective proficiency testing for all training classes still needs to be developed. The Monitor will continue to work with the Defendants on policy and procedure.

<u>Youth Interviews</u>

Plaintiffs' counsel and the Monitor conducted several youth interviews. Approximately forty-two (42) youth were interviewed during the site visit (formally and informally). As in the previous two visits, there were significantly less requests to talk with the Monitor, although the number of requests to speak with Plaintiffs' counsel was higher than during the prior visit. Previously, the major complaints from youth were the new canteen vendor, perceived unfairness in how the point system was applied, being cut off from the phone—and therefore often from family contact—as a punishment, and the desire to have more things to do. During this visit, by far the biggest complaint by the youth was being bored, the quality of the food and frequency of the same meals being served.  The Monitor observed the meals served during the site visit, and they did not seem as appetizing as in the past.  The Defendants stated that they will address this issue and consider a 4-6-week menu.  The second most common complaint was that when selected canteen items were unavailable, this was not communicated to the youth, which would have enabled them to pick alternative items.  The Monitor suggested that LHS/CLS leadership continue to work with the vendor and the business office to fix this communication problem.  The youth work hard to earn points and in turn, earn canteen privileges. Any issues with canteen should be fixed immediately. The third most common complaint was that the RFID bands were uncomfortable (they are on the thicker side). The Monitor suggested speaking with the vendor to see if there are any tweaks that can be made.  It also might just take time for youth to adjust to the bands in general.    The

overwhelming majority continue to report that they are rarely confined, if at all, were not restrained that much, and were not strip searched. Youth liked that there was a single behavioral management system because it is easier to understand. Youth earn points daily and they like that aspect of it, although, as noted above, youth raised concerns with Plaintiffs' counsel about some staff members who they felt were quick to deny points or fail to try to help them succeed. Youth reported that they had recreation often which they enjoyed. Youth also really liked the new music program and staff member. Youth did not complain about unit and room searches like they had previously.

There were a few who discussed certain situations and the Monitor investigated the allegations during and after the site visit. As evidenced by documentation and discussions with youth on Krueger, starting in October confinement was reinstituted for split halls, counts, shift change, and medication pass. The Monitor recommended that the Defendants resume open day rooms and stop confining youth for operational convenience.  The Defendants assured the Monitor that they will modify the program accordingly and the Monitor will evaluate that at the next visit.

Defendants continue to offer more programming however, there is still too much idle time especially during the evenings and weekend. Defendants are and should continue to identify more resources and continue to implement the programs as recommended by the retained experts.

## COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION

Below is the Monitor's assessment of compliance with the consent decree. As previously stated, there is a challenge with adequacy of data for many areas (documentation, accuracy, consistency, and analysis) thus, some sections do not contain a detailed narrative.

Room Confinement

      1.    Punitive Confinement.

          a.    Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence either in data or youth interviews that indicate youth are being confined for seven days.  If Defendants improve their quality of data and documentation and incorporate the Court Order into policy and procedure –and if this improvement is sustained - they will reach substantial compliance.**

          b.    Subject to the terms and provisions of Section V(C)(3)(g),
Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Based on data and youth interviews, most youth are not being confined for three days, although there appear to be some isolated examples of this occurring. If Defendants improve their quality of data and documentation and incorporate the Court Order into policy and procedure – and if and if they ensure that no youth are being confined for three or more days, they will reach substantial compliance.**

        c.    Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Although Defendants do not call it "punitive confinement" there have been instances where youth were confined for punitive reasons. There were a few significant group disturbances in early Fall of 2019 that led to the Defendants confining youth for reasons that do not meet the administrative confinement definition. in that youth were being confined after some threat or misbehavior that did not constitute (or continue to constitute) an imminent threat. The Monitor recommended creating policy which clearly outlines the criteria for administrative confinement so that staff cannot punitively confine youth.**

        2.    Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  During this reporting period, there were instances in which administrative confinement was being used for youth who did not pose a serious risk of imminent physical harm. It also appeared that, rather than releasing youth from confinement "immediately" – *i.e.*, as soon as they no longer pose a risk - Defendants are in many instances generally treating four hours as a default minimum period for administrative confinement (and in some cases quite a bit longer). The Monitor suggested how to document this requirement in policy and in forms as well as made suggestions to place youth in the day room once they no longer pose a serious risk of imminent physical harm to others. According to the data collected, administrative confinement has increased during this reporting period.**

