UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J**., by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

     Plaintiffs,

v.                                                                      Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

     Defendants.

---

## SEVENTH REPORT OF THE MONITOR

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Sixth Report of the Monitor was filed with the Court on July 9, 2020. The Monitor's seventh report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates from the sixth site visit which took place on May 15, 2020.

## SITE VISIT

The seventh site visit by the Monitor took place on September 17, 2020.  Due to the pandemic, the Monitor limited onsite time to one day and completed necessary interviews/information gathering via virtual meetings over the following two weeks after the site visit. The Monitor reviewed materials provided by the parties prior to and after the site visit for the reporting period ending August 31, 2020. Materials included but were not limited to: Covid-19 related memos, directives and plans, programming materials, project plans, grievances, various staff memos, daily shift reports, all of the monthly data submitted to the parties per this Court Order (June, July, and August 2020), updated unit rules, work rules, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Due to Covid-19 (reducing visitors during this time), only the monitoring team was on site during this site visit. Plaintiffs' counsel conducted youth interviews virtually. The Monitor took photographs, toured LHS/CLS, and interviewed youth and staff. The Monitor had the opportunity to talk to the

majority of youth and staff present during the site visit. Approximately fifty-nine (59) youth and thirty-four (34) staff were interviewed formally and informally by the Monitor during this site visit.

## Overall Quality of Life, Conditions, and Atmosphere

### Introduction

It is important to note that during the evaluation period, the pandemic, Covid-19, is still impacting the world. The systematic changes required to stop the spread of this infectious disease were still in place during this site visit with some modifications. LHS/CLS as well as other institutions developed an emergency operation plan with the goal of mitigating any potential exposures to Covid-19. The Governor put a temporary transfer hold in which LHS/CLS did not receive new admissions from March 26, 2020 until August 10, 2020. From August 10 to present, new admissions occurred every two weeks. There is quarantine living space for the girls and boys consistent with CDC and Wisconsin public Health guidelines. All staff are required to wear masks as of July 13, 2020. Youth are encouraged to wear masks. All staff and visitors entering the facilities are screened with a questionnaire and temperature check prior to being allowed to enter the facilities. No youth have tested positive for Covid-19 as of the site visit.

Due to a combination of reducing frequency of new youth admits and working to get youth out more quickly, the total LHS/CLS population declined to below 70 youth. The Monitor is happy to see that the population continues to decline. As stated many times, having fewer youth and keeping them together with consistent, individualized and improved staffing ratios can reduce incidents, improve relationships between youth and staff, which benefits youth and staff alike. Program modifications continued due to the pandemic including, but not limited to: no in person visitation (virtual visitation occurred frequently); youth are still e-learning and the units continue to not comingle; PSU, teachers, social workers, and other staff rotate and conduct services virtually when they could not be done in-person. Although youth and staff had relatively good attitudes, the Monitor noticed a change in the overall atmosphere from the last visit. Staff were not interacting with youth and overall seemed frustrated. Staff seem concerned about the lack of negative incentives and punishments, especially in light of closing the Krueger program. There clearly is a need for change in the incentive structures. Hopefully, the new DBT and behavioral modification training will train staff to interact with youth in ways that minimize negative interactions and increase positive behavior. Moreover, there are not enough positive incentives provided (which could be taken away if youth misbehave). This will help a great deal with managing youth behavior.

### Physical Plant

The grounds and the general areas of the facility were the cleanest the Monitor has ever seen thus far. Seven (7) of the twelve (12) cottages have been remodeled to date (Wells, Miller, Dubois, Curtis, King, Black Elk, and Roosevelt) and the new staff breakroom was completed during the last site visit and now is being utilized (it was closed due to Covid-19). Additional projects not yet completed are the camera upgrade, electrical upgrade, and remaining cottage remodels (scheduled for end of 2020 and beginning of 2021). The Monitor will continue to update the Court

on physical plant improvements that increase the safety and quality of life for youth and staff.

All of the entrances into the units, the bathrooms, and day rooms were very clean and orderly in general. The level of cleanliness of youth rooms were far better than any previous visit. Youth and staff should truly be commended for all of their efforts.

The Monitor previously recommended that searches of all buildings be conducted to maintain a more orderly and safer environment.  Prior to Covid-19, Defendants regularly conducted and documented searches.  However, search procedures were modified due to Covid-19 emergency procedures.  The Defendants have taken the Monitor's recommendation, and reinstituted room and facility searches throughout the facility and pat down searches of youth.

School/Living Units Observations

The Monitor visited each cottage (except Hughes due to an incident occurring at the time of site visit) and toured the school during the site visit.  The school continues to be a beautiful environment. The classrooms and the general school area were very clean.  Yet, youth were not present in the school due to educational services continuing to be held virtually and on the units. A couple of the teachers were present in the school area.  On March 24, 2020, the schools began providing education on the units with most education staff working off-site, and this is ongoing.  Meetings have occurred to discuss how to safely return youth to in-person learning or at least providing education off of the living units.  The Monitor highly recommends a plan be implemented to return youth to the school area as soon as reasonably possible. Music, art, and recreation still occurred with a goal of increasing the frequency.  Grandparents program supervisor facilitating youth volunteer work/programming and one on one PSU sessions occur in the school area.  Students have Zoom meetings with teachers when needed. Teachers checked in regularly with unit staff and students and are able to monitor youth's progress through Edgenuity. Of course, e-learning is not the preferred format for teaching, but during the pandemic, many learning institutions have taken this approach. However, a number of youth and staff complained and had difficulties with this format, especially the inability to ask questions and receive real time feedback from teachers. As the country slowly opens up and education in various areas around the country and Wisconsin are moving to a hybrid or full in-person model, LHS/CLS should consider adjusting the education program as well. At a minimum, increased teacher access, such as moving to live e-learning will greatly impact all youth, but especially those with IEPs.   In discussions with the educational staff, they are eager to return to in person instruction. On a positive note, educational staff's professional development is continuing to regularly occur.

The Monitor was told that retaining the educational consultant has been put on hold due to the pandemic.  The Monitor encourages the Defendants to engage the consultant further and work to address the concerns raised – including the need for more deep and meaningful teacher interaction with youth, enhancing or expanding the daily education hours, and implementing the recommendations made by the consultant and the Monitor with respect to staffing and the educational program for LHS/CLS.  Lack of educational hours and structure is contributing negatively to the environment.  The Monitor believes that the major contributing factor to this issue is the increased time youth spend on their living units due not being able to attend education classes in the school.  Youth are clearly bored and in need of environment and atmosphere changes throughout the day to help reduce mental fatigue, anxiety and boredom.

There continues to be more than adequate staffing levels on the living units. The Monitor saw limited staff engagement with youth.  Youth attitudes overall were good during this site visit but not as positive as the last visit.  All the youth that the Monitor interacted with were respectful but were less interested in interacting with the monitoring team.  The Monitor had an opportunity to talk to most of the youth present in the day rooms.

The RFID system has been fully implemented for the completion of safety/welfare checks. During the last reporting period, Defendants were unable to provide data with respect to safety/welfare checks.  The Defendants have corrected these issues and were able to provide data/reports to the Monitor. DJC continues to work on creating and refining reports regarding various outcomes including youth confinement by date, type, and youth, track length of confinement and reasons for confinement.

During this site visit, the girls were housed on the Wells cottage (female population is very low at 4).  King is being utilized as the female quarantine unit.  One youth was on the King unit as she was a new admission.  The atmosphere on the girls' units was positive.  The girls were not as engaged with the Monitor as in previous visits. Youth in general stated that they were bored but in general had no major complaints. On Wells, one youth was in her room (due to mental health recommendations) and two youth were in the day room eating and doing homework. The girls were in good spirits.  The rooms on the unit were clean and orderly with beds made. The Monitor observed staff in the staff office on the unit.  The staff present knew the youth very well and were relatively talkative with the Monitor.

