UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                                                                    Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

EIGHTH REPORT OF THE MONITOR

---

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Seventh Report of the Monitor was filed with the Court on October 27, 2020. The Monitor's eighth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates from the seventh site visit which took place on September 17, 2020.

## SITE VISIT

The eighth site visit by the Monitor took place on December 17, 2020.  Due to the pandemic, the Monitor limited onsite time to one day and completed necessary interviews/information gathering via virtual meetings over the following two weeks after the site visit. The Monitor reviewed materials provided by the parties prior to and after the site visit for the reporting period ending November 30, 2020. Materials included but were not limited to: Administrative Code drafts, use of force videos, COVID-19 related memos, directives and plans, programming materials, project plans, grievances, various staff memos, daily shift reports, all of the monthly data submitted to the parties per this Court Order (September, October, and November 2020), updated unit rules, work rules, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Again, due to Covid-19 (reducing visitors during this time), only the monitoring team was on site during this site visit. Plaintiffs' counsel conducted youth interviews virtually. The Monitor took photographs, toured LHS/CLS, and interviewed youth and staff. The Monitor had the opportunity to talk to the majority

of youth and staff present and available during the site visit. Approximately fifty-three (53) youth and thirty-eight (38) staff were interviewed formally and informally by the Monitor during this site visit.

## Overall Quality of Life, Conditions, and Atmosphere

Introduction/COVID-19 Updates

It is important to note that during the evaluation period, COVID-19, is still impacting the world. The systematic changes to stop the spread of this infectious disease were still in place during this site visit. New admissions continue to take place every two weeks to allow for medical quarantine with medical monitoring.  There is quarantine living space for the girls and boys consistent with CDC and Wisconsin public Health guidelines and allow for out-time from 8 a.m. to 8 p.m. There were five (5) units in quarantine and eight (8) youth in isolation at the time of the site visit. All staff are required to wear masks as of July 13, 2020. Youth are encouraged to wear masks.  The Monitor is happy to report that <u>all</u> staff present wore face coverings properly at all times.  Only a few youths wore masks. All staff and visitors entering the facilities are screened with a questionnaire and temperature check prior to being allowed to enter the facilities.  There have been Covid-19 positive youth and staff during this reporting period.

All new admissions are placed in a medical quarantine and medical monitoring unit for fourteen (14) days. Each of these youth are seen immediately upon intake for a COVID-19 screening, temperature check, and complete health history review/health assessment by qualified nursing staff. Like all existing youth, new youth receive in-person education supplemented by video learning to help recognize and report symptoms of illness and strategies to help reduce the risk of spreading COVID-19 and other influenza-like illnesses.

Non-intake living units are placed on quarantine status if there is an identified risk of COVID-19 exposure. The unit is placed on medical quarantine and medical monitoring for fourteen (14) days from the last known date of exposure. As with all new admissions, a COVID-19 screening with temperature check is then completed by professional health staff each day youth are on quarantine status until cleared on their final day of quarantine. The Safety Director provides living unit quarantine updates to all staff in collaboration with the Health Services Supervisor; a log of quarantine status and timeframes is also maintained and accessible to all staff in shared electronic files. In addition to daily COVID-19 screenings conducted for youth on quarantine status, the medical team also conducts COVID-19 screenings at every appointment or encounter and prior to youth kitchen workers reporting to work. All youth screenings are completed by qualified healthcare professionals including Registered Nurses, Advanced Practice Nurse Practitioner, or Medical Director.

Youth on medical quarantine and medical monitoring continue to receive essential cares and are provided education as the rest of the population. The Monitor is told that the Special Education teacher goes to the unit to do resource with the youth directly although it is unclear whether and to what extent required special education services are being provided. The physical education teacher either goes to the unit or Zooms in to provide the large muscle activities.

All youth are highly encouraged to wear face coverings and maintain physical distancing although most do not. Youth are reminded that they need to wear a mask when entering the school and the health service unit ("HSU"). HSU will supply youth with a mask during medical appointments should they forget to wear one of their facility-supplied masks. In addition, youth can purchase gray face coverings from approved property vendors to maintain seven (7) masks, one for each day of the week.

Over the summer months, two rounds of testing (youth and staff) occurred in partnership with the Department of Corrections, Department of Health Services and the Wisconsin National Guard. Youth who display objective health symptoms consistent with COVID-19, reported subjective symptoms of COVID-19, required off-site surgical procedures, or have transferred to MJTC, have had additional COVID-19 tests. Since March 2020, LHS/CLS has administered 195 youth COVID tests with 177 negative and 18 positives. Fourteen (14) of the eighteen (18) youths tested positive for COVID-19 from September to November which coincides with increases experienced nationally and across the state of Wisconsin. Due to the continued notable presence of COVID in the state and local communities, LHS/CLS has arranged to conduct more regular COVID testing of staff. Testing is required of all staff every two weeks until further notice from the Department of Corrections. Consistent with CDC and public health guidelines and recommendations, staff who have previously tested positive for COVID-19 are not required to test again for 12 weeks since the original positive test unless they develop new symptoms or have been in close contact with another person who has tested positive in the last fourteen (14) days.

The total LHS/CLS population remains consistently in high 60's to low 70's.  Program modifications continued due to the pandemic including, but not limited to no in person visitation (virtual visitation occurred- although less frequent as of late due to lack of social workers onsite and technical difficulties); youth are still e-learning on the units; PSU, teachers, social workers, and other staff rotate and conduct services virtually when they could not be done in-person. This lack of in person services that the Monitor deems essential is having an impact on youth and direct-care staff alike.  There is a definite change in the overall atmosphere from the last visit.  Staff continue to be concerned about what they perceive to be the need for negative incentives and punishments and the fact that direct-care staff are having to manage not having key support staff on-site to provide services to youth (teachers/social workers/onsite PSU staff). Staff are clearly exhausted, frustrated, and based on PbS data and interviews, fear for their safety.  Overall, there has been very limited improvement and progress in most areas of the consent decree from the last site visit.  While some of the issues are related to the pandemic, the Monitor also feels that some of the issues could be alleviated or reduced if additional support staff were on site providing more normalized facility operations, primarily around education, treatment, mental health services, *etc.* The normalization of facility operations would go a long way toward reducing incidents of violence and other behavioral issues stemming from the lack of meaningful programs.  It would also provide support to direct care staff and aid in reducing their workloads, stress and anxiety levels, thereby promoting a more positive atmosphere, environment, and interactions between youth and staff.

Physical Plant Observations

The entrance, grounds, visitation, units and many other areas had beautiful holiday decorations throughout. The facility overall looked very festive and staff and youth should be commended for

all their efforts.  It was clear to the Monitor that the youth and staff enjoyed the decorating! The grounds and the general areas of the facility were very clean.  On a very positive note- all youth are housed on newly renovated units (Wells, Miller, Dubois, Curtis, King, Black Elk, and Roosevelt).  Additional projects not yet completed are the camera upgrade, electrical upgrade, and remaining three cottage remodels (scheduled to be completed in June 2021).  The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

Education Observations

The Monitor has significant concerns about the provision of education at the facilities at this time, including but not limited to: remote learning, the quality of education, and the lack of adequate hours of schooling.  In fact, this current format is having a negative impact on overall youth behaviors due to the lack of meaningful education and treatment programs.  This is obviously impacting other outcome measures such as the use of restraints and isolation, increased fights, assaults and other behavior incidents that have long-term impacts on issues such as the overall facility climate, safety, and length of stay. Finally, it should be recognized that these issues have a much more profound impact on youth with disabilities, particularly around education outcomes.

The Monitor did not visit the school area as there were no youth present. As previously mentioned, on March 24, 2020, the schools began providing education on the units with most education staff working off-site, and this is ongoing.  Youth participate in the four (4) core academic areas, physical education and library services (weekly). Currently, youth participate in Physical Education, Welding, Construction, Greenhouse, Library and special education services at the school building. Defendants continue to offer in person as well as Zoom special education resource sessions for all youth identified in their IEP's as needing those services. Two additional educational assistants have been hired to support students' learning through tutoring, facilitating a continuation of library resources, and providing intake orientations. When the new assistants finish their training, they will be working to enhance one to one student support services. LHS/CLS continues to offer HSED (High School Equivalency Degree) as allowed by the Department of Public Instruction in the State of Wisconsin to youth who qualify by reading level, age and documented credit deficiencies. This program, in addition to the high school diploma program, has been offered since the facilities inception. Dual credit courses (post-secondary and high school courses) are also offered to youth who are interested and qualify. Some of the challenges that arise are the length of stay of youth, student motivation and scheduling challenges. Unfortunately, youth and staff are having a difficult time with e-learning and are quite frustrated.

For quarantine units, programming continues as normal with the changes of a special education teacher going to the unit as well as physical education taking place on the unit. When a youth is placed on medical isolation, they complete their schoolwork in their room and special education services are made up in the week following.

The Monitor was told that the teachers all began Zoom classes in November. There have been several professional development opportunities provided to staff during this reporting period. The goal is to enhance teachers' skills in providing education in this new learning environment. Some teachers are onsite in the school two to four days a week. All the units have Zoom stations set up in their day room, staff have been provided Training Briefs to help troubleshoot questions, and the

teachers are present remotely to interact with students while they are working on their Edgenuity coursework.

Although these resources are provided, staff and youth are still struggling with education. The Monitor highly recommends a plan be implemented to return youth to the school area as soon as reasonably possible. The Monitor encourages the Defendants to bring teachers back in person. What is very clearly evident, is the educational programming and staffing that is in place is not working. The Monitor observed youth doing other youth's homework on the unit, direct-care staff are not able to assist youth for the most part, and youth complained about not learning anything especially youth in special education classes.  Direct-care staff are not only having to do their jobs-but they are supposed to be assisting with teaching as well. Although music, art, and recreation still occurred, the frequency needs to increase.

Of course, e-learning is not the preferred format for teaching, but during the pandemic, many learning institutions have taken this approach. There are several areas in Wisconsin that have in-person learning.  If schools out in the community can have in person learning, then so could a school within an institution where youth are not comingling with family, friends and the community.  A large number of youth and staff complained and had difficulties with the e-learning format, especially the inability to ask questions and receive real time feedback from teachers. As education in various areas around the country and Wisconsin are moving to a hybrid or full in-person model, LHS/CLS should consider adjusting the education program as well. At a minimum, increased teacher access, such as moving to live e-learning off the units and in the school area, will greatly impact all youth, but especially those with IEPs.  Defendants should recognize that the virtual education platform is insufficient and is not providing youth with adequate education opportunities.

PbS data shows that educational hours remain lower than the national average at about 3.75 hours per day at LHS (weekdays) and 3.84 hours per day at CLS (weekdays). While the October PbS data shows that the average hours of education have remained fairly steady during the pandemic and operational changes, the Monitor's observations during the site visit revealed that the quality of the education program is significantly reduced as a result of the "virtual learning" platform which is occurring on the living units.  In fact, the Monitor observed numerous incidents in which youth were not actually engaged in the learning and were doing other activities such as braiding another youth's hair and playing games- all during school periods.  The Monitor observed at least one incident in which a youth was doing the school lesson for another youth while that youth was braiding his hair.  It was interesting to also learn that the neither the unit staff or the teacher who was on the virtual monitor, recognized that this was occurring or took any measures to prevent one youth from doing the school work for another youth.  The overall quality of the education program was lacking prior to Covid-19. Now, under this virtual on unit format, education is inadequate.

The Monitor continues to encourage the Defendants to engage the educational consultant further and work to address the concerns raised – including the need for deeper and more meaningful teacher interaction with youth, enhancing or expanding the daily education hours, and implementing the recommendations made by the consultant and the Monitor with respect to staffing and the educational program for LHS/CLS and support for the direct-care staff.  Lack of educational hours and structure is contributing negatively to the environment and PbS reflects a low number of

education hours.

