UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J**., by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                      Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

## NINTH REPORT OF THE MONITOR

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Eighth Report of the Monitor was filed with the Court on January 25, 2021. The Monitor's ninth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates from the eighth site visit which took place on December 17, 2020.

## SITE VISIT

The ninth site visit by the Monitor took place on March 18, 2021.  Due to the pandemic, the Monitor limited onsite time to one day and completed necessary interviews/information gathering via virtual meetings prior to and after the site visit. The Monitor reviewed materials provided by the parties prior to and after the site visit for the reporting period ending February 28, 2021. Materials included but were not limited to: use of force videos, video footage of units, COVID-19 related memos, directives and plans, programming materials, project plans, grievances, various staff memos, daily shift reports, all of the monthly data submitted to the parties per this Court Order (December 2020, January 2021, and February 2021), updated unit rules, work rules, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Plaintiffs' counsel and the monitoring team were on site during this site visit. Plaintiffs' counsel conducted youth interviews virtually before the visit, and in person during the visit. The Monitor took photographs, toured LHS/CLS, and interviewed youth and staff. The Monitor had the opportunity to talk to the majority of youth and

staff present and available during the site visit. Approximately forty-eight (48) youth and thirty-three (33) staff were interviewed formally and informally by the Monitor during this site visit.

## Overall Quality of Life, Conditions, and Atmosphere

### Introduction

All of the COVID-19 modifications were still in place during this reporting period. Additionally, rapid antigen testing is available and in use at LHS/CLS.  In February, the facility installed a new instrument for scanning temperatures upon entry to the facility moving away from hand held temperate check devices.  COVID-19 vaccines have been and continue to be available for staff. Communication has also been sent out to parents/legal guardians of youth (16 years of age and older) to give consent to administer to those youth who meet the department of health's guidelines. Although March is not part of this reporting period, it is important to note that as of March 15, 2021, youth began attending education services in the school area.  The Monitor is happy to report that all staff present wore face coverings properly at all times.  More youths wore masks than last site visit due to education taking place in the school area.  There have been Covid-19 positive youth and staff during this reporting period.

The total LHS/CLS population remains low, ranging from the high 50's to low 60's.  There is a positive change in the overall atmosphere from the last visit.  There continues to be concern regarding programming, use of force, restraints, and other issues, however, overall, there has been improvement and progress in several areas of the consent decree from the last site visit.  In the last report, the Monitor stated that some of the issues reported during the last site visit could be alleviated or reduced if additional support staff were on site providing more normalized facility operations, primarily around education, treatment, mental health services, *etc.*  The Defendants have made efforts to normalize education, treatment, and mental health services by having more staff present on site which is having a positive impact on staff and youth.

### Physical Plant Observations

The entrance, grounds, visitation, units, school, and many other areas were extremely neat and clean. The facility overall looked the best it has in the last two years. Staff and youth should be commended for all their efforts.  The installation of a roof deterrent system has been substantially completed.  A room in each of the ten (10) living units has been renovated to create a dedicated space that can be used for treatment or for self-calming and de-escalation.  Furnishings and décor (furniture, pillows, rugs, posters etc.) still need to be placed in/on some of the units. Eighty percent (80%) of the renovation of a large school storage room into a new art room has been completed. The new room will be used to provide a space to work with PSU on art therapy.  There are also significant modifications being made to the music room that will enhance the music programming. Youth will be able to create music for themselves, family, and perform for their peers and staff while at LHS/CLS.  Youth are extremely excited about these new renovations. Additional projects not yet completed are the camera upgrade, electrical upgrade, and remaining two cottage remodels (scheduled to be completed in June 2021).  The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

Education Observations

As previously mentioned, on March 24, 2020, the schools began providing education on the units with most education staff working off-site.  As of February 22, 2021, the school teachers returned on-grounds to begin instruction through Zoom from classrooms.  On March 3, 2021, teachers began delivering classes in person on the units.  On March 15, 2021, a hybrid schedule for youth attending programming within the school building began.  Each unit has been assigned to be in the school area either in the morning or the afternoon.  Youth continue to participate in the four (4) core academic areas, physical education and library services. Youth participated in Physical Education, Welding, Construction, Greenhouse, Library and special education services at the school building and continue to do so.

Defendants continue to offer in person as well as Zoom special education resource sessions for all youth identified in their IEP's as needing those services. In terms of special education services, direct resource classes do not take place during a medical isolation, however all resource sessions that were missed are made up in person as soon as the youth is able to meet with staff. Except for medical isolation, all resource sessions occur in person with SPED teachers either in the school building when possible or on the living unit.  All of the student's services are provided as identified in youth's individual education plans. The school psychologist and special education teachers meet weekly to discuss the youth's schedules to ensure all services are being provided.

Every school in the state of Wisconsin, including LHS/CLS have to go through the procedural self-compliance assessment (PSCA) every 5 years. Defendants are coming into their 5-year cycle. The assessment includes a thorough audit of IEP's and evaluations. This audit is performed in collaboration with an outside entity. The Monitor will update the Court when the evaluations are completed.

Two additional educational assistants have been hired to support students' learning through tutoring, facilitating a continuation of library resources, and providing intake orientations. The new assistants finished their training and began working to enhance one to one student support services. LHS/CLS continues to offer HSED (High School Equivalency Degree) as allowed by the Department of Public Instruction in the State of Wisconsin to youth who qualify by reading level, age and documented credit deficiencies. This program, in addition to the high school diploma program, has been offered since the facilities inception. Dual credit courses (post-secondary and high school courses) are also offered to youth who are interested and qualify.

For youth on quarantine (due to a potential or suspected COVID-19 exposure), the unit essentially operates like a normal unit with only a movement restriction to avoid any further spread of COVID-19 and therefore, the SPED teacher provides services on the unit.

When a youth is in medical isolation, they have either tested positive or are displaying active symptoms and are thus placed on medical isolation pending the result of a COVID-19 test. The youth is only allowed out of his/her room when no other youth are around and therefore, SPED services are either delivered remotely or made up after the youth is off of medical isolation.

Youth, teachers, and staff were present in the school area during this site visit.  There was a very positive energy in the school and students and teachers alike seemed very happy to be there. There

were youth on work detail, in classrooms, in the woodworking room, welding class, and in the gym. The Monitor saw the projects that the youth were working on in sewing, woodwork, welding, gardening, and music. These projects were very impressive. The staff were very engaged with the youth and extremely dedicated to their crafts and teaching the youth. The leadership is working on modifying the Foster Grandparents program so that youth can engage with the volunteers, which the youth love.

The Monitor had significant concerns about the provision of education at the facilities during the last site visit, including but not limited to: remote learning, the quality of education, and the lack of adequate hours of schooling. The remote learning format was having a negative impact on overall youth behaviors due to the lack of meaningful education and treatment programs. For this reporting period, youth were remote learning in January and part of February. Thus, the educational issues described in the last report continued until in person learning began in February (teachers on units)/March (hybrid). With that said, the Monitor is very pleased to see that during this site visit, youth were actively engaged in education both on and off the unit. The youth are very happy to be back in the school area and off the unit for part of their educational hours as well as having teachers accessible on the units. There was a much more positive energy during this site visit.

The Monitor continues to recommend that the frequency of music, art, and recreation needs to increase. It is evident that increased teacher access, such as moving to live e-learning on and off the units and in the school area, have had a positive impact on all youth.

