UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                   Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

## TENTH REPORT OF THE MONITOR

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Ninth Report of the Monitor was filed with the Court on April 20, 2021. The Monitor's tenth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates from the ninth site visit which took place on March 18, 2021.

## SITE VISIT

The tenth site visit by the Monitor took place on June 24, 2021.  Due to the pandemic, the Monitor limited onsite time to one day and completed necessary interviews/information gathering via virtual meetings prior to and after the site visit. The Monitor reviewed materials provided by the parties prior to and after the site visit for the reporting period ending May 31, 2021. Materials included but were not limited to: use of force videos, video footage of units, COVID-19 related memos, directives and plans, programming materials, project plans, grievances, discipline documents, investigations, various staff memos, daily shift reports, all of the monthly data submitted to the parties per this Court Order (March, April, and May 2021), updated unit rules, work rules, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Plaintiffs' and Defendants' counsel and the monitoring team were on site during this site visit. Plaintiffs' counsel conducted youth interviews virtually before the visit, and in person during the visit. The Monitor toured LHS/CLS and interviewed youth and staff. The Monitor had the opportunity to talk to the majority

1

of youth and staff present and available during the site visit. Approximately forty-two (42) youth and thirty-three (33) staff were interviewed by the Monitor during this site visit.

## Overall Quality of Life, Conditions, and Atmosphere

Introduction

All of the COVID-19 modifications (health screenings, intake process, and quarantine process) were still in place during this reporting period. The COVID-19 precautions have remained consistent with the CDC's guidance for congregate settings.  In person visitations will resume on Saturdays beginning July 10, 2021. There have been no youth COVID-19 cases and four (4) staff cases. COVID-19 vaccinations continue to be offered to every youth meeting the CDC guidelines.

The total LHS/CLS population continues to remain low, ranging in the mid to high 50s.  The overall atmosphere was good.  There continues to be concern regarding programming (lack of structured activities), use of force, youth confined to their rooms due to being placed on observation status (in some cases improperly), and other issues. The Monitor is also concerned about inadequate accountability for staff who have engaged in improper behavior (such as excessive force or verbal abuse) towards youth. However, overall, there has been improvement and progress in some areas of the consent decree from the last site visit (detailed throughout the report).

Physical Plant Observations

The entrance, grounds, visitation, most units, school, and many other areas were neat and clean. An over two-year long effort for renovating all living units including asbestos abatement, new flooring, painting, furniture, fans for air circulation have been completed as of May 2021.  New furniture in the living unit day rooms is beginning to be installed. Three (3) living units have been complete and the eight (8) other units should be complete over the next few months.  There is new seating for the phone areas in all ten (10) units. The remaining two units are scheduled to be completed in August.  The renovation of a large school storage room into a new art room is complete with the exception of minor painting.  The new room will be used to provide a space to work with PSU on art therapy.

Defendants are continuing to prepare for the operation of on-site canteen including preparation of an on-site storage room with shelving; inventory tracking system; and installations of lockable cabinets in all twelve (12) living units.  Defendants completed installing sound reducing ceiling tiles in the Copper Lake School classroom to provide a more functional learning space. Although the installation of the ceiling is in place, there needs to be modifications (painting/decorating etc.) to the room to make it feel more school-like because it currently is quite sterile.

Defendants have constructed additional walls to expand the height of the unit safety booths to prevent youth from climbing and creating safety issues. Nine (9) units have been completed with plans to complete the remaining units in the next months. Additional modifications have been made to the lower day room offices to further prevent climbing. Additionally, Defendants addressed water issues at the facility including the repair of the water tower and well in May.

The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

<u>Education Observations</u>

Youth, teachers, and staff were present in the school area during this site visit.  There was a very positive atmosphere in the school and students and teachers alike seemed very happy to be there. Youth and staff complained that the school area is hot. Defendants are working on possible solutions. There were youth on work detail and in classrooms.  All COVID-19 educational protocols for the hybrid model which began in March 2021 reported in the last report remain the same this reporting period.  Defendants continue working on procuring an educational expert. The Monitor urges Defendants to move promptly on this. The youth and staff continue to be very happy to be back in the school area and off the unit for part of their educational hours as well as having teachers accessible on the units.  Youth in COVID-19 quarantine (Krueger) and youth in the Hughes Program (explained in more detail below) continue to have education on their living units.

The Monitor continues to recommend that the frequency of music, art, and recreation needs to increase.  The Monitor also recommends that these programs be equally available to the girls.  The Monitor also recommends that the girls' classroom be painted a brighter color and have more of a classroom feel.  The room is quite sterile and has an institutional feel.

There were three (3) graduations this reporting period. Educators continue doing professional development on a regular basis. LHS/CLS were recognized as the top participating site for the Unjammed Learning Network ("ULN")  program.

PbS data shows that educational hours have increased significantly during the April 2021 data collection period, 4.94 hours per day at LHS (weekdays) and 5.32 hours per day at CLS (weekdays). This reflects an increase of 1.19 daily average hours at LHS and 1.48 daily average hours at CLS compared to the October 2020 data collection cycle.  The Krueger Unit education hours remain lower than the other units at about 3.73 average hours per weekday which impacts the overall education hours reported. This is primarily due to the education program being done on the unit as part of the quarantine process. The new Hughes Program also has education occurring on the unit, but the average weekday average is much higher at 5.36 hours. The Monitor's observations during the most recent site visit reveals that the hours and quality of the education program has significantly improved as a result of the return to normal school operations.

As previously mentioned, the entire educational program at LHS/CLS still needs to be evaluated. The Monitor encouraged the Defendants to engage the educational consultant further and work to address the concerns raised – including the need for deeper and more meaningful teacher interaction with youth and enhancing/expanding the daily education hours. The Defendants are working on engaging a consultant and continue to work on the educational programming.

<u>Living Unit Observations</u>

The Monitor visited each cottage that youth were housed in during the site visit.  Overall, the units were generally clean. The youth rooms were a mix of clean and messy. Overall, the cottages and

youth rooms were not as clean/orderly as the last visit.

There were more than adequate staffing levels on each of the living units.  The unit populations ranged from five (5) to twelve (12) youth. There were at least three (3) staff on each unit. Although there were adequate staffing levels, staff overall were not engaged with the youth.  The Monitor also reviewed video during the reporting period to view day room activities, staff placement and staff engagement. In general, staff did not seem to be positioning themselves near the youth  nor was staff interacting with youth. Interacting and engaging with youth would help with creating a positive youth-staff relationship as well as increase safety for staff and youth.   All the youth that the Monitor interacted with were respectful and were more interested in interacting with the monitoring team, leadership of LHS/CLS, and Plaintiffs' counsel this visit than the last one.   The Monitoring team and Plaintiffs' counsel had an opportunity to talk to most of the youth present in the day rooms.

During this site visit, the girls were housed on the Wells cottage. One youth was in the sensory room with PSU staff, two (2) youth were cleaning, one (1) was doing laundry, one (1) youth was in her room, and one (1) was with a Foster Grandparent.  One youth who was in the day room was very upset.  Staff attempted to talk and de-escalate her. The youth on Wells were quieter/less engaged this site visit.  The rooms on the unit were clean and orderly.

With respect to the boys' cottages, generally, the cottages themselves were pretty clean. The units were calm. The Monitor did not observe any graffiti anywhere in LHS/CLS.  It is clear that the Defendants are continuing to monitor this closely and continue to do an exceptional job resolving this past issue.

In Black Elk, the entry way was very messy and had a very bad odor. The day room and the youths' rooms were very messy. This unit was the one that had been the cleanest unit during the last site visit. There were twelve (12) youth in day room doing unstructured activities such as cards, doing magic tricks, and talking.  Three (3) youth were voluntarily in their rooms. Youth were very talkative with the Monitoring team.  There were three (3) staff and one (1) nurse present.

The Curtis Unit was the cleanest unit.  The youth seemed happy and were talkative. There were ten (10) youth on the unit.  Seven (7) youth were in the day room getting ready to go Group and three (3) youth were in their rooms voluntarily.  There were three (3) staff present.

The Dubois unit was clean; however, most youth rooms were not clean. The youth were in the "free time" period of programming. The unit was calm. There were eleven (11) youth on the unit with six (6)  staff present- three (3) direct care staff, one (1) social worker, one (1) teacher, a Supervisor, and a PSU staff. The Growth team were conducting their weekly meeting on their unit. No youth were in their rooms.  Some youth were cleaning, some youth were talking with each other, one (1) youth was in his Growth Team meeting, and some were on the telephone.  Youth and staff were very talkative with the Monitoring team. Staff seemed to have a very good rapport with the youth on the unit. Staff were very engaged on this unit.

