UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                                                           Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

ELEVENTH REPORT OF THE MONITOR

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Tenth Report of the Monitor was filed with the Court on July 26, 2021. The Monitor's eleventh report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates from the tenth site visit which took place on June 24, 2021.

## SITE VISIT

The eleventh site visit by the Monitor took place on October 14, 2021.  Due to the pandemic, the Monitor limited onsite time to one day and completed necessary interviews/information gathering via in-person and virtual meetings prior to and after the site visit. The Monitor reviewed materials provided by the parties prior to and after the site visit for the reporting period ending September 30, 2021. Materials included but were not limited to: use of force videos, video footage of units and safety and security checks, COVID-19 related memos, directives and plans, programming materials, discipline documents, investigations, PREA investigations, various staff memos, daily shift reports, policies, and all of the monthly data submitted to the parties per this Court Order (June, July, August, and September 2021), updated unit rules, updated post orders, work rules, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Plaintiffs' and Defendants' counsel and the monitoring team were on site during this site visit. Plaintiffs' counsel conducted youth interviews virtually before the visit, and in person during the visit. The Monitor toured

1

LHS/CLS and interviewed youth and staff. The Monitor had the opportunity to talk to the majority of youth and staff present and available during the site visit. Approximately forty-nine youth (49) youth and thirty-one (31) staff were interviewed by the Monitor during this site visit.

## Overall Quality of Life, Conditions, and Atmosphere

### Introduction

All of the COVID-19 modifications (health screenings, intake process, and quarantine process) were still in place during this reporting period. The COVID-19 precautions have remained consistent with the CDC's guidance for congregate settings.  In person visitations has resumed as of July 2021. There have been nine (9) youth COVID-19 cases and eleven (11) staff cases. This marks a substantial increase from the last report, in which there were no youth cases. COVID-19 vaccinations continue to be offered to every youth meeting the CDC guidelines. Approximately 27 youth have received both or one dose of the COVID-19 vaccine. The COVID-19 youth cases were able to be contained to one individual living unit.

The total LHS/CLS population continues to remain low, although slightly higher, ranging in the high 50s to lower 60s.  The overall atmosphere significantly improved from the last visit.  There continues to be concern regarding programming (although improved from the last visit), use of force, use of mechanical restraints, youth confined to their rooms due to being placed on observation status and administrative confinement, increased average minutes for administrative confinement, use of other forms of confinement like "modified programming," and other issues. However, overall, there has been significant improvement in youth and staff morale and improvement and progress in some areas of the consent decree from the last site visit (detailed throughout the report).

### Physical Plant Observations

The entrance, grounds, visitation, all units, school, and many other areas were clean and orderly.

New furniture installation has been completed in an additional eight (8) living unit day rooms for a total of eleven (11) living units. Each living unit installation included five (5) stools and six (6) chairs that are molded and securely fastened. An additional three (3) more chairs will be added to each living unit in the next few months.

A large capital project began to install new windows and window frames in each of the twelve (12) living units. The new windows and frames include specialized glass that can withstand significant duress without failing. This extensive effort is expected to improve the environment and lighting as well as safety while reducing the need to regularly replace broken windows.

Defendants initiated the process to change the lighting in youth rooms, unit dayrooms, and emergency lighting. The new lighting will improve the environment on the units by making the dayrooms brighter. The Monitor was able to observe a unit with the new LED lighting and it is significantly brighter. This will be critical during the upcoming winter months when the units are darker due to reduced sunlight.

Additional fixed cameras throughout the facility (internal and external) will be installed. Over the next year, this project will result in the installation of over 100 new cameras that will increase both safety and accountability throughout the facility.

Defendants have replaced failing boilers in Rogers and Miller living units. These new boilers will improve the heating in the units. Additional units will be addressed in the coming months as needed.  Lastly, Defendants replaced bathroom fixtures in Hughes unit including stainless steel sinks, toilets, etc.

Defendants should continue to focus on the sensory rooms on the units as this can be a place for youth to relax and cool down when needed. The Defendants should be commended for their continuing commitment to improve the physical plant which improves the daily lives for staff and youth. The physical plant is significantly safer than three years ago. The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

Education Observations

The school general areas and classrooms were spotless. Youth, teachers, staff, and a Foster grandparent were present in the school area during this site visit.  There was a very positive atmosphere in the school. The vast majority of youth in the classrooms were actively engaged in education.  The Roosevelt unit was actively engaged in recreation in the gym. There were no students in the STAR room (meaning youth did not have to be removed from the classroom). However, on the morning of the visit one youth from CLS was removed from the school and confined to her room for disruptive activity. The Monitor was able to see the renovated music room including the newly completed recording studio.  The Monitor heard recordings and watched music videos produced at LHS/CLS by the youth.  The music is incredible.  Youth and staff should be very proud of the work they have done in the music department.

There are a few new educational units during this reporting period:

**(1) Project-based Learning Derby Car Unit:** LHS/CLS teachers developed and implemented a unit helping students learn and implement a variety of STEM (science, technology, engineering, and mathematics) skills in building and racing Derby Cars. This unit began in April of 2021 but was expanded to Black Elk and Curtis Living Units in June.

**(2) Project-based Learning Flight Unit:** Teachers designed and implemented a project-based learning unit on flight. This unit ran with Black Elk, Roosevelt, Wells, and Dubois Living Units in August. The unit involved learning about the history of flight, participating in an interview with a pilot, and building and flying paper airplanes, kites, and balsa gliders.

**(3) Mystery Motivator Program**: The Mystery Motivator Program, which was piloted in May, continued throughout the summer. Contingent on their cooperation with classroom expectations, students were able to earn individual as well as class-wide rewards. Some rewards included pizza, movies, basketball competition, Origami projects, Jeopardy! Competitions, cookie and milk breaks, virtual escape rooms, and "minute to win it" classroom games.

The Monitor is happy to report that three (3) LHS students earned their High School Equivalency Diploma ("HSED") in August. A graduation ceremony is planned for late October.

Education staff met with CESA 9 (teaching cohort in Wisconsin) in June, July, and August. Educators continued to work on Project-Based Learning and techniques for student engagement. Four education staff members earned their Google Level 1 certification in June. They were required to pass a rigorous online exam to demonstrate their proficiency in the Google suite applications. Educators are also currently working on Unjammed Learning Network 2.0: Instructional Design using Google Workspace.

On June 1st, education and senior DJC staff participated in a Zoom meeting with juvenile justice educators from Utah and Massachusetts to hear their experiences in implementing DBT at their facilities. This dialogue will be very useful as LHS/CLS continues their journey with DBT.

