UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                              Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

## TWELFTH REPORT OF THE MONITOR

Teresa Abreu, Monitor, hereby submits this status report.

## **INTRODUCTION**

The Eleventh Report of the Monitor was filed with the Court on November 15, 2021. The Monitor's twelfth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates since the eleventh site visit which took place on October 14, 2021.

## **SITE VISIT**

The twelfth site visit by the Monitor took place on January 13 and 14, 2022.  Due to the continuing pandemic, the Monitor limited onsite time to one day and a half (1.5 days) and completed necessary interviews/information gathering via in-person and virtual meetings prior to and after the site visit. The Monitor reviewed materials provided by the parties prior to and after the site visit for the reporting period ending December 31, 2021. Materials included but were not limited to: use of force videos, video footage of units and safety and security checks, COVID-19 related memos, directives and plans, programming materials, discipline documents, investigations, PREA investigations, various staff memos, daily shift reports, policies, all of the monthly data submitted to the parties per this Court Order (October, November, and December 2021), updated unit rules, work rules, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, PbS data, and other housing documentation.  The Monitoring team was on site during this site visit. Plaintiffs' counsel conducted approximately eight (8) youth

interviews virtually before and after the site visit. The Monitor toured LHS/CLS and interviewed youth and staff. The Monitor had the opportunity to talk to the majority of youth and staff present and available during the site visit. Approximately thirty-nine youth (39) youth and twenty-seven (27) staff were interviewed by the Monitor during this site visit.

## Overall Quality of Life, Conditions, and Atmosphere

Introduction

All of the COVID-19 modifications (health screenings, intake process, and quarantine process) were still in place during this reporting period. The COVID-19 precautions have remained consistent with the CDC's guidance for congregate settings. There have been six (6) youth COVID-19 cases and thirty-three (33) staff cases. This marks a substantial increase in staff positive cases from the last report. COVID-19 vaccinations continue to be offered to every youth and staff meeting the CDC guidelines. Defendants need to continue to require staff to where masks.

The total LHS/CLS population continues to remain low, ranging in mid to high forties (40s) on average for this reporting period. The overall atmosphere was pretty consistent from the last visit which was positive overall. There continues to be concern regarding programming, use of force, use of mechanical restraints, youth self-confining, quality and quantity of education, and other issues. However, overall, youth and staff morale were good and there has been progress in some areas of the consent decree from the last site visit (detailed throughout the report).

Physical Plant Observations

The entrance, grounds, visitation, most units, school, and many other areas were clean and orderly. Defendants completed renovating Douglass Living Unit, which is otherwise unoccupied, into a recreation space including the addition of a ping pong table, air hockey, electronic darts, and a variety of board games. The Unit looks amazing with many recreational activities available for youth. Staff and youth are enjoying the space. Defendants added materials and supplies to the kitchen for youth to engage in baking and cooking. The youth told the Monitor how much they love cooking and are enjoying the new recreation space.

Defendants continue with the following projects:

(1) The installation of new windows and window frames in each of the twelve (12) living units. Youth continue to break/damage windows. The new windows and frames include specialized glass that can withstand significant duress without failing. This effort will improve the environment and lighting as well as safety while reducing the need to regularly replace broken windows.

(2) Lighting upgrade project by submitting project documents for final approval and funding. This project will change the lighting in youth rooms, unit dayrooms, and emergency lighting. As stated in the last report, this will significantly improve the atmosphere on the unit.

(3) Additional fixed cameras throughout the facility including both internal and external cameras. Over the next couple of years, this project will result in the installation of over 100 new cameras that will increase both safety and accountability throughout the facility.

(4) Pursuing the replacement of boilers in the remaining living units. Along with heating boilers, the potable water heaters and exhaust fans are being considered for replacement as well.

(5) Received approval to pursue electrical upgrades in the greenhouse. This upgrade will allow for additional functionality in the greenhouse and address aging electrical issues.

(6) Enhanced the Music Arts Initiative by adding additional computer, software, and hardware components.

(7) Upgraded the electrical in the revamped welding shop. The electrical upgrade will allow youth to train and practice their newly learned skills on newer, more modern welders. In addition to the general electrical upgrade the lighting will also be enhanced in the updated space.

The Monitor recommended in the last report that the Defendants should continue to focus on the sensory rooms on the units as this can be a place for youth to relax and cool down when needed. The sensory rooms on the units have vastly improved from the last site visit with added comfortable seating and decor. The Defendants should be commended for their continuing commitment to improve the physical plant which improves the daily lives for staff and youth. The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

Education Observations

The school general areas and classrooms were spotless. Due to the timing of the site visit, the Monitor was not able to observe youth in the classrooms. However, the Monitor viewed random video during the reporting period and observed students actively participating in class and teachers teaching various curriculum.  The Monitor also observed youth having class on their unit (discussed more below). The Monitor was able to meet the new education Director and discussed his plans for the education program.

As detailed in the last report, Defendants completed a competitive bid process and awarded a contract to three consultants to evaluate the educational programming at LHS/CLS. The consultants are national experts and have been selected to evaluate key educational areas including:

- Operations
- Curriculum and Instruction
- Academic Assessments
- Special Education
- Human Capital
- Technology Integration
- Transition

Evaluation work commenced on November 30, 2021 and a full final report is expected sometime in the first half of 2022.

The Monitor recommended in the last report that the girls' classrooms should be painted a brighter color and have more of a classroom feel. The CLS youth picked the colors for the classrooms and the Defendants have painted the rooms. The classrooms are not in use yet as the furniture, décor, etc. still need to be finished. The Monitor looks forward to seeing the finished classroom. The CLS youth are excited to use these rooms.

Any youth in COVID-19 quarantine and youth in the High-Risk Unit ("HRU") Program (Krueger Unit) continue to have education in the unit and not at the school. The Monitor continues to recommend that the frequency of music, art, and recreation needs to increase. The quality of the music program is second to none and all youth would benefit from the program not just during the school day but on weekends when there is the most idle time.

PbS data shows that educational hours for October 2021 decreased slightly from the April 2021 data collection period, dropping to 4.43 hours per day at LHS (weekdays) compared to 4.93 hours in April, and dropping to 4.20 hours per day at CLS (weekdays) from 5.32 hours during the April data cycle.

The Krueger Unit education hours improved and increased during the October cycle and are only slightly below the other units. Krueger recorded 4.18 hours of education compared to 4.45 hours for the other units. During tours of the units, the Monitor observed on-unit education taking place in the Roosevelt dayroom area. There were four (4) youth participating in the remote learning class. The dayroom area was extremely loud and distracting due to other youth in the area. It did not appear that the youth were receiving a quality remote learning experience given the distraction from the other youth. The Monitor looks forward to progress made with the new educational leadership and consultants.

Living Unit Observations

The Monitor visited each cottage that youth were housed in during the site visit. The living units were generally clean. Overall, the units and youth rooms were not as clean as the last visit. Youth were also more spirited/less calm than the last site visit.

There were more than adequate staffing levels on each of the living units. The unit populations ranged from six (6) to eleven (11) youth. Staff were less engaged with the youth than during the last site visit, however the tour of the living units happened when youth were either about to leave the unit or youth were returning to the unit. Staff were mainly positioned in their offices or on the perimeter of the room. The Monitor wanted to confirm whether this was a regular occurrence or coincidental based on the timing. The Monitor reviewed video during the reporting period to view day room activities, staff placement and staff engagement. There were many instances in which staff were engaged with youth and positioned at or near tables and areas with youth, which was positive. The youth-staff relationship in general seems positive and several youth told the Monitor that they liked the staff. The body language and tone were positive from both youth and staff in general. All the youth that the Monitor interacted with were respectful and willingly communicated with the monitoring team. The Monitoring team had an opportunity to talk to most of the youth present in the day rooms. There were more youth in their rooms (self-directed) than the last site visit.

