UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                        Case No.: 17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

THIRTEENTH REPORT OF THE MONITOR

---

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Twelfth Report of the Monitor was filed with the Court on February 12, 2022. The Monitor's thirteenth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates since the twelfth site visit which took place on January 13 and 14, 2022.

## SITE VISIT

The thirteenth site visit by the Monitor took place on May 5, 2022. Due to the continuing pandemic, the Monitor and Plaintiffs' counsel limited onsite time to one day and completed necessary interviews/information gathering via in-person and virtual meetings prior to and after the site visit. The Monitor reviewed materials provided by the parties prior to and after the site visit for the reporting period ending March 31, 2022. Materials included but were not limited to: use of force videos, video footage of units, video of safety and security checks, COVID-19 related memos, programming materials, discipline documents, investigations, PREA investigations, various staff memos, daily shift reports, policies, all of the monthly data submitted to the parties per this Court Order (January, February, and March 2022), updated unit rules, work rules, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  The Monitoring team and Plaintiffs' counsel were on site during this site visit. Plaintiffs' counsel conducted approximately eighteen (18) youth

1

interviews virtually before and during the site visit.  The Monitor toured LHS/CLS and interviewed youth and staff. The Monitor had the opportunity to talk to many of youth and staff present and available during the site visit. Approximately forty-one youth (41) youth and twenty-five (25) staff were interviewed by the Monitor during this site visit.

## OVERALL QUALITY OF LIFE, CONDITIONS, AND ATMOSPHERE

Introduction

The total LHS/CLS population has steadily increased during this reporting period up to the high (60s) on average for this reporting period. At the time of the site visit, the population was in the low 70s. It is important to note that the population level is trending upward and has significantly increased over recent months. This appears to be a trend that will continue into the foreseeable future.  While the population increase is a concern, the issue is compounded by the serious staffing situation of vacancies, turnover, various employee leaves, and overtime required to maintain sufficient staffing levels. The current staffing situation is having a profound negative impact on daily operations, requiring adjustments to the daily schedules to maintain effective staffing ratios for youth supervision. These adjustments have resulted in operational room confinement –that is, confining youth in their rooms not based on behavior but for operational reasons (in this case short staffing)- while attempting to reduce incidents of violence and maintain safety and security. Despite these challenges, leadership, and staff at LHS/CLS remain positive and committed to improving conditions of confinement for youth and staff. Although staff attitudes remain positive, youth attitudes were significantly negative.   Complaints to the monitoring team and counsel significantly increased during this reporting period and site visit. There continues to be concern regarding programming, use of force, quality and quantity of education, and other issues, as well as a significant increase in youth concerns about confinement and associated restrictions.

All of the COVID-19 modifications (health screenings, intake process, and quarantine process) were still in place during this reporting period as last site visit except masks were not mandatory. There have been ten (10) youth COVID-19 cases and forty-nine (49) staff cases during this reporting period. This marks a substantial increase in staff positive cases from the last report and slight increase in youth positive cases. COVID-19 vaccinations continue to be offered to every youth and staff meeting the CDC guidelines. Defendants should reconsider requiring staff to wear masks should this increase continue.

Physical Plant Observations

The entrance, grounds, visitation, school, and many other areas were clean and orderly. Living units in general were not as clean and orderly as observed on previous site visits. Defendants completed renovating Douglass Living Unit during the last reporting period into a recreation space. The Unit looks amazing with many recreational activities available for youth. Staff and youth are enjoying the space. Defendants added materials and supplies to the kitchen for youth to engage in baking and cooking, photography, music, sewing, board games, air hockey, bags tournaments, basketball, popcorn, video games, Legos, cards and more. The youth told the Monitor how much they love the unit and would like to utilize the space more. Staffing challenges have made it more

difficulty to bring youth to the unit.

Defendants continue with the following physical plant improvements:

- Work began on an electrical upgrade for the greenhouse which allow the greenhouse to accommodate more youth programming and yield additional and varied projects, plants, and produce. Excavating services that require a complete thaw for digging continue this spring.

- An additional electrical upgrade to the welding room to facilitate more welding stations and better equipment for the welding program has occurred. Upgrading the electrical in the revamped welding shop, allows youth to train and practice their newly learned skills on newer, more modern welders. In addition to the general electrical upgrade, the lighting will also be enhanced in the updated space.

- Continued the installation of new windows and window frames in each of the twelve (12) living units by completing Rogers and Hughes. The new windows and frames include specialized glass that can withstand significant duress without failing. This extensive effort is expected to improve the environment and lighting as well as safety while reducing the need to regularly replace broken windows.

- Continued the lighting upgrade project throughout the facility by completing all units on grounds except Krueger and Black Elk by the end of March. The final two will be completed in April. This project has changed the lighting and feel of the youth rooms and dayrooms, as well as improved the visibility of emergency lighting. The project removes the aging lights and fixtures and replaces them with better, more efficient LED lighting.

- Continued implementing additional fixed cameras throughout the facility including both internal and external cameras by completing Addams, Hughes, Rogers, Miller, Wells, School and the Administration Building during the reporting period. In total, the project will result in the installation of over 100 new cameras increasing youth and staff safety and accountability throughout the facility.

- Enhanced the Music Arts Initiative by adding additional computer, software, and hardware components. In addition to the therapeutic benefits of music arts efforts, the recreation leaders who are facilitating the music program have begun focusing on youth writing and recording their own original music and several youths have submitted original works to the 2022 PbS Kid Got Talent Awards Contest.

The Defendants should be commended for their continuing commitment to improve the physical plant which improves the daily lives for staff and youth even during a very challenging time. The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

Education Observations

The physical appearance of the school areas and classrooms were beautiful as usual. Youth were

observed in the classrooms actively participating in education.

Defendants engaged three consultants to evaluate the educational programming at LHS/CLS. The consultants are national experts and have been selected to evaluate key educational areas including:

- Operations
- Curriculum and Instruction
- Academic Assessments
- Special Education
- Human Capital
- Technology Integration
- Transition

Evaluation work commenced on November 30, 2021, and the team spent three (3) full days on site. A final report is expected in June. The Monitor looks forward to receiving the final educational report and will update the Court in the next Monitor's report.

The Monitor recommended in previous reports that the girls' classrooms should be painted a brighter color and have more of a classroom feel. The CLS youth picked the colors for the classrooms and the Defendants have painted the rooms. Furniture, décor, etc. have been added and the classrooms are in full use. The Youth really like the newly decorated space and even mentioned they would like to use it more.

