UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF
WISCONSIN

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                             Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

## FOURTEENTH REPORT OF THE MONITOR

Teresa Abreu, Monitor, hereby submits this status report.

## **INTRODUCTION**

The Thirteenth Report of the Monitor was filed with the Court on June 3, 2022. The Monitor's Fourteenth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates since the thirteenth site visit which took place on May 5, 2022.

## **SITE VISIT**

The fourteenth site visit by the Monitor took place on July 28 and 29, 2022. The Monitor and Plaintiffs' counsel were onsite for two days and completed necessary interviews and information gathering via in-person and virtual meetings prior to, during and after the site visit. The Monitor reviewed materials provided by the parties prior to, during, and after the site visit for the reporting period ending July 31, 2022 (April, May, June, and July). Materials included but were not limited to: use of force videos, video footage of units, video of safety and security checks, programming materials, discipline documents, investigations, PREA investigations, various staff memos, daily shift reports, policies, all of the monthly data submitted to the parties per this Court Order, work rules, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Plaintiffs' counsel conducted approximately twenty (20) youth interviews before and during the site visit.  The Monitor toured LHS/CLS and interviewed youth and staff. The Monitor had the opportunity to talk to many of

youth and staff present and available during the site visit. Approximately fifty-three youth (53) youth and thirty-four (34) staff were interviewed by the Monitor during this site visit.

## OVERALL QUALITY OF LIFE, CONDITIONS, AND ATMOSPHERE

Introduction

The total LHS/CLS population has steadily increased during this reporting period up to the high 70s on average.  At the time of the site visit, the population was at 80 youth (one off site) and in mid-August (outside this reporting period) the population was 85 youth. It is important to note that the population level is continuing to trend upward and has significantly increased over recent months. This appears to be a trend that will continue into the foreseeable future.  While the population increase is a concern, the issue is compounded by the serious staffing situation (that still exists) of vacancies, turnover, various employee leaves, and overtime required to maintain sufficient staffing levels. Typically, the Monitor reports that there are more than adequate staffing levels on each of the living units. This is the second time the Monitor reports that there are inadequate staffing levels on the living units, which presents very significant problems for youth and staff. The current staffing situation is having a profound negative impact on daily operations, leading to adjustments to the daily schedules to maintain effective staffing ratios for youth supervision and resulting in operational room confinement of youth (youth confined to their rooms due to inadequate staffing levels not behavior based), change in educational settings, overall programming, reduced recreation, and increased idle time. Despite these challenges, leadership, and staff at LHS/CLS continued to remain positive during the site visit and committed to improving conditions of confinement for youth and staff. The Monitor is concerned about the effect the high levels of room confinement are having on youth mental health, education and general wellbeing. Youth complained about not getting enough recreation or exercise (particularly going outside) and not receiving phone calls/Zoom visits, being on modified programming, property restrictions while on administrative confinement, quality and quantity of education, and youth being confined in their rooms with nothing to do.  A more detailed interview summary is below.

COVID protocols have not changed during the reporting period.  The Department of Juvenile Corrections (DJC) continues to apply COVID protocols consistent with CDC and DHS guidelines and recommendations for congregate settings. Monitoring the facility and surrounding community transmission levels continue.  As of April 1, 2022, Wisconsin Department of Corrections' (DOC) institutions and facilities like DJC's no longer require masks for youth or staff in twenty-four-hour facilities in congruence with many other local, state, and national jurisdictions.  There was a significant reduction in COVID positive cases this reporting period to four (4) youth and fifteen (15) staff.

Outside of this reporting period, Defendants report that operational confinement has been reduced, educational setting has resumed in the school area, and a new behavioral motivation system is being implemented that should have a positive impact on youth and staff.

Physical Plant Observations

The entrance, grounds, visitation, school, and many other areas were clean and orderly. Living units and youth rooms in general were cleaner than on the previous site visit.

Defendants continue with the following physical plant improvements:

- Continued the installation of new windows and window frames in each of the living units by completing Curtis and beginning work in Black Elk. The new windows and frames include specialized glass that can withstand significant duress without failing. This is expected to significantly improve safety and reduce the cost of replacements in addition to assisting the lighting project achieve the goal of an improved dayroom environment.

- Completed the lighting upgrade project throughout the facility by completing all units on grounds. This project has had a significant positive impact on the lighting and feel of the youth rooms and dayrooms, all while actually improving energy efficiency.

- Continued implementing additional fixed cameras throughout the facility including both internal and external cameras by completing Addams, Hughes, Rogers, Miller, Wells, School and the Administration Building during the reporting period. Additional cameras were procured during the reporting period. DOC and external contractors are continuing to install additional cameras in critical areas such as the front vestibule and other spots where incidents can tend to occur. Overall the additional number and quality of cameras are enhancing views and expanding into areas that were previously blind spots.

- Continued to enhance the Music Arts Initiative by adding additional computer, software, and hardware components. There are also additional Apple work spaces for digital art and content creation. Two youth have submitted original works to the 2022 PbS Kid Got Talent Awards Contest. Thanks in part to this initiative, but mostly due to the youth's talent and hard work, two DJC youth were nominated as finalists for a solo vocal original titled "Need None" and the duo original song "In the Night".

- Continued work on an electrical upgrade for the greenhouse which allows the greenhouse to accommodate more youth programming and yield additional and varied projects, plants, and produce. Completed the electrical upgrade to the welding room that will facilitate more welding stations, better equipment, and better lighting for the welding program.

- Completed construction of an outdoor visitation area that will allow for youth and families to have visits outside. The area can also be used by youth and staff to engage with during recreation or leisure time. In addition, DJC began planning space for and purchasing video phones for youth that will provide youth and their families to seamlessly conduct video visitation anytime the youth are on these phones. Importantly, youth calls will remain free, just with the added option of video conferencing.

- Upgraded eyewash stations, sinks, and faucets installed in both HSU stations, the larger HSU office in the Administration building, and the HSU station on the CLS side.

- Ordered bottle filling units to replace the current bubblers on the youth units. These are scheduled to be installed before the end of Summer 2022.

The Defendants should be commended for their continuing commitment to improve the physical plant which improves the daily lives for staff and youth. The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

<u>Education Observations</u>

The physical appearance of the school areas and classrooms were beautiful as usual. Youth were not observed in the classrooms this visit as education was being completed on the units due to staffing issues.  When short staffing leads to periods of operational confinement school is then provided on the unit through a combination of direct instruction, workbooks, learning packets, and Edgenuity. Youth complained that they do not like this format and are not learning as well as they were when education took place in the school area and all in-person with teachers present in every class. Youth complained that while there *might* be a teacher on unit, it often is not the teacher who teaches the subject the youth is working on and thus the teacher often cannot assist them.

As mentioned in previous reports, Defendants engaged three consultants to evaluate the educational programming at LHS/CLS. The consultants are national experts and have been selected to evaluate key educational areas including:

- Operations
- Curriculum and Instruction
- Academic Assessments
- Special Education
- Human Capital
- Technology Integration
- Transition

The education consultant's report is in the process of being finalized and will be provided to the Monitor as soon as that final version is available. Defendants have successfully hired five additional teachers during the reporting period however, the principal resigned. Staffing the school remains critical to increasing the quantity and quality of education for youth.  Hopefully, the increased staff and recommendations by the consultants improves the quality and quantity of education—especially special education ("SPED").

The school also made a number of other improvements during the reporting period while awaiting the final report. Examples include:

- Posting a competitive job posting in search of regular substitute teachers in order to eliminate or reduce the need for teachers to substitute teach in classes that are not their core subject.  This will assist youth and staff to maintain more consistent schedules.
- Placing greater emphasis on STAR reading and math testing and using more in-depth analysis of the results to support students.

- Adding a reading teacher and placing to identify and provide additional support to students who are behind in reading.
- Requiring teachers to submit two engagement lesson plans outside of assigning Edgenuity per class and using guided notes for youth assignments in Edgenuity. If the student achieves less than the lessons benchmark, guided notes allow a teacher to assist the youth in reviewing the information in the lesson and retest.
- Ensuring students who have graduated are provided vocational opportunities.

The education department at CLS/LHS continues to record special education ("SPED") resources provided in the youth attendance record in Infinite Campus. Make-up SPED sessions and a student's progress toward their IEP's are captured on the attendance roster in Infinite Campus as well. Additionally, the school psychologist maintains a resource delivery tracking document, tracking any additional SPED resources provided. During this reporting period, a set of protocols have been developed between school and administration managers to identify the parameters for providing education resources during or after any form of confinement when it is known to have interrupted their scheduled SPED resource time or general education time. The Monitor reviewed video on random days and times and saw SPED teachers engaged with youth on the units on several occasions. Recommendations from the consultant's report will also help guide the education department with regard to the provision of SPED resources to youth once the report and its recommendations are final.   The Monitor is happy to report that in mid-August, youth were able to have more classes in the school area.  The Monitor hopes that this continues. The Monitor continues to recommend that the frequency of music, art, and recreation needs to increase and "out of the box" ideas need to be implemented whenever youth are in operational confinement.

PbS data shows that educational hours increased significantly during the April 2022 data collection period at both LHS and CLS. LHS increased their education hours from 3.75 hours in October 2021 to 5.08 hours in April 2022.  CLS increased education hours from 3.84 hours to 5.14 over the same data collection periods. These increases represent a more normalized education program compared to previous reporting periods.  However, it is important to note that operational confinement due to the staffing shortages did not occur until after the April collection site. Therefore, education hours for May, June, and July most likely would not have been at this level. However, with education resuming in the school area in August and new educators, the Monitor hopes that educational hours will continue to increase.

