UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF
WISCONSIN

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                                                                          Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

## FIFTEENTH REPORT OF THE MONITOR

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Fourteenth Report of the Monitor was filed with the Court on September 9, 2022. The Monitor's fifteenth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates since the fourteenth site visit which took place on July 28 and 29, 2022.

## SITE VISIT

The fifteenth site visit by the Monitor took place on October 27, 2022. The Monitor and Plaintiffs' counsel were onsite for one day and completed necessary interviews and information gathering via in-person and virtual meetings prior to, during and after the site visit. The Monitor reviewed materials provided by the parties prior to, during, and after the site visit for the reporting period ending October 31, 2022 (August, September, and October). Materials included but were not limited to: use of force videos, video footage of units, video of safety and security checks, programming materials, investigations, PREA investigations, various staff video footage of the school area, video footage of administrative confinement, releases, memos, daily shift reports, policies, all of the monthly data submitted to the parties per this Court Order, work rules, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Plaintiffs' counsel conducted approximately

twenty-five (25) youth interviews before and during the site visit.  The Monitor toured LHS/CLS and interviewed youth and staff. The Monitor had the opportunity to talk to many of youth and staff present and available during the site visit. Approximately thirty-two youth (32) youth and twenty-five (25) staff were interviewed by the Monitor during this site visit.

## OVERALL QUALITY OF LIFE, CONDITIONS, AND ATMOSPHERE

Introduction

The total LHS/CLS population ranged during this reporting period from 76 - 85 youths. At the time of the site visit, the population was at 78 youth (4 youth off site).  It is important to note that the population level is not trending down in any significant way. This appears to be a trend that will continue into the foreseeable future.  While the population is a concern, the issue is compounded by the staffing shortages that continues to exist which results in increased confinement of youth for reasons unrelated to their behavior. Staffing has been inconsistent during this reporting period.  There were days where youth did not have to be operationally confined (youth confined to their rooms due to inadequate staffing levels not behavior based) but there was still a large percentage of time where units were short staffed, thus requiring program changes.

Staffing shortages still exist that negatively impacts daily operations, leading to adjustments to the daily schedules to maintain effective staffing ratios for youth supervision and resulting in operational room confinement of youth, change in educational settings, overall programming such has youth not being able to have outdoor recreation, music lab, recreation in the gym or the Douglass unit, reduced recreation in general, increased idle time, and lack of staff available to be CARE team members who are called upon to effectively de-escalate youth in a variety of situations.  Despite these challenges, leadership, staff, and youth overall at LHS/CLS continued to remain positive during the site visit. The Monitor continues to be concerned about the effect the high levels of room confinement are having on youth mental health, staff use of force against youth, education and general wellbeing of youth.

COVID screenings were suspended for all of the Department of Corrections during this reporting period. Staff are responsible for self-screening, monitoring and reporting, as well as staying home until able to return to work, consistent with current CDC guidelines and recommendations. At the time of the site visit there were two units in quarantine due to COVID-19.  A unit is quarantined after consultation with Health Services Unit ("HSU") due to a known COVID-19 exposure. Quarantined units operate the same as any other non-quarantine unit, with the exception of a movement freeze, which restricts youth movement to other areas of the facility and requires that services be provided to youth on the units to help prevent further potential spread of the virus. There were four (4) LHS youth and eleven (11) staff who tested positive during this reporting period.

Physical Plant Observations

The entrance, grounds, visitation, school, and many other areas were clean and orderly. Living units and youth rooms in general were much dirtier and messier than on the previous site visit.

Defendants continue with the following physical plant improvements:

- Implemented a fully operational in-house canteen program in coordination with the rollout of the facility's behavior motivation system. The first youth order was processed and delivered the week of September 15, 2022.

- Completed installation of the new youth video phone system in youth living units. Video phones are now installed in all youth living units for youth to better access and communicate with their families and community. The system is undergoing testing and finalization of privacy settings before it is set to roll out for use by the youth in the coming month.

- Implemented a new system for distributing youth clothing. This applies to youth on all units. Youth receive a clean "roll" each day that includes: underwear, socks, T-shirt, sweatshirt, sweatpants, polo, dress pants, towel, washcloth and mesh bag.

- Installed an updated central media player system that can control content throughout each building in the facility for education, programming and youth entertainment purposes.

- Installed game rooms in each living unit with new Xbox consoles and couch/seating areas in each room for youth to use (youth absolutely enjoy these new game rooms).

- Continued the facility lighting upgrade project throughout the facility by installing upgrades in the school, administration building, and the facilities exterior perimeter. While continuing to serve as a significant an upgrade to safety on the facilities grounds this initiative has also improved energy efficiency. For the next phase of this project, youth room lighting will be improved. The contract has been awarded, procurement of supplies and scheduling installation remains ahead.

- Ongoing implementation of additional fixed cameras throughout the facility including both internal and external cameras. With phase one encompassing all inhabited units completed in addition to the school and the administration building, facility administration continues to procure and install supplementary cameras as opportunities for added coverage are identified.

- Refurbished the sidewalks and renovated the fence apron around Hughes living unit.

- Repainted the facility chapel.

- Replaced and upgraded facility sewage pumps.

- SYC uniforms, formerly white, have been replaced with a dark grey color, also CLS/LHS eagle logo on the chest.  YC/YCA staff uniforms formerly blue, have been replaced with green and maroon polos with the CLS/LHS eagle logo on the chest.

The Defendants should be commended for their continuing commitment to improve the physical plant which improves the daily lives for staff and youth. The staff uniform change is a testament to the culture change commitment by leadership.  The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

<u>Education Observations</u>

The physical appearance of the school areas and classrooms were beautiful as usual. Hughes, Miller, and King youth were observed in the classrooms. Other units were going to the school area later in the afternoon although Wells (which houses most of the girls), Roosevelt (on COVID quarantine), and Krueger units did not have education in the school building. Youth informed the Monitor and Plaintiffs' Counsel that they rarely have education in the school.  Through video review, the Monitor observed youth in the school area eleven (11) out of twenty-six (26) random school days during this reporting period. When short staffing leads to periods of operational confinement, school is then provided on the unit through a combination of direct instruction, workbooks, learning packets, and Edgenuity (an online education program), in which youth do not have access to live in-person instruction and interactions with subject matter teachers are severely limited. Youth complained that they do not like this format and are not learning as well as they were when education took place in the school area and all in-person with teachers present in every class. Several youths also told counsel that the facility is not meeting specific requirements of their IEPs.

As mentioned in previous reports, Defendants engaged three consultants to evaluate the educational programming at LHS/CLS. The consultants are national experts and have been selected to evaluate key educational areas including:

- Operations
- Curriculum and Instruction
- Academic Assessments
- Special Education
- Human Capital
- Technology Integration
- Transition

The education consultant's report was finalized and reviewed.  The report indicated similar concerns as those raised by the youth, including education on the units instead of in the school, overuse of Edgenuity, and needed improvements to services and resources for youth with disabilities, with reading difficulties, or with other special education needs. Upon receipt of the consultant's final report, the education department began evaluating the recommendations in order to prioritize its components and develop an implementation strategy that ensures compliance standards are met. Recently, the school worked to add language assigning direct oversight of special education programming into the responsibilities contained within the Teacher Supervisor position description.

