UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF
WISCONSIN

---

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                                 Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

SIXTEENTH REPORT OF THE MONITOR

---

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Fifteenth Report of the Monitor was filed with the Court on December 6, 2022. The Monitor's sixteenth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates since the fifteenth site visit which took place on October 27, 2022.

## SITE VISIT

The sixteenth site visit by the Monitor took place on February 9, 2023. The Monitor and Plaintiffs' counsel were onsite for one day and completed necessary interviews and information gathering via in-person and virtual meetings prior to, during and after the site visit. The Monitor reviewed materials provided by the parties prior to, during, and after the site visit for the reporting period ending January 31, 2023 (November 2022, December 2022, and January 2023).  Materials included but were not limited to: use of force videos, video footage of units, video of safety and security checks, programming materials, investigations, various staff video footage of the school area, video footage of administrative confinement, memos, daily shift reports, policies, all of the monthly data submitted to the parties per this Court Order, work rules, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Plaintiffs' counsel conducted approximately twelve (12) youth interviews before and during the site visit.  The Monitor toured LHS/CLS and interviewed youth

and staff. The Monitor had the opportunity to talk to many of youth and staff present and available during the site visit. Approximately twenty-eight (28) youth and twenty-seven (27) staff were interviewed by the Monitor during this site visit.

## OVERALL QUALITY OF LIFE, CONDITIONS, AND ATMOSPHERE

Introduction

The total LHS/CLS population ranged during this reporting period from 62-75 youths. The population is much lower compared to the last which was 76 - 85 youths. At the time of the site visit, the population was 61 youths (1 youth off site).  Staffing shortages continue to exist with most days only having 50% of staff.  There continues to be operational confinement (youth confined to their rooms due to inadequate staffing levels, not behavior based) during this reporting period, albeit less than last reporting period.

Although Defendants continue to make significant progress in many of the provisions of this Agreement (discussed throughout this report), the staffing shortages, lack of gender, culturally relevant, and structured programming and youth idleness remain. Additionally, quality and quality of education needs improvement and an increase in PSU presence and services should be considered.  Staffing shortages still exist that impact daily operations, leading to adjustments to the daily schedules to maintain effective staffing ratios for youth supervision and resulting in operational room confinement of youth, change in educational settings, overall programming such as youth not being able to have outdoor recreation, music and gym time, reduced recreation in general, and increased idle time. When there are staffing shortages, there is also a lack of staff available to be CARE team members who are called upon to effectively de-escalate youth in a variety of situations.  Despite these challenges, it is important to note that as of January 31, 2023, youth except those in SDP Levels 1 and 2 are receiving education services in the school.

As stated throughout this report, Defendants continue to make significant progress in many of the provisions of this Agreement. The leadership, staff, and youth overall at LHS/CLS continue to have positive interactions with each other and the environment was very calm throughout LHS/CLS.  Reduced population levels have enabled for some programming to resume (such as education) due to the increase in staffing ratios. The Monitor hopes that the courts and community partners continue to seek alternatives to incarceration (especially since there tends to be an increase in population in facilities in the spring and summer), in order to allow for appropriate staffing levels to continue with necessary programming. The Monitor did not encounter a single staff or youth that did not have a positive attitude. The overall operations of LHS/CLS are the best it has been since the Monitor was appointed.  Staff and leadership's commitment to youth and to this reform effort is evident in every aspect of the operation.

Physical Plant Observations

The entrance, grounds, visitation, school, and many other areas were clean and orderly. Living units and youth rooms in general were the cleanest the Monitor has observed.  All units and the vast majority of youth rooms were clean and organized.  Staff and Youth should be commended

for this improvement.  In conversations with youth, they were very proud of the cleanliness of their rooms.

Defendants have made or plan to make the following physical plant improvements:

- Completed installation of the new youth video phone system in youth living units. Video phones are now installed in all youth living units for youth to better access and communicate with their families and community. The system is expected to go live within the next 30 days. Youth are very excited for this phone system.

- Installed game rooms in each living unit with new Xbox consoles and couch/seating areas in each room for youth to use.

- Began producing music video additions to some of the youth songs created as part of the Music & Arts Initiative ("MAI"). Using new video production software and equipment, the youth are able to produce their own songs from start to finish. Staff and others have donated street clothing for youth to use in the recordings as well. The production quality is first class, but the most inspirational aspects of the MAI are the result of the talent and creativity on display from the youth at the schools. The Monitor observed videos of two youth and they were very impressive with very moving and emotional messages.  The Monitor spoke to the youths who created these videos, and they were very proud of their work. Music is a great outlet for them as it allows them to express their feelings.  The Monitor is hopeful that access to the music lab can be utilized on a regular basis.

- The Youth Leadership Council ("YLC") put together requests from youth to improve quality of life at the schools. Ideas stemming from the YLC meetings that were implemented included adding chocolate milk to the menu for youth to have at supper three times per week. The facility has also moved to replace briefs as far as undergarments, moving instead to a newer supply of boxer per the request of the youth's representatives to the YLC.

- The Monitor and Plaintiffs' counsel recognized that youth need more activities available to them while in their rooms and suggested Defendants ask youth for input. During the reporting period, staff solicited input and suggestions from the YLC, then began planning and ordering items for youth rooms based on those suggestions. During the week of February 6, 2023, staff began attaching a plastic basketball hoop to the wall in all youth rooms with Velcro strips and providing all youth with a foam ball and a rubber fidget/sensory ball along with it. Staff and youth are encouraged to bring suggestions about different incentive items than what has been considered and provided to this point, and it appears that the facility typically supports looking into and providing reasonable requests. The Monitor observed many youths with the balls that came with the basketball hoop and the stress balls.  Youth told the Monitor that they like both additions.

- Discussed and implemented an incentive-based system during the reporting period to begin providing light covers to youth on February 6, 2023. These will be made available to youth who earn a Behavior Grade of A or higher. These will only be provided in units with wall

mounted lights. The facility recognized that many youths prefer a muted light, especially at night, and this provides an opportunity for youth to earn this incentive on a weekly basis.

Defendants should be commended for their continuing commitment to improving the physical plant which improves the daily lives for staff and youth. The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

<u>Education Observations</u>

The physical appearance of the school areas and classrooms were beautiful as usual. The Monitor was happy to see that youth were in class in the school.  Other than youth on stages 1 and 2 of Krueger and Wells, youth returned to the school on January 30, 2023. The majority of youth were engaged in the classrooms.  Staff repeatedly commented how happy they are that youth are more regularly going to the school for education.

However, SDP (Wells and Krueger units) do not have education in the school building unless they are on Step 3.  Through video review, the Monitor observed youth in the school area on most days in January 2023, but numbers varied during the earlier months of this reporting period.  When short staffing leads to periods of operational confinement, school is then provided on the living unit through a combination of direct instruction, workbooks, learning packets, and Edgenuity (an online education program). The problem with this approach is that youth do not have access to live in-person instruction and interactions with subject matter teachers are severely limited. Youth continue to complain that they do not like this format and are not learning as well as they were when education took place in the school area and all in-person with teachers present in every class (not Edgenuity). When youth are on computer restrictions due to accessing inappropriate material or intentionally breaking their Chromebooks, their education consists of self-taught lessons in workbooks.  For the youth who get to go to the school building, it is unclear how much live in-person teaching versus computer-based youth receive, but some youth continued to complain to Plaintiffs' counsel about education even once they returned to the school building. Nevertheless, moving back to the classroom with more access to direct teacher-led instruction is a large step forward.

As mentioned in previous reports, Defendants engaged three consultants to evaluate the educational programming at LHS/CLS. The education consultant's report was finalized and reviewed.  The report indicated similar concerns as those raised by the youth, Plaintiffs' Counsel, and the Monitor, including education on the units instead of in the school, overuse of Edgenuity, and needed improvements to services and resources for youth with disabilities, with reading difficulties, or with other special education needs. Upon receipt of the consultant's final report, the education department began evaluating the recommendations in order to prioritize its components and develop an implementation strategy that ensures compliance standards are met. The education department has continued to work closely in association with CESA-9 with regard to the report's recommendations specific to SPED resource provision, working to develop strategies that will ensure compliance with the relevant provisions of the consent decree while also striving to

complete accompanying educational benchmarks identified in the report not specified there.

In addition, youth on the first two steps of the programming at Krueger and Wells (which are at least three weeks long) only have education on the units. This is frequently only with Edgenuity, which many of the youth do not believe helps them learn.  Further, youth are expected to learn on their own for the half of each day they are confined to their rooms – something that youth raised as a concern to Plaintiffs' counsel. In addition, while there are some teachers on the units, youth only have access to the teachers outside of their room doors if they come during the half of the day when the youth are operationally confined to their rooms.

During the last reporting period, the schools worked to add language to the Teacher Supervisor position description that made direct oversight of special education programming one of that position's primary responsibilities. This reporting period that recruitment was completed all the way through to an accepted offer, however the person accepting the position will not start until February 2023 during the next reporting period. CLS graduated one student, holding the most recent graduation ceremony on December 22, 2022.

Hopefully, youth can have education daily in the school and off the living units and Defendants continue to implement the recommendations of the educational consultants.

<u>Living Unit Observations</u>

The Monitor visited each living unit that youth were housed in during the site visit (Krueger, Wells, King, Hughes, Miller, Rogers, and Roosevelt). Overall, the units and youth rooms, halls, living unit area, closets, and bathrooms were much cleaner than during the last visit. Youth were respectful and playful when interacting with the Monitor.

