UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF
WISCONSIN

**J.J.**, by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                          Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

## SEVENTEENTH REPORT OF THE MONITOR

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Sixteenth Report of the Monitor was filed with the Court on March 8, 2023. The Monitor's seventeenth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates since the sixteenth site visit which took place on February 9, 2023.

## SITE VISIT

The seventeenth site visit by the Monitor took place on May 25, 2023. The Monitor and Plaintiffs' counsel were onsite for one day and completed necessary interviews and information gathering via in-person and virtual meetings prior to, during and after the site visit. The Monitor reviewed materials provided by the parties prior to, during, and after the site visit for the reporting period ending May 31, 2023 (February, March, April, and May 2023).  Materials included but were not limited to use of force videos, video footage of units, video footage of administrative confinement, video of safety and security checks, programming materials, investigations, daily shift reports, policies, all of the monthly data submitted to the parties per this Court Order, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Plaintiffs' counsel conducted approximately twenty-five (25) youth interviews before and during the site visit.  The Monitor toured LHS/CLS and interviewed youth and staff. The Monitor had the opportunity to talk to many of youth and staff

1

present and available during the site visit. Approximately twenty-six (26) youth and twenty-four (24) staff were interviewed by the Monitor during this site visit.

## OVERALL QUALITY OF LIFE, CONDITIONS, AND ATMOSPHERE

Introduction

The total LHS/CLS population continues to decline during this reporting period. The population is much lower compared to the last reporting period which ranged from 62-75 youths. At the time of the site visit, the population was 46 youths (1 youth off site).  Staffing levels have improved overall from last period. Although direct-care staffing vacancy rates have improved, on most days, only 50% of staff report to work due to various employee leaves. However, the current reduced population allows for adequate staffing levels.   Leadership, staff, and youth overall at LHS/CLS continue to have positive interactions with each other and the general atmosphere during the site visit was calm.  Reduced population levels have enabled some programming to resume for most youth due to the increase in staffing ratios. Although youth and staff attitudes were positive in general, youth had more complaints than on the last site visit, which is discussed in more detail below.  The uses of administrative confinement and mechanical restraints were lower in CLS this period. But the uses of administrative confinement and mechanical restraints were much higher for LHS youth. The overall operations of LHS/CLS continue to be moving in a positive direction and Defendants continue to make progress in areas of the provisions of this Agreement.

Physical Plant Observations

The entrance, grounds, visitation, school, and many other areas were clean and orderly. All units and the vast majority of youth rooms were clean and organized.  Staff and youth should be commended for their continued commitment to improving their daily lives at LHS/CLS.

Defendants continue with the following physical plant improvements:

- The video phone system that is replacing the facility Zoom program went live and was made available for youth on March 6, 2023. All legal guardians and the youth's approved visitors were notified via email, and by standard mail, as to the process for creating an account and completing the video visits. It is the approved visitor's responsibility to schedule all video visits with you, so the youth were also encouraged to reach out to their approved family and friends ensuring the system is working for them, or to report issues accessing the system to staff.
- All youth rooms on the Living units have been upgraded and replaced with LED Lighting.
- Updated and installed all new exhaust fans for youth living units to improve heating.
- New windows and doors have been installed in Wells Living Unit making that seven units completed.
- All living units have a new game room for youth (Xbox Room).
- Completed a new staff wellness work out room and created a new staff training room out of the old computer lab.
- Asphalt project has been approved and is scheduled to start beginning in June.

2

- Began the process of updating all boilers, hot water heaters and electric panels in each youth living unit.
- Put an order to replace all living unit dayroom televisions with larger televisions.
- Updated with new faucets and sinks in food service area.
- Removed old ceiling tiles in HSU and replaced them with new antimicrobial ceiling tiles.
- Updating and replacing current water fountains with new water Fountain/bottle filler combination throughout school and administrative areas.
- The Youth Leadership Council ("YLC") put together requests from youth to improve quality of life at LHS/CLS. Defendants changed clothing items for both CLS and LHS youth based on youth feedback, added items in canteen/food service to provide for more options, added hygiene items, added greeting cards so youth can send cards to loved ones, added chocolate milk, burgers with larger patties.

Defendants should be commended for their continuing commitment to improving the physical plant which improves the daily lives of staff and youth. The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

<u>Education Observations</u>

Students returned to the classroom on January 30, 2023, and remained there throughout this reporting period. The physical appearance of the school areas and classrooms were beautiful as usual. There were a lot of staff and teachers in the school area. The Monitor was happy to see that youth were in class in the school receiving traditional instruction (not relying on Edgenuity). Youth were happy that they are back to in-person instruction in the school. Some LHS youth were in the gym playing basketball and utilizing the workout equipment, CLS youth were in the library, and the other students were engaged in the classrooms.

Skills Development Program (SDP) units do not have education in the school building unless they are on Step 3.  These youth continue to receive education on the unit, including primarily on Chromebooks during any school hours they are confined in their rooms. Chromebook-based learning continues to pose a challenge for youth.

As mentioned in previous reports, Defendants engaged three consultants to evaluate the educational programming at LHS/CLS. The education consultant's report was finalized and reviewed.  The report indicated similar concerns as those raised by the youth, Plaintiffs' counsel, and the Monitor, including education on the units instead of in the school, overuse of Edgenuity, and needed improvements to services and resources for youth with disabilities, with reading difficulties, or with other special education needs. Upon receipt of the consultant's final report, the education department began evaluating the recommendations in order to prioritize its components and develop an implementation strategy that ensures compliance standards are met.

The education department has made numerous updates during the reporting period to education services, including changes to services provided to youth who require administrative confinement, or youth who are placed in the SDP. The school provides youth in Skills Development with a special education (SPED) teacher in addition to a general education teacher.  The units housing

the Skills Development Programs now have an upper day classroom dedicated to school classes where licensed SPED teachers are placed for specific social/emotional learning (SEL) support. These teachers also attend youth growth team meetings with other unit staff and work closely with PSU.

