UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF
WISCONSIN

**J.J**., by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                     Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

## EIGHTEENTH REPORT OF THE MONITOR

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Seventeenth Report of the Monitor was filed with the Court on July 5, 2023. The Monitor's eighteenth report will focus on assessing compliance with the Consent Decree, implementation of recommendations in the February 2018 technical assistance report, and comment on any observations and/or updates since the seventeenth site visit which took place on May 25, 2023.

## SITE VISIT

The eighteenth site visit by the Monitor took place on October 5, 2023. The Monitor and Plaintiffs' counsel were onsite for one day and completed necessary interviews and information gathering via in-person and virtual meetings prior to, during, and after the site visit. The Monitor reviewed materials provided by the parties prior to, during, and after the site visit for the reporting period ending September 30, 2023 (June, July, August, and September 2023). Materials included but were not limited to use of force videos, video footage of units, video footage of administrative confinement, video of safety and security checks, programming materials, investigations, daily shift reports, policies, program material, youth handbook, behavior grade incentives, all of the monthly data submitted to the parties per this Court Order, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation.  Plaintiffs' counsel conducted approximately thirty-seven (37) youth interviews before and during the site visit. The Monitor toured LHS/CLS and interviewed youth and staff. The Monitor had the opportunity to talk to many of the youth and staff present and

1

available during the site visit. Approximately twenty-six (26) youth and twenty-two (22) staff were interviewed by the Monitor during this site visit.

## OVERALL QUALITY OF LIFE, CONDITIONS, AND ATMOSPHERE

Introduction

The total LHS/CLS population increased during this reporting period. The population in June was averaging in the low 40s and steadily increased over this reporting period to the high 50s.  At the time of the site visit, the population was 55 youths (3 youth off site).  Staffing levels have improved overall from last period. Although direct-care staffing vacancy rates have improved, on most days, only 47% of staff report to work due to various employee leaves. However, the current population allows for the facility to operate without operational confinement with minimum staffing levels. Leadership, staff, and youth overall at LHS/CLS continue to have positive interactions with each other and the general atmosphere during the site visit was calm. Although youth and staff attitudes were positive in general, youth raised significant consistent concerns to Plaintiffs' counsel more than on the last site visit, which is discussed in more detail below. The uses of administrative confinement were significantly lower this period for LHS and CLS. Mechanical restraint usage was lower this reporting period for both LHS and CLS but there were more instances of youth in mechanical restraints for more than 45 minutes in LHS. This is significant considering the average daily population was higher in this reporting period. The overall operations of LHS/CLS continue to be moving in a positive direction and Defendants continue to make progress in areas of the provisions of this Agreement.

Physical Plant Observations

The entrance, grounds, visitation, school, and many other areas were very clean and organized. All units and the vast majority of youth rooms were clean and organized.  Staff and youth should be commended for their continued commitment to making LHS/CLS  "homelike" environments.

Defendants continue with the following physical plant improvements:

- The living unit boilers, water heaters, and electric panels have been replaced in eight of ten units to date.
- All the dayroom televisions were replaced with larger models for youth use.
- Televisions were installed in the upper day classroom of the units for staff to use with youth.
- Classrooms in the school were equipped with 80" monitors that serve as great instructional tools.
- The new asphalt project has started.
- New living unit sidewalks and stairways have been completed.
- New dish sterilizers have arrived and are being installed on each living unit.
- The newly renovated training center with the administration building is complete.
- Project request approved to update the main kitchen's dishwasher and sink space.
- Project request submitted for complete renovations to living unit bathrooms.

- The Music and Arts Initiative is continuing to build out and expand its video production studio space along with its capabilities.

Defendants should be commended for their continuing commitment to improving the physical plant which improves the daily lives of staff and youth. The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

Education Observations

Most students were in the school area at the time of the site visit. The physical appearance of the school areas and classrooms were beautiful as usual. The education department has made numerous updates during this reporting period, including changes to services provided to youth who require administrative confinement and youth who are in the Skills Development Program (SDP). The units housing SDP have an upper day classroom dedicated to school classes where licensed Special Education (SPED) teachers are placed for specific social/emotional learning (SEL) support, although students who are confined to their rooms have only intermittent access to any teachers and lack live instruction. SDP units have a SPED teacher in addition to a general education teacher. Step 2 SDP youth now come to the school with their home unit.

During the reporting period the Teacher Supervisor began to attend Growth Team Meetings for these youth, where they discuss needs of the youth and help reiterate the school expectations to help set the youth up for successful reintegration. When a SPED youth is placed in SDP, the Teacher Supervisor notifies the parent/guardian of the youth, and the education department continues to monitor the youth's AC placements as an indicator for potential IEP updates. The Teacher Supervisor has implemented this process during the reporting period by either sending out an email to the parent/guardian when a youth is placed in SDP or by contacting the family members directly by phone. A number of responses have indicated that this is a positive line of communication and that parents/guardians are appreciative of these updates regarding their youth's participation in school.

