UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF
WISCONSIN

**J.J**., by and through his next friend, Sakeena
Jackson, for themselves and all others similarly
situated,

      Plaintiffs,

v.                                                                                  Case No.:  17-CV-47

**JON E. LITSCHER**, in his official capacity as
Secretary of the Wisconsin Department
of Corrections, et al.,

      Defendants.

---

NINETEENTH REPORT OF THE MONITOR

---

Teresa Abreu, Monitor, hereby submits this status report.

## INTRODUCTION

The Eighteenth Report of the Monitor was filed with the Court on October 30, 2023. The Monitor's nineteenth report will focus on assessing compliance with the Consent Decree,  and implementation of recommendations in the February 2018 technical assistance report and will also comment on any observations and/or updates since the eighteenth site visit which took place on October 5, 2023.

## SITE VISIT

The nineteenth site visit by the Monitor took place on March 14, 2024. The Monitor and Plaintiffs' counsel were onsite for one day and completed necessary interviews and information gathering via in-person and virtual meetings prior to, during, and after the site visit. The Monitor reviewed materials provided by the Parties for the reporting period ending February 29, 2024 (October 2023, November 2023, December 2023, January 2024, and February 2024). Materials included but were not limited to use of force videos, video footage of units, video footage of administrative confinement, video of safety and security checks, programming materials, investigations, data, daily shift reports, various written directives, program materials, all of the monthly data submitted to the parties per this Court Order, meeting notes, employee leave data, behavior and treatment plans, mechanical restraint documentation, incident reports, and other housing documentation. Plaintiffs' counsel conducted approximately forty-five (45) youth interviews for the site visit. The Monitoring team toured LHS/CLS and interviewed youth and staff. The Monitoring team had the

opportunity to talk to many of the youth and staff present and available during the site visit. Approximately twenty-four (24) youth and twenty-six (26) staff were interviewed by the Monitoring team during this site visit.

## <u>OVERALL QUALITY OF LIFE, CONDITIONS, AND ATMOSPHERE</u>

<u>Introduction</u>

The total LHS/CLS population in October 2023 averaged fifty-five (55) youth and has stayed consistent over this reporting period to the low to mid-fifties. At the time of the site visit, the population was fifty-four (54) youths (three youth off site). Staffing levels have improved overall from last period. Although the direct-care staffing vacancy rates have improved this reporting period, there was still an average daily operational vacancy rate of 35%, which is reflective of daily unanticipated leave. All of the recruitment and retention efforts have had a positive impact. Leadership, staff, and youth overall at LHS/CLS continue to have positive interactions with each other and the general atmosphere during the site visit was calm. Although youth and staff attitudes were positive in general, youth raised significant consistent concerns to Plaintiffs' counsel which is discussed in more detail below. The number of unique uses of administrative confinement ("AC") and mechanical restraints were significantly lower this period for LHS. AC was significantly higher for CLS and Mechanical restraint usage was relatively consistent for CLS. The overall operations of LHS/CLS continue to be moving in a positive direction and Defendants continue to make progress in areas of the provisions of this Agreement.

<u>Physical Plant Observations</u>

The entrance, grounds, visitation, school, and many other areas were clean and organized. All units and most youth rooms were clean and organized. Staff and youth should be commended for their continued commitment to creating "homelike" environments.

Defendants continue with the following physical plant improvements:

- Began water well improvement and power upgrade;

- Final completion of asphalt to commence April 2024, currently all inside roads are completed;

- Roosevelt Living Unit recreation yard is slated to be completed the summer of 2024;

- Replacing and updating various entry doors and overhead doors around the facility;

- Updating of the Freon detection system is in progress;

- Continued implementing additional fixed cameras throughout the facility including both internal and external cameras by replacing all the old security cameras in the CLS living unit. Additional cameras were procured during the reporting period. Overall, the additional

number and quality of cameras are enhancing views and expanding into areas that were previously blind spots;

- Continued to enhance the Music Arts Initiative by adding additional computer, software, and hardware components. There are also additional Apple work spaces for digital art and content creation. The initiative continues to display its therapeutic benefits and more and more youth have been assisted by the Rec Leaders to engage in writing, performing, and recording their own original music as well as music videos and promotional materials that can leave with them when they transition out of the facility;

- Completed the electrical upgrade to the welding room that will facilitate more welding stations, better equipment, and better lighting for the welding program. Completed replacing living unit boilers, water heaters, and electric panels.

Defendants continue their commitment to improving the physical plant which improves the daily lives of staff and youth. The Monitor will continue to update the Court on physical plant improvements that increase the safety and quality of life for youth and staff.

<u>Education Observations</u>

Most students were in the school area at the time of the site visit. The physical appearance of the school areas and classrooms were beautiful as usual. Youth and teachers were engaged in the classrooms. Youth were in the gym playing basketball and were in woodshop with the teacher and staff.

For youth who are in Skills Development Program ("SDP") Pause and Step 1, the school provides a SPED teacher, and education services via electronic means (Chromebook) or with paper packets depending on youth preference. In addition, the school provides a dedicated education assistant and youth attend class in the living unit. While in an SDP unit, High School Equivalency Diploma ("HSED")  and graduate youth are provided the same school options as other youth so they can fully participate in the scheduled school day. Youth placed in the SDP participate in treatment groups as assigned, but their education is self-guided either in the living unit or in their rooms with the same access to teachers aids.

For all general population youth and SDP Step 2 youth, all youth (except those who have graduated) receive educational classes daily (Monday-Friday) in the school building. Youth who are enrolled in HSED classes, participate in those specific classes as well as physical education with other youth, treatment groups, and opportunities for employment/work. Youth who are graduates are assigned work during school hours and also participate in physical education and treatment groups.

A spreadsheet has been created that monitors AC placements for youth as an indicator for potential IEP updates. When a youth has 10 days/60 hours of AC placement during school hours a manifestation determination meeting occurs to determine if the youth's behavior is related to their disability, and if there are modifications to the youth's IEP that could help the student be more successful.

Current staffing levels and population levels allow for most youth to regularly have education in the school and off the living units and Defendants continue to implement the recommendations of the educational consultants. Educational staff vacancy rate improved from 11 out of 22 vacant positions in the last reporting period to 9 out of 22 vacant positions. Although slightly improved, the vacancy rate is higher than the Monitor would like to see. Youth who must complete education on the unit or in their rooms complained to Plaintiffs' counsel that they do not learn much, teachers do not really teach any material and instruction was disjointed. Moreover, SDP youth confined to their rooms are expected to learn on Chromebooks or paper packets without live instruction while they are in their rooms. Similarly, youth on Roosevelt who have a D or have graduated from school complained about having nothing at all to do during the day.

<u>Living Unit Observations</u>

The Monitoring team visited each cottage that youth were housed in during the site visit (Roosevelt, Krueger, Dubois, Black Elk, Curtis, Rogers, Miller, Hughes, King, and Wells). Overall, the units, youth rooms, halls, living area, closets, and bathrooms were very clean. Youth did complain to Plaintiff's counsel that the toilets in Miller consistently smelled of mold prior to the site visit.

Youth were respectful when interacting with the Monitor, Plaintiffs' counsel, and facility leadership in general. All the living units were calm except Roosevelt. Youth were appropriately engaged with each other. Only two (2) youth were in their rooms (voluntarily).

The unit populations ranged from two (2) to eight (8) youth. The Monitoring team saw staff engaging with youth during this site visit and the months preceding it during a review of videos on randomly selected days. All the youth that the Monitoring team interacted with were respectful. Youth were less talkative to the Monitoring team than last site visit.