During the last site visit, the Monitor suggested alternatives to confinement for administrative purposes such as med pass, counts, shift change, and split hall time. Most youth serve the administrative confinement on their home unit. Some youth are serving their confinement on Krueger and are referred to the "Krueger Program." The Krueger Program has been modified based on some of the Monitor's recommendations, but there is still more refinement that needs to happen. The Supervisor of the unit has developed a comprehensive program and is very receptive to suggested changes by the Monitor. Although youth have behavioral plans developed, the program needs to be improved to include more robust behavioral plans and the plans need to be revisited with more frequency should a youth not be able to return to the home unit in an appropriate period of time. The Monitor also suggested that the Defendants evaluate the length of time it takes for a youth to move through levels 1 and 2 and that the policy and procedure clearly outlines the criteria for referral into the program as well as criteria for exiting the program. The Monitor also suggested allowing youth on levels 1 and 2 to attend school in the school area and participate in other programming if their behavior warrants.

The Monitor spent time with PSU and discussed providing "intensive mental health services designed to return the youth safely to the general population." There is a lack of documentation as to this provision making it difficult for the Monitor to fully assess compliance. Policy and procedure and a quality assurance review process needs to be implemented, and documentation needs to be streamlined and improved. The Monitor suggested that the Defendants retain a mental health expert to evaluate the program and make recommendations to, among other things, ensure these services are being provided.

Review of the sampling of reports from the new RFID system show most 30-minute checks are being completed in compliance with the Court Order.

      a.  Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

            i.  A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.** There was a significant number of youth confined for over four (4) hours this reporting period. Specifically:

| | |
|---|---|
| August: | 4 youth |
| September: | 39 youth |
| October: | 29 youth |
| November: | 16 youth |
| December: | 16 youth. |

Many of these confinements reported and documented that youth remained on AC despite

PSU's recommendation of removal. With this said, Defendants are now accurately capturing confinement time, number total placements, average confinement time per month, and number of days without AC placements. This is a huge improvement in data collection. Defendants now need to focus on reducing AC overall, ensuring they are following this Court Order, draft policy and procedure with AC placement criteria, and continue to QA this data.

ii. A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. During the last site visit, generally, youth who were in administrative confinement were in the Krueger program. This has changed in that now most youth serve the administrative confinement on their home unit which is a positive step. Some youth are serving their confinement on Krueger and are referred to the "Krueger Program." The Krueger Program has been modified based on some of the Monitor's recommendations, but there is still more refinement that needs to happen. Although youth have behavioral plans developed, the program needs to be improved to include more robust behavioral plans and the plan needs to be revisited with more frequency should a youth not be able to return to general population promptly.

The Monitor also suggested that the Defendants evaluate the length of time it takes for a youth to move through levels 1 and 2 and that the policy and procedure clearly outlines the criteria for referral into the program. Defendants need to improve their quality of data and documentation and incorporate the court order into policy and procedure and train staff accordingly.

b. Administrative confinement time limits may be tolled from 8 pm to 8 am.

COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 p.m. to 8 a.m.

c. Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were eleven (11) youth in AC for more than 24 hours. Data shows only two (2) youth were transferred to another facility under a commenced plan which left nice (9) instances in which this provision was violated. Defendants need to develop a comprehensive plan for ensuring compliance with this provision in all cases. Defendants need to improve their quality of data and documentation with respect to the "commenced plan" and incorporate the Court Order into policy and procedure.

d. The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

3.    Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 was updated.  The plans developed are very detailed and comprehensive. A quality assurance mechanism needs to be finalized.**

4.    **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a.    Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  As previously stated, the Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. The Monitor recommended that Defendants replace the existing room furniture with furniture that is specifically designed and engineered for secure environments.  The Defendants have completed the renovations in five living units (Wells, Miller, Black Elk, DuBois and Curtis) with a plan for completion of the other cottages in the last quarter of the year. The new replacement furniture is consistent with what the Monitor would expect to see in a secure facility and should certainly reduce the opportunity for suicidal incidents within the youth rooms. This is a huge investment by Defendants and shows their commitment to complying with this provision.**

**The Monitor did not observe rooms with multiple blankets/sheets covering large areas of the room. Room searches are taking place more often and documented, and staff can clearly see the youth through the window.**