King was clean and very beautifully decorated. The rooms in general were clean and the unit itself was clean and orderly. Only one youth was present on the unit.  The youth on the unit was completing her homework and doing puzzles. She had a good attitude and enjoyed being on the unit alone.  The staff present spends a lot of one on one time with the youth.

With respect to the boys' cottages, generally, the cottages themselves were very clean. The Monitor did not observe any graffiti anywhere in LHS/CLS.  This is a huge improvement from previous visits. The Monitor recommended during the last couple of site visits that staff adjust their placement since youth can more freely move around the unit (some youth in day room, outside, in and out of their rooms, and bathroom).  Unfortunately, staff were mainly positioned in their office or on perimeter of the living unit. During this site visit, staff in general were not interacting with the youth at all nor were they positioned near/with the youth (except for one staff member).

As of June 30, 2020, the Krueger Program was discontinued and no longer houses a special program unit thus, youth were not housed on the Krueger living unit.  The unit was being remodeled during this time.

In Black Elk, the entry way, day room, and bathroom were very clean.  Youth rooms on this unit were the messiest of all the units.  One (1) youth was voluntarily in his room. Nine (9) youth were out in the day room appropriately interacting with each other and staff. Most youth were engaged in schoolwork. The atmosphere was calm, and youth and staff were very talkative with the monitoring team. Youth talked to the Monitor about being bored and that they have nothing to do. Youth would like to get off of the unit more and do in person schooling in the school area. Staff

still like the 12-hour shift.

The Rogers unit was clean.  Entry way, bathroom, and day rooms were clean.  All eleven (11) youth were out of their rooms (no confinement). Youth were out cleaning.  This was the loudest unit by far.  There were two (2) staff on the unit. Staff were positioned around the unit.  Unlike last visit (unit was calm and quiet and wanted to engage with the Monitor), youth were loud and did want to engage much with the Monitor.  Youth stated that they wanted to be able to use the bathroom more than one person at a time, wanted more gaming systems, wanted to go to the gym more.  Youth want a "calm" or "relaxation" room on the unit. Youth complained about some of the canteen items being stale. The youth also complained about wanting a better barber. Staff are very frustrated on this unit. Staff said youth are acting out and difficult all day.  Staff said there is nothing they can do but let the behavior continue because they do not perceive that they have control or the ability to impose consequences. Staff also feel there are no incentives for youth to earn that have any meaningful impact on behavior.  The Monitor agrees that positive incentives – which could be taken away if youth engage in anti-social behaviors - need to be increased and made more meaningful to youth needs.

The Curtis Unit was clean and quiet.  This was the cleanest unit with the cleanest rooms. Ten (10) youth present on unit with two (2) staff. One staff was in office and one staff was standing on the perimeter of the unit. Youth stated that staff do not interact with them and don't care about them. Youth were in the day room watching television, doing crafts, and one was doing duty work. Not a single youth was confined.  As in the other units, staff here also stated that all of their tools were taken away to manage youth behavior and no meaningful incentives exist to help manage behaviors.

In Miller, the entryway, day room, and bathroom were relatively clean.  Youth rooms was generally clean.  Eleven (11) youth were in the day room and no one was confined. Three (3) staff were working on the unit. Youth were in the day room eating. It was noticeable that there were not any cushions on the furniture.  Youth were sitting on wood. Overall, the unit was calm. All of the youth talked with the Monitor.  Youth complained about being bored and wanting to go to school.  They also complained that they only received 45 minutes of outside time. The facility should work to increase exercise and outdoor time for youth as this would reduce idleness and likely reduce anti-social behaviors. They also stated that they would like the ping pong table to be fixed.  Staff stated that they did not feel safe and that the boys were becoming increasingly aggressive.

The Dubois unit was very clean. Most youth rooms were clean. Youth were eating in the day room and some were watching television. There were ten (10) youth on the unit. There were two (2) staff on the unit. One was in the booth and one was just outside the booth. The Monitor spoke to 9 of the 10 youth.  Three youth loved the food. None of the youth like e-learning and definitely are eager for school to go back to "normal." I asked the youth why they run around outside and climb buildings and they said because they are really bored and have nothing to do. Youth were extremely polite and well behaved when the Monitor was on the unit.

In Roosevelt, the entryway, day room, and bathrooms were clean. Youth rooms were a mix of clean and messy.  There were unoccupied rooms that were used as storage.  There were a lot of dead bugs in these unoccupied rooms (rooms 11, 12,13, and 14). There was a total of eight (8) youth and six (6) staff on unit. Seven (7) youth were outside playing basketball with one staff and

the other youth was on the unit doing e-learning. No youth were confined. Youth were chatty and quite funny.  Youth said they would like to see Oreos in canteen, the food in general was good, and they would like to have the opportunity for more Zoom calls. One staff was engaged with youth and one PSU staff was talking with another youth.  The staff were very quiet and did not seem happy overall. Staff said youth were bored and had nothing to do.  The staff suggested more fences around the recreation area to prevent youth from running into other areas. Staff were confused as to what the "Roosevelt" unit was in terms of general population or TIP.

What is very clear is that there is still a need for additional structured programming overall especially as youth are on their units the vast majority of the time.  The Monitor has stressed in every report the importance of structured programming for youth. Although the Defendants are working on improving this, much more must be done to improve programming and idleness.  It is clear by the data, shift reports, and youth and staff attitudes that boredom is taking its toll.  The Monitor understands that Covid-19 has required some programming to change/cease, but there still could be more activities for the youth to do.  As previously mentioned, youth are bored and while being out of their rooms is certainly an improvement, more meaningful activities and weekend programs would also help reduce the risk of youth engaging in anti-social behaviors when they have little else to do (like climbing on roofs and running around unauthorized areas) – particularly during Covid-19 when so many interactions with other youth, family, staff, and educators are now being done virtually. Youth need more to do than simply sitting in the dayroom area watching television or playing cards.  In response to needing more structured, gender and culturally relevant programming, Defendants have created a new position of "Program Director." The job description has been finalized and recruiting has begun. In the meantime, the Defendants need to create and implement a daily schedule.  The Monitor worked with the Defendants on developing a weekly schedule with accountability/quality control measures.

It should also be noted that any improvements in structured and meaningful activities to better engage youth will also have a positive impact on staff well-being and help reduce their frustrations and anxiety levels as well.  In turn, this enhances the staff and youth interactions and works to foster improved relationships, awareness and de-escalation of behaviors when necessary.  As mentioned previously, staff are very frustrated with a lack of sanctions to hold youth accountable as well as a lack of incentives that will foster improved behaviors as youth focus on earning the incentives and rewards.  Improving the behavior management system and improving the rewards and incentives will have a profound impact on the overall behavior and atmosphere issues that are driving the main issues that are frustrating both staff and youth.

<u>Youth Interviews</u>

The Monitor conducted several youth interviews. Approximately fifty-nine (59) youth were interviewed during the site visit (formally and informally).  Plaintiffs' counsel also interviewed a half-dozen youth remotely.  There was only one request to talk to Plaintiffs' counsel. The biggest complaints from youth since the last visit was the food, canteen out of stock items, being bored, missing school, and phone restrictions.  Youth in general did not complain to the Monitor about confinement, restraints, being unfairly treated by staff, feeling unsafe, phone restrictions or their RFID bracelets.

Youth did complain to counsel about use of physical force, staff being too quick to use administrative

confinement, keeping youth in administrative confinement even after they have calmed down, missing school while they are in administrative confinement, and the inadequacy of virtual schooling. They also requested more frequent zoom calls.