<u>Living Unit Observations</u>

The Monitor visited each cottage that youth were housed in during the site visit.  All the entrances into the units, the bathrooms, and day rooms were very clean and orderly in general.  However, the level of cleanliness of youth rooms were far worse than any recent visits.

There are adequate staffing levels on the living units. The Monitor saw limited staff engagement with youth.  Youth attitudes overall were not as good during this site visit. Youth in general seemed agitated and bored.  All the youth that the Monitor interacted with were respectful and were interested in interacting with the monitoring team this visit.   The Monitoring team had an opportunity to talk to most of the youth present in the day rooms.

During this site visit, the girls were housed on the Wells cottage (female population is very low with five (5) youth present).  King is being utilized as the female quarantine unit; but no one was currently housed on the unit. The Wells unit was beautifully decorated and very clean.  The girls did a great job (as usual) making the unit festive.   No one was confined to their room. Two youth were with treatment specialists.  The rooms on the unit were clean and orderly with beds made. The Monitor observed staff in the staff office on the unit.  The staff present knew the youth very well and were relatively talkative with the Monitor.

With respect to the boys' cottages, generally, the cottages themselves were very clean. Most units were loud and chaotic. Youth on all units were e-learning or getting ready for lunch. The Monitor did not observe any graffiti anywhere in LHS/CLS.  It is clear that the Defendants are monitoring this closely and have done an exceptional job resolving this issue.

In Black Elk, the entry way, day room, and bathroom were very clean and unit bright.  The Unit was on quarantine.  There were some holiday decorations.  There were fourteen (14) youth on the unit and three (3) staff. Youth rooms on this unit were messy.  Youth were e-learning at the time of visit and sitting in the day room. Staff were doing rounds and monitoring the day room.

The Curtis Unit was very festive, and the youth were very playful and happy. Youth sung a holiday song. Youth were excited about the unit decorating contest (and in fact won).   This was the cleanest unit with the cleanest rooms. Ten (10) youth present on unit with three (3) staff. One staff was in office and two staff were standing on the perimeter of the unit. Youth were in the day room watching television, doing crafts, and one was doing duty work. Not a single youth was confined.  As in the other units, staff here also stated that all of their tools were taken away to manage youth behavior and no meaningful incentives exist to help manage behaviors.

In Miller, the entryway, day room, and bathroom were relatively clean.  Youth rooms was generally clean.  Eleven (11) youth were in the day room and no one was confined. Four (4) staff were working on the unit. HSU staff were leaving the unit. Youth were in the day room eating lunch. It was noticeable that there were not any cushions on the furniture. Youth were sitting on wood. Overall, the unit was calm. All the youth talked with the Monitor.  Youth complained about being bored and wanting to go to school.  They also complained that they only received forty-five (45) minutes of outside time. The facility should work to increase exercise and outdoor time for youth as this would

reduce idleness and likely reduce anti-social behaviors. They also stated that they would like the ping pong table to be fixed.  Staff stated that they did not feel safe and that the boys were becoming increasingly aggressive.

The Dubois unit was clean and decorated. Most youth rooms were not clean. Youth did not seem happy on this unit. There were thirteen (13) youth on the unit and three (3) staff on the unit. No one was confined to their rooms. Some youth were doing schoolwork on laptops (virtual class was supposed to happen but there was an issue with the teacher) and other youth were in day room chatting. Youth were about to eat lunch. Youth were very chatty with the monitoring team.

The Roosevelt unit smelled very badly (perhaps youth cleaned with a dirty mop), but the unit looked clean.  Youth rooms were the messiest of all the units. There was a total of eight (8) youth and five (5) staff on unit. Unit was rowdy and lacked control. Youth were not engaged in online learning. Staff seemed very stressed.

As mentioned in previous reports, more meaningful activities, weekend programs and enhanced educational hours would help reduce the risk of youth engaging in anti-social behaviors when they have little else to do (like climbing on roofs, excessive horseplay, destroying property, and running around unauthorized areas) – particularly during COVID-19 when so many interactions with other youth, family, staff, and educators are now being done virtually.  In response to needing more structured, gender and culturally relevant programming, Defendants have created and hired a Program Director. The Monitor looks forward to the positive impact this person will have for youth and staff.  During previous site visits, the Monitor recommended creating and implementing a daily schedule to help with youth boredom and create opportunity for structured, meaningful programming.  The Monitor worked with the Defendants on developing a weekly schedule with accountability/quality control measures and this has since been created and implemented. Creating and implementing a daily schedule is a good first step.

Staff are very frustrated with what is perceived to be a lack of ways to hold youth accountable as well as a lack of incentives that will foster improved behaviors as youth focus on earning the incentives and rewards.  Defendants are developing and implementing a new behavior management system/implementing DBT and modifying canteen privileges to encourage youth to behave on a daily basis. Improving the behavior management system and improving the rewards and incentives will have a positive impact on the overall behavior and atmosphere issues that are driving the main issues that are frustrating both staff and youth. Youth are concerned about these changes so the Monitor recommended piloting the implementation on a smaller scale.  Defendants have created more staff-led activities since the last site visit which is an improvement.

<u>Youth Interviews</u>

The Monitor conducted several youth interviews. Approximately fifty-three (53) youth were interviewed during the site visit (formally and informally).  Plaintiffs' counsel also interviewed youth remotely.  Youth did complain to counsel about use of physical force and restraints, staff being too quick to use administrative confinement, missing school while they are in administrative confinement, and the inadequacy of virtual schooling, inadequate activities, and reduction in Zoom calls with their families. There were no requests to talk to plaintiffs' counsel while the Monitor was onsite talking with youth.

The youth interviews with the Monitor were all very similar.  Youth complained about education (lack of support, special education classes, missing in-person learning, and missing being in the school area), not getting off the units or going outside, not getting Zoom calls with family, staff not engaging or caring about them, being bored, and staff restraining and confining when there was not a need.

Although Defendants have made attempts to create a schedule with staff directed activities, youth complained that most of the activities were not something they enjoyed.  Youth enjoyed the music lab, various contests, basketball games, and anytime they can do something off unit.   Although the Defendants are working on improving this, much more must be done to improve programming and idleness.  It is clear by the data, shift reports, and youth and staff attitudes, that boredom is taking its toll.

Youth did not complain about canteen this site visit besides being concerned about future changes to the program. LHS/CLS Business Office continues to be responsive to feedback about youth needs and interests as received through youth correspondence and committees.  In collaborative effort with HSU, the Business Office added some additional items to the property catalog and canteen monthly to address health and safety for the youth. During this reporting period, property items that were added include: Boxer/Briefs, watches, brushes, and benzoyl peroxide cream. African Magic Gro has been procured to be maintained onsite as it has often out of stock from the canteen process. The Canteen menu has also been updated to include playing cards, additional hygiene products, and greeting cards.

The Business Office is also working directly with the Superintendent and DOC to explore adjustments making snack and hygiene items available in alignment with the DBT System of Care behavioral management model and the incentive redesign. The Business Office is putting a plan in place to transition to in-house distribution daily of some canteen items, using top selling list from our youth's actual sales history for ordering additional canteen items to have on hand at the facility, taking recommendations through youth council and communication forms, adding items to canteen menu often based on feedback. Defendants are funding through state funds (to be provided as earned incentives) to have weekly on-hand highly desirable and culturally important items. Defendants' work on remedying the canteen issues should be commended.

Due to lack of clinical support staff and connectivity issues, the facility is not providing as many Zoom calls (virtual family visits).  This is clearly having a negative impact on behavior and increasing incidents. Many youth and staff complained about this issue. More Zoom calls would certainty go a long way to improving conditions and reducing anxiety.  Several youths said that they just want to be able to talk and see their family for the holidays.  The Monitor recommends the Defendants resolve the issues with Zoom calls and conduct some of the calls in the visitation area to "normalize" visitation, have youth move off of units, and have a change of environment. The visitation area is very beautifully decorated and is not being utilized currently.

The Defendants should take advantage of the reduced population and the available staff in planning and preparing and developing programs for youth. The Monitor is hopeful that with the new Program Director, gender and culturally competent programming can be brought/introduced (even if virtually), to LHS/CLS s an interim measure while Defendants work to move youth closer to

locations where such programs and services are available.

Staffing

During this reporting period, there have been some key staffing changes.  Key Positions hired from September 1, 2020 through December 20, 2020 are as follows: Safety Director, Safety Administrative Captain, Great Lakes Inter-Tribal Council- ITW Coordinator, two Recreation Coordinators, a Nursing Supervisor for Health Services Units, two Corrections Unit Supervisors, two Supervising Youth Counselor IIs, two Education Assistants, Facilities Maintenance Specialist-Advanced, and the Corrections Treatment Services Director- (Eff. 12/20/20).   Youth Counselor Academies Classes are underway or scheduled.

Direct-care staffing vacancy percentage has increased from the last reporting period (*see below*). There are 311 total positions ("FTEs") at LHS/CLS.  Approximately 153 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA").  The teacher vacancy rate remains high (7 vacancies- same as that last reporting period). Hiring for two educational assistants have occurred during this reporting period which is good. The Monitor encourages continuing to recruit teachers despite the reduced population and challenges with Covid-19.  Recruiting is still a challenge due to the location of the facility, overall teacher shortages, relatively low compensation, location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and the year-round school calendar and thus, hiring needs to continue.  As previously mentioned, the entire educational program at LHS/CLS needs to be evaluated and improved.

| Position | Vacancy Rate % as of January 30, 2020 | Vacancy Rate % as of May 13, 2020 | Vacancy Rate % as of September 19, 2020 | Vacancy Rate % as of December 9, 2020 |
|---|---|---|---|---|
| Youth Counselor | 7% (8 of 115) | 8.6% (10 out of 115) | 18.2% (21 out of 115 | 23% (27 out of 115) |
| Youth Counselor Adv. | 15% (5.5 of 37.5) | 13% (5 out of 37.5) | 12% (4.5 out of 37.5) | 13% (5 out of 37.5) |
| Teacher | 32% (8 of 25) | 32% (8 out of 25) | 28% (7 out of 25) | 28% (7 out of 25) |
| Social Worker | 21 % (3 of 14) | 21% (3 out of 14) | 21% (3 out of 14) | 29% (4 out of 14) |

The Governor approved a meritorious hazard compensation payment for essential front-line state workers in residential facilities that have been experiencing a high number of residents and/or staff with COVID-19. The one-time $1,500 payment will be targeted to employees who are required to physically report to work, regularly tested for COVID-19 because of the risk posed to those in their care, and the health risks they face in their jobs. Consistent with federal CARES Act guidelines and the State's Discretionary Merit Compensation (DMC) program, a lump sum meritorious payment (for employees with a satisfactory performance evaluation in the past twelve (12) months and without discipline within the past twenty-four (24) months) will receive payment at the end of the calendar year. New probationary employees will qualify for the program upon

successful completion of their probationary period. Hopefully, this assists with retention of staff during a very difficult time.

The Monitoring team spoke to over thirty-eight (38) staff. Staff morale ranged from being somewhat happy (a few) to staff being very angry (some) and stressed and frustrated (majority). Staff felt that there were not enough activities for the youth to do, they rarely get off the unit, there were less "tools" available to manage behavior, and youth were acting out a lot more.  Staff are frustrated that some staff do not have to come to work in person and felt that they had to do multiple people's jobs. Management continues to have "Administrator Listening Sessions" and "Superintendent Town Halls." Majority of staff do not seem to engage with the youth regularly based on staff and youth interviews, Monitor's tour, reviewing camera footage and video, and PbS data. The Monitor continues to stress the need to continue making staff wellness a major focus moving forward.