As previously mentioned, the entire educational program at LHS/CLS still needs to be evaluated and improved. The Monitor encouraged the Defendants to engage the educational consultant further and work to address the concerns raised – including the need for deeper and more meaningful teacher interaction with youth, enhancing/expanding the daily education hours. The Defendants are working on engaging a consultant and continue to work on the educational programming. The Monitor was pleased to see significant improvements in the area of education. Although there is more to go, the Defendants are moving in the right direction.

Living Unit Observations

The Monitor visited each cottage that youth were housed in during the site visit. All the entrances into the units, the bathrooms, and day rooms were very clean and orderly in general. There was a unit cleaning contest which most youth were very excited. The vast majority of youth rooms were very clean and orderly. Youth rooms were the cleanest the Monitor has seen over the last few years. Staff and youth definitely took pride in their work/living spaces.

There are adequate staffing levels on the living units. The Monitor regularly saw staff engage with youth. Staff were sitting with youth eating meals, playing games, helping with school work, and doing arts and crafts. Staff were positioned near youth during this site visit. Youth attitudes overall were much better during this site visit. Youth in general seemed less agitated and bored. All the youth that the Monitor interacted with were respectful and were less interested in interacting with the monitoring team this visit. The Monitoring team and Plaintiffs' counsel had an opportunity to talk to most of the youth present in the day rooms.

During this site visit, the girls were housed on the Wells cottage. King is being utilized as the female quarantine unit; one (1) youth was on quarantine. The sensory rooms were calming. The Wells unit was beautifully decorated and very clean. The girls did a great job (as always) cleaning and decorating the unit with artwork and flowers. No one was confined to their room. The youth on Wells and King were very happy and smiling. The rooms on the unit were clean and orderly. The staff present knew the youth very well and were very talkative with the Monitor.

With respect to the boys' cottages, generally, the cottages themselves were very clean. The units were much calmer than the last site visit. The Monitor did not observe any graffiti anywhere in LHS/CLS. It is clear that the Defendants are monitoring this closely and continue to do an exceptional job resolving this issue.

In Black Elk, the entry way, day room, and bathroom were very clean and unit bright. The boys broke out several windows prior to the site visit. The youth painted murals to cover the windows while waiting for repairs. Eight (8) youth were engaged in school work, one (1) youth was sleeping in his room, and (1) was doing his hair. There were three (3) staff, one (1) teacher, and one (1) unit manager present. Youth rooms on this unit significantly cleaner than the last site visit and one of the cleanest units overall.

The Curtis Unit was the cleanest unit. The youth seemed happy and were talkative. One (1) youth is very excited about going home soon. One (1) youth was in his room voluntarily. Youth were excited about the unit decorating contest (and in fact won). Six (6) youth present on unit with two (2) staff present.

The Dubois unit was clean however, most youth rooms were not clean. The youth were in the "free time" period of programming. The unit was calm. There were eight (8) youth on the unit with three (3) staff present. Two (2) youth were in their rooms. Some youth were cleaning, and some youth were talking with each other. Youth very talkative with the Monitoring team, but staff were not. Youth seemed happier during this site visit. Youth indicated that they felt safe, their stay is better than they thought it would be, would like more activities, and liked the food.

The Roosevelt unit itself was cleaner and did not smell like during the last site visit. Youth rooms were the messiest of all the units. There was a total of six (6) youth and four (4) staff on unit. The unit was much more controlled than last visit. Some youth were in group with PSU, playing games (cribbage with staff), and sitting and talking. Staff seemed less stressed than site visit. No youth were confined or in their rooms.

The Krueger unit is the new admissions/medical isolation unit for the boys. The unit overall were pretty clean, and the rooms were a mix. There were nine (9) youth and three (3) staff present on the unit. Two youth were in their rooms. Six (6) youth were playing Spades. Some youth were outside with staff playing basketball and some youth were working on an educational packet. Staff were positioned near youth which is an improvement (last site visit they were in the staff office). Youth had pretty good attitudes, but staff seemed stressed and unhappy.

The Hughes unit was clean, and the rooms were generally clean. Youth were doing education on the unit. There was a high staff presence on the unit due to recent incidents. Specifically, there were six (6) staff and teachers on the unit. One youth threw his computer across the living unit because

he was mad at some news that can came to his attention.  Staff did a good job de-escalating the youth. Staff seemed exhausted and stressed.

In general, there is overall improvement with youth and staff attitudes. Although youth were more engaged in activities than last visit, there is still a need for more meaningful activities, weekend programs and enhanced educational hours which will help reduce the risk of youth engaging in anti-social behaviors when they have little else to do (like climbing on roofs, excessive horseplay, destroying property, and running around unauthorized areas).  During previous site visits, the Monitor recommended creating and implementing a daily schedule to help with youth boredom and create opportunity for structured, meaningful programming.  The Monitor worked with the Defendants on developing a weekly schedule with accountability/quality control measures.  The Defendants have not fully implemented the daily schedule.  There needs to be a focus on creating a daily schedule that provides for meaningful activities and accountability in order to minimize the incidents of youth acting out.

Staff are still frustrated with what is perceived to be a lack of ways to hold youth accountable as well as a lack of incentives that will foster improved behaviors. Defendants are developing and implementing a new behavior management system/implementing DBT and have modified canteen privileges to encourage youth to behave on a daily basis. Improving the behavior management system, improving the rewards and incentives, and developing engaging programming will have a positive impact on the overall behavior and atmosphere issues that are driving the main issues that are frustrating both staff and youth.

<u>Youth Interviews</u>

Approximately forty-eight (48) youth were interviewed prior to and during the site visit (formally and informally) by the Monitoring team and Plaintiffs' counsel.  Youth complained to Plaintiffs' counsel about use of physical force, staff being too quick to go hands on before attempting to verbally de-escalate, discontent with quality of e-learning, and perceived racial biases of staff.

Youth complained to both the Monitoring team and Plaintiffs' counsel about long stretches of downtime and continued issues with telephones and Zoom calls. The Monitor did confirm that there was a period of time where the phone issue was due to the connectivity issues not staff.  The phone issue has since been resolved. There were more requests to talk to Plaintiffs' counsel while the Monitor was onsite talking with youth than last visit.

Youth stated in general that they feel very safe however, they felt that staff did not feel safe and that staff seem intimidated by the youth. Youth had more positive attitudes and significantly less complaints during this visit than last while engaged with the Monitoring team.

The Monitoring team saw less idle time both during site visit and while reviewing random sampling of video of living units.  This is an improvement from the last site visit.  Youth enjoy going outside, the music lab, various contests, art, woodwork, the greenhouse, basketball games, playing games with staff, and anytime they can do something off of the unit.  When asked about release dates, most youth knew the timeframe of their release which is important for behavior management and also shows that staff are more engaged with youth. The Monitor continues to encourage staff to engage youth in meaningful programming and activities.

The Monitor recommended in the last report that the Defendants should conduct Zoom calls in the visitation area to "normalize" visitation, have youth move off of units, and have a change of environment. The Defendants have since followed this recommendation. On February 15, 2021 CLS/LHS implemented Zoom visiting for youth on a weekly basis. Each living unit is designated with a specific day of the week for visits to occur. Visits occur 5:30 P.M.-7:30 P.M. and each youth on a living unit is allotted one twenty (20) minute time slot. A sign-up list is posted on each living unit every Friday, at which time the youth may sign up for a visiting time slot the following week. The Zoom visit must be completed with an approved visitor. Once youth are signed up for their time slot, a video visit/Zoom link is sent to the approved visitors e-mail with the invitation date and time. Youth are enjoying this change.