The Krueger unit is the new admissions/medical isolation/quarantine/observation  unit for the boys. The unit and rooms were very clean overall. There were five (5) youth and five (5) staff present on the unit (three direct-care staff and two mental health staff).    There was no activity on the unit

(even the television was turned off).

The Hughes unit has been modified to house youth who engage in physically aggressive behavior, present a danger to others, and/or exhibited behavior that caused a major disruption to the facility. The program is called the "Hughes Program" and was implemented on March 30, 2021. Youth housed on this unit have a "Supplemental Youth Plan" created by PSU in order to specifically address their behavior. Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team. The Monitor observed a growth meeting in progress. These meetings are very productive, and the Monitor was impressed with the team approach. There is a three (3) step process in which youth's participation/behavior will determine when they transition back to a general population living unit. Youth are not confined to their rooms when assigned to the program and are provided with additional on-unit programs and clinical services. Youth assigned to the program cannot go to the school area for education as all programs and clinical services are provided within the living unit due to the continued physical aggression and safety concerns that the youth present. Review of the unit activity logs comparing data between units, indicates that the Hughes program is providing the same average hours of education, programs, and out of room opportunities as the other general population units, with the exception of recreation time. Hughes youth are receiving approximately 10.95 hours per day of out of room activities, including education, programs, recreation, and leisure time, compared to 8.78 hours for youth assigned to the Krueger Unit. The Monitoring team offered suggestions to improving the program and provided examples of similar programs that can potentially be incorporated within the structure of current program to enhance the overall impact and potentially improve services and outcomes.

The Hughes unit was clean but most of the rooms were not clean. There were eleven (11) youth on the unit and four (4) staff present. The youth were rambunctious on this unit. The youth were sitting idle. There was no television on, no activities, and youth were cussing at staff.

In general, youth and staff attitudes were not as positive as during the last site visit- more negative and detached. There is still a need for more structured and meaningful activities as youth idleness remains a concern, particularly on weekends. Enhancing weekend activities and programs will help reduce the risk of youth engaging in anti-social behaviors when they have little else to do (like climbing on roofs, excessive horseplay, destroying property, and running around unauthorized areas). During previous site visits, the Monitor recommended creating and implementing a daily schedule to help with youth boredom and create opportunity for structured, meaningful programming and activities. Utilizing volunteers and other community organizations is good method for expanding weekend programs and activities. When looking at the PbS daily activity summary logs from the April data collection cycle, both LHS and CLS are averaging about 9.5 hours per day of "leisure activity" on weekends, compared to about 2.75 hours per day Monday-Friday. The "leisure activities" are long periods of time that are unstructured, mainly occurring in the dayroom areas. These are the periods in which most incidents of violence occur (PbS data reflects that 95% of all incidents occur on the living units). Of these, 225 incidents or 42%, occurred on a weekend. The incident report data also indicates that 239 incidents, or 45%, occurred between the hours of 8 A.M. and 10 A.M.(weekdays and weekends included). The Defendants have not fully implemented the daily schedule. There needs to be a focus on creating a daily schedule that provides for structured and meaningful activities and accountability in order to minimize the incidents of youth acting out.

Staff are still frustrated with what is perceived to be a lack of ways to hold youth accountable as well as a lack of incentives that will foster improved behaviors. Staff relayed concerns and frustrations with the behavior management system and stated that staff have simply "given up" trying to hold youth accountable.  As discussed below, however, staff as well as youth following the new system likely would increase safety for all. Staff are not enforcing the rules as a means to avoid confrontation with youth. This is all compounded by the fact that there are a significant number of new staff who are still developing their skills.  This in turn is creating a challenging and potentially unsafe environment for both staff and youth.

Although staff perceive a lack of ways to hold youth accountable, this seems to be due to restrictions on engaging in past practices such as confinement. Instead, Defendants are developing and implementing a new behavior management system, implementing DBT and have modified canteen privileges to encourage youth to behave on a daily basis. Improving the behavior management system, improving the rewards and incentives, and developing engaging programming will have a positive impact on the overall behavior and atmosphere issues that are driving the main issues that are frustrating both staff and youth.  Implementation of the new behavior management system is one of the most critical next steps for the agency and facilities.

<u>Youth Interviews</u>

Approximately forty-two (42) youth were interviewed prior to and during the site visit (formally and informally) by the Monitoring team and Plaintiffs' counsel.  Youth complained to Plaintiffs' counsel about staff using excessive physical force, being confined to their rooms on "observation status" which they believe is at times being used punitively, staff being too quick to go hands on before attempting to verbally de-escalate and experiencing racial discrimination  and racial comments from staff.  Some youth also complained about Zoom calls being taken away, about being subjected to group punishment even when they had complied with rules and orders and being bored. A few youth also indicated to Plaintiffs' counsel there may be other situations called 'modified programming,' that also involve room confinement.  There were more requests to talk to Plaintiffs' counsel while the Monitor was onsite talking with youth than during the last visit. Youth mentioned to Plaintiffs' counsel that they had asked staff to speak to Plaintiffs' counsel in the past but were told this wasn't possible. Defendants are working to inform staff of the proper protocols.

Youth also complained to the Monitoring team about long stretches of downtime, being bored, staff using more force than necessary, going hands on instead of trying to de-escalate, staff not engaging with them and not caring about them.  Youth complained about not going outside.

Youth did not complain about food, education, or being let out of their rooms to use the bathroom when needed. Youth did have some very positive things to say about certain teachers, a particular supervisor, and some direct-care staff.

The Monitoring team saw more idle/unstructured time both during site visit and while reviewing random sampling of video of living units.  The Monitor continues to encourage staff to engage youth in meaningful/structured programming and activities. This has been a consistent problem since the Monitor began monitoring these facilities.

The Monitor recommended in the last report that the Defendants should conduct Zoom calls in the visitation area to "normalize" visitation, have youth move off of units, and have a change of environment. The Defendants have since followed this recommendation. Defendants also created an outdoor visitation space which will be very enjoyable for families and youth when in-person visitation resumes in July.

There were instances in which there were sustained findings that staff had engaged in inappropriate behavior towards youth, but staff were only minimally held accountable for those violations (1 to 3-day suspensions) and allowed to continue to work with youth.  Defendants need to have zero tolerance for physical, sexual, or verbal abuse towards youth, and any staff who engage in such behaviors should not be permitted to work with youth.

The Monitor continues to recommend that the Defendants should take advantage of the reduced population by having the available staff in plan, prepare, and develop programs for youth. The Defendants need to focus on gender and culturally competent programming. Defendants should work to move forward with requirements to close LHS and move youth closer to locations where such programs and services are more widely available.

Staffing

During this reporting period (March-May), there have been some key staffing changes.  Key Positions hired during this reporting period are as follows: Deputy Superintendent, Safety Director, Youth Counselors and Nurse Clinicians.

Direct-care staffing vacancy percentage has increased from the last reporting period (*see below*). There are 311 total positions ("FTEs") at LHS/CLS.  Approximately 153 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA").  The teacher vacancy rate remains high (8 vacancies- similar to the that last two reporting periods). The Monitor encourages continuing to recruit teachers despite the reduced population and challenges with COVID-19.  Recruiting is still a challenge due to the location of the facility, overall teacher shortages, relatively low compensation, location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and the year-round school calendar and thus, hiring needs to continue.

| Position | Vacancy Rate % as of September 19, 2020 | Vacancy Rate % as of December 9, 2020 | Vacancy Rate % as of March 1, 2021 | Vacancy Rate % as of May 31, 2021 |
|---|---|---|---|---|
| Youth Counselor | 18.2% (21 out of 115) | 23% (27 out of 115) | 25% (29 out of 115) | 36% (41 out of 115) |
| Youth Counselor Adv. | 12% (4.5 out of 37.5) | 13% (5 out of 37.5) | 23% (8.5 out of 37.5) | 19 % (7 out of 37.5) |
| Teacher | 28% (7 out of 25) | 28% (7 out of 25) | 28% (7 out of 25) | 32% (8 out of 25) |
| Social Worker | 21% (3 out of 14) | 29% (4 out of 14) | 21% (3 out of 14) | 36% (5 out of 14) |

The Youth Counselor vacancies have increased during this reporting period, but Youth Counselor Advanced vacancies have decreased.  Although the overall vacancies of YC/YCA increased, staffing levels are adequate and meet legal requirements based on the reduced population that exists at LHS/CLS. The Defendants should continue to monitor employee leaves and scheduling to ensure staff are not overly mandated. The Defendants are working on modifying job descriptions, job postings, and interviewing techniques in order to attract and retain the best direct care staff.  It is critical that applicants have a clear understanding of their role at LHS/CLS.