As of July, youth and education/treatment staff begin their day with a 15-minute community mindfulness practice. Staff and students alike appreciate the opportunity to take some time to center themselves and get ready for a full day of learning. Some activities have included freeze-dancing, mindful drawing, and breathing exercises.

With respect to obtaining an educational consultant, Defendants have completed a competitive bid process and intend to award a contract to three consultants to evaluate the educational programming at Lincoln Hills and Copper Lake Schools. The consultants are national experts and have been selected to evaluate key educational areas including:

- Operations
- Curriculum and Instruction
- Academic Assessments
- Special Education
- Human Capital
- Technology Integration
- Transition

Evaluation work is expected to commence in the next couple of months with a full final report expected sometime this winter.

Any youth in COVID-19 quarantine, and youth in the High-Risk Unit Program (explained in more detail below) continue to have education in the unit and not at the school. The Monitor continues to recommend that the frequency of music, art, and recreation needs to increase. The quality of the music program is second to none and all youth would benefit from the program not just during the school day but on weekends when there is the most idle time. The Monitor also continues to recommend that the girls' classroom be painted a brighter color and have more of a classroom feel. The room remains sterile and has an institutional feel. After the site visit, Defendants have begun the process of picking out paint color, décor, etc. with the help of students and education staff. The Monitor looks forward to seeing the finished classroom.

As previously mentioned, the entire educational program at LHS/CLS still needs to be evaluated.

The Defendants are working on procuring an educational consultant to work on addressing the concerns raised – including the need for deeper and more meaningful teacher interaction with youth and enhancing/expanding the daily education hours.

Living Unit Observations

The Monitor visited each cottage that youth were housed in during the site visit.  Overall, the units were very clean. Overall, the cottages and youth rooms were cleaner than last visit.

There were more than adequate staffing levels on each of the living units.  The unit populations ranged from five (5) to thirteen (13) youth. Staff were more engaged with the youth than during the last site visit.  The Monitor also reviewed video during the reporting period to view day room activities, staff placement and staff engagement. In general, staff positioning improved as they were near the youth, sitting with youth, and interacting with youth in a positive way.  The youth-staff relationship seems improved this site visit.  The body language and tone were positive from both youth and staff.   All the youth that the Monitor interacted with were respectful and willingly communicated with the monitoring team, leadership of LHS/CLS, and Plaintiffs' counsel.  The Monitoring team and Plaintiffs' counsel had an opportunity to talk to most of the youth present in the day rooms.  The Monitor did not interrupt youth in school but visited with them on their home units when they were either on break, lunch, or done for the day.

During this site visit, the girls were housed on both the King and Wells cottages. Each unit had six (6) girls which was an increase in population. There were three staff members on each unit. The girls' units were very nicely decorated for Halloween.  The youth housed on King and Wells were playing cards, working on puzzles, while others were in school.  One staff member was working on deescalating a youth in her room.  Only one (1) girl was confined to her room based on behavior. Staff did a very good job of utilizing the de-escalation techniques learned in training.  The girls' rooms were messier than in previous site visits. The girls were calm, engaged, and had no complaints. The Monitor asked various questions as it relates to their quality of life, staff, and use of force and none of the girls had anything negative to say.

With respect to the boys' cottages, Addams, Curtis, Miller, Hughes, and Rogers were empty units during this site visit. The boys were housed on Krueger, Black Elk, Dubois, and Roosevelt. All of the living units were very calm and clean in general.  All units had more than adequate staffing. Some youth were getting back from school, on telephones, playing cards, braiding hair, playing basketball, playing video games, writing, and cleaning.  All of the youth were talkative with the monitoring team.  None of the youth made a single complaint to the Monitoring team even when asked probing questions. The staff on all of the units seemed relaxed and engaged with youth and positioned appropriately.  There was no one on quarantine at the time of the site visit.  There were no boys involuntarily confined and only two boys in their rooms by choice. The atmosphere on all of the units was significantly better than the last site visit.

In the last report, the Monitor discussed the "Hughes Program." The "Hughes Program" was implemented on March 30, 2021 and is considered the high-risk unit. The program is now housed in the Krueger unit. The Hughes Program is modified programming for youth who engage in physically aggressive behavior, present a danger to others, and/or exhibited behavior that caused a

major disruption to the facility. The Monitoring team offered suggestions to improving the program and provided examples of similar programs that can potentially be incorporated within the structure of current program to enhance the overall impact and potentially improve services and outcomes. The Defendants are working on implementing these suggestions. Youth housed on this high-risk unit have a "Supplemental Youth Plan" created by PSU in order to specifically address their behavior. Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team. The Superintendent (or designee) will have to approve placement onto this unit. The Monitor will keep the Court apprised on modifications made to high risk unit.

In general, youth and staff attitudes were much more positive during this site visit. Although there were more activities for youth to do, there is still a need for more structured and meaningful activities as youth idleness remains a concern, particularly on weekends. Enhancing weekend activities and programs will help reduce the risk of youth engaging in anti-social behaviors when they have little else to do. During previous site visits, the Monitor recommended creating and implementing a daily schedule to help with youth boredom and create opportunity for structured, meaningful programming and activities. There needs to be a focus on creating a daily schedule in order to improve accountability and minimize the incidents of youth acting out. Improving the behavior management system, improving the rewards and incentives, and developing engaging programming will have a positive impact on the overall behavior and atmosphere

<u>Youth Interviews</u>

Approximately forty-nine (49) youth were interviewed prior to and during the site visit (formally and informally) by the Monitoring team and Plaintiffs' counsel. There were very few requests to talk to Plaintiffs' counsel while the Monitor was onsite talking with youth than during previous visits.

Youth did not complain about anything to the monitoring team. Previously, youth complained about food, education, not being let out of their rooms to use the bathroom when needed, being confined, staff not engaging with them, youth going hands on too soon, staff not caring about them and general treatment. Youth did <u>not</u> make any of these complaints this site visit. In fact, several youths spoke to the Monitoring team and indicated that the facility culture, programs, and safety is much better now compared to their previous commitments to the facility. This is a good sign that the facility is moving in a positive direction.