During this site visit, the girls were housed in the Wells Unit.  There were twelve (12) youth total in CLS.  The King unit was not used for youth to sleep in, but youth were on the unit for programming during the waking hours. There were three staff members on each unit. Wells unit was clean in general, but the King unit was not.  The youth rooms on CLS were quite messy which is not typical of CLS.  Two (2) youth were confined to their rooms due to being in medical isolation and one (1) youth self-confined because she stated she did not feel safe.  The girls were not calm like they usually tend to be. The CLS youth had complaints for the monitoring team as detailed below.

With respect to the boys' cottages, Addams, Curtis, Miller, Hughes, and Rogers were empty units during this site visit. The boys were housed on Krueger, Black Elk, Dubois, and Roosevelt. As previously mentioned, the Douglass unit is the new recreation unit. All units had more than adequate staffing. Youth were getting back from school, participating in DBT group, on telephones, watching television, playing video games, in their rooms sleeping, or cleaning.

In the last report, the Monitor discussed the "Hughes Program." The "Hughes Program" was implemented on March 30, 2021 and is considered the "High Risk" Unit. The program continues to be housed in the Krueger unit. For the purposes of this report, the unit will be referred to as High Risk Unit ("HRU").  HRU Program is modified programming for youth who engage in physically aggressive behavior, present a danger to others, and/or exhibited behavior that caused a major disruption to the facility.  After the last site visit, the monitoring team offered suggestions to improving the program and provided examples of similar programs that can potentially be incorporated within the structure of current program to enhance the overall impact and improve services and outcomes.  The Defendants implemented some of these suggestions and are still revising the program.  Youth housed on HRU unit have a "Supplemental Youth Plan" created by PSU in order to specifically address their behavior.  Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team.  The Superintendent (or designee) have to approve placement onto this unit. The youth are split into groups, but the unit remains open and are out of their rooms 8 A.M .to 8 P.M. like other units.  The Monitor will keep the Court apprised of further modifications made to HRU.

Review of the unit activity logs comparing data between units, indicates that the HRU program is providing the same average hours of education, programs, and out of room opportunities as the other general population units, with the exception of recreation time.  HRU youth are receiving approximately 12.10 hours per day of out of room activities, including education, programs, recreation, and leisure time, compares to approximately 12.50 hours per day for youth assigned to other units.

In general, youth and staff attitudes were not as positive as during the last site visit, but overall were generally good. The Monitor continues to stress the need for more structured and meaningful activities as youth idleness remains a concern, particularly on weekends. Enhancing weekend activities and programs will help reduce the risk of youth engaging in anti-social behaviors when they have little else to do like excessive horseplay, destroying property, and running around unauthorized areas.   During previous site visits, the Monitor recommended creating and implementing a daily schedule to help with youth boredom and create opportunity for structured, meaningful programming and activities.  The Monitor was provided an example of a daily schedule

but was told it has not been fully utilized as of the site visit.

When looking at the PbS daily activity summary logs from the October data collection cycle, both LHS and CLS are averaging about 8.0 hours per day of "leisure activity" on weekends (down from 9.5 hours in April 2021), but still very high.  It is also notable that the average leisure time hours increased slightly during weekdays, rising to about 3.50 hours per day, compared to about 2.75 hours per day Monday-Friday during the April data cycle. This could be a result of renewed operational challenges resulting from the Omicron variant of COVID-19. The "leisure activities" are long periods of time that are unstructured, mainly occurring in the dayroom areas.  These are the periods in which most incidents of violence occur (PbS data reflects that 95% of all incidents occur on the living units).  Of the 359 incidents recorded at LHS and CLS during the October data cycle, 31%, occurred on a weekend. This is an improvement from the April data cycle which reflected 42% if incidents occurring during the weekends. The incident report data also indicates that 117 incidents, or 33%, occurred between the hours of 8 A.M. and 10 A.M. (weekdays and weekends included). This too improved from the April data cycle. The Monitor also notes that the majority of incidents at CLS occur on Mondays and Fridays, with 3P.M. recording the greatest number of incidents. There needs to be a focus on creating a daily schedule that provides for structured and meaningful activities and accountability in order to minimize the incidents of youth acting out.

(Note: PbS Incident is: an event or crisis that may compromise the safety and security of staff and residents and requires staff response and written documentation. Such events occur within the facility (although they may be precipitated by events outside the facility) and may involve staff, youth, or others. *Examples include assault, escapes, evacuations, vehicular accidents, abuse, disturbances, or riots. Incident also refers to situations of environmental risk, such as broken glass, blocked emergency exits, etc. Some incidents may be resolved without injury to staff or residents. However, some incidents may result in injury, the use of restraint(s), and/or the filing of misconduct charges that may result in punitive sanctions to youth or disciplinary action to staff.)*

Review of the PbS incident report data over the last three years reveals significant declines in the number of reportable incidents.  The 359 reported during the October 2021 data collection cycle are the fewest number of incidents reported dating back to October 2019.

October 2021 – 359 Incidents Reported
April 2021 – 606 Incidents Reported
October 2020 – 709 Incidents Reported
April 2020 – 1,040 Incidents reported
October 2019 – 819 Incidents Reported

While these are remarkable improvements that reflect an overall reduction in incidents of violence, the Monitor also notes that the reductions correlate directly with the reduced population of the facilities.  The reduced incidents are most likely a reflection of the lower population as well as improved facility operations and other changes reflected within the scope of the settlement agreement.

Defendants had the following holiday programming this reporting period:

(1) Christmas Pageant- The facility chaplain assembled a Virtual Christmas Pageant on PowerPoint. The slides include pictures of the youth dressed up in costume telling the Christmas Story. This PowerPoint was saved and shared with the youth upon its completion.

(2) Christmas Caroling Contest- A Christmas Caroling Contest for youth at LHS/CLS was held on December 21, 2021. HSU staff traveled to each living unit to listen to everyone's favorite Christmas song "Jingle Bells" performed by the youth as a group.  Those who participated each received a small bag of candy, provided by HSU. HSU then picked the Grand Prize Winner. The winning unit music got to choose a meal from three restaurants.

(3) Wreath making November 22, 23, and 24, 2021- The nine (9) girls and sixteen (16) boys who participated in the wreath making project were awarded points for their behavior and participation.

(4) CEA-W Creativity Contest- The CEA-W creativity contest was offered to students and submissions were being accepted through December 30, 2021. Any CLS/LHS youth are eligible to submit a sample of creative writing and/or original artwork for consideration.

Defendants now have the welding programs on weekends which is a positive change and recommended by the Monitor.  Youth are enjoying this weekend program. There is still a need for more structured and meaningful activities as youth idleness remains a concern, particularly on weekends.  There also was in increase in self-confinement both in the data and observations during the site visit.  During previous site visits, the Monitor has repeatedly and continually recommended creating and implementing a daily schedule to help with youth boredom and create opportunity for structured activities.  A schedule has not been put in place to date.  A schedule is needed in order to improve accountability and minimize the incidents of youth acting out. Improving the behavior management system, improving the rewards and incentives, and developing engaging programming will have a positive impact on the overall behavior and atmosphere.

<u>Youth Interviews</u>

Approximately thirty-nine (39) youth were interviewed during the site visit (formally and informally) by the Monitoring team and approximately eight (8) youth were interviewed prior and after the site visit by Plaintiffs' counsel.  There was only one request to talk to Plaintiffs' counsel while the Monitor was onsite talking with youth, and counsel followed up on that request.

In the previous site visit, youth did not have any complaints. During this site visit, some of the LHS youth complained to the monitoring team about the food, being bored, having no consistency in rules, the facility not being as clean, and staff not wearing masks at all or improperly.  A couple of the youth on CLS had similar complaints as the LHS youth but also complained about wanting more female staff on the unit, a particular staff member that made them feel uncomfortable, and not having the same opportunities as the boys.  Youth had good things to say as well such as feeling safe, having some good staff that engage with them, liking the recreation unit and music program.