Any youth in COVID-19 quarantine and high-risk youth on levels 1 and 2 of the Skills Development Program ("SDP") (CLS and LHS) continue to have education in the units and not at the school. The Monitor continues to recommend that the frequency of music, art, and recreation needs to increase. The quality of the music program is second to none and all youth would benefit from the program not just during the school day but on weekends when there is the most idle time. The Monitor is happy to report that three LHS youth graduated in January. The Monitor looks forward to progress made with the new educational leadership and consultants.

Living Unit Observations

The Monitor visited each cottage that youth were housed in during the site visit. Overall, the units and youth rooms were significantly less clean as the last visit except the Rogers unit. The behavior management program should be used for youth to earn points and incentives for keeping the units clean and for keeping their rooms clean with beds made. Youth were also more frustrated, vocal, and angry than the last site visit. During the last few site visits, youth did not request to speak to Plaintiffs' counsel but during this site, many youths (approximately 14) asked to speak to counsel. Many of the youth concerns dealt with increases in confinement, and with conditions in confinement that the youth perceived as unwarranted.

Typically, the Monitor reports that there are more than adequate staffing levels on each of the living units. This is the first time the Monitor reports that there are inadequate staffing levels on the living units, which presents very significant problems for youth and staff. The unit populations ranged from six (6) (CLS' units) to twenty-one (21) (LHS) youth which creates significantly higher staffing

ratios. Defendants are trying to have supervisory staff, mental health and other staff regularly come to the units to increase staff presence. This is becoming increasingly difficult as the population continues to increase, and staffing numbers continue to decrease. Staff were engaged with youth during this site visit. Staff attitudes were more positive than the Monitor expected considering the day-to-day challenges they face currently.  The Monitor reviewed video during the reporting period to view day room activities, staff placement and staff engagement. There were many instances in which staff were engaged with youth and positioned at or near tables and areas with youth, which mirrored what was observed during this site visit. The body language and tone were positive from staff but not from most youth. All the youth that the Monitor interacted with were respectful and willingly communicated with the monitoring team but had many complaints. There were not too many positive comments made to the monitoring team or plaintiffs' counsel during this site visit. The Monitoring team had an opportunity to talk to most of the youth present in the day rooms. There were more youth in their rooms (self-directed or operationally confined due to staffing issues) than the last site visit.

During this site visit, the girls were housed in the Wells and King Units. There were thirteen (13) youth total in CLS. The King unit was used for general population and quarantine, while Wells housed youth in the behavior intervention protocol. There were two staff members on each unit (although one staff is not typically assigned  to the unit). Neither unit was clean. Unit day rooms and floors were dirty, beds were not made, storage room cluttered and messy, and mopping needed to be done on both units. The youth rooms on CLS were quite messy which is not typical of CLS youth. Some of the girls were in school and visiting with Foster Grandparents,  two girls were in dayroom (new intakes), and three (3) youth were in their rooms. The girls on King (in quarantine) were very chatty and seemed happy. They were eager to get off of quarantine so that they can interact with the other girls and participate in programming. The Monitor was told that after the site visit, the youth were able to be placed in general population.

With respect to the boys' cottages, Addams and Curtis were empty units during this site visit. The boys were housed on Krueger, Rogers, Black Elk, Hughes, Miller, and Roosevelt. As previously mentioned, the Douglass unit is the new recreation unit. None of the units had adequate direct-care staffing (although Defendants attempted to supplement with other classifications of staff). Youth were in school, on telephones, watching television, engaging with PSU staff, preparing for DBT, cleaning, outside for recreation, or sitting in day room conversing with other youth (excluding youth who were in their rooms and/or in the high-risk unit programming).

In previous reports, the Monitor discussed the "Hughes Program." The "Hughes Program" was implemented on March 30, 2021 and was considered the "High Risk" Unit.  The Program is now the Skills Development Program ("SDP"). The program continues to be housed in the Krueger unit. For the purposes of this report, the unit will be referred to as SDP. The SDP is modified programming for youth who have engaged in physically aggressive behavior, have presented a danger to others, and/or exhibited behavior that caused a major disruption to the facility. Youth housed on SDP unit have a "Supplemental Youth Plan" created by PSU in order to specifically address their behavior.  Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team. The Superintendent (or designee) have to approve placement onto this unit. Prior to this site visit, the unit remained open, and youth were out of their rooms 8 A.M .to 8 P.M. like other units. However, due to the increase in population and limited

staff on the Krueger unit (and others) youth are being "operationally confined" and split into three groups so that some youth can be outside/day room and others confined to their room. This means that youth are spending more time in their rooms which will have negative consequences overall. Although youth were not being operationally confined until April (not during this reporting period) it is important to discuss the impact since the next report will not be completed until August 2022. Defendants need to consider options for youth who are confined to their rooms due to staffing issues as it is not of their doing.  Defendants should consider allowing tablets, electronics, and other personal items as they will be confined to their rooms for more time that in the past. Defendants are working on a plan to have all youth out of their rooms for the 30 hours per week as required by this Court Order.

The pilot of the Behavior Intervention Protocol (BIP) started in Krueger Skills Development Program (SDP) on February 14, 2022. This protocol is a DBT mechanism for addressing high-level life threatening and therapy destroying behaviors. Behaviors that will result in a youth's placement on the protocol will include  physical assault, sexual assault, orchestrating violence against another person, destruction of property that poses a reasonable risk to self or others, running around the facility for longer than five minutes that requires a movement freeze. The intervention plan for youth is outlined in the eight (8) steps below and is designed to provide the intensive mental health services that our youth need in order to safely return to general population following a significant behavioral incident/issue.

**The Behavior Intervention Protocol consists of eight steps**:

1. **Safety is Established.** Often this step will be completed when a youth is on AC, but there may be situations where the BIP is used when AC is not appropriate.

2. **Youth Programming moves to a 1 on 1 structure.**   Youth will be required to participate in all of their responsibilities (*i.e.* school and skills group*)* but these activities may occur in an alternate location.  Youth will not be eligible for *privilege* activities during this time. This one-on-one structure continues while the youth is on the BIP.

3. **Youth is encouraged to re-commit to safe and skillful behavior.** This step may often align with a youth's removal from AC.

4. **Behavior Chain Analysis of the problem behavior is completed.** A youth can start working on this at any time and will be provided a BIP packet with skill-based resources when they are placed on AC. Youth will complete and review the BCA with the PSU or SYC assigned to the SDP, other staff may also assist.

5. **Skills are identified for use in future situations.**

6. **Youth demonstrates or begins to learn skills.** SYCs and PSU, along with other staff, will be working with youth during this time to role play, provide skill practice, and work through hypothetical situations with the youth.