<u>Living Unit Observations</u>

The Monitoring team and Plaintiffs' counsel visited each cottage that youth were housed in during the site visit. Overall, the units and youth rooms were cleaner than during the last visit. Youth were extremely respectful and had more of a positive during the site visit than the site visit in April. Many of the youth concerns dealt with increases in confinement and with conditions in confinement.

The unit populations ranged from five (5) (CLS unit) to fifteen (15) (LHS) youth, which creates significantly higher staffing ratios. Defendants are trying to have supervisory staff, mental health and other staff regularly come to the units to increase staff presence. This is becoming increasingly difficult as the population continues to increase, and staffing numbers continue to decrease. Staff

were engaged with youth during this site visit. Staff attitudes were more positive than the Monitor expected considering the day-to-day challenges they face currently.  The Monitor reviewed video during the reporting period to view day room activities and in every instance (45 video reviews) staff were engaged with youth when they were out of their rooms doing a variety of things such as eating, arts and crafts, groups, helping with school work, recreation, Grandparent program visits, and conversing.  On review of video, staff were engaged with youth and positioned at or near tables with youth, which mirrored what was observed during this site visit. The body language and tone were positive from staff and youth. All the youth that the Monitor interacted with were respectful and willingly communicated with the monitoring team but had some complaints- although not nearly as many as last site visit.  The youth did make several complaints to Plaintiffs' counsel which are described below. The Monitoring team had an opportunity to talk to most of the youth present in the day rooms.

During this site visit, the girls were housed in the Wells and King Units. There were thirteen (13) youth total in CLS. CLS units and youth rooms were cleaner than at the last site visit.  The five (5) youth on King were all in their rooms. One youth was on quarantine because she had recently entered the unit, and so the hours she was allowed out of her room was different than that of the other girls on King. Because she did not want to leave her room during her out time hour, which occurred while the Monitor was on the unit, all youth were confined to their rooms.  Additionally, there were two teachers on units doing nothing because there were no youth to teach.  Adjustments should have been made so that there was not wasted opportunity to have teacher led instruction and reduce confinement time.  There were three (3) youth out of their rooms on Wells. PSU staff were doing rounds and a teacher was on the unit giving instruction. The youth expressed to the Monitor how much they liked their teacher. However, the youth on Wells complained about use of force, bathroom monitoring, and discipline to Plaintiff's counsel.

With respect to the LHS units, Addams, Black Elk, and Curtis were empty units during this site visit. The LHS youth were housed on Krueger, Rogers, Hughes, Miller, and Roosevelt. As previously mentioned, the Douglass unit is the new recreation unit. None of the units had adequate direct-care staffing (although Defendants attempted to supplement with other classifications of staff and there were staff who were doing "on the job training"). Youth were doing education on the units or in their rooms, confined to rooms, on telephones, watching television, engaging with PSU staff, cleaning, outside for recreation, or sitting in day room conversing with other youth (excluding youth who were in their rooms and/or in the high-risk unit programming).

The Krueger and Wells living units operated as the Skills Development Programs (SDP) at LHS and CLS respectively during this reporting period. The Krueger and Wells units are considered the "High Risk" Units. The SDP is modified programming for youth who have engaged in physically aggressive behavior, have presented a danger to others, and/or exhibited behavior that caused a major disruption to the facility.

The SDP ran on a three-group schedule seven days per week beginning in April 2022, however this was transitioned to two-groups in July when further review of the program deemed that certain youth may not have received at least three (3) hours per day/30 hours per week of out-time when a combination of administrative and operational confinement occurred for the same youth on the same day.  The Krueger and Wells SDP units offer school on the unit through a combination of

direct instruction, workbooks, learning packets, and Edgenuity.

DBT is provided to youth in the SDP incorporating individualized planning along with the in-person group work already assigned to youth in the SDP so that they are engaging in DBT skills and receiving feedback on a daily basis. Youth assigned to the SDP have a "Supplemental Youth Plan" created by PSU in order to specifically address their behavior. Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team.

During this reporting period, based on suggestions from the previous Monitor's report and feedback from youth in the SDP, the process has been updated to ensure that data regarding a youth's progression through the SDP is saved electronically and made available to the youth's team of providers. This is done as a means of providing additional context to those working with the youth to aide in developing intervention strategies that help the youth identify skill practice opportunities and ultimately return successfully to regular programming and progression through the wider System of Care.

When looking at the PbS daily activity summary logs from the April 2022 data collection cycle, both LHS and CLS were averaging about 6.00 hours per day of "leisure activity" on weekends, compared to about 3.00 hours per day Monday-Friday. The "leisure activities" are long periods of time that are unstructured, mainly occurring in the dayroom areas. These are the periods in which most incidents of violence occur (PbS data reflects that 90% of all incidents occur on the living units). Of these, 51 incidents or 37%, occurred on a weekend. It should be noted that there were many fewer overall incidents reported during the April 2022 data collection cycle than during previous reporting periods. This is most likely a result of increased education and other activities. For the current reporting period there were 137 (122 LHS and 15 CLS) incidents. However, it should be noted that the April data reporting period cannot necessarily be considered a true reflection for this entire reporting period because operations were much different in April than they were in May-July. Consequently, after April youth were confined to their rooms more frequently and for significantly longer periods of time, therefore more recent data will need to be analyzed to determine the overall impact on incidents of violence. The Defendants have not been able to follow the daily schedule due to staffing shortages. There needs to be a focus on creating and following a daily schedule that provides for structured and meaningful activities and accountability in order to minimize the incidents of youth acting out and ensuring staff are adhering to the schedule absent an emergency.

<u>Youth Interviews</u>

Approximately fifty-three (53) youth were interviewed during the site visit (formally and informally) by the Monitoring team and approximately twenty (20) youth were interviewed prior and during the site visit by Plaintiffs' counsel. There were many requests to talk to Plaintiffs' counsel. Plaintiffs' counsel followed up on these requests during the site visit and after.

In general, youth attitudes were more positive this site visit based on the Monitor's interaction with youth. Based on conversations with youth, they seem nervous about the new behavior motivation system, are bored, do not like being confined so much, want to do more recreation and go to the school for education. It is important Defendants continually communicate the new behavior motivation program and explain all of the steps so that youth have a clearer understanding of how

it works and what the expectations are of youth and staff. The Monitor believes this new system of care will have a positive impact on the culture of the facility and focus on youth's positive behavior. This also allows youth to start on the same level. Staff attitudes continue to remain positive. The Monitor continues to stress the need for more structured and meaningful activities as youth idleness remains a significant concern, particularly on weekends and while staff availability is limited. While Defendants operationally confine, there needs to be additional resources available to youth and more in-room activities to engage youth. As mentioned, with summer coming to an end, there are more staff available as of August which will hopefully result in youth spending more time out of their room, off units, and in the school area.

Youth did complain to Plaintiffs' counsel prior to and during the site visit (during this reporting period of April-July). Specifically, youth complained about operational confinement (being in their rooms most of the day with nothing to do), all of the room confinement causing them stress, and operational room confinement causing them to have less access to phone calls and visits. Youth also complained about never getting off of their units and having to have education in their rooms or on the unit. Youth stated that they do not get to go to the gym for recreation, music studio, or the activity unit for recreation, and some youth in both CLS and LHS complained about having little or no outdoor exercise. Youth on SDP complained about not being able to have the same property as other youth.  Youth complained about being in operational confinement and then administrative confinement which resulted in some youth being confined for long periods of time. When this issue was presented to Defendants, they began to review and track instances where administrative confinement may have overlapped with operational confinement to determine the amount of confinement time for the youth in order to accurately reflect confinement time. Youth complained about being on PAUSE (which means they cannot progress through the behavior motivation system). The girls complained about certain staff which Defendants will be looking into. Youth complained about being on AC a lot (which is reflected in the data) and complained about an increase in uses of force—particularly with the CLS youth. Youth also complained about the grievance process – specifically, that this process is unclear and that there is no clear resolution to any formal grievances/complaints that they file with staff. Youth had more varied and detailed complaints to Plaintiffs' counsel than to the Monitoring team while onsite.

During rounds of the units, the Monitor observed that most youth were in good spirits and engaged in some type of program or activity. Even those confined to their rooms were in most cases working on education through the Edgenuity tablets. However, numerous youths complained that they are not learning anything through Edgenuity and stated they would much rather have in-person learning in the school. Youth had mixed feelings about the modified or split halls program. Many indicated that they do not like the additional time in their rooms but did state that they feel safer as a result. Youth asked for additional incentives and rewards to have in their rooms to help occupy their time, such as the small wall mounted basketball hoops, yoga mats, books, stress balls, etc.

Many youths also stated to the Monitor that the food was good and that they prefer being at LHS/CLS over some of the county detention facilities (many of which are currently also overcrowded and/or largely on lockdown). They stated even with the modified program, they are getting more out of room time than they did at some of the detention facilities.

The Monitor continues to encourage staff to engage youth and have more meaningful/structured programming and activities. It is clear that when staff engage with youth, youth respond positively. The Monitor has witnessed numerous occasions where staff are actively engaged with youth and these opportunities build positive and respectful relationships that help reduce incidents of violence and promote a more therapeutic and trusting environment. This is also evident in that when there are staffing shortages and less opportunity for staff engagement with youth and more confinement, there is an increase in complaints and increased behavior incidents. The Defendants need to continue to focus on gender-specific and culturally competent programming. However, first Defendants need to continue developing a plan to safety manage LHS/CLS during this challenging time.