The school graduated four (4) students during the reporting period, holding the most recent graduation ceremony on October 27, 2022 (day of site visit). Finally, the school staff and other

facility staff members hosted a Halloween themed school celebration day, offering students the opportunity to celebrate the holiday while at the same time recognizing the recent contributions of both students and staff to the ongoing efforts at the schools. Hopefully, as staffing levels increase, youth can regularly have education in the school and off the living units.

Living Unit Observations

The Monitor visited each cottage that youth were housed in during the site visit (Krueger, Wells, King, Hughes, Miller, Rogers, Roosevelt, and Douglass (recreation unit)). Overall, the units and youth rooms, halls, living unit area, and bathrooms were much dirtier than during the last visit. Youth were respectful when interacting with the Monitor.

The unit populations ranged from three (3) (one CLS unit) to thirteen (13) (LHS) youth. Defendants are trying to have supervisory staff, mental health and other staff regularly come to the units to increase staff presence. There were also new staff doing "on the job" training. There were some units that were short staffed which led to youth being operationally confined. The Monitor saw staff engaging with youth occasionally during this site visit, but staff were also very busy trying to complete their duties such as meal preparation, movement, safety-welfare checks, counts, and completing documentation. Due to staff being so busy, the Monitor did not see staff interacting with youth as much as when there are adequate number of staff available and observed on video (more detailed below). However, staff attitudes were just as positive as the last site visit.

All the youth that the Monitor interacted with were respectful and willingly communicated with the Monitor but had some complaints (detailed below). The youth made several complaints to Plaintiffs' counsel which are described below. The Monitor had an opportunity to talk to many of the youth present in the day rooms and youth confined to their rooms for a variety of reasons (AC, operational, voluntary, and sick).

Since the time onsite for the Monitoring visit is limited, the Monitor always reviews video of the living units on random days and times to get a better idea of what youth and staff do on the units and whether staff are positioned near youth and interacting with youth in a positive way. The Monitor reviewed video during the reporting period (random days and times) to view living units, school, outdoor recreation, and other activities. In every instance (50 video reviews) staff were engaged with youth when they were out of their rooms doing a variety of activities such as:

- Eating with youth at the tables
- Watching television with youth
- Playing cards with youth
- PSU (including psychologist) were on the units working with youth
- Educators were on the units including special education teachers
- Growth team meetings
- Groups
- Unit staff helping youth with school work
- Staff and youth were outside playing ball
- Staff and youth were dancing
- Youth and staff were in the recreation unit (Douglass) playing table tennis, video games,

- and other games
- Grandparent program visiting taking place
- Youth and staff were in the music lab on several days
- Youth were observed on telephones, arts and crafts, braiding hair, dancing, various recreation, prepping for showers and meals
- Youth and staff were cleaning

On review of video, staff were engaged with youth and positioned at or near tables with youth. The body language and tone were positive from staff and youth in general on video.

During this site visit, the CLS youth were housed in the Wells and King Units. There were eleven (11) youth total in CLS. CLS units and youth rooms were slightly cleaner than at the last site visit. Seven (7) out of eight (8) youth on Wells were out of their rooms. Youth were on their computers, talking, doing packet education work, and doing diamond art on the unit. One youth, who was in process of moving to King, was in school. One youth was in operational confinement.

The LHS youth were housed on Krueger, Rogers, Hughes, Miller, and Roosevelt. At the time of the site visit, majority of the units had adequate direct-care staffing.  Krueger unit was dirty and rooms messy. Seven (7) youths were in their rooms. Other youth on the unit were just standing around talking.  The youth on Rogers were headed out of the unit to go to school.  The unit and bathroom were dirty, and rooms overall were messy.  The youth were energetic but polite. The Hughes unit was calm. Youth were finishing their lunches when the Monitor was on the unit. Youth were sitting at the tables talking. Medicine pass was occurring, and other youth were in the video game room playing video games. The Miller unit had (what was thought of at the time) a COVID-19 outbreak, so the unit was on quarantine. Unit was messy, and rooms were a mix of tidy and messy. Youth were very chatty and happy. Youth were playing video games, one youth was reading in his room, and three youth were cleaning. Roosevelt had the COVID-19 positive youth. The unit smelled bad and was dirty. Rooms were generally messy. Three youth were out of their room watching television and one youth was sleeping.

The Krueger and Wells living units operated as the Skills Development Programs ("SDP") at LHS and CLS respectively during this reporting period. The Krueger and Wells units are considered the "High Risk" Units. The SDP is modified programming for youth who have engaged in physically aggressive behavior, have presented a danger to others, and/or exhibited behavior that caused a major disruption to the facility.

The SDP ran on a three-group schedule seven days per week beginning in April 2022, however this was transitioned to two-groups in July. The Krueger and Wells SDP units only have education on the unit.

As previously reported, DBT is provided to youth in the SDP incorporating individualized planning along with the in-person group work already assigned to youth in the SDP so that they are engaging in DBT skills and receiving feedback on a daily basis. Youth assigned to the SDP have a "Supplemental Youth Plan" created by PSU in order to specifically address their behavior. Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team.

The Defendants have not been able to follow the daily schedule on days with staffing shortages. There needs to be a focus on creating additional activities for all youth while operationally confined- even youth in the SDP. Under the current program, youth in SDP have less access to property in their rooms than most other youth in the facility. Also, on days when there is adequate staff, Defendants need to focus on following a daily schedule that provides for structured and meaningful activities and accountability (off the unit as much as possible) to minimize the incidents of youth acting out and ensuring staff are adhering to the schedule absent an emergency.  Defendants also need to continue to focus on the new behavioral motivation system.  In time, the program will heed positive results as the Monitor has seen in other jurisdictions.

<u>Youth Interviews</u>

Approximately thirty-two (32) youth were interviewed during the site visit (formally and informally) by the Monitor and approximately sixteen (16) youth were interviewed extensively prior to and during the site visit by Plaintiffs' counsel and several more informally during the tour. (Counsel did not go to the units with actual or assumed COVID outbreaks but youth were informed they could set calls with counsel.)

In general, youth attitudes were as positive during this site visit as previous visits, based on the Monitor's interaction with youth. However, youth only wanted to talk briefly to the Monitor because they did not want to miss out on their meals, recreation outside, education, telephone calls, and video games.

During the last site visit, youth seemed nervous about the new behavior motivation system.  The biggest complaint by far this site visit was the fact that the youth did not like the new behavior motivation system.  The youth also indicated they liked the old system because they could "buy" the things they wanted versus now—where they are required to earn the things that they wanted through following the rules/being on good behavior and exhibiting pro-social skills.