The unit populations ranged from one (1) (one CLS unit) to fourteen (14) (LHS) youth.  The Monitor saw staff engaging with youth more often during this site visit. In the last report, the Monitor reported that staff did not interact as much with youth because they were very busy trying to complete their duties such as meal preparation, movement, safety-welfare checks, counts, and completing documentation. Staff seemed less stressed and were regularly engaging with youth. Staff attitudes were just as positive as the last site visit.

All the youth that the Monitor interacted with were respectful and willingly communicated with the Monitor. The complaints the youth made to the Monitor were not liking the new behavioral motivation program (2 youth) and not liking the food (10 youth). The youth made several complaints to Plaintiffs' counsel which are described below. The Monitor had an opportunity to talk to many of the youth present in the day rooms.

Since the time onsite for the Monitoring visit is limited, the Monitor always reviews video of the living units on random days and times to get a better idea of what youth and staff do on the units and whether staff are positioned near youth and interacting with youth in a positive way.  The Monitor reviewed video during the reporting period (random days and times) to view living units, school, outdoor recreation, and other activities.  In every instance (30 video reviews) staff were

engaged with youth when they were out of their rooms doing a variety of activities such as:

- Eating with youth at the tables
- Watching television with youth
- Playing cards with youth (often)
- Unit staff helping youth with schoolwork
- Youth playing basketball in the gym
- DBT Group
- Youth in classrooms
- Grandparent program visiting taking place
- Youth and staff were in the music lab on several days (LHS/CLS youth)
- Youth were observed on telephones, arts and crafts, various recreation, prepping for showers and meals
- Youth and staff were cleaning
- Staff processing with youth after a Zoom call
- Youth participating in a unit group activity
- Medicine pass

On review of video, staff were engaged with youth and positioned at or near tables with youth. The body language and tone were positive from staff and youth in general on video. The Monitor did not observe mental health on unit in any of the videos and the Monitor observed fewer structured activities. The Defendants do need to work on increasing meaningful and structured programming. Hopefully, as staffing numbers increase, this will be feasible.

During this site visit, the CLS youth were housed in the Wells and King Units. There were five (5) youth total in CLS. CLS units and youth rooms were cleaner than at the last site visit. Two (2) girls were in SDP with one of the youths on Level 3. Youth were in school and in group during the site visit, so the Monitor was only able to speak to one CLS youth.

The LHS youth were housed on Krueger, Rogers, Hughes, Miller, and Roosevelt. At the time of the site visit, the units had adequate direct-care staffing. All units were extremely clean and organized. Two (2) youths were in their rooms in LHS voluntarily. Six (6) youth were in their rooms in operational confinement on Krueger due to the split schedule. Other youth on the units were standing or sitting, talking, playing cards, cleaning, and/or eating. Youth were very chatty and happy.

The Krueger and Wells living units operated as the Skills Development Programs ("SDP") at LHS and CLS respectively during this reporting period. The Krueger and Wells units are considered the "High Risk" Units. The SDP is modified programming for youth who have engaged in physically aggressive behavior, have presented a danger to others, and/or exhibited behavior that caused a major disruption to the facility.

As previously reported, DBT is provided to youth in the SDP incorporating individualized planning along with the in-person group work already assigned to youth in the SDP so that they are engaging in DBT skills and receiving feedback on a daily basis. Youth assigned to the SDP have a "Supplemental Youth Plan" created by PSU in order to specifically address their behavior.

Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team.

The Defendants have not been able to follow the daily schedule on days with staffing shortages. Krueger and Wells SDP continued to operate primarily on a two-group schedule seven days per week throughout the reporting period. However, Wells has operated in one group since January 4, 2023.

Under the current program, youth in SDP have the same property as any other youth on Level D. However, youth are confined more, visit the school building less (if not on step 3), have less access to personal property and higher end hygienic materials.  The Monitor heard from Plaintiffs' counsel that the program and property restrictions in Krueger and Wells are consistently two major complaints youth have.

There needs to be a focus on creating additional activities for all youth while operationally confined- even youth in the SDP. The Monitor is happy that Defendants did provide the basketball hoop and stress ball to youth on SDP. However, additional activities for youth are especially important in Krueger and Wells considering these youth are confined twice as much as general population units. Defendants need to think of alternatives to having two groups for operational confinement on Krueger so that youth are not disproportionally operationally confined. Some suggestions are dividing the unit or having two units operate SDP in LHS.

Also, on days when there is adequate staff, Defendants need to focus on following a daily schedule that provides for structured and meaningful activities and accountability (off the unit as much as possible) to minimize the incidents of youth acting out and should ensure staff adhere to the schedule absent an emergency.  Defendants also need to continue to focus on the new behavioral motivation system as it is already having a positive impact on the safety and security of the LHS/CLS.

<u>Youth Interviews</u>

Approximately twenty-eight (28) youth were interviewed during the site visit (formally and informally) by the Monitor and approximately twelve (12) youth were interviewed extensively prior to and during the site visit by Plaintiffs' counsel and several more informally during the tour.

In general, youth attitudes were extremely positive, and youth were very playful with the Monitoring team. Youth were much more talkative on this site visit.  They told the Monitor that they are excited for the new phones, happy to be going to school, love the music lab, and they liked the staff. As mentioned above, a couple of youth stated they did not like the new behavior motivation system, and several did not like the food. Youth did not complain to the Monitor about having to be on "split" halls or being bored in their rooms.

Most youth did tell Plaintiffs' counsel that things have improved over the last few months except for youth in Krueger and Wells (SDP program). Specifically, youth outside of Krueger and Wells stated that they were out of their rooms more frequently, went to school more often, and there were fewer uses of force and that things are running more smoothly and safely. One youth told counsel about a staff member using racist words towards him (this is being investigated by Defendants), a

few youths complained about uses of force that they thought was unwarranted and excessive, and one youth reported that staff grabbed youth by their neck, and that a couple of staff seem to antagonize the youth. Many youths complained about the new behavior motivation system, not liking Edgenuity and in at least one case not liking school in the school building either, and that youth on SDP were not getting incentives like youth on general population. Youth in Krueger continue to complain to Plaintiffs' counsel about not being able to purchase better quality hygiene products. (It is important to note that none of the youth "purchase" higher hygiene items- they earn it through positive behavior). Although these youth do receive hygiene products, this is a persistent complaint that Defendants could remedy by adjusting the incentives in the program with respect to the higher end hygiene products. One CLS youth stated that staff touched her butt during a restraint (whether intentional or accidental is unclear). The Monitor followed up with Defendants to see if there were grievances or PREA complaints regarding this and there were none. The Monitor did not watch every use of force that occurred during this reporting period, but in the ones reviewed, inappropriate touching was not observed. Defendants are investigating. Youth had more varied and detailed complaints to Plaintiffs' counsel than to the Monitor.

The Monitor observed inconsistency due to staffing challenges. When there were adequate staffing levels, youth went to school, did recreation outside, were in music lab, in the Douglass recreation unit, and spent waking hours out of their rooms. However, on days on which there were inadequate staffing levels, youth mainly stayed on their unit and were operationally confining. LHS/CLS is often operating with only 50% of normal staffing levels.

It is important that Defendants continually communicate the details of the new behavior motivation program and what the expectations are of youth and staff since this is a new program. It will take time to fully implement with fidelity and consistency. Defendants need to make sure through a rigorous quality assurance process that the program is being implemented consistently and in accordance with training, policy, and procedure. Defendants should continue to include the youths' voices for input and development of meaningful incentives and rewards through the youth council. The Monitor believes this new system of care will have a positive impact on the culture of the facility and focus on youth's positive behavior in time. Although the Monitor saw a lot of positive interactions with youth and staff, the Monitor continues to stress the need for more structured and meaningful activities as youth idleness remains a significant concern, particularly on weekends and while staff availability is limited and when youth are confined in their rooms. While Defendants operationally confine, there need to be additional resources available to youth and more in-room activities to engage youth- even for youth on Skills Development Program. The significant hiring in the youth counselor classifications and reduced population should provide more available staff which will result (and has resulted in the last couple of weeks) in youth spending more time out of their room, off units, and in the school area.

During rounds of the units, the Monitor observed that most youth were in good spirits. Youth were in classrooms, eating lunch, talking on phone, playing cards, talking with each other, visiting with Foster Grandparents, and in various Groups.

The Monitor continues to encourage staff to engage youth and have more meaningful/structured programming and activities. Defendants are in the process of hiring six treatment specialists who

will assist in providing programming to youth. It is clear that when staff engage with youth, youth respond positively. The Defendants need to continue to focus on gender-specific and culturally competent programming. As discussed later in this report, PbS data for CLS shows there is a need to evaluate the current training practices and determine if a need exists for additional gender specific training in order to improve outcomes, particularly within the use of force, fear for safety, and de-escalation skills for staff working with the female population.

In January 2023, City of Milwaukee Common Council and the Mayor have approved the rezoning of the proposed site for a new juvenile correctional facility in the northwest part of the city. Many more remain, including approval to purchase the land for the new location and finalizing the building design, before construction can even begin. As a result, completion of a new, Type 1 juvenile correctional facility in Milwaukee is still a few years away, and Lincoln Hills/Copper Lake will not close as a juvenile facility until all youth have been moved to an appropriate placement. Based on current population levels, the Milwaukee potential site will only be able to house about half of the youth. The Monitor has been made aware that under the Governor's proposed 2023-25 State Capital Budget, an additional $32.6 million for the new Type 1 in Milwaukee, another $83 million for the construction of a second Type 1, and $4 million for the exploration of a possible site for a third Type 1 facility has been proposed.