A spreadsheet has been created that monitors AC placements for youth as an indicator for potential IEP updates. 10 days/60 hours of AC during school hours triggers a manifestation determination meeting. A manifestation determination meeting is meant to help determine if the youth's recent behavior is being caused by their disability, and/or if there are modifications to the youth's IEP and its delivery that could help the student be more successful.

A contingency statement has also been added to youth IEPs stating that if a youth becomes part of the SDP program, the youth's school schedule will be modified to provide more intensive and directed services aimed at meeting the youth's behavioral/emotional needs while still providing academic supports designed to allow the student to progress back into the general education environment. The contingency statement is meant to inform students and parents and ensure that students receive their services regardless of what living unit they are in. It also makes clear that SPED youth in SDP will have access to their teachers and support staff, can participate in their IEP meetings, will receive their special education classes, and will receive Social-Emotional Learning classes.

The multidisciplinary approaches between education and the other departments have resulted in more collaboration particularly around the IEP process with PSU. Staff involved in this process are soliciting and sharing more information regarding the youth's progress, as well as the youth's emotional and behavioral concerns in regard to the school environment and filtering this information through the school psychologist. Increased efforts are being made to unify students' IEPs and Behavior Management Plans (BMPs) and to consult on students' behavior and corresponding intervention efforts.

The education department continues to use student testing, previous IEP assessment data, and any other pertinent information in a youth's educational record or through the multidisciplinary approach described above to assist in determining a student's present level of performance. The education department continues to train staff in the design of instruction and is currently working with CESA 9 on this as well as exploring continuum of support options. The process improvement implementation efforts in the education department with the support of CESA 9 will be ongoing and include staff professional development around Curriculum & Instruction (CI) and Specially Designed Instruction (SDI).

Starting on June 5, 2023, the education department contracted with North Central Technical College (NCTC) to offer dual credit welding courses to students at CLS/LHS. The curriculum constitutes 50 total hours of instruction in two classes, Introduction to Welding and Thermal Cutting. Youth enrolled in the welding program attend classes in the shop on weeknights and during the school day. The two classes allow youth to earn six (6) credits in total, three high school credits, and 3 three credits towards the welding certificate program at NCTC that are also transferrable toward any other associate degree.

Staffing levels and reduced population continue to allow for most youth to regularly have

education in the school and off the living units and Defendants continue to implement the recommendations of the educational consultants.

<u>Living Unit Observations</u>

The Monitor visited each cottage that youth were housed in during the site visit (King, Roosevelt, Black Elk, Rogers, Miller, Dubois, and Hughes). Overall, the units and youth rooms, halls, living unit area, closets, and bathrooms were very clean. Youth were respectful when interacting with the Monitor, Plaintiff's counsel, and facility leadership.

The unit populations ranged from three (3) (CLS unit) to ten (10) (LHS) youth. The Monitor saw staff engaging with youth during this site visit and the months preceding it during a review of random videos.

All the youth that the Monitor interacted with were respectful. However, youth were not as interested in talking with the Monitor as the previous site visit. Most youth were on their lunch breaks from school and seemed to want to relax and converse with their friends or play cards. A few youths complained about the food and a few thought that staff showed favoritism. Two (2) youth complained about the new staff not knowing what to do. The youth made several complaints to Plaintiffs' counsel which are described below. The Monitor had an opportunity to talk to many of the youth present in the day rooms.

Since the time onsite for the Monitoring visit is limited, the Monitor always reviews videos of the living units on random days and times to get a better idea of what youth and staff do on the units and whether staff are positioned near youth and interacting with youth in a positive way. The Monitor reviewed videos during the reporting period (random days and times) to view living units, school, outdoor recreation, and other activities. In many instances (25 videos) staff were engaged with youth when they were out of their rooms doing a variety of activities such as:

- Eating with youth at the tables
- Watching television with youth
- Playing cards with youth
- Conducting a mediation between two youths
- Youth in with the Chaplain
- Youth in classrooms
- Youth outside playing basketball
- Youth in the Douglass recreation center
- Youth and staff were in the music lab on several days
- Youth were observed on telephones, arts and crafts, various recreation, prepping for showers and meals
- Youth and staff were cleaning
- Youth on tablets
- Youth in the game room on unit

On review of video, staff were engaged with youth and positioned at or near tables with youth. The body language and tone were positive from staff and youth in general on video. The Monitor did

observe one mental health staff on unit in one of the videos and there seemed to be less structured activities observed.  The Defendants need to continue to focus on meaningful and structured programming.

During this site visit, the CLS youth were housed in King Unit. There were five (5) youth total in CLS. CLS units and youth rooms were clean. Two (2) girls were on the unit and the other three (3) youth were in school. Youth on the unit were not permitted to attend school in the building due to their status in the SDP but were playing ball and sitting and talking. Most youth had positive attitudes and engaged with leadership and the monitoring team. There was adequate staff in CLS.

The LHS youth were housed in Roosevelt, Black Elk, Rogers, Miller, Dubois, and Hughes. At the time of the site visit, the units had adequate direct-care staffing.  All units were extremely clean and organized.   Two (2) youths were on Administrative Confinement, three (3) youths were in their rooms in LHS voluntarily. Other youth on the units were standing or sitting, talking, playing cards, cleaning, and/or eating.

The Roosevelt and King living units operated as the SDP at LHS and CLS respectively during this reporting period due to some unit renovations. Usually, SDP youth are housed in Krueger and Wells. The Roosevelt and part of King units are considered the "High Risk" Units. The SDP is modified programming for youth who have engaged in physically aggressive behavior, have presented a danger to others, and/or have exhibited behavior that caused a major disruption to the facility.

As previously reported, Dialectical behavioral Therapy "DBT" is provided to youth in the SDP incorporating individualized planning along with the in-person group work already assigned to youth in the SDP so that they are engaging in DBT skills and receiving feedback on a daily basis. Youth assigned to the SDP have a "Supplemental Youth Plan" created by PSU in order to specifically address their behavior. Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team.