Current staffing levels and population levels allow for most youth to regularly have education in the school and off the living units and Defendants continue to implement the recommendations of the educational consultants. But unfortunately, educational staff vacancy rate continues to worsen (11 out of 22 positions are vacant). While on site, there was a unit (CLS) that did not have a teacher present in class. Compounding this problem, youth who must complete education on the unit complained to Plaintiffs' counsel that they do not learn much and teachers do not really teach any material. Moreover, SDP youth confined to their rooms are expected to learn on Chromebooks without live instruction while they are in their rooms. On the positive side, youth did praise teachers in the regular school building, and one noted that his teacher came on her day off to help Krueger youth. Adequate staffing levels are key to providing quality education.

Living Unit Observations

The Monitor visited each cottage that youth were housed in during the site visit (Roosevelt, Krueger, Wells, Adams, Black Elk, Curtis, Rogers, Miller, and Hughes). Overall, the units and

youth rooms, halls, living area, closets, and bathrooms were very clean. Youth were respectful when interacting with the Monitor, Plaintiffs' counsel, and facility leadership. All the living units were extremely calm. Youth were appropriately engaged with each other. The Monitor was impressed that every person in the leadership knew the youths by name. It is evident that leadership regularly visits and converses with the youth.

The unit populations ranged from four (4) to nine (9) youth. The Monitor saw staff engaging with youth during this site visit and the months preceding it during a review of random videos. All the youth that the Monitor interacted with were respectful. Youth were more talkative than last site visit.

Since the time onsite for the Monitoring visit is limited, the Monitor always reviews videos of the living units on random days and times to get a better idea of what youth and staff do on the units and whether staff are positioned near youth and interacting with youth in a positive way. The Monitor reviewed videos during the reporting period (random days and times) to view living units, school, outdoor recreation, and other activities. In most instances (18 videos over several hours each) staff were engaged with youth when they were out of their rooms doing a variety of activities such as:

- Eating with youth at the tables.
- Watching television with youth.
- Playing cards with youth.
- Conducting growth meetings.
- Youth in classrooms.
- Youth interacting with social workers, CARE team, mental health, and volunteers.
- Youth outside playing basketball.
- Youth in the Douglass recreation center.
- Youth and staff were in the music lab.
- Youth were observed on telephones.
- Youth and staff were observed playing chess.
- Youth cleaning the units.

On review of video, staff were engaged with youth and positioned at or near tables with youth. The body language and tone were positive from staff and youth in general on video. The Defendants need to continue to focus on meaningful and structured programming. Youth continue to complain that they have nothing to do in and out of their rooms.

During this site visit, the CLS youth were housed in the Wells Unit. The unit was decorated nicely for Halloween and very clean. There were six (6) youth total in CLS at the time of the site visit. CLS unit and youth rooms were clean. Four (4) youth were on the unit and two (2) youth were in school. Youth on the unit were not permitted to attend school in the building due to their status in the SDP but were sitting and talking. Most youth had positive attitudes and engaged with leadership and the monitoring team. There was adequate staff in CLS- three (3) staff on the unit. However, there was not a teacher available for the CLS youth in the classrooms, which prevented them from engaging in schoolwork.

The LHS youth were housed in Roosevelt, Krueger, Adams, Black Elk, Curtis, Rogers, Miller,

Hughes. At the time of the site visit, the units had adequate direct-care staffing. All units were extremely clean and organized. Three (3) youths were in their rooms for administrative confinement in Krueger. Other youth on the units were in outdoor recreation, standing or sitting, talking, playing cards, on the telephone, playing chess with staff, and cleaning.

The Krueger and Wells living units housed youth in the SDP at LHS and CLS respectively during this reporting period. The SDP is modified programming for youth who have engaged in physically aggressive behavior, have presented a danger to others, and/or have exhibited behavior that caused a major disruption to the facility.

As previously reported, Dialectical Behavioral Therapy "DBT" is provided to youth in the SDP incorporating individualized planning along with the in-person group work already assigned to youth in the SDP so that they are engaging in DBT skills and receiving feedback on a daily basis. Youth assigned to the SDP have a "Supplemental Youth Plan" created by PSU to specifically address their behavior. Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team. The Monitor observed youth engaged with their home units during the transition period.

One concern the Monitor has is that there is too much idle time for youth. There needs to be a focus on creating additional activities for all youth, especially while operationally confined and regardless of behavior status (*i.e.*, even youth in the SDP). Youth complained to the Monitor and Plaintiffs' counsel that they are bored and need more activities. Additional activities for youth are especially important in Krueger considering they are confined more than the general population units. SDP includes a PAUSE in which youth are unable to progress through the levels until they meet certain expectations. For LHS PAUSE youth, they are rotated in and out of their rooms. As recommended in the last report, Defendants need to think of alternatives to having two groups for PAUSE modified program confinement in SDP. Although the Monitor discussed suggestions, Defendants continue to rotate youth in and out of their rooms while on PAUSE in SDP even though the Monitor believes that there is adequate staffing to support the youth being out of their rooms.

Youth Interviews

Approximately twenty-two (22) youth were interviewed during the site visit (formally and informally) by the Monitor and approximately thirty-seven (37) youth were interviewed extensively prior to and during the site visit by Plaintiffs' counsel and several more informally during the tour.