Since the time onsite for the Monitoring visit is limited, the Monitor always reviews videos of the living units on random days and times to get a better idea of what youth and staff do on the units and whether staff are positioned near youth and interacting with youth in a positive way. The Monitor reviewed videos during the reporting period to view living units, school, outdoor recreation, and other activities. In most instances (16 videos over several hours each) staff were engaged with youth when they were out of their rooms doing a variety of activities such as:

- Eating with youth at the tables;
- Watching television with youth;
- Playing cards with youth;
- Conducting growth meetings;
- Youth in classrooms;
- Youth interacting with social workers, CARE team, mental health, medical staff, and volunteers;
- Youth outside and in the gym playing basketball;
- Youth in the Douglass recreation center;
- Youth and staff were in the music lab;
- Youth were observed on telephones;

- Youth and staff were observed playing chess;
- Youth cleaning the units;
- Youth and staff doing art projects;
- Youth graduating with several staff congratulating him.

On review of video, staff were engaged with youth and positioned at or near tables with youth. The body language and tone were positive from staff and youth in general on video.

During this site visit, the CLS youth were housed in the Wells and King Unit. There were seven (7) youth total in CLS at the time of the site visit. CLS units and youth rooms were clean. The two (2) youth assigned to King were out in the dayroom. One staff was playing cards with the two youths. The Wells unit had five (5) youth assigned. Three (3) were on the unit and two (2) were in the school. Youth on the unit were not permitted to attend school in the building due to their status in the SDP but were sitting and talking. Most youth had positive attitudes and engaged with leadership and monitoring teams. There were adequate staffing levels in CLS.

The LHS youth were housed in Roosevelt, Krueger, Dubois, Black Elk, Curtis, Rogers, Miller, and Hughes. All units were clean and organized. Two (2) youths were in their rooms voluntarily on Curtis. Other youth on the units were eating lunch, in recreation, standing or sitting, talking, playing cards, playing games with staff, and cleaning. The Miller unit had pictures of youth doing different activities which created a nice environment. It would be great to expand this to the other units. At the time of the site visit, the units had adequate direct-care staffing.

The Krueger and Wells living units housed youth in the SDP at LHS and CLS respectively during this reporting period. The SDP is modified programming for youth who have engaged in physically aggressive behavior, have presented a danger to others, and/or have exhibited behavior that caused a major disruption to the facility. During the site visit, youth on these units were out of their rooms.

As previously reported, Dialectical Behavioral Therapy "DBT" is provided to youth in the SDP incorporating individualized planning along with the in-person group work already assigned to youth in the SDP so that they are engaging in DBT skills and receiving feedback on a daily basis. The Program consists of three steps: (1) PAUSE, (2) Step 1, and (3) Step 2.

While on PAUSE youth must participate in all offered treatment meaningfully and to the best of their ability (determined by Treatment Team). The Treatment Team is heavily involved in the program, assisting the youth in identifying and addressing underlying motivations for anti-social or otherwise disruptive behavior, increasing insight and self-reflection, and learning/practicing skills to better respond to challenging emotions, experiences, and situations/environments. Youth will initially process the incident/behaviors that necessitated an SDP placement through the completion of any applicable Behavior Chain Analysis (BCA). This information then informs each youth's individual treatment needs and goals created in consultation with the Treatment Team. Youth must show the ability to follow facility rules and expectations. Youth must demonstrate that they are making efforts to meet their treatment goals. Youth will be removed from Modified Programming once the Growth Team determines that the youth has demonstrated sufficient skill development to safely be removed from PAUSE.

Youth assigned to the SDP have their "Youth Plan" amended by PSU to specifically address their behavior. Youth placed in this program are evaluated by a multi-disciplinary team in conjunction with their weekly Growth Team. The Monitor observed youth engaged with their home units during the transition period and observed growth meetings in video review. The Monitor saw several examples of mental health and social workers engaging with youth. PSU regularly identifies triggers and documents those triggers and appropriate actions or responses for staff to follow within the SDP's. Although this information is accessible to unit direct care staff, it does not appear that staff regularly access or review the information. Defendants will be implementing a process to ensure staff are regularly reviewing each youth's plan.

In the last report, the Monitor was concerned with too much idle time. During this visit, youth did not complain to the Monitoring team about being bored, but some did to Plaintiffs' counsel particularly youth on extended AC placements that lasted for days, or youth who had graduated and had nothing to do while in the unit on SDP or in Roosevelt. The Monitor saw youth engaged in some sort of activity during video reviews a substantial percentage of the time.

Youth Interviews

Approximately twenty-four (24) youth were interviewed during the site visit (formally and informally) by the Monitor and approximately forty-five (45) youth were interviewed extensively prior to, during, and after the site visit by Plaintiffs' counsel.

In general, youth attitudes were positive in the Monitor's opinion. The Monitoring team had an opportunity to talk to many of the youth present in the day rooms. None of the youth made complaints to the monitoring team outside of liking certain meals better than others. Youth were quieter with the Monitoring team than on the last visit, which could just be a product of timing.

Multiple youth reported to Plaintiffs' counsel that they were isolated for prolonged periods of time while on operational and/or administrative confinement. Youth who were in AC pending transfer had many complaints such as only being allowed to leave their room once a day for approximately thirty (30) minutes, being isolated from other youth, not allowed to shower every day, receiving only one telephone call a day, not being provided with adequate education or mental health services, wearing belt restraints and handcuffs during the limited out-time and not receiving any recreation. Youth complained about the impact on their mental health while in AC coupled with being bored, stressed, having nothing to do, and not knowing when they were going to be released from confinement.

Youth also reported repeatedly to Plaintiffs' counsel that they have many concerns about the behavior motivation system ("BMS"). Youth complained that particular violations were unfounded, overblown, and/or provoked by staff, and that it was unfair to have to keep restarting the orientation program (which currently includes modified room confinement). Youth wish that they would be given warnings before violations and feel violations are often arbitrary. Defendants need to make sure through a rigorous quality assurance process that the system is being implemented consistently and in accordance with training, policy, and procedure, especially with the number of new staff onboarding and with the number of youth complaints of inconsistency. Data on youth at CLS/LHS during the monitor visit shows the aggregate percentage of prosocial

versus noncompliant behaviors to be 83% prosocial and 17% noncompliant which is an appropriate ratio.

Youth complained that family video visits did not work. Management confirmed there were issues with the system or families did not know how to use the system, but they were able to work through the issues. It was confirmed that youth did receive family video calls during this reporting period.

The Monitor continues to encourage staff to engage youth and continue to have meaningful/structured programming and activities. Defendants also need to provide more activities for youth to do while confined in their rooms for any reason. The Defendants need to continue to focus on gender-specific and culturally competent programming.

Update Type I Facility

Following established Wisconsin Department of Administration ("DOA") rules, the DOA opened the project for bid seeking contractors to construct the new site as of March 25, 2024. Final bids are due May 8, 2024, meaning construction on the project can begin in the second half of 2024. The projected timeline for completion of the Type 1 facility located at W. Clinton Avenue in Milwaukee remains on track for the second half of 2026. Moving youth to smaller facilities closer to their homes will facilitate greater family involvement, and connection to school and community, and will improve outcomes for youth.

Staffing

The staffing levels at LHS/CLS have improved during this reporting period. Staff vacancies have been significantly reduced; however, employee leaves continue to be relatively high during this reporting period at LHS/CLS and across DOC. The direct care staff vacancy rate has also improved in this reporting period. Defendants have created significant incentives for new and existing employees to help with attracting new talent and retaining current staff.