**Safety/welfare documentation show that room checks are being completed at least every 30 minutes and are staggered in the majority of cases. Defendants have purchased, installed, and are using the new electronic system in all the units.  Staff have adjusted to the new system very well and stated that this new electronic system is much easier to use than the paper documentation.  Prior to implementing the new electronic system, Defendants had to use additional personnel to ensure that the checks were being done in accordance to policy and procedure. The new system is much less staff intensive, is easily monitored, and creates a safer environment for staff and youth.  Defendants need to modify their policy and procedure related to safety/welfare checks.**

**As stated in every report, while not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model. Defendants should be commended for the vast improvement on these safety/welfare checks and for investing in the technology needed.**

> b.   Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS:   PARTIAL COMPLIANCE. Youth did not complain about access to water, hygiene supplies, or nighttime toilet usage.  If Defendants improve their quality of data and documentation, and incorporate the Court Order into policy and procedure, they will be in substantial compliance.**

> c.   Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible.  PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification.  The time PSU responded and what crisis intervention technique was used should be documented.  Also, since PSU staff are not physically present on weekends and some evening hours (outside of the four hours they are required to do), the Monitor is unsure how PSU staff are engaging youth in a meaningful way.  A quality assurance program needs to be developed and documentation should be streamlined.  As previously stated, the Monitor suggests that the Defendants consider utilizing an expert in order to further develop the mental health program at LHS/CLS.**

> d.   Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1 , MH-2a, MH-2b, or ID), placements in room confinement will be reviewed

by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor requested any documentation indicating that confinement is contraindicated and there were no instances documented during this review period. There is a form "Psychology Input for Security Decision" which is where the contraindication would be documented and there is a policy (Policy 500.70.04).**

e. Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose.  Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Safety/Welfare checks have significantly improved. Safety/welfare documentation show that room checks are being completed at least every 30 minutes and are staggered in most cases. The agency implemented an electronic, software-based rounds checking system- RFID. Prior to the new electronic system, Defendants have provided additional personnel to ensure that the checks are being done in accordance to policy and procedure and modified the documentation as suggested by the Monitor.  There are also regular quality assurance reviews in order to increase compliance. Following an internal review of documentation, random days and times across all units and shifts are selected each month to perform auditing.  Any discrepancies are entered into the "Accountability Tracking" spreadsheet to help identify staff who need more training/assistance/discipline.**

**There was no formal discipline or "Letters of Expectation" during this reporting period. There were 16 job instructions given during this reporting period. PSU staff do visit youth daily when on site and are available 24/7 if needed by phone.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model. Defendants should be commended for the vast improvement on these safety/welfare checks and for implementing the electronic**

system as quickly as they did. **Staff should also be commended for embracing this new system.**

      f.      Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Property restrictions are most commonly applied by PSU for safety reasons, however forms and process for documenting any potential property restrictions need to be created and implemented.**

      g.      Youth in room confinement shall receive:

      1.      All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is a lack of documentation as to this provision. Social worker visits, mental health services, and other health services are provided in general. Documentation, quality assurance, and policy and procedure need to be improved/completed in order for the Monitor to fully assess compliance.**

      ii.      Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth's participation in Skills Streaming is tracked across sessions and reported to the youth's Social Worker and OJOR for consideration, but there is an overall lack of documentation as to specific programming that occurs daily. Staff did confirm that youth in Krueger phase 1 and 2 receive PSU-led small group sessions and evidence-based cognitive behavioral treatment in the form of Skills Streaming rather than receiving the same closed group treatment programming that was scheduled or in progress on their home unit.**

      iii.      Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such

services.   Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Educational Services for general population occur in the classrooms in the school area (although there is also an increase in the use of online instruction). Youth in the Targeted Intervention Program ("TIP") attend classes in the school area but separate from the general population. Youth in Krueger do not receive educational services in the school area (except for youth on Phase 3) but remain on the living unit.  The PbS data also showed almost no schooling for youth in Krueger, education hours varied by unit, and fewer average daily hours of instruction for girls than for boys. It is unclear whether that is a consistent pattern or only occurred because of the situation the week data was collected, but this is concerning and should be monitored and improved.**