The most common complaint this visit was being bored, having nothing to do, and not getting off the living units much.  The common complaint regarding staff was that staff did not care about them and did not interact with them and staff "go through the motions."  The third most common complaint was missing being in school.  The fourth most common complaint was issues with canteen.  The Monitor suggested that LHS/CLS leadership continue to work with the vendor and the business office to fix this communication problem and also consider an on-site mini canteen/commissary of items that youth desire should their canteen order be unavailable/stale etc., or as other incentives.  As the Monitor previously stated, the youth work hard to earn points and in turn, earn canteen privileges. The issues with canteen have been going on long enough and it is unacceptable that the issues with canteen have not been fixed to date.  The challenges with canteen is a management issue (unit staff accountability) and external with the vendor/business office.

Covid-19 required several changes to programming and the general day to day with youth; not just at LHS/CLS but in every juvenile facility.  Regular programming is slowly resuming in various correctional facilities around the country. Defendants are and should continue to identify more resources and continue to implement the programs as recommended by the retained experts. The Defendants should take advantage of the reduced population and the available staff in planning for the future and developing programs for youth and continuing to offer more creative and other activities for youth while in-person interaction is limited.  If additional programming – and especially culturally competent programming - is not available in the vicinity of this facility, that remains a serious concern and one that should lead to an increased sense of urgency to move youth closer to locations where such programs and services are available.

Staffing

During this reporting period, there have been a few key staffing changes.  The new Superintendent of LHS/CLS is active in his new role.   In September, an individual has been promoted to Safety Director.  A new psychology Supervisor has been hired (promoted from another position within LHS/CLS). There are four new PSU interns. Two new Unit Supervisor positions have been created which will allow for the Unit Supervisors to supervise two units. Recruiting is currently underway.

Authority to fill the vacant Chaplain position has not yet been granted to the division at the time of the site visit.  However, as of September, CLS/LHS secured an agreement with Stanley Correction Institution in which the Chaplain there is available to meet with youth through tele-visitations upon a youth's request.  The Educational Assistant recruitment process has been moving through the required stages since the position was posted for applicants on August 24. First round interviews for the position were held on October 16. The Monitor hopes there can be exceptions made to any hiring freezes for any key positions at LHS/CLS in order to meet the requirements of this Court Order.

Direct-care staffing vacancy percentage has increased from the last reporting period (*see below*). There have been 25 new direct-care staff hired during this reporting period. There are 311 total positions ("FTEs") at LHS/CLS.  Approximately 153 of these positions are "direct-care" staff

(Youth Counselor/Youth Counselor Advanced ("YC/YCA"). The teacher vacancy rate remains high (7 vacancies- one less that last reporting period). Hiring for educational staff has not occurred during this reporting period due to Covid-19 and education being online. The Monitor encourages continuing to recruit teachers despite the reduced population and challenges with Covid-19. Recruiting is still a challenge due to the location of the facility, overall teacher shortages, relatively low compensation, location of LHS/CLS, and the year-round school calendar and thus, hiring needs to continue. As previously mentioned, the entire educational program at LHS/CLS needs to be evaluated and improved.

| Position | Vacancy Rate % as of Sept. 6, 2019 | Vacancy Rate % as of January 30, 2020 | Vacancy Rate % as of May 13, 2020 | Vacancy Rate % as of September 19, 2020 |
|---|---|---|---|---|
| Youth Counselor | 14% (15 out of 105) | 7% (8 of 115) | 8.6% (10 out of 115) | 18.2% (21 out of 115) |
| Youth Counselor Adv. | 7% (3.5 out of 50) | 15% (5.5 of 37.5) | 13% (5 of 37.5) | 12% (4.5 of 37.5) |
| Teacher | 36% (10 of 28) | 32% (8 of 25) | 32% (8 out of 25) | 28% (7 out of 25) |
| Social Worker | 21.5% (3 of 14) | 21 % (3 of 14) | 21% (3 out of 14) | 21% (3 out of 14) |

In August, the third staff survey regarding the 12-hour shift (which began in Nov. 2019) was conducted by the Office of Budget and Programs. Every staff person the Monitor spoke to said they love the new schedule. In the recent survey conducted, a large majority of staff said the 12-hour shift had a positive impact on their well-being (approximately 83%). Approximately 62% of staff think the new schedule change has improved the health and safety of staff. Approximately 43% of staff feel the length of shift makes them feel physically fatigued. The Monitor recommends that DJC continue to monitor this issue and provide data tracking measures to assess whether or not fatigue plays a role in any increased incidents or use of restraints or confinement later in a shift when staff are more fatigued. The Monitor recommended asking other youth specific questions in the next survey which hopefully will be incorporated. A data driven assessment has not been completed to date (impact on employee leaves (FMLA, Workers' Comp, etc.) vacancies, turnover etc. There are more staffing issues during this reporting period than last period. Whether staff are ordered to work overtime is dependent on which shift and which cottage they work in. There were more staff comments regarding ordering and breaking protections during this site visit. The Monitor spent time reviewing staffing in general to try and reduce this happening as frequently as it is as of late.

The Monitor spoke to over thirty-four (34) staff and the majority of staff seemed tired and felt there were not enough activities for the youth and there were less "tools" available to manage behavior. Management recognized this and conducted "Administrator Listening Sessions" and "Superintendent Town Halls" in which the Division's vision could be shared and introduced new programming (DBT and Behavioral Motivation Program) coming to LHS/CLS. Staff were also

able to express their concerns and frustrations.  The Monitoring team (in a technical assistance capacity) developed action steps for improving staff morale and safety. This needs to be a priority for the Division.  Staff were definitely not as engaged with the youth this visit. The Monitor continues to stress the need to continue making staff wellness a major focus moving forward.

As part of the agency and facility's desire to improve conditions for both staff and youth, they are continuing to engage in the Youth in Custody Practice Model ("YICPM"), which was explained in the previous Monitor reports.  The YICPM Core Leadership Team continues to meet and discuss implementation and sustainability of the YICPM model at LHS/CLS. The current focus of the Core Leadership Team is the development and implementation of DBT as a behavioral motivation approach.

On June 16-17, 2020, the Core Leadership Team met with consultants from Georgetown University Center of Juvenile Justice Reform, as part of a quarterly site visit. The site visit was conducted via Zoom and focused on three practice model areas; developing a youth's case plan, transitioning youth into the community and supporting youth in the community. Both days of the Zoom training sessions were recorded and allowed for additional DJC teams to view the training sessions.

Action steps from the June site visit included continued work implementing the new Youth Growth Plan and changes to the case management system at LHS/CLS. Also, leaders from DJC field community supervision were tasked with continuing its efforts around Family Find and Engagement along with improving the transition process when youth are exiting the facility and moving back into a community setting.

On September 3, 2020, a video call was conducted with the Georgetown consultants. The focus of the meeting was to develop an agenda for the last site visit in October and discuss the next phase of working with the Georgetown evaluator on designing a model to evaluate outcomes. The final site visit will again be conducted via Zoom and will focus on helping staff understand their role as change agents and sustaining change as an agency. A meeting has been scheduled for September 22, 2020 for the DJC data team to begin discussions with the Georgetown evaluator.

The Defendants are also collaborating with Massachusetts Department of Youth Services to explore Dialectical Behavioral Therapy ("DBT") as a behavior management system. The DBT behavioral motivation project kicked off on July 16, 2020 with an executive leadership meeting with the DBT consultant. The team reviewed a project outline developed by the DBT consultant and next steps were discussed.