<u>Youth in Custody Practice Model Update/ Dialectical Behavior Therapy</u>

As part of the agency and facility's desire to improve conditions for both staff and youth, they are continuing to engage in the Youth in Custody Practice Model ("YICPM"), which was explained in the previous Monitor reports.  The YICPM Core Leadership Team continues to meet and discuss implementation and sustainability of the YICPM model at LHS/CLS. The current focus of the Core Leadership Team is the development and implementation of DBT as a behavioral motivation approach.

The YICPM Core Leadership Team continues to meet and discuss implementation and sustainability of the YICPM model at LHS/CLS. The current focus of the Core Leadership Team is the development and implementation of Dialectical Behavior Therapy ("DBT") as a behavioral motivation approach

On December 1, 2020, agency leadership conducted a video call with YICPM consultants. The focus of the meeting was to develop modules for the final virtual site visit scheduled for January 13 and 14, 2021.  Georgetown consultants will help develop the framework and action plans to support management in sustaining cultural changes that will come with implementing DBT as a behavioral motivation System of Care. A panel discussion with one/two direct line workers from Utah and Massachusetts will provide helpful context to reinforce efforts. The meeting will also include an assigned re-reading of related Practice Model chapters and a DJC Roadmap PowerPoint with updates. These plans are designed to support staff in understanding their role as change agents and sustaining change as an agency.

A DBT Informed System of Care has been identified as vital to the change process. Planning actively continues to integrate a comprehensive revamp of a behavioral management approach coupled with DBT- which is based on three key principles:

Principle 1: Decreasing risk of recidivism   DBT targets and treats multidiagnostic, difficult-to-treat, high risk individuals who engage in life-threatening behaviors toward themselves and others

Principle 2: Responsivity – Appropriately matching treatment to learning styles, capabilities and diagnoses of youth. DBT delivers treatment in a group, individual and milieu setting to those in which research has demonstrated DBT's effectiveness.

Principle 3: Criminogenic needs： DBT teaches emotion regulation, problem solving, self-management, impulse control, interpersonal skills and skills to enhance motivation. This organizational priority will bring a shared focus and language to support treatment needs for youth at LHS/CLS. Thirty-four (34) staff attended the Superintendent Town Hall on October 6, 2020 in which an overview of DBT as a System of Care was shared. Question & Answer allowed for leadership and staff to identify various considerations that will enhance implementation.

On October 22, 2020, executive leadership engaged the Program and Policy Analyst for increased capacity for project management and quality assurance. A SharePoint platform was developed to share task assignments, calendar highlights, and workgroup developments including incentive redesign planning efforts, pro-social point matrix, menu of responses for noncompliant behaviors, skill practice reinforcers and a framework for program progression. Leadership reviewed the draft DBT program guide to ensure integration of basic learning principles (reinforcement, punishment, extinction, and shaping) into the behavioral motivation model.

DBT System of Care supports have included the development of a structured schedule with the school day starting at 9 a.m. (in alignment with American Academy of Pediatrics recommendation to support teens' circadian rhythm and development) and includes rotation of recreation and staff directed activities on the weeknights. Skills Streaming the Adolescent has also become a key part of the new schedule engaging unit-based groups in skill practice that will support DBT efforts. The summer's transition to Growth Plans with SMART goals for each youth will become a key component to support a DBT treatment environment facility wide.

The core leadership group has expanded focus to include planning for staff training, quality and assessment. With full commitment to implement a treatment paradigm with DBT as the foundational curriculum across the facility, it was determined that training strategic groupings of staff continuously starting in early 2021 with six (6) half-day trainings over a three-week period will provide clarity for staff and effectively and efficiently move DBT forward. Once staff have received training, there will be on-going coaching and mentoring to aid staff in becoming comfortable with DBT.

Interdisciplinary engagement has continued to strengthen final preparations for implementation of the DBT System of Care. The Champions group of twenty (20) staff identified in the summer were encouraged to share perspective and feedback with leadership after receiving program updates on December 8th; the input of staff was strategically sought to enhance roll-out plans.

Continued planning efforts include the development of tailored Diary Cards for youth to self-assess usage of skills and engage in supportive dialogue with his/her Primary Youth Counselor and Growth Team. A pre/post assessment DBT WCCL (Ways of Coping Checklist) was identified as an assessment tool to help gauge program outcomes that support youth development of prosocial stress management. The incentive committee continues to work with the business office to explore options and processes to provide daily incentives connected to pro-social points. The Quality committee is working to outline pre-treatment DBT curriculum that can be delivered the first two

weeks of a youth's placement at LHS/CLS to enable youth to readily engage in DBT skills groups upon assignment to a living unit. The DBT System of Care will support a modified open-ended group structure that will align with youth's engagement in programming, education, and ancillary activities while applying skills for progression towards and in preparation of release. The Monitor is encouraged by the progress and commitment made in implementing DBT at LHS/CLS.

Mental Health (PSU) Update

In the last report, the Monitor informed the Court that due to COVID-19, contracting with a mental health consultant was postponed. However, Defendants have identified a potential consultant and the Monitor had the opportunity to speak to him in depth with the needs of the youth at LHS/CLS. The Monitor is optimistic that the Defendants will enter into a contract as soon as possible with the mental health consultant. It is critical that the programming, staffing, and services that exist at LHS/CLS can be evaluated – including for youth with significant mental health needs - and recommendations made on how to address the issues raised and improve treatment and services for youth at LHS/CLS.

The Monitor previously recommended that mental health (PSU) staff be integrated more into operations in order to provide much needed support for youth and staff. Defendants are continuing to expand and increase PSU involvement by:

1) By reinforcing and utilizing all the various roles of the PSU clinicians such as therapist, crisis manager/negotiator, trainer, consultant, collaborator, and program developer when working with the day-to-day operations and staff members. Encouraging and supporting site staff to collaborate directly with PSU Clinicians rather than only reaching out to the Supervisor. During this period PSU Clinicians have been continuing to develop and utilize these roles to engage, train, equip, and support paraprofessionals and professionals to collaborate on an effective treatment approach (decreasing youth noncompliant behavior) and demeanor with the youth.

2) PSU Clinicians have increased attendance at the multi-disciplinary meetings, increased attendance at the unit meetings, increased unit presence, increased involvement on subcommittees and project committees, and increased involvement in training, increased initiation of collaborative meetings, and increased communication with unit and education staff.

3) The PSU Supervisor and one of the PSU clinicians collaborated with Safety Staff to develop an integrated response plan for youth placed on AC. This effort focused on the provision of intensive mental health services in collaboration with safety staff to expedite the successful reintegration of youth back into the general population. This plan was tested by PSU and SYC and continually improved across several weeks.

4) The PSU Supervisor sent an email and set up a folder where PSU Clinicians share successful plans with other PSU Clinicians responding to AC and crises. Clinicians also inform each other through email.

5) The PSU Supervisor and several PSU clinicians collaborated with the Music Art Initiative (MAI) Leader, administration, safety, and education to continue integrating mental-health research and practice in developing youth centric programming and projects.

6) A number of groups and projects are being implemented and planned as a result of this integration. This initiative is having a positive influence on the youth and staff. Anecdotal and J-Tracker evidence indicates this program has been successful in enhancing youth pro-social skills. This collaborative effort between PSU and MAI included work with the Volunteer Coordinator to develop a plan to recruit and train volunteer mentors and consultants. Outcome variables, measurement tools, and timelines are being developed to measure the effectiveness of this programming. A literature review regarding effectiveness of such programming has begun.

7) PSU Clinicians have been included in staff-led activities during the late afternoon and evening hours. Four PSU clinicians have developed and collaborated with safety, unit staff in the development and implementation of staff-led activities. PSU clinicians have integrated mental health research and practices into these activities. It is anticipated that changes in PSU clinician schedules initiated this January 2021 will allow more PSU clinicians to participate in evening programming.

An administrative plan has been approved to return PSU Clinicians on site for one additional day each week. This will go into effect on Jan 17, 2021. In anticipation, PSU Clinicians have begun planning for increased involvement on the units in the late afternoon and evening. This is possible through the schedule design which allowed for two PSU Clinicians on site until 8 P.M. each evening.  PSU Clinicians work remotely and through on-call continue to meet the challenges of covering evening and weekend hours.

Weekday hours from 8 A.M.-8 P.M. have been covered by on site PSU Clinicians. With on- site presence increasing in January 2021, a second PSU clinician will allow for at least one clinician to facilitate groups and engage in staff-led activities. Having two PSU Clinicians available until 8:00 P.M. also allows for one of these Clinicians to remain dedicated to emergency response and consultation. In addition to having two clinicians working until 8:00 P.M. in January, PSU staff has already implemented 3 new treatment groups occurring during weeknights, from 5:30-7:00. Two groups are developed for the young men and focus on fostering conflict resolution and communication. The other PSU nighttime group has been developed for the young women of CLS and focuses on team building. Finally, a fourth nighttime group by a PSU staff member is expected to begin in the next week, which is on Street Art. It will be piloted on an LHS unit (Miller) and is a Music Art Initiative Group.

The Defendants should continue to involve PSU staff, especially leadership, in making improvements at the facility (such as improvements to incentives, consequences, and working with the OJOR system). The Monitor suggested modifying the mental health (PSU) and recreational staff work schedules to include more evening and weekend hours, especially given the lack of sufficient other structured activities during those times. There are no groups or programming involving PSU on the weekends currently, however, starting in January 2021, this should improve with the added in-person staff.  The Monitor continues to recommend that scheduling of PSU be reconsidered (rotate staff if need be, alternating weekends, etc.) or if this is not possible, then hire additional PSU staff to work nights and weekends to engage with all youth.  Weekends are when there is the most idle time and need for additional meaningful programming.  Adding weekend programming will also have a positive impact on reducing incidents of violence and other behavioral incidents related to boredom and lack of activities. There really is a missed opportunity for PSU involvement during this period and particularly during COVID-19 when engagement with

family, staff, and other youth are reduced.  Hopefully, all of these positive changes (to come) will result in an improved atmosphere for youth and staff.

Quality Assurance ("QA")

Defendants have remained committed to ensuring staff accountability in the completion of Visual Monitoring safety/wellness checks since launching its Quality Assurance Review (QAR) process in August 2019.  A report was able to be generated in which 98.8% of 30-minute safety/security checks were recorded during this reporting period.

As of September 2020, the scope of the Point-in-Time (PiT) Youth: Staff Ratio was expanded to include a nighttime analysis of coverage in alignment with PREA standards. Since January 2020, only a daytime analysis was completed to inform programming and resource decisions. The PiT Youth: Staff Ratio utilizes Unit-assigned safety staff schedules and youth population for one week each month. Data has shown that even during the pandemic, LHS/CLS has continued to maintain coverage supportive of daytime and nighttime ratios that enable enhanced programming and safety for youth and staff alike.  During the month of October 2020, a focused effort was made to closely review all incidents, Guardian tracking and programming across LHS and CLS. Data was recorded into PbS software and continues to inform improvement efforts. On November 1, 2020, CARE Team contacts were transitioned into J-Tracker using the Audit/Shift Log. CARE Team members are responsible for logging every hard and soft call they have per shift. The electronic log includes the youth and staff involved, Hard/Soft call, type of issue and if it was resolved. Data can be pulled directly from the log as needed.  As of December 1st, scars and tattoos are being recorded in J-Tracker upon a youth's admission to LHS/CLS. As of December 9, 2020, all current youth (except for those in medical isolation and some who have refused to have pictures taken of scars and tattoos) are logged and available for reference.

To aid in the completion of quality assurance tasks, an extractable format of search data was developed. The report format will facilitate review of search criteria as outlined in the functional policy and procedure drafts for searches of youth and facility.