The Monitor continues to recommend that the Defendants should take advantage of the reduced population, the available staff in planning and preparing and developing programs for youth. The Monitor is hopeful that with the new Program Director, gender and culturally competent programming can be brought/introduced (even if virtually), to LHS/CLS as an interim measure. However, to the maximum extent possible, Defendants should work to move forward with requirements to close LHS and move youth closer to locations where such programs and services are available. Providing culturally competent programming virtually should only be a stopgap, not a long-term solution.

<u>Staffing</u>

During this reporting period, there have been some key staffing changes.  Key Positions hired during this reporting period are as follows: Psychology Supervisor, several Supervising Youth Counselors, and Nurse Clinicians.   Youth Counselor Academies Classes are underway or scheduled.

Direct-care staffing vacancy percentage has increased from the last reporting period (*see below*). There are 311 total positions ("FTEs") at LHS/CLS.  Approximately 153 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA").  The teacher vacancy rate remains high (7 vacancies- same as that last two reporting periods). The Monitor encourages continuing to recruit teachers despite the reduced population and challenges with Covid-19.  Recruiting is still a challenge due to the location of the facility, overall teacher shortages, relatively low compensation, location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and the year-round school calendar and thus, hiring needs to continue.

| Position | Vacancy Rate % as of May 13, 2020 | Vacancy Rate % as of September 19, 2020 | Vacancy Rate % as of December 9, 2020 | Vacancy Rate % as of March 1, 2021 |
|---|---|---|---|---|
| Youth Counselor | 8.6% (10 out of 115) | 18.2% (21 out of 115 | 23% (27 out of 115) | 25% (29 out of 115) |
| Youth Counselor Adv. | 13% (5 out of 37.5) | 12% (4.5 out of 37.5) | 13% (5 out of 37.5) | 23% (8.5 out of 37.5) |

| Teacher | 32% (8 out of 25) | 28% (7 out of 25) | 28% (7 out of 25) | 28% (7 out of 25) |
| Social Worker | 21% (3 out of 14) | 21% (3 out of 14) | 29% (4 out of 14) | 21% (3 out of 14) |

The Youth Counselor/Couth Counselor Advanced vacancies have increased during this reporting period. The Defendants are working on modifying job descriptions, job postings, and interviewing techniques in order to attract and retain the best direct care staff. It is critical that applicants have a clear understanding of their role at LHS/CLS.

The Monitoring team spoke to over thirty-three (33) staff. Staff morale overall seemed better during this site visit. With the exception of the Krueger unit, staff were more engaged with youth, body language was more open, and staff engaged with the Monitoring team and leadership more. Staff continued to complain that there were less "tools" available to manage behavior, youth were acting out a lot, and that they are working a significant amount of overtime. Staff like the twelve (12) hour shifts but would like to work less overtime. Staff also want leadership to be more present on the units and communicate more with staff day to day. The Monitor worked with Defendants on potential scheduling changes to assist in the number of mandated shifts. Staff attitudes depended on which unit they worked- some were very positive, and some were angry, frustrated, and exhausted. During this reporting period there was one significant staff assault, that had a profound impact on staff. There were also several instances of youth running around the unit and grounds and destroying property and breaking windows which, as noted in multiple past reports, is generally caused by insufficient activities for youth. Staff are happy that teachers and other staff are in person on-site but are still adjusting to moving youth for education in the school area.

In response to staff's request for more communication, there are regularly scheduled Superintendent Town Halls that are open to all staff. Zoom sessions continue to occur the first and third Tuesdays of the month. Staff joining from a work location are directed to do so in a confidential setting, so youth do not overhear the meeting. Minutes are taken and disseminated to all staff. Staff are encouraged to send any questions/agenda items ahead of time and discussion-based questions are also welcomed. Minutes are taken and disseminated to all staff. Staff are encouraged to send any questions/agenda items ahead of time in order for a more thorough answer/response to be given at the meeting.

The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives, changes to programming, and general information.

<u>Youth in Custody Practice Model Update/ Dialectical Behavior Therapy</u>

As part of the agency and facility's desire to improve conditions for both staff and youth, they are continuing to engage in the Youth in Custody Practice Model ("YICPM"), which was explained in the previous Monitor reports. DJC recently concluded the period of technical assistance provided in collaboration with the YICPM consultants. The final virtual site visit scheduled was held January 13 and 14, 2021. The Core Leadership team and YICPM consultants finished developing the framework and action plans aimed at supporting DJC sustain the cultural changes

that will come with implementing DBT as a behavioral motivation-based system of care. A panel discussion with four (4) line staff and another four (4) administrators from Utah and Massachusetts also provided helpful context to reinforce efforts and provided a glimpse into how other states have implemented similar systems of care and implemented large scale reform efforts.

DJC will begin the next phase of participation with YICPM by working with the principal investigator from Georgetown University. On March 3, 2021, the Assistant Administrator and Program and Policy Chief conducted a video call with Dr. Woodland. The focus of the meeting was to discuss the YICPM Data Component. Dr. Woodland and her team have developed the framework and spreadsheets to help facilities understand the different types of data they are looking to collect and analyze. Next steps include doing a data inventory, reviewing outcome measures, and review additional data points that are not being currently collected.

A DBT Informed System of Care has been identified as vital to the change process. Planning continues to integrate a comprehensive revamp of a behavioral management approach coupled with DBT.  Many of the enhancements that have been under development follow similar directions taken by the states of Utah, Washington and Massachusetts. Components of the system of care that have moved from the planning stages to completion include DBT training and skill practice for all staff, a program points system and accessible tracking, youth growth team support, the framework for youth to progress through the new system's five stages. Components that continue to be worked on include: the youth motivational incentive-based token economy, tracking of pro- social youth behaviors, a pro-social point matrix, a menu of responses for noncompliant behaviors, a system for tracking outcome measures, and the application of quality assurance reviews.

Part of the goal in introducing the DBT treatment programming-based system of care is in furtherance of the transition the facility has already embraced during previous reporting periods. During the recent three-month period all facility staff, from the maintenance department through administration have been trained in the therapeutic approach envisioned by the new system of care. Training strategic groupings of staff continuously started in early 2021 with six (6) half-day trainings over a three-week period that helped to provide clarity for staff and efficiently move the DBT treatment programming-based system of care forward. Even after staff have completed their initial training, there will be on-going reinforcement, coaching, mentoring, and training to aid staff in becoming comfortable with DBT and assisting them to consistently use DBT skills when interacting with youth. This approach will help to ensure that as the system takes root within the facility culture, staff at all levels of the facility develop trusting relationships with youth, engage them in delivering treatment, and become proficient using the behavioral motivation and shaping system.  The system will seek to reinforce prosocial behaviors and address non-compliant behaviors with DBT and other related skills.

On January 17, 2021 communication from leadership was disseminated to designated staff outlining the responsibilities regarding the tracking and documentation of program points, program progression, and department heads subsequently shared with their staff their responsibilities within the system of tracking. The multi-disciplinary approach to information sharing throughout the program implementation has been intentional to elicit staff input and buy-in by displaying a more cooperative approach towards the facility-wide cultural shift the system of care, rather than just a "top down" mandate.

Youth that are already at CLS/LHS will maintain their existing case file/growth plan. Modifications will be made to the existing plan as the youth go through the various aspects and stages of the program. The documentation and notification of Primary Growth Team Members for each unit/youth, and the initial stage placement was completed prior to February 15, 2021.