The Monitoring team spoke to over thirty-three (33) staff. Staff morale seemed lower (although a large majority were still in good spirits) this site visit.  With the exception of the Dubois unit, staff were less engaged with youth and seemed frustrated and defeated.  Staff continued to complain that there were less punitive "tools" available to manage behavior, no consequences for youth behavior, and staff shortages. The implementation of DBT and other best practices will improve safety for staff and youth.  Staff expressed their desire to have DBT for themselves. The Monitor observed several very good interactions with youth by staff and there are many committed staff who truly enjoy working with youth.

The PbS data for April 2021 reveals an increase in staff fear for safety concerns as well as an increase in staff perceptions regarding how dangerous the facility is based on input taken from the Staff Climate Surveys.  Both of these outcome measures reflect increases in fear for safety concerns over the previous October data collection cycle. Fear for safety indicators at LHS was at 76.79% and at 86.84% at CLS.  Both are increases from the October 2020 data cycle.  Both indicators are also significantly above the national field average of 24.43%.  This data certainly supports the staff and youth feedback that was provided to the Monitor during the site visit.  The Defendants recently created a position that will have staff wellness as one of the main focuses.  The Monitor looks forward to working with the individual selected.

Defendants continue to work on increasing staff morale but have much more work to do. Defendants have done the following to increase staff morale:

- In March DJC handed out snacks including cheese sticks, jerky, chips, etc. to staff on various occasions making sure to include all shifts.

- In April DJC staff wrote out inspirational messages and made care packages to send to Anamosa State Correctional in a pay-it-forward effort when two staff from that facility were killed as the result of an inmate attack.

- For Memorial Day DJC management and supervisory staff along with the CASH committee organized an ice cream sundae social for all staff and all shifts on May 26, 2021.

- For Correctional Employee Appreciation Week, there were snacks, food, and gift giveaways each day

The Monitor recommended various tools that can assist with this, including staff taking ownership with creating a safe environment by building rapport with youth, ensuring order on the units, creating meaningful activities for youth, utilizing DBT, staff positioning, and consistent and fair

programming and treatment of youth, to name a few without reverting to the kind of inappropriate punitive and excessive behaviors that occurred in the past.

Agency and facility leadership also should make it a point to review the PbS data with staff at all levels, perhaps during monthly all staff briefing meetings.  This is an opportunity to show the positive outcomes being achieved through the various changes and efforts to reduce incidents of violence, confinement, and use of restraint.

The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives, changes to programming, and general information.  A major component of staff wellness is ensuring staff feel as safe as possible.

<u>Youth in Custody Practice Model ("YICPM") Update/ Dialectical Behavior Therapy ("DBT")</u>

DJC is continuing in the next phase of participation with YICPM by working with the principal investigator from Georgetown University. On May 18, 2021, the Assistant Administrator, CLS/LHS Superintendent, Program and Policy Chief, and a CLS/LHS Program and Policy Analyst met to review the YICPM Data Component spreadsheet. The focus of the meeting was to begin to review the spreadsheet with the specific data components listed and identify if information is tracked, and if so, who could provide the information. The group continued reviewing the spreadsheet at their most recent meeting on June 8, 2021.

Since the close of the last reporting period in February, training for direct care staff was completed to provide DBT Skills Coaching. On March 22, 2021, Defendants launched DBT Skills Groups co-facilitated by treatment and PSU staff while structuring the opportunity for safety (YC) staff to first engage as a "learner" in support of group dynamics and skill acquisition. Facilitators have been participating in weekly consultation meetings to support ongoing development and continuity across the facility. To date, youth and staff have reviewed specific distress tolerance, mindfulness and emotional regulation skills.

Starting in April, youth arriving at LHS have been introduced to group expectations, core DBT concepts, and opportunities for mindfulness during pretreatment group sessions to help them successfully transition to their assigned unit. During this time, youth also begin discussions with social services staff to guide them in identifying initial Growth Plan goals, and they learn about Stage Progression and Program Point expectations. The youth is introduced to Growth Teams as a resource to help them set goals and overcome challenges which OJOR considers in release planning discussions. To enhance multidisciplinary understanding and application, DBT Skill of the Week highlights have introduced leaders and staff teams to the skills that the youth will be learning in the coming week. Mindfulness activities have also been strategically integrated into leadership and staff meetings as a means to build comfort and skill mastery in support of facilitation with youth.

As Defendants continue to transition away from a correctional model and engage all staff in a treatment paradigm, Defendants reconnected with a YICPM subject matter expert to provide Foundations of Treatment training for all safety staff across three half-day rotations in May. To reinforce understanding and capacity for the System of Care efforts, topics included research on

rehabilitative models, foundations of safety, the functions of behavior, communicating for change, reshaping, relationships, youth developmental needs / the domains of wellbeing, and techniques for staff interventions- "I" statements, circle ups, acknowledgement *etc.* These areas were identified to augment the support provided by Dr. Chapin during this initiative. Once DBT is fully integrated into the programming, there should be improvement in many facets of the daily operations of LHS/CLS as well as a significant reduction in actual and perceived safety concerns.

Quality Assurance ("QA")

Defendants launched their Quality Assurance Review (QAR) process in August 2019.  During this reporting period, a Guardian Workgroup was commissioned. The first meeting of the group focused on updating the current draft electronic rounds tracking policy with an aim of answering outstanding questions, updating language to align with current practice, and ultimately moving the policy to a final draft stage for review by facility managers. Several sections of the Guardian (rounds tracking system) policy were identified for a full re-write.  During the second meeting, a discussion was commenced regarding how to effectively and efficiently train new academy staff on the Guardian device, and also how to identify and assist staff who either ask for, or are identified as needing coaching, mentoring, or retraining on utilizing the Guardian device to its full effectiveness. The next scheduled meeting of the Guardian Workgroup occurs the first week of July, so the effort to continue to refine the process for utilizing Guardian for youth safety checks and front-line data gathering also remains ongoing at the time of this report.

Facility Improvement Plan ("FIP") Progress

A thorough and in-depth review was conducted of the April 2021 PbS data collection for both LHS and CLS.  During the review, outcome measure data clarification and input was sought from both the facility PbS State and Site Coordinators and the assigned PbS Coach.  As a result of the review, the following highlights and outcomes are noted:

PbS Data Quality – In previous reports, some issues were identified as to the quality of the data entered for some outcome measures, including outcomes measuring around daily activity durations. Through the review of the April data reports, the Monitor is pleased to report that those issues appear to have been resolved and the data appears to be much more accurate.  More importantly, the Guardian RFID system continues to be used to record much of the data inputted for the daily Unit Log activity data.  This continues to permit the facility to more accurately report the daily activity for all youth, including education, facility programs, recreation, leisure time, "in sleeping rooms" (room confinement), and finally sleeping time. Using the Guardian RFID system continues to allow for the tracking of daily activity over the entire data collection month and is providing much more accurate data than was previously being collected.  With the improved data collection, there is a better sense of the progress being made.  Before the Monitor begins to outline areas for improvement, it is important to recognize the efforts and positive steps forward in regard to the quality of the PbS data and the overall progress in many of the outcome measures.  It is important to remember that PbS is a "continuous facility improvement program," therefore overall progress is measured over the period of years and numerous data collection cycles.  PbS is a snapshot taken twice a year, during the April and October data collection cycles and, therefore, may not match the three (3) month (March, April, and May) data covered during this reporting period.  The overall outcomes for each may or may not differ depending upon variables. The trendline of the outcome

measures is what is most important as it reflects the direction of the facility over time. The April data clearly shows some positive progress trends moving in the right direction for many of the outcome measures with some having moved in a negative direction. This is expected given the complex operational changes occurring within the culture and atmosphere of the facility.

It is also important to note that both the April 2021 data collection took place as the facility was beginning to return to normal operations after the pandemic, which certainly made facility operations much more challenging, particularly around the issue of reducing "operational" room confinement. As mentioned previously in this report, the issue around youth idleness, behavior accountability, and staff wellness and fear for safety remains a concern and is reflected in many of the outcome measures.

With all that said, there are a couple of outcome measures that warrant attention. First and foremost, is what is unquestionably a continued high rate of "self-requested" confinement. This remains an issue from the April and October 2020 data cycles and continues into the April 2021 cycle with some progress of improvement being recognized. The data reflects 715 incidents of confinement use during the month of April 2021 (610 @ LHS and 105 @ CLS). Of these, there were a total of 621 for self-requested confinement, representing 87% of all confinement for the facility during the month.  Program refusals typically result in room confinement, which is a violation of the Court Order.  On one hand, this is a positive as very little confinement is a result of behavior issues. On the other hand, it is also a reflection of the culture, atmosphere and environment which results in such self-selected confinement. Focusing on improvement on these particular areas of confinement will certainly have an immediate and positive impact on reducing overall confinement numbers.