Youth did complain to Plaintiffs' counsel prior to the site visit (during this reporting period) about staff frequently using observation status, including being deprived of schooling and programming and feeling "isolated" while on 5- or 10-minute observation status, concerns about staff antagonizing or provoking youth and that this was leading to an increase in the use of administrative confinement, keeping youth in their rooms in the Krueger unit specifically, and some staff being too quick to use aggressive physical force and restraints, especially on female youth. During the site visit, four (4) youth on the high-risk unit (Krueger) told Plaintiffs' counsel that they are eager to get back to their home unit and thought six weeks was too long to be in the program. One youth said that when she was on observation status, she really did not interact with PSU on the weekends.

There was less idle/unstructured time both during site visit and while reviewing random sampling of video of living units.  The Monitor continues to encourage staff to engage youth and have more meaningful/structured programming and activities. It is clear that when staff engage with youth, youth respond positively.

The Monitor continues to recommend that the Defendants should take advantage of the reduced population by having the available staff in plan, prepare, and develop programs for youth. The Defendants need to focus on gender and culturally competent programming.

The Monitor was provided an update as it relates to the status of LHS/CLS. 2021 Wisconsin Act 58, the biennial budget, was enacted July 8, 2021 and included $4,000,000 in general fund supported borrowing for the purpose of project planning, development, and design, site selection, and land and property acquisition for a new Type 1 juvenile correctional facility in Milwaukee County. The Department is currently assessing the viability of converting an existing DOC facility in Milwaukee County to serve as a secure facility for youth.  Also, 2021 Assembly Bill 524 was introduced in September 2021 to allow for additional public debt in an amount up to $41,791,000 for the purpose of constructing a new Type 1 juvenile correctional facility in Milwaukee County. Defendants should work on moving forward with requirements to close LHS and move youth closer to locations where needed, culturally and gender competent programs and services are more widely available.

<u>Staffing</u>

During this reporting period (June-September), there have been some key staffing changes.  Key Positions hired during this reporting period are as follows:

- Critical Incident Response Team Coordinator
- Corrections Management Services Director
- Treatment Director
- SYC2
- Chaplain
- Teacher Supervisor
- Psychological Consultant
- Psychological Associates
- Recreation Leaders
- Four (4) PSU interns (interns rotate)

Direct-care staffing vacancy percentage has decreased slightly from the last reporting period (*see below*).  There are 311 total positions ("FTEs") at LHS/CLS.  Approximately 153 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA").  The teacher vacancy rate remains higher than last reporting period (10 vacancies).  There is a significant increase in social worker vacancies.  This is a critical role that should be made a recruiting priority. The Monitor encourages continuing to recruit teachers despite the reduced population and challenges with COVID-19.  Recruiting is still a challenge due to the location of the facility, overall teacher shortages, relatively low compensation, location of LHS/CLS, uncertainty as to when/if

LHS/CLS will close, and the year-round school calendar and thus, hiring needs to continue.

| Position | Vacancy Rate % as of December 9, 2020 | Vacancy Rate % as of March 1, 2021 | Vacancy Rate % as of May 31, 2021 | Vacancy Rate % as of September 2021 |
|---|---|---|---|---|
| Youth Counselor | 23% (27 out of 115) | 25% (29 out of 115) | 36% (41 out of 115) | 30% (35 out of 115) |
| Youth Counselor Adv. | 13% (5 out of 37.5) | 23% (8.5 out of 37.5) | 19 % (7 out of 37.5) | 19% (7 out of 37.5) |
| Teacher | 28% (7 out of 25) | 28% (7 out of 25) | 32% (8 out of 25) | 40% (10 out of 25) |
| Social Worker | 29% (4 out of 14) | 21% (3 out of 14) | 36% (5 out of 14) | 57% (8 out of 14) |

The Youth Counselor vacancies have decreased during this reporting period and Youth Counselor Advanced vacancies remain at 19%. Staffing levels remain adequate and meet legal requirements based on the reduced population that exists at LHS/CLS. The Defendants should continue to monitor employee leaves and scheduling to ensure staff are not overly mandated.

The Monitoring team spoke to over thirty-one (31) staff. Staff morale seemed much higher this site visit. Staff were more engaged with youth and seemed less frustrated. Staff did not have any of the same complaints as the last site visit. In fact, staff did not complain about anything. Staff's body language was more open, and staff seemed to have good rapport with the youth. One staff did complain about the lack of staff diversity which clearly is an issue at LHS/CLS. The continued implementation of DBT and other best practices will improve safety for staff and youth. The Monitor observed several very good interactions with youth by staff (de-scalation, playing games, monitoring basketball, and eating with youth) to name a few.

One newer direct care staff stated that she felt the training she received was adequate but suggested that new staff receive additional OJT time to better prepare for working with youth in this environment. The Monitor also noted that staff felt the training curriculums may need to be reviewed for potential updates to a higher needs/risk population.

Defendants conducted a Professional Quality of Life Survey during this reporting period. Fifty-seven (57) Staff responded, with results indicating that staff scored in the average range for compassion satisfaction, burnout, and secondary trauma. While burnout and secondary trauma scores did increase based on the 57 responses obtained this year in an open response /anonymous format, they are considered to be within "average range". Compassion satisfaction also remained in the "average range". The Defendants will continue with these surveys in the future.

Defendants also conducted a Staff Interests Survey in August 2021. Staff were also asked to respond to a survey monkey and complete a quick two-minute survey regarding staff interests as DJC gathers information from staff as a whole for aiding in development of future programming efforts. The survey highlighted the fact that staff have a range of talents and interests that could

build bridges and spark ideas for programming or other youth and staff-sponsored activities that would reduce idle time and foster positive relationships between youth and staff. The aim is that the list opens up planning to support additional youth programming and activities as well as peer support and team development opportunities. The survey details will be shared with the newly hired Crisis Intervention Response Team Coordinator as well in the hopes that the survey may provide insights into activities that may best support wellness for staff.