Youth did complain to Plaintiffs' counsel prior to  and after the site visit (during this reporting period) about staff not wearing masks and being confused about how to progress through the levels of

programming (CLS and LHS), CLS youth not feeling safe (number of girls increased and there were more fights and tension), girls running from staff while outside, use of force and restraints, using AC too often and for unwarranted reasons.  Additionally, youth on the High-Risk Unit felt that they could not move through the levels quickly enough.  The Monitor observed all staff wearing masks appropriately during the site visit, but while reviewing random videos, the Monitor observed several staff not wearing masks at all or not wearing them correctly (over their nose and mouth), as the youth had indicated.  Given the high rates of COVID-19 among staff and the ease with which Omicron spreads, it is imperative that staff protect  youth by wearing their masks properly and at all times. The Monitor also reviewed several use of force videos/mechanical restraint usage and the use of force/restraints observed were appropriate.

The Monitor continues to encourage staff to engage youth and have more meaningful/structured programming and activities. It is clear that when staff engage with youth, youth respond positively. The Monitor continues to recommend that the Defendants should take advantage of the reduced population by having the available staff in plan, prepare, and develop programs for youth. The Defendants need to focus on gender and culturally competent programming.

There is no significant update from the last site visit as it relates to the status of the LHS/CLS closure. Legislature has not approved locations or funding for new facilities.  Defendants continue to analyze if the site of a current minimum- security adult DOC facility in Milwaukee is suitable for a new juvenile facility.  There needs to be significant movement on complying with the requirements to close LHS and move youth closer to locations where needed, culturally and gender competent programs and services are more widely available.  Further, moving the facility would facilitate family visits, which are generally important and necessary for youth. In addition, the lack of alternative facilities adversely affects those girls who are in need of significant, sustained mental health treatment at a level not available in CLS.

<u>Staffing</u>

Key Positions hired during this reporting period are as follows:

- Juvenile Education Director
- Corrections Program Supervisors (2)
- Special Education Teachers (2)
- Psychology Associate

Direct-care staffing vacancy percentage has increased very slightly from the last reporting period (*see below*). There are 311 total positions ("FTEs") at LHS/CLS.  Approximately 153 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA"). The teacher vacancy rate is slightly higher than last reporting period (11 vacancies), or 44% of positions. There is the same number of social worker vacancies, which at 57% is very high.  This is a critical role that should be made a recruiting priority. The Monitor encourages continuing to recruit teachers despite the reduced population and challenges with COVID-19.  Recruiting is still a challenge due to the location of the facility, overall teacher shortages, relatively low compensation, location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and the year-round school calendar and thus, hiring needs to continue.

| Position | Vacancy Rate % as of May 31, 2021 | Vacancy Rate % as of September 30, 2021 | Vacancy Rate % as of December 31, 2021 |
|---|---|---|---|
| Youth Counselor | 36% (41 out of 115) | 30% (41 out of 115) | 38% (44 out of 115) |
| Youth Counselor Adv. | 19% (7 out of 37.5) | 19% (7 out of 37.5) | 13 % (5 out of 37.5) |
| Teacher | 32% (8 out of 25) | 40% (10 out of 25) | 44% (11 out of 25) |
| Social Worker | 36% (5 out of 14) | 57% (8 out of 14) | 57% (8 out of 14) |

Youth Counselor vacancies have increased during this reporting period, but Youth Counselor Advanced vacancies have decreased from 19% to 13%.  Staffing levels remain adequate and meet legal requirements based on the reduced population that exists at LHS/CLS. The Defendants should continue to monitor employee leaves and scheduling to ensure staff are not overly mandated to work overtime.

The Monitoring team spoke to over twenty-seven (27) staff. Staff morale seemed good overall, however staff were less engaged with youth during this site visit. However, the timing of the visit might have contributed to that because the youth were just returning from school or on their way to school/off unit programming. A review of video over the reporting period showed staff regularly engaging with youth. A few staff felt that the consequences for youth were not sufficient. A few staff said that things are better than a year ago and a few said things are the same as a year ago, but none said they were worse.  Several staff stated that they liked their jobs and felt safe.  Another staff loved working with youth in the new recreation center.  The continued implementation of DBT and other best practices will improve safety for staff and youth.

The PbS data for October 2021 reveals a decrease in staff fear for safety concerns as well as an increase in staff perceptions regarding how dangerous the facility is based on input taken from the Staff Climate Surveys.  Overall, fear for safety has improved, but remains well above the national field average and will continue to need to be addressed.  Both of these outcome measures reflect improvements in the fear for safety concerns over the previous data collection cycles. However, given the fact that fear for safety remains high in comparison to the national field average, this remains a concern for staff, youth, and the Monitor.

Fear for safety indicators at LHS improved, dropping from 76.79% in April 2021 to 52.17% in October and improving from 86.84% in April to 50% in October at CLS.  Both also represent improvement over the October 2020 data cycle as well.  However, both of these indicators remain significantly above the national field average of 22.77%.  This data certainly supports the staff and youth feedback that was provided to the Monitor during the site visit.  The facility may want to consider making fear for safety and staff wellness a target for the next Facility Improvement Plan (FIP).  These are very typical outcomes for facilities going through these types of reform efforts.

- Note:  The Monitor notes that the facility only completed or received (23) total staff climate surveys and 8 additional surveys were recorded as "do not agree to participate".  The low response rate may well affect the data regarding staff perceptions.   The Monitor would encourage the facility to work towards surveying all staff and youth during the next data collection cycle to see if these indicators change significantly with a higher response rate. Staff must trust the anonymity of the process as well as believe that real change will occur as a result of their participation.  The facilities should ensure that they follow the PbS climate survey scripts and that facility leadership is open and transparent with the outcomes and survey results in order to build trust in the process.

Defendants continue to work on increasing staff morale but still have much more work to do. Defendants have done the following to increase staff morale during this reporting period:

- The Crisis Intervention Response Team ("CIRT") Coordinator position hired during last reporting period has been working with DJC Administration to implement a comprehensive multicomponent approach to crisis intervention, also referred to as critical incident stress management at the schools.  The CIRT provides peer to peer support regarding secondary trauma and critical incidents that occur at the schools. DJC's CIRT team is implementing strategies that can help reduce stress and compassion fatigue, as well as foster resilience within the work environment amongst peers.
- Monthly lottery of a gift card has continued to be offered as an incentive for regular attendance and extra hours worked that qualify staff to win. (Note these gift cards are not funded by state funds, funded by personal contributions to support this staff recognition effort). Staff have the ability to be entered into this lottery twice monthly based on set criteria.
- Employee of the Month winners continue to be named every month. Winners are awarded a prime parking spot and names are displayed in the upstairs entry hall.
- Two new vending machines were added downstairs and two were added upstairs.
- There is Winter Greenhouse sale.
- Various holiday events.

The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives, changes to programming, and general information.  A major component of staff wellness is ensuring staff feel as safe as possible.

Youth in Custody Practice Model ("YICPM") Update/ Dialectical Behavior Therapy ("DBT")

DJC is continuing in the next phase of participation with YICPM.  The Defendants continue to work with Dr. Chapin on Dialectical Behavioral Therapy ("DBT") as a behavior management system. DJC continued to develop foundational supports for staff to effectively provide programs and services focused on DBT treatment-informed best practices throughout the System of Care.

In October, DBT Skills Groups and the weekly DBT Skill Highlights (shared with leaders and staff) finished covering the first cycle of all of the DBT curriculum which includes Walking the Middle Path, Mindfulness, Crisis Survival, Distress Tolerance, and Emotional Regulation skills. The second cycle of DBT then began in late October with youth revisiting group expectations,

identifying values, and setting goals prior to engaging in continued mindfulness practice, with facilitators supporting youth to more actively engage and sometimes lead activities. Meanwhile, Morning Mindfulness in the school has continued to bolster the youth's practice with multidisciplinary support.