7. **Youth makes effort to repair damage done.** i.e.:  apology letters, extra duties, cleaning up messes made, etc.

8. **Youth returns to standard milieu/unit operations and privileges.** Upon completion of the BIP requirements, the youth will be returned to the regular unit structure. Their

privileges will be restored, and they will receive back their property items. The Growth Team will convene as soon as reasonably possible to ensure that all requirements have been met and will remove the youth from PAUSE at this time.

The protocol also requires that youth participate in all of their responsibilities which includes education and group. Although educational alternative materials across core subjects of English Language Arts, Science, Social Studies, and Math have been provided to youth, there needs to be more engagement while on BIP. Defendants have made program changes after discussions with the Monitor, but a deeper analysis needs to continue and other tweaks to the program especially while youth are being operationally confined. Educational consultants spent considerable time on the unit and will make recommendations to education while youth are in this program.

The BIP pilot committee also met with DBT consultant Dr. Chapin on March 30, 2022, to discuss other general observations and opportunities to make adjustments that may maximize support during the pilot. The detailed BIP data has been intended to guide discussion and communication around program and process improvements. For example, the BIP committee discussed the opportunity to utilize the PAUSE structure with Growth Team follow-up versus BIP pending the context of the behaviors and the needed intervention strategies. The process has also been updated to ensure that the individual BIP packets are saved electronically to offer providers context in developing intervention strategies to help the youth troubleshoot, identify skill practice opportunities, successfully return to regular programming structure, and resume progress through the System of Care. The Monitor continues to work with the team on suggested adjustments to the program. Many youths have complained to plaintiffs' counsel about the BIP, including that they are isolated from other youth while on BIP and unable to have any gross motor activity. Youth stated to Plaintiffs' Counsel that they are completely prohibited from interacting with other youth at all; that they are either in their rooms or confined in a classroom with at most one staff member; and do not get exercise or meals with other youth. They also stated that they are not getting any education beyond tablets and cannot leave the unit for anything but HSU/PSU.

In general, youth attitudes were not positive during the last site visit. Based on conversations with youth, they seem very confused on what PAUSE is, how to "get out of BIP," out of the Krueger or Wells programs and feel they are being group punished by being confined more frequently and for longer periods (which could be how they are viewing operational confinement). It is important Defendants continually review the program and explain all of the steps so that youth have a clearer understanding of what their program status is currently. Youth are frustrated, confused as to what is going on with their programming, and complained about staff and how they are treated. Staff attitudes however were positive despite negative youth attitudes. The Monitor continues to stress the need for more structured and meaningful activities as youth idleness remains a significant concern, particularly on weekends and while staff availability is limited. Defendants are making progress (detailed more below) but still have work to do. While Defendants are having to operationally confine, there needs to be additional resources available to youth and more in-room activities to engage youth while they are in their room.

During previous site visits, the Monitor has repeatedly and continually recommended creating and implementing a daily schedule to help with youth boredom and create opportunity for structured activities. Youth daily schedules, organized by living units across A and B week rotations, have

been created and implemented. Evening activities led by recreation staff began on January 10, 2022, and the full day 8A.M. to 8P.M. weekday and weekend schedule was implemented on March 14, 2022. It incorporates the school schedule and afternoon/evening and weekend activities facilitated by Youth Engagement Program (YEP) staff. In addition, Health Services Unit and Psychological Services Unit continue to be supportive of engaging youth in specialized programing which includes health group (LHS) and body image group (CLS). The YEP team includes recreation leaders of the Music Art Initiative (MAI), facilitators of creative arts, cooking, and strategy/skill-based games, on-site Chaplin providing Spiritual Services, ITW Coordinator providing cultural programming, and youth counselors providing physical recreation. In addition to regular team meetings, the YEP team has convened twice with leadership and CQI programming staff to share ideas, questions, and creative ideas since the start of YEP in 2022. The team affirms a shared goal to engage youth in positive youth development activities which collectively may produce a safer, healthier environment for the well-being of all youth and staff.

Continuous Quality Improvement (CQI) programming staff have been actively engaged in supporting the development of the weekday and weekend full-day schedules as well as the development of communication tools to provide oversight infused into regular program operations. The shift report has been updated to include the schedule across living units and the A/B weekly rotations. Communication with SYCs has assisted in engaging their support as well as the development of unit specific schedules and a YEP staff absence calendar to share when unit staff will need to plan for staff directed activities. A YEP Tracker has been implemented to track missed assignments across units, as well as excused absences. CQI staff provide a secondary layer of review to share with the Treatment Program Director. Although operational confinement did not occur until April (which is outside of this reporting period), it is important to note that the staffing challenges and increased population make it difficult to adhere to the weekly scheduled programming  and to provide the necessary staff oversight to engage youth in a meaningful way. The Monitor will continue to work with Defendants on creative options for these challenges in order to ensure Defendants can continue to improve the behavior management system, improve the rewards and incentives, and develop engaging programming that will have a positive impact on the overall behavior and atmosphere.

<u>Youth Interviews</u>

Approximately forty-one (41) youth were interviewed during the site visit (formally and informally) by the Monitoring team and approximately eighteen (18) youth were interviewed prior and during the site visit by Plaintiffs' counsel. There were many requests to talk to Plaintiffs' counsel while the Monitor was onsite talking with youth, and counsel followed up on these requests during the site visit and after.

In the previous site visits, youth did not have many complaints that they expressed to the Monitor. During this site visit, many youth complained about being confined frequently and even if they had not misbehaved, being denied personal property such as hygiene products and electronics, the food, staff calling them names, using racial and derogatory statements, being bored, group punishment, issues with Zoom calls, staff taking away their points for no reason, staff allowing youth to fight and not stepping in, being bored, and the facility not being as clean. During the last site visit, youth had good things to say such as feeling safe, having some good staff that engage with them, and liking the

recreation unit and music program.  In contrast, youth did not make one positive comment during the interviews during this site visit. This is a big concern for the Monitor as youth attitudes have not been this negative in years. It was also noted that the attitudes of youth towards staff seem to have worsened with an increase in overall disrespect. This seems to come from increased operational room confinement, the continued lack of a robust incentives and rewards system, and staff's interaction with youth.

Youth did complain to Plaintiffs' counsel prior to  and during the site visit (during this reporting period) about how to progress through the levels of programming in Krueger and Wells, BIP, "modified programming," being confined a lot, not feeling safe, not getting adequate or meaningful education, staff being too aggressive in uses of force, staff saying negative and derogatory comments, lack of confidentiality when youth tell staff information, inadequate recreation, and inappropriate searches, The Monitor reviewed several use of force videos/mechanical restraint usage and the use of force/restraints observed were appropriate.