As previously reported, on April 8, 2022, the Governor signed legislation that called for roughly $42 million to build a new Type 1 juvenile correctional facility in Milwaukee County. This is a step towards the closure of Copper Lake and Lincoln Hills schools.  Several more steps in the process remain, including some that will require significant preparation and/or approvals from other state and local agencies. While the signing of the legislation represents a step forward, the completion of a new Type 1 facility and the subsequent closure of CLS/LHS will still take considerable time.  In the Monitor's experience, this is a long process and potentially could take several years. As previously mentioned, moving youth closer to locations where necessary cultural- and gender-competent programs and services are more widely available, and where family visits can be more easily accessible, will have a positive impact on youth and will allow for a larger pool of applicants to fill critical roles.

<u>Staffing</u>

For the second time, the Monitor observed firsthand the lack of available staff at LHS/CLS. LHS/CLS was in a staffing crisis during this reporting period. Staff vacancies and leaves continue to be high during this reporting period at LHS/CLS and across DOC. DJC knows that its staff are the best assets towards making the programs and initiatives underway in the schools and living units a success, and importantly, that staffing shortages increase the burden on those who work to maintain a safe and healthy environment for youth and staff. Defendants are working diligently to try to attract and retain staff for these critical roles and have truly created significant incentives for new and existing employees in order to help with attracting new talent and retaining current staff.

Direct-care staffing vacancy percentage is similar from the last reporting period (*see below*). There are 311 total positions ("FTEs") at LHS/CLS. Approximately 138 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA"). The teacher vacancy rate is lower than last reporting period (5 vacancies), or 26% of positions which is a huge improvement and will greatly assist with providing increased quality and quantity of education for youth. There is the higher number of social worker vacancies, which at 75% is very high. This is a critical role that should be made a recruiting priority. Recruiting in general is still a challenge due to the location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and for educators, the year-round school calendar and thus, hiring needs to continue.  Even with the added incentives, there is a still difficulty in hiring many classifications of staff.

| Position | Vacancy Rate % as of December 31, 2021 | Vacancy Rate % as of March 31, 2022 | Vacancy Rate % as of July 31, 2022 |
|---|---|---|---|
| Youth Counselor | 36% (41 out of 115) | 41% (44 out of 108) | 40 % (43 out of 108) |
| Youth Counselor Adv. | 19 % (7 out of 37.5) | 20% (6 out of 30) | 20% (6 out of 30) |
| Teacher | 32% (8 out of 25) | 48% (11 out of 23) | 26% (5 out of 19) |
| Social Worker | 36% (5 out of 14) | 67% (8 out of 12) | 75% (9 out of 12) |

Youth Counselor and Youth Counselor Adv. position vacancies have remained consistent during this reporting period however, employee leave usage and the continued increase in the youth population has added to the staffing crisis resulting in facility operational challenges, the continued need for "split" halls, heightened fear for safety, and poor staff wellness (as reported in PbS data). Defendants are going to have to consider some non-traditional staffing options in order safely maintain the facility. This will most certainly include operational adjustments that limit the number of youths out at any given time to ensure proper staffing ratios, thus increasing operational room confinement. Youth seem to understand operational confinement now.  From the youths' perspective though, it does not matter whether or not it is operational – they are being confined to their rooms for long periods of time, even when they have not misbehaved. This can make youth more upset/oppositional. The Monitor is recommending a staffing assessment for the direct care positions and posts be completed and made suggestions to have other classifications trained similar to the direct care positions in order to meet PREA requirements so that they may be considered full time, direct-care staff and factored into the staffing ratios.  The Monitor will continue to work with Defendants on this and other issues.

In order to recruit and retain direct care, as of this reporting period, YC's and YCA's are now offered $10 per hour more than was being offered as of January 1, 2022. In addition, DOC/DJC has taken an across the board approach to filling staff vacancies which have persisted over the reporting period. DJC knows that its staff are the division's best asset towards making the programs and initiatives underway in the schools and living units a success, and importantly, that staffing shortages increase the burden on those who work to maintain a safe and healthy environment for youth and staff. Specific efforts to recruit staff during this reporting period participated in by the HR staff at the facility included:

- Attended the Northcentral Technical College School of Health Job Fair
- Attended the Midstate Technical College virtual career fair
- Attended the Wisconsin Rapids Job Fair
- Attended the Medford High School Job Fair
- Attended the Rhinelander High School Job Fair
- Attended the Merrill High School Job Fair
- Attended the National Guard Job Fair
- Attended the Wausau Job Center Hiring Event

- Attended the Wausau Job Center Walk-In Interviews
- Attended the Rhinelander Job Center Walk-In Interviews
- Attended the Price County Job Fair

Other recruitment efforts occurring during the reporting period involved HR at the facility worked with central office HR personnel and the communications office on getting up billboard advertising for employment. HR also received approval for (5) 0.6 FTE Youth Counselor positions. Historically, DJC hasn't offered any part-time positions amongst YCs, but there were inquiries on the part of prospective employees that warranted DJC getting approval for the positions to fill should there be interest. Finally, HR at the facility and DJC Administration worked with central office HR to clarify and enact a process change to hiring that may allow DJC to make more timely offers of employment to probable candidates.

Key Positions hired during this reporting period (April-July) are as follows:

- Three Treatment Specialist 2
- Five Teachers
- Six Youth Counselors
- One Supervising Youth Counselor 2
- One Supervising Youth Counselor 1
- One Program & Policy Analyst Adv (PbS & Policies)
- One Payroll & Benefits Specialist
- One Recreation intern
- One Treatment intern
- Two Recreation Leader Sr.
- Two Psychological Associates

The struggle to hire licensed/certified social workers continues. DJC has not been able to hire a social worker since 2018. The DOC had raised the minimum pay for social workers, but this has not helped in LHS/CLS garnering any applicants even after the increase. Many social services agencies have moved towards hiring case managers that do not require a state certification/license, and unfortunately LHS has also moved in this direction due to the inability to recruit and retain social workers.

DJC recently hired three Treatment Specialist 2's, one new hire, one who promoted from a YC position, and one who promoted from a Social Worker position. These individuals have been observing DBT Groups, co-facilitating DBT Groups, and learning case management duties. They are also currently in the process of receiving detailed DBT Training from DBT consultant Dr. Chapin in facilitating skills groups. The plan continues to be to have two either Treatment Specialists or Social Workers assigned to each unit. These individuals will together facilitate that unit's DBT Skills Groups and provide all case management services for the youth in the unit.

DJC continues to work on hiring more Treatment Specialist 2's and is also starting of the process of hiring Treatment Specialist 1's. Whereas the TS2's will work Monday-Friday during normal working hours, TS1's would primarily work during the evening and weekend hours. This will allow the facility to expand the treatment services tremendously.

DJC and facility leadership conducted surveys of staff and subsequent planning regarding schedules that could help mitigate staff shortages and reduce overall mandated overtime ordering of staff during the reporting period. The Monitor will report on the outcomes in the next report.

The Monitoring team spoke to over thirty-four (34) staff. Staff morale seemed good overall despite the obvious shortages at the time of the site visit. A review of video over the reporting period showed staff regularly engaging with youth. Several staff were extremely friendly and engaged and stated that they liked their jobs. In several cases, newer staff stated that they "loved" their jobs. One OJT staff member was observed having a very positive interaction with a youth in his room who had his door window covered. The staff member was overheard asking the youth to uncover his window. The youth asked why, and the staff member replied stating, "because I care about you and I want to make sure you are safe." The youth uncovered his window and said thank you.

The PbS data for April 2022 reveals an increase in staff fear for safety concerns as well as an increase in staff perceptions regarding how dangerous the facility is based on input taken from the Staff Climate Surveys. Both of these outcome measures reflect increases in fear for safety concerns over the previous October data collection cycle. Fear for safety indicators at LHS was at 69.49% and at 83.33% at CLS. Both are increases from the October 2021 data cycle. Both indicators are also significantly above the national field average of 24.81%.

Also, interesting, is that many staff stated that they too dislike the modified program and feel the youth need more time out of their rooms and more meaningful activities to engage in. However, they also understood the need for the modified program and felt it was providing a safer environment. While the PbS fear for safety outcome in April reflected a higher fear for safety, the fears seemed to have reduced since the data collection period.

In order to improve conditions of confinement for youth and staff which will improve overall culture, DJC has worked extensively to develop its new System of Care (behavior motivation program) which will be implemented in August 2022. Various staff have visited other states to make informed decisions about operations that would provide fidelity to the system. That experience helped determine that team-based assignments have wielded good results in other facilities and is something DJC wants to replicate at the CLS/LHS. This model involves a focus on positive youth outcomes and an improved behavior motivation program which also focuses on a youth's progress in their education and treatment plans.

The goal of the pilot for the new system of care was to develop a team atmosphere amongst groups of living units, consistent post assignments, and to reduce overall ordering. Given current staffing levels it was not possible to match each team with a single unit, so those teams were set into four categories: LHS General Population; LHS Skills Development and Intake; CLS Skills Development & General Population; and RRT/Control/School Patrol. Some auxiliary posts such as Care Team, Recreation and Visitation that were evenly distributed to balance out the teams.