The Monitor was surprised that the youth did not complain to her as much about having to be on "split" halls or being bored in their rooms like they did during the last visit.  The Monitor talked to each youth who were in their rooms to ask how they felt about being in their rooms and whether they have activities to do.  No one complained to the Monitor, but they did complain regularly to Plaintiffs' counsel during the three months leading to the visit and to some extent during the visit. So, perhaps the lack of complaining to the Monitor is simply that youth have somewhat accepted that this is the new "normal" with respect to operational confinement due to staffing challenges, not that youth are not adversely affected by the increased confinement. Youth also said that they rarely go down to the school for education and rarely get off from their living units.  Based on the youths' feedback, the Monitor reviewed video to see if this is in fact the case.  What the Monitor observed is inconsistency due to staffing challenges. When there were adequate staffing levels, youth went to school, were outside, in music lab, in the recreation unit, and out of their rooms.  However, on days were there was insufficient staff, youth were in fact on the units including education.  There were weeks where there were inadequate staffing levels on six of the seven days, and some with as few as one or two. Staffing is unpredictable due to same-day callouts for a variety of reasons (sick, FMLA, Workers' Comp *etc.*).

7

It is important that Defendants continually communicate the new behavior motivation program and what the expectations are of youth and staff.  Since this is a new program which will take time to fully implement with fidelity and consistency. Defendants need to make sure through a rigorous quality assurance process that the program is being implemented consistently and in accordance with training, policy, and procedure.  Defendants should continue to include the youth voice for input and development of meaningful incentives and rewards through the youth council.  The Monitor believes this new system of care will have a positive impact on the culture of the facility and focus on youth's positive behavior in time.  Although the Monitor saw a lot of positive interactions with youth and staff, the Monitor continues to stress the need for more structured and meaningful activities as youth idleness remains a significant concern, particularly on weekends and while staff availability is limited and when youth are confined in their rooms. While Defendants operationally confine, there needs to be additional resources available to youth and more in-room activities to engage youth- even for youth on Skills Development Program. The significant hiring in the youth counselor classifications (described in more detail below), should provide for more available staff which will hopefully result in youth spending more time out of their room, off units, and in the school area.

As mentioned above, youth complained to Plaintiffs' counsel prior to and during the site visit (during this reporting period of August-October) about operational confinement (being in their rooms most of the day). One youth stated that the confinement was affecting their mental health.  A few youths complained that their "out time" was impacted by the previous group's refusal to go in their rooms and the time is not made up . Youth in SDP continue to complain about having nothing to do. Youth, especially the girls, complained about staff using force when they did not need to and other inappropriate behavior. Youth also reported that refusing to go into their room almost always ends up in staff using force against them. Youth in Krueger noted that it is hard to achieve perfect behavior to pass through the levels and out of that more restrictive unit, particularly as it feels like staff are provoking or testing them. And, as noted above, youth complained heavily about education provided in their rooms or on the unit via packets or Edgenuity. Youth had more varied and detailed complaints to Plaintiffs' counsel than to the Monitor while onsite.

During rounds of the units, the Monitor observed that most youth were in generally good spirits and engaged in some type of activity or were on their way to or from their living units for school or recreation.  Even those confined to their rooms were in most cases working on education through the Edgenuity tablets, sleeping (if sick- a few had COVID-19), or were drawing/writing.  The Monitor asked those youth who were in their rooms at the time of the site visit if they were bored and their response was "no." One youth showed me the bracelets she made while in her room and a couple other youth showed me the diamond art they were doing while in their rooms.  Several youths in CLS stated that they wanted more/better hygiene products. Youth commented that they rarely went to the school area and had restrictions on outside exercise.  Almost all youth complained to the Monitor and Plaintiffs' counsel that they did not like the new behavioral motivation program.  They did not like the fact that they had to earn their privileges based on behavior. The Monitor spoke to a youth who was in AC and he indicated he did see mental health while on AC status. Youth continue to ask for additional incentives to have in their rooms to help occupy their time especially youth who were confined to their rooms for much of the day. Youth are only allowed to have Chromebooks in their rooms during school hours. Defendants should consider expanding that time to occupy time and for additional learning opportunities.

The Monitor continues to encourage staff to engage youth and have more meaningful/structured programming and activities. It is clear that when staff engage with youth, youth respond positively. Only one youth complained about staff to the Monitor during this site visit. The Defendants need to continue to focus on gender-specific and culturally competent programming. However, first Defendants need to continue developing a plan to safely manage LHS/CLS during this challenging time.

The Defendants continue to make progress on closing LHS/CLS.  On August 9, 2022, Governor Evers announced that the state selected a site and purchased property in Milwaukee for the purpose of building a new Type 1 secure juvenile facility. Approval from the City of Milwaukee, and notification to the Legislature's Joint Committee on Finance, among others is required.  These various approval processes still have to happen before the state can seek approval from the State Building Commission for authority to construct the new facility, a design is finalized, and the building project is put out for bids.

Some of these remaining steps may require months of preparation. As a result, completion of any new Type 1 facility and transition of LHS/CLS to a minimum adult facility will still require considerable time and planning. As previously mentioned, moving youth closer to locations where necessary cultural- and gender-competent programs and services are more widely available, and where family visits can be more easily accessible, will have a positive impact on youth and will allow for a larger pool of applicants to fill critical roles.

<u>Staffing</u>

On many days, LHS/CLS had staffing shortages during this reporting period. Staff vacancies and leaves continue to be high during this reporting period at LHS/CLS and across DOC. Staffing shortages increase the burden on those who work to maintain a safe and healthy environment for youth and staff. Defendants are working diligently to try to attract and retain staff for these critical roles and have truly created significant incentives for new and existing employees in order to help with attracting new talent and retaining current staff.

The youth counselor staffing vacancy percentage is much lower than the last reporting period (*see below*) which is great news.  The new youth counselors will have to finish the requisite training thus, this increased staff should have a positive impact at LHS/CLS during the next reporting period. There are 311 total positions ("FTEs") at LHS/CLS. Approximately 138 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA"). The teacher vacancy rate is higher than last reporting period (6 vacancies), or 32% of positions which is not the direction the Monitor hoped for.  With limited educators, Defendants will have continued difficulty with increasing the quality and quantity of education for youth. Social worker vacancies remain the same, which at 75% is very high. This is a critical role that should be made a recruiting priority. Recruiting in general is still a challenge due to the location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and for educators, the year-round school calendar and thus, hiring needs to continue.  Even with the added incentives, there is a still difficulty in hiring many classifications of staff.

| Position | Vacancy Rate % as of March 31, 2022 | Vacancy Rate % as of July 31, 2022 | Vacancy Rate % as of October 31, 2022 |
|---|---|---|---|
| Youth Counselor | 41% (44 out of 108) | 40 % (43 out of 108) | 21% (20 out of 94) |
| Youth Counselor Adv. | 20% (6 out of 30) | 20% (6 out of 30) | 21% (6 out of 28) |
| Teacher | 48% (11 out of 23) | 26% (5 out of 19) | 32% (6 out of 19) |
| Social Worker | 67% (8 out of 12) | 75% (9 out of 12) | 75% (9 out of 12) |

Youth understand operational confinement or "split halls" as they commonly referred to operational confinement. From the youths' perspective though, it does not matter whether or not it is operational – they are being confined to their rooms for long periods of time, even when they have not misbehaved. The Monitor and Plaintiffs' counsel recommended that youth be provided additional things to do while being operationally confined.  Defendants continue to be resistant to providing anything additional to youth on operational confinement while on SDP.