As previously mentioned, moving youth closer to locations where necessary cultural- and gender-competent programs and services are more widely available, and where family visits can be more easily accessible, will have a positive impact on youth and will allow for a larger pool of applicants to fill critical roles.

Staffing

On many days, LHS/CLS had staffing shortages during this reporting period. Staff vacancies and leaves continue to be high during this reporting period at LHS/CLS and across DOC. On average, LHS/CLS is operating at 50% of staffing levels. Staffing shortages increase the burden on those who work to maintain a safe and healthy environment for youth and staff. Defendants are working diligently to try to attract and retain staff for these critical roles and have truly created significant incentives for new and existing employees in order to help with attracting new talent and retaining current staff.

The Youth Counselor/Youth Counselor Advance staffing vacancy percentages are higher than during the last reporting period (*see below*). The new youth counselors will have to finish the requisite training thus, this increased staff should have a positive impact at LHS/CLS during the next reporting period. There are 311 total positions ("FTEs") at LHS/CLS. Approximately 138 of these positions are "direct-care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA"). The teacher vacancy rate is the same as last reporting period (6 vacancies), or 32% of positions which is not the direction the Monitor hoped for. With limited educators, Defendants will have continued difficulty with increasing the quality and quantity of education for youth. Social worker vacancies remain high at which at 64%. The percentage reduction this period is only due to the fact that Defendants reclassified a social worker position. This is a critical role that should continue to be a recruiting priority. Recruiting in general is still a challenge due to the location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and for educators, the year-round school calendar and thus, hiring needs to continue. Even with the added incentives, there is a still difficulty in

hiring many classifications of staff.

| Position | Vacancy Rate % as of March 31, 2022 | Vacancy Rate % as of October 31, 2022 | Vacancy Rate % as of January 31, 2022 |
|---|---|---|---|
| Youth Counselor | 41% (44 out of 108) | 21% (20 out of 94) | 24% (23 out of 94) |
| Youth Counselor Adv. | 20% (6 out of 30) | 21% (6 out of 28) | 32% (9 out of 28) |
| Teacher | 48% (11 out of 23) | 32% (6 out of 19) | 32% (6 out of 19) |
| Social Worker | 67% (8 out of 12) | 75% (9 out of 12) | 64% (7 out of 11) |

Specific efforts to recruit staff during this reporting period included:
- Wausau Job Center Walk-In Interviews
- Rhinelander Job Center Walk-In Interviews
- CLS/LHS specific Billboard
- Current staff sharing job opportunities on social media

The struggle to hire licensed/certified social workers continues and the vacancy rate remains high. Since the hiring of the CIRT Coordinator at the end of 2021, that position has worked to incorporate the combined efforts of CIRT's aim with that of the Committee Assigned to Safety and Health (CASH) Team. The most recent quarterly meeting of LHS/CLS Critical Incident Response Team (CIRT) was held in January. The meeting was aimed at rewarding the CIRT team members themselves for dedication over the last year steering the implementation of CIRT. The first half of the meeting addressed staff questions and concerns surrounding CIRT and welcomed four additional staff added as they completed their required critical incident stress management training in December and January. The added staff included an additional mental health professional, a supervising youth counselor, a youth counselor and program and policy analyst who will bring attributed to help strengthen the multi-disciplinary team.

Defendants continue to focus on staff wellness. Below are the employee wellness events occurring during this reporting period:

- The Committee Assigned to Safety and Health (CASH) put on staff events throughout the reporting period.

- On Thanksgiving CASH team members came in and handed out treats at shift changes. There was also a Chili contest followed by a chili dump the last weekend of November and into the beginning of December. This occurred twice on November 30th and December 7th for staff on each key in order to maximize participation.

- Leading up to Christmas, the facility held a baking contest and baking sale on two different

days to accommodate both work keys. To spread a little Holiday cheer on the bake sale days staff were able to wear their most fun holiday sweaters. On Christmas Eve and New Year's Eve the CASH committee came in and handed out treats to staff and thanked them for working on the holiday and being away from family.

- Finally, on January 16th, CASH held a fan favorite amongst staff serving Mocha Chills across shifts, an iced coffee drink that staff have said they enjoy in feedback to the committee.

The Monitor spoke to over twenty-seven (27) staff. Staff morale seemed very good overall at the time of the site visit. A review of video over the reporting period showed staff regularly engaging with youth. Staff were more talkative this site visit.

The PbS data for October 2022 reveals a significant improvement at LHS for fear for safety, dropping from 69.4% in April 2022 to 36.11%, slightly above the national average of 25.46%. CLS showed a slight improvement in reducing fear for safety, improving from 83.33% to 66.67%. Both outcome measures reflect improvements in fear for safety concerns over previous data collection cycles.

DJC has continued to develop the facilities' system of care model by developing and implementing another one of its four core components- the behavioral motivation program, which also focuses on a youth's progress in their education and treatment plans. This model involves a focus on positive youth outcomes and an improved behavior motivation program. As stated in the last report, the goal of the pilot for the new system of care was to develop a team atmosphere amongst groups of living units, consistent post assignments, and to reduce overall ordering. Given current staffing levels it was not possible to match each team with a single unit, so those teams were set into four categories: LHS General Population; LHS Skills Development and Intake; CLS Skills Development & General Population; and RRT/Control/School Patrol. Some auxiliary posts such as Care Team, Recreation and Visitation that were evenly distributed to balance out the teams. The Monitor recommends that this team approach extend to PSU and Education so that each living unit has the same team working with them. Moving the Supervisors office to the units helped create a team dynamic and add additional support. The Monitor recommends that PSU staff also move to the unit they are assigned in order to increase their support on the units. When critical staff are present and available on the units, overall safety and quality of life improves. The Monitor watched several videos of youth refusing to go to their rooms or refusing other staff directives and having PSU staff readily available on the unit could have resulted in a positive outcome.

The Monitor is very supportive of this new system of care. The "one team" approach has proved successful in other jurisdictions. Staff wellness has clearly improved over the last few monitoring periods; however, staff fear for safety issues are higher than the PbS national field averages. Improvement in the fear for safety outcome measures is occurring. CLS fear for safety continues to be a major factor. Additional training for staff on gender specific needs, issues and approaches may provide additional skills that could help reduce incidents of violence and reduce fear for safety concerns. Additionally, Defendants should analyze the data in CLS to identify the potential contributors to the fear for safety. The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives,

changes to programming, and general information as well as sharing positive outcome measure data. A major component of staff wellness is ensuring staff feel as safe as possible and are properly trained for the environment and youth needs. Improving staff wellness will certainly have a positive impact on the overall atmosphere and reduce turnover, which will then provide an opportunity to decrease the vacancy rate, reduce employee leaves and improve staffing ratios.

Facility Improvement Plan ("FIP") Progress

A thorough and in-depth review was conducted of the October 2022 PbS data collection for both LHS and CLS.  During the review, outcome measure data clarification and input was sought from both the facility PbS State and Site Coordinators.  As a result of the review, the following highlights and outcomes are noted:

LHS has one FIP open, #1012, which is focused on outcome measures Order 03 – Physical Restraint Use; Order 04 – Mechanical Restraint Use; and Order 13 – Isolation and Room Confinement Use. This FIP has been open since January 2021.  Each of the outcome measures are rated as improved and are below or better than the original goals set by the FIP.

(Note: The below charts reflect the original values or outcomes of each specific measure when the FIP was first developed and only focus on improving the outcomes measures identified within the below FIP's.  The "current value" represents the outcomes during the most data collection period, in this case October 2022.  The "average value" represents the averages over several data collection cycles and since the FIP was first developed.)

**LHS FIP #1012:**

| Outcome Measure | Original Value | Current Value | Average Value | Goal | Status |
|---|---|---|---|---|---|
| Order 03 Physical restraint use per 100 person-days of youth confinement. | 92.00 | 32.00 | 26.71 | 69.00 | G |
| Order 04 Mechanical restraint use per 100 person-days of youth confinement. | 41.00 | 15.00 | 18.63 | 30.00 | G |
| Order 13 Isolation, room confinement use for reasons not related to behavior per 100 person-days of youth confinement. | 679.00 | 7.00 | 66.37 | 340.00 | G |

CLS has two FIP's currently open, #1009 which focuses on outcome measures Order 08 – Isolation and Room Confinement.  This FIP was originally started in January 2019 and is marked as having worsened during the October 2022 data period and reflects improvement needed.

**CLS FIP #1009:**

| Outcome Measure | Original Value | Current Value | Average Value | Goal | Status |
|---|---|---|---|---|---|

| Order 08 Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement. | 29.00 | 46.00 | 8.33 | 6.00 | (R) |

The second FIP, #1011, was just recently developed and started July 2022 focusing on outcome measures Health 02; Health – 05; and Health 07.  As of the October 2022 data period, improvements have been made on outcomes measures 02 and 05.  Outcome measure 07 remains above the objective goal.