There needs to be a focus on creating additional activities for all youth, especially while operationally confined and regardless of behavior status (*i.e.,* even youth in the SDP). The Monitor is happy that Defendants continue to provide a basketball hoop and stress ball to youth on SDP. Additional activities for youth are especially important in Krueger considering they are confined more than the general population units. SDP includes a PAUSE in which youth are unable to progress through the levels until they meet certain expectations. For LHS PAUSE youth, they are rotated in and out of their rooms and this has been documented as "operational confinement." As recommended in the last report, Defendants need to think of alternatives to having two groups for PAUSE "operational confinement" on Krueger so that youth are not disproportionally operationally confined. Some suggestions are dividing the unit or having two units operate SDP in LHS. The Monitor and Leadership will be discussing this in the next few weeks.

Defendants need to focus on following a daily schedule that provides for structured and meaningful activities and accountability (off the unit as much as possible) to minimize the incidents of youth acting out and ensuring staff are adhering to the schedule absent an emergency.  Defendants also need to continue to focus on consistent implementation of the new behavioral motivation system as

it seems to be having a positive impact on the safety and security of the LHS/CLS.

Youth Interviews

Approximately twenty-eight (26) youth were interviewed during the site visit (formally and informally) by the Monitor and approximately twenty-five (25) youth were interviewed extensively prior to and during the site visit by Plaintiffs' counsel and several more informally during the tour.

In general, youth attitudes were not as positive as the last site visit, and youth were not playful or talkative with the Monitoring team. A couple of youth stated that the staff "are really good here" but some of the newer staff do not know what they are doing yet. A few youths complained about the food but overall, the youth preferred to socialize more with each other and staff than with the Monitor during this site visit.

Many youths did want to talk with Plaintiffs' counsel prior to and during the site visit and had more complaints than the last site visit. Youth in the Skills Development Program complained about having education on the units using Chromebooks and not attending class in the school area with live instruction. Several youths complained about not liking the new Behavior Motivation System ("BMS") and it not being evenly or consistently applied to all youth. Several youths complained that staff treated them badly. A few youths complained about staff going "hands on" too quickly and too much. Youth also complained about recreation restrictions.  Youth also complained about some staff exhibiting racist behaviors.

It is important that Defendants continually communicate the details of the new behavior motivation system and what the expectations are of youth and staff since this is still a new system and youth don't seem to have a uniform understanding of it. It will take time to fully implement with fidelity and consistency. Defendants need to make sure through a rigorous quality assurance process that the system is being implemented consistently and in accordance with training, policy, and procedure, especially with the number of new staff onboarding.  Defendants should continue to include the youths' voices for input and development of meaningful incentives and rewards through the youth council.  The Monitor believes this new system of care will have a positive impact on the culture of the facility and focus on youth's positive behavior in time.   While Defendants operationally confine, there needs to be additional resources available to youth and more in-room activities to engage youth—even for youth on Skills Development Program. The significant hiring in the youth counselor classifications and reduced population, should provide for more available staff and less operational confinement, in turn resulting in youth spending more time out of their room, off units, and in the school area.

The Monitor continues to encourage staff to engage youth and have more meaningful/structured programming and activities. The hiring of social workers should assist in this endeavor. It is clear that when staff engage with youth, youth respond positively. The Defendants need to continue to focus on gender-specific and culturally competent programming.

<u>Update Type I Facility</u>

In January 2023, the Milwaukee Common Council and Mayor approved rezoning the proposed site for a new juvenile correctional facility in the northwest part of the City. On February 3, 2023, the request for the land purchase was approved through the State Building Commission.

The state's Joint Committee on Finance (JCF) met June 1, 2023, and adopted budget provisions to fully fund the construction of the Milwaukee Type 1. The JCF serves as the principal legislative committee charged with review of all state appropriations and revenues, and it carries out a detailed review of the biennial budget recommendations of the Governor. The committee's vote to include funding for the Type 1 represents a step forward, however the final budget bill must still be approved by the Legislature and signed by the Governor. In light of these recent developments, the facility remains on track for a projected completion date in 2026.

As previously mentioned, moving youth closer to locations where necessary cultural- and gender-relevant programs and services are more widely available, and where family visits can be more easily accessible, will have a positive impact on youth and will allow for a larger pool of applicants to fill critical roles.

<u>Staffing</u>

The staffing levels at LHS/CLS have improved during this reporting period. Staff vacancies have significantly been reduced however, employee leaves continue to be high during this reporting period at LHS/CLS and across DOC. On average, LHS/CLS is operating at 50% of staffing levels. Staffing shortages increase the burden on those who work to maintain a safe and healthy environment for youth and staff. Defendants are working diligently to try to attract and retain staff for these critical roles and have truly created significant incentives for new and existing employees in order to help with attracting new talent and retaining current staff.

The Youth Counselor/Youth Counselor Advance staffing vacancy percentages are lower than the last reporting period (*see below*).   There are 311 total positions ("FTEs") at LHS/CLS. Approximately 122 of these positions are "direct care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA"). There has been an improvement in the vacancy rate for youth counselors this period. The teacher vacancy rate is higher than the last reporting period (8 vacancies), or 36% of positions, which is not the direction the Monitor hoped for.  With limited educators, Defendants will have continued difficulty with increasing the quality and quantity of education for youth. There are no social worker vacancies at the moment which is a huge improvement over the last reporting period. The salary range was increased in order to attract and retain social workers. Recruiting in general is still a challenge due to the location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and for educators, the year-round school calendar and thus, hiring needs to continue.

| Position | Vacancy Rate % as of October 31, 2022 | Vacancy Rate % as of January 31, 2023 | Vacancy Rate % as of April 30, 2023 |
|---|---|---|---|
| | | | |

| Youth Counselor | 21% (20 out of 94) | 24% (23 out of 94) | 14% (13 out of 94) |
|---|---|---|---|
| Youth Counselor Adv. | 21% (6 out of 28) | 32% (9 out of 28) | 25% (7 out of 28) |
| Teacher | 32% (6 out of 19) | 32% (6 out of 19) | 36% (8 out of 22) |
| Social Worker | 75% (9 out of 12) | 64% (7 out of 11) | 0% (0 out of 6) |