In general, youth attitudes were more positive than the last site visit in the Monitor's opinion. The Monitor had an opportunity to talk to many of the youth present in the day rooms. Youths' major complaint to the Monitor was being bored. However, youth also informed the Monitor that they wanted more school time, wanted to go outside more, wanted staff to engage with them more, and did not like the behavior motivation system. Multiple youth reported to Plaintiffs' counsel that the teachers who come down to lower day when youth are out do not teach any lessons, do not care, and merely distribute optional work. The youth described a very chaotic environment not conducive to actual learning. On the positive side, youth did praise teachers in the regular school building, and one noted that his teacher came on her day off to help Krueger youth. Youth reported

that there is very little to do in their rooms. They stated that they are allowed reading and writing material, but that is not enough to keep them occupied. One youth wished he could draw and merely wanted a few "reference pictures" to help him. Another youth noted that it wouldn't be as bad to be in the room if they had electronics, but now they're just "just looking at the wall or talking to themself." Youth also report that there is little to do even during their limited "out time." Youth are not allowed to go outside or make phone calls during "school hours," but youth repeatedly pointed out how unfair this is given that no actual instruction or learning is taking place during those hours currently.

Youth also reported to the Monitor and repeatedly to Plaintiffs' counsel that they have many concerns about the behavior motivation system ("BMS"). There was a significant increase in the number of youths who made these complaints to Plaintiffs' counsel prior to and during the site visit. Youth complained that staff apply violations inconsistently. For example, some staff let things slide while other staff will assign a "high violation," which automatically puts the youth on PAUSE. Youth are upset that they are often put on PAUSE for unnecessary reasons, such as based on their body language alone. In almost every call with counsel, youth bring up how unfair they feel the BMS is. Youth feel staff are quick to exercise their power and hand out "negative" points but rarely recognize youth with positive points. Data on youth at CLS/LHS during the monitor visit shows the aggregate percentage of prosocial versus noncompliant behaviors to be 84.5% prosocial and 15.5% noncompliant. Expanding to cover the entire reporting period that ratio increased to 90% / 10% which is an appropriate ratio.

It is important that Defendants continually communicate the details of the new behavior motivation system and what the expectations are of youth and staff since youth do not seem to have a uniform understanding of it. Defendants need to make sure through a rigorous quality assurance process that the system is being implemented consistently and in accordance with training, policy, and procedure, especially with the number of new staff onboarding and with the number of youth complaints of inconsistency.  Defendants should continue to include the youths' voices for input and development of meaningful incentives and rewards through the youth council. One youth told the Monitor that he made a recommendation to the unit's representative to bring to the council.

There needs to be additional resources available to youth and more in-room activities to engage youth, especially for youth on Skills Development Program. The significant hiring in the youth counselor classifications and population level has provided for more available staff resulting in youth spending more time out of their rooms, off unit, and in the school area and no operational confinement other than youth placed on a Program Pause in SDP.

The Monitor continues to encourage staff to engage youth and have more meaningful/structured programming and activities. The Defendants need to continue to focus on gender-specific and culturally competent programming.

Update Type I Facility

On August 9, 2023, Governor Evers announced that the Wisconsin State Building Commission approved funding for several key projects across the state, including the construction of a Type 1 Juvenile Correctional Facility in Milwaukee County and the planning and development of a second

Type 1 facility in Dane County.

The construction of the new facility and planning and development for a second will make it possible for more youth to be located closer to their homes and will move the state forward in being able to close CLS/LHS. The projected timeline for completion of the Type 1 facility located at W. Clinton Avenue in Milwaukee remains on track for 2026. Moving youth to smaller facilities closer to their homes will facilitate greater family involvement, connection to school and community, and should improve outcomes.

Staffing

The staffing levels (excluding educational staff) at LHS/CLS have improved slightly during this reporting period. Staff vacancies have been slightly reduced however, employee leaves continue to be high during this reporting period at LHS/CLS and across DOC. On average, LHS/CLS is operating at 47% of staffing levels. Defendants are working diligently to try to attract and retain staff for these critical roles and have truly created significant incentives for new and existing employees to help with attracting new talent and retaining current staff.

The Youth Counselor/Youth Counselor Advance staffing vacancy percentages are lower than the last reporting period (*see below*). There are 311 total positions ("FTEs") at LHS/CLS. Approximately 122 of these positions are "direct care" staff (Youth Counselor/Youth Counselor Advanced ("YC/YCA"). There has been an improvement in the vacancy rate for youth counselors this period and there are no social worker vacancies, which is huge improvement from a year ago. However, there is a shortage of Treatment Specialists and teachers. Treatment Specialists 2 lead DBT groups and are responsible for program PAUSES, behavior chains, other treatment responses to behavior, and participate in Growth meetings. The shortage results in staff having to be assigned to two or more units. Ideally, Treatment Specialists should be assigned to one unit so that they can focus on a smaller group of youth. The teacher vacancy rate is higher than the last reporting period (11 vacancies), or 50% of positions, which is not the direction the Monitor hoped. With limited educators, Defendants will have continued difficulty with increasing the quality and quantity of education for youth. These vacancies are having a negative impact on the youth. Recruiting in general is still a challenge due to the location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and for educators, the year-round school calendar and thus, hiring needs to continue.