The Youth Counselor/Youth Counselor Advance staffing vacancy percentages are lower than the last reporting period (*see below*). There are 311 total positions ("FTEs") at LHS/CLS. Approximately 122 of these positions are "direct care" staff (Youth Counselor/Youth Counselor Advanced, collectively ("YC/YCA"). There has been significant improvement in the vacancy rate for youth counselors and youth counselor advance this period. However, there is a shortage of Treatment Specialists (5 out of 7 are vacant) and teachers. Treatment Specialists 2 lead DBT groups and are responsible for program PAUSES, behavior chains, other treatment responses to behavior, and participate in Growth meetings. The teacher vacancy rate is lower than the last reporting period (9 vacancies), or 40% of positions, which is still higher than the Monitor hoped. With limited educators, Defendants will have continued difficulty with increasing the quality and quantity of education for youth. These vacancies are having a negative impact on the youth. Recruiting in general is still a challenge due to the location of LHS/CLS, uncertainty as to when/if LHS/CLS will close, and for educators, the year-round school calendar and thus, hiring needs to continue.

| Position | Vacancy Rate % as of April 30, 2023 | Vacancy Rate % as of October 1, 2023 | Vacancy Rate % as of February 1, 2024 |
|---|---|---|---|
| Youth Counselor | 14% (13 out of 94) | 6% (6 out of 94) | 3% (3 out of 97) |
| Youth Counselor Adv. | 25% (7 out of 28) | 25% (7 out of 28) | 0% (0 out of 27) |
| Teacher | 36% (8 out of 22) | 50% (11 out of 22) | 40% (9 out of 22) |
| Social Worker | 0% (0 out of 6) | 0% (0 out of 6) | 28.5% (2 out of 7) |

Recruiting efforts for this period include:

- New State of Wisconsin Compensation Plan;
- 4% General Wage Adjustment for all employees (provided they meet the requirements);
- YC/YCA received base pay increase of $4/hour;
- YC/YCA placed in new pay structure;
- NC 2 sign-on bonus extended for 1 year; and
- UWSP All Career/Internship Fair.

Defendants continue to focus on staff wellness. The Critical Incident Response Team ("CIRT") holds a refresher meeting every quarter. Additional staff wellness activities included:

- Jeans and football apparel are allowed for every gameday and Friday from season start through the Superbowl;
- Caramel Apples for all staff on both keys;
- Pink day for breast cancer awareness;
- Purple day for domestic violence awareness;
- Treats for teammates fundraiser;
- Halloween costumes on Halloween;
- Stress Awareness week we handed out coffee, cocoa, and tea to staff on both keys;
- Made veterans magnets for all veterans;
- Pancake breakfast fundraiser;
- Handed out treats to staff that had to work on Thanksgiving;
- Chicken soup cookoff;
- Staff Secret Santa;
- Ugly Sweater Days;
- Winter Drawing Event;
- Handed out goodie bags to all staff;
- Put out Treats for staff working Christmas Eve and Christmas Day;
- Continued to hand out Christmas goodie bags to staff; and
- Staff family night Valentines Day event for both work keys.

The Monitoring team spoke to over twenty-six (26) staff. Staff morale was exceptionally good overall at the time of the site visit. A review of video over the reporting period showed staff regularly engaging with youth. Staff were just as talkative on this site visit. Staff were extremely friendly from the moment you walked through the front door. The new staff who were on-the-job training expressed their excitement to begin their positions, stated the training was good, and genuinely were happy with their decision to join the team. Staff also said to the Monitoring team that they felt safe at the facility and loved their jobs. Staff had one complaint which was they missed all the overtime they used to get. This is a good complaint to have because this means that staff are not exhausted or overworked and will better engage with youth in a positive way.

Defendants have made staff wellness a major focus, which is evident in the positive attitudes of staff. A major component of staff wellness is ensuring staff feel as safe as possible and are properly trained for the environment and youth demographics. Defendants have improved in this area based on observations in person and on video review and conversations with staff.

Use of Force Reviews

The Monitor reviewed several uses of force incidents during this reporting period. Appropriate force was used in each instance. The CARE team was present to attempt to de-escalate the situation in several instances. In the last report the Monitor encouraged the Defendants to fully implement the Mandt system strategies and techniques designed to support de-escalation and lower the potential of staff or youth injury. As of January 1, 2024 The Mandt System became the primary model. In January of 2024, DJC announced it would no longer be utilizing or sending academy recruits through training in the Principles of Subject Control ("POSC") curriculum and yearly physical intervention refreshers for current staff will be Mandt only.

DJC began the process of implementing Mandt long before its official replacement of POSC in January 2024. Now it serves as the sole model for prevention and de-escalation that staff can use to safely manage behaviors in our juvenile correctional setting. The focus of The Mandt System is on building healthy relationships between all stakeholders in human services settings to facilitate the development of an organizational culture that provides the emotional, psychological, and physical safety needed to teach new behaviors that can replace behaviors that are labeled 'challenging.' The Mandt goal, which DJC has embraced, is to foster a workplace culture that is supportive.

Some of the ways DJC has measured the effectiveness of Mandt implementation is by looking at things such as workplace injuries, restraint use (physical & mechanical), and the overall safety of both staff and youth. In a two-year comparison of 2022 and 2023 there has been a 44% decrease in the use of mechanical restraints, a 32% decrease in use of force incidents, and a 50% decrease in AC placements. There has also been a reduction in workplace injuries. Although incident data can fluctuate month to month due to complex precipitating factors, overall, as a facility, there is an overall decrease in the frequency, duration, and use of both physical and mechanical restraints. Significantly, when comparing PbS survey data of staff who reportedly feared for their safety working at the facility, there has been a dramatic improvement. That statistic has decreased from an all-time high on the LHS side near 80% in 2019, to 36% in 2022, down all the way to approximately 16% in October 2023, after Mandt implementation.

Quality Assurance ("QA")

The Quality Assurance Program at LHS/CLS continues to be second to none. DJC has a program that other jurisdictions should model. Critical information is readily available to the leadership which allows them to make proactive, data driven decisions that increases the safety of youth and staff. The QA team has greatly expanded data collection and quality using Guardian RFID during this and last reporting periods. During the last reporting period, Defendants developed data to comply with the various sections of this Court Order. The dashboard was refined during the last reporting period. The dashboard is now fully developed. This is an especially useful tool to assess compliance with this Court Order.

Administrative Code Revisions Update

DJC's Administrative Code committee continues moving both DOC Chapter 376 and DOC Chapter 373 forward. The Department of Corrections submitted its final draft proposed rule order for CR 24-003 (DOC Chapter 376), relating to Safety in Type 1 Secured Correctional Facilities, to the legislature March 1, 2024. The statement of scope for this rule was approved by the Governor on August 26, 2021, and approved by Secretary Kevin Carr on September 29, 2021. The legislature noted that they officially received the rule into the record on March 5, 2024, beginning their 30-day passive review period prior to Legislative Committee Hearings scheduled for April 10, 2024.

Revisions to the draft of Chapter 373 have been expedited during the reporting period in order for 373 to remain in keeping with provisions from 376, specifically those prohibiting punitive confinement. The latest round of changes is now back with the DOC's Office of Legal Counsel for final review and formatting before its submission to the legislature can be completed similar to 376.

DJC's advancement of both DOC Chapter 373 and DOC Chapter 376 during the reporting period represents significant progress toward having the amendments adopted.