**Additionally, during the last reporting period and for all but two days of this reporting period, administration decided to move the girls' educational services out of the traditional school area and into a building with fewer amenities and facilities than the main school. The Defendants did resume the girls' education in the main school two days before the site visit which is a positive change.  The girls really enjoy getting out of their cottage and into the main school and that should be continued. The Monitor recommends that all youth regardless of status have education in the school area.  The Defendants should further engage the education expert to make further recommendations that should be implemented, including an assessment of the quality and benefits of the online education system Defendants are using. Defendants should implement the recommendations made by the educational consultant, including those in the June 1, 2019 memorandum to LHS/CLS. The Defendants also need to focus on bringing more programming into LHS/CLS, especially programming culturally relevant and specific to the race and genders of the youth who are at the facility.**

iv.       Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. "Out time" has significantly improved over the last year.  In general, youth are out of their rooms from 8 a.m. to 8 p.m. (with the exceptions in Krueger discussed previously). The Monitor regularly saw youth conversing with other youth and staff during out time.  In youth interviews, youth stated that they are not really confined to their rooms at all. However, the data shows that a large number of youth are self-confining.   This is a concern for the Monitor.   Youth still want more structured activities when they are out of their rooms and feel they do not really do anything, which continues to be a significant problem and could lead to self-confining.  More refinement**

to the Krueger Program also needs to occur as discussed during the site visit, such as eliminating confinement for staff convenience (which Defendants stopped doing after the site visit) and evaluating the length youth are on Levels 1 and 2.  Enhancing programs and meaningful activities for the Krueger program should have a positive impact and allow for youth to return to their home cottages more quickly.

> v.     Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Most meals take place out of the room.  Meals are now being documented for all youth (not just youth in Krueger as during the last site visit).  Staff are now able to document when the meal is eaten in their room voluntarily or staff imposed. The Monitor did not witness youth eating in their rooms but has reviewed documentation in which youth are eating meals in their room.  Documentation has improved from the last site visit and will further improve with the RFID system.  Policy and procedure need to incorporate this section of the Court Order.**

> vi.     Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Logs indicate that youth are receiving 3 hours of "out time" per day or 30 hours per week in a large majority of the time. This has significantly increased since confinement due to split halls, confinement for shift change, counts, and medicine pass were discontinued (although as discussed above, the hours of confinement for youth on Krueger for these and other reasons, did increase after October and, based on the PbS data showing youth in their cells for more than 20 hours per day, which appears to have reduced out time to less than 30 hours per week on the Krueger Unit). Documentation and data collection need to be improved.**

> **5.     Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is now a box on the incident debriefing form that is checked if staff informed the youth of his or her rights regarding grievances and appeals and time of notification. The Monitor suggests that staff ask the youth to sign off that they were informed of their rights and were provided with written notice of his/her rights.  There were 76 grievances filed by youth during the first three months of this**

reporting period (on a variety of issues, not just placement) and 9% were discipline related. This indicates youth are aware of the grievance procedure and utilize it.  Defendants do have a robust tracking system in place.  Defendants do analyze and have created measures for youth grievances. The quality assurance piece needs to ensure grievances are being timely and appropriately addressed and communicated to youth.

      **6.**    Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are now documenting this more consistently. Documentation needs to continue to be completed and consistently applied to all situations. Documentation, data collection and reliability, and quality assurance needs to continue to be improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

    B.    OC-Spray and Other Chemical Agents

      1.    OC reduction plan.  Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated during this reporting period.  There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere. This is a huge accomplishment by the agency and staff at LHS/CLS.**

      2.    Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated during this reporting period.  There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere. This is a huge accomplishment by the agency and staff at LHS/CLS.**

C.   Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

    1.   Prohibition on types and uses of mechanical restraints.

        a.   Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visit, but data and documentation show that there was an increase in use of mechanical restraints during this reporting period. Defendants need to focus on reducing the use of mechanical restraints. Defendants need to document and establish that there were not less restrictive means available and quality assurance measures and final policy and procedure are in place.**

        b.   Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of mechanical restraints has increased during this reporting period. Documentation shows that a few times youth were restrained even when the youth were calm and compliant. Documentation needs to be improved to document that an imminent threat of physical harm existed, and when and how that decision is reviewed. If Defendants reduce the use of mechanical restraints, and develop better documentation and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

        c.   No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

            i.   Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  The monitor is aware that the transboard was used three times for one youth as authorized by PSU during the reporting period. With better documentation and quality assurance measures and continuing to focus on reducing the use of restraints, Defendants may be close to achieving substantial compliance with this provision.**

            ii.   Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor is aware that a wrap has been used during this reporting period three times. Note: Future use of the wrap should be monitored and documented within monthly data reports as well as in the PbS data collection cycles and, per PbS definitions, should be documented as "other" mechanical restraint usage for outcome measure Order #5 – Other Restraint Use. Documentation has improved relative to when restraints have been used and the rationale for usage. With better documentation and quality assurance measures and continuing to focus on reducing the use of restraints, Defendants may be close to achieving substantial compliance with this provision.**