On July 22, 2020, another executive leadership meeting occurred to further discuss organizational structure and designating participants for the DBT Core Leadership team. The results of the facility readiness assessment and the importance of being clear on our DBT goals was discussed, for both youth and staff.

On July 29, 2020 and August 5, the DBT consultant presented an overview to over twenty-five (25) staff that will be part of the implementation/pilot teams. In the afternoon DBT meeting, with the smaller leadership group, staff were encouraged to think about who should be involved in the roll-out and on the pilot units. Staff were also encouraged to formulate the goals for DBT

implementation including: behaviors to increase, behaviors to decrease, and how will we know when these things are changing and how we will gauge this.

The DBT Core Leadership team met again on August 19 and 26, 2020. On August 19, in the morning, Dr. Chapin presented to the large roll-out group of staff (over 20 staff), on basic learning principles (reinforcement, punishment, extinction, shaping) along with a brainstorming discussion about how to incorporate these principles into the level system and what different things people might like to see go into this. In the afternoon, the smaller leadership group met with a discussion on goals, behavior management, point system, and system vision. The focus of the meetings was developing strategies for enhancing the living unit structure and behavioral motivation system redesign. The team focused on a draft of a new living unit program structure. The purpose of the new living unit program structure was to reduce the idle time youth are experiencing on the living units, implement the DBT model, and enhance/overhaul the behavioral motivation system.

On September 2, 2020 the Core Leadership team met and went through the living unit program document. Modifications were made based on team feedback and four workgroups were developed to further detail the living unit enhancements. The four workgroups are the following: Information gathered from the self-assessment will assist the division once they begin implementing the strategic framework for DBT. The Monitor is happy to see that progress has been made with implementation of DBT at LHS/CLS. This is clearly a priority for the Defendants that will have very good outcomes for youth and staff.

In the last report, the Monitor informed the Court that due to Covid-19, contracting with a mental health consultant was postponed. However, Defendants have identified a potential consultant. The Monitor continues to strongly recommend that the facility obtain a mental health expert to evaluate the programming, staffing, and services that exist at LHS/CLS – including for youth with significant mental health needs - and make recommendations on how to address the issues raised and improve treatment and services for youth at LHS/CLS. This needs to be a priority item.

The Monitor previously recommended that mental health (PSU) staff be integrated more into operations in order to provide much needed support for youth and staff. The Monitor is happy to see that this has begun. The Defendants should continue to involve PSU staff, especially leadership, in making improvements at the facility (such as improvements to incentives, consequences, and working with the OJOR system). The Monitor suggested modifying the mental health (PSU) and recreational staff work schedules to include more evening and weekend hours, especially given the lack of sufficient other structured activities during those times. There are no groups or programming involving PSU on the weekends. The Monitor continues to recommend that scheduling of PSU be reconsidered (rotate staff if need be, alternating weekends, etc.) or if this is not possible, then hire additional PSU staff to work nights and weekends. Weekends are when there is the most idle time and need for additional meaningful programming. Adding weekend programming will also have a positive impact on reducing incidents of violence and other behavioral incidents related to boredom and lack of activities. There really is a missed opportunity for PSU involvement during this period and particularly during Covid-19 when engagement with family, staff, and other youth are reduced.

The CARE team continues to have a very positive impact. The CARE Team expanded their

coverage over the last few months. Defendants continue to develop the team in order to maximize the effectiveness of our CARE Team to prevent, de-escalate, and resolve youth incidents. Feedback from staff is encouraged as CLS/LHS continue to develop the CARE Team and as they greatly expand this resource for youth and staff. Defendants are working on documentation and data to analyze the use and effectiveness of the CARE team.

Staff wellness remains an important issue and one that continues to impact the overall culture and atmosphere. While the Monitor senses that staff are feeling better to some degree, their overall wellbeing and anxiety remains high. Staff are very frustrated by a lack of incentives and/or consequences for poor, disrespectful and/or aggressive behaviors. Resolving these issues is complex but achievable through a multi-phase response that involves enhancing the behavior management system, increasing meaningful activities, rewards, and incentives and establishing clear program achievement goals and consequences.

Quality Assurance ("QA")

In the last report, the Monitor was unable to assess compliance for Visual Monitoring safety/wellness checks due to difficulties in extrapolating the info from the RFID system. Defendants have remained committed to ensuring staff accountability in the completion of Visual Monitoring safety/wellness checks since launching its Quality Assurance Review (QAR) process in August 2019. Initial efforts resulted in a 98% accuracy rate through randomized video audits; however, the need for staff to record extemporaneous observations at staggered intervals continues to be a need for facility improvement.

In an effort to support enhanced accountability and real-time documentation, technology was introduced in January 2020 in order to cultivate a culture of accountability across departments and staff positions. LHS/CLS has outlined a QAR process for Visual Monitoring that integrates the support of Correction Unit Supervisors (CUS) transitioning to lead in supporting staff with coaching or re-training, a competency assessment, and progressive follow-up including formalized job instructions prior to potential referral to HR for follow up action.

To help ensure consistency in staff follow-up, a detailed process and additional resources have been developed for CUS leaders including formal policy and procedural acknowledgements for staff, integrated tracking of staff assigned to posts across shifts and living units, and device training briefs and videos. Correction Unit Supervisors are responsible to review their respective unit's daily reports to identify any missed or late checks and follow-up with identified staff members.

The Defendants are working with the RFID company to develop additional customized reporting features allowing for additional intelligence gathering, data analysis, and climate monitoring to assist DJC maintain facility security and prevent serious incidents before they can happen.

Additional real time data collection and tracking data trends across added facility operations captured by the Guardian RFID system may include:
• confinement time
• special status checks for youth on observation
• recreational activity
• educational attendance

• completion of facility security rounds
• headcounts
• meal distribution

Enhancing youth safety through ensuring visual monitoring accuracy with the quality assurance pilot process in addition to adding the Guardian RFID dashboard reporting feature will allow DJC to even more efficiently and effectively demonstrate compliance with specific provisions of the consent decree. Additionally, the system will assist to inform management in making data-driven decisions while seeking to implement further best practices as they relate to the broader scope of DJC's juvenile correctional practices as a whole.

DJC analysts have spent time implementing a process for data sharing throughout the facility during this reporting period. An initial five critical outcome measures consisting of incidents resulting in administrative confinement, incidents resulting in the use of physical force, CARE Team utilization, youth on staff assaults or attempted assaults, and youth on youth fights or batteries were identified and are reported on monthly divided out based on the living unit in which the incident or other outcome metric occurred.

Facility wide critical outcome measures are tracked on a monthly basis and shared with management regarding youth on youth batteries or fights, completed youth on staff assaults, incidents resulting in administrative confinement, incidents resulting in the use of force, incidents resulting in mechanical restraints, as well as additional data pertaining to the use of administrative confinement and mechanical restraints.

As stated in previous reports, a framework for identified outcome measures was developed to align with PbS national benchmarks.  PbS data collection cycles occur twice annually, and the most recent cycle was in April 2020.  Facility Improvement Plans ("FIP") have been created after the most recent PbS Coach Site Visit.  As a reminder, PbS is a continuous data-driven improvement model grounded in research that holds juvenile justice agencies, facilities and residential care providers to the highest standards for operations, programs and services.  The FIPs are the vehicles for jurisdictions to continuously bring about meaningful change. They bridge the gap between understanding and actions to improve the conditions of confinement at a facility, beginning with identifying the specific outcome measure(s) a facility want to improve.

Based on advice and direction gained through participation in PbS, DJC has decided to reformulate a Facility Improvement Planning Committee to further integrate the PbS Facility Improvement Plans for each school into our overall daily operations. DJC is seeking to broaden the scope of the steering committee to include a multi-disciplinary team consisting of at least one member representing each work area within the facility. The members involved in this workgroup are also going to be a part of developing and implementing additional quality assurance measures and tracking consent decree compliance throughout the facility. The Program and Policy Analyst positions working on PbS are also concurrently working to update a pre-existing draft PbS policy.