Data from the debrief reports was also made into an extractable format which will enable point in time review of the requirements for mechanical restraints and AC placements. This will support Quality Assurance staff's ability to facilitate assurance measures (including response assignments within J-Tracker) with supervisory or professional staff before or after the Safety Director, Deputy Superintendent, or Superintendent formally review the documented incident debrief form.

Quality assurance for visual monitoring has continued to be a focus during the reporting period. The process transitioned to engage Corrections Unit Supervisors with oversight of a Supervising Youth Counselor II. The process was transitioned from a "grace" period into standardized communication requiring specific action items. During this time, two new CUSs have started and a new Treatment Director (who will supervise CUSs) has been hired. These individuals will all play an important role in continued facilitation of quality assurance reviews.

The CUSs have maintained daily Visual Monitoring reports produced by Guardian and have utilized resources developed to clarify expectations for accountability measures. Quality Assurance staff collaborates with the assigned SYCII to review inquires and track QA emails to

staff, policy acknowledgements, and competency assessments as required. As stated in previous reports, a framework for identified outcome measures was developed to align with PbS national benchmarks.  PbS data collection cycles occur twice annually, and the most recent cycle was in October 2020.  Facility Improvement Plans ("FIP") have been created after the most recent PbS Coach Site Visit.  As a reminder, PbS is a continuous data-driven improvement model grounded in research that holds juvenile justice agencies, facilities and residential care providers to the highest standards for operations, programs and services.  The FIPs are the vehicles for jurisdictions to continuously bring about meaningful change. They bridge the gap between understanding and actions to improve the conditions of confinement at a facility, beginning with identifying the specific outcome measure(s) a facility want to improve.

<u>Facility Improvement Plan ("FIP") Progress</u>

**FIP Action Steps**
PbS offers a 7-action step tool, driven by a research-informed improvement model, to support and guide PbS participating agencies and facilities as they work to achieve both incremental and sustainable change. The action steps entered into the PbS website make up the team's concrete plan to attain the improvement you are seeking.

1. **Analysis of Performance**
   - Pinpoint the causes of your outcome performance.
2. **Creating Buy-In**
   - Identify how you will engage those whose support you need to improve the targeted outcome or area of change.
3. **Setting Outcome Measure Goal**
   - Create short, interim & long-term goals that provide benchmarks and a vision to work toward.
4. **Improvement Process Action Steps**
   - Develop concrete, measurable actions to address the factors that contributed to your outcome performance.
5. **Interim Measures**
   - Identify how you will monitor your progress toward your goals to see what is working and adjust your strategies, as necessary.
6. **Sustaining Performance**
   - Identify strategies that will support what is working to ensure sustainable change.
7. **Performance Recognition**
   - Determine how you will formally and informally recognize staff, youth, and other stakeholders for their contribution to the improvement process; celebrate successes!

The following FIP's were selected and developed after the April 2020 data collection cycle based on input from the PbS Coach and facility outcome measures. The below FIP's are in the process of being updated based on the most recent October 2020 data collection cycle.  However, after consultation with the assigned PbS Coach, the agency should consider closing these FIP's in favor of developing a new one focused on improving the culture and relationships between youth and staff.  Any improvement within these context areas would have mutual improvement in many critical outcome measures.  Without improving the overall culture along with improving the mutual respect between youth and staff, that minimal improvement will be seen within the critical outcome

measures.  Another thought would be to pilot an FIP on culture and relationships at the CLS, on a smaller scale basis to monitor its impact and then transition the FIP to LJH once it is a proven effective.

**CURRENT/OPEN FIP's:**

**LHS Facility Improvement Plan #1010**

| Outcome Measure |
|---|
| Safety 02 Injuries to youths per 100 person-days of youth confinement. |
| Safety 03 Injuries to staff per 100 staff-days of employment. |
| Safety 04 Injuries to youths by other youths per 100 person-days of youth confinement. |
| Safety 11 Assaults and fights on youth per 100 person-days of youth confinement. |
| Safety 12 Assaults on staff per 100 person-days of youth confinement. |

| Outcome Measure | Original Value | Current Value | Average Value | Goal | |
|---|---|---|---|---|---|
| Order 03 Physical restraint use per 100 person-days of youth confinement. | 45.00 | 92.00 | 18.19 | 30.00 | R |
| Order 04 Mechanical restraint use per 100 person-days of youth confinement. | 35.00 | 41.00 | 10.51 | 20.00 | R |
| Safety 02 Injuries to youths per 100 person-days of youth confinement. | 64.00 | 73.00 | 14.11 | 48.00 | R |
| Safety 03 Injuries to staff per 100 staff-days of employment. | 19.00 | 33.00 | 2.76 | 0.00 | R |
| Safety 04 Injuries to youths by other youths per 100 person-days of youth confinement. | 17.00 | 10.00 | 3.02 | 0.00 | G |
| Safety 11 Assaults and fights on youth per 100 person-days of youth confinement. | 38.00 | 21.00 | 7.77 | 5.00 | G |
| Safety 12 Assaults on staff per 100 person-days of youth confinement. | 9.00 | 7.00 | 3.42 | 0.00 | G |

**CLS Facility Improvement Plan # 1009**

| Outcome Measure |
|---|
| Order 08 Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement. |

| Outcome Measure | Original Value | Current Value | Average Value | Goal | |
|---|---|---|---|---|---|
| Order 08 <br><br> Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement. | 29.00 | 11.00 | 2.75 | 15.00 | Ⓖ |

A thorough and in-depth review was conducted of the October 2020 PbS data collection for both LHS and CLS.  During the review, outcome measure data clarification and input was sought from both the facility PbS State and Site Coordinators and the assigned PbS Coach.  As a result of the review, the following highlights and outcomes are noted:

**PbS Data Quality** – In the previous report, some issues were identified as to the quality of the data entered for some outcome measures, including outcomes measuring around daily activity durations. Through the review of the October data reports, the Monitor is pleased to report that those issues appear to have been resolved.  More importantly, the new Guardian RFID system was used to record much of the data inputted for the daily Unit Log activity data.   This permitted the facility to accurately report the daily activity for all youth, including education, facility programs, recreation, leisure time, and "in sleeping rooms" (room confinement), and finally sleeping time. Using the Guardian RFID system continues to allow for the tracking of daily activity over the entire data collection month and is providing much more accurate data than was previously being collected. With the improved data collection, we can now get a better sense for the progress being made. Before the Monitor begins to outline areas for improvement, it is important to recognize the efforts and positive steps forward in regard to the quality of the PbS data and the overall progress in many of the outcome measures.  It is important to remember that PbS is a "continuous facility improvement program," therefore overall progress is measured over the period of years and numerous data collection cycles.  The trendline of the outcome measures is what is most important as it reflects the direction of the facility over time.  The October data clearly shows some positive progress trends moving in the right direction for many of the outcome measures with some having moved in a negative direction.  This is expected given the operational changes occurring as a result of the pandemic and supports the Monitor's critical findings and suggested changes around support staff, education, PSU and other issues related to a lack of programming.

It is important to note that both the April and October 2020 data collections took place in the middle

of the pandemic, which certainly made facility operations much more challenging, particularly around the issue of reducing "operational" room confinement.  In these circumstances, the easy approach would have been to put youth in their rooms as much as possible to promote social distancing and reduce the risk of infection.  The Monitor is happy to report that this did NOT occur at LHS or CLS.  It certainly appears that the facility continues to make every attempt to maintain facility operations as best possible under these challenging conditions.  This is highly commendable and reflects the agency and facility leadership commitment to improving conditions of confinement.  However again, the Monitor feels that more can be done and achieved if support staff were brought back into the facility to help normalize daily activities and programs.

With all that said, there are a couple of outcome measures that bear attention.  First and foremost, is what is unquestionably a continued high rate of "self-requested" confinement.  This remains an issue from the April cycle and continues into the October cycle with little or no improvement.  The data reflects 825 incidents of confinement use during the month of October (754 @ LHS and 71 @ CLS).  Of these, there were a total of 676 for self-requested confinement, representing 82% of all confinement for the facility during the month.  This represents an overall increase from 76% of all confinement in April 2020.  One area of improvement was within the confinements related to "program refusal".  In April, there were 213 incidents (19% of all confinement) where youth "declined to participate in program".  Program refusals typically result in room confinement which is a violation of the Court Order.  These two categories alone represent 95% of all confinement for the month of April.  On one hand, this is a positive as very little confinement is a result of behavior issues.  On the other hand, it is also a reflection of the culture, atmosphere and environment which results in such self-selected confinement.  Focusing on improvement on these particular areas of confinement will certainly have an immediate and positive impact on reducing overall confinement numbers.

It is also a positive trend that behavioral related confinement only represents 8% of all confinement (8% to "protect youth from other youth", 1% to "give youth time to cool off").  To illustrate this point differently, at LHS, there were 679 incidents of confinement unrelated to behavior (self-requested, program refusal, medical, and mental health) compared to 74 incidents related to behavior.  Similar disparity is seen at CLS, where there were 60 confinement incidents unrelated to behavior compared to 11 behavior related incidents. Focus on reducing these types of confinement through improving the overall atmosphere and environment as well as tying program participation into the incentive and rewards program should have a positive effect.  The overall effort of the facility improvement plans as well as the focus issues of the settlement agreement should also have a positive impact on these issues.

Additionally, the previous report discussed that the unit activity record for the Krueger Unit reflected that youth were spending approximately 20.64 hours per day in their rooms (10.5 hours reflected as sleeping time and 10.14 hours reflected as "in sleeping rooms," room confinement, much of which appears to be self-requested or program refusals).  The activity log for the Krueger Unit also did not reflect any hours for education.  The Krueger "program" has since been eliminated and the unit now operates as a normal general population unit. As such, this issue seems to have been resolved as youth are spending considerably less time in their rooms.  The April activity log for the Krueger Unit reflects that youth are spending 3.09 hours per day in education programing; 4.95 hours per day in leisure activity; 2.45 hours per day in operational activity; 10.73 hours per

day in rooms for sleeping; 2.50 hours per day in rooms (operational confinement); with the remainder of time identified as 0.09 facility programming; and 0.09 recreation. In comparison, the October data reflects similar outcomes to the April data with a couple of declining outcome measures, most likely resulting from operational changes related to the pandemic and reduced support staff on site to conduct education or other treatment programs.  The October data shows Krueger youth spending approximately 11.18 hours in their rooms for "sleeping" time and 2.75 hours in their rooms for other reasons.   Education hours for Krueger youth declined to approximately 1.5 hours per day (weekdays) and leisure activity time increased to 6.78 hours per day. This represents a major portion of their day is spent in meaningless activities occurring within the dayroom area.

Finally, the Monitor encourages the facility to closely review all of the PbS data and outcome measures as a means to better understand the impacts generated from the many changes occurring within the facility.  Agency and facility leadership should make it a point to review the PbS data with staff at all levels, perhaps during monthly all staff briefing meetings.  This is an opportunity to show the positive outcomes being achieved through the various changes and efforts to reduce incidents of violence, confinement, and use of restraint. As a result, while much work remains to be done, the data clearly shows that many trend lines are moving in the right direction and providing a safer environment for staff and youth, particularly within outcome measures reflecting fewer assaults and injury rates of staff.