On February 15, 2021 the new Program Points and Stage Progression system was implemented, and youth began weekly meetings with their multidisciplinary Growth Teams. The first week of Growth Team meetings allowed an opportunity for the teams to share information with youth about the new System of Care, Program Points and Stage Progression as well as highlight how the Growth Teams will work with the youth to identify his/her strengths and reduce barriers by building skills and helping the youth set and progress towards the youth's goals.

The comprehensive effort to begin implementing the system of care over the past three months involved training well-over one hundred staff members to learn both the new program points system and then complete the DBT approach to treatment trainings which concluded at the end of January. Clinicians, administration, and direct care staff then moved on to organizing youth DBT groups and staff consultation groups in February, and all of this was integrated within the system of care involving each and every area within the facility. With the first phase of training accomplished, the facility is ready to implement the system of care and begin tracking outcome measures when facility-wide DBT groups began the week of March 22, 2021.

Mental Health (PSU) Update

In the last report, the Monitor informed the Court that a mental health consultant was contracted to assess the overall mental health program at LHS/CLS.  It was critical that the programming, staffing, and services that exist at LHS/CLS were evaluated and recommendations on improving treatment and services for youth at LHS/CLS. The initial site visit took place at the end of February 2021. Overall, the report made positive findings determining that the program is comprehensive from intake through discharge, uses evidence-based intervention services in identifying and addressing the needs of the youth with severe mental health, severe emotional disturbances, and adjustment related concerns.

Clinicians incorporate a comprehensive treatment plan and use a mental health classification system allowing for appropriate mental-health treatment. Psychological services have been integrated with the medical, safety, and educational staff. Integrating PSU staff into the day to day operations has had a tremendous impact on youth and staff. The consultant also found that PSU staff are able to effectively respond to the needs of all youth on the campus.

Effective Jan 17, 2021, an administrative plan was approved to return PSU Clinicians on site for one additional day each week. The schedule design allows for two PSU Clinicians on site until 8 P.M. each evening.  PSU Clinicians work remotely and through on-call to attempt to meet the challenges of covering evening and weekend hours.

Weekday hours from 8 A.M.-8 P.M. have been covered by on site PSU Clinicians. With on- site presence increasing in January 2021, a second PSU clinician will allow for at least one clinician to facilitate groups and engage in staff-led activities. Having two PSU Clinicians available until

8:00 P.M. also allows for one of these Clinicians to remain dedicated to emergency response and consultation. In addition to having two clinicians working until 8:00 P.M., in January, PSU staff has already implemented 3 new treatment groups occurring during weeknights, from 5:30-7:00. The Monitor was pleased to see mental health staff actively engaged with youth during the site visit and present in most use of force incidents that the Monitoring team reviewed.

LHS/CLS clinical staff have also become actively engaged with youth programming. The oversight of the music program has been transferred to PSU and coined as MAI (Music Art initiative) to provide increased opportunities for therapeutic expression. Creative outlet is meaningful for youth who are in prime stages of identity development. PSU has implemented three other evening treatment groups- two for young men focusing on communication and conflict resolution and one for young women focusing on teambuilding. The PSU Supervisor and several PSU clinicians continue to collaborate with the Music Art Initiative (MAI) Leader, administration, safety, and education to continue integrating mental- health research and practice in developing youth centric arts programming and projects.

The Defendants should continue to involve PSU staff in making improvements at the facility (such as improvements to incentives, consequences, and working with the OJOR system). The Monitor continues to suggest modifying the mental health (PSU) and recreational staff work schedules to include more evening and weekend hours, especially given the lack of sufficient other structured activities during those times. The Monitor continues to recommend that scheduling of PSU be reconsidered (rotate staff if need be, alternating weekends, etc.) or if this is not possible, then hire additional PSU staff to work nights and weekends to engage with all youth. Weekends are when there is the idlest time and need for additional meaningful programming. Adding weekend programming will also have a positive impact on reducing incidents of violence and other behavioral incidents related to boredom and lack of activities. Hopefully, all of these positive changes (to come) will result in an improved atmosphere for youth and staff.

Quality Assurance ("QA")

Defendants launched its Quality Assurance Review (QAR) process in August 2019. A report was able to be generated during this period in which over 98.8% of 30-minute safety/security checks were recorded during this reporting period. The Monitor (as well as the QA team) reviewed random video samplings to ensure staff were observed looking into each room while scanning the door tags. There were 100% confirmed quality scores across the random sampling period. Additionally, in the few occasions where the safety/security checks were not completed according to policy, staff were held accountable in order to correct behavior. Leadership and staff should be commended for their efforts in this area.

To aid in the completion of quality assurance tasks, an extractable format of J-Tracker search data was developed. The report format will facilitate review of search criteria as outlined in the functional policy and procedure drafts for searches of youth and facility. Data from the debrief reports was also made into an exportable format which will enable point in time review of the requirements for mechanical restraints and AC placements. This will support Quality Assurance staff's ability to facilitate assurance measures with supervisory or professional staff before or after the Safety Director, Deputy Superintendent, or Superintendent formally review the documented

incident debrief form. Weekly multidisciplinary reviews of AC placements by Security and PSU supervisors occurring based on the new data export that began on January 15, 2021.

With the re-start of classes taking place in the school through a hybrid model as of March 15, 2021, random pat/personal searches prior to school movements will become a standard of practice. Safety administrative staff complete a weekly review of searches to identify if/when a strip search occurs. Quality Assurance staff also utilizes extractable search data from J-Tracker to confirm on a monthly basis that search data is thoroughly completed (with reason for search, types of search, contraband/items found) and that the gender of staff matches that of the youth for all pat/personal searches as well.

The Quality Assurance and Training staff developed a DJC Searches of Youth Training module on Cornerstone eLearning to include policy highlights, video demonstration of proper search technique, and assessment questions. This training was assigned to all safety staff in February 2021. Starting March 1, 2021 SYCs have been coordinating at shift change annual in-person competency checks. DJC has authored a Trauma-Informed Care (TIC) post-training assessment for TIC trainings and YC academies going forward in order to bolster staff knowledge of TIC principles and augment the department's TIC refresher training required of all department staff in 2021.

Finally, the STOPS acronym (Systematic, Thorough, Objective, Preventative, and Safe) will be utilized to underscore best practices for searches of youth and facility-wide areas during future training opportunities that will include support from the Field Training Officers (FTO) Program.

Facility Improvement Plan ("FIP") Progress

During this reporting period, DJC expanded its Facility Improvement Plan (FIP) Team to utilize a more multi-disciplinary approach in an effort to get input from all areas of the facility. An effort has been made to select non-management staff to be the representatives for each of the areas so that there is more ownership with the FIPs by staff who work with youth day to day.  The FIP Committee has expanded to include the State Coordinator, Site Coordinator, PbS Data Entry Team, Superintendent, Deputy Superintendent, Program Director, Safety Director or Administrative Captain, QA Staff, SYCs, Health Services Unit staff, PSU staff, Education staff, Social Services staff, 4- YCA/YC, CARE Team staff, Recreation staff and Field Representatives. The first monthly meeting with the new group was on January 20, 2021. The committee reviewed data from the October data collection and reviewed the PbS FIPs. It was determined in consultation with the PbS coach to maintain the current CLS FIP with plans to re-evaluate after the April data collection cycle is completed and reviewed. The LHS FIP was determined to be closed and a new FIP was opened.