Additionally, the previous reports discussed that the unit activity record for the Krueger Unit reflected that youth were spending approximately 20.64 hours per day in their rooms (10.5 hours reflected as sleeping time and 10.14 hours reflected as "in sleeping rooms," room confinement). The activity log for the Krueger Unit also did not reflect any hours for education.  This issue seems to have been resolved.  The April 2021 data shows Krueger youth spending approximately 11.87 hours in their rooms for "sleeping" time and 0.63 hours in their rooms for other reasons.  Education hours for Krueger youth increased to approximately 3.73 hours per day (weekdays) and leisure activity time decreased to 4.20 hours per day. This represents a larger portion of their day that is spent in more meaningful activities such as education. While the Monitor recognizes these improvements, it is necessary for the facility to provide more meaningful programs and activities to youth during the leisure time periods.

Finally, the Monitor encourages the facility to closely review all of the PbS data and outcome measures as a means to better understand the impacts generated from the many changes occurring within the facility.  Agency and facility leadership should make it a point to review the PbS data with staff at all levels, perhaps during monthly all staff briefing meetings.  This is an opportunity to show the positive outcomes being achieved through the various changes and efforts to reduce incidents of violence, confinement, and use of restraint. Much work remains to be done.  The data shows fluctuating trend lines, some moving in the right direction, while others are not. These fluctuating trends can and should be expected as staff and youth adjust to the ever-changing behavior response techniques and the skill level of staff in utilizing various training, de-escalation techniques, and, as discussed earlier, in the full implementation of the behavior management

system.

**PbS Critical Outcome Measures Review:**

Use of Restraint Outcome Measures - Both LHS and CLS show "0" incidents of use of chemical agents (Order 6) during the April 2021 data collection cycle, which is commendable and per the Settlement Agreement.  The rates of physical restraint use (Order 3 – Physical Restraint Use per 100-person days of confinement) at LHS and CLS declined during this data cycle but remains above the national average, as does the rate of mechanical restraint (Order 4 – Mechanical Restraint use per 100-person days of confinement) usage incidents.  Both facilities experienced the fewest mechanical restraint usage during this period compared to prior data collection cycles and this points to a changing culture in how staff are responding to youth behaviors.  However, physical restraint usage, especially at CLS, is still very high and does tend to confirm the youths' complaints that staff frequently go "hands on. In addition, there is a relatively high rate of youth injury by staff in CLS, which also seems to support these concerns.

As mentioned earlier, PbS is a continuous facility improvement process which involves complex operational issues.  The following two charts reveal that overall, the trends lines for both physical and mechanical restraint use has returned to the average levels from the October 2020 spike, and now appear to be trending the right direction.  It is normal to see fluctuation in this type of data and the October spike is most certainly related to temporary operational changes that were in place as a result of the pandemic.   Improvement in reducing youth idleness with meaningful programs and activities along with an improved behavior management program, can have a significant impact on these outcome measures.

## Order 03

Physical restraint use per 100 person-days of youth confinement.



(Note: PbS defines Physical Restraints as facility authorized and trained holds used by staff to subdue an otherwise uncontrollable youth in order to prevent the youth from injuring him or herself, or others.)

## Order 04
Mechanical restraint use per 100 person-days of youth confinement.



(Note: PbS defines Mechanical Restraints as Mechanical Devices used to prevent an uncontrollable youth from injuring him or herself or others. Mechanical restraints may only be used for short periods of time and must be used under medical supervision.)

The previous Monitoring reports discussed issues around the reduced use of the Care Teams which had resulted in a higher number of restraint-usage incidents.  Given the positive reductions in the use of physical and mechanical restraints during this PbS cycle, it appears the heightened focus on Care Teams has had a positive impact.  Care Teams are designed precisely to reduce the need for the use of restraints and have been effectively shown to work at facilities across the country and have been shown to be effective at LHS and CLS as well. The Agency and facility should continue to expand the use of the Care Team concept and ensure that direct care staff are training to properly use the Care Team as a de-escalation and use of restraint avoidance response.  It is critical that direct care staff develop skills around total awareness in order to recognize the early signs of pending behavior and incidents in order to engage the Care Team members at the earliest possible opportunity.  This in turn increases the opportunities for de-escalation and resolution of situations without the use of restraint. Care Team members should not be involved in the use of physical restraint of a youth except in exceptional situations and only to protect the safety and welfare of others as this is counterproductive to the concept and does not permit the youth to begin de-escalating if they believe the Care Team member may still use physical force against them.

The Defendants should continue to implement the core principles of the Care Team model by utilizing

an agency strategic plan process that involves additional staff training in de-escalation techniques; include Care Team deployment information in shift debriefings in order to review the process and provide on-going situational training for staff;  implement a Care Team response incident report that also reflects the outcome of the response in order to better track outcomes from Care Team deployments; implement the S.O.D.A.S model (Situation, Options, Disadvantages, Advantages, Solution) into the Care Team model; and, finally, the facility leadership team should incorporate daily/weekly review of all use of force/restraint incidents to evaluate if and when the Care Team should have been activated to help de-escalate a situation.  This should be used as a staff training and awareness process to help staff build new skills and to help change their mindsets in how they first react to certain types of youth behaviors.

Isolation, Room Confinement and Segregation Measures – Overall, the PbS outcome measures around isolation and room confinement remained unchanged from the October 2020 PbS data collection cycle, reflecting that 100% of room confinements are terminated in under eight hours at CLS and 94.12% at LHS, although the LHS rate was slightly, but not significantly less than the October 2020 rate.  Slightly fewer incidents of room confinement are terminated in under four hours at CLS, 88.89%, while the same rate holds at LHS at 94.12%. These are both very commendable achievements, and both are better than the national field averages for these outcome measures. Order 13 – Isolation, room confinement use for reasons other than behavior reflects increases at both LHS and CLS for this data period over prior reporting periods, this may be a result of the increased use of "observation status" confinements.   This issue needs to be reviewed more thoroughly to better understand the overall impact and duration data of these confinements.

It should also be noted as to the improved outcomes and reduced rates of initial room confinement placements during the April data cycle. Both facilities showed reduced incidents of confinement practices, with LHS dropping below the national field average.

## Order 08

Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement.



(Note: PbS defines confinement as any instance when a youth is separated from the youth population and placed in a room or cell alone for 15 minutes or longer. Youths are considered to be confined from the moment they are separated from others until they have rejoined the population. Youths may be transferred to a designated unit for confinement (e.g., a segregation dorm or program separation unit). Confinement may occur in locked or unlocked rooms but cannot occur in large dormitories. Any instance of confinement of 15 minutes or more is a reportable PbS incident event.)

As discussed earlier in this report, there remains an issue around Order 13 – Isolation, Room Confinement for reasons *not related to behavior*. These appear to primarily be incidents where youth are refusing to participate in programs and education. As you can see from the following chart, self-requested involves 92% of the non-behavior related confinement incidents at LHS and 55% of confinement incidents at CLS. While the use of room confinement for "self-requested" declined from the October 2020 data cycle, it still remains a very high percentage of confinement usage. This continues to be a reflection from the overall behavior management system and lack of appropriate use of incentives and rewards. Youth continue to refuse to go to school and elect to remain in their rooms and, often simply watch TV all day. Facility staff need to focus on youth engagement or re-engagement strategies as well as the behavior management system in order to get youth to participate in programs. The use of room confinement for "mental health" related issues rose significantly CLS during the month of April, rising from 11 incidents in October 2020, to 38 this period. This represents 36% of the room confinements at CLS. The Monitor suggests that the facility and clinical staff review these confinements to evaluate their appropriateness and justification in both LHS and CLS.

| Why confinement was used | Lincoln Hills | | Copper Lake | |
|---|---|---|---|---|
| Value | Count | Percent | Count | Percent |
| Self-requested | 563 | 92% | 58 | 55% |
| Mental Health | 27 | 4% | 38 | 36% |
| Protect other youths or staff | 17 | 3% | 9 | 9% |

The PbS Incident reporting data for April 2021 reflects the following important data points:
➢ 95% of the incidents occurring at CLS occurred in the living unit.
➢ 79% of restraints use at CLS involved the same two youth.
➢ Zero incidents of injuries to youth from suicidal behaviors were reported.
➢ 95% of the incidents occurring at LHS occurred in the living units.
➢ 27% of the incidents occurred in the DuBois Unit (136 total incidents).
➢ 26% of incidents occurred in the Curtis Unit (130 incidents).
➢ 42% of the recorded incidents at LHS occurred on a Saturday or Sunday when there is significantly less activity.