Defendants continue to work on increasing staff morale but still have much more work to do. Defendants have done the following to increase staff morale during this reporting period:

- Two new vending machines were added downstairs and two were added upstairs. There is now a new coffee machine and a new fresh food machine providing fresher options in the visiting room.
- Street Taco Cook-Off CASH Committee Fundraiser.
- The Wisconsin Correctional Association's sponsored community service project allowed staff to participate in one of two charitable drives and the resulting cash was donated to the facilitating charity Hope House.
- Greenhouse sale
- Staff give back day with ice cream and popsicles for staff to "beat the heat."
- An awards ceremony was held for winners of DJC's Annual Employee Recognition "YOU" Awards on July 7, 2021. The ceremony featured speeches and awards presented to employees by Secretary Carr, Deputy Secretary Hoy, and Administrator Hermes. Prior to the event, the Secretary and Deputy Secretary spent about 90 minutes on- grounds meeting with staff in their units. After the ceremony, all staff were invited to a brat fry on the patio and picnic tables outside the administration building. Meal boxes were also packaged and delivered to staff that could not leave their posts during lunch. Other meal boxes were kept refrigerated for the second shift staff and third shift staff coming in later in the day. After the conclusion of the day's events, Secretary Carr remained on grounds to host a listening session open to all staff able to attend.
- Monthly YCA/YC Attendance and Additional Hours Incentive & Recognition: Many staff regularly go above and beyond in different ways every day. In an effort to positively recognize staff regarding attendance and additional hours worked (which are often not by choice), DJC continues to hold a monthly lottery in which qualified staff will be entered and the winner will receive a gift card (not funded by state funds, funded by personal contributions from staff to support this staff recognition effort).
- Employee(s) of the Month: Nomination forms are due each month and are then shared with managers and posted around the facility to allow staff an opportunity to read the nominations. Employees are nominated by their peers and management staff review the nominations every month to declare the employee of the month winners who receive one of three reserved "Employee of the Month" parking spots.
- Employee Supports & Trainings: Peer supporters follow up with staff who are identified as having been involved in a stressful situation on grounds or off grounds. Sometimes by phone, sometimes in person, peer supporters try to ensure people are alright or have the services they need in place following tough situations. Peer support is offered during debriefings following significant incidents and sometimes this is a difficult time for people to discuss their feelings. Confidentiality is maintained at all times.

The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives, changes to programming, and general information.  A major component of staff wellness is ensuring staff feel as safe as possible.

Youth in Custody Practice Model ("YICPM") Update/ Dialectical Behavior Therapy ("DBT")

DJC is continuing in the next phase of participation with YICPM by working with the principal investigator from Georgetown University. DJC has made progress in the next phase of participation with YICPM. Throughout the summer a small team met to review the YICPM Data spreadsheet. The spreadsheet was completed in August with a call in September to review the spreadsheet and next steps with Georgetown University.

DJC is committed to developing a treatment-focused organizational culture. The Defendants are collaborating with Massachusetts Department of Youth Services to explore Dialectical Behavioral Therapy ("DBT") as a behavior management system. In consultation with Dr. Lesley Chapin and colleagues from Massachusetts, Utah, and Washington, the DBT informed System of Care (SoC) has been designed to reinforce skill practice and support behavior change.

To date, DBT Skills Groups and the weekly DBT Skill Highlights (shared with leaders and staff) are now covering skills within the last module of the DBT skills curriculum. Following the completion of "walking the middle path" skills, facilitators will have taught all of the DBT Skills (including specific distress tolerance, mindfulness, emotional regulation skills) to youth at least once within this first cycle. As of September, the "learner" role has been expanded to include not only safety staff but also some recreation, spiritual services, and administrative staff to support continued awareness and skill practice across the organization.

DBT consultant Dr. Lesley Chapin facilitated a multidisciplinary staff engagement opportunity to hear from a panel of Utah and Massachusetts colleagues. Dr. Chapin's regular onsite visits also continued to provide staff development in the form of skills coaching, team and individual consultation, and mentoring to help staff consistently use DBT principals and skills when interacting with youth. Based on the heavy amount of treatment-based trainings provided since the start of 2021 and staffing considerations typical for the summer months, it was determined that reinforcement of DBT skills would be the most strategic long-term approach in supporting staff resilience and an operational paradigm shift to treatment.

Outreach was incorporated to engage staff feedback in the change process and support staff understanding, identify and develop needed resources, and enhance buy-in as a precursor to successful implementation. The Prosocial Pilot in Black Elk and CLS provided a soft introduction to SoC elements (prosocial points and incentives along with the noncompliant behavior matrix of treatment responses).

Based on staff dialogue, the DBT Strategy Team coordinated follow-up consultation with Utah in July to develop behavior ratings as a key component of the new Behavior Management System (BMS). The behavior rating will provide a weekly score (a weighted ratio of prosocial to noncompliant behavior) that indicates the level to which the youth utilizes skill to effectively manage and engage in prosocial behaviors and problem solving rather than noncompliant behavior.

Youth, Growth Teams, and OJOR will also review youth's behavior rating to help determine youth's readiness to utilize and maintain skills to manage problems effectively prior to transition and release planning.

A BMS overview (highlighting prosocial points, incentives, noncompliant behavior and behavior ratings with privileges) was presented during a Town Hall meeting in early September. Trainings for noncompliant behavior and treatment responses to enhance the conduct report process (4 hour) as well as BMS elements of prosocial points, incentives, and behavior ratings with privileges (4 hours) have continued to be developed for delivery and integration into practice within the coming months.

The second round of Growth Team Youth Surveys was conducted in late August to align with the quarterly schedule set by the Quality Committee. Again, the surveys were purposely given during SDA (Staff Directed Activities) to allow for objective facilitation, modeling of engagement activities, and establishing future buy- in. The facilitators involved youth in outdoor water games and an ice cream social. Prior to the fun, 76% of youth completed the surveys. The results demonstrated that youth have been very receptive to Growth Teams indicating they have helped the youth understand what was needed to reach their goals, experienced greater positive feedback, felt listened to and expressed having a greater degree of trust as compared to perceptions about staff in general.

During this same time, an Activities Survey was also facilitated (68% of youth responded) to help identify potential activities that youth may want to try or become engaged with as programming develops. 55 activities were listed; the top one was cooking with 80% of youth indicating interest. Just like the Growth Team Survey data, the information is broken down by Unit and shared for integration into planning and response. The integration of youth feedback is an important step in enhancing the treatment milieu and potentially identifying additional privileges that provide increased motivation for skill development.

The Quality committee also facilitated the PROQOL (Professional Quality of Life) assessment survey in August.  The PROQOL was first administered in the summer of 2020 prior to staff awareness of DBT/SoC planning efforts, and it was facilitated with direct department contacts.

Staff were very receptive to taking the quick Activities Survey as represented by the 127 respondents. 29 staff indicated they were interested in consulting with a YEP (Youth Engagement Programs) Crew to help develop opportunities for youth. The data is also useful for leaders considering ideas to recognize their staff and will also be shared with the new Crisis Intervention Response Team Coordinator.