In consultation with Dr. Chapin, the pre-treatment curriculum was designed to prepare youth in intake to successfully enter into their Unit's assigned groups. As of November, pre-treatment efforts have benefited from having a Treatment Specialist dedicated to Krueger as well as the support of the new Krueger Corrections Program Supervisor ("CPS") who was a prior PSU associate) and the new social services CPS. During pre-treatment, youth have been learning about the goals and expectations of group, structure of lessons, dialectics, options for solving any problem, validation, behavior chain analysis and the skills of mindfulness. In addition, as of December, the System of Care ("SoC") Stage Progression framework was updated to allow intake youth the opportunity to begin earning Program Points towards Stage Progression for their active engagement in pre-treatment, mindfulness, intake educational assessments and facility orientation.

The core executive leadership team focused on holding SoC/DBT meetings with Dr. Chapin to discuss strategic priorities in alignment with DBT practices and organizational needs. A Behavior Chain Analysis (BCA) workgroup was established in partnership with PSU and Dr. Chapin to provide BCA updates, develop a Help Sheet to guide youth, and outline a plan for staff and supervisor training to enhance BCA practice as a key DBT intervention option. A Noncompliant Conditions and Violations workgroup also developed to draft the business process for documenting responses to noncompliant behavior within J-Tracker. The Monitoring team had the opportunity to meet with Dr. Chapin during the site visit and review a potential egregious behavior protocol and recommended changes to that protocol. Once DBT is fully integrated into the programming, if done appropriately, and with a race/equity lens, there should be significant improvement in many facets of the daily operations of LHS/CLS. The Monitor looks forward to DBT being fully and properly integrated into the daily life of youth and staff.

Quality Assurance ("QA")

During this reporting period, CLS/LHS hired a Program and Policy Analyst-Advanced focused on the ongoing Quality Assurance ("QA") implementation efforts surrounding the consent decree and other important functions in the school and facility system of care updates.

Since October, the QA staff has worked to create a database that allows speedy retrieval and analysis of J- Tracker data. There is work left to be done building out the databases functionality and reporting capabilities, but in the initial phases of the ongoing project, the databases ability to assist incident debrief analysis has given management staff reviewing incidents more consistently accurate and timely reports.

The database allows the user to easily defragment information from the debrief form and run user-specific reports and graphs. When these reports are finalized, the more rapid turnaround ability for tracking progress has moved the facility closer than in the past to retrieval of timely and relevant data reports that can reliably assist management in making data driven decisions for the facility.

In an effort to align PbS data collection efforts with our ongoing quality assurance framework, definitions are being standardized into policy, J-Tracker, and Guardian. Previously a youth counselor entering an incident in J-Tracker would have a different array of confinement categories from a youth counselor on the unit using a handheld device.

The confinement categories available to staff tracking confinement on the units with the handheld, are now matched exactly with the confinement categories in J-Tracker. Aligning the terminology and definitions for confinement between J-Tracker and Guardian is one example of how multi-disciplinary committees of DJC staff continue to work to establish collaborative communication strategies that can work to bridge different data collection platforms and improve data quality. Again, tremendous improvements have been made in data collection and in the quality assurance program.

PbS Facility Improvement Plan ("FIP"):

PbS Data Quality – In previous reports, some issues were identified as to the quality of the data entered for some outcome measures, including outcomes measuring around daily activity durations. Through the review of the data reports, the Monitor is pleased to report that those issues continue to appear to have been resolved and the data appears to be much more accurate.  With the improved data collection, there is a better sense of the progress being made.  Before the Monitor begins to outline areas for improvement, it is important to recognize the efforts and positive steps forward in regard to the quality of the PbS data and the overall progress in many of the outcome measures.  It is important to remember that PbS is a "continuous facility improvement program," therefore overall progress is measured over the period of years and numerous data collection cycles.  PbS is a snapshot taken twice a year, during the April and October data collection cycles and, therefore, may not match the three (3) month data cycle covered during this reporting period.  The overall outcomes for each may or may not differ depending upon variables. The trendline of the outcome measures is what is most important as it reflects the direction of the facility over time.  The October data clearly shows some positive progress trends moving in the right direction for many of the outcome measures with some having moved in a negative direction.  This is expected given the complex operational changes occurring within the culture and atmosphere of the facility.

A thorough and in-depth review was conducted of the October 2021 PbS data collection for both LHS and CLS.  During the review, outcome measure data clarification and input was sought from both the facility PbS State and Site Coordinators and the assigned PbS Coach.  As a result of the review, the following highlights and outcomes are noted: It is also important to note that the October 2021 data collection took place as the facility was again managing operational challenges resulting from the pandemic, which certainly made facility operations much more challenging, particularly around the issue of reducing "operational" room confinement and leisure time activities.  As mentioned previously in this report, the issue around youth idleness, behavior accountability, and staff wellness and fear for safety remains a concern and is reflected in many of the outcome measures.

With all that said, there are a couple of outcome measures that warrant attention.  First and foremost is what is unquestionably a continued high rate of "self-requested" confinement.  This remains an issue from previous data cycles and continues into the October 2021 cycle with some progress of

improvement being recognized. The data reflects 530 incidents of confinement use during the month of October 2021 (389 @ LHS and 141 @ CLS). Of these, there were a total of 427 for self-requested confinement, representing 81% of all confinement for the facility during the month. It should be noted that the facility has instituted a procedure in which youth refusing to participate in school or other programs are not locked in their rooms, the doors remain unlocked and youth may exit at any point to participate in programs. On one hand, this is a positive as very little confinement is a result of behavior issues. On the other hand, it is also a reflection of the culture, atmosphere and environment which results in such self-selected confinement. Focusing on improvement on these particular areas of confinement will certainly have an immediate and positive impact on reducing overall confinement numbers.

Additionally, the previous reports discussed that the unit activity record for the Krueger Unit reflected that youth were spending approximately 20.64 hours per day in their rooms (10.5 hours reflected as sleeping time and 10.14 hours reflected as "in sleeping rooms," room confinement). The activity log for the Krueger Unit also did not reflect any hours for education. This issue seems to have been resolved. The April and October 2021 data shows Krueger youth spending approximately 11.00 hours in their rooms for "sleeping" time and 0.50 hours in their rooms for other reasons. Education hours for Krueger youth increased to approximately 4.18 hours per day (weekdays) and leisure activity time decreased to 3.82 hours per day. This represents a larger portion of their day that is spent in more meaningful activities such as education. While the Monitor recognizes these improvements, it is necessary for the facility to provide more meaningful programs and activities to youth during the leisure time periods, particularly on weekends.

Finally, the Monitor encourages the facility to continue closely reviewing all of the PbS data and outcome measures with staff at all levels as a means to better understand the impacts generated from the many changes occurring within the facility. The Monitor recommended that agency and facility leadership should make it a point to review the PbS data with staff at all levels, perhaps during monthly all staff briefing meetings. The Monitor is happy to see that the Superintendent's Town Hall meetings have included the PbS site coordinator after each data collection cycle beginning with April 2021. This has helped disseminate relevant statistics and progress points from the FIP's, answer staff's questions about PbS, and identify opportunities for improving the data collection process. Additionally, the PbS Facility Improvement Plan Committee comprising of members from a multi-disciplinary team that encompasses all the facility departments has met monthly during the reporting period sharing data collection improvement strategies and significant outcomes from past month's data collection cycles.

This is an opportunity to show the positive outcomes being achieved through the various changes and efforts to reduce incidents of violence, confinement, and use of restraint. Much work remains to be done. The data shows fluctuating trend lines, some moving in the right direction, while others are not. These fluctuating trends can and should be expected as staff and youth adjust to the ever-changing behavior response techniques and the skill level of staff in utilizing various training, de-escalation techniques, and, as discussed earlier, in the full implementation of the behavior management system.

As discussed in the previous Monitor's report, many PbS indicators, particularly the ones singled out in our facility improvement plan action steps have trended in a positive direction as compared to previous collection cycles and against the national averages produced by PbS.  After the April 2022 data cycle reports and surveys are finalized in mid-May, a new round of PbS data will provide DJC with a clearer picture as to whether progress on these Orders has been sustained or if there are any other metric indicators that will need addressing. The Monitor will continue to update the Court when the next PbS data becomes available.