The Monitor continues to encourage staff to engage youth and have more meaningful/structured programming and activities. It is clear that when staff engage with youth, youth respond positively. The Monitor has witnessed numerous occasions where staff are actively engaged with youth and these opportunities build positive and respectful relationships that help reduce incidents of violence and promote a more therapeutic and trusting environment. This is also evident in that when we see staffing shortages and less opportunity for staff engagement with youth and more confinement, we also see increased complaints and increased behavior incidents. The Defendants need to continue to focus on gender and culturally competent programming. However, first Defendants need to continue developing a plan to safety manage LHS/CLS during this challenging time.

On April 8, 2022, the Governor signed legislation that called for roughly $42 million to build a new Type 1 juvenile correctional facility in Milwaukee County. This is a step towards the planned closure of Copper Lake and Lincoln Hills schools. Several more steps in the process remain, including some that will require significant preparation and/or approvals from other state and local agencies. While the signing of the legislation represents a step forward, the completion of a new Type 1 facility and the subsequent closure of CLS/LHS will still take considerable time. As previously mentioned, moving youth closer to locations where needed, culturally and gender competent programs and services are more widely available, and where family visits can be more easily accessible, will have a positive impact on youth and will allow for a larger pool of applicants to fill critical roles.

Staffing

For the first time, the Monitor observed firsthand the lack of available staff at LHS/CLS. LHS/CLS is in a staffing crisis. Staffing shortages have increased over this reporting period at LHS/CLS and across DOC. DJC knows that its staff are the best assets towards making the programs and initiatives underway in the schools and living units a success, and importantly, that staffing shortages increase the burden on those who work to maintain a safe and healthy environment for youth and staff. Defendants are working diligently to try to attract and retain staff for these critical roles.

Direct-care staffing vacancy percentage has increased slightly from the last reporting period (*see below*). There are 311 total positions ("FTEs") at LHS/CLS. Approximately 138 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA"). The teacher vacancy rate is the same than last reporting period (11 vacancies), or 48% of positions. There is still a high number of social worker vacancies at 67%. This is a critical role that should be made a recruiting priority. The Monitor encourages continuing to recruit teachers despite the reduced population and challenges with COVID-19. Recruiting is still a challenge due to the location of the facility, overall teacher shortages, relatively low compensation, location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and the year-round school calendar and thus, hiring needs to continue.  Even with the added incentives, there is a still difficulty in hiring many classifications of staff.

| Position | Vacancy Rate % as of September 30, 2021 | Vacancy Rate % as of December 31, 2021 | Vacancy Rate % as of March 31, 2022 |
|---|---|---|---|
| Youth Counselor | 30% (41 out of 115) | 41% (44 out of 108) | 41% (44 out of 108) |
| Youth Counselor Adv. | 19% (7 out of 37.5) | 17 % (5 out of 30) | 20% (6 out of 30) |
| Teacher | 40% (10 out of 25) | 48% (11 out of 23) | 48% (11 out of 23) |
| Social Worker | 57% (8 out of 14) | 67% (8 out of 12) | 67% (8 out of 12) |

During the reporting period (January-March) staffing was challenging but not insurmountable, However, beginning in April as the youth population increased, staff shortages (much due to various employee leaves) increased. Defendants are going to have to consider some non-traditional staffing options in order safely maintain the facility. This will most certainly include operational adjustments that limit the number of youths out at any given time to ensure proper staffing ratios, thus increasing operational room confinement. Youth do not understand the different types of confinements. From the youths' perspective, it does not matter whether or not it is operational – they are being confined to their rooms for long periods of time, even when they have not misbehaved. This will make youth more upset/oppositional. The Monitor will continue to work with Defendants on this and other issues.

In light of the high vacancy rates in security positions, and number of supervisory staff that are being required to fill in for vacant non-supervisory posts or required to take additional supervisory shifts due to vacancies, the DJC, with the approval of the Office of the Secretary, are authorizing overtime for employees in positions classified as Supervising Officer 1 or 2, or Supervising Youth Counselor 1 or 2, to be paid at time and one-half (1.5x) under the following conditions:

- The supervisor is working additional hours for shift coverage in the following DAI or DJC positions:  Supervising Officer 1, Supervision officer 2, Officer, Sergeant, Supervising YC 1, Supervision YC 2, Youth Counselor, Youth Counselor – Adv.  Additional hours for non-

shift coverage purposes (i.e., pre-shift, writing reports, etc.), will continue to be paid at the straight time rate.

- The supervisor worked more than 40 hours in the week and the extra hours that qualify at the 1.5x meet the first bullet point above.

- Subordinate staff are being required to work overtime due to vacancies and are receiving time and a half for over 40 hours worked.

The Human Resources Department at CLS/LHS, along with provisions approved in the state compensation plan, have worked in combination to introduce new policies, strategies, and initiatives intended to drive both recruitment and retention.

The Human Resource Department has been actively attending three job fairs during the reporting period: one general recruitment fair, one geared toward healthcare, and one aimed at mental health professionals. Staff are scheduled to attend an additional six area job fairs in April and May. Finally, walk-in interviews at local job centers will be available. Walk-in interviews were held prior to COVID and are returning as local ordinances and mandates allow.

On January 2, 2022, a $2.00 per hour add-on that was approved as part of the 2021-2023 state compensation plan for safety staff at CLS/LHS went into effect for youth counselors and youth counselors advanced. On March 11, 2022, DOC/DJC announced to all staff that the Governor had approved a $3.00 per hour add-on for security staff at 24/7 facilities including Correctional Officers and Sergeants, Youth Counselors and Youth Counselors-Advanced, Supervising Officer and Supervising Youth Counselor classes, and Corrections Program Supervisors. In addition, Corrections Program Supervisors and Supervising Youth Counselors 1 & 2 received parity pay in the amount of $0.90-an-hour.

In February 2022 DOC/DJC began to offer a $1,500 referral bonus to current employees working at 24/7 correctional facilities who refer candidates for hire. In developing this Referral Bonus Program, DOC/DJC focused on classifications that have been determined to have a higher vacancy rate, or retention or recruitment difficulties. The new hire needs to be hired into one of the following classifications:

- Advanced Practice Nurse Prescriber
- Nurse Clinician 2/2-Weekend, NC 3/3-Weekend, NC 4
- Licensed Practical Nurse
- Nursing Assistant
- Nursing Supervisor
- Psychological Associate
- Psychologist – Licensed
- Psychologist Supervisor
- Treatment Specialist 1 & 2
- Social Worker – Corrections & Senior
- Teacher
- Youth Counselor/Youth Counselor Adv.
- Correctional Officer
- Correctional Sergeant

In addition to the referral bonus opportunity, a $2,000 sign-on bonus is currently being offered to eligible employees who meet the requirements after being hired into the following classifications: Teacher, Social Worker & Social Worker Senior, Treatment Specialist 1 & 2. Recruitment efforts mentioned above led to three (3) teachers and (2) treatment specialists in the month of April. Defendants are making these significant changes in order to help with staffing shortages, but these efforts are not solving this ongoing problem.