The LHS General Population units and the CLS/LHS Skills Development units will have two primary YCA's and four primary YC's. King & Roosevelt will have four primary YC's. The Wells YCA will become Wells/King. The keys within the RRT/Control group will remain at the time

they currently are. Within the General Population team and both the LHS/CLS Skills Development teams:

- YC's who are working 0630 - 1830 transitioning to 0800 - 2000.
- YC's who are working 1830 - 0630 transitioning to 2000 - 0800.
- YC's who are working 1030 - 2230 transitioning to 0800 – 2000.
- YC's who are working 1430 - 0230 transitioning to 1600 – 0400 mid-shift or 2000 – 0800.
- YCA's would transition to 0800 – 2000.

Provided this information, staff were asked to respond to a survey regarding their general opinions of the team approach and as well as some of the specific impacts it may have. The staff survey showed a strong preference to move towards this new scheduling format.

Some logistical considerations requiring additional preparation to accommodate the new schedule was completed in June 2022 before it was announced on July 8, 2022 that the new schedule would be implemented at the facility beginning Monday, August 1, 2022. The Monitor is very supportive of this new system of care. Also, by seeking staff input on the new system of care and respective scheduling, this will create buy in and improve staff morale as staff helped shape the new program.

Most staff seemed to feel as if the overall atmosphere was improving but stated that they continue to have no control or adequate consequences for youth behaviors. Staff were aware of the new behavior motivation program/system of care and seemed excited for the change. Staff felt that the new BMP would provide them with the needed incentives, rewards, and consequences to more effectively manage youth behaviors.  The Monitor had the opportunity to talk to several mental health staff and they were very knowledgeable about the various programming and knew the youth and expressed how much they liked working with the youth.  It was very nice to see such optimism from the staff.  The continued implementation of DBT and other best practices will improve safety for staff and youth.

Defendants continue to work on increasing staff morale but still have much more work to do. This is even more critical during a time where there is not enough staff and staff are getting mandated to work overtime regularly. Defendants have done the following to increase staff morale during this reporting period:

**Critical Incident Response Team**
On July 13, 2022, DJC LHS/CLS Critical Incident Response Team (CIRT) held their first quarterly refresher training since they were initially trained in March. CIRT aims to foster resilience in staff and promote physical and mental well-being after critical incidents wherein normal coping skills may be overwhelmed.  CIRT meets with staff one on one or in a group setting to formally process thoughts and emotions staff may be experiencing after a critical incident. The day included refreshing group intervention skills with critical incident scenarios, policy and procedure review, discussion on ways to improve the CIRT program and the importance of self-care. The team met offsite at the Northwoods Veterans Post in Merrill. The day concluded with team building exercises to strengthen team cohesion.

**Committee Assigned to Safety and Health (CASH)**

On April 14, 2022, the CASH committee hid candy filled Easter eggs throughout the administrative building for staff as they were reporting for shift.

On April 21, 2022, the spring-cleaning contest winners were announced. This was a weeklong cleaning contest in the units to promote a healthy working environment for both youth and staff and both were encouraged to participate with the winning youth units receiving rewards or special events.

May 2, 2022 through May 6, 2022 was correctional employee appreciation week. The facility put on a full week of treats and recognition culminating in the length of service award ceremony which gives special recognition to employee who reach five-year milestones in their state employment.

On May 24, 2022, brats, burgers, chips, punch and desserts for a Memorial Day cookout.

On May 31, 2022, the CIRT coordinator put out a staff wellness, safety, and appreciation survey to all staff. The survey was open through June and the CIRT coordinator is tabulating results from the survey with management in order to help establish what the attitudes and needs of staff are, and how best to improve operations as well as address staff concerns.

On July 20, 2022, for the Pie-in-the-Face fundraiser, select staff put themselves forward to receive a pie in the face should they garner the most support in the form of donations. The money raised helped fund the CASH committee which plans staff gatherings and events like the ones listed in this section. Staff who ended up receiving a Pie-to-the-Face were the Administrator, Deputy Superintendent, Safety Director, Scheduling SYC, and the Buildings and Groups Supervisor. The event was very successful raising just over $500 that will help fund further staff wellness efforts.

The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives, changes to programming, and general information. A major component of staff wellness is ensuring staff feel as safe as possible. Fear for safety continues to be a major concern and one that impacts the overall culture and atmosphere of the facility. Improving staff wellness will certainly have a positive impact on the overall atmosphere and reduce turnover, which will then provide an opportunity to decrease the vacancy rate, reduce employee leaves and improve staffing ratios.

Facility Improvement Plan ("FIP") Progress

A thorough and in-depth review was conducted of the April 2021 PbS data collection for both LHS and CLS. During the review, outcome measure data clarification and input was sought from both the facility PbS State and Site Coordinators and the assigned PbS Coach. As a result of the review, the following highlights and outcomes are noted:

LHS has one FIP open, #1012, which is focused on outcome measures Order 03 – Physical Restraint Use; Order 04 – Mechanical Restraint Use; and Order 13 – Isolation and Room Confinement Use. This FIP has been open since January 2021. Each of the outcome measures are rated as improved and are below the original goals set by the FIP.

| Outcome Measure | Original Value | Current Value | Average Value | Goal | |
|---|---|---|---|---|---|
| Order 03 Physical restraint use per 100 person-days of youth confinement. | 92.00 | 43.00 | 18.10 | 69.00 | |
| Order 04 Mechanical restraint use per 100 person-days of youth confinement. | 41.00 | 17.00 | 11.25 | 30.00 | |
| Order 13 Isolation, room confinement for reasons not related to behavior per 100 person-days of youth confinement. | 679.00 | 24.00 | 54.85 | 340.00 | |

CLS has two FIP's currently open, #1009 which focuses on outcome measures Order 08 – Isolation and Room Confinement.  This FIP was originally started in January 2019 and is marked as having met the goal originally established.

| Outcome Measure | Original Value | Current Value | Average Value | Goal | |
|---|---|---|---|---|---|
| Order 08 Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement. | 29.00 | 9.00 | 6.80 | 6.00 | |

The second FIP, #1011, was just recently developed and started July 2022 focusing on outcome measures Health 02; Health – 05; and Health 07.  Since this is a new FIP, no progress has yet been made.

| Outcome Measure | Original Value | Current Value | Average Value | Goal | |
|---|---|---|---|---|---|
| Health 02 Percent of youths presented for admission who had a health intake screening completed by trained or qualified staff in one hour or less. | 67% | 67% | 93% | 75% | |
| Health 05 Percent of youths presented for admission who had an intake screening completed by trained or qualified staff in one hour or less from the time of admission. | 67% | 67% | 87% | 75% | |

| Outcome Measure | Original Value | Current Value | Average Value | Goal | |
|---|---|---|---|---|---|
| Health 07 Percent of youths presented for admission whose health assessments were completed by trained or qualified staff 6 months prior to or within 7 days from admission. | 83% | 83% | 89% | 89% | |

With all that said, there are a couple of outcome measures that warrant discussion. First and foremost, is what was unquestionably a high rate of "self-requested" confinement during previous data collection cycles. Prior data reflected 715 incidents of confinement use during the month of April 2021 (610 @ LHS and 105 @ CLS). Of these, there were a total of 621 for self-requested confinement, representing 87% of all confinement for the facility during the month. The outcome measures related to self-requested or program refusals improved drastically over the course of several collection cycles. The April 2022 data shows (156) incident of confinement use at LHS, with only (24) of those being recorded as self-requested or program refusals. Similarly, CLS also shows dramatic improvement in overall confinement use having reported only (18) incidents, with only (4) having been the result of self-request or program refusal.

Additionally, the previous reports discussed that the unit activity record for the Krueger Unit reflected that youth were spending approximately 20.64 hours per day in their rooms (10.5 hours reflected as sleeping time and 10.14 hours reflected as "in sleeping rooms," room confinement). The activity log for the Krueger Unit also did not reflect any hours for education. This issue has been resolved. The April 2022 data shows Krueger youth spending approximately 11.90 hours in their rooms for "sleeping" time and 0.0 hours in their rooms for other reasons. Education hours for Krueger youth increased to approximately 5.11 hours per day (weekdays) and leisure activity time decreased to 2.83 hours per day (weekdays). This represents a larger portion of their day that is spent in more meaningful activities such as education.

While the Monitor recognizes these improvements, it is necessary for the facility to provide more meaningful programs and activities to youth during weekend hours. Leisure time activities increases during the weekends in all the units, to as much as 6.39 hours. Reducing and replacing leisure time with more meaningful activities will have a positive impact on reducing incidents of violence occurring over the weekend periods.

Finally, the Monitor encourages the facility to closely review all of the PbS data and outcome measures as a means to better understand the impacts generated from the many changes occurring within the facility. Agency and facility leadership should make it a point to review the PbS data with staff at all levels, perhaps during monthly all staff briefing meetings. This is an opportunity to show the positive outcomes being achieved through the various changes and efforts to reduce incidents of violence, confinement, and use of restraint. Much work remains to be done. The data shows fluctuating trend lines, some moving in the right direction, while others are not. These fluctuating trends can and should be expected as staff and youth adjust to the ever-changing behavior response techniques and the skill level of staff in utilizing various training, de-escalation techniques, and, as discussed earlier, in the full implementation of the behavior motivation system.