The Monitor continues to recommend that a staffing assessment for the direct care positions and posts be completed and made suggestions to have other classifications trained like the direct care positions in order to meet PREA requirements so that they may be considered full time, direct-care staff and factored into the staffing ratios.  The Monitor will continue to work with Defendants on this and other issues.

Beginning on October 23, 2022, the $5 pilot add-on based on staff vacancy rates will be replaced with a $5 pilot add-on that will continue while CLS/LHS remains in operation as a youth facility. Employees in the Correctional Officer, Sergeant, Probation and Parole Agent, and Probation and Parole Agent Senior classifications are eligible for the add-on if they are assigned or volunteer for safety shifts at the facility with from the employee's supervisor. Correctional Officers, Sergeants, Probation and Parole Agents, and Probation and Parole Agent Senior employees who assist with safety shifts at CLS/LHS will also continue to receive the $5 add-on. The continuation of the $5 add-on highlights the importance of staffing the facility in order to safely and successfully work with the youth placed in our care.

Specific efforts to recruit staff during this reporting period participated in by the HR staff at the facility included:

- Rhinelander Job Center Virtual Job Fair
- Wausau Job Center Walk-In Interviews
- Rhinelander Job Center Walk-In Interviews
- CLS/LHS specific Billboard created
- UW Stevens Point Job Fair
- Lincoln County Fair

Key positions hired during the reporting period August 1, 2022 through October 31, 2022:

- Twenty-one (21) Youth Counselors
- Three (3) Supervising Youth Counselor 2
- One (1) Teacher
- Juvenile Ed Director
- Psychology Associate
- Nurse Clinician 2
- Treatment Specialist 2

The struggle to hire licensed/certified social workers continues. DJC has not been able to hire a social worker since 2018. The DOC had raised the minimum pay for social workers, but this has not helped in LHS/CLS garnering any applicants even after the increase. Many social services agencies have moved towards hiring case managers that do not require a state certification/license, and unfortunately LHS has also moved in this direction due to the inability to recruit and retain social workers.

Since the hiring of the CIRT Coordinator at the end of 2021, that position has worked to incorporate the combined efforts of CIRT's aim with that of the Committee Assigned to Safety and Health (CASH) Team. During the current reporting period the CIRT Coordinator position and the CASH committee have served to upgrade services provided to staff, and the staff's awareness of the resources available to them. The CIRT Coordinator and CASH Team continue to advocate on behalf of staff to engender a shared atmosphere prioritizing employee wellness through a series of outreach, meetings, and special staff events.

One simple but responsive solution to better facilitate employee wellness events was proposed by the CASH committee and implemented during the reporting period. During past employee events staff in any classification, on any unit, were invited to participate in special events. However, very often safety staff, and staff in other classifications working the unit during these events were unable to leave their post. Staff consistently voiced that they appreciated the events but would rather be able to take time away to eat, congregate, and experience the social benefit of the event itself. Now for special events involving these types of gatherings, the CIRT coordinator facilitates the scheduling of staff willing to rotate through unit coverage to relieve staff to come and participate.

Defendants continue to focus on staff wellness. Below are the employee wellness events occurring during this reporting period:

**August 8, 2022:** Kepro (employee assistance program) sponsored webinar on stress management techniques and active self-care.

**August 30 & 31, 2022:** CASH Team giveback event: Free Ice Cream Sundae Bar for staff.

**September 16 through 30, 2022:** CASH Team organized a fitness challenge to spread awareness for suicide prevention and remind staff of their QPR suicide prevention skills. If you see the warning signs, ask the question and save a life. Co-workers challenged each other to see who can put on the most miles on their pedometer or put in the most time exercising.

**September 27 & 28, 2022:** CASH Team giveback event: Free Tailgate and Tacos for staff.

**October 12 through 24, 2022:** CASH team organized the Change Wars! The participating facility management team member that gets the most money donated in their name will wear a hot dog costume to serve staff at the "HalloWeenie" giveback later in October. Donations went to fund a local charity.

**October 25 & 26, 2022:** CASH Team giveback event: Free "HalloWeenie" hotdogs for staff.

**October 31, 2022:** Treats for Teammates fundraiser hosted by the CASH Team. Treats donated by staff, for staff, and sold for just $1 serve as a fundraiser for the CASH Team. Staff treat themselves or designate a co-worker and the CASH team delivers the treats to them on shift. The CASH Team also provided whistles and glow sticks in the entryway lobby for staff with little ones trick-or-treating this year.

The facility management team plans to distribute and collect a survey on a semi-annual basis in order to encourage and effectuate meaningful discourse between staff and supervisors. Offering the staff survey on an ongoing basis will grant staff the ability to express their perspective and experience in a forum that management can utilize to implement changes and make progress toward maintaining a healthy and safe work environment for those who work in the facility.

The BMS implementation has been responsive to past concerns raised by staff regarding youth accountability.  When staff were asked what accountability looks like to them the top answers included: effective consequences; a standard/structure; rewards for reinforcement of good behavior; youth taking responsibility for their actions or choices; and immediately addressing behaviors. The new BMS system provides effective consequences within a structured system that issues the youth a weekly behavior grade. This grade then determines what rights and privileges that youth have for the following week. As long as pro-social behaviors and non-compliant behaviors are identified and recorded the BMS will provide accountability and responsibility for the youth's actions.

The Monitor spoke to over twenty-five (25) staff. Staff morale seemed good overall at the time of the site visit. A review of video over the reporting period showed staff regularly engaging with youth. Staff were less talkative this site visit due to being busy on units- not because their attitudes were negative.

DJC has continued to develop the facilities system of care model by developing and implementing another one of its four core components- the behavioral motivation program, which also focuses on a youth's progress in their education and treatment plans. This model involves a focus on positive youth outcomes and an improved behavior motivation program. As stated in the last report, the goal of the pilot for the new system of care was to develop a team atmosphere amongst groups of living units, consistent post assignments, and to reduce overall ordering. Given current staffing levels it was not possible to match each team with a single unit, so those teams were set into four categories: LHS General Population; LHS Skills Development and Intake; CLS Skills Development & General Population; and RRT/Control/School Patrol. Some auxiliary posts such

as Care Team, Recreation and Visitation that were evenly distributed to balance out the teams.