**CLS FIP #1011:**

| Outcome Measure | Original Value | Current Value | Average Value | Goal | Status |
|---|---|---|---|---|---|
| Health 02 Percent of youths presented for admission who had a health intake screening completed by trained or qualified staff in one hour or less. | 67% | 100% | 87% | 75% | (G) |
| Health 05 Percent of youths presented for admission who had an intake screening completed by trained or qualified staff in one hour or less from the time of admission. | 67% | 100% | 79% | 75% | (G) |
| Health 07 Percent of youths presented for admission whose health assessments were completed by trained or qualified staff 6 months prior to or within 7 days from admission. | 83% | 80% | 90% | 89% | (R) |

With all that said, there are a couple of outcome measures that warrant discussion.  First and foremost, is what was unquestionably a high rate of "self-requested" confinement during previous data collection cycles.  Prior data reflected 715 incidents of confinement use during the month of April 2021 (610 @ LHS and 105 @ CLS).  Of these, there were a total of 621 for self-requested confinement, representing 87% of all confinement for the facility during the month.  The outcome measures related to self-requested, or program refusals improved drastically over the course of several collection cycles. The April 2022 data shows improvement having reduced to (156) incident of confinement use at LHS and only (24) of those being recorded as self-requested or program refusals. Similarly, CLS also shows dramatic improvement in overall confinement use having reported only (18) incidents, with only (4) having been the result of self-request or program refusal.

During the October 2022 collection cycle, these trends continue to improve, falling well below the national field average, having recorded only (79) incidents of isolation/confinement at LHS with only (5) of those having been for program refusal or self-requested.  While the overall incidents of isolation/confinement at CLS increased to (48), none of those were recorded for the purposes of program refusal/self-requested.

Additionally, the previous reports discussed that the unit activity record for the Krueger Unit reflected that youth were spending approximately 20.64 hours per day in their rooms (10.5 hours reflected as sleeping time and 10.14 hours reflected as "in sleeping rooms," room confinement). The activity log for the Krueger Unit also did not reflect any hours for education.  The April 2022 data showed Krueger youth spending approximately 11.90 hours in their rooms for "sleeping" time and 0.0 hours in their rooms for other reasons.  Education hours for Krueger youth increased to approximately 5.11 hours per day (weekdays) and leisure activity time decreased to 2.83 hours per day (weekdays). This represents a larger portion of their day that is spent in more meaningful activities such as education.  However, the Monitor is still concerned with the quality and quantity of education and is hopeful that implementing the recommendations of the consultant will have positive results.

These positive trends continued during the October 2022 data collection cycle with a couple of exceptions.  The time in rooms for "sleeping" increased to 12 hours per day in all units, including Krueger.  The education hours for youth on Krueger dropped slightly to 4.39 hours.  Education hours seems to have dropped on all units to just above 4.0 hours per day (weekdays). There also seems to be a data collection issues involving operational confinement or "in sleeping rooms" as no data was reported during the April and October 2022 data cycles even though the facility is operating on a split schedule in which some youths are being operationally confined due to staffing shortages and facility operational decisions. The Monitor is unable to verify operational confinement or quality check the data as it is not being tracked or provided on an individual basis. This issue is further concerning as the facility was previously tracking operational confinement for purposes of PbS daily activity data collection. Defendants are developing the means to track operational confinement by youth utilizing the RFID System.  Once implemented, the Monitor will be able to verify the operational confinement data.

While the Monitor recognizes these improvements, it is necessary for the facility to provide more meaningful programs and activities to youth during weekday and weekend hours. While leisure time activities decrease slightly during the weekdays, it remains high making up the bulk of youths' time out of rooms to as much as 8.50 hours per day weekends and 4.50 hours per day on weekdays. This reflects a slight improvement from April 2022 which reflected 5.87 hours during weekdays and approximately 8.85 hours on weekends dedicated to leisure time. Reducing and replacing leisure time with more meaningful activities will have a positive impact on reducing incidents of violence occurring during these periods of time. It should be noted that the Monitor believes this issue as well as the education hours decline has improved during the weekdays since the October data collection as the facility returned to a full-day school schedule in January 2023. It is critical to have meaningful and structured activities at all times, but during the winter months especially when youth cannot go outside.

Finally, the Monitor encourages the facility to closely review all the PbS data and outcome measures

as a means to better understand the impacts generated from the many changes occurring within the facility. Agency and facility leadership should make it a point to review the PbS data with staff at all levels, perhaps during monthly all staff briefing meetings or during shift changes on the units. This is an opportunity to show the positive outcomes being achieved through the various changes and efforts to reduce incidents of violence, confinement, and use of restraint. The data shows fluctuating trend lines, some moving in the right direction, while others are not. These fluctuating trends can and should be expected as staff and youth adjust to the ever-changing behavior response techniques and the skill level of staff in utilizing various training, de-escalation techniques, and, as discussed earlier, in the full implementation of the behavior motivation system.

PbS Critical Outcome Measures Review

Use of Restraint Outcome Measures - Both LHS and CLS show "0" incidents of use of chemical agents (Order 6) since the October 2019 data collection cycle, which is commendable and per the Settlement Agreement. The rates of physical restraint use (Order 3 – Physical Restraint Use per 100-person days of confinement) at LHS decreased during this data cycle to a rate of 1.48 and is only slightly above the national field average rate of 1.24. The rate of mechanical restraint (Order 4 – Mechanical Restraint use per 100-person days of confinement) also declined during this rating period to a rate of 0.69, falling below the national field average rate of 0.86.

At CLS, the rates of physical restraint use (Order 3 – Physical Restraint Use per 100-person days of confinement) increased during this data cycle to a rate of 5.51, which is well above the national field average rate of 1.24. The rate of mechanical restraint (Order 4 – Mechanical Restraint use per 100-person days of confinement) also increased significantly during this rating period to a rate of 3.58, again well above the national field average rate of 0.86.

As mentioned earlier, PbS is a continuous facility improvement process which involves complex operational issues. The following two charts reveal that both physical and mechanical restraint use at LHS has improved, while the rate has increased significantly at CLS. Improvement in reducing youth idleness with meaningful programs and activities along with an improved behavior motivation program, and continued staff training, has had a significant impact on these outcome measures at LHS. Assessing and providing additional training for staff working at CLS, particularly focused on gender-specific training, could have a positive impact on reducing and ultimately improving these outcomes measures for the use of restraints at CLS. Gender specific training would help staff in responding to behavior issues in a manner that promotes de-escalation.

# Order 03

Physical restraint uses per 100 person-days of youth confinement.



(Note: PbS defines Physical Restraints as facility authorized and trained holds used by staff to subdue an otherwise uncontrollable youth in order to prevent the youth from injuring him or herself, or others.)

# Order 04

Mechanical restraint use per 100 person-days of youth confinement.



(Note: PbS defines Mechanical Restraints as Mechanical Devices used to prevent an uncontrollable youth from injuring him or herself or others. Mechanical restraints may only be used for short periods of time and must be used under medical supervision.)

The previous Monitoring reports discussed issues around the reduced use of the Care Teams which had resulted in a higher number of restraint-usage incidents. The overall trends for Outcomes 3 and 4 continue to show positive improvements, even with the noted increases above at CLS. Given the overall positive reductions in the use of physical and mechanical restraints during this PbS cycle, it appears the heightened focus on Care Teams has had a positive impact. Care Teams are designed precisely to reduce the need for the use of restraints and have been effectively shown to work at

facilities across the country and have been shown to be effective at LHS and CLS as well. The Agency and facility should continue to expand the use of the Care Team concept and ensure that direct care staff are training to properly use the Care Team as a de-escalation and use of restraint avoidance response. It is critical that direct care staff develop skills around total awareness in order to recognize the early signs of pending behavior and incidents in order to engage the Care Team members at the earliest possible opportunity. This in turn increases the opportunities for de-escalation and resolution of situations without the use of restraint. It is imperative that Care Team members not be involved in the use of physical restraint of a youth except in exceptional situations and only to protect the safety and welfare of others as this is counterproductive to the concept and does not permit the youth to begin de-escalating if they believe the Care Team member may still use physical force against them. An enhanced CARE Team approach to include building direct care staff skills in de-escalation techniques for the female population would certainly be beneficial in reducing the use of restraint practices at CLS.

The Defendants should continue to implement the core principles of the Care Team model by utilizing an agency strategic plan process that involves additional staff training in de-escalation techniques; include Care Team deployment information in shift debriefings in order to review the process and provide on-going situational training for staff; implement a Care Team response incident report that also reflects the outcome of the response in order to better track outcomes from Care Team deployments; implement the S.O.D.A.S model (Situation, Options, Disadvantages, Advantages, Solution) into the Care Team model; and, finally, the facility leadership team should incorporate daily/weekly review of all use of force/restraint incidents to evaluate if and when the Care Team should have been activated to help de-escalate a situation. This should be used as a staff training and awareness process to help staff build new skills and to help change their mindsets in how they first react to certain types of youth behaviors.

Isolation, Room Confinement and Segregation Measures – Overall, there are fluctuations in the PbS outcome measures around isolation and room confinement for the October 2022 cycle, reflecting that 100% of room confinements are terminated in under eight (8) hours at CLS and 87.50% at LHS. CLS also shows 95.65% of confinements ending in under four (4) hours, with approximately 84.72% ending in under four (4) hours at LHS. Order 13 – Isolation, room confinement use for reasons other than behavior reflects decreases at both LHS and CLS for this data period with CLS having recorded (2) incidents for a rate of 0.55 and (7) recorded at LHS for a rate of 0.32, both of which reflect rates much better than the national field average rate of 3.07.

LHS showed reduced rates of behavior related confinement practices, while CLS showed a substantial rate increase (see Order 8 Charts below). Both facilities also show dropping below the national field average for incidents of confinement NOT related to behavior, Order 13 (i.e., operational confinement). However, as previously stated, it should be noted that while operational confinement data shows "0" incidents of operational confinement during both the April and October data collection periods, this data point is misleading as more recent operational practices resulting from the staffing challenges have substantially increased operational confinement resulting from the "split" schedule. The facilities are not currently tracking operational confinement in a manner sufficient for the Monitor to verify or quality assurance check these data points as necessary for compliance per the Judgment.