Critical hires this period are as follows:
- One Special Education Teacher
- Two new Psychological Associates are scheduled to start in June
- Twenty-one (21) new YC were hired from February 1, 2023, through April 30, 2023
- Seven additional new YCs accepted offers after April 30, 2023
- All six Social Worker positions are now filled

Specific efforts to recruit staff during this reporting period included:
- YC/YCA $4 add-on extended to the date of implementation of the 2023-2025 State of WI Compensation Plan
- NC 2 $5 add-on extended to the date of the implementation of the 2023-2025 State of WI Compensation Plan
- Some current Psychological Associates received a base pay increase due to equity
- Sign-on bonuses extended for YC, Treatment Specialist 1 & 2, Social Worker, Psych Assoc & Psych Licensed, Teacher
- DOC Recruitment commercials continue with Bally Sports (these air during major WI sports games)
- DOC Recruitment continues with billboard advertising in select areas around the state including one specific to DJC and the facility located on the corner of two densely traveled local highways

Recruiting efforts for this period include:
- UW Stevens Point Career Fair- 2/28/23
- YC Walk-In Interviews- Rhinelander Job Center- 3/20/23
- YC Walk-In Interviews- Wausau Job Center- 3/22/23
- Merrill High School Job Fair- 4/6/23
- DOC Virtual Military Open House & Career Fair- 4/19/23
- Rhinelander High School Job Fair- 4/20/23
- CLS/LHS Treatment Director presented to UW Stevens Point "Intro to Social Work" class- 4/20/23
- UW Stevens Point (Marathon County) Career Expo- 4/21/23
- YC Walk-In Interviews- Rhinelander Job Center- 5/1/23
- YC Walk-In Interviews- Wausau Job Center- 5/2/23
- Northcentral Technical College Nursing Career Fair- 5/12/23

- Medford High School Job Fair- 5/16/23

Defendants continue to focus on staff wellness. Below are the employee wellness events occurring during this reporting period:

| February 7 & 8, 2023 | Breakfast Burritos |
|---|---|
| February 10, 2023 | Therapy Dogs |
| February 15, 2023 | Wisconsin Day! |
| March 15 & 17, 2023 | St. Patrick's Day Events |
| April 5, 2023 | Treats for Teammates |
| April 9, 2023 | Easter Egg Hunt for Staff |
| April 11 & 12, 2023 | Chen family fundraiser |

The CIRT's most recent meeting was held March 30 at Wiggly Field Indoor Volleyball Court. Many of the team members came in on their days off, which showed their individual commitment to the efforts of supporting DJC's staff. The group started the morning off with a quick icebreaker intended to compel new ideas for the team. One such proposal was performing scheduled CIRT presence throughout the facility. Because the facility has a fair number of newer employees, the CIRT wants to be front and center ensuring facility staff are aware of CIRT, know what CIRT's core function and purpose is, and most importantly, avail themselves of the resources CIRT offers. Finally, staff were reminded about the important role that confidentiality plays in making CIRT successful and how CIRT members are held to a higher standard and looked up to as leaders. To conclude the meeting the CIRT team participated in a mock defusing and a mock debriefing focusing on the skills the team has been trained on and keeping those skills sharp.

May 8 through 12, was Correctional Employees Week. Throughout the first week of May, four times a day during all five weekdays, goodies for staff were delivered across all shifts for employee appreciation week plus drawings for gift cards and assorted gift baskets that in total twenty-one (21) staff won.

Numerous facility staff were nominated, and several were chosen as winners in the 2023 DOC SALUTE Awards. The SALUTE awards annually recognize employees who go above and beyond in the performance of their job duties under the categories of Service, Awareness, Leadership, Unique, Team, and Excellence.

The Monitor spoke to over twenty-four (24) staff. Staff morale seemed good overall at the time of the site visit. A review of video over the reporting period showed staff regularly engaging with youth. Staff were less talkative on this site visit, but this could be due to the time of day of the site visit (lunch break) or the fact that many of the staff were new and OJT staff were in training.

The behavioral motivation system has been fully implemented. The BMS focuses on a youth's progress in their education and treatment plans. This model involves a focus on positive youth outcomes and an improved behavior motivation system. As stated in previous reports, the goal of the pilot for the new system of care was to develop a team atmosphere amongst groups of living units, consistent post assignments, and to reduce overall ordering. The Monitor continues to recommend that this team approach extend to PSU and Education so that each housing unit has

the same team working with them.  Moving the Supervisors office to the units helped create a team dynamic and add additional support. The Monitor recommends that PSU staff also move to the unit they are assigned in order to increase their support on the units.  When critical staff are present and available on the units, overall safety and quality of life improve.

The Monitor is very supportive of this new system of care.   The "one team" approach has proved successful in other jurisdictions.  The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives, changes to programming, and general information as well as sharing positive outcome measure data. A major component of staff wellness is ensuring staff feel as safe as possible and are properly trained for the environment and youth demographics. Improving staff wellness will certainly have a positive impact on the overall atmosphere and reduce turnover, which will then provide an opportunity to decrease the vacancy rate, reduce employee leaves and improve staffing ratios.

Use of Force Reviews

The Monitor has reviewed a variety of use of force incidents during this reporting period.  Some of the incident videos showed staff using Principles of Subject Control (POSC) during physical restraints and others showed the use of Mandt.  The Mandt system is a comprehensive integrated approach to preventing, de-escalating, and if necessary, intervening, when a youth's behavior poses a threat of harm to themselves or others. While the Mandt system acknowledges the need to use physical restraints, it focuses on physical restraints being used on a youth at a lower frequency and lower duration than POSC—only in circumstances to prevent harm to staff, other youth or themselves.

The Mandt System integrates knowledge about the neurobiological impact of trauma with the principles of positive behavior interventions and provides a framework that empowers staff to do their work in a way that attempts to minimalize the use of physical intervention. The Monitor encourages the Defendants to fully implement the Mandt system strategies and techniques designed to support de-escalation and lower the potential of staff or youth injury. Defendants should incorporate facility expectations for the use of Mandt techniques and set a target date to discontinue training staff in POSC.