| Position | Vacancy Rate % as of January 31, 2023 | Vacancy Rate % as of April 30, 2023 | Vacancy Rate % as of October 1, 2023 |
|---|---|---|---|
| Youth Counselor | 24% (23 out of 94) | 14% (13 out of 94) | 6% (6 out of 94) |
| Youth Counselor Adv. | 32% (9 out of 28) | 25% (7 out of 28) | 25% (7 out of 28) |
| Teacher | 32% (6 out of 19) | 36% (8 out of 22) | 50% (11 out of 22) |

| Social Worker | 64% (7 out of 11) | 0% (0 out of 6) | 0% (0 out of 6) |
|---|---|---|---|

Recruiting efforts for this period include:

- YC Walk-In Interviews - Rhinelander Job Center - 6/12/23
- YC Walk-In Interviews - Wausau Job Center - 6/13/23
- YC Walk-In Interviews - Wausau Job Center - 7/25/23
- YC Walk-In Interviews - Rhinelander Job Center - 7/27/23
- Recruitment booth - Lincoln CO Fair 8/16 to 8/20/23

Defendants continue to focus on staff wellness. The Critical Incident Response Team (CIRT) began conducting rounds during shift this reporting period to broaden their outreach and raise awareness about resources available to staff through CIRT. The facility has many staff who are relatively new in addition to CIRT itself being a more recently implemented initiative, so team members have sought to make all staff aware of CIRT. This has been very well received by many staff.

The most recent quarterly CIRT meeting was held in July 2023. Topics included scheduling refresher training for the current CIRT membership with the same Critical Incident Stress Management trainer who initially helped certify CIRT members to sharpen and retain their acquired skills. CIRT resource materials, including the CIRT brochure and various handouts, were updated to reflect current membership and resources available to staff. Finally, the team members conducted mock defusing and debriefing scenarios followed by review and discussion amongst the team to again help sharpen and hone their skills in confronting what can often present as challenging scenarios. The session concluded with an emphasis on the importance of self-care and its contribution to a wider climate of staff wellness.

The Committee Assigned to Safety and Health (CASH) utilized its past event planning and fundraising experience to expand its outreach by developing a Coworker Care fund. When facility staff become aware that a coworker or their family may be experiencing particularly tough circumstances, the situation can be brought to the attention of CASH. As staff came to the CASH with these instances, they gauged it as a real indication of how much people care and want to support one another at the facility. Beginning in July, CASH planned four different fundraising events and made arrangements to help people on all shifts enjoy the meal and participate, even if their schedules did not allow them to be present in the courtyard at the scheduled times. All proceeds went to a separate fund designated for disbursement to staff that experience an overwhelmingly tough time. Through its first four events the fund raised over $2,000.

Additional staff wellness activities included:

- July 11 and July 12, 2023: Burgers in the courtyard! A $5 donation purchased staff a burger, chips, pickle, and a drink.
- July 19 and 20, 2023: BBQ in the courtyard! A $5 donation purchased staff a sandwich, chips, pickle, and a drink.

- July 4th Pie in the Face Day.
- CASH put on the 4th of July Face Full of Pie Fundraiser for the first time in 2022.
- The pie throwing celebration was held August 3 and raised over $500 again this year.
- Keep Calm and Back the Pack- During football season, all staff can wear jeans along with their team's apparel on Gameday or the Friday before a game in support of their favorite team.

The Monitor spoke to over twenty-two (22) staff. Staff morale seemed very good overall at the time of the site visit. A review of video over the reporting period showed staff regularly engaging with youth. Staff were more talkative on this site visit. The new staff who were on-the-job training expressed their excitement to begin their positions. Staff also said to the Monitor that they felt safe at the facility. One staff playing chess with a youth told the Monitor that the youth was teaching her how to play because she did not know how when she came to the LHS.

The Monitor continues to stress the need to continue making staff wellness a major focus moving forward and continue to communicate with staff on any initiatives, changes to programming, and general information as well as sharing positive outcome measure data. A major component of staff wellness is ensuring staff feel as safe as possible and are properly trained for the environment and youth demographics. It appears that Defendants have improved in this area based on observations and conversations with staff.  Improving staff wellness will certainly have a positive impact on the overall atmosphere and reduce turnover, which will then provide an opportunity to decrease the vacancy rate, reduce employee leaves and improve staffing ratios.

Use of Force Reviews

The Monitor reviewed several uses of force incidents during this reporting period. Appropriate force was used in each instance. However, it would have been helpful to have the CARE team present to attempt to de-escalate the situation in some instances and in two instances staff could have responded quicker. In the last report the Monitor encouraged the Defendants to fully implement the Mandt system strategies and techniques designed to support de-escalation and lower the potential of staff or youth injury. The Monitor also recommended that the Defendants should incorporate facility expectations for the use of Mandt techniques and set a target date to discontinue training staff in POSC. The Monitor is happy to report that POSC will be discontinued during the next reporting period and starting in 2024, only MANDT will be trained.

Quality Assurance ("QA")

The Quality Assurance Program at LHS/CLS continues to be second to none. DJC has a program that other jurisdictions should model. Critical information is readily available to the leadership which allows them to make proactive, data driven decisions that increases the safety of youth and staff.  The QA team has greatly expanded data collection and quality using Guardian RFID during this and last reporting periods. Examples of confinement tracking, as well as the most detailed and reliable out time records related to three (3) hours daily and thirty (30) hours weekly. During the last reporting period, Defendants have developed data for the requirements of this Court Order. The dashboard has been more refined during this reporting period. This is an especially useful tool to assess compliance with this Court Order. Again, continuous improvements have been made in

data collection and in the quality assurance program.