Policy Updates

The DJC Policy Committee continues to review and update policies of note to the facility. The following policies have been reviewed through the policy committee and approved by administration:

- 100.07.04 – Tornados
- 100.07.05 – Emergency Procedures for Chemical Spills, Gas leaks, or similar emergencies
- 100.04.09 – American with Disabilities Act
- 100.04.01 – DNA Collection and Documentation
- 100.01.16 - Training and Conference Requests and Travel Reimbursement
- 100.01.10 – Review by Committee on Inmate and Youth Deaths
- 100.01.01 - Issuance of DJC Policies and Procedures
- 300.01.08 – Facility tours
- 300.02.14 - Sale of Facility Goods at DJC Facilities

- 300.04.06 – Mail
- 300.05.16 – Contraband
- 300.08.01 – Death of Youth
- 300.08.09 – Emergency Services CPR and AED Use
- 500.10.31 – Clinical Performance Enhancement
- 500.30.01 – Injury and Significant Illness Notification
- 500.30.20 – Involuntary Administration of Psychotropic Medication
- 500.30.21 – Voluntary Psychotropic Medication
- 500.60.03 – Tuberculosis Testing Program – Employee
- 500.60.05 – Employee Hepatitis B Vaccination Program

**COMPLIANCE WITH THE CONSENT DECREE AND PERMANENT INJUNCTION**

Below is the Monitor's assessment of compliance with the consent decree.

Room Confinement

1. Punitive Confinement.

   a. Subject to the terms and provisions of Section V(C)(3)(g) effective immediately upon entry of the Court's order incorporating this Agreement, no punitive room confinement shall exceed seven days. Defendants shall calculate the seven-day period by including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Data shows that out of 176 administrative confinement uses reviewed, four (4) incidents lacked detail in articulating reasons for the placement on administrative confinement and staff were issued formal job instructions but were not found to be punitive. Of note, fifteen (15) youth were transferred to MJTC and only 33% of those were transferred from the status of "AC pending transfer", while 67% were transferred from general population which is an open day room.**

**Defendants need to continue to examine their use of all forms of confinement and review incidents to ensure that staff are not using any form of confinement as punitive confinement including High-Risk Program PAUSE stage. Confinement is not appropriate during the PAUSE stage of the High-Risk Program if youth behavior does not warrant confinement. The Monitor continues to recommend that the Defendants reassess confinement for youth on PAUSE and all confinement placements. Additionally, for part of this reporting period, for youth who were confined in AC pending transfer, Defendants rotated youth in and out of their room with restraints. For the last few months of this reporting period, youth were no longer rotating in and out of their rooms at all during AC pending transfer; nor were they permitted to talk with other youth or receive daily basic programming like recreation, education, showers, *etc*. The Parties will be further discussing this issue. Defendants did inform the Monitor that they will resume the practice of rotating youth in and out of their**

**rooms. The Monitor also stated that youth should be provided with recreation, showers, phone calls, meaningful education, and additional out time when youth's behavior allows (in consultation with mental health). Defendants need to limit any extended room confinement such as this, especially for youth with mental health needs. Defendants may be in partial compliance during the next reporting period if they continue the practices identified in this paragraph.**

> b. Subject to the terms and provisions of Section V(C)(3)(g),
> Effective seven months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be limited to three days, including both pre-hearing and post-hearing room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. See, previous response.**

> c. Subject to the terms and provisions of Section V(C) (3) (g), effective ten months after entry of the Court's order incorporating this Agreement, punitive room confinement shall be prohibited.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. See, previous response.**

> 2. Administrative Confinement. Administrative confinement may only be used for a youth who poses a serious risk of imminent physical harm to others. Subject to the terms and provisions of Section V(C)(3)(g), effective six months after entry of the Court's order incorporating this Agreement, an initial period of administrative confinement may not exceed four hours for a youth posing a risk of imminent physical harm to others. When the youth is in room confinement to prevent a risk of imminent physical harm to others, Defendants shall engage in visual checks at least every 30 minutes, as specified in current policy, and shall provide intensive mental health services designed to return the youth safely to the general population. If at any point the youth no longer pose a risk of imminent physical harm, he or she must be immediately returned to general population. Time in administrative confinement may exceed four hours only under the following circumstances:

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The use of AC was lower for  LHS this period but significantly higher for CLS. Seven (7) CLS youth were confined administratively for more than four (4) hours. Approximately the same number of youths were confined for over (4) four hours during this reporting period for LHS. However, there were instances where LHS youth were confined for longer periods of times pending transfer to other facilities due to bed availability. Defendants need to continue to examine use of all forms of confinement and review incidents to ensure that staff are not using any form of confinement as punitive confinement including the SDP PAUSE stage. Confinement is not appropriate during the PAUSE stage of the SDP Program unless youth's behavior warrants**

**it. Defendants need to reconsider confining youth during the PAUSE stage of the program. Additionally, when there are extended periods of time for youth transferring to MJTC or another facility, Defendants rotated youth pending transfer in and out of their room with restraints. These are very limited circumstances however; the Monitor recommends the parties discuss this further and that Defendants document any restraints as required by the Consent Decree.**

**May 2023**
**CLS: 11 uses of A.C. Average 117 minutes. No youth over 4 hours.**
**LHS: 46 uses of A.C. Average 163 minutes. Three (3) youth over 4 hours.**

**June 2023**
**CLS: 4 uses of A.C. Average 114 minutes. No youth over 4 hours.**
**LHS: 16 uses of A.C. Average 1631 minutes. Six (6) youth over 4 hours. One (1) youth 2180 minutes (approximately 36 hours).**

**July 2023**
**CLS: 14 uses of A.C. Average 127 minutes. No youth over 4 hours.**
**LHS: 30 uses of A.C. Average 148 minutes. One (1) youth over 4 hours.**

**August 2023**
**CLS: 3 uses of A.C. Average 54 minutes. No youth over 4 hours.**
**LHS: 48 uses of A.C. Average 647 minutes. Seven (7) youth over 4 hours. One (1) youth in for 6905 minutes 4.79 days, one (1) youth in for 10593 minutes (7.35 days).**

**September 2023**
**CLS: 8 uses of A.C. Average 115 minutes. No youth over 4 hours.**
**LHS: 27 uses of A.C. Average 236 minutes. One (1) youth over 4 hours.**

**October 2023**
**CLS: 14 uses of A.C. Average 112 minutes. No youth over 4 hours.**
**LHS: 11 uses of A.C. Average 117 minutes. One (1) youth over 4 hours. One (1) youth 720 minutes.**

**November 2023**
**CLS: 12 uses of A.C. Average 125 minutes. No youth over 4 hours.**
**LHS: 28 uses of A.C. Average 884 minutes. Two (2) youth over 4 hours. 15, 020 minutes, 6085 minutes.**

**December 2023**
**CLS: 26 uses of A.C. Average 117 minutes. One (1) youth over 4 hours. 430 minutes.**
**LHS: 25 uses of A.C. Average 433 minutes. One (1) youth over 4 hours. 7871 minutes.**

**January 2024**
**CLS: 61 uses of A.C. Average 180 minutes. Six (6) youth over 4 hours. (six unique youth accounted for 61 uses).**
**LHS: 25 uses of A.C. Average 433 minutes. One (1) youth over 4 hours (131 hours).**

**February 2024**
**CLS: 27 uses of A.C. Average 131 minutes. No youth over 4 hours.**
**LHS: 18 uses of A.C. Average 519 minutes. Four (4) youth over 4 hours. One (1) youth for 85 hours.**