> iii.   During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used.  Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

> d.   Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. It appears that in isolated cases, restraints may have been used for discipline based on past behavior, when the youth was calm and compliant. If Defendants eliminate such uses of restraints, with better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

> e.   Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence of youth being restrained to a fixed object. With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

> f.   Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques

may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Training records indicate that the large majority of staff have received training in physical force, restraints, and trained in proper de-escalation. However, de-escalation training needs to be completed more often (regular, informal, refreshers) so that staff can continue to develop this skill. These skills are also important to help staff identify and prevent situations which might lead to disruption or altercations before such incidents occur Proper de-escalation cannot be trained only once, or even only once a year. The Monitor continues to suggest having staff who are very good at de-escalation work with staff who could use a refresher or with new staff especially since a large majority are new.**

> g. Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter. As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

> 2. Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process itself is being analyzed for improvement. New data will be available. The length of time youth spend in restraints is now being documented as part of the Incident Debrief process. If Defendants maintain this, they will be close to achieving substantial compliance.**

> D. Strip Searches. The following provisions are effective immediately upon entry of the Cou1t's order incorporating this Agreement.

> 1. Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could

not be discovered through less intrusive means.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that there are very few occasions where youth are strip searched period and there is no evidence that strip searches without probable cause are being done. The policy for searches needs to be finalized and QA developed. Defendants are close to being in substantial compliance.**

2. Strip searches with probable cause.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that strip searching still occurs but on a much lesser frequency. Documentation shows there were less than five (5) strip searches during this reporting period. Blanket strip searches of youth at intake or returning from court and hygiene checks have been completely eliminated. The policy for searches needs to be finalized and QA developed. Defendants are close to being in substantial compliance.**

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved as to how staff are ensuring that unintended individuals cannot view the search (detail the area where search is occurring, state that there are no recording devices, and document who is present in the area, etc.) If documentation and policy revisions are made, substantial compliance can be obtained.**

b. Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved detailing the area where search is conducted and how other youth cannot view the youth being strip searched.  If documentation and policy revisions are made, substantial compliance can be obtained.**

c. Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved**

**as to which staff conducted the search, that the search is by staff who is of the same gender identity as the youth if the strip search is being conducted by someone other than a medical professional. The Monitor previously recommended form changes for documentation purposes.**

    d.    Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records indicate that staff have been trained in trauma informed care.**

    e.    If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor is told by direct care staff that PSU is consulted. Documentation needs to be improved.**

    4.    Documentation. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. With continued practices and QA developed, Defendants will be in substantial compliance.**

    E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Most staff have been trained in MANDT and other training which includes de-escalation skills training. Several training sessions have occurred during this reporting period. The Monitor recommends increasing the training frequency for staff to increase their experience and skill levels in managing and de-escalating situations before they result in the use of force, restraint and/or isolation. The use of force review process continues to improve. It continues to be more thorough, comprehensive, and timely. Corrective action plans when force was used where it could have been avoided are being done in most cases. The Monitor recommended in instances where de-escalation was successful, those examples should be used as a training tool for other staff including having other staff view the videos.**

    F.    Programming. Immediately upon entry of the Court's order incorporating this

agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of id le time in the facility to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Many of the recommendations that were made in the February 2018 technical assistance report have been implemented such as family events, yoga/Zumba, increased tournaments, dog therapy, more arts and music, writing contests, living unit decorating contests, CREW. Youth advisory and family councils have been implemented, regularly scheduled, and the Monitor's recommendations have been incorporated into the process (agendas, minutes, frequency, and increased staff involvement). Recreation leaders have been hired to focus on art and music. There have been musical instruments purchased and music lab enhanced.  Although there were more activities for youth during this reporting period, there is still a significant amount of idle time.  Now that youth are basically out of their rooms from 8 a.m. to 8 p.m., there is a need for more activities/programming. These activities/programming should be in addition to school, not as a substitute for education.**

**As recommended previously, counselors, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth.  There has been an activities committee established. Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. As mentioned previously, increasing education hours, including for youth who have obtained a diploma or HSED, can greatly assist in reducing idleness time and provide positive youth development strategies through meaningful education and vocational programming.**