The current CLS and LHS FIP's have been updated after the April data collection and review period. LHS' was updated specifically to emphasize decreasing the use of mechanical and physical restraints.

Other in-progress areas identified in the FIP's during this reporting period include:
- Social workers are working to develop growth plans
- Started DBT training for pilot buildings.
- Fun Days & Rope Course for youth incentive activities
- New food menus based on youth input
- Town Halls are being held on a regular basis with Superintendent
- Completed a youth survey regarding the Care Mail they were receiving
- HR has been updating staff position descriptions to align with PbS

<u>Policies and Procedures</u>

There were no new policies/procedures finalized in this reporting period.  A Policy, Performance-based Standards, Data and Quality Assurance workgroup dedicated to identifying and strategically prioritizing policy and procedure updates related to the consent decree and PbS facility improvement plans has started work on revising important division policies and facility procedures related to those core facility priorities. Below is the work done on policies and procedures for this reporting period:

*<u>Finalized Draft Prepared for Review</u>*
900.05.03 - Administrative Confinement
300.05.07 - Control of Water Supply to Units

*<u>Functional Draft during implementation of pilot QA process:</u>*
900.05.01 Visual Monitoring

*<u>Identified Need – Drafting Updates to Current Policy/Procedure</u>*
Mechanical Restraints
Searches of Youth
Guardian RFID
Facility Searches
Use of Force
Emergency Response Unit

*<u>Identified Need – New Drafts in Progress</u>*
QA
Shift Report
Care Team
Rapid Response Team
Voluntary Confinement
Emergency Confinement
Performance-based Standards

Administrative Code There are no significant updates to the Administrative Code.  Below is a status on specific Chapters.

DOC Chapter 373 - scope statement submitted to DOA, approved and published in the Legislative Reference Bureau. DOC Secretary approved rulemaking. DJC is moving forward with the rulemaking process.

DOC Chapter 376 - scope submitted to DOA. Governor approved, legislature requested preliminary public hearing, hearing completed. DOC Secretary approved rulemaking. DJC is moving forward with the rulemaking process.

DOC Chapter 347 – (county facilities) sent to legislative council, public hearing scheduled for September 9, 2020.

## COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

1.  Punitive Confinement.

    a.  Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence either in data or youth interviews that indicate youth are being confined for seven days.  If Defendants incorporate the Court Order into final policy and procedure –and if this improvement is sustained - they will reach substantial compliance.**

    b.  Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is no evidence either in data or youth interviews that indicate youth are being confined for three days.  If Defendants incorporate the Court Order into final policy and procedure –and if this improvement is sustained - they will reach substantial compliance.**

    c.  Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this

Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that there are some instances of confinement that do not meet the criteria for Administrative Confinement – there is no risk of imminent physical harm - and appear to impermissibly constitute punitive confinements. Youth are also given "reflection" time which in some instances appears to be punitive in nature. The Monitor recommended creating a policy which clearly outlines the criteria for administrative confinement so that staff cannot punitively confine youth.**

2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. During this reporting period, the Krueger Program was discontinued and thus all youth were in general population. While the facility should be commended for closing this program, the Monitor feels they do need a plan or policy in place to outline how youth will be managed in instances where they represent a threat to their own safety or the safety of others. Staff voiced concerns that they have no idea how to manage these situations since the closure of the Krueger Program. There were fewer instances in which administrative confinement was being used for youth who did not pose a serious risk of imminent physical harm (although there were still some such incidents). The Defendants should be commended for not using AC for any youth in CLS during this reporting period. The use of AC for youth who posed a risk of imminent physical harm was higher for LHS youth this reporting period (June-August). The Monitor suggested during the last site visit on how to document this requirement in policy and in forms as well as made suggestions to place youth in the day room once they no longer pose a serious risk of imminent physical harm to others.**

**February 2020**
**CLS: 9 uses of AC. Average of 152 Minutes. 1 youth went over four hours.**
**LHS: 59 uses of AC. Average of 168 minutes. 2 youth over four hours.**

**March 2020**

**CLS: 7 uses of AC. Average of 175 minutes.**
**LHS: 69 uses of AC. Average of 240 minutes.**
**15 youth over four hours (as high as 1300 minutes)**

**April 2020**
**CLS: 3 uses of AC. Average of 142 minutes. 1 youth over four hours**
**LHS: 40 uses of AC: Average of 191 minutes. No youth over four hours**

**May 2020**
**CLS: 5 uses of AC. Average of 182 minutes. No youth over four hours**
**LHS: 37 uses of AC: no youth over four hours.**

**June 2020**
**CLS: 0 uses of AC**
**LHS: 34 uses of AC. Average of 175 minutes. 3 youth over four hours.  3 youth at exactly four hours.**

**July 2020**
**CLS: 0 uses of AC.**
**LHS: 46 uses of AC: Average of 171 minutes. 3 youth over four hours. 2 youth at exactly 4 hours.**

**August 2020**
**CLS: 0 uses of AC.**
**LHS: 101 uses of AC. Average of 132 minutes. 3 youth over 4 hours. 3 youth at four hours.**

**DBT groups have not been running because of Covid-19 but youth are receiving weekly individual DBT sessions. The Sex Offender Treatment group was not interrupted and is continuing. The Monitor suggested that the Defendants retain a mental health expert to evaluate the program and make recommendations to, among other things, ensure these services are being provided, including while youth are in AC. The Defendants have engaged a consultant. Policy and procedure and a quality assurance review process needs to be implemented, and documentation needs to be streamlined.**

**The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit.  Majority of checks were completed in compliance with policy and this Court Order.  For checks that were not complete, a detailed plan for accountability has been created and should be implemented as soon as possible.**

      a.  Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

           i.    A psychologist, psychology associate or psychiatrist

recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were nine (9) youth confined for over four (4) hours this reporting period (see response in previous question). All of the confinements were recommended by PSU.**

**With this said, Defendants are accurately capturing confinement time, number total placements, average confinement time per month, and number of days without AC placements. Defendants now need to continue to focus on reducing AC overall, ensuring they are following this Court Order, draft policy, and procedure with AC placement criteria, and continue to QA this data.**

    ii.    A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.  During this reporting period, the Krueger living unit was closed and no longer houses a special program unit. Defendants need to improve their quality of data and documentation with respect to the "commenced plan" and incorporate the Court Order into policy and procedure.  Defendants are close to being in substantial compliance.**

    b.    Administrative confinement time limits may be tolled from 8 pm to8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE.  Time is being tolled from 8 P.M. to 8 A.M.**

    c.    Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced  plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no instances in which a youth was confined for over 24 hours. Defendants need to improve their quality of data and documentation with respect to the "commenced plan" and incorporate the Court Order into policy and procedure.  Defendants are close to being in substantial compliance.**

    d.    The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

    3.    Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants

shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 was updated.  The plans developed are very detailed and comprehensive. A quality assurance mechanism needs to be finalized.**

4.     **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a.     Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  As previously stated, the Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. The Monitor recommended that Defendants replace the existing room furniture with furniture that is specifically designed and engineered for secure environments.  The Defendants have completed the renovations in seven living units with a plan for completion of the other cottages by July 2021. The new replacement furniture is consistent with what the Monitor would expect to see in a secure facility and should certainly reduce the opportunity for suicidal incidents within the youth rooms. This is a huge investment by Defendants and shows their commitment to complying with this provision.**