**Use of Restraint Outcome Measures** - Both LHS and CLS show "0" incidents of use of chemical agents (Order 6) during the October 2020 data collection cycle, which is commendable and per the Settlement Agreement.  However, the rate of physical restraints (Order 3 – Physical Restraint Use per 100-person days of confinement) at LHS and CLS remains high and significantly above the national average as does the rate of mechanical restraint (Order 4 – Mechanical Restraint use per 100-person days of confinement) usage incidents.  While the rate of physical and mechanical restraint uses initially declined at LHS, it rose slightly at LHS during the April and again in the October 2020 data cycles compared to the October 2019 cycle. This is very typical of a facility transitioning from and eliminating the use of OC (pepper spray) as staff develop new skills for de-escalation and behavior response techniques.  As mentioned earlier, this is a continuous facility improvement process which involves complex operational issues.  The following two charts reveal that overall, the trends lines for both physical and mechanical restraint use has taken an upward trend and is moving in the wrong direction from previous data collection cycles.  The Monitor feels that this trend from April and October is more reflective of the lack of meaningful education and other programs as a result of the operational changes occurring as a result of the pandemic.

**(Remainder of page intentionally left blank for formatting.)**

19

## Order 03

Physical restraint use per 100 person-days of youth confinement.



(Note: PbS defines Physical Restraints as facility authorized and trained holds used by staff to subdue an otherwise uncontrollable youth in order to prevent the youth from injuring him or herself, or others.)

## Order 04

Mechanical restraint use per 100 person-days of youth confinement.

**(Remainder of page intentionally left blank for formatting.)**



(Note: PbS defines Mechanical Restraints as Mechanical Devices used to prevent an uncontrollable youth from injuring him or herself or others. Mechanical restraints may only be used for short periods of time and must be used under medical supervision.)

The previous Monitoring report discussed issues around the reduced use of the Care Teams which resulted in a higher number of restraint-usage incidents. Care Teams are designed precisely to reduce the need for the use of restraints and have been effectively shown to work at facilities across the country and have been shown to be effective at LHS and CLS as well. The Agency and facility should continue to expand the use of the Care Team concept and ensure that direct care staff are training to properly use the Care Team as a de-escalation and use of restraint avoidance response. It is critical that direct care staff develop skills around total awareness in order to recognize the early signs of pending behavior and incidents in order to engage the Care Team members at the earliest possible opportunity. This in turn increases the opportunities for de-escalation and resolution of situations with the use of restraint. The Monitor's review of Care Team deployments and video recordings left the impression that the Care Team concept is not being fully implemented under Care Team concepts. In one incident, the Monitor observed Care Team members resolving the situation through the use of physical restraint/force. This goes against the Care Team principals. Care Team members should never be involved in the use of physical restraint of a youth. This is counterproductive to the concept and does not permit the youth to begin de-escalating if they believe the Care Team member may still use physical force against them.

The Department should continue to implement the core principles of the Care Team model by utilizing an agency strategic plan process that involves additional staff training in de-escalation techniques; include Care Team deployment information in shift debriefings in order to review the process and provide on-going situational training for staff; implement a Care Team response incident report that also reflects the outcome of the response in order to better track outcomes from Care Team deployments; implement the S.O.D.A.S model (Situation, Options, Disadvantages, Advantages, Solution) into the Care Team model; and, finally, the facility leadership team should incorporate daily/weekly review of all use of force/restraint incidents to evaluate if and when the Care Team

should have been activated to help de-escalate a situation. This should be used as a staff training and awareness process to help staff build new skills and to help change their mindsets in how they first react to certain types of youth behaviors.

**Isolation, Room Confinement and Segregation Measures** – Overall, the PbS outcome measures around isolation and room confinement are improved over the October 2019 PbS data collection cycle reflecting that 100% of room confinements are terminated in under eight hours, and slightly fewer in under four hours, 92.00% at LHS and 100% at CLS. These are both very commendable achievements, and both are better than the national field averages for these outcome measures. These rates also reflect improvement from the October 2019 rates. While these rates are commendable, we continue to see a high rate of initial confinements reflected in Order 8, which remains significantly higher than the national field average. Based on the Monitors review, this is clearly occurring as a result of the high numbers of self-requested confinements as reported and reflected in the PbS data.

## Order 08

Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement.



As discussed earlier in this report, there remains an issue around Order 13 – Isolation, Room Confinement for reasons *not related to behavior*. These appear to primarily be incidents where youth are refusing to participate in programs and education. As you can see from the following chart, self-requested and declined to participate in programs involves 95% of the non-behavior related confinement incidents at LHS and 91% of confinement incidents at CLS. While the use of room confinement for "self-requested" or "program refusal" declined from the April 2020 data cycle, it still remains a very high percentage of confinement usage. This continues to be a reflection from the overall behavior management system and lack of appropriate use of incentives and rewards. Youth continue to refuse to go to school and elect to remain in their rooms and, in most cases, simply watch TV all day. Furthermore, while the number of confinements for "program

refusal" declined significantly from the April data, 213 incidents in April to just one in October at LHS, this was the result of the facility simply changing the reporting data from a "program refusal" to "voluntary confinement". Overall, LHS and CLS had a combined 1,000+ incidents of program and/or self-requested incidents during the April data collection cycle, which reduced to 677 incidents during the October cycle. This is misleading data since youth continue to refuse to participate in programs. Facility staff need to focus on youth engagement or re-engagement strategies as well as the BMS in order to get youth to participate in programs.

| Why confinement was used | Lincoln Hills | | Copper Lake | |
|---|---|---|---|---|
| Value | Count | Percent | Count | Percent |
| Self-requested | 627 | 83% | 49 | 69% |
| Declined to participate in program | 1 | 0% | 0 | 0% |
| Mental Health | 2 | 0 | 11 | 15% |
| Protect other youths or staff | 63 | 8% | 7 | 10% |
| Give youth time to cool off | 11 | 1% | 4 | 6% |
| Medical | 49 | 6% | 0 | 0% |

The PbS Incident reporting data for October 2020 reflects the following important data points:

➢ 22% of the incidents occurred in the Rogers Unit;
➢ 21% of incidents occurred in the Miller Unit;
➢ 99% of all incidents occurred within a living unit;
➢ 47% of incidents involved "Other Misconduct."
➢ 38% of incidents involved "Group Disturbance".
➢ Substantial increase in injuries to youth by staff, Safety 5, at CLS.

# Safety 05

Injuries to youths by staff per 100 person-days of youth confinement.



## Safety 06

Suicidal behavior with injury by youths per 100 person-days of youth confinement.



While there appears to be a substantial increase in suicidal behavior with injuries, Safety 06, at CLS, review of the actual data reveals that the number of incidents has declined over the last three data collection cycles. It should be noted that due to the lower population of CLS, each incident has a major impact on the overall rate, which is the measure against the field average. The total number of these incidents during the October 2020 data cycle was five (5), a drop from eight (8) similar incidents during the April 2020 data cycle.

The following data is a breakdown of the total number of incidents submitted into the PbS incident

reporting data measures for October 2020.

**LHS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 630 | 99% |
| No | 6 | 1% |

**CLS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 73 | 100% |
| No | 0 | 0% |

**LHS Incident location (living units):**

| Value | Count | Percent |
|-------|-------|---------|
| Rogers | 138 | 22% |
| Miller | 133 | 21% |
| Black Elk | 98 | 16% |
| Roosevelt | 87 | 14% |
| DuBois | 68 | 11% |
| Curtis | 55 | 9% |
| Krueger | 49 | 8% |
| Hughes | 2 | 0% |

**CLS Incident location (living units):**

| Value | Count | Percent |
|-------|-------|---------|
| Wells | 73 | 100% |
| Hughes | N/A | N/A |
| King | N/A | N/A |

**Youth and Staff Climate Surveys** – Both youth and staff appear to be more responsive in utilizing the youth and staff climate surveys.  It is strongly recommended that both department and facility leadership take the time to thoroughly review the agency/jurisdiction count summaries for both the youth and staff climate surveys.  The results can be very insightful and useful for leadership.  Below are some of the survey results that the Monitor found most useful to be included in this report.

**Staff Climate Survey Results:**

**In your opinion, what would make this facility safer?**

| Value | Count | Percent |
|---|---|---|
| More staff | 114 | 79% |
| Safety equipment | 82 | 57% |
| Other | 65 | 45% |
| Training | 61 | 42% |
| Less overcrowding | 11 | 8% |

In regard to the above chart, the following are the top ten most requested training that staff felt would make the facility safer:

**What training would you like to see?**

| Value | Count | Percent |
|---|---|---|
| General behavior management | 64 | 44% |
| Safety and security | 62 | 43% |
| Communication | 54 | 38% |
| Agency policies and procedures | 52 | 36% |
| Appropriate staff/youth relationships | 49 | 34% |
| Adolescent development | 48 | 33% |
| Verbal de-escalation | 47 | 33% |
| Gang training | 45 | 31% |
| Cultural diversity and awareness | 44 | 31% |
| Ethics | 42 | 29% |

**October 2020 PbS Staff Climate Survey Results:**
➢ 69% of staff responses reported they fear for their safety;
➢ 82% of responses reported they believe the facility is unsafe or very dangerous;
➢ 78% of responses indicate that staff believe they do not have authority to discipline youth appropriately;
➢ 94% of responses indicated that staff have not practiced a fire drill in the last six months;

**Youth Climate Survey Results:**

**Do you fear for your safety in this facility?**

26

| Value | Count | Percent |
|---|---|---|
| No | 15 | 48% |
| Yes | 9 | 29% |
| Refuse to answer | 1 | 3% |
| Not recorded | 3 | 10% |

In comparison, the youth fear for safety measure, Safety 13, has steadily improved from the previous data collection cycles. The rate still remains higher than the national field average but is improving.

**Within the last six months at this facility, have you been beaten up or threatened with being beaten up?**

| Value | Count | Percent |
|---|---|---|
| No | 14 | 36% |
| Yes | 22 | 56% |
| Not recorded | 3 | 8% |
| Refuse to answer | 0 | 0% |

**Do staff members show residents respect?**

| Value | Count | Percent |
|---|---|---|
| Sometimes | 40 | 57% |
| No | 20 | 29% |
| Yes | 5 | 7% |
| Not recorded | 5 | 7% |

**Are the staff good role models?**

| Value | Count | Percent |
|---|---|---|
| No | 33 | 47% |
| Sometimes | 29 | 41% |
| Not recorded | 5 | 7% |
| Yes | 3 | 4% |

- ➢ 54% of youth responded that they do not understand their legal rights;
- ➢ 80% of youth reported that they were involved in the development of their treatment plans;
- ➢ 77% reported that they understand the level, phase or points system;
- ➢ 69% reported they have not received a family visit.  (It should be noted that the pandemic and restrictions around visitation impacted these results.  The facility did increase the use of technology for video visitation, but these appear to have also declined over recent months.)
- ➢ Only 7% of youth responded that staff show residents respect and only 4% of youth responded that staff are good role models. This supports the idea and suggestion that the facilities should focus their FIP efforts on improving the overall culture and relationship between youth and staff.

Defendants should continue to pay particular attention to each Facility Improvement Plan as each FIP includes a section for comments relating to the implementation status of each action step completed by the PbS Site Coordinator or assigned staff member. Ongoing FIP review comments are entered by Facility Administrators, Agency Directors, and the assigned PbS Coach.  This is an excellent way to for the agency and facility leadership to monitor on-going progress with each of the FIP goals and to provide input, guidance, and direction during the process.

Based on advice and direction gained through participation in PbS, DJC has decided to reformulate and expand their Facility Improvement Planning Committee to further integrate the PbS Facility Improvement Plans for each school into our overall daily operations. DJC is seeking to broaden the scope of the steering committee to include a multi-disciplinary team consisting of at least one member representing each work area within the facility. The members involved in this workgroup are also going to be a part of developing and implementing additional quality assurance measures and tracking consent decree compliance throughout the facility. The Program and Policy Analyst positions working on PbS are also concurrently working to update a pre-existing draft PbS policy.