The second meeting was on February 17, 2021. During the meeting, there was an overview of the PbS website, walked through the FIP's, and explained the process for adding comments/notes to the FIP's. The group discussed various in the FIP and addressed making changes to language in J-Tracker and within divisional policies and procedures in order to match PbS language and definitions building consistency with the stated goals of DJC where the coincided with PbS. The group was informed of the Kids Got Talent and Scholarship as well as the upcoming PbS awards

opportunities. Information was provided about our submissions last year and some progress was made toward more submissions for this year.

The next data collection period for PbS begins again April 1, 2021 and thus, PbS data will not be included in this Monitoring report.

Policies and Procedures/Administrative Code

There were no new policies/procedures finalized in this reporting period.  Draft policies have been created for: Searches of Youth, Searches of Facility, Performance-based Standards, Control of Water Supply to Units.

Draft procedures for Room Confinement (Administrative Confinement) have been developed. On December 3, 2021 a formal training memo outlining the trainings approved by the Administrator was disseminated by the facility Superintendent specifying the training priorities for facility staff in 2021. These priorities have been identified:

    (1) Required Training: POSC for Uniform staff, POSC for non-uniform staff, Verbal Judo Drills, CPR, Suicide Prevention, DBT, Diversity, and Mandt.
    (2) Optional Training: Wellness, Fire Safety, Living Unit Basics

Administrative Code

First draft created of DOC Chapter 373. Final draft of DOC 376 was submitted for approval.

Overall, there has been significant improvement in many key areas and in the overall atmosphere of LHS/CLS.

**COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION**

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

      1.    Punitive Confinement.

          a.    Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence either in data or youth interviews that indicate youth are being confined for seven days.  If Defendants incorporate the Court Order into final policy and procedure –- they will reach substantial compliance.**

b. Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is no evidence either in data or youth interviews that indicate youth are being confined for three days. If Defendants incorporate the Court Order into final policy and procedure –and if this improvement is sustained - they will reach substantial compliance.**

c. Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. During the last site visit, documentation and video showed that there were instances of confinement that did not meet the criteria for Administrative Confinement – there was no risk of imminent physical harm - and appeared to impermissibly constitute punitive confinements. There is significantly less evidence of this during this reporting period. The Monitor previously recommended creating a policy which clearly outlines the criteria for administrative confinement so that staff cannot punitively confine youth. The Monitor reiterates this recommendation. By establishing clear and objective criteria, leadership can ensure that youth are not punitively confined.**

2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer poses a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  The use of AC was significantly lower for LHS youth this reporting period (December-February). There was a 36% reduction for LHS.  CLS is similar to the last reporting period due to December's numbers. It is important to note that CLS had no AC in January and February 2021.**

**September 2020**
**CLS: 0 uses of AC**
**LHS: 66 uses of AC. Average of 174 minutes. 1 youth over four hours.**
**16 youth at exactly four hours.**

**October 2020**
**CLS: 5 uses of AC. Average of 119 minutes. 1 youth over four hours. 1**
**Youth at exactly four hours.**
**LHS: 66 uses of AC: Average of 179 minutes. 7 youth over four hours. 2**
**youth at exactly 4 hours.**

**November 2020**
**CLS: 7 uses of AC. Average of 104 minutes. No youth over 4 hours**
**LHS: 82 uses of AC. Average of 143 minutes. 2 youth over 4 hours. 5**
**youth at four hours.**

**December 2020**
**CLS: 10 uses of AC**
**LHS: 88 uses of AC. Average of 117 minutes. 6 youth over four hours.**

**January 2021**
**CLS: 0 uses of AC**
**LHS: 40 uses of AC: Average of 117 minutes. No youth over four hours**

**February 2021**
**CLS: 0 uses of AC**
**LHS: 9 uses of AC. Average of 74 minutes. No youth over four hours**

**PSU clinicians document an overview of the intensive mental health services in J- Tracker and on EMR. The overarching goal of providing intensive mental health services is to safely reintegrate the youth back into the general population immediately after placing the youth on AC and to maintain youth success while off AC. The IMHS developed for a youth reintegrating from AC, are repeatedly re-evaluated and adjusted as needed.**

**PSU clinicians provide intensive mental-health services to each youth on AC through a detailed process outlined in the Guidance document. Currently, all PSU clinicians have been trained in DBT. All YC Academies have included overviews of DBT and facility-wide training of Skills Groups/Coaching is scheduled to start in the early part of 2021 for DBT System of Care.**

**Each youth on AC already has a youth plan (previously called Behavioral Management Plan BMP) developed collaboratively between PSU and the youth. These plans are preventative as they outline youth triggers, self-soothing strategies, and highlight treatment issues. These plans also provide input into the development of effective mental-health services to be provided to the youth while in AC. This youth plan is also consulted when developing a**

specific treatment plan for AC-specific intensive mental health services. It, along with the Guidance document, guides the collaborative effort amongst various staff to provide youth with immediate and comprehensive mental-health services while on AC.

All involved staff use the AC flow chart (within the Guidance document) to guide decision making and action while a youth is on AC. While the SYC notifies PSU soon after the youth is placed in AC, the SYC and YC may reference the youth plan to incorporate the recommendations of PSU to de-escalate agitation. As soon as possible, SYC contacts PSU. When PSU is contacted, the PSU clinician reviews the mental health needs of the youth. This aids in the first determination of whether AC is contraindicated. PSU provides immediate consultation and treatment recommendations to the SYC. By the two-hour mark, the PSU clinician begins a risk assessment if the youth is unresponsive to the initial treatment and have not reintegrated back into general population. PSU clinicians collaborate with the Safety staff and continue to evaluate youth response to services.

The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit.  Majority of checks (over 98.8%) were completed within 30 minutes. QA has been developed and completed with use of video to confirm that checks were completed in compliance with policy and this Court Order.

The mental health expert evaluated the mental health program and had very positive findings overall. Policy and procedure and a quality assurance review process needs to be implemented, and documentation needs to be streamlined.

      a.  Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

          i.  A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were six (6) youth confined for over four (4) hours during this reporting period (in December) (see response in previous question). All of the confinements were recommended by PSU.  Intensive treatment provided to the youth included: completing thinking reports, discussing alternative, making safety plans, engaging the youth in mediation, reviewing motivations, and reviewing coping strategies.**

Defendants are accurately capturing confinement time, number total placements, average confinement time per month, and number of days without AC placements. Defendants need to continue to focus on reducing AC overall, ensuring they are following this Court Order, draft policy and procedure with AC placement criteria, and continue to QA this data.

        ii.     A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no AC placements that were extended. There were no transfers as a result of extended placements in administrative confinement. Defendants need to improve their quality of data and documentation with respect to the "commenced plan" and incorporate the Court Order into policy and procedure.**

        b.  Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 P.M. to 8 A.M.**

        c.  Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no instances in which a youth was confined for over 24 hours. Once incorporated the Court Order into policy and procedure, Defendants will be in substantial compliance.**

        d.  The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

3.     Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 was updated. The plans developed are very detailed and comprehensive. Additional discussion and clarification should be sought surrounding observation status. The Monitor will ensure this occurs with the parties.**

4.    **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

        a.  Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As previously stated, the Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. The Monitor recommended that Defendants replace the existing room furniture with furniture that is specifically designed and engineered for secure environments. The new replacement furniture is consistent with what the Monitor would expect to see in a secure facility and should certainly reduce the opportunity for suicidal incidents within the youth rooms. All youth are housed on renovated units.**