## Safety 05

➤ Injuries to youths by staff per 100 person-days of youth confinement.



## Safety 06

Suicidal behavior with injury by youths per 100 person-days of youth confinement.



While there appeared to be a substantial increase in suicidal behavior with injuries, Safety 06 at CLS during the October 2020 data cycle, review of the actual data revealed that the number of incidents had declined over the last three data collection cycles.  It should be noted that due to the

lower population of CLS, each incident has a major impact on the overall rate, which is the measure against the field average. The total number of these incidents during the October 2020 data cycle was five (5), a drop from eight (8) similar incidents during the April 2020 data cycle. The facility recorded "0" such incidents during the April 2021 period.

**LHS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 503 | 95% |
| No | 27 | 5% |

**CLS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 72 | 95% |
| No | 4 | 5% |

**LHS Incident location (living units):**

| Value | Count | Percent |
|-------|-------|---------|
| DuBois | 136 | 27% |
| Curtis | 130 | 26% |
| Black Elk | 113 | 22% |
| Hughes | 78 | 16% |
| Krueger | 33 | 7% |
| Roosevelt | 12 | 2% |
| Rogers | 1 | 0% |

**CLS Incident location (living units):**

| Value | Count | Percent |
|-------|-------|---------|
| Wells | 71 | 99% |
| King | 1 | 1% |

Youth and Staff Climate Surveys – Both youth and staff appear to be more responsive in utilizing the youth and staff climate surveys. It is strongly recommended that both department and facility leadership take the time to thoroughly review the agency/jurisdiction count summaries for both the youth and staff climate surveys. The results can be very insightful and useful for leadership. Below

are some of the survey results;

**Staff Climate Survey Results:**

**Within the last six months, have you feared for your safety in this facility?**

| Value | Count | Percent |
|---|---|---|
| Yes | 119 | 79% |
| No | 31 | 21% |
| Not recorded | 1 | 1% |

**How safe or dangerous do you feel this facility is for staff?**

| Value | Count | Percent |
|---|---|---|
| Unsafe | 68 | 45% |
| Very dangerous | 56 | 37% |
| Safe | 20 | 13% |
| Very safe | 6 | 4% |
| Not recorded | 1 | 1% |

**In your opinion, what would make this facility safer?**

| Value | Count | Percent |
|---|---|---|
| More staff | 120 | 79% |
| Safety equipment | 82 | 54% |
| Training | 64 | 42% |
| Other | 62 | 41% |
| Less overcrowding | 13 | 9% |
| Not recorded | 4 | 3% |

In regard to the above chart, the following are the top ten most requested training that staff felt would make the facility safer:

**What training would you like to see?**

| Value | Count | Percent |
|---|---|---|
| Safety and security | 78 | 52% |
| Agency policies and procedures | 63 | 42% |
| Verbal de-escalation | 60 | 40% |
| Communication | 60 | 40% |
| General behavior management | 57 | 38% |
| Appropriate staff/youth relationships | 56 | 37% |
| Gang training | 55 | 36% |
| Ethics | 54 | 36% |
| Adolescent development | 53 | 35% |
| Cultural diversity and awareness | 47 | 31% |
| Incident reporting | 43 | 28% |
| Appropriate use of restraints | 40 | 26% |
| Use of isolation | 40 | 26% |
| First aid, CPR, AED | 34 | 23% |
| Cognitive behavior programs | 30 | 20% |
| Juvenile rights | 30 | 20% |
| Aggression Replacement Therapy (ART) | 27 | 18% |
| Suicide prevention | 25 | 17% |
| Not recorded | 25 | 17% |
| Fire safety | 23 | 15% |

**April 2021 PbS Staff Climate Survey Results:**

➢ **79% of staff responses reported they fear for their safety;**
➢ **82% of responses reported they believe the facility is unsafe or very dangerous;**
➢ **84% of responses indicate that staff believe they do not have authority to discipline youth appropriately.**
➢ **70% of staff report that they value family members and youths' social supports as**

**partners in their work with youth.**

**Youth Climate Survey Results:**

**Do you fear for your safety in this facility?**

| Value | Count | Percent |
|---|---|---|
| No | 27 | 68% |
| Yes | 11 | 28% |
| Refuse to answer | 1 | 3% |
| Not recorded | 1 | 3% |

In comparison, the youth fear for safety measure, Safety 13, has steadily improved from the previous data collection cycles.  The rate still remains higher than the national field average but is improving.

**Within the last six months at this facility, have you had personal property stolen directly by force or by threat?**

| Value | Count | Percent |
|---|---|---|
| No | 29 | 73% |
| Yes | 9 | 23% |
| Refuse to answer | 1 | 3% |
| Not recorded | 1 | 3% |

**Do staff members show residents respect?**

| Value | Count | Percent |
|---|---|---|
| Sometimes | 18 | 45% |
| Yes | 11 | 28% |
| No | 10 | 25% |
| Not recorded | 1 | 3% |

**Are the staff good role models?**

| Value | Count | Percent |
|---|---|---|
| No | 18 | 45% |
| Sometimes | 12 | 30% |
| Yes | 9 | 23% |
| Not recorded | 1 | 3% |

**Do staff here respect your traditions, beliefs and culture?**

| Value | Count | Percent |
|---|---|---|
| Yes | 16 | 40% |
| No | 11 | 28% |
| Sometimes | 10 | 25% |
| Not recorded | 2 | 5% |
| Refuse to answer | 1 | 3% |

**16a. If yes, approximately how often do you talk on the phone with your parent and/or guardian?**

| Value | Count | Percent |
|---|---|---|
| 5 or more times per week | 25 | 66% |
| 3 - 4 times per week | 7 | 18% |
| 1 - 2 times per week | 5 | 13% |
| Once a month | 1 | 3% |

➤ 67% of youth reported that they were involved in the development of their treatment plans;

➤ 78% reported that they understand the level, phase or points system;

➤ 75% reported they have not received a family visit.  (It should be noted that the pandemic and restrictions around visitation impacted these results.  The facility did increase the use of technology for video visitation, but these appear to have also declined over recent months.)

➤ 28% of youth responded that staff show residents respect and only 23% of youth responded that staff are good role models. These are both increases from the previous reporting period. Both are still very concerning and may also suggest the need for better staff training, including cultural diversity training.

The larger PbS Workgroup met in January to review the current FIP and discuss updates and action steps. Based on some of the outcomes highlighted in this report, it appears many of the FIP action steps taken during this reporting period have had a positive impact.

It is further recommended that the agency, facility and the PbS team members spend considerable time reviewing the PbS Blueprint Domains, particularly those domains focused on Order; Programing, and Safety. Much can be learned from review of these outcome domains and the data associated with them, in particular those focused on youth and staff relationships.

Policies and Procedures/Administrative Code Update

The below policies, procedures, and Administrative Code sections have been completed during this reporting period:

Policies Completed
Searches of Youth *(March 16, 2021)*
Security Inspections and Searches of Facilities *(March 16, 2021)*
Use of Force *(March 16, 2021)*
Performance-based Standards *(March 16. 2021)*
Control of Water Supply to Units *(October 9, 2020)*

Procedures Developed
*1. Searches of Youth*
*2. Room Confinement*
*3. Security Inspections and Searches of Facilities*
*4. Control of Water Supply to Units*
*5. Performance-based Standards*
*6. Use of Force*
*7. Room Confinement (Administrative Confinement)*

Administrative Code
DOC Chapter 376- the Scope Statement has been amended seeking to repeal DOC Chapter 374 as part of the 376-re-write approved by the Secretary's Office and submitted for Governor approval.