The DBT Strategy Team recognizes the importance of investing its support behind staff development, treatment milieu, and resource development to provide a successful foundation to fully implement our System of Care. For example, the team has also worked with the Safety Director to update post-orders and develop reinforcement strategies to help both staff and youth be prepared for elements of the Behavior Motivation System. A youth preparation plan has also been outlined to engage CPS and SYCs as a team in delivering one-on-one education with youth

around the changes (integration of prosocial points, incentives, noncompliant behaviors and responses, behavior ratings, and privileges) that will be coming.

Once DBT is fully integrated into the programming, there should be improvement in many facets of the daily operations of LHS/CLS as well as a significant reduction in actual and perceived safety concerns.

Quality Assurance ("QA")

Defendants launched their Quality Assurance Review (QAR) process in August 2019.  There was a Guardian (handheld device that is used to complete safety/welfare checks) Workshop meeting held in July in order to continue refining the process for utilizing Guardian for youth safety checks and front-line data gathering also remains ongoing at the time of this report.

The two new QA staff has been working on consent decree compliance data measures and QA processes have included:

- Visual Monitoring
- Administrative Confinement
- Mechanical Restraints
- Use of Force
- Monthly Metrics Chart
- Searches
- CARE Team
- Youth to Staff Ratio
- Youth Complaints
- J-Tracker Notes Audit
- Notification of Rights

Beginning in March, the Administrative confinement ("AC") review committee started meeting every Monday morning to review all AC placements having occurred more than seven days prior to that Monday's date. The aim and scope of the AC review committee has adapted and expanded since June 1, to include new or additional data points that aid the placement reviews. The Monday reviews have aided in streamlining the process for reviewing incidents. Whether or not a particular incident merits additional review, each incident involving AC is reviewed at the Monday meeting to ensure that the debrief form is completed at seven days or is assigned follow up.

Facility Improvement Plan ("FIP") Progress

As discussed in the previous Monitor's report, many PbS indicators, particularly the ones singled out in our facility improvement plan action steps, have trended in a positive direction as compared to previous collection cycles and against the national averages produced by PbS.

After the October 2021 data cycle reports and surveys are finalized in mid-November, a new round of PbS data will provide DJC with a clearer picture as to whether progress on these Orders has

been sustained or if there are any other metric indicators that will need addressing. The Monitor will continue to update the Court when the next PbS data becomes available.

<u>Policies and Procedures/Administrative Code Update</u>

The below policies, procedures, and Administrative Code sections have been completed during this reporting period:

<u>Policies Completed</u>

- Incident Reporting and Notification
- Mandatory Reporting
- Use of Body Worn Cameras
- Emergency Services, CPR, and AED Use
- Injury and Significant Illness Notification (health services unit policy)

<u>Administrative Code Revisions Update</u>

DJC staff and committees continue working to revise both DOC Chapter 376 and DOC Chapter 373. While the drafting process for 376 was suspended awaiting approval for the amended scope statement, DJC's 373 committee met weekly completing a substantial draft overhaul of the previous chapter. Due to the large-scale changes with respect to process, practice, and philosophy represented by DJC's vision for 373, and requirements of this Court Order, the rulemaking process requires the department to submit an amended scope. Given the general timeline associated with the process, both DOC Chapter 373 and DOC Chapter 376 have made significant steps forward in the administrative rule-making process since June 1, 2021.

Chapter 373: First draft completed by DJC committee on August 10, 2021 and submitted to DOC's Office of Legal Counsel for review. The attorneys have scheduled a meeting for early October to discuss some suggested edits or additions prior to submitting the amended scope for approval through the Governor's Office.

Chapter 376: An amended scope statement was submitted for approval June 21, 2021 which had the effect halting any further drafting by the committee on the chapter until the amended scope could be reviewed through the Governor's office. That process was completed, and the Secretary of the Department has approved drafting work on the rule to resume as of September 29, 2021. Defendants need to continue to aggressively work towards completing the respective Administrative Code sections.


**COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION**

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

1.   Punitive Confinement.

    a.   Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Data does not indicate that youth are being confined for seven days or for punitive reasons however, Defendants need to re-examine the use of "observation status" and administrative confinement to ensure that staff are not using this as a form of punitive confinement. There were youth who were in observation status (confined to room if five- or ten-minute intervals) for several days.**

    b.   Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Data does not indicate that most youth are being confined for three days or for punitive reasons however, Defendants need to re-examine the use of "observation status" and administrative confinement to ensure that staff are not using this as a form of punitive confinement. There were youth who were in observation status (confined to room and observed on five- or ten-minute intervals) for several days during this site visit.**

    c.   Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of observation status and administrative confinement has increased during this reporting period. Youth are also in these statuses for longer periods of time that previous reporting periods. It appears some of the confinement should have been AC- not observation status - or combination of both. Defendants need to re-examine the use of "observation status" to ensure that staff are not using this as a form of punitive confinement.  There were also many instances of "modified programming" which can and often does require periods of operational confinement for youth. This is not in compliance with this Court Order.  There is a new directive by Defendants that youth who are a danger to others will not be in observation status moving forward.**

**The Monitor, counsel for Plaintiffs, and Defendants discussed Administrative Confinement/Observation Status and a plan is in place to change how these confinements are being utilized and monitored and ensuring compliance with this Court Order. The Monitor previously recommended establishing clear criteria for administrative confinement**

**so that staff cannot punitively confine youth and cannot confine youth for more than 24 hours if they do not pose an imminent danger of harm to themselves. The Monitor reiterates this requirement.  By establishing clear and objective criteria, leadership can ensure that youth are not punitively confined or subject to harmful isolation beyond the periods prescribed by this Court order. The Monitor requested additional documentation that will be reported on in the next report to the Court as it was not readily available prior to submission.**

2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others.  Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  The use of AC was significantly higher for both LHS and CLS youth this reporting period, which is not attributable to the fact this reporting period is four months instead of the usual three months (June-September). The number of youths confined for over four (4) hours is also significantly higher than last reporting period.  The Monitor is unable to assess whether the youth received "intensive mental health services" at the time of this report but will review with the mental health staff and consultant prior to the next site visit.**

**March 2021**
**CLS: 9 uses of AC. Average 74 minutes. No youth over four hours**
**LHS: 19 uses of AC. Average of 125 minutes. 1 youth over four hours.**

**April 2021**
**CLS: 4 uses of AC: Average of 142 minutes. No youth over four hours**
**LHS: 16 uses of AC: Average of 141 minutes. No youth over four hours (4 youth exactly at four hours)**

**May 2021**
**CLS: 2 uses of AC: Average of 113 minutes. No youth over four hours**
**LHS: 15 uses of AC: Average of 140 minutes. Two (2) youth over four hours**