PbS Critical Outcome Measures Review

Use of Restraint Outcome Measures - Both LHS and CLS show "0" incidents of use of chemical agents (Order 6) during the October 2021 data collection cycle, which is commendable and per the Settlement Agreement.  The rates of physical restraint use (Order 3 – Physical Restraint Use per 100-person days of confinement) at LHS and CLS declined during this data cycle but remains above the national average, as does the rate of mechanical restraint (Order 4 – Mechanical Restraint use per 100-person days of confinement) usage incidents.  Both facilities experienced the lowest mechanical restraint usage during this period compared to prior data collection cycles and this points to a changing and positive culture in how staff are responding to youth behaviors.  However, physical restraint usage, especially at CLS, remains high and does tend to confirm the youths' complaints that staff frequently go "hands on." In addition, there is a relatively high rate of youth injury by staff in CLS, which also seems to support these concerns.  During the month of October 2021, CLS recorded 11 youth injuries during the application of physical or mechanical restraints. This is well above the national average.

As mentioned earlier, PbS is a continuous facility improvement process which involves complex operational issues.  The following two charts reveal that overall, the trends lines for both physical and mechanical restraint use has returned to the average levels from the October 2020 spike, and now appear to be trending the right direction.  It is normal to see fluctuation in this type of data and the October spike is most certainly related to temporary operational changes that were in place as a result of the pandemic.   Improvement in reducing youth idleness with meaningful programs and activities along with an improved behavior management program, can have a significant impact on these outcome measures.

Use of physical and mechanical restraint at LHS is now below the national field average but remains high at CLS.

## Order 03
Physical restraint use per 100 person-days of youth confinement.

LHS:



CLS:



(Note: PbS defines Physical Restraints as facility authorized and trained holds used by staff to subdue an otherwise uncontrollable youth in order to prevent the youth from injuring him or herself, or others.)

## Order 04
Mechanical restraint use per 100 person-days of youth confinement.

LHS:



CLS:



(Note: PbS defines Mechanical Restraints as Mechanical Devices used to prevent an uncontrollable youth from injuring him or herself or others. Mechanical restraints may only be used for short periods of time and must be used under medical supervision.)

The previous Monitoring reports discussed issues around the reduced use of the Care Teams which had resulted in a higher number of restraint-usage incidents. Given the positive reductions in the use of physical and mechanical restraints during this PbS cycle, it appears the heightened focus on Care Teams has had a positive impact. Care Teams are designed precisely to reduce the need for the use of restraints and have been effectively shown to work at facilities across the country and have been shown to be effective at LHS and CLS as well.

Isolation, Room Confinement and Segregation Measures – Overall, the PbS outcome measures around isolation and room confinement remained unchanged from the April 2021 PbS data collection cycle, reflecting that 93.22% (down from April) of room confinements are terminated in under eight hours at CLS and 96.55% at LHS (increase over April), although the LHS rate was slightly improved from the April 2021 rate. Slightly fewer incidents of room confinement are terminated in under four hours at CLS, 91.43%, while the same rate holds at LHS at 96.55%. These are both very commendable achievements, and both are better than the national field averages for these outcome measures. Order 13 – Isolation, room confinement use for reasons other than behavior reflects decreases at both LHS and CLS for this data period over prior reporting periods, this may be a result of recent changes limiting the use of "observation status" confinements. This issue needs to be reviewed more thoroughly to better understand the overall impact and duration data of these confinements as the data continues to reflect higher use than the national field average.

It should also be noted as to the improved outcomes and reduced rates of initial room confinement placements during the October data cycle. Both facilities showed reduced incidents of confinement practices, with LHS remaining at the national field average.

## Order 08

Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement.

LHS:



CLS:



## Order 13

Isolation, room confinement use for reasons not related to behavior per 100 person-days of youth confinement.

LHS:



CLS:



(Note:  PbS defines confinement as any instance when a youth is separated from the youth population and placed in a room or cell alone for 15 minutes or longer. Youths are considered to

be confined from the moment they are separated from others until they have rejoined the population. Youths may be transferred to a designated unit for confinement (e.g., a segregation dorm or program separation unit). Confinement may occur in locked or unlocked rooms but cannot occur in large dormitories. Any instance of confinement of 15 minutes or more is a reportable PbS incident event.)

As discussed earlier in this report, there remains an issue around Order 13 – Isolation, Room Confinement for reasons *not related to behavior*.  These appear to primarily be incidents where youth are refusing to participate in programs and education. As you can see from the following chart, self-requested involves 92% of the non-behavior related confinement incidents at LHS and 55% of confinement incidents at CLS.  While the use of room confinement for "self-requested" declined from the October 2020 data cycle, it still remains a very high percentage of confinement usage.  This continues to be a reflection from the overall behavior management system and lack of appropriate use of incentives and rewards.  Youth continue to refuse to go to school and elect to remain in their rooms and often simply watch TV all day.  Facility staff need to focus on youth engagement or re-engagement strategies as well as the behavior management system in order to get youth to participate in programs. The use of room confinement for "mental health" related issues decreased significantly at CLS during the month of October, decreasing from 38 incidents in April 2021, to just 4 this period.  This represents just 3% of the room confinements at CLS.  Use of room confinement for mental health reasons was 0 at LHS.

| Why confinement was used | Lincoln Hills | | Copper Lake | |
|---|---|---|---|---|
| Value | Count | Percent | Count | Percent |
| Self-requested | 360 | 93% | 67 | 48% |
| Mental Health | 0 | 0% | 4 | 3% |
| Protect other youths or staff | 18 | 5% | 57 | 40% |
| Other responses to behavior | 4 | 1% | 0 | 0% |
| Other | 0 | 0% | 10 | 7% |
| Consequences of rule violation | 1 | 0% | 2 | 1% |
| Protect property | 3 | 1% | 0 | 0% |
| Give youth time to cool off | 2 | 1% | 0 | 0% |

The PbS Incident reporting data for October 2021 reflects the following important data points:
➢ 87% of the incidents occurring at CLS occurred in the living unit.
➢ 58% of restraints use at CLS involved the same two youth.
➢ Zero incidents of injuries to youth from suicidal behaviors were reported.
➢ 93% of the incidents occurring at LHS occurred in the living units.
➢ 60% of the incidents occurred in the Black Elk Unit (148 total incidents).

➢ 25% of incidents occurred in the Dubois Unit (62 incidents).
➢ 31% of the recorded incidents at LHS occurred on a Saturday or Sunday when there is significantly less activity.
➢ CLS continues to see a high number of youth injuries from staff (Safety 5) which appears to be occurring during the use of physical and/or mechanical restraint.

# Safety 05

Injuries to youths by staff per 100 person-days of youth confinement.

LHS:



CLS:



## Safety 06

Suicidal behavior with injury by youths per 100 person-days of youth confinement.

LHS:



CLS:



While there appeared to be a substantial increase in suicidal behavior with injuries, Safety 06 at

CLS during the October 2020 data cycle, more recent data cycles have recorded zero such injuries. It should be noted that due to the lower population of CLS, each incident has a major impact on the overall rate, which is the measure against the field average.  The total number of these incidents during the October 2020 data cycle was five (5), a drop from eight (8) similar incidents during the April 2020 data cycle.  The facility recorded "0" such incidents during the April and October 2021 data periods.

**LHS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 248 | 93% |
| No | 18 | 7% |

**CLS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 81 | 87% |
| No | 12 | 13% |

**LHS Incident location (living units):**

| Value | Count | Percent |
|-------|-------|---------|
| Black Elk | 148 | 60% |
| DuBois | 62 | 25% |
| Krueger | 24 | 10% |
| Roosevelt | 14 | 6% |

**CLS Incident location (living units):**

| Value | Count | Percent |
|-------|-------|---------|
| Wells | 55 | 68% |
| King | 26 | 32% |

Youth and Staff Climate Surveys –   It is strongly recommended that both department and facility leadership take the time to thoroughly review the agency/jurisdiction count summaries for both the youth and staff climate surveys.  The results can be very insightful and useful for leadership.  Below are some of the survey results.