Key Positions hired during this reporting period (January-March) are as follows:

- Recreation Leaders (2)
- Corrections Program Supervisors (1)
- Psychology Associate
-

The Defendants continue to struggle to hire licensed/certified social workers. The DOC has recently raised the minimum pay for social workers; however, this has not increased the applicant pool. Many social service agencies have moved towards hiring case managers that do not require a state certification/license. LHS/CLS is moving in this direction due to their inability to recruit and retain social workers. Moving forward, Defendants will be hiring several Treatment Specialists. The goal is to have two Treatment Specialists 2's and/or Social Workers assigned to every living unit. These individuals will be responsible for all case management needs and services for the youth in their units and will also facilitate all Dialectical Behavioral Therapy Skills Groups for the youth on their units. Defendants are also starting the process to hire Treatment Specialist 1's that will work mid-shift, evening, and weekend hours. They will be responsible for leading groups with the youth in the evenings, completing daily Diary Cards with youth, in alignment with DBT, and will be involved in helping with BIP's.

The Monitoring team spoke to over twenty-five (25) staff. Staff morale seemed good overall despite the obvious shortages at the time of the site visit. A review of video over the reporting period showed staff regularly engaging with youth. Several staff were extremely friendly and engaged and stated that they liked their jobs. Most staff seemed to feel as if the overall atmosphere was improving, but that they continue to have no control or adequate consequences for youth behaviors. Staff feel that the behavior management program is not working and lack incentives and consequences to promote positive behaviors. The Monitor had the opportunity to talk to several mental health staff and they were very knowledgeable about the various programming and knew the youth and expressed how much they liked working with the youth.  It was very nice to see such optimism from the staff.   The continued implementation of DBT and other best practices will improve safety for staff and youth.

Defendants continue to work on increasing staff morale but still have much more work to do. This is even more critical during a time where there is not enough staff and staff are getting mandated regularly. Defendants have done the following to increase staff morale during this reporting period:

(1) Defendants have developed the CLS/LHS Critical Incident Response Team (CIRT). The goal of the CIRT is to provide peer to peer support regarding secondary trauma and critical incidents that occur within the facilities. The CIRT team is committed to providing information and education, reducing stress and compassion fatigue, and fostering resilience

within peers and the work environment.

The CIRT employs a comprehensive, systematic, and multicomponent approach to crisis intervention in order to mediate stress reactions associated with critical incidents. Since the CIRT Coordinator started, the facility has trained 19 staff, and three more were making their way through the training as of this reporting period.

The CIRT conducted three critical incident debriefings during the reporting period and are using the experience from conducting the first three to inform bi-weekly meetings that will work through getting the policy and procedure for the CIRT drafted and finalized.

(2) CASH

The Committee Assigned to Safety and Health (CASH) holds numerous events every month hosted on behalf of the staff. This reporting period there was:

- January 13, 2022, National Rubber Ducky Day Prize Drawing
- February 2, 2022, Baker's for Brian
- February 9, 2022, Coffee Break Day
- February 15, 2022, Wisconsin Day
- February 16, 2022, Treats for Teammates
- March 17, 2022, St. Patrick's Day

The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives, changes to programming, and general information. A major component of staff wellness is ensuring staff feel as safe as possible. Fear for safety continues to be a major concern and one that impacts the overall culture and atmosphere of the facility. Staff wellness, including training, skills development, attitudes, etc., impact the overall relationship and level of positive engagement between staff and youth. When this is not occurring as expected, it then has a direct impact on an increase in incidents of violence, use of confinement, and use of restraints. Improving staff wellness will certainly have a positive impact on the overall atmosphere and reduce turnover, which will then provide an opportunity to decrease the vacancy rate, reduce employee leaves and improve staffing ratios.

Quality Assurance ("QA")

During the last reporting period, CLS/LHS hired a Program and Policy Analyst-Advanced focused on the ongoing Quality Assurance ("QA") implementation efforts surrounding the consent decree and other important functions in the school and facility system of care updates.

Since October, the QA staff has worked to create a database that allows speedy retrieval and analysis of J- Tracker data. The database's ability to assist incident debrief analysis has given management staff reviewing incidents more consistently accurate and timely reports. Critical information is now readily available to the leadership which so that they can make proactive, data driven decisions that increases the safety of youth and staff.  Again, tremendous improvements have been made in data collection and in the quality assurance program.

Policies and Procedures/Administrative Code Update

The mechanical restraints procedure was signed effective April 4, 2022. This procedure accompanies all the work to convert the use of force form into J-Tracker and will give the procedural backing to the operational process, documentation, and quality assurance pieces bracketing our efforts to demonstrate, document, and maintain compliance with the mechanical restraint provisions in the consent decree.

The DJC Policy Committee also continues to review and update policies of note to the facility. In the February meeting the committee reviewed the following policies:
300.01.04 – Administrative Duty Officer
300.07.01 – Health Safety Committee

A group of policies reviewed in previous months by the committee were signed by administration and posted to the staff website in March. These included:
100.04.04 – Youth Identification
100.04.06 – Naloxone
300.02.11 – Food Service Standards
300.05.03 – Transportation
300.11.04 – Telephone Use
500.30.35 – Optometry Services
900.05.06 – Incident Debrief

Defendants also look forward to the addition of a new Program and Policy Analyst, who will fill the vacancy that was left last December in the PbS position at the end of April. This new analyst will assist with PbS and will be an addition to the policy committee. This will be extremely beneficial to ensure coinciding facility procedures to passed policies are reviewed and signed by the superintendent. They will also be a key person in assisting in the completion of other facility procedures being drafted for new practices in regard to the system of care and the compliance of the consent decree.

Other policy projects include a systematic review of all divisional policies and facility procedures as the documents themselves are moved into an OnBase software system that will ensure all staff are accessing and reading DJC policies and procedures. The system will also help track policy acknowledgments, assisting with the coaching, training, and follow up components of the facilities quality assurance framework.