<u>PbS Critical Outcome Measures Review</u>

Use of Restraint Outcome Measures - Both LHS and CLS show "0" incidents of use of chemical agents (Order 6) since the October 2019 data collection cycle, which is commendable and per the Settlement Agreement.  The rates of physical restraint use (Order 3 – Physical Restraint Use per 100-person days of confinement) at LHS increased during this data cycle and is well above the national field average, as does the rate of mechanical restraint (Order 4 – Mechanical Restraint use per 100-person days of confinement) usage incidents.  CLS' use of physical restraints saw a substantial decline during the April 2022 data cycle, as did the use of mechanical restraints, which fell below the national field average for the first time.

As mentioned earlier, PbS is a continuous facility improvement process which involves complex operational issues.  The following two charts reveal that overall, the trends lines for both physical and mechanical restraint use has returned to the average levels from the October 2020 spike, and now appear to be trending the right direction.  It is normal to see fluctuations in this type of data and the October 2020 spike is most certainly related to temporary operational changes that were in place as a result of the pandemic.   Improvement in reducing youth idleness with meaningful programs and activities along with an improved behavior motivation program, and continued staff training, can have a significant impact on these outcome measures.

# Order 03

Physical restraint use per 100 person-days of youth confinement.



(Note: PbS defines Physical Restraints as facility authorized and trained holds used by staff to subdue an otherwise uncontrollable youth in order to prevent the youth from injuring him or herself, or others.)

## Order 04

Mechanical restraint use per 100 person-days of youth confinement.



(Note: PbS defines Mechanical Restraints as Mechanical Devices used to prevent an uncontrollable youth from injuring him or herself or others. Mechanical restraints may only be used for short periods of time and must be used under medical supervision.)

The previous Monitoring reports discussed issues around the reduced use of the Care Teams which had resulted in a higher number of restraint-usage incidents. The overall trends for Outcomes 3 and 4 continue to show positive improvements, even with the noted increases above at LHS. Given the overall positive reductions in the use of physical and mechanical restraints during this PbS cycle, it appears the heightened focus on Care Teams has had a positive impact. Care Teams are designed precisely to reduce the need for the use of restraints and have been effectively shown to work at facilities across the country and have been shown to be effective at LHS and CLS as well. The Agency and facility should continue to expand the use of the Care Team concept and ensure that direct care staff are training to properly use the Care Team as a de-escalation and use of restraint avoidance response. It is critical that direct care staff develop skills around total awareness in order to recognize the early signs of pending behavior and incidents in order to engage the Care Team members at the earliest possible opportunity. This in turn increases the opportunities for de-escalation and resolution of situations without the use of restraint. Care Team members should not be involved in the use of physical restraint of a youth except in exceptional situations and only to protect the safety and welfare of others as this is counterproductive to the concept and does not permit the youth to begin de-escalating if they believe the Care Team member may still use physical force against them.

The Defendants should continue to implement the core principles of the Care Team model by utilizing an agency strategic plan process that involves additional staff training in de-escalation techniques; include Care Team deployment information in shift debriefings in order to review the process and provide on-going situational training for staff; implement a Care Team response incident report that also reflects the outcome of the response in order to better track outcomes from Care Team deployments; implement the S.O.D.A.S model (Situation, Options, Disadvantages, Advantages, Solution) into the Care Team model; and, finally, the facility leadership team should incorporate daily/weekly review of all use of force/restraint incidents to evaluate if and when the Care Team

should have been activated to help de-escalate a situation. This should be used as a staff training and awareness process to help staff build new skills and to help change their mindsets in how they first react to certain types of youth behaviors.

Isolation, Room Confinement and Segregation Measures – Overall, there are fluctuations in the PbS outcome measures around isolation and room confinement for the April 2022 cycle, reflecting that 100% of room confinements are terminated in under eight (8) hours at CLS and 99.24% at LHS. CLS also shows 100% of confinements ending in under four (4) hours, with approximately 84.09% ending in under four (4) hours at LHS.   Order 13 – Isolation, room confinement use for reasons other than behavior reflects decreases at both LHS and CLS for this data period over prior reporting periods. In fact, both facilities were below the national field averages for this outcome measure.

It should also be noted as to the improved outcomes and reduced rates of initial room confinement placements during the April data cycle. Both facilities showed reduced incidents of confinement practices, with LHS dropping below the national field average for incidents of confinement NOT related to behavior (i.e., operational confinement). It should also be noted that while operational confinement was reduced during the April data collection period, more recent operational practices resulting from the staffing challenges have substantially increased operational confinement.

## Order 08

Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement.



(Note:  PbS defines confinement as any instance when a youth is separated from the youth population and placed in a room or cell alone for 15 minutes or longer. Youths are considered to be confined from the moment they are separated from others until they have rejoined the population. Youths may be transferred to a designated unit for confinement (e.g., a segregation dorm or program separation unit). Confinement may occur in locked or unlocked rooms but cannot occur in large dormitories. Any instance of confinement of 15 minutes or more is a reportable PbS incident event.)

## Order 13

Isolation, room confinement use for reasons not related to behavior per 100 person-days of youth confinement.



Both LHS and CLS have very dramatically reduced incidents of self-separation and program refusals to levels below and better than the national field averages.

| Why confinement was used | Lincoln Hills | | Copper Lake | |
|---|---|---|---|---|
| Value | Count | Percent | Count | Percent |
| Self-requested | 24 | 15% | 4 | 22% |
| Mental Health | NA | NA | 3 | 17% |
| Protect other youths or staff | 125 | 80% | 8 | 44% |
| Give youth time to cool off | NA | NA | 1 | 6% |
| Consequences of rule violations | 4 | 3% | NA | NA |
| Other response to behavior | 2 | 1% | NA | NA |
| Protect property | 1 | 1% | NA | NA |

The PbS Incident reporting data for April 2022 reflects the following important data points:

➢ 93% of the incidents occurring at CLS occurred in the living unit.
➢ 66% of restraints used at CLS involved the same two youth.
➢ Zero incidents of injuries to youth from suicidal behaviors were reported at CLS.
➢ 80% of the fights/assaults at CLS involved the same two youth.
➢ 85% of the incidents occurring at LHS occurred in the living units.
➢ 31% of the incidents occurred in the DuBois Unit (32 total incidents).
➢ 29% of incidents occurred in the Black Elk Unit (30 incidents).
➢ 29% of incidents occurred in the Krueger Unit (30 incidents).
➢ 38% of the recorded incidents at LHS occurred on a Saturday or Sunday when there is

significantly less activity.
➢ 14 youth at LHS were responsible for 100% of the incidents of violence (assaults and fights).

## Safety 06
Suicidal behavior with injury by youths per 100 person-days of youth confinement.



CLS continues to have zero incidents of suicidal behaviors resulting in injury for the last three reporting cycles. LHS had a slight increase during these reporting cycles, with one incident occurring during the October 2021 cycle and two incidents occurring during the April 2022 cycle.

**LHS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 104 | 85% |
| No | 18 | 15% |

**CLS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 14 | 93% |
| No | 1 | 7% |

**LHS Incident location (living units):**

| Value | Count | Percent |
|-------|-------|---------|
| DuBois | 32 | 31% |
| Black Elk | 30 | 29% |

| Value | Count | Percent |
|---|---|---|
| **Krueger** | **30** | **29%** |
| **Roosevelt** | **5** | **5%** |
| **Rogers** | **7** | **7%** |

**CLS Incident location (living units):**

| Value | Count | Percent |
|---|---|---|
| **Wells** | **8** | **57%** |
| **King** | **6** | **43%** |

Youth and Staff Climate Surveys – Both youth and staff appear to be more responsive in utilizing the youth and staff climate surveys.  It is strongly recommended that both department and facility leadership take the time to thoroughly review the agency/jurisdiction count summaries for both the youth and staff climate surveys.  The results can be very insightful and useful for leadership.  Below are some of the survey results;

**Staff Climate Survey Results:**

**Within the last six months, have you feared for your safety in this facility?**

| Value | Count | Percent |
|---|---|---|
| Yes | 61 | 73% |
| No | 22 | 27% |

**How safe or dangerous do you feel this facility is for staff?**

| Value | Count | Percent |
|---|---|---|
| Unsafe | 36 | 43% |
| Very dangerous | 20 | 24% |
| Safe | 23 | 28% |
| Very safe | 4 | 1% |

**In your opinion, what would make this facility safer?**

| Value | Count | Percent |
|---|---|---|
| More staff | 79 | 95% |
| Training | 37 | 42% |

| Value | Count | Percent |
|---|---|---|
| Safety equipment | 35 | 42% |
| Other | 22 | 27% |
| Less overcrowding | 19 | 23% |

In regard to the above chart, the following are the top ten most requested training that staff felt would make the facility safer:

**What training would you like to see?**

| Value | Count | Percent |
|---|---|---|
| Communication | 30 | 51% |
| Verbal de-escalation | 25 | 42% |
| General behavior management | 24 | 41% |
| Adolescent development | 23 | 39% |
| Gang training | 21 | 36% |
| Safety and security | 21 | 36% |
| Appropriate staff/youth relationships | 19 | 32% |
| Ethics | 17 | 29% |
| Incident reporting | 17 | 29% |
| Agency policies and procedures | 16 | 27% |
| First aid, CPR, AED | 15 | 25% |
| Cultural diversity and awareness | 14 | 24% |
| Appropriate use of restraints | 12 | 20% |
| Suicide prevention | 11 | 19% |
| Not recorded | 11 | 19% |
| Aggression Replacement Therapy (ART) | 10 | 17% |
| LGBTI | 10 | 17% |
| Use of isolation | 9 | 15% |
| Reporting, documenting and investigating allegations of sexual abuse/victimization | 9 | 15% |

| Value | Count | Percent |
|---|---|---|
| Juvenile rights | 9 | 15% |

**April 2022 PbS Staff Climate Survey Results:**

➢ 73% of staff responses reported they fear for their safety;
➢ 67% of responses reported they believe the facility is unsafe or very dangerous (down from 82% in October 2021);
➢ 85% of responses indicate that staff believe they do not have authority to discipline youth appropriately.
➢ 75% of staff report that they value family members and youths' social supports as partners in their work with youth.