The LHS General Population units and the CLS/LHS Skills Development units will have two primary YCA's and four primary YC's. King & Roosevelt will have four primary YC's. The Wells YCA will become Wells/King. The keys within the RRT/Control group will remain at the time they currently are. Within the General Population team and both the LHS/CLS Skills Development teams:

- YC's who are working 0630 - 1830 transitioning to 0800 - 2000.
- YC's who are working 1830 - 0630 transitioning to 2000 - 0800.
- YC's who are working 1030 - 2230 transitioning to 0800 – 2000.
- YC's who are working 1430 - 0230 transitioning to 1600 – 0400 mid-shift or 2000 – 0800.
- YCA's would transition to 0800 – 2000.

The staff survey showed a strong preference to move towards this new scheduling format and thus, the schedule described above and in the Fourteenth Report to the Court was implemented on August 1, 2022.  The implementation of the new staff schedule on August 1, 2022 was designed with alleviating staffing concerns and creating a better work environment in mind, but it was also tailored to the youth schedule. The scheduled aims to have the most, and the most consistent, staffing during the youth's normal waking hours. Prior to the change the 12-hour schedule had staff working shifts beginning at 6:30AM and ending at 6:30PM, now the staffing pattern is based around the same 8:00AM-8:00PM waking hours built into the youth's daily schedule.

This allows more staff to be on, particularly from 4:00PM to 8:00PM when youth are typically back on their units. The shift has also helped to reduce the times that modified programming is required, particularly in the afternoon when one or more buildings can come off of modified due to relief staff arriving at 4:00PM instead of 6:30PM. The new youth counselors hired during the reporting period will only serve to bolster the number of staff able to help this scheduling adaptation serve the staff and youth alike as the facility moves toward as much consistent normal programming as staffing can allow.

The Monitor is very supportive of this new system of care once fully implemented.  There is definitely an adjustment period for youth and staff.  Youth prefer the "old system" because they could buy various privileges instead of having to earn through good behavior.

The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives, changes to programming, and general information. A major component of staff wellness is ensuring staff feel as safe as possible. Improving staff wellness will certainly have a positive impact on the overall atmosphere and reduce turnover, which will then provide an opportunity to decrease the vacancy rate, reduce employee leaves and improve staffing ratios. PbS data and survey results will be available in the next Report to the Court and the Monitor will be able to assess the effectiveness of all the programming and staffing changes with more objective data.

Quality Assurance ("QA")

The Program and Policy Analyst-Advanced focused on the ongoing Quality Assurance ("QA") implementation efforts surrounding the consent decree and other important functions in the school and facility system of care updates.

Defendants began using the newly digitized use of force review form in May 2022.  The process still requires incident review for all physical restraint uses, but it includes the additional requirement that any incidents involving the use of mechanical restraints be automatically assigned the additional facility level use of force review. The J-Tracker use of force form retains all relevant fields of information from the prior department form, but also includes questions specific to mechanical restraints. Finally, it serves as at least a retrospective confirmation/communication between the reviewer and the youth's clinician ensuring PSU was either present at the time of the incident or responded within the two-hour timeframe when mechanical restraints exceed 45 minutes.

Critical information is now readily available to the leadership which so that they can make proactive, data driven decisions that increases the safety of youth and staff.  Again, continuous improvements have been made in data collection and in the quality assurance program.

DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. The committee has completed another round of revisions to the draft of Chapter 373.  This included incorporating aspects that coincide with the new Behavioral Motivation System's development and implementation.  The DJC committee is scheduled to meet with DJC Administration in early November for a final review of the chapter before it is sent for approval by the Office of Legal Counsel and subsequently to the Secretary.

The Chapter 376 final draft has been completed by DJC's Administrative Code committee, approved by the Secretary, and most recently reviewed by the Legislative Reference Bureau (LRB). DJC's administrative rules committee reviewed the LRB's analysis and recommendations during the reporting period, responded to them, and thus has concluded its internal drafting process. With the approval of the Office of Legal Counsel the LRB can submit the proposed language and the amended Chapter 376 can move to the public commenting period required by the rulemaking process.

The advancement of both DOC Chapter 373 and 376 during 2022, but particularly during this reporting period, marks significant progress moving these two chapters implicated by the consent decree toward publication.

**Policy and Procedure Update**

The DJC Policy Committee continues to review and update policies of note to the facility.

In the August meeting the committee reviewed the following policies:
•        100.04.03 - Network Access for Youth in a DJC Facility
•        300.05.02 – Equipment Inventory

- •       300.05.12 – Youth Counts
- •       300.05.13 – Lockdown

In the October meeting the committee reviewed the following policies:
- •       300.02.15 – Youth Property
- •       300.04.03 – Incentives
- •       300.05.24 – Internal and External Communications System for Emergencies

Facility procedures updated and signed during the reporting period include:
- •       900.02.02 - Damaged Property
- •       900.02.03 - Closing Youth Accounts Upon Release
- •       900.02.04 - Collection Safeguarding Disbursing and Reporting of Monies
- •       900.02.05 - Safety Glasses
- •       900.02.06 - Inventory Control and Distribution of Uniforms
- •       900.02.07 - Requisition and Purchase of Supplies and Services
- •       900.02.08 - School Meals Sold
- •       900.02.09 - Capital Items Inventory
- •       900.03.01 - Staff Professional Behavior
- •       900.03.02 - Timesheets
- •       900.03.03 - Reporting Unscheduled Absences

**Policy Database & Acknowledgement Tracking**

Defendants need to continue to aggressively work towards completing the respective Administrative Code sections. The National Institute of Corrections recommends that a central point of access for policies is available to staff. For this reason, hundreds of Division and local policies and procedures that were being stored on the local intranet for employee access, have been migrated into a software system called OnBase for use.

OnBase allows those who manage policies to go through a more efficient process when uploading, editing, and rescinding policies and procedures. In turn, it provides employees a tool for policies to be to more easily searched and retrieved. Lastly, the OnBase system has a tool where policies can be distributed and assigned to certain employee groups using Document Knowledge Training Compliance (DKTC). DKTC will allow those who manage polices a way to assign and track when policies have been read by specific employees.

**COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION**

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

      1.     Punitive Confinement.

           a.     Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this

Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data does not indicate that youth are being confined for seven days for any reason.**

  b.  Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data indicates one (1) youth was confined for over 3 days but not for punitive reasons.**

  c.  Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to examine use of all forms of confinement and review incidents to ensure that staff are not using any form of confinement as punitive confinement. The Monitor previously recommended establishing clear criteria for all confinement so that staff cannot punitively confine youth and cannot confine youth for more than 24 hours if they do not pose an imminent danger of harm to themselves. For the first time, the Monitor QA'd whether youth came out of their room for administrative confinement at the time indicated in reports. Out of twelve (12) reviews, five (5) matched the report which means seven (7) others did not. Although the Monitor cannot tell why the youth did not come out of room, Defendants need to make sure that youth are not being kept in their room longer for punitive reasons.**

  2.  Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the

following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of AC was slightly lower for CLS (3 month look back) and almost double for LHS youth this reporting period. One youth in LHS was confined for 74.30 hours (over 3 days). There were eleven (11) youths confined over four (4) hours in this reporting period. Defendants need to continue to assess how they can more effectively provide intensive mental health services for youth**.