# Order 08

Isolation, room confinement, segregation/special management unit use per 100 person-days of youth confinement.



(Note:  PbS defines confinement as any instance when a youth is separated from the youth population and placed in a room or cell alone for 15 minutes or longer. Youths are considered to be confined from the moment they are separated from others until they have rejoined the population. Youths may be transferred to a designated unit for confinement (e.g., a segregation dorm or program separation unit). Confinement may occur in locked or unlocked rooms but cannot occur in large dormitories. Any instance of confinement of 15 minutes or more is a reportable PbS incident event.)

# Order 13

Isolation, room confinement use for reasons not related to behavior per 100 person-days of youth confinement.



Both LHS and CLS have dramatically reduced incidents of self-separation and program refusals to levels well below and better than the national field averages. However, the Monitor has concerns regarding the quality of the data for use of confinement for purposes related to Mental Health and Consequences for rule violations as the data reflected in PbS reflect only (1) Mental Health related placement at LHS and (0) at CLS during the October 2022 data cycle.  Similarly, only (1) youth at LHS and (0) at CLS were reported as having been confined for consequences of rule violations

during the October 2022 cycle.

| Why confinement was used | Lincoln Hills | | Copper Lake | |
|---|---|---|---|---|
| Value | Count | Percent | Count | Percent |
| Self-requested | 5 | 6% | 0 | 0% |
| Mental Health | 1 | 1% | 0 | 0% |
| Protect other youths or staff | 71 | 90% | 46 | 96% |
| Give youth time to cool off | 0 | 0% | 0 | 0% |
| Consequences of rule violations | 1 | 1% | 0 | 0% |
| Other | 1 | 1% | 0 | 0% |
| Protect the youth | 0 | 0% | 2 | 4% |

**The PbS Incident reporting data for October 2022 reflects the following important data points:**

**CLS:**
➢ 96% of the incidents occurring at CLS occurred in the living unit with 92% occurring on the Wells Unit.
➢ 63% of restraints used at CLS involved three youth accounting for 21 of the 33 uses of restraints.
➢ Zero incidents of injuries to youth from suicidal behaviors were reported at CLS (Safety 6).
➢ 28% of the "assaults" at CLS involved the one youth aggressor, while 62% of "assaults" were caused by three youth.
➢ Assaults/Fights increased significantly at CLS, rising above the national field average (Safety 11).
➢ Assaults on staff also increased significantly from (4) in April 2022 to (16) in October 2022 data cycle (Safety 12).
➢ The percent of youth at CLS reporting they fear for their safety increased from 50% to 88% (Safety 13)
➢ The percent of staff reporting they fear for their safety improved, dropping from 83.33% in April 2022 to 66.67% in October 2022 (Safety 14).

**LHS:**
➢ 93% of the incidents occurring at LHS occurred in the living units.
➢ 44% of the incidents occurred in the Krueger Unit (42 total incidents).
➢ Of the (24) incidents recorded as assaults or fights, 75% of them were for an assault.
➢ There were (4) incidents recorded involving a weapon.
➢ 24 youth at LHS were responsible for 100% of the incidents of violence (assaults and fights).

➢ The incidents involving assaults or fights decreased and was slightly above the national average (Safety 11).
➢ The number of assaults on staff increased, from (8) in April 2022 to (11) in October 2022 (Safety 12).
➢ The rate of youth reporting that they fear for their safety continued to decline, falling to 21.43%, slightly above the national average of 18.53% (Safety 13).
➢ The percent of staff reporting they fear for their safety also improved, dropping from 69.49% in April 2022 to 36.11% in October 2022 (Safety 14).

## Safety 06

Suicidal behavior with injury by youths per 100 person-days of youth confinement.



CLS continues to have zero incidents of suicidal behaviors resulting in injury for the last four reporting cycles.  LHS had a slight increase during these reporting cycles, with (1) incident occurring during the October 2021 cycle; (2) incidents occurring during the April 2022 cycle; and (2) during the October 2022 cycle.

**LHS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 96 | 93% |
| No | 7 | 7% |

**CLS Did the incident occur in a living unit?**

| Value | Count | Percent |
|-------|-------|---------|
| Yes | 49 | 96% |
| No | 2 | 4% |

**LHS Incident location (living units):**

| Value | Count | Percent |
|---|---|---|
| Krueger | 42 | 44% |
| Roosevelt | 15 | 16% |
| Rogers | 15 | 16% |
| Hughes | 13 | 14% |
| Miller | 11 | 11% |

**CLS Incident location (living units):**

| Value | Count | Percent |
|---|---|---|
| Wells | 45 | 92% |
| King | 4 | 8% |

Youth and Staff Climate Surveys – Both youth and staff appear to be more responsive in utilizing the youth and staff climate surveys.  It is strongly recommended that both department and facility leadership take the time to thoroughly review the agency/jurisdiction count summaries for both the youth and staff climate surveys.  The results can be very insightful and useful for leadership.  Below are some of the survey results:

**Staff Climate Survey Results:**

**Within the last six months, have you feared for your safety in this facility?**

| Value | Count | Percent |
|---|---|---|
| Yes | 13 | 36% |
| No | 23 | 64% |

**How safe or dangerous do you feel this facility is for staff?**

| Value | Count | Percent |
|---|---|---|
| Unsafe | 26 | 46% |
| Very dangerous | 8 | 14% |
| Safe | 19 | 34% |
| Very safe | 3 | 1% |
| Not recorded | 1 | 1% |

**In your opinion, what would make this facility safer?**

| Value | Count | Percent |
|---|---|---|
| More staff | 52 | 40% |
| Training | 30 | 23% |
| Safety equipment | 28 | 21% |
| Less overcrowding | 14 | 11% |
| Other | 9 | 1% |

In regard to the above chart, the following are the top ten most requested training that staff felt would make the facility safer:

**What training would you like to see?**

| Value | Count | Percent |
|---|---|---|
| Communication | 29 | 47% |
| Appropriate staff/youth relationships | 23 | 47% |
| Safety and security | 23 | 39% |
| Verbal de-escalation | 21 | 39% |
| Gang training | 21 | 42% |
| Adolescent development | 20 | 36% |
| General behavior management | 19 | 42% |
| Ethics | 18 | 39% |
| Agency policies and procedures | 16 | 44% |
| Cultural diversity and awareness | 16 | 33% |

**October 2022 PbS Staff Climate Survey Results:**

➤ 36% of staff responses reported they fear for their safety, which is a significant improvement from the previous report of 76%.
➤ 60% of responses reported they believe the facility is unsafe or very dangerous (down from 82% in October 2021 and down from 66% in April 2022).
➤ 71% of responses indicate that staff believe they do not have authority to discipline youth appropriately.
➤ 72% of staff agree that the facility uses incentives and rewards to influence youth behaviors.

➢ Only 58% of staff feel they have the authority to reward youth appropriately.
➢ 72% of staff value family members and youths' social supports as partners in their work with the youths.

**Youth Climate Survey Results:**

**Do you fear for your safety in this facility?**

| Value | Count | Percent |
|---|---|---|
| No | 34 | 60% |
| Yes | 17 | 30% |
| Refuse to answer | 3 | 5% |
| Not Recorded | 2 | 5% |

In comparison, the youth fear for safety measure, Safety 13, has steadily improved from the previous data collection cycles at LHS, but worsened this period at CLS. Both rates still remain higher than the national field average but are improving.

**Within the last six months at this facility, have you had personal property stolen directly by force or by threat?**

| Value | Count | Percent |
|---|---|---|
| No | 31 | 55% |
| Yes | 18 | 32% |
| Refuse to answer | 4 | 7% |
| Not recorded | 3 | 5% |

**Within the last six months at this facility, have you been beaten up or threatened with being beaten up?**

| Value | Count | Percent |
|---|---|---|
| No | 37 | 66% |
| Yes | 16 | 29% |
| Refuse to answer | 2 | 4% |

**Within the last six months at this facility, has anyone forced you to engage in sexual activity?**

| Value | Count | Percent |
|---|---|---|
| No | 51 | 91% |

| Value | Count | Percent |
|---|---|---|
| Yes | 1 | 2% |
| Refuse to answer | 1 | 2% |
| Not recorded | 3 | 4% |

**Do staff members show residents respect?**

| Value | Count | Percent |
|---|---|---|
| Sometimes | 31 | 55% |
| No | 15 | 27% |
| Yes | 10 | 18% |

**Are the staff good role models?**

| Value | Count | Percent |
|---|---|---|
| Sometimes | 22 | 48% |
| No | 14 | 30% |
| Yes | 8 | 17% |
| Not recorded | 2 | 4% |

**Do staff here respect your traditions, beliefs and culture?**

| Value | Count | Percent |
|---|---|---|
| Yes | 17 | 31% |
| No | 17 | 31% |
| Sometimes | 18 | 33% |
| Refuse to answer | 1 | 2% |
| Not recorded | 2 | 4% |

**Have you talked on the phone with your parent and/or guardian?**

| Value | Count | Percent |
|---|---|---|
| Yes | 44 | 79% |
| No | 9 | 16% |
| Don't know | 2 | 4% |

| Value | Count | Percent |
|---|---|---|
| Not recorded | 1 | 2% |

**Have you gotten visits from your family?**

| Value | Count | Percent |
|---|---|---|
| No | 33 | 59% |
| Yes | 21 | 38% |
| Not recorded. | 2 | 4% |

**What would make it easier for your family to visit?**

| Value | Count | Percent |
|---|---|---|
| The facility was closer | 26 | 57% |
| The facility provided transportation* | 14 | 37% |
| The visiting hours were better | 17 | 37% |
| The facility allowed family visits | 10 | 22% |
| It was more affordable | 6 | 13% |
| The court or judge allowed my family to visit me | 4 | 9% |
| Nothing, it is already easy for my family to visit | 9 | 20% |
| Not recorded | 6 | 9% |

(*Note: DJC does provide a weekly bus visitation service. It is promoted to youth and their families during intake, contained in the materials youth and their families get upon the youth's admission to the facility, and the schedule is posted on the facilities public facing webpage.)