The two techniques (POSC and Mandt) had sharply different results. Oftentimes, the POSC restraints actually escalated physical restraint incidents, meaning youth got more upset and staff intervention was more aggressive than when the Mandt techniques were implemented, which in turn raised the potential for negative outcomes to safety for the staff and youth involved.

Quality Assurance ("QA")

The Quality Assurance Program at LHS/CLS continues to be second to none.  DJC has a program that other jurisdictions should model. Critical information is readily available to the leadership which allows them to make proactive, data driven decisions that increases the safety of youth and staff.  During this reporting period, Defendants have developed data for the requirements of this Court Order.   This is very useful tool to assess compliance with this Court Order. Again, continuous improvements have been made in data collection and in the quality assurance program.

**Policy and Procedure Update**

The DJC Policy Committee continues to review and update policies of note to the facility. In the December meeting, the committee reviewed the following policies which will allow for further review of facility procedure in the coming months:

- 100.07.04 – Bomb Threats
- 100.07.05 – Emergency Procedures for Major Chemical Spills, Gas Leaks, or Similar Emergencies
- 300.02.14 – Sale of Facility Goods
- 300.05.16 – Contraband
- 300.07.03 – Escorting and Transporting Pregnant Youth

The following policies have been reviewed and approved by administration;

- 100.07.03 – Fire Emergency Procedures
- 200.07.02 – Bomb Threats
- 300.02.15 – Youth Property
- 300.04.03 – Incentives
- 300.05. 24 – Internal and External Communication Systems for Emergencies

Administrative Code Revisions Update

DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. During this reporting period the committee met with the Office of Legal Counsel (OLC) to discuss the current draft of Chapter 373. The committee continues to refine Chapter 373 and incorporate OLC recommendations. The committee also received the final edits from OLC regarding Chapter 376 and is now in the process of reviewing suggested edits and finalizing the draft.

**COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION**

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

    1.   Punitive Confinement.

        a.   Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data does not indicate that**

**youth are being confined for seven days for any reason.**

        b.     Subject to the terms and provisions of Section V(C)(3)(g), Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data does not indicate that youth are being confined for three days for any reason.**

        c.     Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to examine their use of all forms of confinement and review incidents to ensure that staff are not using any form of confinement as punitive confinement including High-Risk Program PAUSES stage. Confinement is not appropriate during the PAUSE stage of the High-Risk Program. After discussion with the Defendants, they are reassessing the confinement for youth for the PAUSE stage of the program. In addition, the Monitor assessed whether youth came out of their room for administrative confinement at the time indicated in reports by reviewing ten (10) incidents. Nine out of ten youth came out at the time indicated in documentation. Upon further review, the one (1) youth that did not come out of room at the time indicated, was because they immediately went into operational confinement.**

        2.     Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of AC was significantly lower for CLS this period. The use of AC was much higher for LHS. There was a substantial increase in youth confined over four (4) hours in this reporting period (16 instances). Defendants need to continue to examine use of all forms of confinement and review incidents**

to ensure that staff are not using any form of confinement as punitive confinement including the High-Risk Program PAUSES stage.  Confinement is not appropriate during the PAUSE stage of the High-Risk Program. After discussion with the Defendants, they are reassessing the confinement for youth for the PAUSE stage of the program. Defendants need to continue to assess how they can more effectively provide intensive mental health services for youth.

**October 2022**
**CLS: 40 uses of A.C. Average 153 minutes. Two (2) youth over four hours.**
**LHS: 53 uses of A.C. Average of 307 minutes. Seven (7) youth over four hours.**

**November 2022**
**CLS: 22 uses of A.C. Average 134 minutes. No youth over four hours.**
**LHS: 19 uses of A.C. Average of 210 minutes. One (1) youth over four hours (22 hours).**

**December 2022**
**CLS: 11 uses of A.C. Average 147 minutes. No youth over four hours.**
**LHS: 35 uses of A.C. Average of 172 minutes. No youth over four hours.**

**January 2023**
**CLS: 3 uses of A.C. Average 113 minutes. No youth over four hours.**
**LHS: 30 uses of A.C. Average of 151 minutes. No youth over four hours.**

**February 2023**
**CLS: 3 uses of A.C. Average 128 minutes. No youth over 4 hours.**
**LHS: 49 uses of A.C. Average 241 minutes. Seven (7) youth over 4 hours. One youth 2180 minutes (approximately 36 hours).**

**March 2023**
**CLS: 14 uses of A.C. Average 109 minutes. No youth over 4 hours.**
**LHS: 19 uses of A.C. Average 108 minutes. No youth over 4 hours.**

**April 2023**
**CLS: 10 uses of A.C. Average 120 minutes. No youth over 4 hours.**
**LHS: 57 uses of A.C. Average 194 minutes. Six (6) youth over 4 hours with one youth confined for 2164 minutes (approximately 36 hours).**

**May 2023**
**CLS: 11 uses of A.C. Average 117 minutes. No youth over 4 hours.**
**LHS: 46 uses of A.C. Average 163 minutes.  Three (3) youth over 4 hours.**

**The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit. 99.25%- 99.66% of checks were completed within 30 minutes during this reporting period. The Monitor reviewed video footage for random days and times (50 reviews) and Defendants were 100% compliance with completing the checks in accordance with policy. Staff did an outstanding job and should be commended for their**

**diligence in ensuring youth safety while in their rooms.**

        a.  Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

            i.  A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth pose a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were sixteen (16) youth confined for over four (4) hours during this reporting period (see response in previous question). This is a significant increase in number of placements and the amount of time in placements from the last reporting period. Documentation shows that PSU approved the extended time.**

**Defendants need to continue to focus on reducing AC overall, ensuring any form of room confinement is compliant with this Court Order, draft policy and procedure with AC placement criteria, and continue to QA this data.**

            ii.  A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Six (6) youth were placed on extended placement in administrative confinement pending transfer out of the facility (4-MJTC, 1- released, 1-adult prison). The other ten (10) youth had a plan commenced to return the youth to general population.**

        b.  Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 P.M. to 8 A.M.**

        c.  Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were two (2) youths administratively confined beyond 24 hours who were transferred.**

        d.  The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. See above.**

> 3.  Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol policy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 is being utilized. The plans developed are very detailed and comprehensive. Only youth who are at imminent risk of serious self-harm to themselves/risk of self-harm will be placed in observation status. There were 27 youth in observation status this period. Youth were regularly seen by mental health per documentation. The Monitor will continue to review and monitor the practice.**