<u>Administrative Code Revisions Update</u>

DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. During this reporting period the committee met with the Office of Legal Counsel (OLC) to discuss the current draft of Chapter 373. The committee continues to refine Chapter 373 and incorporate OLC recommendations. The committee also received the final edits from OLC regarding Chapter 376 and is now in the process of reviewing suggested edits and finalizing the draft. When considering the projected timelines for moving Wisconsin Administrative Code revisions through the rulemaking process, DJC's advancement of both DOC Chapter 373 and DOC Chapter 376 during the reporting period represents progress moving these two Chapters, most directly implicated by the consent decree, to having the amendments adopted.

## COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

1. Punitive Confinement.

   a. Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data shows one youth  was confined for seven (7.35)  days pending transfer out of LHS. However, this was not for punitive reasons.**

   b. Subject to the terms and provisions of Section V(C)(3)(g),
      Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room  confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data indicates that one youth was confined for four (4.79) days pending transfer out of LHS. However, this was not for punitive reasons. The Monitor still suggests Defendants limit any extended room confinement such as this, especially for youth with mental health needs.**

   c. Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants need to continue to examine their use of all forms of confinement and review incidents to ensure that staff are not using any form of confinement as punitive confinement including High-Risk Program PAUSE stage. Confinement is not appropriate during the PAUSE stage of the High-Risk Program. The Monitor continues to recommend that the Defendants reassess the confinement for youth for the PAUSE stage of the program. Additionally, when there are extended periods of time for youth transferring to MJTC, Defendants rotated youth pending transfer in and out of their room with restraints. These are very limited circumstances, however; the Monitor recommends the parties discuss this further and that Defendants document any restraints as required by the Consent Decree.**

2.   Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of AC was lower for both CLS and LHS this period. No CLS youth were confined administratively for more than four (4) hours. Approximately the same number of youths were confined for over (4) four hours during this reporting period for LHS. However, there were instances where LHS youth were confined for longer period of times pending transfer to MJTC due to bed availability. Defendants need to continue to examine use of all forms of confinement and review incidents to ensure that staff are not using any form of confinement as punitive confinement including the SDP PAUSE stage. Confinement is not appropriate during the PAUSE stage of the SDP Program. Defendants need to reconsider confining youth during the PAUSE stage of the program. Additionally, when there are extended periods of time for youth transferring to MJTC, defendants rotated youth pending transfer in and out of their room with restraints. These are very limited circumstances however; the Monitor recommends the parties discuss this further and that Defendants document any restraints as required by the Consent Decree.**

**January 2023**
**CLS: 3 uses of A.C. Average 113 minutes. No youth over four hours.**
**LHS: 30 uses of A.C. Average of 151 minutes. No youth over four hours.**

**February 2023**
**CLS: 3 uses of A.C. Average 128 minutes. No youth over 4 hours.**
**LHS: 49 uses of A.C. Average 241 minutes. Seven (7) youth over 4 hours. One youth 2180 minutes (approximately 36 hours).**

**March 2023**
**CLS: 14 uses of A.C. Average 109 minutes. No youth over 4 hours.**
**LHS: 19 uses of A.C. Average 108 minutes. No youth over 4 hours.**

**April 2023**
**CLS: 10 uses of A.C. Average 120 minutes. No youth over 4 hours.**
**LHS: 57 uses of A.C. Average 194 minutes. Six (6) youth over 4 hours with one youth confined for 2164 minutes (approximately 36 hours).**

**May 2023**
**CLS: 11 uses of A.C. Average 117 minutes. No youth over 4 hours.**
**LHS: 46 uses of A.C. Average 163 minutes.  Three (3) youth over 4 hours.**

**June 2023**
**CLS: 4 uses of A.C. Average 114 minutes. No youth over 4 hours.**
**LHS: 16 uses of A.C. Average 1631 minutes. Six (6) youth over 4 hours. One youth 2180 minutes (approximately 36 hours).**

**July 2023**
**CLS: 14 uses of A.C. Average 127 minutes. No youth over 4 hours.**
**LHS: 30 uses of A.C. Average 148 minutes. One (1) youth over 4 hours.**

**August 2023**
**CLS: 3 uses of A.C. Average 54 minutes. No youth over 4 hours.**
**LHS: 48 uses of A.C. Average 647 minutes. Seven  (7) youth over 4 hours. One youth in for 6905 minutes- 4.79 days,  one youth in for 10593 minutes (7.35 days)**

**September 2023**
**CLS: 8 uses of A.C. Average 115 minutes. No youth over 4 hours.**
**LHS: 27 uses of A.C. Average 236 minutes.  1 (1) youth over 4 hours.**

**The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit. 99.19%- 99.49% of checks were completed within 30 minutes during this reporting period. The Monitor reviewed video footage for random days and times (30 reviews) and Defendants were 100% compliance with completing the checks in accordance with policy. Staff did an outstanding job and should be commended for their continued diligence in ensuring youth safety while in their rooms.**

a.  Administrative confinement may be extended four hours with one

additional four-hour extension thereafter (for a total of up to 12 hours) when:

    i.    A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth pose a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. There were seventeen (17) youth confined for over four (4) hours during this reporting period (see response in previous question). Five (5) youth had their initial AC placement extended but all five were released prior to requiring a second four-hour extension at the eight-hour mark. The number of overall placements is consistent with the last reporting period, however, the amount of time in placements from the last reporting period was higher. Documentation shows that PSU approved the extended time in each case.**