**The Monitor was able to assess compliance with 30-minute checks as data was readily available during this site visit. 97.9%- 99.70% of checks were completed within 30 minutes during this reporting period. The Monitor reviewed video footage for random days and times (25 reviews) and Defendants were 100% compliant with completing the checks in accordance with policy. Staff did an outstanding job and should be commended for their continued diligence in ensuring youth safety while in their rooms.**

        a. Administrative confinement may be extended four hours with one additional four-hour extension thereafter (for a total of up to 12 hours) when:

            i. A psychologist, psychology associate or psychiatrist recommends continued confinement because the youth pose a risk of imminent physical harm to others, and

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were seventeen (17) youth confined for over four (4) hours during this reporting period (see response in previous question). The only instance that continued beyond four hours that did not receive a documented four-hour extension approval was a youth was determined would be moved to AC pending transfer status. The number of overall placements is consistent with the last reporting period.**

**Defendants need to continue to focus on reducing AC overall. Defendants created excellent quality assurance measures and data.**

            ii. A plan is commenced to either promptly return the youth to general population or transfer the youth to another facility.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Fourteen (14) youth were placed on extended placement in administrative confinement pending transfer out of the facility on 16 occasions (7-MJTC, 3 Lincoln County SD, 1 adult commitment transferred to the division of adult institutions, 1 juvenile commitment expired (release), and 4 no longer posed a threat so although there was a plan commenced to transfer, the youths' behavior**

14

**was such that they could remain at LHS, 1 remained on AC).  There were plans commenced to return the youth to general population/transfer to another facility. PSU was involved in all instances. Providing youth on AC pending transfer status with daily out of room time for programs, education, recreation, showers, etc., will also provide additional opportunities for the PSU to continuously reassess the AC pending transfer status for potential return to general population pending transfer.**

        b.  Administrative confinement time limits may be tolled from 8 pm to 8 am.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. Time is being tolled from 8 P.M. to 8 A.M.**

        c.  Administrative confinement may only be extended beyond 24 hours to effectuate transfer of the youth to another facility under a commenced plan.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Fourteen (14) youth were placed on extended placement in administrative confinement pending transfer out of the facility on 16 occasions (7-MJTC, 3 Lincoln County SD, 1 adult commitment transferred to the division of adult institutions, 1 juvenile commitment expired (release), and 4 no longer posed a threat so although there was a plan commenced to transfer, the youths' behavior was such that they could remain at LHS, 1 remained on AC).  There were plans commenced to return the youth to general population/transfer to another facility. PSU was involved in all instances. However, Defendants should continue to assess confinement placements for youth confined while pending transfer. Defendants may be in partial compliance during the next reporting period. See comments in the above section.**

        d.  The provisions of this section shall apply to all situations involving room confinement of any youth based on the risk of harming others and shall supersede any rule or policy to the contrary.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. See above.**

        3.  Youth at imminent risk of serious self-harm. Effective immediately Upon entry of the Court's order incorporating this Agreement, Defendants shall amend DJC Pol policy #500. 70.24 as set forth in Appendix A and shall treat youth at risk of self-harm in compliance with that amended policy.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. DJC Clinical Observation policy 500.70.24 is being utilized. The plans developed are detailed and comprehensive. Only youth who are at imminent risk of serious self-harm to themselves/risk of self-harm will be placed in observation status. There were 58 youth in observation status this period. Youth were regularly seen by mental health per documentation. The Monitor will continue to**

review and monitor the practice.

4.   **Conditions of Room Confinement.** Effective immediately upon entry of the Court's order incorporating this Agreement, the following conditions shall apply to youth in any form of room confinement:

a.   Any cell designated to house youth in room confinement must be suicide resistant and protrusion free.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Monitor would not deem any room in any facility as being "suicide proof," however there are safety and security measures that can be put into place to reduce the risk of suicides and to make the rooms more suicide resistant. All youth are housed in renovated units. Youth rooms were overall exceptionally clean. The rooms were very organized allowing staff to clearly see into the room, perform room searches more effectively, and ensure to the extent possible that there are no dangerous items in room.**

**As stated in every report, while not required by the Court Order, the Monitor, the JDAI standards, PREA standards, NCCHC, ACA standards, and the Best Practice Model recommends increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms, and checks must be done properly. However, based on the language of this section, Defendants are in substantial compliance.**

b.   Youth in room confinement shall have prompt access to water, toilet facilities, and hygiene supplies, either in their rooms or upon request to a staff member via intercom or some other accessible and constantly monitored form of communication within approximately 15 minutes of such request.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Youth did not complain to the Monitor or Plaintiffs' counsel about access to water, regular hygiene supplies, or nighttime toilet usage. Youth made several complaints regarding room confinement to Plaintiffs' Counsel which is detailed in the narrative section of this report.**

c.   Staff must notify a PSU staff member as soon as possible, and no later than two hours after placement, when a youth is placed in room confinement. A youth must have access to any needed mental health treatment while in room confinement. During the time that a youth is in room confinement, staff shall engage in challenges intervention techniques designed to return the youth to general population as soon as possible. PSU interventions during this time shall not consist only of conversations with youth through a locked door.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Defendants continue to properly document who from PSU was notified, time of notification, and the intervention technique utilized with the youth.**

**Examples of the crisis intervention techniques used with youth when confined can include, but are not limited to: processing of the incident, coping ahead/safety plans, in the moment skills coaching/practice of DBT skills including mindfulness, recommitment to goals, validation, time away from stressors or time for reflection/refusing, fostering insight, implementation of established Youth Plan, assistance problem-solving, increase self-awareness/awareness of body sensations as indicators, Behavior Chain Analysis (formal and informal) and Thinking Report, encourage self-reflection/identify vulnerabilities, consistent redirection/limits, Behavior Intervention Protocol fostering insight/skill identification/skill practice, and plans to address conflict/safety/skills practice.**

**Clinicians are on-site for 6 hours each Saturday and Sunday. There is PSU coverage from 0730-2000 Monday-Friday; weekends at least 6 hours per day. Youth are seen per their MH-code (per policy: MH-2 at least every two weeks; MH-1 at least once monthly); however, MH-0 youth are seen at least once monthly as well as opposed to per request as indicated by policy. Despite the minimum requirements, youth are seen far more frequently by PSU staff, for many, often on a daily basis. Youth continue to have contact with PSU at Growth Teams as well as in DBT groups. As of May 2022, additional daily rounds by PSU staff are also conducted on all units when operational confinement youth are in more than two groups. Youth in SDP are seen daily for rounds. Clinicians working on the weekend, have a priority of service provision which include assessing/meeting with youth on Administrative Confinement, meeting with youth on observation status, attending to any crises, and conducting rounds and check-ins with youth. There are typically quite a few staff referrals, and these youth are seen as well. The only time spent in non-direct contact with youth on the weekend is for documenting on the AC and observation placements (other clinical documentation is completed on Monday).**