G.    Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Most of the recommendations made in the February 2018 report have been implemented such as conducting a staffing analysis, hiring bonuses to obtain new staff, adjustment to schedules, staff break room, increased wages for current staff, staff recognition, and several staff wellness initiatives. Defendants have clearly made staff wellness a priority and this is evident in my interactions with staff. Defendants should continue to focus on training and developing staff in order for them to feel safe and actively engage with youth.  There still are major staffing challenges due to various employee leaves and teacher vacancies.  There is an urgent need to address the teacher vacancy rate. A plan needs to be developed that will provide mandated education to youth on a daily basis (certifying security staff, combining classrooms, increasing student ratios than currently, reducing the number of teachers on leave or vacation, reaching out to community**

schools/substitutes etc.)

**Although the population is lower at LHS/CLS, the agency needs to develop meaningful methods for further reducing youth populations. This might include expediting the OJOR process and evaluating youth for placement under community supervision, including intensive community supervision, as permitted by state law.  Defendants need to continue to work towards developing smaller, geographically located Type 1 facilities and also to evaluate whether there are alternative kinds of facilities and/or intensive community services to which youth could be released. In October 2019, the Agency submitted a request to the Joint Committee on Finance requesting the authority to construct two Type 1 facilities, as well as necessary funding required to construct the facilities. This needs to be an ongoing priority or Defendants will not be able to come into substantial compliance with this Court Order.**

H.   Amendments to administrative code.  Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS:  PARTIAL COMPLIANCE. DOC has identified sections of the Administrative Code that need to be modified, but significant revisions have not yet occurred. Defendants need to continue drafting interim policies for LHS/CLS while also developing final Code revisions.**

## IV.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A. **Incident review process.**  Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There has been an improvement in meeting the 24-hour timeline. Informal reviews occur right after an incident in majority of**

cases.    When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). A framework for other QA measures relating to the consent decree is being created.

      **B.**     **Quality assurance**.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goa ls that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Critical quality assurance positions are now filled and will be assisting in developing a quality assurance program. The Monitor reviewed sample performance goals, reviewed PbS in great detail, and made suggestions for monthly performance measures and how to incorporate into policy. As discussed throughout this report, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff.  The Monitor remains confident that the Defendants will create a competent quality assurance program especially with the addition of the new RFID system.**

<u>**CONCLUSION**</u>

There have been significant improvements to the physical plant of LHS/CLS which is providing a less institutionalized feel for youth and staff. This is reflected in an improved quality of life for both youth and staff. The overall atmosphere today has vastly improved from a year ago, although there have been some setbacks since the last site visit.  Eliminating OC spray and implementing the new RFID system are the two biggest accomplishments this reporting period.  Leadership, staff, and youth should be commended because it took a lot of hard work and commitment by all to get to the place where LHS/CLS is today.  Defendants have more programming for youth than LHS/CLS has ever had available to youth. Direct-care staff vacancies have been reduced.  As a result of the progress made, it is clearly evident that these changes are having a positive impact on the overall atmosphere and culture of the facility.

The Monitor feels that the facility can benefit from and see improved outcomes from further implementation of the Care Team model.  The Care Team model has shown great success in other jurisdictions in not only reducing the number of use of force/restraint and confinement instances, but also improvement to the overall atmosphere, climate and culture of a facility by improving staff and youth relationships.  As noted throughout the report, the facility would also benefit from utilizing a mental health expert to evaluate the mental health program.

The facility would also benefit from an increased focus on reducing idleness and increasing meaningful activities, particularly during weekends and evening hours.  The facility should continue to work on improving the behavior management system, providing improved and increased youth incentives that will help in reducing many behavioral incidents and reduce the high number of self-requested confinements and program refusals.  The agency recently reviewed a behavior management

system being used in Utah and is working to implement a similar BMS program here.  Once in place, the new system should show success in reducing these types of refusals.

Continued efforts need to be made to further engage the educational expert, reduce teacher vacancies, and increase educational time and quality. Regular training in de-escalation and physical restraint techniques need to continue to occur. Policies and procedures for LHS/CLS need to continue to be developed as well as administrative code. Implementing the new quality assurance program needs to be a primary goal.  The physical plant improvements need to continue as scheduled.  Although there are improvements to be made, the Defendants continue to make progress.

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

/S/ Teresa Abreu
Teresa Abreu
Monitor