**The Monitor did not observe rooms with multiple blankets/sheets covering large areas of the room. Staff can clearly see the youth through the window. Room searches were not taking place due to a change in Covid-19 procedures for the most of this reporting period. The Monitor recommended that searches continue to be completed and documented in the last report.  Defendants have recently reinstituted searches.**

**In the last report, the Monitor was unable assess compliance as to the 30- minute safety/security checks.   Defendants were able to pull data related to 30-minute room checks.  There are some instances of non-compliance.  Defendants have created a very detailed action plan to improve compliance and accountability measures. Defendants need to modify their policy and procedure related to safety/welfare checks and hold staff accountable when appropriate.**

**As stated in every report, while not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

**Defendants should be commended for the vast improvement on these safety/welfare checks and for investing in the technology needed.**

        b.       Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, hygiene supplies, or nighttime toilet usage. One youth complained to counsel about nighttime toilet usage.  If Defendants improve their quality of data and documentation, and incorporate the Court Order into policy and procedure, they will be in substantial compliance.**

        c.       Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible.  PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification.  The crisis intervention technique is being documented but when PSU responded is not documented in a way that makes it easy to assess compliance.  Also, since PSU staff are not physically present on weekends and some evening hours outside of the four hours they are required to do, it is difficult for PSU staff to engage youth in a meaningful way during this time.**

**There have been good changes in communication which is critical to youth wellness and treatment. Cerner Electronic Medical System has been tailored for the Wisconsin DOC from an electronic charting platform within hospital systems, to fit the needs of Wisconsin DOC. Both HSU and PSU staff utilize Cerner's Electronic Medical Record (EMR) to document medical and mental health status updates. This includes documentation of all medical encounters, treatment, provider orders, medication administration, etc. As a shared system, a youth's assigned PSU clinician has access to relevant medicals records such as medication compliance, lab results, injuries, and medical conditions. EMR aids in communication between HSU-Psychiatry and referrals for additional treatment. It also aids in tracking treatment outcomes and ensuring that follow-ups, for things such as self-harm/observation status, are completed in a timely manner.**

**With robust functionality for HSU and PSU, EMR replaced the paper files PSU clinicians**

used. A record (documentation) is maintained for each youth at CLS/LHS, and they are assigned a PSU clinician regardless of having an identified mental-health disorder. All encounters with the youth and family are documented in EMR. These encounters may include intakes, psychological assessments, individual therapy, group therapy, Administrative Confinement placement reviews, referrals, communication with the family or staff regarding the youth, documented refusals (to an offered treatment session), treatment plans, and responses to treatment (progress).  In addition, PSU maintains Behavior Management Plans that are accessible to all staff within electronic CLS/LHS group folders. This enables a multidisciplinary review of helpful strategies and coping techniques that staff may utilize in assisting a particular youth.

A quality assurance program needs to be developed. As previously stated, the Monitor suggests that the Defendants consider utilizing an expert in order to further develop the mental health program/integration at LHS/CLS.

> d.  Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1 , MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Evaluations are completed and within 24 hours after being placed in room confinement. There was one instance of contraindication documented during this review period. There is a form "Psychology Input for Security Decision" which is where the contraindication is documented and there is a policy (Policy 500.70.04).

> e.  Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose.  Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

COMPLIANCE STATUS:  In the last report, the Monitor was unable assess compliance as to the 30- minute safety/security checks.   Defendants were able to pull data related to

**30-minute room checks during this reporting which the Monitor reviewed on-site. There are some instances of non-compliance. Defendants have created a very detailed action plan to improve compliance and accountability measures. There was no formal discipline or "Letters of Expectation" during this reporting period. PSU staff do visit youth daily when on site and are available 24/7 if needed by phone.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

> f. Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Property restrictions are most commonly applied by PSU for safety reasons, however forms and process for documenting any potential property restrictions need to be created and utilized. Once Defendants make these improvements, they will be close to substantial compliance.**

> g. Youth in room confinement shall receive:
>
> > 1. All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided in general. Documentation, quality assurance, and policy and procedure need to be improved/completed in order for the Monitor to fully assess compliance.**

> > ii. Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has improved during this reporting period. COMPAS is the current system that DJC utilizes for all related social services notes and encounters with youth and their families. Within COMPAS are tools such as Risk/Needs Assessments, Adverse Childhood Experience (ACE) Scores, Case Plans, group treatment notes, and youth follow-up notes. All DJC State Agents and staff who have**

attended COMPAS training are granted access to this information.

In order to expand access and enhance support for a youth's overall wellbeing and skill development, the Youth Growth Plan has been developed as a strength based, youth driven tool and process to help a youth prepare for re-entry to the community. All youth develop an individualized Youth Growth Plan with their assigned social worker, who works with them to detail SMART goals and action steps. The initial plan is to be completed within 21 days of the youth's initial Joint Planning and Review Committee (JPRC) meeting. When the initial plan is completed, a copy of it is shared with the youth's Office of Juvenile Offender Review (OJOR) Specialist, County worker(s) and/or State agent, and their parent/guardian. A social worker meets with the youth at least once per week to discuss progress they have made in completing action steps to meet their goals. Every time a youth has a JPRC meeting the most recent version of the Youth Growth Plan is reviewed and discussed.

The Youth Growth Plan and the social worker's notes are also in CLS/LHS groups folders, providing all staff access to the plan and notes. Social workers share created plans with other staff in the Living Unit. Social workers and Unit Managers are encouraged to discuss these plans with Youth Counselors during team time meetings.

Youth's participation in Skills Streaming is tracked across sessions and reported to the youth's Social Worker and OJOR for consideration, but there is an overall lack of documentation as to specific programming that occurs daily.

DBT groups have not been running because of Covid-19 but youth are receiving weekly individual DBT sessions. The Sex Offender Treatment group was not interrupted and is continuing. The Monitor suggested that the Defendants retain a mental health expert to evaluate the program and make recommendations to, among other things, ensure these services are being provided.

     iii.  Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general (prior to Covid-19) educational services for general population occurred in the classrooms in the school area. Youth in the Targeted Intervention Program ("TIP") attended classes in the school area but separate from the general population. Covid-19 has changed how the educational services are being provided to youth at LHS/CLS. On March 24, the schools began providing education on the units with most education staff working off-site. The schedule has been distributed

along with a training brief assisting with Chromebooks and logging into Edgenuity. Applicable staff continue to be monitoring e-mail, conducting phone calls, and performing Zoom/video calls.  The Monitor strongly recommends that educational programming be re-evaluated.  The Monitor also recommends that educational services be completed off the unit when possible. Low population and staffing would allow for this.  The Monitor feels that the facility needs to increase the daily education hours as best possible as this will have a positive impact on meaningful programs and reduce youth idleness.  Additionally, Defendants need to ensure that special education is provided while on administrative confinement.

The Defendants should further engage the education expert to make further recommendations that should be implemented, including an assessment of the quality and benefits of the online education system Defendants are using. The Defendants also need to focus on bringing more programming into LHS/CLS, especially programming culturally relevant and specific to the race and genders of the youth who are at the facility.

<blockquote>
iv.      Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.
</blockquote>

COMPLIANCE STATUS: PARTIAL COMPLIANCE. "Out time" has significantly improved over the last year.  In general, youth are out of their rooms from 8 A.M. to 8 P.M. except for youth in quarantine due to Covid-19 safety measures implemented by Defendants, periods of self-reflection, and any confinement recommended by PSU.  The Monitor regularly saw youth conversing with other youth during out time.  Youth still want more structured activities when they are out of their rooms and feel they do not really do anything, which continues to be a significant problem and could lead to self-confining.