The PbS Facility Leads participated in the Distance Learning Webinar (DLW) on December 9, 2020 and the PbS Steering Committee met with PbS coach on December 10, 2020 to review the facilities' performance profile which is developed from data obtained during the October 2020 reporting period. The larger PbS Workgroup will be meeting in January to review the current FIP and discuss updates and action steps. It is further recommended that the agency, facility and the PbS team members spend considerable time reviewing the PbS Blueprint Domains, particularly those domains focused on Order; Programing; and Safety; Much can be learned from review of these outcome domains and the data associated with them, in particular, those focused on youth and staff relationships.

<u>Policies and Procedures/Administrative Code</u>

There were no new policies/procedures finalized in this reporting period.  A Policy, Performance-based Standards, Data and Quality Assurance workgroup dedicated to identifying and strategically prioritizing policy and procedure updates related to the consent decree and PbS facility improvement plans has started work on revising important division policies and facility procedures related to those core facility priorities. Below is the work done on Administrative Code and policies and procedures for this reporting period:

Administrative Code

DOC Chapter 373 – DJC has continued to move forward with the rulemaking process.
DOC Chapter 376 – DJC Administrator Hermes shared draft with the Monitor in December.
DOC Chapter 347 – (county facilities) the public hearing occurred on September 9, 2020 and final approval is pending. (This is not a DJC Administrative Rule)

Policy and Procedure

Drafts of the policy and procedures below will be forwarded to the DJC Policy Committee for review in February:

900.04.01 – CARE Team
300.05.09 Searches of Youth
300.05.17 – Searches of Facilities

Note: The drafting process of Searches of Youth and Searches of Facilities has facilitated training enhancements planned for 2021.

Training

DJC certified trainers provided the first round of multiple All-Day, drop-in refresher trainings/drills with practice scenarios to support skill retention and continued application of Verbal Judo skills. The Verbal Judo curriculum was taught to all staff who work with youth through 8-hour trainings held this summer. Verbal Judo aligns with Professional Communication module of POSC (Use of Force curriculum) and fosters staff confidence in effectively de-escalating conflict or potential violent encounters with youth.

In addition to MANDT, Verbal Judo provides another paradigm to teach complimentary techniques and build de-escalation skills to enhance safety and treatment supportive environments. Led by PSU's Dr. Schoen, MANDT Refresher trainings held during the reporting period highlighted Active Listening as a key skill for de-escalating situations when engaging youth. Reinforcement of skill will remain a continued focus with the addition of quarterly Verbal Judo Drills.

A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all of the necessary criteria and documentation requirements under which a strip search may be completed. With support from the Bureau of Training and Development, Quality Assurance and Training staff developed a DJC Searches of Youth Training module on Cornerstone eLearning to include policy highlights, video demonstration of search technique, and assessment questions that will be assigned to all safety staff in the first months of 2021.

SYCs will also coordinate at shift change in-person competency checks in which safety staff will need to demonstrate the use of proper search techniques. Finally, the STOPS acronym (Systematic, Thorough, Objective, Preventative, and Safe) will be utilized to underscore best practices for searches of youth and facility-wide areas during future training opportunities that will include support from the Field Training Officers (FTO) Program.

In partnership with the Training Center in DOC Central Office, trainings directly connected with accountability measures for the consent decree (including De- escalation, Trauma Informed Care, Use of Force, Searches, Observation, and Visual Monitoring) that are trained during YC Academies will be entered into Cornerstone Training Records separately to streamline reports. Currently Cornerstone maintains record of YC participation in a particular Academy; this modification of practice will eliminate the need to cross reference Academy training schedules and class lists for particular core training topics. With greater ease in gathering this information, accessibility and reference for additional follow-up needs will be enhanced. Training is foundational to supporting staff and maintaining a culture of accountability. Quality Assurance staff continue to work closely with Training staff to bridge the natural connection for organizational improvements.

The Monitoring team had the opportunity to review several use of force videos.  Video review should be conducted regularly in order to teach, coach, and train staff. Defendants need to continue to develop the CARE team in order to maximize the effectiveness to prevent, de-escalate, and resolve youth incidents.  Based on video observed by the Monitor, leadership should re-evaluate the team to ensure that staff utilized possess and display the skills necessary to de-escalate youth. Only those staff who have a proven ability to de-escalate and have built a trusting and respectful relationship with youth should be CARE team members.  CARE team members should not be involved in the use of force that they were called upon to de-escalate.  This is contrary to their purpose and mission.

Staff wellness remains an important issue and one that continues to impact the overall culture and atmosphere.  Staff's overall wellbeing and anxiety remains high, as does the staff fear for safety levels.  As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere and environment of the facility.  Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, and the use of isolation and confinement.  It is clear from the Monitor's interactions with staff during the site visit that staff wellness is an issue.  High levels of anxiety, stress, increased workloads on direct care staff as well as the reduce support staff assistance is having a profound impact on their wellness and, in turn, negatively impacting the overall environment.

## COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

    1.    Punitive Confinement.

        a.    Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence either in data or youth interviews that indicate youth are being confined for seven days.  If Defendants incorporate the Court Order into final policy and procedure –and if this improvement is sustained - they will reach substantial compliance.**

b. Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is no evidence either in data or youth interviews that indicate youth are being confined for three days.  If Defendants incorporate the Court Order into final policy and procedure –and if this improvement is sustained - they will reach substantial compliance.**

c. Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation and video show that there are instances of confinement that do not meet the criteria for Administrative Confinement – there is no risk of imminent physical harm - and appear to impermissibly constitute punitive confinements. The Monitor recommended creating a policy which clearly outlines the criteria for administrative confinement so that staff cannot punitively confine youth. If this does not change, Defendants will be in non-compliance in the next report.**

2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others.  Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  During the last reporting period,**

the Krueger Program was discontinued and thus all youth were in general population. Staff continue to voice concerns that they have no idea how to manage these situations. The use of AC was significantly higher for both CLS and LHS (18% higher in LHS) youth this reporting period (September-November).

**February 2020**
**CLS: 9 uses of AC. Average of 152 Minutes. 1 youth went over four hours.**
**LHS: 59 uses of AC. Average of 168 minutes. 2 youth over four hours.**

**March 2020**
**CLS: 7 uses of AC. Average of 175 minutes.**
**LHS: 69 uses of AC. Average of 240 minutes.**
**15 youth over four hours (as high as 1300 minutes)**

**April 2020**
**CLS: 3 uses of AC. Average of 142 minutes. 1 youth over four hours**
**LHS: 40 uses of AC: Average of 191 minutes. No youth over four hours**

**May 2020**
**CLS: 5 uses of AC. Average of 182 minutes. No youth over four hours**
**LHS: 37 uses of AC: no youth over four hours.**

**June 2020**
**CLS: 0 uses of AC**
**LHS: 34 uses of AC. Average of 175 minutes. 3 youth over four hours.  3 youth at exactly four hours.**

**July 2020**
**CLS: 0 uses of AC.**
**LHS: 46 uses of AC: Average of 171 minutes. 3 youth over four hours. 2 youth at exactly 4 hours.**

**August 2020**
**CLS: 0 uses of AC.**
**LHS: 101 uses of AC. Average of 132 minutes. 3 youth over 4 hours. 3 youth at four hours.**

**September 2020**
**CLS: 0 uses of AC**
**LHS: 66 uses of AC. Average of 174 minutes. 1 youth over four hours. 16 youth at exactly four hours.**

**October 2020**
**CLS: 5 uses of AC. Average of 119 minutes. 1 youth over four hours. 1 Youth at exactly four hours.**

**LHS: 66 uses of AC: Average of 179 minutes. 7 youth over four hours. 2 youth at exactly 4 hours.**

**November 2020**
**CLS: 7 uses of AC. Average of 104 minutes. No youth over 4 hours**
**LHS: 82 uses of AC. Average of 143 minutes. 2 youth over 4 hours. 5 youth at four hours.**

**DBT groups have not been running because of COVID-19 but youth are receiving weekly individual DBT sessions. The Sex Offender Treatment group was not interrupted and is continuing.   Data regarding "intensive mental-health services" (IMHS) is collected in various ways. PSU clinicians document an overview of the intensive mental health services in J- Tracker and on EMR. The format of this reporting can be viewed in the attached Guidance Document. Due to confidentiality, additional details regarding mental-health services are documented in EMR under case management. The overarching goal of providing intensive mental health services is to safely reintegrate the youth back into the general population immediately after placing the youth on AC and to maintain youth success while off AC. The IMHS developed for a youth reintegrating from AC, are repeatedly re-evaluated and adjusted as needed.**

**PSU clinicians provide intensive mental-health services to each youth on AC through a detailed process outlined in the Guidance document. Currently, all PSU clinicians have been trained in DBT. All YC Academies have included overviews of DBT and facility-wide training of Skills Groups/Coaching is scheduled to start in the early part of 2021 for DBT System of Care.**

**A form was developed that SYCs and YCs give to youth as soon as they are placed AC. This is called the "Thinking Report and Youth Statement". This form reflects the elements of a chain analysis referred to in the Guidelines. This paperwork is available to the PSU clinician following up with the youth during and after AC.**

**Each youth on AC already has a youth plan (previously called Behavioral Management Plan BMP) developed collaboratively between PSU and the youth. These plans are preventative as they outline youth triggers, self-soothing strategies, and highlight treatment issues. These plans also provide input into the development of effective mental-health services to be provided to the youth while in AC. This youth plan is also consulted when developing a specific treatment plan for AC-specific intensive mental health services. It, along with the attached Guidance document, guides the collaborative effort amongst various staff to provide youth with immediate and comprehensive mental-health services while on AC.**

**All involved staff use the AC flow chart (within the Guidance document) to guide decision making and action while a youth is on AC. While the SYC notifies PSU soon after the youth is placed in AC, the SYC and YC may reference the youth plan to incorporate the recommendations of PSU to de-escalate agitation. As soon as possible, SYC contacts PSU. When PSU is contacted, the PSU clinician reviews the mental health needs of the youth. This**

aids in the first determination of whether AC is contraindicated. PSU provides immediate consultation and treatment recommendations to the SYC. By the 2-hour mark, the PSU clinician begins a risk assessment if the youth is unresponsive to the initial treatment and have not reintegrated back into GP. PSU clinicians collaborate with the Safety staff and continue to evaluate youth response to services.

The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit.  Majority of checks 98.8% were completed within 30 minutes. QA should be developed and completed with use of video to confirm that checks were completed in compliance with policy and this Court Order.

Efforts have been made, but the Monitor believes staff and youth will benefit from a mental health expert to evaluate the program and make recommendations to, among other things, ensure these services are being provided, including while youth are in AC. The Defendants have identified a consultant. Policy and procedure and a quality assurance review process needs to be implemented, and documentation needs to be streamlined.

The Monitor is very concerned that staff are placing youth in Administrative Confinement when it is not warranted, and that staff are not evaluating early release based on behavior. If data continues to reflect this, the Defendants will be in non-compliance.

> a. Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:
>
> > i. A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were eleven (11) youth confined for over four (4) hours this reporting period (see response in previous question). All of the confinements were recommended by PSU.  Eight (8) of the eleven (11) extensions were recommended within PSU documentation. In general, the remaining three (3) related to the coordination of follow-up and release.  Intensive treatment provided to the youth included completing thinking reports, discussing alternative, making safety plans, engaging the youth in mediation, reviewing motivations, and reviewing coping strategies.**

Defendants are accurately capturing confinement time, number total placements, average confinement time per month, and number of days without AC placements. Defendants now need to continue to focus on reducing AC overall, ensuring they are following this Court Order, draft policy and procedure with AC placement criteria, and continue to QA this data.