**The Monitor did not observe rooms with multiple blankets/sheets covering large areas of the room. Staff can clearly see into youth rooms now that the windows do not have etching and are not covered by paper/pictures. Room searches have occurred during this reporting period. Youth rooms were very clean and organized.**

**As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by. Defendants should be commended for the vast improvement on these safety/welfare checks and for investing in the technology needed. Although the Monitor, and available literature, believes safety/security checks should be fifteen (15) minutes instead of thirty (30) minute checks, technically, the Defendants could reach substantial compliance if this is maintained.**

> b.   Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, hygiene supplies, or nighttime toilet usage. If Defendants improve their quality of data and documentation, and incorporate the Court Order into policy and procedure, they will be close to reaching substantial compliance.**

> c.   Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible.  PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification.  The crisis intervention technique is being documented.  Clinicians are on-site for a minimum of 6 hours each Saturday and Sunday and the majority of this time is spent meeting directly with youth.  Clinicians working on the weekend have a priority of service provision which include assessing/meeting with youth on Administrative Confinement, meeting with youth on observation status, attending to any crises, and conducting rounds and check-ins with youth.  There are typically quite a few staff referrals, and these youth are seen as well.  The only time spent in non-direct contact with youth on the weekend, is for documenting on the AC and observation placements (other clinical documentation is completed on Monday).  The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours in order to engage youth in a meaningful way during this time.**

**A quality assurance program needs to be developed. The Monitor suggests that the Defendants consider implementing the mental health expert's recommendations to further develop the mental health program/integration at LHS/CLS.**

  d. Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1 , MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Documentation/data shows that evaluations are completed and within 24 hours after being placed in room confinement. There were no instances of contraindication documented during this review period. PSU clinicians developed a protocol for on-call situations. Each primary PSU clinician reviews the record, assesses the risk and designates whether the risk is low, medium, or high. The risk factors considered are supported by the literature on isolation and confinement. This determination is recorded in the mental-health caseload report which is accessible to all of PSU clinicians. The on-call PSU clinician uses this risk level determination and considers the input from the SYC placing the youth in confinement to make a determination whether the placement (each time) will be deemed contraindicated.**

  e. Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose.  Staff who fail to make such checks or who

falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE: Defendants are over 98% compliant with safety and security checks. QA program has been developed. There are very few instances of non-compliance. Quality assurance measures are in place and when necessary, formal investigations occur. There were no formal disciplines issued as of the conclusion of the reporting period. PSU staff do visit youth daily when on site and are available 24/7 if needed by phone.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

f.    Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Property restrictions are most commonly applied by PSU for safety reasons, however forms and process for documenting any potential property restrictions need to be created and utilized. Once Defendants make these improvements, they will be in substantial compliance.**

g.    Youth in room confinement shall receive:

1.    All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided in general. The on-call PSU clinician communicates to all the PSU clinicians through email that a youth has been placed on AC. This allows the primary clinician to provide consultation and direction as to how to return the youth to a baseline, self-regulated state. The primary clinician consults with the on-call clinician and with the SYC/YC/CUS/SW staff regarding specifics ways the youth plan addresses the issues at hand and how it can be adopted when the youth is on AC. A PSU**

clinician follows up in the absence of the primary clinician and/or the crisis clinician. PSU collaborates with the SYC and direct staff. PSU also meets with the youth while they are on AC and through a follow-up session. The social worker and youths' meeting schedules are individualized. Therefore, as is the case with any arising short-term scheduling conflicts (e.g., court, medical needs, OJOR, AC etc.) the social worker works with the youth to identify availability if an AC placement occurs during regularly scheduled meeting. The AC placement also provides an opportunity for the social worker and the youth to review AC placement as outlined in a new J-Tracker form. With shared awareness around AC placement, Social Workers are positioned to incorporate cognitive-behavioral or motivational interviewing practices in revisiting goals from the Youth Growth Plan.

Documentation, quality assurance, and policy and procedure need to be improved/completed. A review of the social worker roles and responsibilities need to be assessed.

> ii.   Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. During the pandemic, Defendants moved to smaller-group based treatment to youth where group participation was provided on the units. Treatment programming for youth never ceased due to Covid precautions, but the size of the groups was modified to accommodate safe social distancing measures and keep youth who shared a living unit assignment in groups with one another. Beginning in March, some housing units now utilize the school for their group treatment sessions as determined by their respective living unit's weekly schedule.  The Monitor encourages these groups to occur off of the living unit as much as possible.

Only youth who are actively in AC status due to posing a serious risk of imminent physical harm to others would potentially miss a treatment group. A process is in place for that specific missed treatment group to be made up for the youth on an individual basis, and since January 15, 2021 youth notes in J-Tracker should reflect the completion of the make-up session. Additionally, during the March through May reporting period, Defendants are designing and implementing a QA audit process for youth notes in J-Tracker in order ensure this process is completed. Missing a treatment group and having a make-up session does not affect the youth in terms of any setback to their progression towards completing the treatment group. This is the same process for a youth who were to miss a group due to any other short-term scheduling conflicts (e.g., court, medical needs, OJOR, *etc.*). For example, if a 2-hour placement in AC occurs during regularly scheduled Skills Streaming group time, treatment staff will re-engage the youth in making progress in their treatment course avoiding any delays in progression through the course of their assigned treatment. Defendants to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress when possible.

In January, DJC integrated treatment notes and social worker notes into J-Tracker, while

youth growth plans, and behavior management plans are made accessible to all staff on a shared network drive. This has resulted in greater information sharing between classifications and will make accessing documentation for individualized treatment follow up more readily accessible for a QA. Moving forward, staff assigned to the QA role will conduct random spot check audits of J-Tracker youth notes to ensure that proper documentation and follow up is occurring as intended. **Defendants need to continue to focus (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement.**

> iii. Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. (See education narrative for more detail). In general (prior to COVID-19) educational services for general population occurred in the classrooms in the school area. COVID-19 has changed how the educational services are being provided to youth at LHS/CLS. On March 24, 2020, the schools began providing education on the units with most education staff working off-site. On February 22, 2021, the school teachers returned on-grounds at the facility to begin instructing through Zoom from classrooms in the school. On March 3, 2021 Teachers began delivering classes on the units. On March 15, 2021, a hybrid schedule for youth attending some programming within the school building began. Youth and staff will begin the transition back into the school building after the challenging year of COVID-19 posing obstacles that staff and youth continue to work through. Each unit has been assigned to be in the school for either the AM or PM part of the day, whichever includes the physical education time.**

**DJC started the process to pursue an education consultant beyond the current work with the ULN. The purpose of the consultant would be to evaluate the current education program and provide a strategic plan for improvement efforts. Also, the Office of Budget and Programs is concurrently working to establish a contracting process to move forward.**

**The Monitor feels that the facility needs to increase the daily education hours as this will have a positive impact on meaningful programs and reduce youth idleness. Additionally, Defendants need to ensure that special education is provided while on administrative confinement. The Monitor's observations during the site visit revealed that the quality of the education program has improved from the last site visit. Youth were engaged in the classrooms and on the units (teachers were present on the unit). Youth were paying attention, sitting appropriately, and actively participating. Youth are very interested in art, music, woodworking, the greenhouse, welding, and sewing. The instructors in these areas are experts in their crafts and truly love teaching the youth their craft. It would be extremely**

beneficial to provide these types of programs to youth in the evening and on weekends. The Defendants should continue to focus on bringing more programming into LHS/CLS, especially programming culturally relevant and specific to the race and genders of the youth who are at the facility.

iv.     Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general, youth are out of their rooms from 8 A.M. to 8 P.M.  except for youth in isolation due to Covid-19 safety measures implemented by Defendants, any confinement recommended by PSU, or any self-confinement. The Defendants discontinued the use of "self-reflection." The Monitor regularly saw youth conversing with other youth during out time. Each unit had sensory rooms. There were very few instances of youth being in their room during the site visit- those that were in their rooms, voluntarily did so.  There were less instances of self-confinement during this site visit.

v.      Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

COMPLIANCE STATUS:  PARTIAL COMPLIANCE. There were four (4) documented instances of youth eating in their rooms which were staff imposed based on substantial threat of physical harm.  Defendants are able to track when youth eat meals in room. Policy and procedure need to incorporate this section of the Court Order. Defendants are close to being in substantial compliance.

vi.   Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Logs indicate that youth are receiving much more than the 3 hours of "out time" per day or 30 hours per week. Defendants incorporate the Court Order into policy and procedure, they will be in substantial compliance.