DOC Chapter 373- Continuing to draft with the drafting team meeting weekly to plan and adopt language consistent with the System of Care Overall. However there need to be clear and expedited timelines for finishing these revisions and finalizing these rules

**COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION**

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

1.    Punitive Confinement.

   a.    Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Youth have stated to Counsel and the Monitoring team that they have been confined for several days on "observation status" but felt it was being done for punitive reasons.  The use of observation status has increased during this reporting period.  It appears some of the confinement should have been AC- not observation status or combination of both. Data does not indicate that youth are being confined for seven days or for punitive reasons however, Defendants need to re-examine the use of "observation status" to ensure that staff are not using this as a form of punitive confinement.**

   b.    Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth have stated that to Counsel and the Monitoring team that they have been confined for several days on "observation status." The use of observation status has substantially increased during this reporting period. It appears some of the confinement should have been AC- not observation status or combination of both. Data does not indicate that most youth are being confined for three days or for punitive reasons however, Defendants need to re-examine the use of "observation status" to ensure that staff are not using this as a form of punitive confinement.**

   c.    Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth have stated to Counsel and the Monitoring team that they have been confined for long periods of time. The use of observation status has increased during this reporting period. It appears some of the confinement should have been AC- not observation status or combination of both. Defendants need to re-examine the use of "observation status" to ensure that staff are not using this as a form of punitive confinement.**

**The Monitor, counsel for Plaintiffs, and Defendants discussed Administrative Confinement/Observation Status and a plan is in place to change how these confinements are being utilized and ensuring compliance with this Court Order. The Monitor previously recommended establishing clear criteria for administrative confinement so that staff cannot**

**punitively confine youth and cannot confine youth for more than 24 hours if they do not pose an imminent danger of harm to themselves. The Monitor reiterates this requirement. By establishing clear and objective criteria, leadership can ensure that youth are not punitively confined or subject to harmful isolation beyond the periods prescribed by this Court order.**

2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of AC was significantly lower for LHS youth this reporting period (March-April). The use of AC in CLS increased from last reporting period. However, as previously indicated, confinement on observation status has increased this reporting period. The Monitor is unable to determine whether observation status being properly utilized and whether this data is therefore accurate.**

**December 2020**
**CLS: 10 uses of AC**
**LHS: 88 uses of AC. Average of 117 minutes. 6 youth over four hours.**

**January 2021**
**CLS: 0 uses of AC**
**LHS: 40 uses of AC: Average of 117 minutes. No youth over four hours**

**February 2021**
**CLS: 0 uses of AC**
**LHS: 9 uses of AC. Average of 74 minutes. No youth over four hours**

**March 2021**
**CLS: 9 uses of AC. Average 74 minutes. No youth over four hours**
**LHS: 19 uses of AC. Average of 125 minutes. 1 youth over four hours.**

**April 2021**
**CLS: 4 uses of AC: Average of 142 minutes. No youth over four hours**

> **LHS: 16 uses of AC: Average of 141 minutes. No youth over four hours
> (4 youth exactly at four hours)**
>
> **May 2021**
> **CLS: 2 uses of AC: Average of 113 minutes. No youth over four hours**
> **LHS: 15 uses of AC: Average of 140 minutes. Two (2) youth over four hours**

**PSU clinicians document an overview of the intensive mental health services in J- Tracker and on EMR. The overarching goal of providing intensive mental health services is to safely reintegrate the youth back into the general population immediately after placing the youth on AC and to maintain youth success while off AC. The IMHS developed for a youth reintegrating from AC, are repeatedly re-evaluated and adjusted as needed.**

**Each youth on AC already has a youth plan (previously called Behavioral Management Plan BMP) developed collaboratively between PSU and the youth. These plans are preventative as they outline youth triggers, self-soothing strategies, and highlight treatment issues. These plans also provide input into the development of effective mental-health services to be provided to the youth while in AC. This youth plan is also consulted when developing a specific treatment plan for AC-specific intensive mental health services. It, along with the Guidance document, guides the collaborative effort amongst various staff to provide youth with immediate and comprehensive mental-health services while on AC. Defendants need to ensure that the staff on the units review these plans in order to safely manage youth.**

**While the SYC notifies PSU soon after the youth is placed in AC, the SYC and YC may reference the youth plan to incorporate the recommendations of PSU to de-escalate agitation. As soon as possible, SYC contacts PSU. When PSU is contacted, the PSU clinician reviews the mental health needs of the youth. This aids in the first determination of whether AC is contraindicated. PSU provides immediate consultation and treatment recommendations to the SYC. By the two-hour mark, the PSU clinician begins a risk assessment if the youth is unresponsive to the initial treatment and have not reintegrated back into general population. PSU clinicians collaborate with the Safety staff and continue to evaluate youth response to services. During youth interviews with Plaintiffs' counsel, youth have indicated that there is very little interaction with PSU.**

**The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit. Majority of checks (over 98%) were completed within 30 minutes. The Monitor reviewed video footage for random days and times and there were several instances in which staff did not complete the checks in compliance with policy (not ensuring they are looking into youth rooms to ensure youth are safe). Defendants already had a directive created to remind staff to properly conduct safety/wellness checks while youth are in room. Policy and procedure and a quality assurance review process needs to be implemented, and documentation needs to be streamlined.**

> a. Administrative confinement may be extended four hours with one
> additional four-hour extension thereafter (for a total of up to 12 hours)

when:

    i.       A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were three (3) youth confined for over four (4) hours during this reporting period (March-May 2021) (see response in previous question). All of the confinements were recommended by PSU. "Intensive treatment" provided to the youth included: completing thinking reports, discussing alternative, making safety plans, engaging the youth in mediation, reviewing motivations, and reviewing coping strategies.**

**Defendants need to continue to focus on reducing AC overall, ensuring for any form of room confinement they are following this Court Order, draft policy and procedure with AC placement criteria, and continue to QA this data. As previously discussed, observation status where there is confinement needs to be looked at very closely to determine whether it is appropriate or whether observation status is being used as a substitute for punitive confinement or administrative confinement.**

    ii.      A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no AC placements that were extended. There were no transfers as a result of extended placements in administrative confinement. Defendants need to improve their quality of data and documentation with respect to the "commenced plan" and incorporate the Court Order into policy and procedure.**

    b.   Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 P.M. to 8 A.M.**

    c.   Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no instances in which a youth was confined for over 24 hours. Once incorporated the Court Order into policy and procedure, Defendants will be in substantial compliance.**

    d.   The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others

and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

3.      Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 was updated. The plans developed are very detailed and comprehensive. Discussion and clarification have occurred surrounding observation status during this reporting period. The Monitor will update the court on implementation of the changes in the next report to the Court. Although this provision of the Court Order only allows confinement under the observation policy for youth at "imminent" risk of "serious" "self-harm," It appears that it may be used (or continued) when the harm is attenuated, not imminent and when risk was posed to others. Also, it may be used or continued when the risk of harm is not "serious." A robust conversation with Plaintiffs' counsel and Defendants occurred during this reporting period. However, more conversations with the Parties need to occur as the Monitor does not think there is a meeting of the minds on observation status.**

4.      **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a.      Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As previously stated, the Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed on renovated units.**

**The Monitor did observe rooms with multiple blankets/sheets covering large areas of the room. Staff can clearly see into youth rooms now that the windows do not have etching and are not covered by paper/pictures. Room searches have occurred during this reporting period. Youth rooms in general, were not as clean and organized. Many rooms had several blankets, sheets, and other items that could pose a safety risk due to the volume of items in the rooms. Also, the Monitor reviewed video of staff completing safety/welfare checks, and several were not in compliance with policy and procedure. Staff need to make sure they are looking into each room to make sure they have a visual on the youths' faces.**

As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly.

> b.   Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, hygiene supplies, or nighttime toilet usage. If Defendants improve their quality of data and documentation, and incorporate the Court Order into policy and procedure, they will be close to reaching substantial compliance.

> c.   Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible.  PSU interventions during this time shall not consist only of conversations with youth through a locked door.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification.  The crisis intervention technique is being documented.  Clinicians are on-site for a minimum of 6 hours each Saturday and Sunday and the majority of this time is spent meeting directly with youth. The Defendants have hired two new PSU staff.   The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours in order to engage youth in a meaningful way during this time.

A quality assurance program needs to be developed. The Monitor suggests that the Defendants consider implementing the mental health expert's recommendations to further develop the mental health program/integration at LHS/CLS.