**June 2021**

**CLS: 4 uses of AC. Average 132 minutes. No youth over four hours**
**LHS: 20 uses of AC. Average of 113 minutes. No youth over four hours.**

**July 2021**
**CLS: 13 uses of AC. Average 130 minutes. No youth over four hours**
**LHS: 80 uses of AC. Average of 166 minutes. 6 youth over four hours.**

**August 2021**
**CLS: 20 uses of AC. Average 120 minutes. One (1) youth over four hours**
**LHS: 54 uses of AC. Average of 168 minutes. Two (2) youth over four hours.**

**September 2021**
**CLS: 31 uses of AC. Average 108 minutes. No youth over four hours**
**LHS: 49 uses of AC. Average of 187 minutes. Six (6) youth over four hours.**

**The Monitor was able to able to assess compliance with 30-minute checks as data was readily available during this site visit.  99.43% of checks were completed within 30 minutes. The Monitor reviewed video footage for random days and times and was only one instance in which staff did not complete the checks in compliance with policy (not ensuring they are looking into youth rooms to ensure youth are safe). Defendants will continue to remind staff to properly conduct safety/wellness checks while youth are in room and hold staff accountable when appropriate.**

> a. Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:
>
> > i. A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were fourteen (14) youth confined for over four (4) hours during this reporting period (June-September) (see response in previous question). Twelve (12) out of the fourteen (14) extended confinements were recommended by PSU.**

**Defendants need to continue to focus on reducing AC overall, ensuring any form of room confinement is compliant with this Court Order, draft policy and procedure with AC placement criteria, and continue to QA this data.  As previously discussed, observation status resulting in confinement needs to be looked at very closely to determine whether it is appropriate or whether observation status is being used as a substitute for punitive confinement or administrative confinement.**

> > ii. A plan is commenced to either promptly return the youth to

general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.  There were three (3) transfers as a result of extended placements in administrative confinement. Defendants have improved the details of the commenced plan.**

  b.  Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE.  Time is being tolled from 8 P.M. to 8 A.M.**

  c.  Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced  plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no instances in which a youth was confined for over 24 hours.**

  d.  The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

  3.  Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 was updated.   The plans developed are very detailed and comprehensive. Discussion and clarification have occurred surrounding observation status during this reporting period.  A recent directive was given pertaining to youth placed in observation status. Moving forward, only youth who are in imminent risk of serious self-harm to themselves/risk of self-harm will be placed in observation status.  Although this provision of the Court Order only allows confinement under the observation policy for youth at "imminent" risk of "serious" "self-harm," it appears that it may be used (or continued) when the harm is attenuated, not imminent and when risk was posed to others. Also, it may be used or continued when the risk of harm is not "serious."  Based on the new directive and after conversations with the parties, it would appear there is a meeting of the minds on who should be placed in observation status. The Monitor will continue to review and monitor the practice**

  4.  **Conditions of Room Confinement.** Effective immediately upon entry of

the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a.   Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As previously stated, the Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed on renovated units.**

**The Monitor did observe rooms with multiple blankets/sheets covering large areas of the room. Staff can clearly see into youth rooms now that the windows do not have etching and are not covered by paper/pictures. Room searches have occurred during this reporting period. Many rooms had several blankets, sheets, and other items that could pose a safety risk due to the volume of items in the rooms.**

**As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly. However, based on the language of this section, Defendants are very close to substantial compliance.**

b.   Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, hygiene supplies, or nighttime toilet usage. Defendants have improved their documentation and data collection. Defendants are close to reaching substantial compliance.**

c.   Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification.  The crisis intervention technique is being documented.  Clinicians are on-site for a minimum of 6 hours each Saturday and Sunday and the majority of this time is spent meeting directly with youth. The Defendants have hired new PSU staff and are working on expanding on-site treatment time on weekends.  The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours in order to engage youth in a meaningful way during this time.  The Monitor is reviewing PSU data and information. The Monitor work with Defendants and consultant after review.**

**A quality assurance program needs to be developed. The Monitor suggests that the Defendants consider implementing the mental health expert's recommendations to further develop the mental health program/integration at LHS/CLS.**

> d.   Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Documentation/data shows that evaluations are completed and within 24 hours after being placed in room confinement. There were no instances of contraindication documented during this review period. PSU launched two new initiatives this reporting period: (1) PSU attends SYC meetings in order to enhance collaboration and communication and (2) created a decision-making model and an AC assessment guide.  PSU also developed a job aid to enhance consistency across PSU clinicians when conducting the risk assessment, engaging in treatment planning, collaborating with safety staff.  QA needs to be created and implemented.**

> e.   Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose.  Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video

conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE: Defendants are over 99% compliant with meeting the thirty (30) minute safety and security check timeframe. QA program has been developed. Quality assurance measures are in place and when necessary, formal investigations occur. There were two (2) Letters of Expectations, four (4) formal job instructions, two (2) letters of expectations, and three (3) suspensions given to staff who did not complete safety/security checks per policy during this reporting period. The Monitor observed safety/wellness checks being completed on various days/times during this reporting period and observed only one instance in which staff did not make visual contact with youth. PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor continues to encourage more on-site time on evenings and weekends.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

  f. Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Property restrictions are most commonly applied by PSU for safety reasons. Forms and processes for documenting any potential property restrictions have been created and utilized. Defendants are close to reaching substantial compliance.**

  g. Youth in room confinement shall receive:

    1. All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided in general. However, the vacancy rate is high for Social Workers. The on-call PSU clinician communicates to all the PSU clinicians through email that a youth has been placed on AC. This allows the primary clinician to provide consultation and direction as to how to return the youth to a baseline, self-regulated state. The primary clinician consults with the on-call clinician and with the SYC/YC/CUS/SW staff regarding specifics ways the youth plan addresses the issues at hand and how it can be adopted when the youth is on AC. A PSU clinician follows up in the absence of the primary clinician and/or the crisis clinician. PSU collaborates with the SYC and direct**

staff. The social worker and youths' meeting schedules are individualized. Therefore, as is the case with any arising short-term scheduling conflicts (e.g., court, medical needs, OJOR, AC etc.) the social worker works with the youth to identify availability if an AC placement occurs during regularly scheduled meeting. The vacancy rate for social workers is high and should be priority.  Social workers are critical to quality of care and services for the youth and effective re-entry planning.