**Staff Climate Survey Results:**

(Note: There was a significant decrease in the number of staff surveys completed for this reporting period, 23 compared to 150 during the previous data cycle.)

**Within the last six months, have you feared for your safety in this facility?**

| Value | Count | Percent |
|---|---|---|
| Yes | 12 | 52% |
| No | 11 | 48% |
| Not recorded | 0 | 0% |

**How safe or dangerous do you feel this facility is for staff?**

| Value | Count | Percent |
|---|---|---|
| Unsafe | 7 | 30% |
| Very dangerous | 7 | 30% |
| Safe | 8 | 35% |
| Very safe | 1 | % |
| Not recorded | 0 | 0% |

**In your opinion, what would make this facility safer?**

| Value | Count | Percent |
|---|---|---|
| More staff | 20 | 87% |
| Safety equipment | 8 | 35% |
| Training | 11 | 48% |
| Other | 9 | 39% |
| Less overcrowding | 4 | 17% |
| Not recorded | 0 | 0% |

In regard to the above chart, the following are the top ten most requested training that staff felt would make the facility safer:

**What training would you like to see?**

| Value | Count | Percent |
|---|---|---|
| Safety and security | 13 | 57% |
| General behavior management | 12 | 52% |
| Communication | 11 | 48% |
| Appropriate staff/youth relationships | 9 | 39% |
| Agency policies and procedures | 8 | 35% |
| Verbal de-escalation | 8 | 35% |
| Gang training | 8 | 35% |
| Ethics | 7 | 30% |
| Cultural diversity and awareness | 7 | 30% |
| Use of isolation | 7 | 30% |

**October 2021 PbS Staff Climate Survey Results:**

➢ **52% of staff responses reported they fear for their safety, which is an improvement over previous data periods.**
➢ **60% of responses reported they believe the facility is unsafe or very dangerous, again an improvement over previous data cycles.**
➢ **74% of responses indicate that staff believe they do not have authority to discipline youth appropriately.**
➢ **74% of staff report that they value family members and youths' social supports as partners in their work with youth.**
➢ **65% of staff report that they do not have the authority to reward youth appropriately.**
➢ **70% of staff report that they don't know if staff inform youth about trauma and why it matters.**

**Youth Climate Survey Results:**

**Do you fear for your safety in this facility?**

| Value | Count | Percent |
|---|---|---|
| No | 20 | 65% |
| Yes | 9 | 29% |
| Refuse to answer | 0 | 0% |
| Not recorded | 2 | 6% |

In comparison, the youth fear for safety measure, Safety 13, has steadily improved from the previous data collection cycles. The rate still remains higher than the national field average but is improving.

**Within the last six months at this facility, have you had personal property stolen directly by force or by threat?**

| Value | Count | Percent |
|---|---|---|
| No | 18 | 58% |
| Yes | 9 | 29% |
| Refuse to answer | 2 | 6% |
| Not recorded | 2 | 6% |

**Do staff members show residents respect?**

| Value | Count | Percent |
|---|---|---|
| Sometimes | 16 | 52% |
| No | 7 | 23% |
| Yes | 6 | 19% |
| Not recorded | 2 | 6% |

**Are the staff good role models?**

| Value | Count | Percent |
|---|---|---|
| No | 13 | 42% |
| Sometimes | 12 | 39% |
| Yes | 4 | 13% |
| Not recorded | 2 | 6% |

**Do staff here respect your traditions, beliefs and culture?**

| Value | Count | Percent |
|---|---|---|
| Yes | 12 | 39% |
| Sometimes | 9 | 29% |
| No | 6 | 19% |
| Refuse to answer | 2 | 6% |
| Not recorded | 2 | 6% |

**If yes, approximately how often do you talk on the phone with your parent and/or guardian?**

| Value | Count | Percent |
|---|---|---|
| 5 or more times per week | 17 | 68% |
| 1 - 2 times per week | 4 | 16% |
| Less than once a month | 2 | 8% |
| 3 - 4 times per week | 2 | 8% |

**What would make it easier for your family to visit?**

| Value | Count | Percent |
|---|---|---|
| The facility was closer | 17 | 55% |
| The visiting hours were better | 15 | 48% |

| The facility provided transportation | 8 | 26% |
|---|---|---|
| The facility allowed family visits | 5 | 16% |
| Nothing, it is already easy for my family to visit | 5 | 16% |
| It was more affordable | 4 | 13% |
| The court or judge allowed my family to visit me | 1 | 3% |
| Not recorded | 1 | 3% |

➢ 64% of youth reported that they were involved in the development of their treatment plans;
➢ 90% reported that they understand the level, phase or points system;
➢ 58% reported they have not received a family visit.  (It should be noted that the pandemic and restrictions around visitation impacted these results.  The facility did increase the use of technology for video visitation, but these appear to have also declined over recent months and youth have requested that they be allowed more video visits.)
➢ 19% of youth responded that staff show residents respect and only 52% of youth responded yes or sometimes that staff are good role models.

The larger PbS Workgroup met in January to review the current FIP and discuss updates and action steps. Based on some of the outcomes highlighted in this report, it appears many of the FIP action steps taken during this reporting period have had a positive impact.

It is further recommended that the agency, facility and the PbS team members spend considerable time reviewing the PbS Blueprint Domains, particularly those domains focused on Order; Programing, and Safety. Much can be learned from review of these outcome domains and the data associated with them, in particular those focused on youth and staff relationships.

Policies and Procedures/Administrative Code Update

A mechanical restraint procedure has been drafted encompassing all the requirements in the consent decree in addition to incorporating quality assurance measures consistent with those outlined in the Room Confinement procedure passed in March 2021. The procedure being codified will allow the policy and procedure committee to work with management and supervisory staff to point to clear expectations for both process and documentation through incident reporting related to youth confinement and use of force.

The DJC Policy Committee also held its recurring monthly meeting in October and November to review the following additional policies.

500.30.3- Optometry Services
300.11.04 - Telephone Use
100.05.02 - Transporting Youth

Other policy projects include a systematic review of all divisional policies and facility procedures as the documents themselves are moved into an OnBase software system that will ensure all staff are accessing and reading DJC policies and procedures. The system will also help track policy acknowledgments, assisting with the coaching, training, and follow up components of the facilities quality assurance framework.

While transferring the documents, the policies are under review for updates and sign off from the current DJC administration. This project as a whole will result in revised and up to date policies and procedures, uniform and easier access to policy documents for staff, and automated documentation for staff policy acknowledgment.

Administrative Code Revisions Update

DJC staff and committees continue working to revise both DOC Chapter 376 and DOC Chapter 373 forward.

The amended scope statement for 373 was approved by the Governor on December 10, 2021. The scope was then approved by the Secretary January 10, 2022, allowing the committee to move forward with drafting the rule. The draft has since been completed and is currently being reviewed by DOC attorneys in the Office of Legal Counsel.

Defendants need to continue to aggressively work towards completing the respective Administrative Code sections.

## COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

1.  Punitive Confinement.

    a.  Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Data does not indicate that youth are being confined for seven days or for punitive reasons. Defendants have and continue to re-examine the use of observation status and administrative confinement to ensure that staff are not using this as a form of punitive confinement.  If sustained, Defendants will be close to being in substantial compliance.**

    b.  Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Data does not indicate that most youth are being confined for three days or for punitive reasons. Defendants have and continue to re-examine the use of observation status and administrative confinement to**

**ensure that staff are not using this as a form of punitive confinement.**

c.  Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of observation status and administrative confinement has decreased during this reporting period. Defendants have and continue to re-examine the use of observation status and administrative confinement to ensure that staff are not using this as a form of punitive confinement. The Monitor previously recommended establishing clear criteria for administrative confinement so that staff cannot punitively confine youth and cannot confine youth for more than 24 hours if they do not pose an imminent danger of harm to themselves. The Defendants have made significant improvement in this area, but it needs to be continually reviewed to ensure compliance with this Court Order.**

2.  Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of AC was higher for CLS (previous three-month period) but significantly lower for LHS youth this reporting period. There were no youths confined over four (4) hours in LHS for any of the months in this reporting period and for two months for CLS. The Monitor reviewed documentation of "intensive mental health services" provided to youth in confinement. Defendants are continuing to assess how they can more effectively provide intensive mental health services for youth.**

**July 2021**
**CLS: 13 uses of A.C. Average 130 minutes. No youth over four hours.**
**LHS: 80 uses of A.C. Average of 166 minutes. 6 youth over four hours.**

**August 2021**
**CLS: 20 uses of A.C. Average 120 minutes. One (1) youth over four hours.**
**LHS: 54 uses of A.C. Average of 168 minutes. Two (2) youth over four hours.**

**September 2021**
**CLS: 31 uses of A.C. Average 108 minutes. No youth over four hours.**
**LHS: 49 uses of A.C. Average of 187 minutes. Six (6) youth over four hours.**

**October 2021**
**CLS: 45 uses of A.C. Average 147 minutes. Three (3) youth over four hours.**
**LHS: 37 uses of A.C. Average of 136 minutes. No youth over four hours.**

**November 2021**
**CLS: 32 uses of A.C. Average 157 minutes. No youth over four hours.**
**LHS: 47 uses of A.C. Average of 135 minutes. No youth over four hours.**

**December 2021**
**CLS: 16 uses of A.C. Average 125 minutes. No youth over four hours.**
**LHS: 20 uses of A.C. Average of 163 minutes. No youth over four hours.**

**The Monitor was able to able to assess compliance with 30-minute checks as data was readily available during this site visit.  99.43% of checks were completed within 30 minutes. The Monitor reviewed video footage for random days and times and there were no instances in which staff did not complete the checks in compliance with policy.  Staff should be commended for their diligence in ensuring youth safety while in their rooms.**

> a.  Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:
>
> i.  A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth poses a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were four (4) youth confined for over four (4) hours during this reporting period (CLS- October 2021) (see response in previous question). All extended confinements were recommended by PSU.**

**Defendants need to continue to focus on reducing AC overall, ensuring any form of room confinement is compliant with this Court Order, draft policy and procedure with AC placement criteria, and continue to QA this data.**

        ii.      A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.  There were no transfers as a result of extended placements in administrative confinement.**

       b.  Administrative confinement time limits may be tolled from 8 pm to8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE.  Time is being tolled from 8 P.M. to 8 A.M.**

       c.  Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced  plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no instances in which a youth was confined for over 24 hours.**

       d.  The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

      3.    Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 is utilized.  The plans developed are very detailed and comprehensive. Discussion and clarification have occurred surrounding observation status during this reporting period. Currently, only youth who are in imminent risk of serious self-harm to themselves/risk of self-harm will be placed in observation status.  The Monitor will continue to review and monitor the practice.**

      **4.**   **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

      a.  Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  As previously stated, the Monitor**

would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed on renovated units.

Youth rooms were messier than the previous site visit. Many rooms had several blankets, sheets, and other items that could pose a safety risk due to the volume of items in the rooms and inability to see the beds, floors, and desks.

As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly. However, based on the language of this section, Defendants are very close to substantial compliance.

b.   Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, hygiene supplies, or nighttime toilet usage. Defendants have improved their documentation and data collection.

c.   Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification. The crisis intervention technique is being documented. Clinicians are on-site for a minimum of 6 hours each Saturday and Sunday and the majority of this time is spent meeting directly with youth. The Defendants have hired new PSU staff and are working on expanding on-site treatment time on weekends. The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours in order to engage youth in a meaningful way during this time.

**A quality assurance program needs to be further developed. The Monitor suggests that the Defendants move quicker on retaining a mental health consultant to further develop the mental health program/integration at LHS/CLS.**

> d. Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Documentation/data shows that evaluations are completed and within 24 hours after being placed in room confinement. There were no instances of contraindication documented during this review period. QA needs to be implemented and sustained.**

> e. Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose.  Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE: Defendants are over 99% compliant with meeting the thirty (30) minute safety and security check timeframe.  Quality assurance measures are in place and when necessary, formal investigations occur.  There were three (3) Letters of Expectations and two (2) formal job instructions given to staff who did not complete safety/security checks per policy during this reporting period.  The Monitor observed safety/wellness checks being completed on various days/times during this reporting period and observed no instances in which staff did not make visual contact with youth. PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor continues to encourage more on-site time on evenings and weekends.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

f.  Any youth in room confinement shall have property items similar to or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth.  A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Property restrictions are most commonly applied by PSU for safety reasons.  Forms and processes for documenting any potential property restrictions have been created and utilized. Defendants are close to reaching substantial compliance.**

g.  Youth in room confinement shall receive:

1.  All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  Social worker visits, mental health services, and other health services are provided in general. The primary clinician consults with the on-call clinician and with the SYC/YC/CPS/SW staff regarding specifics ways the youth plan addresses the issues at hand and how it can be adopted when the youth is on AC. A PSU clinician follows up in the absence of the primary clinician and/or the crisis clinician. PSU collaborates with the SYC and direct staff. The social worker and youths' meeting schedules are individualized. The social worker works with the youth to identify availability if an AC placement occurs during regularly scheduled meeting. The vacancy rate for social workers continues to be high and should be a priority in hiring.  Social workers are critical to quality of care and services for the youth and effective re-entry planning.**

**Documentation, quality assurance, and policy and procedure need to be improved/completed as it relates to social work, mental health, and other health services. Defendants need to ensure there is accountability with respect to the services provided by the social workers, mental and healthcare workers.**

ii.  Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. During the pandemic, Defendants moved to smaller-group based treatment to youth where group participation was provided on the units. This continues. Treatment programming for youth never ceased due to COVID-19 precautions, but the size of the groups was modified to accommodate safe social distancing measures and keep youth who shared a living unit assignment in groups with one another.**

Beginning in March, some housing units now utilize the school for their group treatment sessions as determined by their respective living unit's weekly schedule. The Monitor continues to encourage these groups to occur off of the living unit as much as possible.

Only youth who are actively in AC status due to posing a serious risk of imminent physical harm to others would potentially miss a treatment group.

Defendants need to continue to focus (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement. Youth complained to Plaintiffs' counsel that school closures were affecting their ability to progress through the stages. Defendants need to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress.

> iii.  Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Classes now occur in the school building except for HRU youth on Steps 1 and 2, new intakes due to quarantine, youth in medical isolation, youth who are in 5- or 10-minute observation status, or AC. As stated previously in this report, the PbS education data shows youth are receiving about 4.43 hours per day (weekdays) of education at LHS and 4.20 hours per day (weekdays) of education at CLS. Both reflect reductions in education hours.

Evaluation work with the education consultants started November 20, 2021. Staff are working on gathering the extensive documentation needed to be reviewed by the consultants. Defendants need to ensure that special education is provided while on administrative confinement and observation status and overall educational hours should increase. The Monitor continues to suggest that Defendants should provide more art, music, woodworking, the greenhouse, welding, and sewing and other types of programs to youth in the evening and on weekends. Also, it would be ideal for social workers to work with you outside of the school day in order to have less scheduling issues and would help with any idle time after school. The Defendants should continue to focus on bringing more programming into LHS/CLS, especially culturally and gender relevant programs.