While transferring the documents the policies are under review for updates and sign off from the current DJC administration. This process includes looking more closely at the policies that reference administrative code 373 and 376 to ensure that they are reviewed to match the changes updated in code. In addition, the committee is identifying policies that should reference one or more relevant administrative codes or other guidance documents moving forward. This project as a whole will result in revised and up to date policies and procedures, uniform and easier access to policy documents for staff, and automated documentation for staff policy acknowledgment.

DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. Chapter 373 was reviewed by DOC attorneys in the Office of Legal Counsel in March and is now back with DJC's Administrative Code committee for further revisions. Chapter 376 final draft has been completed by the committee and sent to Office of Legal Counsel and Division of Management Services to complete the fiscal estimate and economic impact analysis before the submission of the proposed rule draft.

When considering the projected timelines for moving Wisconsin Administrative Code revisions through the rulemaking process, DJC's advancement of both DOC Chapter 373 and DOC Chapter 376 during the reporting period represents significant progress moving these two Chapters, most directly implicated by the consent decree, to having the amendments adopted.   Defendants need to continue to aggressively work towards completing the respective Administrative Code sections.

**COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION**

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

1.   Punitive Confinement.

   a.   Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data does not indicate that youth are being confined for seven days for any reason.**

   b.   Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporing this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data does not indicate that most youth are being confined for three days for any reason.**

   c.   Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to re-examine the use of observation status, administrative confinement, operational confinement**

**and review incidents to ensure that staff are not using this as a form of punitive confinement. The Monitor previously recommended establishing clear criteria for administrative confinement so that staff cannot punitively confine youth and cannot confine youth for more than 24 hours if they do not pose an imminent danger of harm to themselves. The Defendants have made significant improvement in this area, but it needs to be continually reviewed to ensure compliance with this Court Order.**

2.   Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of AC was lower for both CLS and LHS youth this reporting period. There were five (5) youths confined over four (4) hours in this reporting period. The Monitor reviewed documentation of "intensive mental health services" provided to youth in confinement. The Monitor also observed mental health services being provided to a youth on AC. Defendants need to continue to assess how they can more effectively provide intensive mental health services for youth**.

**September 2021**
**CLS: 31 uses of A.C. Average 108 minutes. No youth over four hours.**
**LHS: 49 uses of A.C. Average of 187 minutes. Six (6) youth over four hours.**

**October 2021**
**CLS: 45 uses of A.C. Average 147 minutes. Three (3) youth over four hours.**
**LHS: 37 uses of A.C. Average of 136 minutes. No youth over four hours.**

**November 2021**
**CLS: 32 uses of A.C. Average 157 minutes. No youth over four hours.**
**LHS: 47 uses of A.C. Average of 135 minutes. No youth over four hours.**

**December 2021**
**CLS: 16 uses of A.C. Average 125 minutes. No youth over four hours.**

**LHS: 20 uses of A.C. Average of 163 minutes. No youth over four hours.**

**January 2022**
**CLS: 25 uses of A.C. Average 124 minutes. Three (3) youth over four hours.**
**LHS: 21 uses of A.C. Average of 170 minutes. One (1) youth over four hours.**

**February 2022**
**CLS: 15 uses of A.C. Average 139 minutes. No youth over four hours.**
**LHS: 19  uses of A.C. Average of 138 minutes. No youth over four hours.**

**March 2022**
**CLS: 17 uses of A.C. Average 132 minutes. No youth over four hours.**
**LHS: 59 uses of A.C. Average of 138 minutes. One (1) youth over four hours.**

**The Monitor was able to able to assess compliance with 30-minute checks as data was readily available during this site visit. 99.29% of checks were completed within 30 minutes. The Monitor reviewed video footage for random days and times and Defendants were 100% compliance with completing the checks in accordance to policy. Staff did an outstanding job and should be commended for their diligence in ensuring youth safety while in their rooms.**

    a.  Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

        i.  A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth pose a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were five (5) youth confined for over four (4) hours during this reporting period (see response in previous question). All extended confinements were recommended by PSU.**

**Defendants need to continue to focus on reducing AC overall, ensuring any form of room confinement is compliant with this Court Order, draft policy, and procedure with AC placement criteria, and continue to QA this data.**

        ii.  A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. There was one (1) transfer (January) as a result of extended placement in administrative confinement. After consultation with PSU, it was determined that the youth would transfer to MJTC. As a result,**

**the youth was maintained on AC status pending transfer to MJTC.**

        b.  Administrative confinement time limits may be tolled from 8 pm to8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 P.M. to 8 A.M.**

        c.  Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced  plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There was one instance in which a youth was confined for over 24 hours.**

        d.  The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

    3.      Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 is being utilized. The plans developed are very detailed and comprehensive. Discussion and clarification have occurred surrounding observation status during this reporting period. Currently, only youth who are in imminent risk of serious self-harm to themselves/risk of self-harm will be placed in observation status. The Monitor will continue to review and monitor the practice.**

    4.    **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

        a.  Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As previously stated, the Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed on renovated units.**

**Youth rooms were messier than the previous site visit. In previous reports, the Monitor noted that many rooms had several blankets, sheets, and other items that could pose a safety risk due to the volume of items in the rooms and inability to see the beds, floors, and desks. The Defendants issued a directive in February and have made great improvements in this area and changed how property is dispersed to youth in order to minimize safety risks.**

**As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly. However, based on the language of this section, Defendants are very close to substantial compliance.**

b.    Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, hygiene supplies, or nighttime toilet usage. Defendants have improved their documentation and data collection. However, youth did complain to Plaintiff's counsel about only getting the basic hygiene products.**

c.    Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification. The crisis intervention technique is being documented. Clinicians are on-site for a minimum of 6 hours each Saturday and Sunday and the majority of this time is spent meeting directly with youth. The Defendants have hired new PSU staff (in April 2022) and are working on expanding on-site treatment time on weekends. The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours in order to engage youth in a meaningful way during this time.  As stated in the narrative, several PSU staff were present on the units working with youth. Additionally, the staff that the Monitor spoke to were very**

passionate about their work.