**Youth Climate Survey Results:**

**Do you fear for your safety in this facility?**

| Value | Count | Percent |
|---|---|---|
| No | 30 | 71% |
| Yes | 11 | 26% |
| Refuse to answer | 1 | 2% |

In comparison, the youth fear for safety measure, Safety 13, has steadily improved from the previous data collection cycles. The rate still remains higher than the national field average but is improving.

**Within the last six months at this facility, have you had personal property stolen directly by force or by threat?**

| Value | Count | Percent |
|---|---|---|
| No | 30 | 71% |
| Yes | 10 | 24% |
| Refuse to answer | 2 | 5% |

**Within the last six months at this facility, have you been beaten up or threatened with being beaten up?**

| Value | Count | Percent |
|---|---|---|
| No | 25 | 60% |
| Yes | 16 | 38% |

| Value | Count | Percent |
|---|---|---|
| Refuse to answer | 1 | 2% |

**Within the last six months at this facility, has anyone forced you to engage in sexual activity?**

| Value | Count | Percent |
|---|---|---|
| No | 35 | 83% |
| Yes | 5 | 12% |
| Refuse to answer | 2 | 5% |

**Do staff members show residents respect?**

| Value | Count | Percent |
|---|---|---|
| Sometimes | 22 | 52% |
| No | 11 | 26% |
| Yes | 9 | 21% |

**Are the staff good role models?**

| Value | Count | Percent |
|---|---|---|
| Sometimes | 16 | 38% |
| No | 16 | 38% |
| Yes | 10 | 24% |

**Do staff here respect your traditions, beliefs and culture?**

| Value | Count | Percent |
|---|---|---|
| Yes | 18 | 43% |
| No | 11 | 26% |
| Sometimes | 10 | 24% |
| Refuse to answer | 3 | 7% |

**Have you talked on the phone with your parent and/or guardian?**

| Value | Count | Percent |
|---|---|---|
| Yes | 35 | 83% |

| Value | Count | Percent |
|---|---|---|
| No | 4 | 10% |
| Don't know | 3 | 7% |

**Have you gotten visits from your family?**

| Value | Count | Percent |
|---|---|---|
| No | 27 | 64% |
| Yes | 11 | 26% |
| Refuse to answer | 4 | 10% |

**What would make it easier for your family to visit?**

| Value | Count | Percent |
|---|---|---|
| The facility was closer | 30 | 71% |
| The facility provided transportation* | 20 | 48% |
| The visiting hours were better | 19 | 45% |
| The facility allowed family visits | 13 | 31% |
| It was more affordable | 7 | 17% |
| The court or judge allowed my family to visit me | 7 | 17% |
| Nothing, it is already easy for my family to visit | 5 | 12% |
| Not recorded | 3 | 7% |

(*Note: DJC does provide a weekly bus visitation service. It is promoted to youth and their families during intake, contained in the materials youth and their families get upon the youth's admission to the facility, and the schedule is posted on the facilities public facing webpage.)

**When you leave here, who will you call when you need to talk or need help working out a problem?**

| Value | Count | Percent |
|---|---|---|
| Family | 35 | 83% |
| Friends | 30 | 71% |
| Social Worker/case manager | 14 | 33% |

| Value | Count | Percent |
|---|---|---|
| Teacher | 7 | 17% |
| Neighbor | 7 | 17% |
| Someone from church/temple | 7 | 17% |
| Police officer | 3 | 7% |
| Not recorded | 3 | 7% |
| I don't know | 2 | 5% |

➢ 81% of youth reported that they were involved in the development of their treatment plans.
➢ 90% reported that they understand the level, phase or points system.
➢ 64% reported they have not received a family visit. (Slightly improved from the October 2021 data.)
➢ 28% of youth responded that staff show residents respect, 52% replied sometimes.
➢ 24% of youth responded that staff are good role models, 38% replied sometimes.

It is further recommended that the agency, facility and the PbS team members spend considerable time reviewing the PbS Blueprint Domains, particularly those domains focused on Order; Programing, and Safety. Much can be learned from review of these outcome domains and the data associated with them, in particular those focused on youth and staff relationships.

Quality Assurance ("QA")

The Program and Policy Analyst-Advanced focused on the ongoing Quality Assurance ("QA") implementation efforts surrounding the consent decree and other important functions in the school and facility system of care updates.

Defendants began using the newly digitized use of force review form b in May 2022. The process still requires incident review for all physical restraint uses, but it includes the additional requirement that any incidents involving the use of mechanical restraints be automatically assigned the additional facility level use of force review. The J-Tracker use of force form retains all relevant fields of information from the prior department form, but also includes questions specific to mechanical restraints. Finally, it serves as at least a retrospective confirmation/communication between the reviewer and the youth's clinician ensuring PSU was either present at the time of the incident or responded within the two-hour timeframe when mechanical restraints exceed 45 minutes.

Critical information is now readily available to the leadership which so that they can make proactive, data driven decisions that increases the safety of youth and staff. Again, continuous improvements have been made in data collection and in the quality assurance program.

Policies and Procedures/Administrative Code Update

The DJC Policy Committee continues to review and update policies of note to the facility. In the April meeting the committee reviewed the following policies:

1) 100.01.07 - Division Representation in Court Appearances
2) 500.00.04 - Reporting Health concerns to on call nursing staff
3) 500.70.03 - On Call Mental Health Services

In the June meeting the committee reviewed the following policies:

1) 300.07.02 - Post orders
2) 300.03.01 - On Grounds While Off Duty
3) 100.04.08 - Joint Planning and Review Conferences
4) 300.05.02 - Security Devices

The process for youth notes in J-Tracker has also been written into a draft procedure being reviewed by facility administration. The Youth Notes procedure codifies the requirement that youth receive services while in confinement and outlines the monthly and quarterly CQI processes that will support adherence to documentation standards. Similarly, the Incident Debrief procedure seeks to further define process and standards for notifications, justification, and documentation surrounding AC placements.

Other policy projects include continuing to work on moving all divisional policies and facility procedures to an OnBase software system that will ensure all staff are accessing, reading, and acknowledging DJC policies and procedures. The DJC team is currently working with IT to test the system before publication of the policies to OnBase. While transferring the documents, all the policies are under review for updates for signature. This process also includes checking policy references including those that may reference Administrative Code 373 or 376 to ensure that they are reviewed to match the changes updated in code. With the addition of a new Program and Policy Analyst at the facility, a procedure committee has been created and will be meeting on a monthly basis.

DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. Revisions to the draft of Chapter 373 is being worked on by DJC's Administrative Code committee. Chapter 376 final draft has been completed by the committee. Currently the economic impact statement is being completed by the Division of Management Services. Once that is finalize Chapter 376 will move to the external review portion. Defendants need to continue to aggressively work towards completing the respective Administrative Code sections.

## COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

1.     Punitive Confinement.

    a.     Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data does not indicate that youth are being confined for seven days for any reason.**

    b.     Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data does not indicate that youth are being confined for three days for any reason.**

    c.     Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to examine use of all forms of confinement and review incidents to ensure that staff are not using any form of confinement as punitive confinement. The Monitor previously recommended establishing clear criteria for all confinement so that staff cannot punitively confine youth and cannot confine youth for more than 24 hours if they do not pose an imminent danger of harm to themselves.**

2.     Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in

administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of AC was significantly higher for both CLS and LHS youth this reporting period. There were twenty (20) youths confined over four (4) hours in this reporting period. The number of AC placements for LHS and CLS is trending down in July.  Defendants need to continue to assess how they can more effectively provide intensive mental health services for youth.**

**January 2022**
**CLS: 25 uses of A.C. Average 124 minutes. Three (3) youth over four hours.**
**LHS: 21 uses of A.C. Average of 170 minutes. One (1) youth over four hours.**

**February 2022**
**CLS: 15 uses of A.C. Average 139 minutes. No youth over four hours.**
**LHS: 19 uses of A.C. Average of 138 minutes. No youth over four hours.**

**March 2022**
**CLS: 17 uses of A.C. Average 132 minutes. No youth over four hours.**
**LHS: 59 uses of A.C. Average of 138 minutes. One (1) youth over four hours.**

**April 2022**
**CLS: 11 uses of A.C. Average 160 minutes. No youth over four hours.**
**LHS: 92 uses of A.C. Average of 154 minutes. 14 youth over four hours.**

**May 2022**
**CLS: 27 uses of A.C. Average 122 minutes. One (1) youth over four hours.**
**LHS: 33 uses of A.C. Average of 145 minutes. No youth over four hours.**

**June 2022**
**CLS: 60 uses of A.C. Average 145 minutes. No youth over four hours.**
**LHS: 59 uses of A.C. Average of 184 minutes. Five (5) over four hours.**

**July 2022**
**CLS: 35 uses of A.C. Average 132 minutes. No youth over four hours.**
**LHS: 17 uses of A.C. Average of 138 minutes. No youth over four hours.**