**April 2022**
**CLS: 11 uses of A.C. Average 160 minutes. No youth over four hours.**
**LHS: 92 uses of A.C. Average of 154 minutes. 14 youth over four hours.**

**May 2022**
**CLS: 27 uses of A.C. Average 122 minutes. One (1) youth over four hours.**
**LHS: 33 uses of A.C. Average of 145 minutes. No youth over four hours.**

**June 2022**
**CLS: 60 uses of A.C. Average 145 minutes. No youth over four hours.**
**LHS: 59 uses of A.C. Average of 184 minutes. Five (5) over four hours.**

**July 2022**
**CLS: 35 uses of A.C. Average 132 minutes. No youth over four hours.**
**LHS: 17 uses of A.C. Average of 138 minutes. No youth over four hours.**

**August 2022**
**CLS: 43 uses of A.C. Average 144 minutes. No youth over four hours.**
**LHS: 95 uses of A.C. Average of 184 minutes. No youth over four hours.**

**September 2022**
**CLS: 33 uses of A.C. Average 144 minutes. No youth over four hours.**
**LHS: 47 uses of A.C. Average of 158 minutes. Two (2) youth over four hours.**

**October 2022**
**CLS: 40 uses of A.C. Average 153 minutes. Two (2) youth over four hours.**
**LHS: 53 uses of A.C. Average of 307 minutes. Seven (7)  youth over four hours.**

**The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit. 98.62%- 99.89% of checks were completed within 30 minutes during this reporting period. The Monitor reviewed video footage for random days and times (115 instances) and Defendants were 100% compliance with completing the checks in accordance to policy. Staff did an outstanding job and should be commended for their diligence in ensuring youth safety while in their rooms.**

a. Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours)

when:

    i.      A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth pose a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were eleven (11) youth confined for over four (4) hours during this reporting period (see response in previous question). Some extended confinements were not recommended by PSU.**

**Defendants need to continue to focus on reducing AC overall, ensuring any form of room confinement is compliant with this Court Order, draft policy and procedure with AC placement criteria, and continue to QA this data.**

    ii.     A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. Three (3) youth were placed on extended placement in administrative confinement pending transfer out of the facility.  One (1) youth was pending discharge from facility and two (2) transferred to MJTC.**

    b.   Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 P.M. to 8 A.M.**

    c.   Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

**COMPLIANCE STATUS: PARTIAL  COMPLIANCE. Three (3) youth were placed on extended placement in administrative confinement pending transfer out of the facility.  One (1) youth was pending discharge from facility and two (2) transferred to MJTC.**

    d.   The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

    3.    Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants

shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 is being utilized. The plans developed are very detailed and comprehensive. Only youth who are in imminent risk of serious self-harm to themselves/risk of self-harm will be placed in observation status. The Monitor will continue to review and monitor the practice.**

4. **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

   a. Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed on renovated units. Youth rooms were not clean overall. Rooms were very cluttered in general which poses risks when surface areas cannot be easily viewed.**

**As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly. However, based on the language of this section, Defendants continue be close to substantial compliance.**

   b. Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, regular hygiene supplies, or nighttime toilet usage. Some youth complained to Plaintiffs' counsel, however. The Monitor reviewed random video footage of living units in evening hours and observed several instances in which youth were given access to the toilet upon request. Defendants have improved their documentation and data collection.**

   c. Staff must notify a PSU staff member as soon as possible, and no later

than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in challenges intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation has been improved as to who from PSU was notified and time of notification (although there were a few reports that did not contain this information). The challenges intervention technique is being documented. Clinicians are on-site for a minimum of 6 hours each Saturday and Sunday and the majority of this time is spent meeting directly with youth.  There is no change to PSU on-site schedule.   The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours in order to engage youth in a meaningful way during this time.  Because confinement can create or exacerbate mental health problems, treatment is going to be even more critical as the population continues to remain higher if the Defendants are operationally confining.**

d.    Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general, documentation/data shows that evaluations are completed (if there is not already a mental health evaluation) within 24 hours after being placed in room confinement. The Monitor is told youth on operational confinement are being seen by PSU and evaluated for contraindication, but the Monitor has not seen documentation for youth on operational confinement and whether they are evaluated for contraindication.  There were no instances of contraindication documented during this review period. Defendants need to ensure that they are meeting the criteria in this section and document any and all room confinement including operational room confinement.**

e.  Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who

falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE: Defendants were between 98.62%-99.89% compliant with meeting the thirty (30) minute safety and security check timeframe. Quality assurance measures are in place and when necessary, formal investigations occur. There were no formal job instructions for not completing safety and security checks. The Monitor observed safety/wellness checks being completed on various days/times on every unit during this reporting period and observed no instances in which staff did not make visual contact with youth per policy- 100% of the checks were compliant.**

**PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor continues to encourage more on-site time on evenings and weekends. Examples of the challenges intervention techniques used with youth when confined can be viewed/verified in the PSU On-Call and/or PSU Clinician notation box on the J-Tracker Incident Debrief custom form. Examples of challenges intervention techniques include but are not limited to validation, practice of DBT skills, processing of the incident, mediation, assistance problem-solving, fostering perspective-taking, Behavior Chain Analysis (formal and informal), plans to address conflict/safety/skills practice, in the moment coaching skills, time away from stressors, body scans, mindfulness, increase insight, encourage self-reflection. The Monitor has reviewed these documents.  When the monitor was reviewing unit activity via video on random days and time, PSU was observed providing youth with services.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

f.   Any youth in room confinement shall have property items similar to or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth continue to complain about property restrictions while in the SDP. This is an area that Defendants need to re-examine. Youth in SDP do not get the same property as youth in general population which is not consistent with this required provision. Additionally, while youth are on operational room**

**confinement, regardless of level or being on SDP, the Monitor recommends that youth be provided with activities to do that would encourage physical movement in rooms, arts, crafts, music etc.**

        g.      Youth in room confinement shall receive:

           1.      All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided in general.  It is difficult to assess whether these services are being provided while youth are in operational room confinement because Defendants do not track operational room confinement time per youth. The Monitor saw social workers, mental health and health services being provided to youth during the site visit and in random video review. The primary clinician consults with the on-call clinician and with the SYC/YC/CPS/SW staff regarding specifics ways the youth plan addresses the issues at hand and how it can be adopted when the youth is on AC. A PSU clinician follows up in the absence of the primary clinician and/or the challenges clinician. The vacancy rate for social workers continues to be extremely high and vacancy rates remains the same at 75%. Social workers are critical to quality of care and services for the youth and effective re-entry planning.**

**Defendants need to ensure there is accountability with respect to the services provided by the social workers, mental and healthcare workers.**

        ii.      Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants moved to smaller group-based treatment to youth where group participation was provided on the units. This continues. Beginning in March, some housing units now utilize the school for their group treatment sessions as determined by their respective living unit's weekly schedule. The Monitor continues to encourage these groups to occur off of the living unit as much as possible.**