**When you leave here, who will you call when you need to talk or need help working out a problem?**

| Value | Count | Percent |
|---|---|---|
| Family | 38 | 83% |
| Friends | 31 | 67% |
| Social Worker/case manager | 16 | 35% |
| Teacher | 1 | 2% |
| Neighbor | 5 | 11% |

25

| Value | Count | Percent |
|---|---|---|
| Someone from church/temple | 2 | 4% |
| Police officer | 2 | 4% |
| Not recorded | 4 | 9% |
| I don't know | 2 | 4% |

- 59% of youth reported that they were involved in the development of their treatment plans.
- 60% reported that they understand the level, phase or points system. 77% report they know what level, phase, or points they are on.
- 59% reported they have not received a family visit. (Slightly improved from the October 2021 data.)
- 28% of youth responded that staff show residents respect, 52% replied sometimes.
- 17% of youth responded that staff are good role models, 38% replied sometimes.

It is further recommended that the agency, facility and the PbS team members spend considerable time reviewing the PbS Blueprint Domains, particularly those domains focused on Order; Programing, and Safety. Much can be learned from review of these outcome domains and the data associated with them, in particular those focused on youth and staff relationships.

Quality Assurance ("QA")

The Quality Assurance Program at LHS/CLS is second to none. When the Monitor first came to LHS, she showed leadership examples from several other jurisdictions to use as a potential model. They have now far exceeded expectations. DJC has a program that other jurisdictions should model. Critical information is readily available to the leadership which allows them to make proactive, data driven decisions that increases the safety of youth and staff. Again, continuous improvements have been made in data collection and in the quality assurance program.

DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. The committee has completed another round of revisions to the draft of Chapter 376. This included incorporating aspects that coincide with the new behavioral management system and current treatment model. The Committee is scheduled to meet with DJC Management team for a final review of the chapter, then it will be sent to the Office of Legal Counsel and sent to the Secretary for approval.

Chapter 376 final draft has been completed by DJC's Administrative Code committee, approved by the Secretary, and most recently reviewed by the Legislative Reference Bureau. The committee then reviewed and incorporated LRB's feedback, moving the chapter toward public commenting period. DJC's advancement of both DOC Chapter 373 and DOC Chapter 376 during the reporting period represents continued progress moving these two Chapters forward.

**Policy and Procedure Update**

The DJC Policy Committee continues to review and update policies of note to the facility.  In the October meeting, the committee reviewed the following policies which will allow for further review of facility procedure in the coming months:

1) 300.02.15 – Youth Property
2) 300.04.03 – Incentives
3) 300.05.24 – Internal and External Communications System for Emergencies

With the assistance of a new Program and Policy Analyst focused on PbS and Policy, the facility has continued to review facility procedures in conjunction with the Division's policy committee process. The coordination between the facility and division policy committee will continue to expand throughout this year and this has already allowed for the following procedures to be reviewed since the position was filled.

The following were reviewed and signed this period:

900.03.02 - Timesheets
900.03.03 - Reporting Unscheduled Absences

**COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION**

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

      1.    Punitive Confinement.

          a.    Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data does not indicate that youth are being confined for seven days for any reason.**

          b.    Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data does not indicate that youth are being confined for three days for any reason.**

    c.    Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to examine use of all forms of confinement and review incidents to ensure that staff are not using any form of confinement as punitive confinement. The Monitor QA'd whether youth came out of their room for administrative confinement at the time indicated in reports. Out of fifteen (15) reviews, all youth came out at the time indicated in documentation. This is a significant improvement from the last reporting period. Defendants are close to being in substantial compliance.**

    2.    Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of AC was significantly lower for both CLS and LHS (3 month look back). There was one youth confined over four (4) hours in this reporting period. Defendants need to continue to assess how they can more effectively provide intensive mental health services for youth**.

**July 2022**
**CLS: 35 uses of A.C. Average 132 minutes. No youth over four hours.**
**LHS: 17 uses of A.C. Average of 138 minutes. No youth over four hours.**

**August 2022**
**CLS: 43 uses of A.C. Average 144 minutes. No youth over four hours.**
**LHS: 95 uses of A.C. Average of 184 minutes. No youth over four hours.**

**September 2022**
**CLS: 33 uses of A.C. Average 144 minutes. No youth over four hours.**
**LHS: 47 uses of A.C. Average of 158 minutes. Two (2) youth over four hours.**

**October 2022**
**CLS: 40 uses of A.C. Average 153 minutes. Two (2) youth over four hours.**
**LHS: 53 uses of A.C. Average of 307 minutes. Seven (7) youth over four hours.**

**November 2022**
**CLS: 22 uses of A.C. Average 134 minutes. No youth over four hours.**
**LHS: 19 uses of A.C. Average of 210 minutes. One (1) youth over four hours (22 hours).**

**December 2022**
**CLS: 11 uses of A.C. Average 147 minutes. No youth over four hours.**
**LHS: 35 uses of A.C. Average of 172 minutes. No youth over four hours.**

**January 2023**
**CLS: 3 uses of A.C. Average 113minutes. No youth over four hours.**
**LHS: 30 uses of A.C. Average of 151 minutes. No youth over four hours.**

**The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit. 98.62%- 99.89% of checks were completed within 30 minutes during this reporting period. The Monitor reviewed video footage for random days and times (85 instances) and Defendants were 100% compliant with completing the checks in accordance with policy. Staff did an outstanding job and should be commended for their diligence in ensuring youth safety while in their rooms.**

      a. Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

          i. A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth pose a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There was one (1) youth confined for over four (4) hours during this reporting period (see response in previous question). This is a significant reduction from the last reporting period.**

**Defendants need to continue to focus on reducing AC overall, ensuring any form of room confinement is compliant with this Court Order, draft policy and procedure with AC placement criteria, and continue to QA this data.**

          ii. A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. One (1) youth was placed on extended placement in administrative confinement pending transfer out of the facility to Lincoln County Sheriff's Department.**

> b.  Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 P.M. to 8 A.M.**

> c.  Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were no youths administratively confined beyond 24 hours.**

> d.  The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. See above.**

> 3.  Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol icy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 is being utilized. The plans developed are very detailed and comprehensive. Only youth who are in imminent risk of serious self-harm to themselves/risk of self-harm will be placed in observation status. The Monitor will continue to review and monitor the practice.**

> 4.  **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

> a.  Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed on renovated units. Youth rooms were the**

cleanest the Monitor has seen since appointed. The rooms were very organized allowing staff to clearly see into the room, perform room searches more effectively, and ensure to the extent possible that there are no dangerous items in room.

As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly. However, based on the language of this section, Defendants will be in substantial compliance should this pattern continue.

> b.    Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Youth did not complain to the Monitor about access to water, regular hygiene supplies, or nighttime toilet usage. Some youth complained to Plaintiffs' counsel (specifically on SDP) that they did not receive the higher quality hygiene items that youth in general population can earn through the Behavior Motivation System. The Monitor does recommend that the Defendants reconsider the inability for youth on SDP to earn the higher-level hygiene items since they are operationally confined much longer than other units. The Monitor reviewed random video footage of living units in evening hours and observed several instances in which youth were given access to the toilet upon request. Defendants have improved their documentation and data collection.**

> c.    Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in challenges intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants continue to properly document who from PSU was notified, time of notification, and the intervention technique utilized with the youth. Examples of the crisis intervention techniques used with youth when confined can include, but are not limited to: processing of the incident, coping ahead/safety plans, in the moment skills coaching/practice of DBT skills including mindfulness, recommitment to goals, validation, time away from stressors or time for reflection/refusing, fostering insight, implementation of established Youth Plan, assistance problem-solving,**

**increase self-awareness/awareness of body sensations as indicators, Behavior Chain Analysis (formal and informal) and Thinking Report, encourage self-reflection/identify vulnerabilities, consistent redirection/limits, Behavior Intervention Protocol fostering insight/skill identification/skill practice, and plans to address conflict/safety/skills practice.**

**Clinicians are on-site for 6 hours each Saturday and Sunday. Although Defendants state that the majority of this time is spent meeting directly with youth, youth interviews and video reviews do not necessarily reflect this.  The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours in order to engage youth in a meaningful way during this time.  Because confinement can create or exacerbate mental health problems, treatment is going to be even more critical as the population continues to remain higher if the Defendants are operationally confining-especially on Krueger where youth are operationally confined twice as long as other units. The Monitor also suggests that specific PSU clinicians should work with the same youth in order to establish continuity (when possible) and should primarily work on the units. If possible, Defendants should consider putting PSU staff offices on the unit like they did with the Supervisors' offices.  This will reinforce to the youth and staff that they are "one team" servicing the youth and could be readily present to mitigate any situations.**