> 4.  **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:
>
> > a.  Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed in renovated units. Youth rooms were the cleanest the Monitor has seen since being appointed. The rooms were very organized allowing staff to clearly see into the room, perform room searches more effectively, and ensure to the extent possible that there are no dangerous items in room.**

**As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly. However, based on the language of this section, Defendants are in substantial compliance.**

> > b.  Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Youth did not complain to the**

Monitor about access to water, regular hygiene supplies, or nighttime toilet usage. A few of SDP youth complained to Plaintiffs' counsel that they did not receive the higher quality hygiene items that youth in general population can earn through the Behavior Motivation System.  Defendants have modified their practice as per recommendation by the Monitor. Defendants have improved their documentation and data collection.

     c.     Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in challenges intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants continue to properly document who from PSU was notified, time of notification, and the intervention technique utilized with the youth.

Examples of the crisis intervention techniques used with youth when confined can include, but are not limited to: processing of the incident, coping ahead/safety plans, in the moment skills coaching/practice of DBT skills including mindfulness, recommitment to goals, validation, time away from stressors or time for reflection/refusing, fostering insight, implementation of established Youth Plan, assistance problem-solving, increase self-awareness/awareness of body sensations as indicators, Behavior Chain Analysis (formal and informal) and Thinking Report, encourage self-reflection/identify vulnerabilities, consistent redirection/limits, Behavior Intervention Protocol fostering insight/skill identification/skill practice, and plans to address conflict/safety/skills practice.

Clinicians are on-site for 6 hours each Saturday and Sunday. The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours in order to engage youth in a meaningful way during this time.  Because confinement can create or exacerbate mental health problems, treatment is going to be even more critical as the population continues to remain higher if the Defendants are confining youth to their rooms for any reason. The Monitor also suggests that specific PSU clinicians should work with the same youth in order to establish continuity (when possible) and should primarily work on the units. If possible, Defendants should consider putting PSU staff offices on the unit like they did with the Supervisors' offices.  This will reinforce to the youth and staff that they are "one team" servicing the youth and could be readily present to mitigate any situations.  The Monitor did speak to a clinician on the unit who is primarily assigned to two units. The Monitor was pleased to see the clinician on the unit, and she was very familiar with the youth she worked with on the units.

     d.     Any youth placed in room confinement for whom there is not

already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. In general, documentation/data shows that evaluations are completed (if there is not already a mental health evaluation) within 24 hours after being placed in room confinement. The Monitor is told youth on operational confinement are being seen by PSU and evaluated for contraindication. The documentation has improved, and the Monitor has seen documentation for youth on operational confinement and whether they are evaluated for contraindication.**

**There were no instances of contraindication documented during this review period. Defendants need to ensure that they are meeting the criteria in this section and document any and all room confinement including operational room confinement.**

> e.  Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE: Defendants were between 99.25%-99.66% compliant with meeting the thirty (30) minute safety and security check timeframe. Quality assurance measures are in place and when necessary, formal investigations occur. There were no formal job instructions for not completing safety and security checks. The Monitor observed safety/wellness checks being completed on various days/times on every unit during this reporting period and observed no instances in which staff did not make visual contact with youth per policy- 100% of the checks were compliant. Staff met or exceeded the 30-minute timeframe, looked into room, and the intervals were staggered.**

**PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor continues to encourage more on-site time in the evenings and weekends doing groups and having one-on-one sessions with youth. The Monitor also continues to recommend that PSU staff, like Supervisors, have offices on the unit and work with the same youth when possible.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

e.      Any youth in room confinement shall have property items similar to or the same as items allowed in general population.  Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. While youth are on operational room confinement, regardless of level in the behavior management program or their status on SDP, the Monitor recommends that youth be provided with activities to do that would encourage physical movement in rooms, arts, crafts, music etc.  Based on the Monitor's recommendation, as of February 2023, youth on SDP transitioned to level "C" from "D" affording youth better hygiene products and fans. Thus, all youth on level C receive the same property regardless of where they are housed.**

g.      Youth in room confinement shall receive:

1.      All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided in general.  It is difficult to assess whether these services are being provided while youth are in operational room confinement because Defendants do not track operational room confinement time per youth. During the reporting period the DOC broad-banded the Social Worker Classification giving the facility the ability to pay employees in that classification more money than previously was possible to offer. As a result, several people who were certified social workers, but were working in different positions at CLS/LHS accepted positions back as social workers.  This is a significant improvement from the last site visit. Social workers are critical to quality of care and services for the youth and effective re-entry planning.**

**Defendants need to ensure there is accountability with respect to the services provided by the social workers, mental and healthcare workers.**

ii.      Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants moved to smaller group-based treatment to youth where group participation was provided on the units. This continues. Beginning in March, some housing units now utilize the school for their group treatment sessions as determined by their respective living unit's weekly schedule. The Monitor continues to encourage these groups to occur off of the living unit as much as possible.**

**Defendants need to continue to focus (document and QA) on providing rehabilitative programming that was scheduled/in process before placement in room confinement including operational confinement. Defendants need to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress.**

> iii.    Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. On January 31, 2023, youth began going down to the school area including SDP youth on Level 3 (SDP youth on Levels 1 and 2 complete their educational instruction on the living unit). Youth were in school during the site visit and the Monitor saw youth in school during random video reviews. Some youth also had difficulty learning through Edgenuity. The Monitor is pleased to report that education is being provided in the traditional manner which is not relying on Edgenuity for many youths. As noted above, some youth on SDP Step 1 and 2 continue to receive education on the unit and they continue to work from Chromebooks when confined to their rooms.**

**The education consultants completed their report which included recommendations. Defendants are working on implementing many of the recommendations. There needs to be a continued focus on providing more instruction by teachers and not self-instruction or instruction on Edgenuity, more assistance for students with disabilities or reading problems, and education in the school area which is more representative of a typical educational setting in the community.**