**Defendants need to continue to focus on reducing AC overall. Defendants created excellent quality assurance measures and data during this reporting period.**

    ii.    A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Twelve (12) youth were placed on extended placement in administrative confinement pending transfer out of the facility (8-MJTC, 1- juvenile commitment expired, 2 no longer posed a threat so although there was a plan commenced to transfer, the youths' behavior was such that they could remain at LHS, 1 remained on AC).  There were plans commenced to return the youth to general population/transfer to another facility. PSU was involved in all instances.**

    b.  Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 P.M. to 8 A.M.**

    c.  Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were seven (7) youths (excluding the one youth where their juvenile commitment expired) confined beyond 24 hours who were transferred. See comments in the above section.**

    d.  The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others

and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. See above.**

    3.    Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol policy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 is being utilized. The plans developed are very detailed and comprehensive. Only youth who are at imminent risk of serious self-harm to themselves/risk of self-harm will be placed in observation status. There were 42 youth in observation status this period. Youth were regularly seen by mental health per documentation. The Monitor will continue to review and monitor the practice.**

    4.    **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

        a.    Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed in renovated units. Youth rooms were overall very clean. The rooms were very organized allowing staff to clearly see into the room, perform room searches more effectively, and ensure to the extent possible that there are no dangerous items in room.**

**As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly. However, based on the language of this section, Defendants are in substantial compliance.**

        b.    Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Youth did not complain to the Monitor or Plaintiffs' counsel about access to water, regular hygiene supplies, or nighttime toilet usage. Defendants have improved their documentation and data collection.**

> c.    Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in challenges intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants continue to properly document who from PSU was notified, time of notification, and the intervention technique utilized with the youth.**

**Examples of the crisis intervention techniques used with youth when confined can include, but are not limited to: processing of the incident, coping ahead/safety plans, in the moment skills coaching/practice of DBT skills including mindfulness, recommitment to goals, validation, time away from stressors or time for reflection/refusing, fostering insight, implementation of established Youth Plan, assistance problem-solving, increase self-awareness/awareness of body sensations as indicators, Behavior Chain Analysis (formal and informal) and Thinking Report, encourage self-reflection/identify vulnerabilities, consistent redirection/limits, Behavior Intervention Protocol fostering insight/skill identification/skill practice, and plans to address conflict/safety/skills practice.**

**Clinicians are on-site for 6 hours each Saturday and Sunday. The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours to engage youth in a meaningful way during this time. Because confinement can create or exacerbate mental health problems, treatment is going to be even more critical as the population continues to remain higher if the Defendants are confining youth to their rooms for any reason. The Monitor also suggests that specific PSU clinicians should work with the same youth to establish continuity (when possible) and should primarily work on the units. If possible, Defendants should consider putting PSU staff offices on the unit like they did with the Supervisors' offices. This will reinforce to the youth and staff that they are "one team" servicing the youth and could be readily present to mitigate any situations.**

> d.    Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed

by a PSU staff member to determine whether that placement is a contraindication to the youth's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Documentation/data shows that evaluations are completed (if there is not already a mental health evaluation) within 24 hours after being placed in room confinement. Youth on operational confinement are being seen by PSU and evaluated for contraindication. The documentation has improved, and the Monitor has seen documentation for youth on operational confinement and whether they are evaluated for contraindication. There were no instances of contraindication documented during this review period.**

e.   Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE: Defendants were between 99.19%- 99.49% compliant with meeting the thirty (30) minute safety and security check timeframe. Quality assurance measures are in place and when necessary, formal investigations occur. There were no formal job instructions for not completing safety and security checks. The Monitor observed safety/wellness checks being completed on various days/times on every unit during this reporting period and observed no instances in which staff did not make visual contact with youth per policy- 100% of the checks were compliant. Staff met or exceeded the 30-minute timeframe, looked into room, and the intervals were staggered.**

**PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor continues to encourage more on-site time in the evenings and weekends doing groups and having one-on-one sessions with youth. The Monitor also continues to recommend that PSU staff, like Supervisors, have offices on the unit and work with the same youth when possible.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

e.   Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the youth and

staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. While youth are on operational room confinement/modified programming, regardless of level in the behavior management program or their status on SDP, the Monitor recommends that youth be provided with activities to do that would encourage physical movement in rooms, arts, crafts, music *etc*. Based on the Monitor's recommendation, as of February 2023, youth on SDP transitioned to level "C" from "D" affording youth better hygiene products and fans. Thus, all youth on level C receive the same property regardless of where they are housed. Youth complained to both the Monitor and Plaintiffs' counsel about having nothing to do in their rooms. Defendants should continue to evaluate items allowed in youth rooms to keep them occupied.**

      g.    Youth in room confinement shall receive:

           1.    All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided in general. The Defendants are working on creating a report with underlying documentation  in order to more efficiently assess compliance levels Defendants need to ensure there is accountability with respect to the services provided by the social workers, mental and healthcare workers.**

           ii.    Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants moved to smaller group-based treatment to youth where group participation was provided on the units. This continues. The Defendants are working on creating a report with underlying documentation in order to assess compliance levels more easily. Defendants need to ensure that any missed/rescheduled treatment groups do not negatively impact a youth's progress.**

           iii.    Educational services with the general population to the extent practicable. If attending educational services with the general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational

services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The education consultants completed their report which included recommendations. The education department has made numerous updates during the reporting period to school services (described in the education section of this report).**

    iv.    Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Staffing levels are appropriate this period. Youth are regularly out of their rooms from 8 A.M. to 8 P.M. Monitor regularly saw youth conversing with other youth during out time when the youth were on the units in the day room. During this reporting period, Defendants implemented a change for youth who are on AC pending transfer when the transfer is delayed. When there are extended periods of time for youth transferring to MJTC, defendants rotated youth pending transfer in and out of their room with restraints in order for them to receive their 30 hours per week and 3 hours of out times. The alternative would be for youth to be confined continuously for days pending transfer. These are very limited circumstances however; the Monitor recommends the parties discuss this further.**

    v.    Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were forty-two (42) documented instances of youth eating in their rooms which were staff imposed based on substantial threat of physical harm during this reporting period. Defendants can track when youth eat meals in their rooms and based on reports that the Monitor reviewed, it appears these instances were justified.**

    vi.    Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. According to Defendants' tracking, there were fourteen (14) youth who did not receive 3 hours of out time per day and six (6)**

youth who did not receive at least 30 hours per week. The facility continues to confine youth on SDP who are also on PAUSE. During the last period, Defendants were strategizing on how to continue with PAUSE in SDP without rotating youth in and out of their rooms. The Monitor recommends reconsidering this practice when staffing levels allow for all youth on PAUSE to remain out of their rooms.

Defendants now track out time on an individual basis using RFID, so the Monitor can determine how many youths are not getting at least three (3) hours of out-time per day or thirty (30) hours per week independently. Defendants are close to being in substantial compliance with this provision.

5. **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

COMPLIANCE STATUS: PARTIAL COMPLIANCE. The DOC-2942A was developed and moved into J-Tracker operation designed to draw the required information for the written report directly from the incident debrief form, as soon as the SYC overseeing the incident has completed their required fields for a major incident. Once the SYC has completed their required fields, a response assignment can be generated by the SYC to the unit staff where the youth on AC is housed. Upon receipt of the response assigned, unit staff are then able to generate the DOC-2942A and deliver it to the youth. The new process and forms have been drafted into an updated Incident Debrief procedure. There is a photo uploaded showing staff giving the notice to youth with time stamp. Defendants would be in substantial compliance but the youth who are confined due to staffing issues/PAUSE are not given these notifications of rights.

6. Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are documenting this consistently, including when less restrictive means were attempted.

B.     OC-Spray and Other Chemical Agents

1. OC reduction plan. Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as

outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

2. Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

C. Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

1. Prohibition on types and uses of mechanical restraints.

a. Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visit. Data and documentation show that there was significant decrease in use of mechanical restraints for LHS and a decrease for CLS. The Monitor reviewed several uses of force videos and there were no inappropriate uses of mechanical restraints observed. Defendants do need to monitor any use of restraints while youth are awaiting transfer to another facility.**

b. Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regain control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Below is the number of mechanical restraints uses in LHS and CLS this reporting period.**

**Uses of mechanical restraints LHS:**

**October 2022:        13 uses**
**November 2022:        1 use**
**December 2022:        4 uses**
**January 2023:         3 uses**
**February 2023:        21 uses**

20

|                  |                          |
|------------------|--------------------------|
| **March 2023:**     | **2 uses**                   |
| **April 2023:**     | **12 uses**                  |
| **May 2023:**       | **15 uses**                  |
| **June 2023:**      | **9 uses (1 over 45 mins)**  |
| **July 2023:**      | **8 uses (2 over 45 mins)**  |
| **August 2023:**    | **10 uses(1 over 45 mins)**  |
| **September 2023:** | **2 uses (1 over 45 mins)**  |

**Uses of mechanical restraints CLS**

|                   |            |
|-------------------|------------|
| **October 2022:**    | **13 uses**   |
| **November 2022:**   | **4 uses**    |
| **December 2022:**   | **2 uses**    |
| **January 2023:**    | **1 use**     |
| **February 2023:**   | **1 use**     |
| **March 2023:**      | **4 uses**    |
| **April 2023:**      | **1 use**     |
| **May 2023:**        | **1 use**     |
| **June 2023:**       | **1 use**     |
| **July 2023:**       | **4 uses**    |
| **August 2023:**     | **0 uses**    |
| **September 2023:**  | **0 uses**    |

**Defendants have significantly reduced the use of mechanical restraints in LHS compared to the last four-month reporting period. CLS is slightly lower than the last reporting period.**

      c.   No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

          i.   Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were three (3) uses of restraints other than handcuffs (ankle) during this reporting period. Defendants have developed policy and procedure, training, and QA measures.**

          ii.   Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were three uses of restraints other than handcuffs (ankle) during this reporting period. They were ordered by security staff as youth posed an immediate and substantial threat of physical harm to others. Defendants need to develop policy and procedure, training, and QA measures.**

          iii.   During transportation, the facility may use handcuffs and, in

rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. See above.**

    d.    Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Monitor has not observed mechanical restraints used for punishment/discipline on site visits, review of video, or documentation reviewed.**

    e.    Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

    f.    Only staff who have been specifically trained in the use of physical force and restraints and trained on proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. All safety staff equipped with mechanical restraints are trained specifically in the use of physical force, and restraints, and in proper de-escalation techniques.**

    g.    Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living unit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter.  As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE FOR THIS PERIOD. There were five (5) instances of a youth being placed in mechanical restraints for over 45 minutes and it was approved by the Deputy Superintendent. Defendants have created a QA process for this section.**