**The Monitor continues to suggest that PSU increase the hours in which they are physically present on weekends and evening hours to engage youth in a meaningful way during this time. Because confinement can create or exacerbate mental health problems, treatment is going to be even more critical as the population continues to remain higher if the Defendants are confining youth to their rooms for any reason. The Monitor also suggests that specific PSU clinicians should work with the same youth to establish continuity (when possible) and should primarily work on the units. If possible, Defendants should consider putting PSU staff offices on the unit like they did with the Supervisors' offices. This will reinforce to the youth and staff that they are "one team" servicing the youth and could be readily present to mitigate any situations. The Monitor saw many contacts with PSU during video review of random days of this reporting period.**

d.   Any youth placed in room confinement for whom there is not already a mental health evaluation must have such an evaluation as soon as possible, and in any event no later than 24 hours after being

placed in room confinement. If a youth is identified with a mental health need (a mental health code designation of MH-1, MH-2a, MH-2b, or ID), placements in room confinement will be reviewed by a PSU staff member to determine whether that placement is a contraindication to the youth 's mental health or if other options will adequately protect the youth or staff.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Documentation/data shows that evaluations are completed (if there is not already a mental health evaluation) within 24 hours after being placed in room confinement. Youth on operational confinement are being seen by PSU and evaluated for contraindication. The documentation has improved, and the Monitor has seen documentation for youth on operational confinement and whether they are evaluated for contraindication. There were no instances of contraindication documented during this review period.**

e.   Staff must visually and in person check safety of youth pursuant to current policy at least every 30 minutes in all cases, and contemporaneously record the actual time of such checks in a log kept for that purpose. Staff who fail to make such checks or who falsify such records may be subject to discipline. Any youth placed in room confinement for any period in excess of 24 hours shall receive daily contact with a mental health provider. This contact shall be face-to-face unless, due to staffing limitations, no PSU staff is personally available, in which case it may occur by phone or video conferencing.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE: Defendants were between 97.9%-99.70% compliant with meeting the thirty (30) minute safety and security check timeframe. Quality assurance measures are in place and when necessary, formal investigations occur. There were no formal job instructions for not completing safety and security checks. The Monitor observed safety/wellness checks being completed on various days/times on every unit during this reporting period and observed no instances in which staff did not make visual contact with youth per policy- 100% of the checks were compliant. Staff met or exceeded the 30-minute timeframe, looked into room, and the intervals were staggered.**

**PSU staff do visit youth daily when on site and are available 24/7 if needed by phone. The Monitor continues to encourage more on-site time in the evenings and weekends doing groups and having one-on-one sessions with youth. The Monitor also continues to recommend that PSU staff, like Supervisors, have offices on the unit and work with the same youth when possible.**

**While not required by the Court Order, the Monitor continues to recommend increasing the frequency of safety/welfare checks to a minimum of every 15 minutes when youth are confined to their rooms as this is supported by JDAI standards, PREA standards, NCCHC, ACA standards, and is the Best Practice Model.**

     e.     Any youth in room confinement shall have property items similar to or the same as items allowed in general population. Specific items of property may be restricted as needed for safety of the youth and staff on a case-by-case basis. These restrictions will be temporary in nature until these items can be safely returned to the youth. A Supervising Youth Counselor or Unit Supervisor shall review any prope1ty restrictions on a daily basis and document the review.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. While youth are on operational room confinement/modified programming, regardless of level in the behavior management program or their status on SDP, the Monitor recommends that youth be provided with activities to do that would encourage physical movement in rooms, arts, crafts, music *etc*. Based on the Monitor's recommendation, as of February 2023, youth on SDP transitioned to level "C" from "D" affording youth better hygiene products and fans. Thus, all youth on level C receive the same property regardless of where they are housed. Youth complained to Plaintiffs' counsel about having nothing to do in their rooms. Defendants should continue to evaluate items allowed in youth rooms to keep them occupied.**

     g.     Youth in room confinement shall receive:

        i.     All regularly scheduled social worker visits, mental health services, and other health services.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Social worker visits, mental health services, and other health services are provided. The Defendants created a report with underlying documentation in order to more efficiently assess compliance levels Defendants need to ensure there is accountability with respect to the services provided by the social workers, mental and healthcare workers.**

        ii.     Any rehabilitative programming (e.g., Aggression Replacement Training, Juvenile Cognitive Intervention Program, etc.) that was scheduled or in process before placement in room confinement.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Defendants moved to smaller group-based treatment to youth where group participation was provided on the units. This continues. The Defendants created a report with underlying documentation in order to assess compliance levels more easily. Documentation showed that Defendants are in substantial compliance.**

        iii.     Educational services with the general population to the extent practicable. If attending educational services with the

general population proves unworkable due to an immediate and substantial threat of physical harm or an unreasonable risk of significant disruption to classroom instruction, youth in room confinement shall receive alternative educational services on days that the general population receives such services. Defendants shall ensure special education services for all eligible youth.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. The education consultants completed their report which included recommendations. The education department has made numerous updates during the reporting period to school services (described in the education section of this report).**

iv.     Additional "out time" for gross motor exercise and social interaction. Defendants shall permit youth to talk to peers during such "out time" unless such conversations pose an immediate and substantial threat of physical harm to another person. Sensory stimulation shall also be available during "out time," unless such activities cause immediate and substantial disruption or risk of physical harm.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. Staffing levels are appropriate this period. In general, youth are regularly out of their rooms from 8 A.M. to 8 P.M. The Monitor regularly saw youth conversing with other youth during out time when the youth were on the units in the day room. During the last reporting period, Defendants implemented a change for youth who are on AC pending transfer when the transfer is delayed. When there are extended periods of time for youth transferring to MJTC or other placements, Defendants rotated youth pending transfer in and out of their room with restraints in order for them to receive their 30 hours per week and 3 hours of out times. The alternative would be for youth to be confined continuously for days pending transfer. Defendants reverted back to continuously confining youth in AC pending transfer. Although some discussions were had between the Defendants, Plaintiff's Counsel, and the Monitoring team, additional discussions need to take place and the Monitor recommends changes to the current practice.**

v.      Meals out of the cell, absent an immediate and substantial threat of physical harm to another person from the youth eating that meal out of the cell.

**COMPLIANCE STATUS:  SUBSTANTIAL COMPLIANCE. There were twenty-three (23) documented instances of youth eating in their rooms which were staff imposed based on substantial threat of physical harm during this reporting period which is almost 50% less from last period. Defendants can track when youth eat meals in their rooms and based on reports that the Monitor reviewed, it appears these instances were justified.**

vi.   Minimum "out time" from the cell of at least 30 hours per week and at least 3 hours per day. Time in general population on a given day shall be credited to those hours.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. During this reporting period 97.96% of LHS youth and 100% of CLS youth received 30 hours of out time per week. 98.9% of LHS youth and 99.5% of CLS youth received at least 3 hours of out time per day. The Monitor recommends reconsidering this practice when staffing levels allow for all youth on PAUSE to remain out of their rooms (*i.e.*, not confined on PAUSE).**

**Defendants now track out time on an individual basis using RFID, so the Monitor can determine how many youths are not getting at least three (3) hours of out-time per day or thirty (30) hours per week independently. Once the practice changes for youth in pending transfer and Program PAUSE, Defendants are close to being in substantial compliance with this provision. As addressed in previous provisions, it is imperative for youth placed in AC pending transfer to receive daily programming consistent with meeting the out of room time requirements of this provision. Furthermore, providing the out of room time will provide additional opportunities for PSU to continuously reassess the youth for potential return to general population.**

5.   **Notification of Rights.** Within 15 minutes of a youth's placement in room confinement, facility staff shall orally inform the youth of his or her rights regarding grievances and appeals. Within one hour of a youth's placement in room confinement, facility staff shall provide the youth with written notice of his or her rights regarding grievances and appeals.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The DOC-2942A was developed and moved into J-Tracker operation designed to draw the required information for the written report directly from the incident debrief form, as soon as the SYC overseeing the incident has completed their required fields for a major incident. Once the SYC has completed their required fields, a response assignment can be generated by the SYC to the unit staff where the youth on AC is housed. Upon receipt of the response assigned, unit staff are then able to generate the DOC-2942A and deliver it to the youth. The new process and forms have been drafted into an updated Incident Debrief procedure. There is a photo uploaded showing staff giving the notice to youth with time stamp.**