<blockquote>
v.      Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.
</blockquote>

COMPLIANCE STATUS:  The Monitor is unable to assess compliance because there is no longer documentation as to whether meals are in or out of room. Youth and staff indicated that most meals take place out of the room.  Documentation needs to be created and policy and procedure need to incorporate this section of the Court Order and youth should be eating out of their rooms unless there is a substantial threat of physical harm.

<blockquote>
vi.      Minimum "out time" from the cell of at least 30 hours per
</blockquote>

week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Logs indicate that youth are receiving much more than the 3 hours of "out time" per day or 30 hours per week in a large majority of the time.  If Defendants improve their quality of data and documentation, and incorporate the Court Order into policy and procedure, they will be in substantial compliance.**

     5.   **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is a box on the incident debriefing form that is checked if staff informed the youth of his or her rights regarding grievances and appeals and time of notification. Youth continue to receive their notification of rights/grievance procedures when they are placed in administrative confinement. The process for obtaining a youth signature (or two staff signatures in the event of a refusal) has been proposed as a part of youth receiving PSU thinking chain reports during the first stage of the administrative confinement process. However, the process and forms need to be enacted and written into policy.**

     6.   Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are now documenting this more consistently, including when less restrictive means were attempted. Documentation needs to continue to be completed and consistently applied to all situations. Documentation, data collection and reliability, and quality assurance needs to continue to be improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

    B.   OC-Spray and Other Chemical Agents

     1.   OC reduction plan.  Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-

Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated. There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere.**

2. Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated. There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere.**

C. Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1. Prohibition on types and uses of mechanical restraints.

a. Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visit, but data and documentation show that there have been many uses of mechanical restraints in LHS during this reporting period. However, there were no uses in CLS. Defendants need to focus on reducing the use of mechanical (as well as physical) restraints. Defendants need to document and establish that there were not less restrictive means available and quality assurance measures and a final policy and procedure are in place. The Monitor will note that although there have been many uses of mechanical restraints in LHS, the average is less than 7.5 minutes.**

b. Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants should be commended that there were zero uses of mechanical restraints in CLS. However, use of mechanical restraints is higher this reporting period in LHS (August was very high due to a serious group disturbance).**

**Uses of mechanical restraints LHS:**

| | |
|---|---|
| **October 2019:** | **36 uses** |
| **November 2019:** | **21 uses** |
| **December 2019:** | **33 uses** |
| **January 2020:** | **25 uses** |
| **February 2020:** | **37 uses** |
| **March 2020:** | **38 uses** |
| **April 2020:** | **37 uses** |
| **May 2020:** | **27 uses** |
| **June 2020:** | **20 uses** |
| **July 2020:** | **30 uses** |
| **August 2020:** | **65 uses** |

**Uses of mechanical restraints CLS**

| | |
|---|---|
| **October 2019:** | **10 uses** |
| **November 2019:** | **11 uses** |
| **December 2019:** | **5 uses** |
| **January 2020:** | **8 uses** |
| **February 2020:** | **2 uses** |
| **March 2020:** | **7 uses** |
| **April 2020:** | **6 uses** |
| **May 2020:** | **0 uses** |
| **June 2020:** | **0 uses** |
| **July 2020:** | **0 uses** |
| **August 2020:** | **0 uses** |

**Documentation needs to be improved to document that an imminent threat of physical harm existed, and when and how that decision is reviewed. Defendants do have critical outcome measures for restraints. Defendants need to continue to work towards reducing the use of mechanical restraints, develop better documentation and quality assurance measures.**

    c.    No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

        i.  Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. With better documentation, policy revisions, and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

        ii.    Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has improved**

**relative to when restraints have been used and the rationale for usage. However, as noted above, restraints are being used more frequently than they should be. Defendants need quality assurance measures and need to continue to focus on reducing the use of restraints.**

           iii.      During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. With policy revisions and quality assurance measures, Defendants will be close to achieving substantial compliance with this provision.**

           d.      Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. With better documentation, policy revisions, and quality assurance measures, Defendants will be close to achieving substantial compliance with this provision.**

           e.      Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is no evidence of youth being restrained to a fixed object. With better documentation, policy revisions, and quality assurance measures, Defendants will be close to achieving substantial compliance with this provision.**

           f.      Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Training records indicate that the large majority of staff have received training in physical force, restraints, and trained in proper de-escalation. However, de-escalation training needs to be completed more often (regular, informal, refreshers) so that staff can continue to develop this skill. These skills are also important to help staff identify and prevent situations which might lead to disruption or altercations before such incidents occur Proper de-escalation cannot be**

trained only once, or even only once a year. DBT implementation will be very beneficial to youth and staff. Staff continue to want additional training on de-escalation.

> g. Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter. As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is no evidence that youth were placed in mechanical restraints in excess of 45 minutes during this reporting period. In fact, the majority of mechanical restraints were less than 20 minutes. With policy revisions and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

> 2. Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process itself has been analyzed for improvement. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process. If Defendants maintain this, they will be close to achieving substantial compliance.**

> D. Strip Searches. The following provisions are effective immediately upon entry of the Cou1t's order incorporating this Agreement.

> 1. Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that there was one strip search (CLS youth) this reporting period. The strip search conducted was approved by PSU for contraband/self-harm reasons and in compliance with this Court Order. The policy for searches needs to be finalized and QA developed. Defendants are very close to being in substantial compliance.**

2.    Strip searches with probable cause.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that there was one strip search (CLS youth) this reporting period. The strip search conducted was approved by PSU for contraband/self-harm reasons and in compliance with this Court Order. The policy for searches needs to be finalized and QA developed. Defendants are very close to being in substantial compliance.**

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that there was one strip search (CLS youth) this reporting period. The strip search conducted was approved by PSU for contraband/self-harm reasons and in compliance with this Court Order. If documentation and policy revisions are made, substantial compliance will be obtained.**

b.    Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that there was one strip search (CLS youth) this reporting period. The strip search conducted was approved by PSU for contraband/self-harm reasons and in compliance with this Court Order. If documentation and policy revisions are made, substantial compliance will be obtained.**

c.    Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation shows that there was one strip search (CLS youth) this reporting period. The strip search conducted was approved by PSU for contraband/self-harm reasons and in compliance with this Court Order. Documentation showed it was completed by an individual of the same gender identity. Policy revisions are made, substantial compliance will be obtained.**

d.    Strip searches must be conducted by staff trained in trauma-

informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records indicate that staff have been trained in trauma informed care.**

> e.    If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved.**

> 4.    Documentation.  Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. With continued practices and QA developed, Defendants will be in substantial compliance.**

> E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Most staff have been trained in MANDT and other training which includes de-escalation skills training. LHS/CLS secured Wisconsin Department of Administration grant funding to allow ten (10) instructors to complete train the trainer trainings and subsequently provide Eight-hour Verbal Judo training sessions to all staff who work with youth with the goal of reducing risk for injury and enhancing staff confidence at effectively de-escalating conflict or potential violent encounters with youth.**

**Competency testing was administered for all staff completing training and the scores from the competency exam were tracked as part of a quality assurance measure underscoring the importance utilizing well trained de-escalation techniques. De-escalation training was requested by staff on the Oct 2019 PbS Staff Survey and was well received.  With 5 equal to strongly agree, the average score for "I learned skills I can practice in my work with youth at LHS/CLS" was 4.6 and the average score for "I have greater confidence in de-escalating conflict with the use of Verbal Judo" was 4.4. DJC certified trainers will continue to provide quarterly refresher trainings with practice scenarios to support skill retention and continued application of Verbal Judo skills at the facility going forward.**

The Monitor recommends increasing the training frequency for staff to increase their experience and skill levels in managing and de-escalating situations before they result in the use of force, restraint and/or isolation. The use of force review process continues to improve.