> ii. A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.  There were youth transferred to MJTC but there were no transfers as a result of extended placements in administrative confinement. Defendants need to improve their quality of data and documentation with respect to the "commenced plan" and incorporate the Court Order into policy and procedure.**

          b.  Administrative confinement time limits may be tolled from 8 pm to8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE.  Time is being tolled from 8 P.M. to 8 A.M.**

          c.  Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced  plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no instances in which a youth was confined for over 24 hours. Defendants need to improve their quality of data and documentation with respect to the "commenced plan" and incorporate the Court Order into policy and procedure.**

          d.  The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

        3.  Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL  COMPLIANCE. DJC Clinical Observation policy 500.70.24 was updated.  The plans developed are very detailed and comprehensive. A quality assurance mechanism needs to be finalized.**

        **4.**  **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

          a.  Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  As previously stated, the Monitor**

would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. The Monitor recommended that Defendants replace the existing room furniture with furniture that is specifically designed and engineered for secure environments.  The new replacement furniture is consistent with what the Monitor would expect to see in a secure facility and should certainly reduce the opportunity for suicidal incidents within the youth rooms. <u>All youth</u> are housed on renovated units.  This is a huge investment by Defendants and shows their commitment to complying with this provision but more importantly, creating a safer environment for youth and staff.

The Monitor did observe several rooms with multiple blankets/sheets covering large areas of the room. Staff can clearly see into youth rooms now that the windows do not have etching and are not covered by paper/pictures.  Room searches did occur during this reporting period.  The Monitor recommended that searches continue to be completed and documented in the last report.

In the last report, the Monitor was unable assess compliance as to the 30- minute safety/security checks.   Defendants were able to pull data related to 30-minute room checks.  There are some instances of non-compliance, but vast majority have been completed within 30-minutes.  Defendants have created a very detailed action plan to improve compliance and accountability measures. Defendants need to modify their policy and procedure related to safety/welfare checks and hold staff accountable when appropriate.

As stated in every report, while not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model. Defendants should be commended for the vast improvement on these safety/welfare checks and for investing in the technology needed.

> b.  Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, hygiene supplies, or nighttime toilet usage. If Defendants improve their quality of data and documentation, and incorporate the Court Order into policy and procedure, they will be close to reaching substantial compliance.**

> c.  Staff must notify a PSU staff member as soon as possible, and no later

than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible.  PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification.  The crisis intervention technique is being documented (see previous compliance assessment responses). Since PSU staff are not physically present on weekends and some evening hours (outside of the four hours they are required to do), PSU staff cannot engage youth in a meaningful way during this time.**

**A quality assurance program needs to be developed. As previously stated, the Monitor suggests that the Defendants consider utilizing an expert in order to further develop the mental health program/integration at LHS/CLS.**

d.  Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1 , MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Evaluations are completed and within 24 hours after being placed in room confinement. There were no instances of contraindication documented during this review period. PSU clinicians developed a protocol for on-call situations. Each primary PSU clinician reviews the record, assesses the risk and designates whether the risk is low, medium, or high. The risk factors considered are supported by the literature on isolation and confinement. This determination is recorded in the mental-health caseload report which is accessible to all of PSU clinicians. The on-call PSU clinician uses this risk level determination and considers the input from the SYC placing the youth in confinement to make a determination whether the placement (each time) will be deemed contraindicated.**

e.  Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose.  Staff who fail to make such checks or who

falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE: Defendants were able to provide data related to 30-minute room checks during this reporting which the Monitor reviewed on-site (see previous responses for details).  There are some instances of non-compliance. Defendants have created a very detailed action plan to improve compliance and accountability measures. There were no formal investigations/discipline relating to Safety/Security Checks and/or COVID-19 in the months of September, October, and November. However, two staff were referred to Human Resources for a Letter of Expectation (which provides formal documentation for the personnel file but is not yet official discipline) following a third occurrence of a late safety check.**

**PSU staff do visit youth daily when on site and are available 24/7 if needed by phone.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

f.  Any youth in room confinement shall have property items similar to or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth.  A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Property restrictions are most commonly applied by PSU for safety reasons, however forms and process for documenting any potential property restrictions need to be created and utilized. Once Defendants make these improvements, they will be close to substantial compliance.**

g.  Youth in room confinement shall receive:

1.  All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Social worker visits, mental health services, and other health services are provided in general.  The on-call PSU clinician communicates to all the PSU clinicians through email that a youth has been placed on AC.**

This allows the primary clinician to provide consultation and direction as to how to return the youth to a baseline, self-regulated state. The primary clinician consults with the on-call clinician and with the SYC/YC/CUS/SW staff regarding specifics ways the youth plan addresses the issues at hand and how it can be adopted when the youth is on AC. A PSU clinician follows up in the absence of the primary clinician and/or the crisis clinician. PSU collaborates with the SYC and direct staff. PSU also meets with the youth while they are on AC and through a follow-up session. The social worker and youths' meeting schedules are individualized. Therefore, as is the case with any arising short-term scheduling conflicts (e.g., court, medical needs, OJOR, AC etc.) the social worker works with the youth to identify availability if an AC placement occurs during regularly scheduled meeting. The AC placement also provides an opportunity for the social worker and the youth to review AC placement as outlined in a new J-Tracker form. With shared awareness around AC placement, Social Workers are positioned to incorporate cognitive-behavioral or motivational interviewing practices in revisiting goals from the Youth Growth Plan.

Documentation, quality assurance, and policy and procedure need to be improved/completed.

ii.     Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. During the pandemic, various changes have occurred. One of these adaptations resulted in more individualized scheduling of treatment; group treatment did not resume until November 16, 2020. Now, as is the case with any arising short-term scheduling conflicts (e.g., court, medical needs, OJOR, AC etc.) treatment staff will identify the next available time to meet with the youth to make-up and tailor the material to support the youth in successfully continuing in rehabilitative programming. For example, if a 2-hour placement in AC occurs during regularly scheduled Skills Streaming group time, treatment staff will re-engage the youth in making progress in treatment. The placement may allow for tailored cognitive- behavioral processing (with potential integration of Carey Guides, BITs, Social Skill, or Thinking Report etc.) between the youth and the treatment facilitator in addition to continuance in standard treatment curriculum.  Defendants need to focus and make certain (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement.

iii.    Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational

services on days that the general population receives such services.   Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general (prior to COVID-19) educational services for general population occurred in the classrooms in the school area. COVID-19 has changed how the educational services are being provided to youth at LHS/CLS.  On March 24, the schools began providing education on the units with most education staff working off-site. Staff are learning various Google tools to assist with virtual learning.  Applicable staff continue to be monitoring e-mail, conducting phone calls, and performing Zoom/video calls.   The Monitor strongly recommends that educational programming be re-evaluated.  The Monitor also recommends that educational services be completed off the unit when possible. Low population and staffing would allow for this. The Monitor feels that the facility needs to increase the daily education hours as best possible as this will have a positive impact on meaningful programs and reduce youth idleness.  Additionally, Defendants need to ensure that special education is provided while on administrative confinement.  As stated previously in this report, the PbS education data shows youth are receiving about 3.75 hours per day (weekdays) of education at LHS and 3.84 hours per day (weekdays) of education at CLS.  While this remains fairly steady to previous data reporting cycles, it remains below the national average.  More importantly, the Monitor's observations during the site visit revealed that the quality of the education program is significantly reduced as a result of the "virtual learning" platform which is occurring on the living units.  The Defendants should further engage the education expert to make further recommendations that should be implemented, including an assessment of the quality and benefits of the online education system Defendants are using. The Defendants also need to focus on bringing more programming into LHS/CLS, especially programming culturally relevant and specific to the race and genders of the youth who are at the facility.**

iv.      Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. "Out time" has significantly improved over the last year.  In general, youth are out of their rooms from 8 A.M. to 8 P.M. except for youth in isolation due to Covid-19 safety measures implemented by Defendants and any confinement recommended by PSU.  The Defendants issued a directive regarding periods of "self-reflection." Through the use of data, they were able to capture instances of staff placing youth in rooms for periods of self -reflection and addressing with staff.  The Monitor regularly saw youth conversing with other youth during out time which is substantially on**

the unit.

> v.  Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS:  Defendants are able to track when youth eat meals in room which is an improvement from last reporting period. There were some instances of youth eating meals in rooms-albeit few. Policy and procedure need to incorporate this section of the Court Order and youth should be eating out of their rooms unless there is a substantial threat of physical harm.**

> vi.  Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Logs indicate that youth are receiving much more than the 3 hours of "out time" per day or 30 hours per week. If Defendants improve their quality of data and documentation, and incorporate the Court Order into policy and procedure, they will be in substantial compliance.**

> 5.  **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is a box on the incident debriefing form that is checked if staff informed the youth of his or her rights regarding grievances and appeals and time of notification. Youth continue to receive their notification of rights/grievance procedures when they are placed in administrative confinement. The process for obtaining a youth signature (or two staff signatures in the event of a refusal) has been proposed as a part of youth receiving PSU thinking chain reports during the first stage of the administrative confinement process. However, the process and forms need to be enacted and written into policy.**

> 6.  Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are now documenting this more consistently, including when less restrictive means were attempted. Documentation needs to continue to be completed and consistently applied to all situations. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue to be improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

B.   OC-Spray and Other Chemical Agents

1.   OC reduction plan.  Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.  There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere.**

2.   Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated. There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere.**

C.   Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1.   Prohibition on types and uses of mechanical restraints.

a.   Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visit, but data and documentation show that there have been uses of mechanical restraints in LHS and CLS during this reporting period. Defendants need to focus on reducing the use of mechanical (as well as physical) restraints. Defendants need to document and establish that there were not less restrictive means available and quality assurance measures, and a final policy and procedure are in place.  As**

discussed in previous sections of this report, the use of both physical and mechanical restraints has trended upward over the last two data collection cycles. The Monitor believes this is a reflection of the lack of meaningful activities, programs, education and the need to enhance the behavior management system, including more robust and meaningful incentives and rewards for youth. Most concerning in the data is that both the rate and number of uses of restraint rose during the October 2020 data cycle, substantially increasing the jurisdictional rates well above the national average.

        b.    Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Use of mechanical restraints is slightly lower this reporting period in LHS and higher in CLS.**

**Uses of mechanical restraints LHS:**

| Month | Uses |
|---|---|
| October 2019: | 36 uses |
| November 2019: | 21 uses |
| December 2019: | 33 uses |
| January 2020: | 25 uses |
| February 2020: | 37 uses |
| March 2020: | 38 uses |
| April 2020: | 37 uses |
| May 2020: | 27 uses |
| June 2020: | 20 uses |
| July 2020: | 30 uses |
| August 2020: | 65 uses |
| September 2020: | 38 uses |
| October 2020: | 43 uses |
| November 2020: | 26 uses |

**Uses of mechanical restraints CLS**

| Month | Uses |
|---|---|
| October 2019: | 10 uses |
| November 2019: | 11 uses |
| December 2019: | 5 uses |
| January 2020: | 8 uses |
| February 2020: | 2 uses |
| March 2020: | 7 uses |
| April 2020: | 6 uses |
| May 2020: | 0 uses |
| June 2020: | 0 uses |
| July 2020: | 0 uses |
| August 2020: | 0 uses |