5.      **Notification of Rights.** Within 15 minutes of a youth's placement in room

confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is a box on the incident debriefing form that is checked if staff informed the youth of his or her rights regarding grievances and appeals and time of notification. Youth continue to receive their notification of rights/grievance procedures when they are placed in administrative confinement. The process for obtaining a youth signature (or two staff signatures in the event of a refusal) has been proposed as a part of youth receiving PSU thinking chain reports during the first stage of the administrative confinement process. However, the process and forms need to be enacted and written into policy. Once this is done and sustained, Defendants will be in substantial compliance.**

6.   Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are now documenting this more consistently, including when less restrictive means were attempted. Documentation needs to continue to be completed and consistently applied to all situations. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue to be improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

B.   OC-Spray and Other Chemical Agents

1.   OC reduction plan.  Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.  There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere.**

2.   Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and

24

other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated. There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere.**

    C.    Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

        1.    Prohibition on types and uses of mechanical restraints.

            a.    Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visit, but data and documentation show that there were uses of mechanical restraints during this reporting period. However, the use in LHS is trending downwards with a decrease by 63% this reporting period. Defendants need to continue focusing on reducing the use of mechanical (as well as physical) restraints. Defendants need to document and establish that there were not less restrictive means available and quality assurance measures in every instance of the use of restraints and follow the final policy and procedure that are in place.**

            b.    Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Use of mechanical restraints is significantly lower this reporting period in LHS and lower in CLS.**

**Uses of mechanical restraints LHS:**

| | |
|---|---|
| **March 2020:** | **38 uses** |
| **April 2020:** | **37 uses** |
| **May 2020:** | **27 uses** |
| **June 2020:** | **20 uses** |
| **July 2020:** | **30 uses** |
| **August 2020:** | **65 uses** |
| **September 2020:** | **38 uses** |
| **October 2020:** | **43 uses** |
| **November 2020:** | **26 uses** |
| **December 2020:** | **20 uses** |
| **January 2021:** | **12 uses** |

**February 2021:**       **8 uses**

**Uses of mechanical restraints CLS**
| | |
|---|---|
| **March 2020:** | **7 uses** |
| **April 2020:** | **6 uses** |
| **May 2020:** | **0 uses** |
| **June 2020:** | **0 uses** |
| **July 2020:** | **0 uses** |
| **August 2020:** | **0 uses** |
| **September 2020:** | **4 uses** |
| **October 2020:** | **4 uses** |
| **November 2020:** | **0 uses** |
| **December 2020:** | **6 uses** |
| **January 2021:** | **0 uses** |
| **February 2021:** | **0 uses** |

**Documentation needs to be improved to document that an imminent threat of physical harm existed, and when and how that decision is reviewed. Defendants should note why the acts in question required a specific type of use of force, such as explaining why measure utilizing less force would have been insufficient in a specific situation. The review process should consider the nuances in different situations.  Defendants do have critical outcome measures for restraints.  Defendants need to continue to work towards reducing the use of mechanical restraints, develop better documentation and quality assurance measures.**

      c.    No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

          i.    Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   There were five (5) uses of mechanical restraints other than handcuffs during this reporting period. Four (4) uses were ankle restraints and one was the "wrap" (full body restraint). The "wrap" is a restraint device that falls under this section and needs to be monitored for usage compliance. The wrap should only be used in situations in which PSU has ordered and/or authorized its use in order to prevent active self-harm. PSU did not order or authorize the wrap.  If other mechanical restraints are used, the Defendants need to make sure they are ordered by PSU to attempt to prevent active self-harm.  The Monitor reviewed the use of force involving the wrap and PSU was present and staff attempted to verbally de-escalate.  However, the Defendants need to develop policy and procedure, training, and QA measures and ensure PSU staff order these types of restraints. Additional discussion and clarification should be sought surrounding compliant usage of the wrap.**

          ii.    Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Leg restraints were used during this reporting period. In each use, the leg restraints were placed as part of a routine use of force/restraint process in which the youth was non-compliant and/or combative. Documentation has improved relative to when restraints have been used and the rationale for usage. Defendants need quality assurance measures and need to continue to focus on reducing the use of restraints.**

      iii.    During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  See above.**

      d.    Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Defendants need to focus on reducing the use of mechanical restraints and ensuring use is not for punishment. Defendants need to make policy revisions and create quality assurance measures.**

      e.    Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is no evidence of youth being restrained to a fixed object. With policy revisions and quality assurance measures, Defendants will be close to achieving substantial compliance with this provision.**

      f.    Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Training records indicate that the large majority of staff have received training in physical force, restraints, and trained in proper de-escalation. The Defendants are increasing the frequency of these trainings (regular, informal, refreshers). These skills are also important to help staff identify and prevent situations which might lead to disruption or altercations before such incidents occur. DBT implementation will be very beneficial to youth and staff.**

g.    Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit.   No youth shall be left alone in restraints.    Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.   There was one youth who was placed in mechanical restraints over 45 minutes (85 minutes). In this instance, the approval process was followed, and mental health services were provided.  With policy revisions and quality assurance measures, Defendants may be close to achieving substantial compliance with this provision.**

2.    Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process. Defendants are close to reaching substantial compliance.**

D.    Strip Searches. The following provisions are effective immediately upon entry of the Cou1t's order incorporating this Agreement.