> d.   Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1 , MH-2a, MH-2b, or ID), placements in room confinement will be reviewed

by a PSU staff member to determine whether that placement is a contraindication to the youth's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation/data shows that evaluations are completed and within 24 hours after being placed in room confinement. There were no instances of contraindication documented during this review period. PSU clinicians developed a protocol for on-call situations. Each primary PSU clinician reviews the record, assesses the risk and designates whether the risk is low, medium, or high. The risk factors considered are supported by the literature on isolation and confinement. This determination is recorded in the mental-health caseload report which is accessible to all of PSU clinicians. The on-call PSU clinician uses this risk level determination and considers the input from the SYC placing the youth in confinement to make a determination whether the placement (each time) will be deemed contraindicated.**

e. Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE: Defendants are over 98% compliant with meeting the thirty (30) minute safety and security check timeframe. QA program has been developed. Quality assurance measures are in place and when necessary, formal investigations occur. There were five (5) Letters of Expectations given to staff who did not complete safety/security checks per policy during this reporting period. As previously mentioned, Defendants issued a directive to remind staff to complete checks according to policy with available training if necessary. The Monitor observed safety/wellness checks being completed on various days/times during this reporting period and observed instances in which staff did not make visual contact with youth. PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor saw several PSU staff on the units during this site visit.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

f. Any youth in room confinement shall have property items similar to

or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth.  A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Property restrictions are most commonly applied by PSU for safety reasons, however forms and process for documenting any potential property restrictions need to be created and utilized. Once Defendants make these improvements, they will be in substantial compliance.**

g.   Youth in room confinement shall receive:

1.   All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Social worker visits, mental health services, and other health services are provided in general.  The on-call PSU clinician communicates to all the PSU clinicians through email that a youth has been placed on AC. This allows the primary clinician to provide consultation and direction as to how to return the youth to a baseline, self-regulated state. The primary clinician consults with the on-call clinician and with the SYC/YC/CUS/SW staff regarding specifics ways the youth plan addresses the issues at hand and how it can be adopted when the youth is on AC. A PSU clinician follows up in the absence of the primary clinician and/or the crisis clinician. PSU collaborates with the SYC and direct staff. PSU also meets with the youth while they are on AC and through a follow-up session. The social worker and youths' meeting schedules are individualized. Therefore, as is the case with any arising short-term scheduling conflicts (e.g., court, medical needs, OJOR, AC etc.) the social worker works with the youth to identify availability if an AC placement occurs during regularly scheduled meeting. The AC placement also provides an opportunity for the social worker and the youth to review AC placement as outlined in a new J-Tracker form. With shared awareness around AC placement, Social Workers are positioned to incorporate cognitive-behavioral or motivational interviewing practices in revisiting goals from the Youth Growth Plan.**

**Documentation, quality assurance, and policy and procedure need to be improved/completed. A review of the social worker roles and responsibilities need to be assessed and Defendants need to evaluate how they are using social workers to ensure they are being advocates for the youth.  Defendants need to ensure there is accountability with respect to the services provided by the social workers.**

ii.   Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. During the pandemic, Defendants moved to smaller-group based treatment to youth where group participation was provided on the units. This continues. Treatment programming for youth never ceased due to COVID-19 precautions, but the size of the groups was modified to accommodate safe social distancing measures and keep youth who shared a living unit assignment in groups with one another. Beginning in March, some housing units now utilize the school for their group treatment sessions as determined by their respective living unit's weekly schedule.  The Monitor encourages these groups to occur off of the living unit as much as possible especially now that COVID-19 numbers have significantly reduced, and programming is being more normalized post pandemic.**

**Only youth who are actively in AC status due to posing a serious risk of imminent physical harm to others would potentially miss a treatment group. A process is in place for that specific missed treatment group to be made up for the youth on an individual basis, and since January 15, 2021 youth notes in J-Tracker should reflect the completion of the make-up session. Additionally, during the March through May reporting period, Defendants are designing and implementing a QA audit process for youth notes in J-Tracker in order ensure this process is completed. Missing a treatment group and having a make-up session does not affect the youth in terms of any setback to their progression towards completing the treatment group. This is the same process for a youth who were to miss a group due to any other short-term scheduling conflicts (e.g., court, medical needs, OJOR, *etc.*). For example, if a 2-hour placement in AC occurs during regularly scheduled Skills Streaming group time, treatment staff will re-engage the youth in making progress in their treatment course avoiding any delays in progression through the course of their assigned treatment. Defendants to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress when possible.**

**As of May 13, 2021, Corrections Program Supervisor instructed treatment staff group facilitators that a special "Make-Up" note (not just standard weekly notes) shall be entered when a youth misses group due to an AC placement. This aligns with the drafted youth notes in J-Tracker procedure.  Supervisory staff will be able to provide guidance and oversight regarding "make-up" note expectations. Defendants need to continue to focus (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement.**

iii.   Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services.   Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general (prior to COVID-19) educational services for general population occurred in the classrooms in the school area. On March 24, 2020, the schools began providing education on the units with most education staff working off-site. On February 22, 2021, the school teachers returned on-grounds at the facility to begin instructing through Zoom from classrooms in the school. On March 3, 2021 Teachers began delivering classes on the units. On March 15, 2021, a hybrid schedule for youth attending some programming within the school building began. Each unit has been assigned to be in the school for either the morning or afternoon part of the day, whichever includes the physical education time. As stated previously in this report, the PbS education data shows youth are receiving about 4.94 hours per day (weekdays) of education at LHS and 5.32 hours per day (weekdays) of education at CLS. Classes now occur in the school building except for youth in the Hughes unit who receive school on the unit, and youth who are in 5- or 10-minute observation status or AC who miss school entirely while confined to their rooms.**

**DJC started the process to pursue an education consultant beyond the current work with the ULN. The purpose of the consultant would be to evaluate the current education program and provide a strategic plan for improvement efforts. During the recent reporting period, DJC continued to meet with industry experts including Peter Leone with the University of Maryland and David Domenici with Break Free Education. Input from a variety of experts, as well as additional research, has allowed DJC to further refine the evaluation focus, costs, and timelines and draft a scope document that will be used during the actual solicitation. This research has also allowed the division to identify the most appropriate procurement process to solicit the services; to craft an initial budget; and, to identify potential funding for the effort. Defendants have been working for several months to procure an expert. Defendants need to expedite the process so that educational services to youth can be evaluated and improved.**

**There needs to be an increase in the daily education hours as this will have a positive impact on meaningful programs and reduce youth idleness. Additionally, Defendants need to ensure that special education is provided while on administrative confinement and observation status. Youth were engaged in the classrooms. Youth were paying attention, sitting appropriately, and actively participating. It would be extremely beneficial to provide art, music, woodworking, the greenhouse, welding, and sewing and other types of programs to youth in the evening and on weekends. The Defendants should continue to focus on bringing more programming into LHS/CLS, especially culturally relevant and specific to the race and genders of the youth who are at the facility.**

iv.     Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general, youth are out of their rooms from 8 A.M. to 8 P.M. except for youth in isolation due to Covid-19 safety measures implemented by Defendants, any confinement required, or any self-confinement. The Monitor regularly saw youth conversing with other youth during out time. Each unit had sensory rooms. There were more instances of youth being in their room during this site visit than last; those that were in their rooms voluntarily did so.**

> v.   Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. There were four (4) documented instances of youth eating in their rooms (3 in March and 1 in April) which were staff imposed based on substantial threat of physical harm.  Defendants are able to track when youth eat meals in room. Policy and procedure need to incorporate this section of the Court Order. Defendants are close to being in substantial compliance.**

> vi.   Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Logs indicate that youth are receiving much more than the 3 hours of "out time" per day or 30 hours per week. (As stated earlier in the report, PbS definition of "room confinement" does include confinement for purposes of observation, even when ordered by PSU. )However, there were youth on observation status that did not get at least three hours per day of out time.**

> 5.   **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is a box on the incident debriefing form that is checked if staff informed the youth of his or her rights regarding grievances and appeals and time of notification. Youth continue to receive their notification of rights/grievance procedures when they are placed in administrative confinement. The process for obtaining a youth signature (or two staff signatures in the event of a refusal) has been proposed as a part of youth receiving PSU thinking chain reports during the first stage of the administrative confinement process. However, the process and forms need to be enacted and written into policy. Once this is done and sustained, Defendants will be in substantial compliance.**

6.    Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are now documenting this more consistently, including when less restrictive means were attempted. Documentation needs to continue to be completed and consistently applied to all situations. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue to be improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

B.    OC-Spray and Other Chemical Agents

1.    OC reduction plan.  Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.  There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere.**

2.    Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated. There needs to be continued focus on training, skills development and coaching, programming, and continued focus on overall atmosphere.**

C.    Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1.    Prohibition on types and uses of mechanical restraints.

a.    Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visit, but data and documentation show that there were uses of mechanical restraints during this reporting period. Defendants need to continue focusing on reducing the use of mechanical (as well as physical) restraints. Defendants need to document and establish that there were not less restrictive means available and quality assurance measures in every instance of the use of restraints and follow the final policy and procedure that are in place.**

**As discussed in previous sections of this report, the use of both physical and mechanical restraints trended upward during the two 2020 data collection cycles.  The Monitor believes this was a reflection and combination of the lack of meaningful activities, programs, education and the need to enhance the behavior management system, including more robust and meaningful incentives and rewards for youth as well as operational changes resulting from the pandemic.  Reducing youth idleness with meaningful programs and activities along with an improved behavior management program, can have a significant impact on these outcome measures.**

> b.    Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Use of mechanical restraints is higher in both LHS and CLS this reporting period.**