Documentation, quality assurance, and policy and procedure need to be improved/completed. Defendants are working on a review of the social worker roles and responsibilities.  Defendants need to ensure there is accountability with respect to the services provided by the social workers.

> ii.     Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. During the pandemic, Defendants moved to smaller-group based treatment to youth where group participation was provided on the units. This continues. Treatment programming for youth never ceased due to COVID-19 precautions, but the size of the groups was modified to accommodate safe social distancing measures and keep youth who shared a living unit assignment in groups with one another. Beginning in March, some housing units now utilize the school for their group treatment sessions as determined by their respective living unit's weekly schedule.  The Monitor continues to encourage these groups to occur off of the living unit as much as possible.**

**Only youth who are actively in AC status due to posing a serious risk of imminent physical harm to others would potentially miss a treatment group. Beginning in July, QA and SoC staff and supervisors have identified and implemented a QA process for checking make up treatment programming sessions are completed and documented in the J-Tracker youth notes. QA staff review monthly AC data and cross-reference AC placements against scheduled treatment programming times. Where AC placements coincide with the youth's scheduled group time, QA staff review each instance for J-Tracker Youth Notes on or around the date of the AC Placement that properly document the required make-up session was provided. This process has improved the frequency of documentation being provided for the make-up sessions. It has also identified gaps that QA and SoC Staff are working together to address through reviewing and formalizing the business process for providing make up sessions and writing that into a facility procedure.**

**Defendants need to continue to focus (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement. Defendants to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress.**

> iii.     Educational services with the general population to the

extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services.   Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Classes now occur in the school building except for high risk of Steps 1 and 2, new intakes due to quarantine, youth in medical isolation, youth who are in 5- or 10-minute observation status, or AC.**

**As stated in the narrative section of this report, the Defendants are in the bid process to award a contract to three (3) consultants to evaluate the educational program.   The evaluation work will begin in the next few months with a report expected later in the winter. The Monitor will update the Court with the findings and recommendations.**

**Defendants need to ensure that special education is provided while on administrative confinement and observation status and overall educational hours should increase.  The Monitor is happy to report that during the site visit, youth were engaged in the classrooms. It would be extremely beneficial to provide art, music, woodworking, the greenhouse, welding, and sewing and other types of programs to youth in the evening and on weekends. Also, it would be ideal for social workers to work with you outside of the school day in order to have less scheduling issues and would help with any idle time after school.  The Defendants should continue to focus on bringing more programming into LHS/CLS, especially culturally and gender relevant.**

iv.   Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general, youth are out of their rooms from 8 A.M. to 8 P.M.  except for youth in isolation due to Covid-19 safety measures implemented by Defendants, any confinement required, or any self-confinement.   The Monitor regularly saw youth conversing with other youth during out time. Although each unit had sensory rooms, they were quite bare this site visit.   There were very few instances of youth being in their rooms during this site visit.**

v.   Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth

eating that meal out of the cell.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. There were two (2) documented instances of youth eating in their rooms (June and July) which were staff imposed based on substantial threat of physical harm.  Defendants are able to track when youth eat meals in room and based on reports, the two instances were justified as the youth posed an immediate and substantial threat. Defendants are close to being in substantial compliance.**

vi.   Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Logs indicate that youth on administrative confinement are receiving much more than the 3 hours of "out time" per day or 30 hours per week. (As stated earlier in the report, PbS definition of "room confinement" does include confinement for purposes of observation, even when ordered by PSU.) However, there were youth on observation status and Administrative confinement that did not get at least three hours per day of out time.**

5.       **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals.  Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There is a box on the incident debriefing form that is checked if staff informed the youth of his or her rights regarding grievances and appeals and time of notification. Youth continue to receive their notification of rights/grievance procedures when they are placed in administrative confinement. The process for obtaining a youth signature (or two staff signatures in the event of a refusal) has been proposed as a part of youth receiving PSU thinking chain reports during the first stage of the administrative confinement process. Policy has been completed. Defendants are close to being in substantial compliance.**

6.       Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are documenting this**

**consistently, including when less restrictive means were attempted. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue to be improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

B.   OC-Spray and Other Chemical Agents

1.   OC reduction plan.  Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.**

2.   Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

C.   Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1.   Prohibition on types and uses of mechanical restraints.

a.   Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visit, but data and documentation show that there were increased uses of mechanical restraints /other restraints during this reporting period. Defendants need to continue focusing on reducing the use of mechanical (as well as physical) restraints.  Defendants need to document and establish that there were not less restrictive means available and quality assurance measures in every instance of the use of restraints and follow the final policy and procedure that are in place.  The review process and quality assurance have significantly improved during this reporting period.**

b.   Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety

concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Below is the number of mechanical restraints uses in LHS and CLS this reporting period.**

**Uses of mechanical restraints LHS:**

| | |
|---|---|
| **March 2021:** | **17 uses** |
| **April 2021:** | **18 uses** |
| **May 2021:** | **17 uses** |
| **June 2021:** | **20 uses** |
| **July 2021:** | **33 uses** |
| **August 2021:** | **11 uses** |
| **September 2021:** | **12 uses** |

**Uses of mechanical restraints CLS**

| | |
|---|---|
| **March 2021:** | **1 uses** |
| **April 2021:** | **3 uses** |
| **May 2021:** | **4 uses** |
| **June 2021:** | **5 uses** |
| **July 2021:** | **3 uses** |
| **August 2021:** | **6 uses** |
| **September 2021:** | **7 uses** |

**Documentation needs to be improved to document that an imminent threat of physical harm existed, and when and how that decision is reviewed. Defendants should note why the acts in question required a specific type of use of force, such as explaining why measure utilizing less force would have been insufficient in a specific situation. The review process should consider the nuances in different situations. Defendants have excellent critical outcome measures for restraints. Defendants need to continue to work towards reducing the use of mechanical restraints and quality assurance measures.**

    c.    No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

        i.  Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were five (5) uses of ankle or wrap this reporting period. The ankle/wrap restraints were not ordered by PSU, but PSU was consulted and present. Defendants need to develop policy and procedure, training, and QA measures and ensure PSU staff order these types of restraints.**

        ii.    Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has improved relative to when restraints have been used and the rationale for usage. Defendants have created quality assurance measures. Defendants need to continue to focus on reducing the use of restraints.**

    iii.    During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

    d.    Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue focusing on reducing the use of mechanical restraints. Defendants need to continue to monitor and assess the use of restraints and duration.**

    e.    Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

    f.    Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Staff have received training in physical force, restraints, and trained in proper de-escalation. The Defendants are increasing the frequency of these trainings (regular, informal, refreshers). These skills are also important to help staff identify and prevent situations which might lead to disruption or altercations before such incidents occur. DBT implementation will be very beneficial to youth and staff. Defendants have made DBT a priority and are continuing to train staff.**

    g.    Any use of mechanical restraints, except during transportation or

for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit.   No youth shall be left alone in restraints.    Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were five (5) instances of youth being placed in mechanical restraints over 45 minutes. However, two (2) instances were due to an incident on the Hughes unit which required outside law enforcement and thus, the mechanical restraints were not placed by the Defendants. For instances in which Defendants placed mechanical restraints on youth, the appropriate personnel authorized the use of the mechanical restraints.  PSU approved and followed up within two (2) hours. Defendants are working on a QA process for this section.  Defendants also need to ensure therapeutic interventions occur.**