> iv.  Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another

person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general, youth are out of their rooms from 8 A.M. to 8 P.M. except for youth in isolation due to Covid-19 safety measures implemented by Defendants, any confinement required, or any self-confinement. The Monitor regularly saw youth conversing with other youth during out time. The sensory rooms are much better than last time and have a more inviting, calming décor. There were no instances of youth being confined in their rooms based on behavior during this site visit. However, there were more instances of self-confinement. Defendants need to attempt to get at the root cause of why youth are choosing to stay in their room.**

> v. Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were three (3) documented instances of youth eating in their rooms which were staff imposed based on substantial threat of physical harm. Defendants are able to track when youth eat meals in room and based on reports, the three instances were justified as the youth posed an immediate and substantial threat. Defendants are close to being in substantial compliance.**

> vi. Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Logs indicate that youth on administrative confinement are receiving much more than the 3 hours of "out time" per day or 30 hours per week. (As stated earlier in the report, PbS definition of "room confinement" does include confinement for purposes of observation, even when ordered by PSU.)**

> 5. **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is a box on the incident debriefing form that is checked if staff informed the youth of his or her rights regarding grievances and appeals and time of notification. Youth continue to receive their notification of rights/grievance procedures when they are placed in administrative confinement. The process for obtaining a youth signature (or two staff signatures in the event of a refusal) has**

**been proposed as a part of youth receiving PSU thinking chain reports during the first stage of the administrative confinement process. Policy has been completed. Defendants are close to being in substantial compliance.**

      **6.**   Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are documenting this consistently, including when less restrictive means were attempted. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue to be improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

B.    OC-Spray and Other Chemical Agents

    1.   OC reduction plan. Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.**

    2.   Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

C.    Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

    1.   Prohibition on types and uses of mechanical restraints.

        a.   Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.**

**The Monitor did not personally see any youth in mechanical restraints during site visit and data and documentation show that there was a decrease in the use of mechanical restraints /other restraints during this reporting period. Also, it is important to note that the only mechanical restraints used during this period were handcuffs.  Defendants need to continue focusing on reducing the use of mechanical (as well as physical) restraints.**

**As discussed in previous sections of this report, the use of both physical and mechanical restraints trended downward during the two 2021 data collection cycles.  Reducing youth idleness with meaningful programs and activities along with an improved behavior management program, can continue to have a significant impact on these outcome measures.**

           b.    Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Below is the number of mechanical restraints uses in LHS and CLS this reporting period.**

        **Uses of mechanical restraints LHS:**

| | |
|---|---|
| **July 2021:** | **33 uses** |
| **August 2021:** | **11 uses** |
| **September 2021:** | **12 uses** |
| **October 2021:** | **6 uses** |
| **November 2021:** | **9 uses** |
| **December 2021:** | **2 uses** |

        **Uses of mechanical restraints CLS**

| | |
|---|---|
| **July 2021:** | **3 uses** |
| **August 2021:** | **6 uses** |
| **September 2021:** | **7 uses** |
| **October 2021:** | **13 uses** |
| **November 2021:** | **12 uses** |
| **December 2021:** | **0 uses** |

**Documentation needs to be improved to document that an imminent threat of physical harm existed, and when and how that decision is reviewed. Defendants should note why the acts in question required a specific type of use of force, such as explaining why measure utilizing**

**less force would have been insufficient in a specific situation. The review process should consider the nuances in different situations. Defendants have excellent critical outcome measures for restraints. Defendants need to continue to work towards reducing the use of mechanical restraints and quality assurance measures.**

      c.    No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

      i.    Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no uses of ankle restraints or the wrap during this reporting period. Defendants need to develop policy and procedure, training, and QA measures and ensure PSU staff order these types of restraints.**

      ii.    Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has improved relative to when restraints have been used and the rationale for usage. Defendants have created quality assurance measures. Defendants need to continue to focus on reducing the use of restraints.**

      iii.    During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

      d.    Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue focusing on reducing the use of mechanical restraints. Defendants need to continue to monitor and assess the use of restraints and duration.**

      e.    Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE.   There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

        f.      Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Staff have received training in physical force, restraints, and trained in proper de-escalation. The Defendants are increasing the frequency of these trainings (regular, informal, refreshers). DBT implementation will be very beneficial to youth and staff. Defendants have made DBT a priority and are continuing to train staff.**

        g.      Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit.   No youth shall be left alone in restraints.    Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.  There were two (2) instances of youth being placed in mechanical restraints over 45 minutes. For instances in which Defendants placed mechanical restraints on youth, the appropriate personnel authorized the use of the mechanical restraints.  PSU approved and followed up within two (2) hours. Defendants are working on a QA process for this section.  Defendants also need to ensure therapeutic interventions occur.**

        2.      Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process. Defendants need to continue developing the behavior management program, actively engage with youth, and develop engaging and meaningful programming in order to reduce the use of mechanical restraints.**

D.   Strip Searches. The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

    1.   Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possesses drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches in this reporting period. The policy and procedure for Searches of Youth have been finalized. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search.**

    2.   Strip searches with probable cause.  Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

    a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

    b.   Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches during this reporting period. QA has been developed. The policy for searches has been finalized.**

    c.   Strip searches may only be conducted by individuals of the same

gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches conducted this reporting period. QA has been developed. The policy for searches has been finalized.**

d.  Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records reviewed indicate that all staff have been trained in trauma informed care. There no strip searches this period.**

e.  If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches during this reporting period. Documentation has improved. Policy and procedure/QA developed. PSU is consulted, and it is documented.**

4.  Documentation.  Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. Policy and Procedure finalized.**

E.  De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants are focusing on de-escalation skills.  Staff have been trained in MANDT and other training which includes de-escalation skills training. De-escalation training/modeling continues to occur.**

**The Monitor observed several instances of de-escalation in review of video footage.  Staff are more comfortable utilizing these skills, but continued focus, training, and review need to occur.  Defendants should include cultural diversity issues as part of crisis management**

training and procedures. **Knowing these issues and how they are communicated is critical to successful behavior management.**

      F.    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average.  Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Programming needs improvement (as discussed throughout this report) and idleness remains high but improved.**

**As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth.  Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. Increasing education hours and vocational programming, including for youth who have obtained a diploma or HSED, can greatly assist in reducing idleness time and provide positive youth development strategies.**

      G.    Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018 report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants have made significant effort in implementing the strategies suggested in improving staffing ratios and staff morale. Defendants should continue to focus on hiring, training and developing staff and evaluating their hiring process. As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere and environment of the facility.  Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, and the use of isolation and confinement.**

      H.    Amendments to administrative code.  Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE.  Defendants need to create an expedited timeline for finalizing all regulations and submitting them for approval.**

### IV.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

**A. Incident review process.**  Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The 24-hour timeline is met in the vast majority of cases. Informal reviews occur right after an incident in majority of cases. When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component).  More thorough reviews occurred this reporting period.**

**B.**      **Quality assurance**.  The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As discussed throughout previous reports, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff.  Defendants have created a competent quality assurance program and have made substantial progress in developing daily data to review that will automatically be available in order to make real time operational decisions. The Monitoring team will continue to work with the superintendent to establish performance goals, analyzing data, and creation of corrective action plans.**

### <u>CONCLUSION</u>

There was progress made in several initiatives such as a strong, committed leadership team, overall increased educational hours being provided to youth compared to prior reporting periods, the quality assurance program, training/implementing DBT, incorporating PSU more into daily operations, the creation of the new recreation center, and continued in-person education on and off the units.

The facility would continue to benefit from an increased focus on reducing idleness, particularly during weekends and evening hours.  There are several very good programs with positive outcomes for youth (music, art, gardening, welding, *etc.*) that should be expanded.  The Defendants should continue to move youth off of their home units as much as possible and outside when weather permits. The Defendants should continue to work on improving the behavior management system, continue with their progress in implementing DBT, providing improved youth incentives that will help in reducing many behavioral incidents, and bringing gender and culturally relevant programming to LHS/CLS.  Defendants should continue to expand the influence and impact of CARE Teams would also improve critical outcome measures around the use of restraint practices, staff wellness, youth accountability and in reducing use of any form of room confinement. This is particularly true for CLS, which continues to show a high rate in the use of physical and mechanical restraints, while trending in the right direction.  Continued efforts need to be made to further engage the educational and mental health experts, reduce teacher vacancies, increase educational time and quality. Continued training in de-escalation and assessment, evaluation, and review of use of force continuum need to occur.  Applicable administrative code needs to be finalized and approved. Staff wellness needs to continue to be a priority. Lastly, as the Monitor continues to state in reports to the Court, there needs to be a focus on moving youth from LHS/CLS to more appropriate setting(s).

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

/S/ Teresa Abreu
Teresa Abreu
Monitor