**Defendants are continually overhauling the system of care and DBT based treatment model. Defendants continue to engage the DBT consultant. Treatment is going to be even more critical as the population continues to increase and the Defendants are having to operationally confine.**

> d.   Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation/data shows that evaluations are completed and within 24 hours after being placed in room confinement. There was one instance of contraindication documented during this review period. QA needs to be implemented and sustained.**

> e.   Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE: Defendants are over 99% compliant with meeting the thirty (30) minute safety and security check timeframe. Quality assurance measures are in place and when necessary, formal investigations occur. There was no discipline given to staff for not completing safety/security checks per policy during this reporting period. Defendants focused on communication, accountability, and quality assurance which has led to substantial compliance as it relates to room checks (part of this provision). The Monitor observed safety/wellness checks being completed on various days/times during this reporting period and observed no instances in which staff did not make visual contact with youth.**

**PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor continues to encourage more on-site time on evenings and weekends. Examples of the crisis intervention techniques used with youth when confined can be viewed/verified in the PSU On-Call and/or PSU Clinician notation box on the J-Tracker Incident Debrief custom form. Examples of crisis intervention techniques include but are not limited to: validation, practice of DBT skills, processing of the incident, mediation, assistance problem-solving, fostering perspective-taking, Behavior Chain Analysis (formal and informal), plans to address conflict/safety/skills practice, in the moment coaching skills, time away from stressors, body scans, mindfulness, increase insight, encourage self-reflection. The Monitor has reviewed these documents.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

      f.    Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth did make complaints about property restrictions while in the SDP. Staff confirmed that there are property restrictions for youth while they are in the SDPs. This is an area that Defendants need to re-examine. There were also property restrictions applied by PSU for safety reasons.**

      g.    Youth in room confinement shall receive:

          1.    All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided in general. The primary clinician consults with the on-call clinician and with the SYC/YC/CPS/SW staff regarding specifics ways the youth plan addresses the issues at hand and how it can be adopted when the youth is on AC. A PSU clinician follows up in the absence of the primary clinician and/or the crisis clinician. PSU collaborates with the SYC and direct staff. The social worker and youths' meeting schedules are individualized. The social worker works with the youth to identify availability if an AC placement occurs during regularly scheduled meeting. The vacancy rate for social workers continues to be high and should be a priority in hiring. Social workers are critical to quality of care and services for the youth and effective re-entry planning.**

Documentation, quality assurance, and policy and procedure need to be improved/completed as it relates to social work, mental health, and other health services. Defendants need to ensure there is accountability with respect to the services provided by the social workers, mental and healthcare workers.

ii.    Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. During the pandemic, Defendants moved to smaller group-based treatment to youth where group participation was provided on the units. This continues. Treatment programming for youth never ceased due to COVID-19 precautions, but the size of the groups was modified to accommodate safe social distancing measures and keep youth who shared a living unit assignment in groups with one another. Beginning in March, some housing units now utilize the school for their group treatment sessions as determined by their respective living unit's weekly schedule. The Monitor continues to encourage these groups to occur off of the living unit as much as possible.

Defendants need to continue to focus (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement. Youth complained to Plaintiffs' counsel that school closures were affecting their ability to progress through the stages. Defendants need to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress.

iii.    Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Classes occur in the school building except for SDP youth (Krueger & Wells) on Steps 1 and 2, youth in medical isolation, youth who are in 5- or 10-minute observation status, or AC.

The education consultants completed their site visit and are preparing their report which will include recommendations. The Monitor will update the Court once the report has been reviewed.

The Monitor continues to suggest that Defendants should provide more art, music, woodworking, the greenhouse, welding, and sewing and other types of programs to youth in

the evening and on weekends. Also, it would be ideal for social workers to work with youth outside of the school day in order to have less scheduling issues and would help with any idle time after school. The Defendants should continue to focus on bringing more programming into LHS/CLS, especially culturally and gender relevant programs.

> iv.     Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general, youth are out of their rooms from 8 A.M. to 8 P.M. However, youth in operational confinement, isolation due to Covid-19 safety measures, any confinement required, and youth working on the BIP do not/are not permitted to talk to peers or participate in regular social interaction. Additionally, they do not go to the school area for education (unless on level 3 of the behavior modification program). The Monitor regularly saw youth conversing with other youth during out time when the youth were on the units in the day room.**

> v.     Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. There were four (4) documented instances of youth eating in their rooms which were staff imposed based on substantial threat of physical harm during this reporting period. Defendants are able to track when youth eat meals in room and based on reports that the Monitor reviewed, the instances were justified as the youth posed an immediate and substantial threat. Youth did complain about having to eat meals in their rooms during this site visit.**

> vi.   Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Logs indicate that youth on administrative confinement received at least 3 hours of "out time" per day or 30 hours per week during this reporting period. The Monitor will note that during the next reporting period (April, May, and June) Defendants will not meet the 30-hour weekly out time requirement for part of the reporting period because they are operationally confining youth in at least some units. Defendants did indicate they are working on a plan to meet the 30-hour requirement for all youth even when operationally confining.**

5. **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is a box on the incident debriefing form that is checked if staff informed the youth of his or her rights regarding grievances and appeals and time of notification. Youth continue to receive their notification of rights/grievance procedures when they are placed in administrative confinement. The process for obtaining a youth signature (or two staff signatures in the event of a refusal) has been proposed as a part of youth receiving PSU thinking chain reports during the first stage of the administrative confinement process. Policy has been completed. Defendants are close to being in substantial compliance.**

6. Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are documenting this consistently, including when less restrictive means were attempted. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue but has significantly improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

B. OC-Spray and Other Chemical Agents

1. OC reduction plan. Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.**

2. Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

C.   Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

    1.   Prohibition on types and uses of mechanical restraints.

        a.   Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.**

**The Monitor did not personally see any youth in mechanical restraints during site visit, yet data and documentation show that there was an increase in use of mechanical restraints for LHS and a significant decrease in the use of mechanical restraints during this reporting period for CLS. Also, it is important to note that the only mechanical restraints used during this period were handcuffs. Defendants need to continue focusing on reducing the use of mechanical (as well as physical) restraints.**

        b.   Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Below is the number of mechanical restraints uses in LHS and CLS this reporting period.**

        **Uses of mechanical restraints LHS:**
        **October 2021:**        **6 uses**
        **November 2021:**      **9 uses**
        **December 2021:**      **2 uses**
        **January 2022:**        **3 uses**
        **February 2022:**      **6 uses**
        **March 2022:**         **12 uses  (1- 65 minutes)**

        **Uses of mechanical restraints CLS**
        **October 2021:**        **13 uses**
        **November 2021:**      **12 uses**
        **December 2021:**      **0 uses**
        **January 2022:**        **5 uses**
        **February 2022:**      **6 uses**
        **March 2022:**         **4 uses**

In addition to the Mechanical Restraints policy being signed into practice, DJC worked to digitize its current use of force review forms and incorporate them into J-Tracker in order to create efficiency, new sources of data for the facility training supervisor, and most importantly, to implement a strict process for reviewing mechanical restraint use.