**The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit. 98.61% of checks were completed within 30 minutes. The Monitor reviewed video footage for random days and times and Defendants were 100% compliance with completing the checks in accordance to policy. Staff did an outstanding job and should be commended for their diligence in ensuring youth safety while in their rooms.**

      a.  Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

        i.      A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth pose a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were twenty (20) youth confined for over four (4) hours during this reporting period (see response in previous question). Some extended confinements were <u>not</u> recommended by PSU. Also, one youth was confined for 13.75 hours pending transfer to MJTC.**

**Defendants need to continue to focus on reducing AC overall, ensuring any form of room confinement is compliant with this Court Order, draft policy, and procedure with AC placement criteria, and continue to QA this data.**

        ii.     A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were two (2) transfers as a result of extended placement in administrative confinement. In one instance, after consultation with PSU, it was determined that the youth would transfer to MJTC. As a result, the youth was maintained on AC status pending transfer to MJTC. However, in the other instance, administration, not PSU, made the decision to keep a youth in extended AC pending his transfer to jail.**

      b.   Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 P.M. to 8 A.M.**

      c.   Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There was one instance in which a youth was confined for over 24 hours.**

      d.   The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

     3.     Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants

shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 is being utilized. The plans developed are very detailed and comprehensive. Only youth who are in imminent risk of serious self-harm to themselves/risk of self-harm will be placed in observation status. The Monitor will continue to review and monitor the practice.**

4. **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a. Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As previously stated, the Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed on renovated units. Youth rooms were relatively clean overall. The directive issued in February changing how property is dispersed continues to have an impact.**

**As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly. However, based on the language of this section, Defendants are very close to substantial compliance.**

b. Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, regular hygiene supplies, or nighttime toilet usage. The Monitor reviewed random video footage of living units in evening hours and observed several instances in which youth were given access to the toilet upon request. Defendants have improved their documentation and data collection. However, youth in Krueger and Wells did complain to Plaintiff's counsel about not being able to use their own toiletries and complained about toilet/shower facilities.**

      c.      Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in crisis intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification. The crisis intervention technique is being documented. Clinicians are on-site for a minimum of 6 hours each Saturday and Sunday and the majority of this time is spent meeting directly with youth. The Defendants have hired 3 treatment specialists and 1 psychology associate. There is no change to PSU on-site schedule. The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours in order to engage youth in a meaningful way during this time. As stated in the narrative, several PSU staff were present on the units working with youth and talking with youth who were in their rooms.**

**Defendants are continually overhauling the system of care and DBT based treatment model. Defendants continue to engage the DBT consultant. Treatment is going to be even more critical as the population continues to increase and the Defendants are operationally confining.**

      d.      Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general, documentation/data shows that evaluations are completed (if there is not already a mental health evaluation) within 24 hours after being placed in room confinement. The Monitor is told youth on operational confinement are being seen by PSU and evaluated for contraindication, but the Monitor has not seen documentation for youth on operational confinement and whether they are evaluated for contraindication. There was one instance of contraindication documented during this review period. Defendants need to ensure that they are meeting the criteria in this section and document any and all room confinement including operational room**

confinement. **Youth who are placed in their room for operational confinement should QA needs to be implemented and sustained.**

> e. Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE: Defendants are over 98% compliant with meeting the thirty (30) minute safety and security check timeframe. Quality assurance measures are in place and when necessary, formal investigations occur. There wasn't data available to assess whether there were any formal job instructions for not completing safety and security checks. The Monitor observed safety/wellness checks being completed on various days/times on every unit during this reporting period and observed no instances in which staff did not make visual contact with youth per policy- 100% of the checks were compliant.**

**PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor continues to encourage more on-site time on evenings and weekends. Examples of the crisis intervention techniques used with youth when confined can be viewed/verified in the PSU On-Call and/or PSU Clinician notation box on the J-Tracker Incident Debrief custom form. Examples of crisis intervention techniques include but are not limited to: validation, practice of DBT skills, processing of the incident, mediation, assistance problem-solving, fostering perspective-taking, Behavior Chain Analysis (formal and informal), plans to address conflict/safety/skills practice, in the moment coaching skills, time away from stressors, body scans, mindfulness, increase insight, encourage self-reflection. The Monitor has reviewed these documents.  Youth did complain to Plaintiffs' counsel about quality and quantity of mental health services.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

> f. Any youth in room confinement shall have property items similar to or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary

in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth continue to complain about property restrictions while in the SDP. Staff confirmed that there are property restrictions for youth while they are in the SDPs. This is an area that Defendants need to re-examine. Youth in SDP do not get the same property as youth in general population which is not consistent with this required provision.**

g.   Youth in room confinement shall receive:

1.   All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided in general.  It is difficult to assess whether these services are being provided while youth are in operational room confinement because Defendants do not track operational room confinement time per youth during this reporting period. The Monitor saw social workers, mental health and health services being provided to youth during the site visit and in random video review. The primary clinician consults with the on-call clinician and with the SYC/YC/CPS/SW staff regarding specifics ways the youth plan addresses the issues at hand and how it can be adopted when the youth is on AC. A PSU clinician follows up in the absence of the primary clinician and/or the crisis clinician. The vacancy rate for social workers continues to be extremely high. Social workers are critical to quality of care and services for the youth and effective re-entry planning.**

**The struggle to hire licensed/certified social workers continues. DJC has not been able to hire a social worker since 2018. The DOC had raised the minimum pay for social workers, but this hasn't proved to help LHS/CLS garner any applicants even after the increase.  Many social services agencies have moved towards hiring case managers that do not require a state certification/license, unfortunately LHS has also moved in this direction due to their inability to recruit and retain social workers.**

**DJC recently hired three Treatment Specialist 2's. These individuals have been observing DBT Groups, co-facilitating DBT Groups, and learning our case management duties.  They are also currently in the process of receiving detailed DBT Training from DBT consultant Dr. Chapin in facilitating skills groups. The plan continues to be to have two either Treatment Specialists or Social Workers assigned to each unit.  These individuals will together facilitate that unit's DBT Skills Groups and provide all case management services for the youth in the unit.**

**DJC continues to work on hiring more Treatment Specialist 2's and is also starting of the process of hiring Treatment Specialist 1's.  Whereas the TS2's will work Monday-Friday during normal working hours, TS1's would primarily work during the evening and weekend hours. This will allow the facility to expand the treatment services.**

**Documentation, quality assurance, and policy and procedure need to be improved/completed as it relates to social work, mental health, and other health services. Defendants need to ensure there is accountability with respect to the services provided by the social workers, mental and healthcare workers.**

ii.    Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. During the pandemic, Defendants moved to smaller group-based treatment to youth where group participation was provided on the units. This continues. Treatment programming for youth never ceased due to COVID-19 precautions, but the size of the groups was modified to accommodate safe social distancing measures and keep youth who shared a living unit assignment in groups with one another. Beginning in March, some housing units now utilize the school for their group treatment sessions as determined by their respective living unit's weekly schedule. The Monitor continues to encourage these groups to occur off of the living unit as much as possible.**

**Defendants need to continue to focus (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement including operational confinement. Defendants need to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress.**

iii.    Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Staffing challenges have led to changes in education this reporting period. For most of this reporting period, youth were not going to the school area for class.  Youth were on their units utilizing packets or on their computers completing education, which youth consistently noted was considerably more difficult.  Youth did computer and packet-based work alone in their rooms when they were being operationally confined.**

**The education consultants completed their site visit and are preparing their report which included recommendations.   The Monitor has not seen the final report or specific**

recommendations.  However, Defendants have committed to make best efforts for improving education for all youth, but especially in special education.

As stated previously in this report, the PbS education data from April 2022 – before the significant confinement changes in this reporting period – shows youth are receiving about 5.08 hours per day (weekdays) of education at LHS and 5.14 hours per day (weekdays) of education at CLS.

The Monitor continues to suggest that Defendants should provide more art, music, woodworking, the greenhouse, welding, and sewing and other types of programs to youth in the evening and on weekends. Defendants have enhanced many of these programming (as detailed in the physical plant improvement section), but during this reporting period, youth were unable to access many of these programs due to staffing issues. Also, it would be ideal for social workers to work with youth outside of the school day in order to have less scheduling issues and would help with any idle time after school (consultants agreed).  The Monitor understands that with the staffing challenges and movement freezes, these types of programming are difficult to continue. However, Defendants need to think of other activities to do while on the unit when it is necessary to keep youth on their units for safety reasons. This is especially true for youth who are operationally confined who have nothing to do for several hours a day.  Defendants have begun asking youth and staff for ideas of activities while in their rooms.  The Monitor hopes some of the suggestions are implemented. However, The Defendants should continue to focus on bringing more programming into LHS/CLS, especially culturally and gender relevant programs.

> iv.   Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Prior to the staffing issues, youth were regularly out of their rooms from 8 A.M. to 8 P.M. However, this is not the case during the time Defendants operationally confined youth due to staffing challenges. Youth in operational confinement, isolation due to Covid-19 safety measures, any confinement required, and youth working on the BIP do not/are not permitted to talk to peers or participate in regular social interaction. Additionally, youth are not going to the school area for education unless staffing levels allow.  Youth did complain about not getting exercise or recreational activities. The Monitor regularly saw youth conversing with other youth during out time when the youth were on the units in the day room.