**Defendants need to continue to focus (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement including operational confinement. Defendants need to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress.**

        iii.      Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate

and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. When short staffing leads to periods of operational confinement school is then provided on the unit through a combination of direct instruction, workbooks, learning packets, and Edgenuity. Youth complained about not going down to the school area for class and being "stuck" on the units. Through video review, the Monitor observed youth in the school area eleven (11) out of twenty-six (26) random school days during this reporting period which is less than 50% of available school time. Youth were on their units utilizing packets or on their computers completing education, which youth consistently noted was considerably more difficult.  Youth did computer and packet-based work alone in their rooms when they were being operationally confined.  Youth told counsel that they could not meaningfully learn because of these actions.**

**The education consultants completed their report which included recommendations. Defendants are working on implementing many of the recommendations. There needs to be more instruction by teachers and not self-instruction or instruction on Edgenuity, more assistance for students with disabilities or reading problems, and mor education in the school area which is more representative of a typical educational setting in the community.**

**The Monitor continues to suggest that Defendants should provide more art, music, woodworking, the greenhouse, welding, and sewing and other types of programs to youth in the evening and on weekends. The Monitor was happy to see during the site visit and through random video review that during this reporting period, youth were able to access many of these programs when staffing allowed. The youth expressed how much they like these activities to the Monitor.  The Monitor understands that with the staffing challenges and movement freezes, these types of programming are difficult to continue. However, Defendants need to think of other activities to do while on the unit when it is necessary to keep youth on their units for safety reasons.  This is especially true for youth who are operationally confined who have nothing to do for the several hours a day.  Defendants have begun asking youth and staff for ideas of activities while in their rooms.  Defendants provided some of their recommendations such as stress balls and additional art supplies.  However, the Defendants should continue to focus on bringing more programming into LHS/CLS, especially culturally and gender relevant programs.**

      iv.      Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. When staffing is not an issue, youth are regularly out of their rooms from 8 A.M. to 8 P.M. However, this is not the case during the time Defendants operationally confined youth due to staffing challenges. Youth in operational confinement, isolation due to Covid-19 safety measures, any confinement required, and youth working on the BIP do not participate in regular social interaction. Additionally, youth are not going to the school area for education unless staffing levels allow. Youth on SDP do not go the school area for education area period.  Youth did complain about not getting exercise or recreational activities to Plaintiffs' counsel.  The Monitor regularly saw youth conversing with other youth during out time when the youth were on the units in the day room.**

> v.  Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE. There were twenty-two (22) documented instances of youth eating in their rooms which were staff imposed based on substantial threat of physical harm during this reporting period. Defendants are able to track when youth eat meals in room and based on reports that the Monitor reviewed, it appears these instances were justified.**

> vi.  Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Due to staffing challenges (operational confinement) Defendants admit that there are instances where youth were not getting out three (3) hours per day or thirty (30) hours per week.  Defendants do not track this on an individual basis, so the Monitor cannot determine how many youths are not getting at least 3 hours of out-time per day or 30 hours per week.  Defendants are tracking groups of youth per unit based on scheduling.  There also were instances in which youth are technically out of AC but remain in room because it their group's turn to remain in rooms for operational confinement. This is adding additional confinement time for youth that can lead to them getting fewer than 3 hours per day or 30 hours per week of out time. Defendants need to reevaluate and consider allowing the youth out of their rooms once AC is ended.**

> 5.  **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There is a box on the incident debriefing form that is checked if staff informed the youth his or her rights regarding**

14

grievances and appeals and time of notification. A few forms did not have the box checked that youth were notified of their right within 15 minutes. During the reporting period the quality assurance and policy staff worked to make a series of changes to the DOC forms utilized for documenting this provision. In the interim, the DOC-1844 Youth Statement still records that the youth was informed of their rights to grievance and appeal orally within 15 minutes, and on paper within one hour. This provision's completion is quality assured by requiring the youth's signature acknowledging receipt of the notifications, or in the event of the youth's refusal to acknowledge receipt, two staff signatures bearing witness to the youth having been provided the notification of rights.

Staff have been working to transition the checkbox denoting that the notification of rights was properly completed, along with the youth's signature or the signatures of the witness upon a youth's refusal, currently on the DOC-1844 to the DOC-2942 AC Notification of Rights.

The DOC-2942A was developed and moved into J-Tracker operation designed to draw the required information for the written report directly from the incident debrief form, as soon as the SYC overseeing the incident has completed their required fields for a major incident. Once the SYC has completed their required fields, a response assignment can be generated by the SYC to the unit staff where the youth on AC is housed. Upon receipt of the response assigned, unit staff are then able to generate the DOC-2942A and deliver it to the youth.

The new process and forms have been drafted into an updated Incident Debrief procedure. Next steps will require finalizing the debrief procedure, then reinforcing the notification of rights process update while staff work to operationalize delivery of the required written AC summary report to the youth.

Youth who are confined due to staffing issues are not given these notifications of rights.

6. Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are documenting this consistently except in cases of operational confinement, including when less restrictive means were attempted. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue especially for AC. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement including operational room confinement.

B. OC-Spray and Other Chemical Agents

1. OC reduction plan. Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.**

2. Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

C.   Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1.   Prohibition on types and uses of mechanical restraints.

a.   Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  PARTIAL COMPLIANCE.  The Monitor did not personally see any youth in mechanical restraints during site visit, however, data and documentation show that there was an increase in use of mechanical restraints for both LHS and CLS. Defendants need to continue focusing on reducing the use of mechanical (as well as physical) restraints.**

b.   Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regains control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Below is the number of mechanical restraints uses in LHS and CLS this reporting period.**

**Uses of mechanical restraints LHS:**

| | |
|---|---|
| **March 2022:** | **12 uses** |
| **April 2022:** | **17 uses** |
| **May 2022:** | **9 uses** |

| | |
|---|---|
| **Jun 2022:** | **8 uses** |
| **July 2022:** | **13 uses** |
| **August 2022** | **10 uses** |
| **September 2022:** | **11 uses** |
| **October 2022:** | **13 uses** |

**Uses of mechanical restraints CLS**

| | |
|---|---|
| **March 2022:** | **4 uses** |
| **April 2022:** | **2 uses** |
| **May 2022:** | **12 uses** |
| **Jun 2022:** | **15 uses** |
| **July 2022:** | **6 uses** |
| **August 2022** | **10 uses** |
| **September 2022:** | **16 uses** |
| **October 2022:** | **13 uses** |