> d. Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general, documentation/data shows that evaluations are completed (if there is not already a mental health evaluation) within 24 hours after being placed in room confinement. The Monitor is told youth on operational confinement are being seen by PSU and evaluated for contraindication, but the Monitor has not seen documentation for youth on operational confinement and whether they are evaluated for contraindication.  Efforts to enhance the facility's capability to track confinement data utilizing additional staff and technology resources has been the undertaking of an additional program and policy analyst hired at the facility during the reporting period. The position was filled by a person with experience working directly with youth as a YC and YCA, which will help bridge the necessary set of expertise and perspective in order to both coach and instruct line staff on the use and expectations for Guardian RFID data collection, as well as integrate that data into the existing framework for quality assurance existing at the schools.**

**There were no instances of contraindication documented during this review period. Defendants need to ensure that they are meeting the criteria in this section and document any and all room confinement including operational room confinement.**

> e.     Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log   kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in         room confinement for any period in excess of 24 hours shall    receive daily contact with a mental health provider. This contact         shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE: Defendants were between 98.54%-99.55% compliant with meeting the thirty (30) minute safety and security check timeframe. Quality assurance measures are in place and when necessary, formal investigations occur. There were no formal job instructions for not completing safety and security checks. The Monitor observed safety/wellness checks being completed on various days/times on every unit during this reporting period and observed no instances in which staff did not make visual contact with youth per policy- 100% of the checks were compliant. Staff met or exceeded the 30-minute timeframe, looked into room, and the intervals were staggered.**

**PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor continues to encourage more on-site time on evenings and weekends doing groups and having one on one sessions with youth. The Monitor also recommends that PSU staff, like Supervisors, have offices on the unit and work with the same youth when possible. Unlike during the last site visit, when the monitor was reviewing unit activity via video on random days and time, PSU was not observed providing youth with services.  This is not to say that PSU are not providing services, but it seemed less prevalent than last period's review of video.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

> e.     Any youth in room confinement shall have property items similar to or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Youth continue to complain to Plaintiff's counsel about property restrictions while in the SDP. This is an area that Defendants need to re-examine. The Monitor was happy to see that the youth were provided with the basketball hoops and balls, but Defendants should consider adjusting SDP especially because youth are in operational confinement twice as long as general population youth. The Monitor understands the programming on SDP, but while youth are having to be confined through no fault of their own- there should be accommodations made. Youth in SDP do not get the same property as youth in general population which is not consistent with this required provision. Additionally, while youth are on operational room confinement, regardless of level or being on SDP, the Monitor recommends that youth be provided with activities to do that would encourage physical movement in rooms, arts, crafts, music etc. Based on the Monitor's recommendation, beginning the end of February 2023, youth on SDP will transition to level "C" from "D" affording youth with better hygiene products and fans.**

        g.      Youth in room confinement shall receive:

             1.      All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided in general.  It is difficult to assess whether these services are being provided while youth are in operational room confinement because Defendants do not track operational room confinement time per youth. The vacancy rate for social workers continues to be extremely high (67%). Social workers are critical to quality of care and services for the youth and effective re-entry planning.**

**Defendants need to ensure there is accountability with respect to the services provided by the social workers, mental and healthcare workers.**

             ii.      Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants moved to smaller group-based treatment to youth where group participation was provided on the units. This continues. Beginning in March, some housing units now utilize the school for their group treatment sessions as determined by their respective living unit's weekly schedule. The Monitor continues to encourage these groups to occur off of the living unit as much as possible. During random video review and during the site visit, the Monitor saw these services being provided.**

**Defendants need to continue to focus (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement including operational confinement. Defendants need to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress.**

iii.     Educational services with the general population to the
         extent practicable. If attending educational services with the
         general population proves unworkable due to an immediate
         and substantial threat of physical harm or an unreasonable
         risk of significant disruption to classroom instruction, youth
         in room confinement shall receive alternative educational
         services on days that the general population receives such
         services. Defendants shall ensure special education services
         for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. When short staffing leads to periods
of operational confinement, education is then provided on the unit through a combination of
direct instruction, workbooks, learning packets, and Edgenuity. On January 31, 2023, youth
began going down to the school area including SDP youth on Level 3 (SDP youth on Levels
1 and 2 complete their educational instruction on the living unit). Youth were in school during
the site visit and the Monitor saw youth more regularly in school during random video reviews.
Some youth also had difficulty learning through Edgenuity. Youth did computer and packet-
based work alone in their rooms when they were being operationally confined.  Youth told
counsel that they could not meaningfully learn because of these actions and did not like being
on the unit for class. In addition, youth who were put on computer restriction because of
damage to their tablets told Plaintiffs' counsel that they had essentially no education while
in confinement.**

**The education consultants completed their report which included recommendations.
Defendants are working on implementing many of the recommendations. There needs to be
more instruction by teachers and not self-instruction or instruction on Edgenuity, more
assistance for students with disabilities or reading problems, and mor education in the school
area which is more representative of a typical educational setting in the community.**

**As stated previously in this report, the PbS education data from October 2022 – before the
significant confinement changes in this reporting period – shows youth are receiving about
4.16 hours per day (weekdays) of education at LHS and 4.54 hours per day (weekdays) of
education at CLS.**

**The Monitor continues to suggest that Defendants should provide more art, music,
woodworking, the greenhouse, welding, and sewing and other types of programs to youth in
the evening and on weekends. The Monitor was happy to see during the site visit and through
random video review that during this reporting period, youth were able to access many of
these programs when staffing allowed. The youth expressed how much they like these
activities to the Monitor.  The Monitor understands that with the staffing challenges and
movement freezes, these types of programming are difficult to continue. However,
Defendants need to think of other activities to do while on the unit when it is necessary to
keep youth on their units for safety reasons.  This is especially true for youth who are
operationally confined who have nothing to do for the several hours a day.  Defendants have**

begun asking youth and staff for ideas of activities while in their rooms. Defendants provided some of their recommendations such as stress balls and additional art supplies. However, the Defendants should continue to focus on bringing more programming into LHS/CLS, especially culturally and gender relevant programs.

      iv.      Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. When staffing is not an issue, youth are regularly out of their rooms from 8 A.M. to 8 P.M. However, this is not the case during the time Defendants operationally confined youth due to staffing challenges. Youth in operational confinement, isolation due to Covid-19 safety measures, any confinement required, and youth working on the BIP do not participate in regular social interaction. Additionally, general population youth are not going to the school area for education unless staffing levels allow (although improved in February). Youth on SDP Levels 1 and 2 do not go to the school area for education area. Monitor regularly saw youth conversing with other youth during out time when the youth were on the units in the day room.**

      v.      Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were eighteen (18) documented instances of youth eating in their rooms which were staff imposed based on substantial threat of physical harm during this reporting period. Defendants are able to track when youth eat meals in their rooms and based on reports that the Monitor reviewed, it appears these instances were justified.**

      vi.      Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The facility continues to operationally confine youth on varied dates due to staffing shortages. However, this necessity occurred much less frequently in January-February 2023.**

**For the safety of youth and staff, Krueger and Wells SDP continued to operate primarily on a two-group schedule seven days per week throughout the reporting period. However, Wells has operated in one group since January 4, 2023. Documentation of the youth who are subject**

to operational confinement began in May. Since then, DJC has tracked and documented the use of operational confinement and the reason for its necessity. This documentation has been maintained and provided with the materials produced for the 10th of the month reports.

Efforts to enhance the facility's capability to track confinement data utilizing additional staff and technology resources has been the undertaking of an additional program and policy analyst hired at the facility. The position was filled by a person with experience working directly with youth as a YC and YCA, which will help bridge the necessary set of expertise and perspective in order to both coach and instruct line staff on the use and expectations for Guardian RFID data collection, as well as integrate that data into the existing framework for quality assurance existing at the schools.

Defendants do not track this on an individual basis, so the Monitor cannot determine how many youths are not getting at least 3 hours of out-time per day or 30 hours per week. Defendants are tracking groups of youth per unit based on scheduling.  According to their data, only two (2) youth did not receive thirty (30) hours of "out time."  Once the RFID can track this on an individual bases, the Monitor will be able to more accurately assess this provision.

> 5.  **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE.** There is a box on the incident debriefing form that is checked if staff informed the youth his or her rights regarding grievances and appeals and time of notification. A few forms did not have the box checked that youth were notified of their right within 15 minutes. During the reporting period, the quality assurance and policy staff worked to make a series of changes to the DOC forms utilized for documenting this provision. In the interim, the DOC-1844 Youth Statement still records that the youth was informed of their rights to grievance and appeal orally within 15 minutes, and on paper within one hour. This provision's completion is quality assured by requiring the youth's signature acknowledging receipt of the notifications, or in the event of the youth's refusal to acknowledge receipt, two staff signatures bearing witness to the youth having been provided the notification of rights.

Staff have been working to transition the checkbox denoting that the notification of rights was properly completed, along with the youth's signature or the signatures of the witness upon a youth's refusal, currently on the DOC-1844 to the DOC-2942 AC Notification of Rights.

The DOC-2942A was developed and moved into J-Tracker operation designed to draw the required information for the written report directly from the incident debrief form, as soon as the SYC overseeing the incident has completed their required fields for a major incident. Once the SYC has completed their required fields, a response assignment can be generated

by the SYC to the unit staff where the youth on AC is housed. Upon receipt of the response assigned, unit staff are then able to generate the DOC-2942A and deliver it to the youth.