**The Monitor continues to suggest that Defendants should provide more art, music, woodworking, the greenhouse, welding, and sewing and other types of programs to youth in the evening and on weekends. The Monitor was happy to see during the site visit and through random video review that during this reporting period, youth were able to access many of these programs. As of June, youth are now able to get educational credit for welding. This will assist youth in obtaining employment when released. The youth expressed how much they like these activities to the Monitor. However, the Defendants should continue to focus**

on bringing more programming into LHS/CLS, especially culturally and gender relevant programs.

      iv.      Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Staffing levels have significantly improved this period. Youth are regularly out of their rooms from 8 A.M. to 8 P.M. During this reporting period, the general population youth are going to the school area. Youth on SDP Levels 1 and 2 do not go to the school area for education area. Monitor regularly saw youth conversing with other youth during out time when the youth were on the units in the day room.**

      v.      Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. There were eighteen (18) documented instances of youth eating in their rooms which were staff imposed based on substantial threat of physical harm during this reporting period. Defendants are able to track when youth eat meals in their rooms and based on reports that the Monitor reviewed, it appears these instances were justified.**

      vi.      Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. According to Defendants' tracking, there were sixteen (16) youth who did not receive 3 hours of out time per day and three (3) youth who did not receive at least 30 hours per week. The facility continues to confine youth on SDP who are also on PAUSE.  Defendants are strategizing on how to continue with PAUSE in SDP without rotating youth in and out of their rooms.  There was less operational confinement due to staffing shortages in this period.**

**LHS SDP unit continues to operate primarily on a two-group schedule seven days per week throughout the reporting period. However, CLS SDP unit has operated in one group since January 4, 2023. Documentation of the youth who are subject to operational confinement began in May. Since then, DJC has tracked and documented the use of operational confinement and the reason for its necessity. This documentation has been maintained and**

provided with the materials produced for the 10th of the month reports.

Defendants do not track this on an individual basis, so the Monitor cannot determine how many youths are not getting at least 3 hours of out-time per day or 30 hours per week independently. Defendants are tracking groups of youth per unit based on scheduling. According to their data, sixteen (16) youth did not meet their required 3 hours of "out time" per day and three (3) youth did not receive at least 30 hours/week of out time.  Once the RFID can track this on an individual basis, the Monitor will be able to more accurately assess this provision.

> 5. **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The DOC-2942A was developed and moved into J-Tracker operation designed to draw the required information for the written report directly from the incident debrief form, as soon as the SYC overseeing the incident has completed their required fields for a major incident. Once the SYC has completed their required fields, a response assignment can be generated by the SYC to the unit staff where the youth on AC is housed. Upon receipt of the response assigned, unit staff are then able to generate the DOC-2942A and deliver it to the youth.**

**The new process and forms have been drafted into an updated Incident Debrief procedure. There is a photo uploaded showing staff giving the notice to youth with time stamp.  Youth who are confined due to staffing issues/PAUSE are not given these notifications of rights.**

> 6. Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are documenting this consistently except in cases of operational confinement, including when less restrictive means were attempted. Documentation, data collection and reliability, and quality assurance (with video review) needs to continue especially for AC. Also, documentation needs to be created that proves a youth was promptly provided with the report upon the completion of room confinement including operational room confinement.**

B.      OC-Spray and Other Chemical Agents

1. OC reduction plan. Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been completely eliminated.**

2. Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

C. Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1. Prohibition on types and uses of mechanical restraints.

a. Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visit. Data and documentation show that there was significant decrease in use of mechanical restraints for both LHS and CLS. The Monitor reviewed several uses of force videos and there were no inappropriate uses of mechanical restraints observed.**

b. Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regain control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Below is the number of mechanical restraints uses in LHS and CLS this reporting period.**

**Uses of mechanical restraints LHS:**

**October 2022:        13 uses**
**November 2022:        1 use**

| | |
|---|---|
| **December 2022:** | **4 uses** |
| **January 2023:** | **3 uses** |
| **February 2023:** | **21 uses** |
| **March 2023:** | **2 uses** |
| **April 2023:** | **12 uses** |
| **May 2023:** | **15 uses** |

**Uses of mechanical restraints CLS**

| | |
|---|---|
| **October 2022:** | **13 uses** |
| **November 2022:** | **4 uses** |
| **December 2022:** | **2 uses** |
| **January 2023:** | **1 use** |
| **February 2023:** | **1 use** |
| **March 2023:** | **4 uses** |
| **April 2023:** | **1 use** |
| **May 2023:** | **1 use** |

**Defendants have significantly reduced the use of mechanical restraints in CLS but significantly increased the use in LHS compared to the last four-month reporting period.**

    c.    No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

        i.    Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero uses of restraints other than handcuffs during this reporting period. Defendants have developed policy and procedure, training, and QA measures.**

        ii.    Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero uses of restraints other than handcuffs during this reporting period. They were ordered by security staff as youth posed an immediate and substantial threat of physical harm to others. Defendants need to develop policy and procedure, training, and QA measures.**

        iii.    During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a

> non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. See above.**

    d.    Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Monitor has not observed mechanical restraints used for punishment/discipline on site visits, review of video, or documentation reviewed. The mechanical restraints policy and a subsequent facility procedure was finalized April 4, 2022. The Incident Debrief QA process, and the Use of Force Review QA process updates have overlapped to provide QA staff, POSC/MANDT instructors, and facility administration with a triple layered system for scrutinizing all uses of mechanical restraints.**

    e.    Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

    f.    Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. All safety staff equipped with mechanical restraints are trained specifically in the use of physical force, and restraints, and in proper de-escalation techniques. Defendants should incorporate facility expectations for the use of Mandt techniques and set a target date to discontinue training staff in POSC.**

    g.    Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living unit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter. As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE FOR THIS PERIOD. There was one instance of a youth being placed in mechanical restraints for over 45 minutes and it was approved by the Deputy Superintendent. Defendants have created a QA process for this section. Defendants also need to ensure therapeutic interventions occur when youth are mechanically restrained in excess of 45 minutes.**

> 2.  Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is regularly documented as part of the Incident Debrief process.**