      2.     Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is regularly documented as part of the Incident Debrief process.**

    D.    Strip Searches. The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

      1.     Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possess drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches in this reporting period. The policy and procedure for Searches of Youth have been finalized. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search.**

      2.     Strip searches with probable cause. Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

          a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches this reporting period. It was conducted in a private area. QA has been developed. Contraband was in fact found.**

> b.   Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches during this reporting period. No youth was near the youth being strip searched. QA has been developed. The policy for searches has been finalized.**

> c.   Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches conducted during this reporting period. The staff conducting the strip search was the same gender. QA has been developed. The policy for searches has been finalized.**

> d.   Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches this period the staff conducting the search was trained in trauma informed care.**

> e.   If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches during this reporting period. Policy and procedure/QA developed.**

> 4.   Documentation. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of**

September 1, 2019. Policy and Procedure have been finalized.

    E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Defendants do provide de-escalation training to new and current staff.**

    F.    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The Monitor and Defendants have had many conversations/meetings regarding increased programming. As recommended previously, counselors, religious services leader, recreation workers, social workers, PSU staff, and volunteers can be utilized in creating and leading programming for youth. Defendants should continuously work to increase meaningful/structured program and activity hours to further reduce youth idleness hours.**

    G.    Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018, report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Defendants made significant effort in implementing the strategies suggested for improving staffing ratios and staff morale. Defendants have implemented several initiatives to increase recruiting and retention, particularly in the social worker classification which has resulted in all the social worker positions being filled. As stated in previous reports, staff wellness is a complex issue that impacts the overall culture, atmosphere, and environment of the facility. Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, reduces employee leave/vacancies, and the use of isolation and confinement. During the recent site visit, the Monitor observed staff utilizing the staff wellness room. Defendants also added a staff workout space. The staff all seemed in good spirits, engaged with the youth, and had great things to say about the youth and their day-to-day work life. The Monitor could not find one staff that did not have a positive attitude. Defendants need to conduct an analysis into employee leaves since 47% of staff on any given day are out on some sort of leave.**

H.   Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCES STATUS: PARTIAL COMPLIANCE. DJC's Administrative Code committee continues working on moving both DOC Chapter 376 and DOC Chapter 373 forward. During this reporting period the committee met with the Office of Legal Counsel (OLC) to discuss the current draft of Chapter 373. The committee continues to refine Chapter 373 and incorporate OLC recommendations. The committee also received the final edits from OLC regarding Chapter 376 and is now in the process of reviewing suggested edits and finalizing the draft.**

## IV.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A.   **Incident review process.** Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24 hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review all uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The 24-hour timeline is met in the vast majority of cases absent weekends. Informal reviews occur right after an incident in majority of cases. When it has been determined lesser means could have been used, there is a corrective action plan developed but follow-up needs to occur to ensure the plans are completed (QA component). Defendants QA program is exceptional and continues to further develop the program to include compliance measures with this Court Order. New dashboards have been created during this reporting period. The QA team should be commended for all the hard work and dedication to creating an extremely robust system that has increased the safety for youth and staff by allowing leadership to make proactive**

decisions and analyze many key data points on a daily, weekly, and monthly basis.

      **B.**      **Quality assurance**. The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. As discussed throughout previous reports, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff. Defendants have created an exceptional quality assurance program and have developed daily data to review that will automatically be available to make real-time operational decisions. Defendants continue to further develop the program to include additional compliance measures with this Court Order and created new dashboards during this reporting period.**

<u>CONCLUSION</u>

The population remains low overall but did increase during this reporting period by approximately twenty-five percent (25%). In general, staffing vacancy rates improved slightly, but employee leaves remained high at forty-seven percent (47%) on any given day. Defendants also need to develop strategies to improve teacher vacancies since fifty percent (50%) of the positions are open. Lack of teachers has a detrimental impact on youths' education as articulated by youth to both the Monitor and Plaintiffs' counsel.

The recommendations of the educational consultant should continue to be implemented to improve the quality and quantity of education. Defendants need to continue to focus on programming, de-escalation training, and ensuring that the new system of care/behavior motivation system is being implemented consistently. The Monitor continues to recommend that PSU and the CARE team have a bigger presence on the units as this can mitigate any incidents of violence and subsequent use of force as well. Once the Mandt system strategies and techniques are fully implemented, this should lower the potential of staff or youth injury.

Lastly, as the Monitor continues to state in reports to the Court, there needs to be a continued focus on moving youth from LHS/CLS to more appropriate setting(s) or diverting them from confinement entirely. Overall, the Monitor continues to see significant progress in most areas.

The Monitor is happy to answer any questions or address any concerns of the Court or the parties.

Respectfully Submitted,

/S/ Teresa Abreu
Teresa Abreu
Monitor