6.   Documentation. Whenever a youth is placed in room confinement, facility staff shall create a written report documenting the necessity of room confinement, the less restrictive measures attempted before placement in room confinement, and the length of time the youth spent in room confinement. The youth must be promptly provided with this report immediately upon its completion.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Court Order requires documentation of all forms of room confinement, and Defendants are documenting this**

**consistently, including when less restrictive means were attempted.**

    B.     OC-Spray and Other Chemical Agents

        1.   OC reduction plan. Effective immediately upon entry of the Court's order incorporating this Agreement, the Defendants shall continue to implement OC-Spray reduction plans, attached, and incorporated hereto as Append ix B, as outlined in the preliminary injunction.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

        2.   Prohibition on use of OC-Spray and other Chemical Agents. Subject to the terms and provisions of Section V(C) (3)(g), within twelve (12) months of entry of the Court 's order incorporating this Agreement, the use of OC spray and other chemical agents will be prohibited.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. OC has been eliminated.**

    C.     Mechanical Restraints. The following provision shall be effective immediately upon entry of the Court's order incorporating this Agreement:

        1.   Prohibition on types and uses of mechanical restraints.

            a.   Under all circumstances, there is a presumption that youth shall not be mechanically restrained.

**COMPLIANCE STATUS:   SUBSTANTIAL COMPLIANCE. The Monitor did not personally see any youth in mechanical restraints during site visit. Data and documentation show that there was significant decrease in use of mechanical restraints for LHS. The Monitor reviewed several uses of force videos and there were no inappropriate uses of mechanical restraints observed. Defendants do need to monitor any use of restraints while youth are awaiting transfer to another facility. Defendants need to ensure that they are documenting all uses of restraints, including those implemented for youth whose AC has been extended pending transfer.**

            b.   Restraints may only be used if staff determine that they are the least restrictive means of addressing an imminent threat of physical harm to self or others and must be removed immediately when the youth regain control and when the threat of harm or the safety concern has abated.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Below is the number of mechanical restraints uses in LHS and CLS the prior and current reporting periods.**

**Uses of mechanical restraints LHS:**

| | |
|---|---|
| **February 2023:** | **21 uses** |
| **March 2023:** | **2 uses** |
| **April 2023:** | **12 uses** |
| **May 2023:** | **15 uses** |
| **June 2023:** | **9 uses (1 over 45 mins)** |
| **July 2023:** | **8 uses (2 over 45 mins)** |
| **August 2023:** | **10 uses (1 over 45 mins)** |
| **September 2023:** | **2 uses  (1 over 45 mins)** |
| **October 2023:** | **2 uses** |
| **November 2023:** | **0 uses** |
| **December 2023:** | **4 uses** |
| **January 2024:** | **1 use** |
| **February 2024:** | **4 uses (1 over 45 mins)** |

**Uses of mechanical restraints CLS**

| | |
|---|---|
| **February 2023:** | **1 use** |
| **March 2023:** | **4 uses** |
| **April 2023:** | **1 use** |
| **May 2023:** | **1 use** |
| **June 2023:** | **1 use** |
| **July 2023:** | **4 uses** |
| **August 2023:** | **0 uses** |
| **September 2023:** | **0 uses** |
| **October 2023:** | **0 uses** |
| **November 2023:** | **0 uses** |
| **December 2023:** | **1 use** |
| **January 2024:** | **7 uses (1 over 45 minutes)** |
| **February 2024** | **1 use** |

**Defendants have reduced the use of mechanical restraints in LHS compared to the last four-month reporting period. The use of mechanical restraints in CLS is higher than the last reporting period.**

c.   No mechanical restraint device other than handcuffs may be used on youth while they are in the facility, except:

i.   Mechanical restraints may be used when ordered by PSU to attempt to prevent active self-harm.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There was one (1) use of**

**trans board placement ordered by PSU during this reporting period. Defendants have developed policy and procedure, training, and QA measures.**

        ii.     Mechanical restraints may be used if the youth poses an immediate and substantial threat of physical harm to others.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There was one (1) use of trans board placement ordered by PSU during this reporting period. Defendants have developed policy and procedure, training, and QA measures.**

        iii.     During transportation, the facility may use handcuffs and, in rare instances when necessary for articulated reasons necessary to prevent an imminent threat of harm to youth and/or staff, additional restraints such as waist chains or leg restraints. When youth are being transported for release to a non-locked environment, there shall be a presumption that restraints are not used. Restraints may be used during such transportation to prevent a threat of harm to youth and/or staff.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. See above.**

        d.     Mechanical restraints shall never be used for punishment or discipline.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The Monitor has not observed mechanical restraints used for punishment/discipline on site visits, review of video, or documentation reviewed.**

        e.     Youth may never be restrained to a fixed object, unless specifically ordered by PSU to attempt to prevent active self-harm

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There is no evidence of youth being restrained to a fixed object. Policies have been finalized and quality assurance measures created.**

        f.     Only staff who have been specifically trained in the use of physical force and restraints and trained in proper de-escalation techniques may place a youth in mechanical restraints.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. All safety staff equipped with mechanical restraints are trained specifically in the use of physical force, and restraints, and in proper de-escalation techniques.**

g.  Any use of mechanical restraints, except during transportation or for mental health purposes, must be authorized by a Youth Counselor, Youth Counselor Advanced, or supervisor in a living unit. No youth shall be left alone in restraints. Any use of mechanical restraints in excess of 45 minutes must be approved by the superintendent, security director or designee and approved by PSU staff, and reviewed every 45 minutes thereafter. As soon as possible and no later than 2 hours following, PSU staff shall evaluate and provide therapeutic interventions to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were two (2) instances of a youth being placed in mechanical restraints for over 45 minutes and it was approved by the Deputy Superintendent. Defendants have created a QA process for this section.**

2.  Documentation. Facility staff must document all uses of restraints in the facility, including a description of the events leading up to the use of restraints, the less restrictive alternatives attempted, and the length of time the youth spent in restraints.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Mechanical restraint use has been added to the Incident Debrief process and the Incident Debrief process has been modified. The length of time youth spent in restraints and events leading up to the use is regularly documented as part of the Incident Debrief process.**

D.  Strip Searches. The following provisions are effective immediately upon entry of the Court's order incorporating this Agreement.

1.  Prohibition on strip searches without probable cause. Facility staff may not conduct a strip search of any youth unless there is probable cause to believe that the individual youth possess drugs or weapons that could not be discovered through less intrusive means.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches in this reporting period. The policy and procedure for Searches of Youth have been finalized. A Strip Search Quarterly Training Brief was developed and shared with all supervisors to outline all the necessary criteria and documentation requirements under which a strip search may be completed. Only supervisors can authorize a strip search.**

2.  Strip searches with probable cause. Less intrusive searches, including using a metal detector, pat down, or allowing the youth to change into a tank top or other clothing, must be attempted before a strip search is conducted, unless it is determined by PSU in consultation with the youth that less

intrusive searches, which may include physical contact, would cause greater trauma to the youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches this reporting period. QA has been developed. The policy for searches has been finalized.**

> a. When a strip search is conducted, staff must ensure that no unintended individuals are able to view the search, including by video or other recording device.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches this reporting period.**

> b. Under no circumstance may a youth be strip searched within view of another youth.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip searches during this reporting period. No youth was near the youth being strip searched. QA has been developed. The policy for searches has been finalized.**

> c. Strip searches may only be conducted by individuals of the same gender identity as the youth being searched unless the search is conducted by a medical professional.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches conducted during this reporting period. QA has been developed. The policy for searches has been finalized.**

> d. Strip searches must be conducted by staff trained in trauma-informed practices.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were (0) strip searches this period.**

> e. If a youth with a known or suspected mental health diagnosis or history of sexual abuse objects to a strip search, staff must consult with mental health practitioners before conducting the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. There were zero (0) strip**

searches during this reporting period. Policy and procedure/QA developed.