F.   Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor understands that changes had to be made during the pandemic, but inadequate programming and excessive idle time was a problem before then and continues to be a problem. The Monitor's recommendations are the same as last report.  Many of the recommendations that were made in the February 2018 technical assistance report have been implemented- although there is still far too much idle time. During this reporting period, the following programs occurred:

Ending the Game Human Trafficking Treatment Curriculum
Three PSU clinicians attended a training on the "Ending the Game" (ETG) curriculum on May 21. The training allows for direct-care service providers to facilitate the ETG curriculum with victims of commercial sexual exploitation. ETG focuses on intervention, not prevention meaning that each lesson anticipates and validates the experiences of trafficking survivors and provides a safe place for them to process these experiences together. The ETF treatment curriculum is being used specific to female youth at CLS that have experienced trafficking or are at high-risk of being trafficked. So far, the girls have been very receptive to the curriculum.

Ropes Course
The Ropes Challenge Course officially re-open operations this summer. The LHS/CLS ropes and challenge course uses physical challenges and a series of problem-solving events to compel our youth to reach new levels of dealing with high stress situations. Many situations create the necessity for team problem solving, working together and cohesiveness to fulfill a given task. The goal is cooperation rather than competition in which the simple act of trying makes each person a winner.

In June, DJC completed the process of developing certified facilitators for the course at the schools. Any previously certified facilitators were required to submit an email indicating their continued interest and were required to attend recertification training. New staff who were interested in becoming a facilitator needed to be willing to participate in the Ropes Course along with the youth and attempt each skill on all of the apparatuses. Training took place the week of July 22 and satisfied the 40-hour training requirement necessary for full certification of facilitators.

Summer Games Alternative
In lieu of summer games this year, a group of educational staff will be hosting a series of activity days. Time will be scheduled for each individual living unit. All youth and staff

within the living unit are encouraged and welcome to attend and participate.

The first activity was a "lawn games" style event. Youth had the opportunity to participate in various activities (table tennis, bag toss, Can Jam, etc.) with raffle tickets presented for participation. A handful of small prizes were drawn at the end of the games.

<u>Youth Council Adaptations Due to COVID-19</u>
Due to health concerns related to COVID-19, the CLS/LHS Youth Council has been unable to meet in person for their monthly meetings. Instead, staff distributed a "Youth Council Communication Slip" to all units that all youth are encouraged to use to send ideas topics and questions to be addressed by the youth council.

Youth ideas are documented, discussed, and always considered. Not all suggestions are feasible or ultimately implemented, but many ideas that have stemmed from the youth council have in fact been implemented and continue to contribute to the facility environment in a positive way.  Ideas youth can propose through the "Youth Council Communication Slip" include:

- Suggested items to be added to canteen or property
- Ideas for incentive activities and the daily schedule
- Food Service menu options
- Movies to add to the movie library

<u>Youth Haircuts</u>
Beginning on June 3, 2020 haircuts for youth at the schools were resumed and scheduled. With high levels of expected interest, the haircut roster will be created and followed in order to accomplish as many as possible during any given session. WEDC COVID-19 Hair Salon guidelines have been followed to keep everyone safe during the process. Youth must wear a face mask that goes behind the ears, preferably the disposable face masks that were provided through canteen.  (Youth commented that they would like different stylists as their haircuts did not meet their expectations.)

<u>Hoop It Up</u>
3-on-3 Basketball Tournaments were held August 15 and 20, 2020.

<u>CLS Outdoor Mural / Graffiti Board Incentive</u>
On July 29 maintenance installed a "graffiti board" behind Wells living unit. The idea behind the boards will be to provide youth with an artwork incentive and for them to be able to display their artwork for their peers and staff at the facility. Eventually every unit that is occupied will have a space to display their artwork either behind their unit or at the ball field. A procedure is currently being developed for this new incentive which considers parameters like how the winners will earn the incentive, requiring the youth earning the incentive to submit a proposed sketch of their painting to the unit manager prior to painting on the board and how long the artwork will be displayed before a new incentive earner is selected. (There were very few instances of graffiti on the units which is a huge improvement).

Although there were new activities for youth during this reporting period, there is still a significant and excessive amount of idle time. Now that youth are basically out of their rooms from 8 a.m. to 8 p.m., there is a need for more activities/programming. These activities/programming should be in addition to school, not as a substitute for education.

As recommended previously, counselors, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. There has been an activities committee established. Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. As mentioned previously, increasing education hours, including for youth who have obtained a diploma or HSED, can greatly assist in reducing idleness time and provide positive youth development strategies through meaningful education and vocational programming.

G.   Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants should continue to focus on training and developing staff in order for them to feel safe and actively engage with youth. Even though education had to change due to the pandemic, there is an urgent need to address the teacher vacancy rate. A plan needs to be developed that will provide mandated education to youth on a daily basis.

The average day population continues to decline (60s). There continues to be a significant reduction in population even though there were new admissions. An analysis should be completed to understand how the population was reduced and determine how the Agency can sustain this reduction.

As stated in previous reports, this might include expediting the OJOR process and evaluating youth for placement under community supervision, including intensive community supervision, as permitted by state law. Doing so would likely also facilitate keeping youth closer to their home communities, and closer to more programming and culturally relevant services. Defendants need to continue to work towards developing smaller, geographically located Type 1 facilities and also to evaluate whether there are alternative kinds of facilities and/or intensive community services to which youth could be released. There does not seem to be any more progress made as this section. This needs to be a priority or Defendants will not be able to come into substantial compliance with this Court Order.

H.   Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other

Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE.  There are no new updates at the time of this report.   As previously reported, DOC has identified sections of the Administrative Code that need to be modified, but significant revisions have not yet occurred. Defendants need to continue drafting interim policies for LHS/CLS while also developing final Code revisions. If there is not significant movement on the amendments to administrative code, Defendants will be in non-compliance in the next report.**

## IV.     DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A. **Incident review process.**  Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There has been a vast improvement in meeting the 24-hour timeline. Informal reviews occur right after an incident in majority of cases.  When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). A framework for other QA measures relating to the consent decree was being created but has not been completed.**

B. **Quality assurance**.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goa ls that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As discussed throughout this report, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff.  The Monitor remains confident that the Defendants will create a competent quality assurance program especially with the addition of the new RFID system, the new Superintendent, and dedicated personnel.**

## CONCLUSION

Overall, the facility was impeccably clean and organized with significantly reduced graffiti. The CARE Team model is being implemented and performance measures have been created.  The CARE Team is very successful in de-escalating youth. The Monitor is very pleased with how the CARE team has been expanded and integrated into the day to day operations. The Defendants' commitment to implementing DBT should be commended and the Monitor looks forward to seeing progress in this area and its impact on youth and staff.

The Monitor remains very concerned over the continuing lack of adequate and meaningful activities and programming for youth, especially though not only on weekends, which leads to extreme boredom and can result in anti-social behavior. The Monitor has repeatedly raised this issue in reports, yet it remains a serious problem. The facility would benefit from an increased focus on reducing idleness and increasing meaningful activities, particularly during weekends and evening hours.  The Defendants need to figure out how to get youth off of the unit more.  This is even more important during the changes to daily life due to Covid-19.  The facility should continue to work on improving the behavior management system, continue with their progress in implementing DBT, providing improved and increased youth incentives that will help in reducing many behavioral incidents and reduce the high number of self-requested confinements and program refusals. Continued efforts need to be made to further engage the educational expert, reduce teacher vacancies, and increase educational time and quality. Regular training in de-escalation and physical restraint techniques need to continue to occur. Policies and procedures for LHS/CLS need to continue to be developed as well as administrative code. Continued implementation of the new quality assurance program needs to remain a primary goal.

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

/S/ Teresa Abreu
Teresa Abreu
Monitor