**September 2020:**     **4 uses**
**October 2020:**     **4 uses**
**November 2020:**     **0 uses**

**Documentation needs to be improved to document that an imminent threat of physical harm existed, and when and how that decision is reviewed. Defendants do have critical outcome measures for restraints.  Defendants need to continue to work towards reducing the use of mechanical restraints, develop better documentation and quality assurance measures.**

    c. No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

        i. Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were four (4) uses of the "wrap" (full body restraint) during this reporting period (one use occurred during transport by a different agency).  The "wrap" is a restraint device that falls under this section and needs to be monitored for usage compliance.  The wrap should only be used in situations in which PSU has ordered and/or authorized its use in order to prevent active self-harm. In these cases, PSU did not order the wrap.  Improved documentation, policy revisions, and quality assurance measure need to be created to better monitor use of such restraint devices.**

        ii. Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Leg restraints were used during this reporting period. In each use, the leg restraints were placed as part of a routine use of force/restraint process in which the youth was non-compliant and/or combative.  In one situation, a CARE team member placed the leg restraint on a youth which ideally should not occur.  Documentation has improved relative to when restraints have been used and the rationale for usage. However, restraints are being used more frequently than they should be. Defendants need quality assurance measures and need to continue to focus on reducing the use of restraints.**

        iii. During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used.  Restraints may be used during such transportation to prevent a threat of harm to youth and/or

staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  See above.**

     d.     Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Defendants need to focus on reducing the use of mechanical restraints and ensuring use is not for punishment. Defendants need to improve documentation, policy revisions, and quality assurance measures.**

     e.     Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence of youth being restrained to a fixed object. With better documentation, policy revisions, and quality assurance measures, Defendants will be close to achieving substantial compliance with this provision.**

     f.     Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Training records indicate that the large majority of staff have received training in physical force, restraints, and trained in proper de-escalation. However, de-escalation training needs to be completed more often (regular, informal, refreshers) so that staff can continue to develop this skill. These skills are also important to help staff identify and prevent situations which might lead to disruption or altercations before such incidents occur Proper de-escalation cannot be trained only once, or even only once a year.  DBT implementation will be very beneficial to youth and staff.**

     g.     Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit.  No youth shall be left alone in restraints.   Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  With policy revisions and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.  (note: data reflected there was one youth in mechanical restraints for more than 45 minutes but upon further investigation, this was documented in error.)**

> 2. Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process.**

> D. Strip Searches. The following provisions are effective immediately upon entry of the Cou1t's order incorporating this Agreement.

> 1. Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no strip searches in this reporting period. The policy and procedure for Searches of Youth will be reviewed at the DJC Policy Committee meeting in February 2021. It can then be finalized following review by Administration and Legal. Training and related quality assurance measures will be addressed in the procedure. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. With support from the Bureau of Training and Development, Quality Assurance and Training staff developed a DJC Searches of Youth Training module on Cornerstone eLearning to include policy highlights, video demonstration of search technique, and assessment questions that will be assigned to all safety staff in the first months of 2021.**

> 2. Strip searches with probable cause.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no strip searches this reporting period. The policy for searches needs to be finalized and QA developed. Defendants are very close to being in substantial compliance.**

        a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. If documentation and policy revisions are made, substantial compliance will be obtained.**

        b. Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no strip searches during this reporting period. If documentation and policy revisions are made, substantial compliance will be obtained.**

        c. Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no strip searches conducted this reporting period. If policy revisions are made, substantial compliance will be obtained.**

        d. Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records reviewed indicate that all staff have been trained in trauma informed care.**

        e. If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation needs to be improved and policy and procedure/QA developed.**

    4. Documentation. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. With continued practices and QA developed, Defendants will be in substantial compliance.**

> E.   De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As stated in the last report, staff have been trained in MANDT and other training which includes de-escalation skills training. LHS/CLS secured Wisconsin Department of Administration grant funding to allow ten (10) instructors to complete train the trainer trainings and subsequently provide Eight-hour Verbal Judo training sessions to all staff who work with youth with the goal of reducing risk for injury and enhancing staff confidence at effectively de-escalating conflict or potential violent encounters with youth.**

**Competency testing was administered for all staff completing training and the scores from the competency exam were tracked as part of a quality assurance measure underscoring the importance utilizing well trained de-escalation techniques. DJC certified trainers will continue to provide quarterly refresher trainings with practice scenarios to support skill retention and continued application of Verbal Judo skills at the facility going forward.**

**DJC certified trainers provided the first round of multiple all-day, drop-in refresher trainings/drills with practice scenarios to support skill retention and continued application of Verbal Judo skills. The Verbal Judo curriculum was taught to all staff who work with youth through 8-hour trainings held this summer.**

**In addition to MANDT, Verbal Judo provides another paradigm to teach complimentary techniques and build de-escalation skills to enhance safety and treatment supportive environments. Led by PSU, MANDT Refresher trainings held during the reporting period highlighted Active Listening as a key skill for de-escalating situations when engaging youth. Reinforcement of skill will remain a continued focus with the addition of quarterly Verbal Judo Drills.**

**Quality Assurance has initiated discussion regarding opportunities to streamline reports for specific trainings to reduce the need to cross-reference Academy schedules and class rosters. In addition, the Accountability Tracker was previously developed in partnership with Human Resources and made accessible to Leadership to help Supervisors identify needs related to the consent decree and facilitate corrective action. Because quality assurance includes progressive follow-up which may include re- training, training dates have been determined Therefore, continued conversation and coordination is needed to efficiently maintain these records; at this time, related documentation is shared.**

F.      Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor understands that changes had to be made during the pandemic, however, inadequate programming and excessive idle time is still a problem. Hopefully, the new Program Director can focus on this as it is critical to the wellness of youth and staff. The Defendants have created daily schedules which is a good step in the right direction.  During this reporting period, the following programs occurred:**

**Fall Fun Days and Ropes Course was held during this reporting period. Youth were able to sign up in advance once completing 10 Edgenuity activities and free from a recreation restriction. Leadership has encouraged staff led activities and coupled support with food incentives to encourage prosocial interactions among youth and with staff while participating in tournaments and unit activities.**

**Youth were encouraged by staff and School Psychologist to participate in the 2021 CEA-W Creativity Contest by submitting a sample of creative writing and/or original artwork for consideration. Submissions were accepted through December 1, 2020.**

**Two youth from LHS participated in the first ever Youth Forum, sponsored by CJJA, the Behavioral Health Committee, on a panel discussion (via Zoom) regarding Social and Racial Justice Issues. The event also included art displays and a motivational speaker. The two youth from LHS participated along with youth from 3 other states.**

**The oversite of the music program has been transferred to PSU and coined as MAI (Music Art initiative) to provide increased opportunities for therapeutic expression. A Street Art group will be piloted in Miller soon. PSU has implemented three other evening treatment groups- two for young men focusing on communication and conflict resolution and one for young women focusing on teambuilding.**

**LHS/CLS Psychology interns are becoming more active in supporting youth through engagement in evening staff-led activities and integration of research. On Thanksgiving, the phones were accessible throughout the day, and as we near the holidays, a Living Unit decoration contest is creating excitement with youth. Youth absolutely loved this contest!**

**A Zoom cart and job aide have been sent out to provide instructions to staff within the living units. Within structured study hall, time is set for students to participate in Special Education Resource, Welding, Construction, Greenhouse, meeting with Social Workers, etc. All youth have continued to have access to library materials with the new schedule as before. One day a week, youth will be pulled in small groups from the gym to return and check out new library materials. If a living unit is on quarantine status, there is a bin that will be**

delivered to the living unit with a folder containing library requests. The youth can fill out the form, and the staff in the school do their best to accommodate the items.

With the November 16, 2020, implementation of the integrated school and program schedule, all youth are now scheduled in unit-based group of Skill Streaming the Adolescent. The Administrators' memo to counties outlines the change in cognitive behavioral treatment programming.

Leadership continues to integrate youth feedback and increase incentives offered to youth. In response to youth survey suggestions, weekly movie orders (using Netflix subscription for fresh and new release options) and monthly video game orders are now available. Youth feedback also resulted in the Business Office ordering additional hair care and other desired products such as Old Spice. Popular items were suggested for holiday gifts and for weekly raffle items. The youth also received Halloween candy this year and were able to enjoy Oreo packages given to each youth as an incentive following the last COVID-19 test at the end of November which aligned with Thanksgiving.

On Mondays, teachers choose two or three youth from each unit that have made progress with their on-line learning platform. They look at how many activities, quizzes and time on task youth spend and award them with a treat of their choice or a 5 by 7 picture of themselves to send home.

As a precursor and support of the youth's transition to the DBT System of Care, an Engagement Raffle was instituted November 16, 2020, to reinforce prosocial engagement in treatment groups and evening staff directed activities. As determined by the facilitator, youth can earn raffle tickets for attendance and engaged participation during role plays and activities. Raffle tickets are drawn weekly on Sunday nights with youth winning exclusive hygiene items that are not available on the canteen list.

During this reporting period, various food incentives have also been implemented with a range of options supported by Food Service as ordered by any Supervisor. Supervisors may also receive support from the Business Office to procure food from an outside establishment or request specialized purchases. SYCs have organized tournaments and contests across living units.  Led by Great Lakes Inter-Tribal Council ITW (Indian Tribes of Wisconsin) youth programming, the making of fry bread continues to be a cultural staple for youth and staff.

As recommended previously, counselors, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth.  Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. As mentioned previously, increasing education hours, including for youth who have obtained a diploma or HSED, can greatly assist in reducing idleness time and provide positive youth development strategies through meaningful education and vocational programming.

G.    Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. (see previous section on staffing for more details). As previously stated, Defendants should continue to focus on training and developing staff for them to feel safe and actively engage with youth.**

**As stated in previous reports, the OJOR process could be expedited and youth should be evaluated for placement under community supervision, including intensive community supervision, as permitted by state law.  Doing so would likely also facilitate keeping youth closer to their home communities, and closer to more programming and culturally relevant services. Defendants need to continue to work towards developing smaller, geographically located Type 1 facilities and also to evaluate whether there are alternative kinds of facilities and/or intensive community services to which youth could be released. There does not seem to be any more progress made as this section. This needs to be a priority or Defendants will not be able to come into substantial compliance with this Court Order.**

H.    Amendments to administrative code.  Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS:  PARTIAL COMPLIANCE.  (see previous section for details). Defendants need to continue drafting interim policies for LHS/CLS while also developing final Code revisions.**

## IV.    DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A.  **Incident review process.**  Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24

hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There has been a vast improvement in meeting the 24-hour timeline. Informal reviews occur right after an incident in majority of cases.  When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). A framework for other QA measures relating to the consent decree was being created but has not been completed.**

> B.     **Quality assurance**.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goa ls that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As discussed throughout this report, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff.  The Monitor remains confident that the Defendants will create a competent quality assurance program especially with the addition of the new RFID system, the new leadership team, and dedicated personnel.**

## <u>CONCLUSION</u>

The Monitor recognizes how difficult COVID-19 has been for everyone at LHS/CLS- staff and youth alike.  The Monitor is pleased that many key positions have been hired for which in turn should have a positive impact on the daily life of youth and staff.  There are several key initiatives underway this reporting period such as training/implementing DBT, identifying a mental health consultant, increase of staff-led activities, and additional staff training and development. In time, this should result in positive outcomes for youth.  The Monitor remains very concerned over the continuing lack of adequate and meaningful activities and programming for youth which leads to extreme boredom and can result in anti-social behavior. This concern has become more evident with recent operational changes, particularly around the manner in which education is being provided during the pandemic.  The education program is not providing youth with adequate learning opportunity or support. The facility would benefit from an increased focus on reducing idleness, particularly during weekends and evening hours.  The Defendants have to identify ways to move youth off of their home units more.   This is even more important during the changes to daily life due to COVID-19.  The facility should continue to work on improving the behavior management system, continue with their progress in implementing DBT, providing improved and increased youth incentives that will help in reducing many behavioral incidents and reduce the high number of self-requested confinements and program refusals. Continued efforts need to be made to further engage the educational expert, reduce teacher vacancies, and increase educational time and quality. Regular training in de-escalation and physical restraint techniques need to continue to occur. Policies and procedures for LHS/CLS need to continue to be developed as well as administrative code. Continued

implementation of the new quality assurance program needs to remain a primary goal.

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

/S/ Teresa Abreu
Teresa Abreu
Monitor