1.    Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no strip searches in this reporting period. The policy and procedure for Searches of Youth have been reviewed and awaiting approval. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search. A DJC "Searches of Youth" training module on the eLearning platform has been assigned to all safety staff in the first few months of 2021. Defendants are close to reaching substantial compliance.**

28

2. Strip searches with probable cause. Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no strip searches this reporting period. QA has been developed. The policy for searches needs to be finalized. Defendants are very close to being in substantial compliance.**

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Once the policy/procedure is finalized, substantial compliance will be obtained.**

b. Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no strip searches during this reporting period. If documentation and policy revisions are made, substantial compliance will be obtained.**

c. Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no strip searches conducted this reporting period. If policy revisions are made, substantial compliance will be obtained.**

d. Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records reviewed indicate that all staff have been trained in trauma informed care. There were no strip searches this period.**

e. If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult

with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no strip searches during this reporting period. Documentation needs to be improved and policy and procedure/QA developed.**

    4.    Documentation.  Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. With continued practices, Defendants will be in substantial compliance.**

E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants are focusing more on de-escalation skills.  Staff have been trained in MANDT and other training which includes de-escalation skills training. LHS/CLS secured Wisconsin Department of Administration grant funding to allow ten (10) instructors to complete train the trainer trainings and subsequently provide Eight-hour Verbal Judo training sessions to all staff who work with youth with the goal of reducing risk for injury and enhancing staff confidence at effectively de-escalating conflict or potential violent encounters with youth.**

**Competency testing was administered for all staff completing training and the scores from the competency exam were tracked as part of a quality assurance measure underscoring the importance utilizing well trained de-escalation techniques. DJC certified trainers will continue to provide quarterly refresher trainings with practice scenarios to support skill retention and continued application of Verbal Judo skills at the facility going forward.**

**In addition to MANDT, Verbal Judo provides another paradigm to teach complimentary techniques and build de-escalation skills to enhance safety and treatment supportive environments. The Monitor personally observed staff de-escalating youth with success and observed several instances of de-escalation in review of video footage.  Staff are more comfortable utilizing these skills, but continued focus, training, and review need to occur. Defendants should include cultural diversity crisis management. Knowing these issues and how they are communicated is critical to successful behavior management.**

F.    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility

to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants are working on decreasing idle time and providing more programming for youth. The below are some examples:**

**Staff Directed Activities LHS/CLS has encouraged staff led activities. Staff go out onto the units and participate in activities with the youth. There is a calendar sign-up sheet completed for each night of the week. Each unit has a monthly budget to purchase more items as needed to complete activities and a single staff person is designated to coordinate, monthly budget each to purchase incentive foods from outside the facility.  Some of the staff directed activities are simply putting on movies or video games which is not interactive.  There needs to be more creative activities developed in partnership with the youth.**

**PSU Facilitated Programs/Other Programs During the March site visit, the Monitor spent a great deal of time talking with staff and youth involved in the new Music Art Initiative (MAI) program and the vocational programs, including welding and woodworking.  All three programs were very impressive, and both youth and staff were highly engaged.  Youth in the welding and woodworking shops were able to express learning skills and motivation for using the programs and skills learned to help with long-term success when transition back into the community.  The Monitor was highly impressed with the MAI program and the enthusiasm and commitment expressed by the instructor.  The instructor is able to connect with youth in a highly effective manner that clearly has created a positive mentoring and skill building relationship.  Many youths have been able to learn to play an instrument and have written their own lyrics and music.  This program was so impressive, that the Council of Juvenile Justice Administrators ("CJJA") invited the instructor to present at the CJJA Summer conference in August to highlight this program and the success of the youth.**

**Zoom Visits On February 15, 2021, CLS/LHS implemented Zoom visiting for youth on a weekly basis. Each living unit is designated with a specific day of the week for visits to occur. Visits occur 5:30 P.M-7:30 P.M and each youth on a living unit is allotted one twenty (20) minute time slot. Once youth are signed up for their time slot, a video visit/Zoom link is sent to the approved visitors e-mail with the invitation date and time.**

**Multipurpose/sensory rooms. There are now new multipurpose rooms put into use February 22, 2021. Since the rooms are relatively new, they are expected to change and evolve as the facility moves forward with them. Staff who have items, suggestions, or ideas for bettering the rooms have been encouraged to bring them forward, and additional items ordered will be delivered to the rooms as soon as they are received at the facility.**

**Music Program MPC's. Each living unit has their own "MPC" (Music) Production Station for incentive youth use. There are youth in every building who have a working knowledge of these already and with YouTube access.**

**Welding Projects.** **Youth in the welding vocational program at LHS have been learning, developing and implementing valuable technical skills. Participants are instructed in basic industrial safety concepts, fundamental arc welding skills, and introductory metal fabrication. Career pathways are also explored. Students are given the opportunity to apply their developing skills to projects that benefit the workshop and institution. Youth recently helped create signs for military veteran parking spaces at the facility. If possible, Defendants should make this available on nights and weekends.**

**Food Incentives:** **During this reporting period, various food incentives have also been implemented with a range of options supported by Food Service as ordered by any Supervisor. Supervisors may also receive support from the Business Office to procure food from an outside establishment or request specialized purchases. SYCs continue to have tournaments and contests across living units.**

**As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. Ideally, the programs mentioned above (and additional programs such as the greenhouse, sewing, knitting, Grandparents program, *etc.*) should be available in the evening and on weekends. The Monitor is happy to hear that the budget hold has been released for a religious service leader. Youth missed having religious services at LHS/CLS. As mentioned previously, increasing education hours and vocational programming, including for youth who have obtained a diploma or HSED, can greatly assist in reducing idleness time and provide positive youth development strategies.**

G.   Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants have made significant effort in implementing the strategies suggested in improving staffing ratios and staff morale. Defendants should continue to focus on training and developing staff and evaluating their hiring process. As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere and environment of the facility. Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, and the use of isolation and confinement. Although improved from the last site visit, it is clear from the Monitor's interactions with staff during the site visit that staff wellness remains an issue. High levels of anxiety, stress, increased working hours is continuing to impact on their wellness and, in turn, negatively impacting the overall environment. The Monitor will continue to work with Defendants on strategies to improve staffing ratios and identifying additional strategies to positively impact staff morale/wellness.**

H.    Amendments to administrative code.  Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE.   First draft created of DOC Chapter 373. Final draft of DOC 376 was submitted for approval.  Defendants need to continue drafting interim policies for LHS/CLS while also developing final Code revisions.**

## IV.    DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

**A. Incident review process.**  Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There has been a vast improvement in meeting the 24-hour timeline. Informal reviews occur right after an incident in majority of cases.  When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). A framework for other QA measures relating to the consent decree has been created. Defendants have made huge progress as it relates to QA.**

**B.    Quality assurance**.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE**. **As discussed throughout this report, data driven decisions are critical to come into compliance with this Court Order and to**

**improve the quality of life for youth and staff. Defendants have created a competent quality assurance program. The new leadership team, dedicated QA personnel, and RFID has had a positive impact on data collection and quality assurance. The Monitoring team will continue to work with the superintendent to establish performance goals, analyzing data, and creation of corrective action plans.**

## CONCLUSION

There has been vast improvement in many areas of the consent decree and overall atmosphere from the last site visit. There was progress made in several initiatives such as training/implementing DBT, incorporating PSU more into daily operations, retaining a mental health consultant, increasing staff-led activities, additional staff training and development, in-person education on and off the units, additional key staff present on-site, searches resumed, more normalized visitation, CARE Team modifications, use of data in day to day decision-making, and improvement made to the food, incentives, and canteen.

The facility would benefit from an increased focus on reducing idleness, particularly during weekends and evening hours. There are several very good programs with positive outcomes for youth (music, art, gardening, welding, *etc.*) that should be expanded. The Defendants should continue to move youth off of their home units as much as possible. The facility should continue to work on improving the behavior management system, continue with their progress in implementing DBT, providing improved youth incentives that will help in reducing many behavioral incidents, and bringing gender and culturally relevant programming to LHS/CLS. Continued efforts need to be made to further engage the educational expert, reduce teacher vacancies, and increase educational time and quality. Regular training in de-escalation and assessment, evaluation, and review of use of force continuum need to continue to occur. Policies and procedures for LHS/CLS need to continue to be developed as well as applicable administrative code. Staff wellness needs to continue to be a priority. Lastly, there needs to be a focus on moving youth from LHS/CLS to more appropriate setting(s) as per the Court Order. The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

/S/ Teresa Abreu
Teresa Abreu
Monitor