**Uses of mechanical restraints LHS:**

| | |
|---|---|
| **June 2020:** | **20 uses** |
| **July 2020:** | **30 uses** |
| **August 2020:** | **65 uses** |
| **September 2020:** | **38 uses** |
| **October 2020:** | **43 uses** |
| **November 2020:** | **26 uses** |
| **December 2020:** | **20 uses** |
| **January 2021:** | **12 uses** |
| **February 2021:** | **8 uses** |
| **March 2021:** | **17 uses** |
| **April 2021:** | **18 uses** |
| **May 2021:** | **17 uses** |

**Uses of mechanical restraints CLS**

| | |
|---|---|
| **June 2020:** | **0 uses** |
| **July 2020:** | **0 uses** |
| **August 2020:** | **0 uses** |
| **September 2020:** | **4 uses** |
| **October 2020:** | **4 uses** |

| | |
|---|---|
| **November 2020:** | **0 uses** |
| **December 2020:** | **6 uses** |
| **January 2021:** | **0 uses** |
| **February 2021:** | **0 uses** |
| **March 2021:** | **1 uses** |
| **April 2021:** | **3 uses** |
| **May 2021:** | **4 uses** |

**Documentation needs to be improved to document that an imminent threat of physical harm existed, and when and how that decision is reviewed. Defendants should note why the acts in question required a specific type of use of force, such as explaining why measure utilizing less force would have been insufficient in a specific situation. The review process should consider the nuances in different situations. Defendants do have critical outcome measures for restraints. Defendants need to continue to work towards reducing the use of mechanical restraints, develop better documentation and quality assurance measures.**

    c.   No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

        i.  Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were four (4) uses of the "wrap" (full body restraint). The "wrap" is a restraint device that falls under this section and needs to be monitored for usage compliance. The wrap should only be used in situations in which PSU has ordered and/or authorized its use in order to prevent active self-harm. PSU did not order the wrap in these four instances but were consulted.  If other mechanical restraints are used, the Defendants need to make sure they are ordered by PSU to attempt to prevent active self-harm.  Defendants need to develop policy and procedure, training, and QA measures and ensure PSU staff order these types of restraints.**

       ii.  Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has improved relative to when restraints have been used and the rationale for usage. Defendants need quality assurance measures and need to continue to focus on reducing the use of restraints.**

       iii.  During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that

restraints are not used.  Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  See above.**

       d.     Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Defendants need to continue focusing on reducing the use of mechanical restraints.  Defendants need to create and monitor quality assurance measures.**

       e.     Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE.  There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

       f.     Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Staff have received training in physical force, restraints, and trained in proper de-escalation. The Defendants are increasing the frequency of these trainings (regular, informal, refreshers). These skills are also important to help staff identify and prevent situations which might lead to disruption or altercations before such incidents occur. DBT implementation will be very beneficial to youth and staff.**

       g.     Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit.  No youth shall be left alone in restraints.   Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were no instances of youth being placed in mechanical restraints over 45 minutes. Defendants may be close to**

achieving substantial compliance with this provision.

> 2.  Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process. Defendants are close to reaching substantial compliance.**

> D.  Strip Searches. The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

> > 1.  Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were two (2) strip searches in this reporting period- both completed in compliance with policy and procedure. The policy and procedure for Searches of Youth have been finalized during this reporting period. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search. A DJC "Searches of Youth" training module on the eLearning platform has been assigned to all safety staff in the first few months of 2021. Defendants are close to reaching substantial compliance.**

> > 2.  Strip searches with probable cause. Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were two (2) strip searches this reporting period. QA has been developed. The policy for searches has been finalized. If maintained, Defendants will be in substantial compliance next reporting period.**

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were two (2) strip searches this reporting period. QA has been developed. The policy for searches has been finalized.  If maintained, Defendants will be in substantial compliance next reporting period.**

b. Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were two (2) strip searches during this reporting period. QA has been developed. The policy for searches has been finalized.  If maintained, Defendants will be in substantial compliance next reporting period.**

c. Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were two (2) strip searches conducted this reporting period. QA has been developed. The policy for searches has been finalized. If maintained, Defendants will be in substantial compliance next reporting period.**

d. Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records reviewed indicate that all staff have been trained in trauma informed care. There were two (2) strip searches this period.**

e. If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were two (2) strip searches during this reporting period. Documentation has improved. Policy and procedure/QA developed. If maintained, Defendants will be in substantial compliance next reporting period.**

4.    Documentation.  Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. Policy and Procedure finalized.**

E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants are focusing more on de-escalation skills.  Staff have been trained in MANDT and other training which includes de-escalation skills training. Future and continuing de-escalation training/modeling should be conducted.**

**Competency testing was administered for all staff completing training and the scores from the competency exam were tracked as part of a quality assurance measure underscoring the importance utilizing well trained de-escalation techniques. DJC certified trainers will continue to provide quarterly refresher trainings with practice scenarios to support skill retention and continued application of Verbal Judo skills at the facility going forward.**

**The Monitor personally observed staff de-escalating youth with success and observed several instances of de-escalation in review of video footage.  Staff are more comfortable utilizing these skills, but continued focus, training, and review need to occur.  Defendants should include cultural diversity issues as part of crisis management training and procedures. Knowing these issues and how they are communicated is critical to successful behavior management.**

F.    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Programming needs improvement (as discussed throughout this report) and idleness remains high.**

**As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth.  Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. The interviewing process for a religious service leader**

was occurring during this reporting period.  As mentioned previously, increasing education hours and vocational programming, including for youth who have obtained a diploma or HSED, can greatly assist in reducing idleness time and provide positive youth development strategies.

G.  Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants have made significant effort in implementing the strategies suggested in improving staffing ratios and staff morale. Defendants should continue to focus on training and developing staff and evaluating their hiring process. As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere and environment of the facility.  Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, and the use of isolation and confinement.  It is clear from the Monitor's interactions with staff during the site visit that staff wellness remains an issue.  High levels of anxiety and stress impact on their wellness and, in turn, negatively impacts the overall environment. The Monitor will continue to work with Defendants on strategies to improve staffing ratios and identifying additional strategies to positively impact staff morale/wellness.**

H.  Amendments to administrative code.  Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE.  Drafts have been created of DOC Chapter 373. Final draft of DOC 376 was submitted for approval by the Governor's office. Defendants need to continue drafting interim policies for LHS/CLS while also developing final Code revisions. Defendants need to create an expedited timeline for finalizing all regulations and submitting them for approval.**

## IV.  DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A. **Incident review process.**  Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the

facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There has been a vast improvement in meeting the 24-hour timeline. Informal reviews occur right after an incident in majority of cases.  When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). Meaningful QA also requires that the facility hold accountable staff who engage in sexual, physical or verbal abuse of youth, and preclude such staff from continuing to work with youth. There must be zero tolerance for such behaviors. A framework for other QA measures relating to the consent decree has been created. Defendants have made huge progress as it relates to QA.**

> **B.**      **Quality assurance**.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE**. **As discussed throughout this report, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff.  Defendants have created a competent quality assurance program.  The new leadership team, dedicated QA personnel, and RFID has had a positive impact on data collection and quality assurance.  The Monitoring team will continue to work with the superintendent to establish performance goals, analyzing data, and creation of corrective action plans.**

## <u>CONCLUSION</u>

There was progress made in several initiatives such as a strong, committed leadership team, increased educational hours, the quality assurance program, training/implementing DBT, incorporating PSU more into daily operations, additional staff training and development, continued in-person education on and off the units, use of data in day-to-day decision-making, and several key policy and procedures being updated and completed.

The facility would benefit from an increased focus on reducing idleness, particularly during weekends and evening hours.  There are several very good programs with positive outcomes for youth (music,

art, gardening, welding, *etc.*) that should be expanded.  The Defendants should continue to move youth off of their home units as much as possible and outside when weather permits.  The Defendants should continue to work on improving the behavior management system, continue with their progress in implementing DBT, providing improved youth incentives that will help in reducing many behavioral incidents, and bringing gender and culturally relevant programming to LHS/CLS. Defendants should continue to expand the influence and impact of CARE Teams would also improve critical outcome measures around the use of restraint practices, staff wellness, youth accountability and in reducing use of any form of room confinement. Continued efforts need to be made to further engage the educational expert, reduce teacher vacancies, increase educational time and quality. Regular training in de-escalation and assessment, evaluation, and review of use of force continuum need to continue to occur.   Applicable administrative code needs to be finalized and approved. Staff wellness needs to continue to be a priority. If staff wellness does not improve, the Defendants will have a very difficult time making progress with the provisions of the consent decree. Lastly, as the Monitor continues to state in reports to the Court, there needs to be a focus on moving youth from LHS/CLS to more appropriate setting(s).

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

/S/ Teresa Abreu
Teresa Abreu
Monitor