    2.    Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process.**

D.    Strip Searches. The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

    1.    Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches in this reporting period. The policy and procedure for Searches of Youth have been finalized during this reporting period. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search.**

2.   Strip searches with probable cause.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**. **There were no strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

b.   Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches during this reporting period. QA has been developed. The policy for searches has been finalized.**

c.   Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches conducted this reporting period. QA has been developed. The policy for searches has been finalized.**

d.   Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records reviewed indicate that all staff have been trained in trauma informed care. There no strip searches this period.**

e.   If a youth with a known or suspected mental health diagnosis or

history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches during this reporting period. Documentation has improved. Policy and procedure/QA developed. PSU is consulted, and it is documented.**

    4.    Documentation.  Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. Policy and Procedure finalized.**

    E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants are focusing on de-escalation skills.  Staff have been trained in MANDT and other training which includes de-escalation skills training. De-escalation training/modeling continues to occur.**

**The Monitor personally observed staff de-escalating youth and observed several instances of de-escalation in review of video footage.  Staff are more comfortable utilizing these skills, but continued focus, training, and review need to occur.  Defendants should include cultural diversity issues as part of crisis management training and procedures. Knowing these issues and how they are communicated is critical to successful behavior management.**

    F.    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Programming needs improvement (as discussed throughout this report) and idleness remains high but improved.**

**As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth.  Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. The staff survey completed by Defendants show that staff have a wide range of talents that can shared with the youth.  The religious service leader**

has been hired during this reporting period and regularly works with youth. Youth are enjoying the religious services. As mentioned previously, increasing education hours and vocational programming, including for youth who have obtained a diploma or HSED, can greatly assist in reducing idleness time and provide positive youth development strategies.

G. Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants have made significant effort in implementing the strategies suggested in improving staffing ratios and staff morale. Defendants should continue to focus on training and developing staff and evaluating their hiring process. As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere and environment of the facility. Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, and the use of isolation and confinement. Staff interactions were much improved this site visit and staff seemed less stressed. Staff wellness remains an issue but there seems to have been a positive change over the last four months. The Monitor will continue to work with Defendants on strategies to improve staffing ratios and identifying additional strategies to positively impact staff morale/wellness.

H. Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (1) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

COMPLIANCES STATUS: PARTIAL COMPLIANCE. DJC staff and committees continue working to revise both DOC Chapter 376 and DOC Chapter 373. While the drafting process for 376 was suspended awaiting approval for the amended scope statement, DJC's 373 committee met weekly completing a substantial draft overhaul of the previous chapter. Due to the large-scale changes with respect to process, practice, and philosophy represented by DJC's vision for 373, the rulemaking process requires the department to submit an amended scope. Given the general timeline associated with the process, both DOC Chapter 373 and DOC Chapter 376 have made significant steps forward in the administrative rule-making process since June 1, 2021.

Chapter 373: First draft completed by DJC committee on August 10, 2021. Submitted to DOC's Office of Legal Counsel for review. The attorneys have scheduled a meeting for early

October to discuss some suggested edits or additions prior to submitting the amended scope for approval through the Governor's Office.

**Chapter 376: An amended scope statement was submitted for approval June 21, 2021 which had the effect halting any further drafting by the committee on the chapter until the amended scope could be reviewed through the Governor's Office. That process was completed, and the Secretary of the Department has approved drafting work on the rule to resume as of September 29, 2021. Defendants need to create an expedited timeline for finalizing all regulations and submitting them for approval.**

## IV.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A. **Incident review process.**  Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The 24-hour timeline is met in the vast majority of cases. Informal reviews occur right after an incident in majority of cases. When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). Also, a more thorough review with staff involved needs to occur. A framework for other QA measures relating to the consent decree has been created. Defendants have made huge progress as it relates to QA.**

B. **Quality assurance**.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As discussed throughout this report, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff.  Defendants have created a competent quality assurance program.  The leadership team is developing daily data to review that will**

**automatically be available in order to make real time operational decisions. The Monitoring team will continue to work with the superintendent to establish performance goals, analyzing data, and creation of corrective action plans.**

## <u>CONCLUSION</u>

The overall atmosphere has significantly improved during this site visit.  Staff and youth seemed less stressed during this site visit and the interactions between staff and youth were very positive. The Defendants should also be commended on all of their work on the physical plant including painting, lights, windows, general maintenance, and making the units as home-like and safe as possible.

With that being said, the facility would benefit from an increased focus on reducing idleness, particularly during weekends and evening hours.  Increased focus on creating "meaningful" programs and activities during the periods of time would have a profound impact on reducing incidents of violence and improving staff and youth relationships. Defendants need to continue to develop the "High Risk Unit" programming that ensures youth can move through the steps at an expedited pace if a youth's behavior warrants it. The music, art, gardening, welding, *etc.* should be expanded as youth really enjoy these activities and youth exhibit positive behavior while participating in these activities. The Defendants should continue their work on implementing the behavior management system, continue with their progress in implementing DBT, providing improved youth incentives that will help reduce behavioral incidents, and bringing gender and culturally relevant programming to LHS/CLS.  Continued efforts need to be made to further engage the educational expert, reduce teacher and social worker vacancies, increase educational time and quality, reduce use of administrative confinement, and clarify the observation policy to ensure compliance with the Agreement. Regular training in de-escalation and assessment, evaluation, and review of use of force continuum need to continue to occur. Applicable administrative code needs to be finalized and approved. Staff wellness needs to continue to be a priority. Lastly, as the Monitor continues to state in reports to the Court, there needs to be a focus on moving youth from LHS/CLS to more appropriate setting(s).

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

<u>/S/ Teresa Abreu</u>
Teresa Abreu
Monitor