The new process for reviewing all physical restraint use includes the requirement that all MR cases be reviewed by a member of the Use of Force review committee, all of whom are trained instructors at the facility. In addition to incorporating the old use of force review form fields, the new custom form in J-Tracker requires answers to the following questions written specifically from the language of the consent decree to triple check compliance when mechanical restraints are used.

       a. **Were the restraints least restrictive means of addressing an imminent threat of physical harm to the youth or others justified?**

       b. **Were restraints removed immediately when the youth regained control and when the threat of harm or the safety concern had abated?**

       c. **If any restraints other than handcuffs were applied, was the determination that the youth posed an immediate and substantial threat of physical harm to others justified?**

       d. **Were restraints used for punishment or discipline?**

       e. **Were any youth restrained to a fixed object?**

       f. **Were any youth left not in the presence of staff while in restraints?**

       g. **If any restraints application exceeded 45 minutes, was the continued use of mechanical restraints approved by the superintendent, security director or designee,**

       h. **If yes, was it reviewed every 45 minutes thereafter for the same approval?**

       i. **Did the incident report associated with this use of mechanical restraints contain an adequate description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints?**

**Defendants should continue to work on reducing the use of mechanical restraints and continue to monitor.**

       c. No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

         i. Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no uses of ankle restraints or the wrap during this reporting period. The only mechanical restraints used were handcuffs. Defendants need to develop policy and procedure, training, and QA measures and ensure PSU staff order these types of restraints.**

ii.    Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has improved relative to when restraints have been used and the rationale for usage. Defendants have created quality assurance measures (see response above).**

iii.    During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

d.    Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue focusing on reducing the use of mechanical restraints. Defendants need to continue to monitor and assess the use of restraints and duration. The Monitor has not observed mechanical restraints used for punishment/discipline on site visits, review of video, or documentation reviewed.**

e.    Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

f.    Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Staff have received training in physical force, restraints, and trained in proper de-escalation. The Defendants are increasing the frequency of these trainings (regular, informal, refreshers). DBT implementation will be very beneficial to youth and staff. Defendants have made DBT a**

**priority and are continuing to train staff and continue working with the DBT consultant.**

> g. Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter. As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There was one (1) instance of a youth being placed in mechanical restraints over 45 minutes. The appropriate personnel authorized the use of the mechanical restraints. PSU approved and followed up within two (2) hours. Defendants have created a QA process for this section. Defendants also need to ensure therapeutic interventions occur.**

> 2. Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process. Defendants need to continue developing the behavior management program, actively engage with youth, and develop engaging and meaningful programming in order to reduce the use of mechanical restraints.**

> D. Strip Searches. The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

> 1. Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possess drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches in this reporting period. The policy and procedure for Searches of Youth have been finalized. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search.**

28

2.   Strip searches with probable cause. Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

b.   Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches during this reporting period. QA has been developed. The policy for searches has been finalized.**

c.   Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches conducted this reporting period. QA has been developed. The policy for searches has been finalized.**

d.   Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records reviewed indicate that all staff have been trained in trauma informed care. There no strip searches this period.**

e.   If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches**

during this reporting period. Documentation has improved. Policy and procedure/QA developed. PSU is consulted, and it is documented.

      4.    Documentation. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. Policy and Procedure finalized.**

      E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants are focusing on de-escalation skills. Staff have been trained in MANDT and other training which includes de-escalation skills training. De-escalation training/modeling continues to occur.**

**The Monitor observed several instances of de-escalation in review of video footage. Staff are more comfortable utilizing these skills and regularly use these skills in each instance. Defendants should include cultural diversity issues as part of crisis management training and procedures. Knowing these issues and how they are communicated is critical to successful behavior management.**

      F.    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Programming needs improvement (as discussed throughout this report) and idleness—which was already high—is increasing with the staffing crisis. The newly implemented schedule should help but with the staffing challenges, the Defendants might not be able to fully implement the program as planned.**

**As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. Increasing education hours and vocational programming, including for youth who have obtained a diploma or HSED and who therefore have even fewer activities, especially if on Krueger, can greatly assist in reducing idleness time and provide positive youth development strategies.**

G.   Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018, report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants have made significant effort in implementing the strategies suggested in improving staffing ratios and staff morale. However, as stated more in depth in the narrative section of this report, Defendants are experiencing significant staffing challenges. Defendants have implemented several initiatives to increase recruiting and retention however, these initiatives are not resulting in increased available staff to a level that is needed. Additionally, the percentage of staff on various leaves is very high which adds to the staffing issues.   As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere, and environment of the facility. Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, reduces employee leave/vacancies, and the use of isolation and confinement.**

H.   Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE. DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. Chapter 373 was reviewed by DOC attorneys in the Office of Legal Counsel in March and is now back with DJC's Administrative Code committee for further revisions. Chapter 376 final draft has been completed by the committee and sent to Office of Legal Counsel and Division of Management Services to complete the fiscal estimate and economic impact analysis before the submission of the proposed rule draft. Defendants need to create an expedited timeline for finalizing all regulations and submitting them for approval.**

## IV.    DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A.   **Incident review process.** Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether

physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The 24-hour timeline is met in the vast majority of cases. Informal reviews occur right after an incident in majority of cases. When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). Defendants continue to make improvement in the area of quality assurance.**

  **B.**   **Quality assurance**. The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As discussed throughout previous reports, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff. Defendants have created an exceptional quality assurance program and have made substantial progress in developing daily data to review that will automatically be available in order to make real time operational decisions. The Monitoring team will continue to work with the superintendent to establish performance goals, analyzing data, and creation of corrective action plans.**

## CONCLUSION

There was progress made in several initiatives such as a strong, committed leadership team, the quality assurance program improvements, training/implementing DBT, creating and implementing a weekly programming schedule, incorporating PSU more into daily operations, the creation of the new recreation center, continued in-person education on and off the units, and engaging the educational experts to improve the quality and quantity of education.

The Defendants are seeing an increase in the average daily population level at LHS/CLS. This increase is beginning to impact daily operations significantly. There is an increase of operational room confinement stemming from the population increases and the staffing challenges. While these operational adjustments may be necessary to promote safety for both staff and youth, leadership should begin considering other options, external staffing options (with training), working with partners/courts to reduce the population, analyzing staff leave data, and continuing to work on staff morale. At a minimum, programming, and youth's access to resources while operationally confined must increase to occupy them while they are isolated for something that is not related to their behavior. Improving the overall BMP program, to include more meaningful

incentives, rewards, and consequences will go a long way toward improving the overall environment and promoting a safer, more respectful atmosphere.  Lastly, as the Monitor continues to state in reports to the Court, there needs to be a focus on moving youth from LHS/CLS to more appropriate setting(s).

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

<u>/S/ Teresa Abreu</u>
Teresa Abreu
Monitor