> v.   Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. There were twenty-nine (29) documented instances of youth eating in their rooms which were staff imposed based on substantial threat of physical harm during this reporting period. Defendants are able to track when youth eat meals in room and based on reports that the Monitor reviewed, the instances were justified as the youth posed an immediate and substantial threat. This is a significant increase from last reporting period.**

> vi.   Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Due to staffing challenges (operational confinement) Defendants admit that there are instances where youth were not getting out three (3) hours per day or thirty (30) hours per week.  Defendants do not track this on an individual basis, so the Monitor cannot determine how many youths are not getting at least 3 hours of out-time per day or 30 hours per week.  Defendants did indicate they are working on a plan to meet the minimum of 3-hour per day and 30-hour per week of out-time. The Monitor will note that beginning in August (outside of this reporting period) youth are being operationally confined less due to the plan created to reduce confinement.**

> 5.   **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is a box on the incident debriefing form that is checked if staff informed the youth of his or her rights regarding grievances and appeals and time of notification. Youth continue to receive their notification of rights/grievance procedures when they are placed in administrative confinement. The process for obtaining a youth signature (or two staff signatures in the event of a refusal) has been proposed as a part of youth receiving PSU thinking chain reports during the first stage of the administrative confinement process. Policy has been completed. Youth who are confined due to staffing issues are not given these notifications of rights.**

> 6.   Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires**

**documentation of all forms of room confinement, and Defendants are documenting this consistently except in cases of operational confinement, including when less restrictive means were attempted. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue but has significantly improved. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement.**

    B.      OC-Spray and Other Chemical Agents

        1.   OC reduction plan. Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.**

        2.   Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

    C.     Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

        1.   Prohibition on types and uses of mechanical restraints.

            a.   Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.  The Monitor did not personally see any youth in mechanical restraints during site visit, however, data and documentation show that there was an increase in use of mechanical restraints for LHS and CLS. Defendants need to continue focusing on reducing the use of mechanical (as well as physical) restraints.**

            b.   Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Below is the number of mechanical restraints uses in LHS and CLS this reporting period.**

**Uses of mechanical restraints LHS:**

| | |
|---|---|
| **December 2021:** | **2 uses** |
| **January 2022:** | **3 uses** |
| **February 2022:** | **6 uses** |
| **March 2022:** | **12 uses** |
| **April 2022:** | **17 uses** |
| **May 2022:** | **9 uses** |
| **Jun 2022:** | **8 uses (1- 83 minutes)** |
| **July 2022:** | **13 uses** |

**Uses of mechanical restraints CLS**

| | |
|---|---|
| **December 2021:** | **0 uses** |
| **January 2022:** | **5 uses** |
| **February 2022:** | **6 uses** |
| **March 2022:** | **4 uses** |
| **April 2022:** | **2 uses** |
| **May 2022:** | **12 uses** |
| **Jun 2022:** | **15 uses (1-57 minutes)** |
| **July 2022:** | **6 uses** |

**In addition to the Mechanical Restraints policy being signed into practice, DJC worked to digitize its current use of force review forms and incorporate them into J-Tracker in order to create efficiency, new sources of data for the facility training supervisor, and most importantly, to implement a strict process for reviewing mechanical restraint use. Defendants should continue to work on reducing the use of mechanical restraints and continue to monitor.**

c. No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

i. Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were two uses of restraints other than handcuffs during this reporting period. One was a belt restraint and the other was a leg restraint. PSU was present during these two incidents, but PSU did not order these restraints to prevent self-harm. Defendants need to develop policy and procedure, training, and QA measures and ensure PSU staff order these types of restraints.**

ii.      Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has improved relative to when restraints have been used and the rationale for usage. Defendants have created quality assurance measures (see response above).**

iii.     During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

d.     Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue focusing on reducing the use of mechanical restraints. Defendants need to continue to monitor and assess the use of restraints and duration. The Monitor has not observed mechanical restraints used for punishment/discipline on site visits, review of video, or documentation reviewed.**

e.     Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

f.     Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Staff have received training in physical force, restraints, and trained in proper de-escalation. The Defendants are increasing the frequency of these trainings (regular, informal, refreshers). DBT implementation will be very beneficial to youth and staff. Defendants have made DBT a**

**priority and are continuing to train staff and continue working with the DBT consultant.**

> g.  Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living u nit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were (2) instance of a youth being placed in mechanical restraints over 45 minutes. The appropriate personnel authorized the use of the mechanical restraints. PSU approved and followed up within two (2) hours. Defendants have created a QA process for this section. Defendants also need to ensure therapeutic interventions occur.**

> 2.  Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process. Defendants need to continue developing the behavior motivation program, actively engage with youth, and develop engaging and meaningful programming in order to reduce the use of mechanical restraints.**

> D.  Strip Searches. The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

> 1.  Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possess drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches in this reporting period. The policy and procedure for Searches of Youth have been finalized. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search.**

2.   Strip searches with probable cause. Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

b.   Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches during this reporting period. QA has been developed. The policy for searches has been finalized.**

c.   Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches conducted this reporting period. QA has been developed. The policy for searches has been finalized.**

d.   Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Training records reviewed indicate that all staff have been trained in trauma informed care. There no strip searches this period.**

e.   If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no strip searches**

during this reporting period. Documentation has improved. Policy and procedure/QA developed. PSU is consulted, and it is documented.

4. Documentation. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. Policy and Procedure finalized.**

E. De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to focus on de-escalation skills. De-escalation training/modeling continues to occur.**

**The Monitor observed several instances of de-escalation in review of video footage. Staff are more comfortable utilizing these skills and regularly use these skills in each instance. Defendants should include cultural diversity issues as part of crisis management training and procedures. Knowing these issues and how they are communicated is critical to successful behavior motivation.**

**Defendants will be implementing a new behavior motivation program in August 2022 (see narrative section of this report for details). The Monitor believes the new program will have a significant impact on all aspects of daily life for youth and staff.**

F. Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Programming needs improvement (as discussed throughout this report) and idleness—which was already high especially during times of staff shortages. The newly implemented schedule would have helped but on many days, scheduled programming did not occur due to the staffing issues. Once staffing is no longer an issue, Defendants need to fully implement the program as planned.**

**As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. Administration needs to increase meaningful/structured program and activity hours**

to further reduce youth idleness hours. Defendants need to create in-room activities for youth while they are being operationally confined.  Increasing education hours and vocational programming, including for youth who have obtained a diploma or HSED and who therefore have even fewer activities, especially if on Krueger, can greatly assist in reducing idleness time and provide positive youth development strategies.

G.    Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018, report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants have made significant effort in implementing the strategies suggested in improving staffing ratios and staff morale, but the staffing crisis has curtailed any progress in this area. Defendants have implemented several initiatives to increase recruiting and retention however, these initiatives are not resulting in increased available staff to a level that is needed to improve conditions of confinement and to be in substantial compliance with this Court Order during this reporting period. The Monitor recommends that a formal staffing assessment be completed.  The Monitor/SME can complete the staffing assessment if requested.  A staffing assessment will provide the jurisdiction with an updated analysis of FTE's needed to properly maintain mandatory posts for each facility as well as identify any specific needs based on facility designs, populations, and staffing ratio needs based on incidents of violence and other unique circumstances to each facility. Staffing assessments also take into consideration the average leave usage for all types of leave used on an annual basis, to include vacations, sick leave, Worker's Compensation, FMLA, and leave associated with annual training.  Ensuring that each facility has the appropriate number of FTE's to effectively manage the facility also has a direct impact on staff wellness and reducing fear for safety concerns.   As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere, and environment of the facility. Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, reduces employee leave/vacancies, and the use of isolation and confinement.**

H.    Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE.**

**DJC's Administrative Code committee continues working on moving both DOC Chapter 376**

**and DOC Chapter 373 forward. Revisions to the draft of Chapter 373 is being worked on by DJC's Administrative Code committee. Chapter 376 final draft has been completed by the committee. Currently, the economic impact statement is being completed by the Division of Management Services. Once that is finalize Chapter 376 will move to the external review portion.**

## IV. DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A. **Incident review process.** Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The 24-hour timeline is met in the vast majority of cases absent weekends. Informal reviews occur right after an incident in majority of cases. When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). Defendants continue to make improvement in the area of quality assurance.**

B. **Quality assurance**. The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As discussed throughout previous reports, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff. Defendants have created an exceptional quality assurance program and have made substantial progress in developing daily data to review that will automatically be available in order to make real time operational decisions. The Monitoring team will continue to work with the superintendent to establish performance goals, analyzing data, and creation of corrective action plans.**

## <u>CONCLUSION</u>

The Defendants are seeing a significant increase in the average daily population at LHS/CLS combined with a significant staffing crisis which is resulting in youth being confined to their rooms, education occurring on the units, daily schedules not being implemented, reduced outdoor recreation time, and increase in youth idleness. Although the Monitor notes that outside of this reporting period, the data for August thus far shows a significant reduction in operational confinement, education resumed in the school area, and there is an increase in recreation time. The new system of care/behavior motivation program was implemented in August which will have a positive impact on conditions of confinement for youth.

While operational confinement is not ideal, given the staffing crisis during this reporting period, it does appear to be necessary in many instances. Resolving the staffing concerns and completing a staffing assessment will help ensure proper staffing needs and coverage for posts based on facility unique criteria and incident of violence rates. Until the staffing crisis is resolved, Defendants will have difficulty in continuing their progress with many of the areas of this Consent Decree.

Lastly, as the Monitor continues to state in reports to the Court, there needs to be a focus on moving youth from LHS/CLS to more appropriate setting(s).

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

<u>/S/ Teresa Abreu</u>
Teresa Abreu
Monitor