**Defendants should continue to work on reducing the use of mechanical restraints and continue to monitor. The total use of mechanical restraints at CLS is roughly equal to the use at LHS although the population is only about one-sixth (1/6) of LHS.**

    c.    No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

        i.   Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were five (5) uses of restraints other than handcuffs (ankle restraints) during this reporting period. They were ordered by security staff as youth posed an immediate and substantial threat of physical harm to others. PSU did not order the ankle restraints to prevent-self harm. Defendants need to develop policy and procedure, training, and QA measures.**

        ii.   Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were five (5) uses of restraints other than handcuffs (ankle restraints) during this reporting period. They were ordered by security staff as youth posed an immediate and substantial threat of physical harm to others. Defendants need to develop policy and procedure, training, and QA measures.**

        iii.   During transportation, the facility may use handcuffs and, in

rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See above.**

    d.    Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor has not observed mechanical restraints used for punishment/discipline on site visits, review of video, or documentation reviewed.   The mechanical restraints policy and a subsequent facility procedure was finalized April 4, 2022. The Incident Debrief QA process, and the more recent Use of Force Review QA process updates have overlapped to provide QA staff, POSC instructors, and facility administration a triple layered system for scrutinizing all uses of mechanical restraints. Defendants are close to reaching substantial compliance. Defendants need to continue focusing on reducing the use of mechanical restraints. Defendants need to continue to monitor and assess the use of restraints and duration.**

    e.    Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

    f.    Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. All safety staff equipped with mechanical restraints are trained specifically in the use of physical force, and restraints, and on proper de-escalation techniques. Ongoing internal trainings like POSC refreshers are department requirements for all safety staff, and that facility has invested to provide additional systems trainings including Mandt and Verbal Judo as examples related to this specific provision.**

g.   Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living unit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter. As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were no instances of a youth being placed in mechanical restraints over 45 minutes. Defendants have created a QA process for this section. Defendants also need to ensure therapeutic interventions occur.**

2.   Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process. Defendants have developed the behavior motivation program. Defendants should actively engage with youth and develop engaging and meaningful programming in order to reduce the need to use incidents of violence which requires the use of mechanical restraints.**

D.   Strip Searches. The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

1.   Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possess drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There was one (1) strip search in this reporting period. The policy and procedure for Searches of Youth have been finalized. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search. It was conducted for probable cause of contraband used in self-harm. Contraband was in fact found.**

2.   Strip searches with probable cause. Less intrusive searches, including using

a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There was one (1) strip search this reporting period. QA has been developed. The policy for searches has been finalized. It was conducted for probable cause of contraband used in self-harm. Contraband was in fact found.**

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There was one (1) strip search this reporting period. It was conducted in a private area. QA has been developed. Contraband was in fact found.**

b. Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There was one (1) strip search during this reporting period. No youth was near the youth being strip searched. QA has been developed. The policy for searches has been finalized.**

c. Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There was one (1) strip search conducted this reporting period. The staff conducting the strip search was the same gender. QA has been developed. The policy for searches has been finalized.**

d. Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There was one (1) strip search this period the staff conducting the search was trained in trauma informed care.**

e. If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There was one (1) strip search during this reporting period. Staff was aware of the mental health status prior to the search as youth regularly attempts to self-harm. Staff did find contraband that could have been used in self-harm. Documentation has improved. Policy and procedure/QA developed.**

4. Documentation. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. Policy and Procedure finalized.**

E. De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Defendants do provide de-escalation training to new and current staff. All safety staff are trained specifically on proper de-escalation techniques and are provided with additional systems trainings including Mandt and Verbal Judo. In addition to the internal refresher trainings all staff are required to maintain their POSC certification. Defendants need to continue to focus on de-escalation skills.**

F. Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Programming needs improvement (as discussed throughout this report) and idleness—which was already high especially during times of staff shortages.**

**As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. Administration needs to increase meaningful/structured program and activity hours**

to further reduce youth idleness hours. **Defendants need to create additional in-room activities for youth while they are being operationally confined.**

G.  Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018, report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants have made significant effort in implementing the strategies suggested in improving staffing ratios and staff morale, but the staffing challenges has curtailed any progress in this area. Defendants have implemented several initiatives to increase recruiting and retention. Defendants have reduced the vacancy rate for youth counselor positions from 40% to 21% this period which is significant.  The Monitor recommends that a formal staffing assessment be completed.  A staffing assessment will provide the jurisdiction with an updated analysis needed to properly maintain mandatory posts for each facility as well as identify any specific needs based on facility designs, populations, and staffing ratio needs based on incidents of violence and other unique circumstances to each facility. Staffing assessments also take into consideration the average leave usage for all types of leave used on an annual basis, to include vacations, sick leave, Worker's Compensation, FMLA, and leave associated with annual training.  Ensuring that each facility has the appropriate number of FTE's to effectively manage the facility also has a direct impact on staff wellness and reducing fear for safety concerns.   As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere, and environment of the facility. Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, reduces employee leave/vacancies, and the use of isolation and confinement.**

H.  Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE. DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. The committee has completed another round of revisions to the draft of Chapter 373.  This included incorporating aspects that coincide with the new Behavioral Motivation System's development and implementation.  The DJC committee is scheduled to meet with DJC Administration in early November for a final review of the chapter before it is sent for approval by the Office of Legal Counsel and subsequently to the Secretary.**

**The Chapter 376 final draft has been completed by DJC's Administrative Code committee, approved by the Secretary, and most recently reviewed by the Legislative Reference Bureau (LRB). DJC's administrative rules committee reviewed the LRB's analysis and recommendations during the reporting period, responded to them, and thus has concluded its internal drafting process. With the approval of the Office of Legal Counsel the LRB can submit the proposed language and the amended Chapter 376 can move to the public commenting period required by the rulemaking process.**

**The advancement of both DOC Chapter 373 and 376 during 2022, but particularly during this reporting period, marks significant progress moving these two chapters implicated by the consent decree toward publication.**

## IV.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A. **Incident review process.** Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The 24-hour timeline is met in the vast majority of cases absent weekends. Informal reviews occur right after an incident in majority of cases. When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). Defendants continue to make improvement in the area of quality assurance.**

B. **Quality assurance**. The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. As discussed throughout previous**

**reports, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff. Defendants have created an exceptional quality assurance program and have made substantial progress in developing daily data to review that will automatically be available in order to make real time operational decisions. The Monitoring team will continue to work with the superintendent to establish performance goals, analyzing data, and creation of corrective action plans.**

## <u>CONCLUSION</u>

The population remains consistent with the last reporting period.  Staffing issues remain but should improve once the newly hired direct-care staff complete their required training. Youth are still being confined to their rooms, education is still occurring on the units on many days, youth are receiving reduced outdoor recreation time on many days. The new system of care/behavior motivation program was implemented in August, which the Monitor anticipates will have a positive impact on conditions of confinement for youth over time.

While operational confinement is not ideal, given the staffing challenges during many days in this reporting period, it does appear to be necessary in many instances.  Until the staffing challenges are resolved, Defendants will have difficulty in continuing their progress with many of the areas of this Consent Decree. The recommendations of the educational consultant should be implemented to improve the quality and quantity of education. There also needs to be a focus on ensuring youth are being let out of administrative confinement when they no longer pose a threat to others per this Court Order.

Lastly, as the Monitor continues to state in reports to the Court, there needs to be a focus on moving youth from LHS/CLS to more appropriate setting(s) or diverting them from confinement entirely.

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

<u>/S/ Teresa Abreu</u>
Teresa Abreu
Monitor