The new process and forms have been drafted into an updated Incident Debrief procedure. Next steps will require finalizing the debrief procedure, then reinforcing the notification of rights process update while staff work to operationalize delivery of the required written AC summary report to the youth. **Youth who are confined due to staffing issues are not given these notifications of rights.**

> 6.    Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are documenting this consistently except in cases of operational confinement, including when less restrictive means were attempted. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue especially for AC. Also, documentation needs to be created that prove a youth was promptly provided with the report upon the completion of room confinement including operational room confinement.**

B.    OC-Spray and Other Chemical Agents

> 1.    OC reduction plan. Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.**

> 2.    Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

C.    Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1.  Prohibition on types and uses of mechanical restraints.

    a.  Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE.  The Monitor did not personally see any youth in mechanical restraints during site visit. Data and documentation show that there was significant decrease in use of mechanical restraints for both LHS and CLS. The Monitor reviewed several uses of force videos in which Defendants in the past would use mechanical restraints but did not now.**

    b.  Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regain control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: SUBSTANTIAL  COMPLIANCE. Below is the number of mechanical restraints uses in LHS and CLS this reporting period.**

**Uses of mechanical restraints LHS:**

| | |
|---|---|
| **Jun 2022:** | **8 uses** |
| **July 2022:** | **13 uses** |
| **August 2022** | **10 uses** |
| **September 2022:** | **11 uses** |
| **October 2022:** | **13 uses** |
| **November 2022:** | **1 use** |
| **December 2022:** | **4 uses** |
| **January 2023:** | **3 uses** |

**Uses of mechanical restraints CLS**

| | |
|---|---|
| **Jun 2022:** | **15 uses** |
| **July 2022:** | **6 uses** |
| **August 2022** | **10 uses** |
| **September 2022:** | **16 uses** |
| **October 2022:** | **13 uses** |
| **November 2022:** | **4 uses** |
| **December 2022:** | **2 uses** |
| **January 2023:** | **1 use** |

**Defendants have significantly reduced the use of mechanical restraints in both LHS and CLS.**

   c. No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

     i. Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE THIS REPORTING PERIOD. There were zero uses of restraints other than handcuffs during this reporting period. Defendants have developed policy and procedure, training, and QA measures.**

     ii. Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero uses of restraints other than handcuffs during this reporting period. They were ordered by security staff as youth posed an immediate and substantial threat of physical harm to others. Defendants need to develop policy and procedure, training, and QA measures.**

     iii. During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. See above.**

   d. Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Monitor has not observed mechanical restraints used for punishment/discipline on site visits, review of video, or documentation reviewed. The mechanical restraints policy and a subsequent facility procedure was finalized April 4, 2022. The Incident Debrief QA process, and the Use of Force Review QA process updates have overlapped to provide QA staff, POSC/MANDT instructors, and facility administration a triple layered system for scrutinizing all uses of mechanical restraints.**

   e. Youth may never be restrained to a fixed object, unless specifically

ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

      f.    Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. All safety staff equipped with mechanical restraints are trained specifically in the use of physical force, and restraints, and on proper de-escalation techniques. Ongoing internal trainings like POSC refreshers are department requirements for all safety staff, and that facility has invested to provide additional systems trainings including Mandt and Verbal Judo as examples related to this specific provision.**

      g.    Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living unit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter. As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE FOR THIS PERIOD. There were no instances of a youth being placed in mechanical restraints over 45 minutes. Defendants have created a QA process for this section. Defendants also need to ensure therapeutic interventions occur when youth are mechanically restrained in excess of 45 minutes.**

      2.    Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is now being documented as part of the Incident Debrief process.**

      D.    Strip Searches. The following provisions are effective immediately upon entry of the

Court's order incorporating this Agreement.

1.    Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possess drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches in this reporting period. The policy and procedure for Searches of Youth have been finalized. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search.**

2.    Strip searches with probable cause. Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches this reporting period. It was conducted in a private area. QA has been developed. Contraband was in fact found.**

b.    Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches during this reporting period. No youth was near the youth being strip searched. QA has been developed. The policy for searches has been finalized.**

c.    Strip searches may only be conducted by individuals of the same

gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches conducted this reporting period. The staff conducting the strip search was the same gender. QA has been developed. The policy for searches has been finalized.**

        d.    Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches this period the staff conducting the search was trained in trauma informed care.**

        e.    If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches during this reporting period. Staff was aware of the mental health status prior to the search as youth regularly attempts to self-harm. Staff did find contraband that could have been used in self-harm. Documentation has improved. Policy and procedure/QA developed.**

        4.    Documentation. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. Policy and Procedure finalized.**

        E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Defendants do provide de-escalation training to new and current staff. All safety staff are trained specifically on proper de-escalation techniques and are provided with additional systems trainings including Mandt and Verbal Judo. In addition to the internal refresher trainings all staff are required to maintain their POSC certification. Defendants should continue to focus on de-escalation skills. The Monitor observed many instances in her review of video of staff attempting to de-**

escalate youth. Additionally, staff are receiving the new Mandt de-escalation and physical intervention training, which once fully implemented, should have a positive impact on further reducing the use of restraints. The Mandt verbal de-escalation concepts are invaluable in dealing with youth in crisis. The program helps build healthy relationships between direct care staff and youth to better manage behavior and promote a healthy environment.

    **F.**    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Programming needs improvement (as discussed throughout this report) and idleness—which was already high especially during times of staff shortages.**

**As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. Administration needs to increase meaningful/structured program and activity hours to further reduce youth idleness hours. Defendants need to create additional in-room activities for youth while they are being operationally confined.**

    G.    Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018, report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants have made significant effort in implementing the strategies suggested in improving staffing ratios and staff morale. Defendants have implemented several initiatives to increase recruiting and retention. The Monitor recommends that a formal staffing assessment be completed. A staffing assessment will provide the jurisdiction with an updated analysis needed to properly maintain mandatory posts for each facility as well as identify any specific needs based on facility designs, populations, and staffing ratio needs based on incidents of violence and other unique circumstances to each facility. Staffing assessments also take into consideration the average leave usage for all types of leave used on an annual basis, to include vacations, sick leave, Worker's Compensation, FMLA, and leave associated with annual training. Ensuring that each facility has the appropriate number of FTE's to effectively manage the facility also has a direct impact on staff wellness and reducing fear for safety concerns. As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere, and environment of the facility. Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, reduces employee**

leave/vacancies, and the use of isolation and confinement.

H.   Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE. DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. The committee has completed another round of revisions to the draft of Chapter 376. This included incorporating aspects that coincide with the new behavioral management system and current treatment model. The Committee is scheduled to meet with DJC Management team for a final review of the chapter, then it will be sent to the Office of Legal Counsel and sent to the Secretary for approval.**

**Chapter 376 final draft has been completed by DJC's Administrative Code committee, approved by the Secretary, and most recently reviewed by the Legislative Reference Bureau. The committee then reviewed and incorporated LRB's feedback, moving the chapter toward public commenting period. DJC's advancement of both DOC Chapter 373 and DOC Chapter 376 during the reporting period represents continued progress moving these two Chapters forward.**

IV.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A.   **Incident review process.** Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review al l uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The 24-hour timeline is met in the vast majority of cases absent weekends. Informal reviews occur right after an incident in**

majority of cases. When it has been determined lesser means could have been used, there is a corrective action plan developed but follow up needs to occur to ensure the plans are completed (QA component). Defendants QA program is one of the best the Monitor has seen- simply put, it is exceptional.  The QA team should be commended for all the hard work and dedication to creating an extremely robust system that has increased the safety for youth and staff by allowing leadership to make proactive decisions and analyze many key data points on a daily, weekly, and monthly basis.

      **B.**     **Quality assurance**. The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**. **As discussed throughout previous reports, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff. Defendants have created an exceptional quality assurance program and have developed daily data to review that will automatically be available in order to make real time operational decisions.**

<u>**CONCLUSION**</u>

The population is trending down and is lower than the last reporting period.  Staffing issues remain but have improved due to the reduced population. During most of this reporting period, youth were still being confined to their rooms, education was still occurring on the units on many days, youth received reduced outdoor recreation time on many days. However, it should be noted that towards the end of the reporting period and into February, most youth went to school (except SDP units Levels 1 and 2) and there are/were many days where youth (outside of SDP units) were able to be out of their rooms 8 A.M. to 8 P.M. The new system of care/behavior motivation program was implemented in August, and based on a review of data, has already had a positive impact on conditions of confinement for youth. The Monitor believes there should be some modifications for the youth on SDP considering they are operationally confined twice as much as the general population.  The Monitor has been informed that some of the suggested modifications to the Behavior Motivation System for SDP youth has been implemented at the end of February 2023.

While operational confinement is not ideal, given the staffing challenges during many days in this reporting period, it does appear to be necessary in many instances.  The recommendations of the educational consultant should be implemented to improve the quality and quantity of education. It is critical that PSU have a bigger presence on the units as this can mitigate any incidents of violence and subsequent use of force.

Lastly, as the Monitor continues to state in reports to the Court, there needs to be a focus on moving youth from LHS/CLS to more appropriate setting(s) or diverting them from confinement entirely. The Defendants have identified a space for a new facility.  Although the Monitor believes this will take several years, it is a step in the right direction. Overall, the Monitor is very impressed with the positive changes and commitment by staff and leadership at LHS/CLS.

The Monitor is happy to answer any questions or address any concerns by the Court or the parties.

Respectfully Submitted,

/S/ Teresa Abreu
Teresa Abreu
Monitor