> D.  Strip Searches. The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

> 1.  Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possess drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches in this reporting period. The policy and procedure for Searches of Youth have been finalized. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search.**

> 2.  Strip searches with probable cause. Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

> a. When a strip search is conducted, staff must ensure that no

unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE**. **There were (0) strip searches this reporting period. It was conducted in a private area. QA has been developed. Contraband was in fact found.**

      b.     Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches during this reporting period. No youth was near the youth being strip searched. QA has been developed. The policy for searches has been finalized.**

      c.     Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches conducted during this reporting period. The staff conducting the strip search was the same gender. QA has been developed. The policy for searches has been finalized.**

      d.     Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches this period the staff conducting the search was trained in trauma informed care.**

      e.     If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches during this reporting period. Staff were aware of the mental health status prior to the search as youth regularly attempts to self-harm. Staff did find contraband that could have been used in self-harm. Documentation has improved. Policy and procedure/QA developed.**

      4.     Documentation. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items

discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. Policy and Procedure finalized.**

    E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Defendants do provide de-escalation training to new and current staff. All safety staff are trained specifically on proper de-escalation techniques and are provided with additional systems trainings including Mandt and Verbal Judo. In addition to the internal refresher training all staff are required to maintain their POSC certification.**

**The Monitor has reviewed a variety of use of force incidents during this reporting period. Some of the incident videos showed staff using Principles of Subject Control (POSC) during physical restraints and others showed the use of Mandt. The Mandt system is a comprehensive integrated approach to preventing, de-escalating, and if necessary, intervening, when a youth's behavior poses a threat of harm to themselves or others. While the Mandt system acknowledges the need to use physical restraints, it focuses on physical restraints being used on a youth at a lower frequency and lower duration than POSC—only in circumstances to prevent harm to staff, other youth or themselves.**

**The Mandt System integrates knowledge about the neurobiological impact of trauma with the principles of positive behavior interventions and provides a framework that empowers staff to do their work in a way that attempts to minimalize the use of physical intervention. The Monitor encourages the Defendants to fully implement the Mandt system strategies and techniques designed to support de-escalation and lower the potential of staff or youth injury. Defendants should incorporate facility expectations for the use of Mandt techniques and set a target date to discontinue training staff in POSC.**

**The two techniques (POSC and Mandt) had sharply different results. Oftentimes, the POSC restraints actually escalated physical restraint incidents, meaning youth got more upset and staff intervention was more aggressive than when the Mandt techniques were implemented, which in turn raised the potential for negative outcomes to safety for the staff and youth involved.**

    F.    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts

to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor and Defendants have had many conversations/meetings regarding increased programming. As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. Defendants should continuously work to increase meaningful/structured program and activity hours to further reduce youth idleness hours.**

G. Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018, report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants have made significant effort in implementing the strategies suggested for improving staffing ratios and staff morale. Defendants have implemented several initiatives to increase recruiting and retention, particularly in the social worker classification which has resulted in all of the social worker positions being filled. The Monitor recommends that a formal staffing assessment be completed. A staffing assessment will provide the jurisdiction with an updated analysis needed to properly maintain mandatory posts for each facility as well as identify any specific needs based on facility designs, populations, and staffing ratio needs based on incidents of violence and other unique circumstances to each facility. Staffing assessments also take into consideration the average leave usage for all types of leave used on an annual basis, to include vacations, sick leave, Worker's Compensation, FMLA, and leave associated with annual training. Ensuring that each facility has the appropriate number of FTE's to effectively manage the facility also has a direct impact on staff wellness and reducing fear for safety concerns. As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere, and environment of the facility. Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, reduces employee leave/vacancies, and the use of isolation and confinement.**

H. Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE. DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. During this reporting period the committee met with the Office of Legal Counsel**

(OLC) to discuss the current draft of Chapter 373. The committee continues to refine Chapter 373 and incorporate OLC recommendations. The committee also received the final edits from OLC regarding Chapter 376 and is now in the process of reviewing suggested edits and finalizing the draft.

## IV.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A. **Incident review process.** Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review all uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The 24-hour timeline is met in the vast majority of cases absent weekends. Informal reviews occur right after an incident in majority of cases. When it has been determined lesser means could have been used, there is a corrective action plan developed but follow-up needs to occur to ensure the plans are completed (QA component). Defendants QA program is exceptional and continues to further develop the program to include compliance measures with this Court Order. The QA team should be commended for all the hard work and dedication to creating an extremely robust system that has increased the safety for youth and staff by allowing leadership to make proactive decisions and analyze many key data points on a daily, weekly, and monthly basis.**

B.    **Quality assurance**. The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. As discussed throughout previous reports, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff. Defendants have created an exceptional quality assurance program and have developed daily data to review that will automatically be available in order to make real-time operational decisions. Defendants**

**continue to further develop the program to include additional compliance measures with this Court Order.**

<u>**CONCLUSION**</u>

The population trended down, and staff vacancy rates improved resulting in improved staffing ratios in this reporting period. The Monitor was pleased that youth attended traditional education in the school area (except those on units 1 and 2 of SDP) for the entire reporting period. The recommendations of the educational consultant should continue to be implemented to improve the quality and quantity of education. Defendants need to continue to focus on programming, de-escalation training, and ensuring that the new system of care/behavior motivation system is being implemented consistently which should have a positive impact on youth by reducing administrative confinement and physical and mechanical restraints. The Monitor continues to recommend that PSU have a bigger presence on the units as this can mitigate any incidents of violence and subsequent use of force as well. Based on these video reviews, the Monitor encourages the Defendants to fully implement the Mandt system strategies and techniques designed to support de-escalation and lower the potential of staff or youth injury.

Lastly, as the Monitor continues to state in reports to the Court, there needs to be a continued focus on moving youth from LHS/CLS to more appropriate setting(s) or diverting them from confinement entirely. Overall, the Monitor continues to see progress.

The Monitor is happy to answer any questions or address any concerns of the Court or the parties.

Respectfully Submitted,

<u>/S/ Teresa Abreu</u>
Teresa Abreu
Monitor