    4.    Documentation. Facility staff must document all uses of strip searches, including the reason for the search and any drugs, weapons, or other items discovered through the search.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The process for tracking and documenting all searches including the probable cause for any necessary strip search and the weapons, drugs, or other items discovered has been incorporated into J-Tracker as of September 1, 2019. Policy and Procedure have been finalized.**

    E.    De-escalation Training. Within three months following entry of the Court's order incorporating this agreement, all staff in the facility shall receive de-escalation training by a nationally recognized provider. De-escalation training shall be provided at least annually thereafter.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Defendants do provide de-escalation training to new and current staff.**

    F.    Programming. Immediately upon entry of the Court's order incorporating this agreement, the Defendants shall request that the Monitor provide assistance and strategies to increase programming and reduce the hours of idle time in the facility to no more than the PbS field average. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE/UNKNOWN. The Monitor and Defendants have had many conversations/meetings regarding increased programming and Defendants have implemented the recommendations. Defendants have attempted to obtain the PbS field average to assess compliance level, but PbS will not release this information or is not capturing the data in this manner, therefore the Monitor cannot assess compliance with part of this section.**

    G.    Staffing. Immediately upon entry of the Court's order incorporating this agreement, Defendants shall request that the Monitor provide assistance and strategies to improve staffing ratios, and/or use strategies identified in the February 26, 2018, report and recommendations of Mark Soler, Michael Dempsey, Teresa Abreu, and Jennifer Lutz. Defendants shall make reasonable efforts to implement the recommendations.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. Defendants made significant effort in implementing the strategies suggested for improving staffing ratios and staff morale. Defendants have implemented several initiatives to increase recruiting and retention. As stated in previous reports, staff wellness is a complex issue that impacts the overall culture,**

**atmosphere, and environment of the facility. Staff wellness has a direct impact on the relationship between youth and staff, directly impacts the incidents of violence, use of restraint, reduces employee leave/vacancies, and the use of isolation and confinement. The Monitor could not find one member of staff who did not have a positive attitude.**

H.   Amendments to administrative code. Defendants will make all reasonable efforts to amend the administrative code to impose restrictions on any juvenile correctional facilities operated by DOC that codify the material terms of this Agreement as they relate to: (l) Room Confinement, (2) OC-Spray and Other Chemical Agents, (3) Mechanical Restraints and (4) Strip Searches.

**COMPLIANCE STATUS: PARTIAL COMPLIANCE. DJC's Administrative Code committee continues moving both DOC Chapter 376 and DOC Chapter 373 forward. The Department of Corrections submitted its final draft proposed rule order for CR 24-003 (DOC Chapter 376), relating to Safety in Type 1 Secured Correctional Facilities, to the legislature March 1, 2024. The statement of scope for this rule was approved by the Governor on August 26, 2021, and approved by Secretary Kevin Carr on September 29, 2021. The legislature noted that they officially received the rule into the record on March 5, 2024, beginning their 30-day passive review period prior to Legislative Committee Hearings scheduled for April 10, 2024.**

**Revisions to the draft of Chapter 373 have been expedited during the reporting period in order for 373 to remain in keeping with provisions from 376, specifically those prohibiting punitive confinement. The latest round of changes is now back with the DOC's Office of Legal Counsel for final review and formatting before its submission to the legislature can be completed similar to 376.**

**DJC's advancement of both DOC Chapter 373 and DOC Chapter 376 during the reporting period represents significant progress toward having the amendments adopted.**

## IV.   DOCUMENTATION, REVIEW, AND QUALITY ASSURANCE.

A. **Incident review process.** Defendants will establish a review process for any incident that involved the use of force; OC spray; room confinement; or mechanical restraints used for more than 45 minutes (excluding during transportation). The review committee will include all staff directly involved in the incident, their supervisors, the social worker assigned to the youth, PSU staff who are familiar with the youth, the facility director of security, the deputy superintendent, and the superintendent. Within 24 hours, all available members of the review committee shall meet to assess whether physical force, OC spray, room confinement, or mechanical restraints were used appropriately, to discuss less restrictive alternative strategies that staff could have used, and to provide an opportunity for staff training and/or redirection if needed. If not all members of the review committee are available for the meeting within 24

hours, the full review committee shall meet or confer as soon as possible and no later than one week after the event. The review committee shall also review all uses of strip searches weekly to ensure that all such searches were conducted only upon probable cause.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. The 24-hour timeline is met in the vast majority of cases absent weekends. Informal reviews occur right after an incident in majority of cases. When it has been determined lesser means could have been used, there is a corrective action plan developed but follow-up needs to occur to ensure the plans are completed (QA component). Defendants QA program is exceptional and continues to further develop the program to include compliance measures with this Court Order. New dashboards have been created during this reporting period. The QA team should be commended for all the hard work and dedication to creating an extremely robust system that has increased the safety for youth and staff by allowing leadership to make proactive decisions and analyze many key data points on a daily, weekly, and monthly basis.**

      B.      **Quality assurance**. The superintendent shall establish performance goals, including compliance with the terms of this settlement; shall analyze data on whether those goals are met; and shall put in place immediate corrective action to address goals that are not being met.

**COMPLIANCE STATUS: SUBSTANTIAL COMPLIANCE. As discussed throughout previous reports, data driven decisions are critical to come into compliance with this Court Order and to improve the quality of life for youth and staff. Defendants have created an exceptional quality assurance program and have developed daily data to review that will automatically be available to make real-time operational decisions. Defendants developed the program to include additional compliance measures with this Court Order and created new dashboards during this reporting period.**

## CONCLUSION

The population remains low overall. In general, staffing vacancy rates improved and the number of employee leaves on any given day is less than the last reporting period. Although the teacher vacancy rate has improved this period, it remains high at forty percent (40%). Defendants need to develop strategies to improve teacher vacancies. Lack of teachers has a detrimental impact on youths' education. Defendants need to continue to focus on gender and culturally relevant programming and ensuring that the system of care/behavior motivation system is being implemented consistently. The Monitor continues to recommend that PSU and the CARE team have a bigger presence on the units as this can mitigate any incidents of violence and subsequent use of force as well. Although it is a very small percentage of youth, the current operational practices around youth who are confined to AC while pending transfer to another facility and youth on PAUSE need to ensure that youth are getting the required out time, programming, showers, mental health, education services and all other basic rights. The Monitor continues to state in reports to the Court, there needs to be a continued focus on moving youth from LHS/CLS to more appropriate setting(s) or diverting them from confinement entirely. Although there are a few areas to improve upon, Defendants are close to being in substantial compliance with most provisions of

this Agreement.

The Monitor is happy to answer any questions or address any concerns of the Court or the parties.

Respectfully Submitted,

/S/ Teresa Abreu
Teresa Abreu
Monitor